BETH A. GUNN, CA Bar No. 218889
beth@gunncoble.com
CATHERINE J. COBLE, CA Bar No. 223461
cathy@gunncoble.com
GUNN COBLE LLP
101 S. 1st Street, Suite 407
Burbank, CA 91502
Telephone:  818.900.0695
Facsimile:  818.900.0723

Attorneys for Plaintiffs-Intervenors
RYAN HYAMS and REGINE DUHON,
on behalf of themselves, and all others similarly situated

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEVAG CHALIAN, an Individual, Individually and on behalf of all others similarly situated and the general public,<br><br>    Plaintiffs,<br><br>    *v.*<br><br>CVS PHARMACY, INC., a Rhode Island corporation; CVS RX SERVICES, INC., a New York corporation; GARFIELD BEACH CVS, LLC, a California limited liability company; and DOES 1 thru 100, inclusive,<br><br>    Defendants. | CASE NO.: 2:16-cv-08979-AB-AGR<br>Assigned to Hon. Andre Birotte Jr.<br>*Related Case No.:2:20-cv-02401-AB-AGR*<br><br>**PROPOSED INTERVENORS' OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND DIRECTION OF NOTICE UNDER RULE 23(e) OF THE FEDERAL RULES OF CIVIL PROCEDURE**<br><br>DATE:  July 24, 2020<br>TIME:  10:00 a.m.<br>PLACE: Courtroom 7B<br>     350 West First Street,<br>     Los Angeles, California<br><br>Complaint Filed: July 20, 2016<br>Action Removed: December 5, 2016 |

   Proposed Intervenors Ryan Hyams and Regine Duhon ("Intervenors") hereby oppose the Motion for Preliminary Approval of Class Action Settlement ("Motion") filed by Plaintiff Sevag Chalian ("Plaintiff") in the proposed class action filed against Defendants CVS Pharmacy, Inc., CVS RX Services, Inc., and Garfield Beach CVS, LLC ("Defendants" or "CVS").

1

# **Table of Contents**

I.   INTRODUCTION ..................................................................... 4

II.  RELEVANT FACTS ................................................................ 5

   A.  CVS Regularly Exploits its Arbitration Policy to Escape
       the Consequences of Class Actions While Simultaneously
       Using it as Leverage to Obtain Favorable Class-Wide
       Settlements. ....................................................................... 5

   B.  The Instant Case Has Always Been Limited to Class (Not
       PAGA) Claims Related to CVS' Unpaid Mandatory
       Training Programs. ............................................................ 5

   C.  The Related Case Seeking Consolidation Has No PAGA
       Claims. ............................................................................... 6

   D.  Proposed Intervenors' Lawsuit Was Filed in August 2018,
       Encompassing the Claims Plaintiff Now Seeks to Release. .......... 7

   E.  The Proposed Settlement Seeks to Expand the Scope of
       This Case to Include Multiple PAGA Claims, Including
       Those That Were Dismissed or Have Only Ever Been
       Asserted by Intervenors. ................................................. 8

   F.  Plaintiff's Limited Examination of CVS' Potential
       Liability and Risks Conflicts with Intervenors' More
       Comprehensive Assessments. ......................................... 9

   G.  Plaintiff's Proposed Release and Class Definition Far
       Exceed His Claims and Damages Analysis, Requiring
       Court Intervention. ....................................................... 14

   H.  The Value of the PAGA Claims in this Case Comprises
       84% of Plaintiff's Damages Assessment but Less Than
       1% of the Settlement. .................................................... 16

III. THE COURT SHOULD DENY THE MOTION BECAUSE
     THE PROPOSED SETTLEMENT WOULD RESULT IN
     SEVERE PREJUDICE TO TENS OF THOUSANDS OF
     CLASS MEMBERS/ AGGRIEVED EMPLOYEES AND THE
     STATE OF CALIFORNIA ..................................................... 16

A.  At the Preliminary Approval Stage, a Court Must Apply a Heightened Level of Scrutiny to Examine Whether the Proposed Class Settlement is Fair, Reasonable and Adequate. ..................................................................... 16

B.  The Indicia of Collusion Are Present. ............................................ 17

C.  Intervenors' Superior Evidence Establishes That the Proposed Settlement is Not Fair, Reasonable, and Adequate. ..................................................................... 18

   1.  Plaintiff's Assessment of the Risk of Arbitration is Undermined by Intervenors' Evidence and Legal Authorities. .......................................................... 18

   2.  Plaintiff's Assessment of the Risk of Prior Settlement Agreements Does Not Apply to Intervenors' Case. ............................................... 19

   3.  Plaintiff's Assessment of the Risk of Individualized Issues Does Not Apply to Intervenors' Case. .................... 20

   4.  Plaintiff's Proposed Method of Notice is Not the Best Practicable Method Under the Circumstances ........... 22

D.  The Proposed Settlement is Not a Genuine and Meaningful Settlement for the LWDA and Aggrieved Employees. ..................................................................... 23

   1.  Plaintiff Does Not Have Standing to Pursue PAGA Claims. ................................................................. 23

   2.  Plaintiff's $75,000 PAGA Settlement Does Not Satisfy the Criteria Required for Court Approval. ............. 25

   3.  The Proposed Settlement Grossly Undervalues the PAGA Penalties Available in Plaintiffs' Own Case, as Well as Those Taken From Intervenors' Case. ............. 26

E.  The Motion Is Silent Regarding Necessary Compliance with the LWDA's Reporting Requirements. ................................. 28

IV.  CONCLUSION ..................................................................... 28

3

# I.     INTRODUCTION

The Court has one primary duty in this Motion:   To determine whether the proposed settlement is fair, reasonable, and adequate to the absent class members/aggrieved employees who will be bound by it if it is approved.  Plaintiff and CVS would have this Court make that determination based on limited evidence pertaining to the limited claims and theories in his original lawsuit, while simultaneously trying to slip in extra claims, extra class members/aggrieved employees, and an extremely broad release that would enable CVS to escape liability for Intervenors' pending claims asserted on behalf of the same class members/ aggrieved employees, and the State of California.  Even though the scope of the release has expanded to include more than eleven times the number of employees at issue and substantially more claims and viable legal theories of recovery, Plaintiff's damages and risk analysis remains rooted in his original claims.

There are too many red flags for the Court to approve this type of settlement.  First, there are the suspicious factual circumstances:  CVS failed to inform Plaintiff of Intervenors' case, despite its obligation to do so pursuant to Central District of California Local Rule 83-1.4.1.   At about the same time that CVS canceled its mediation with Intervenors because they insisted on receiving complete class data and applicable policies to evaluate their claims, unbeknownst to Intervenors, CVS was working out this deal to tack Intervenors' claims onto Plaintiff's case – for no additional money – with a party who did not investigate or understand their true value.

But the true value of these claims is not unknowable.  In fact, for almost two years, Intervenors have conducted extensive discovery, investigation, and damages analyses, and are well-positioned to assess the strengths and risks of the case, as well as potential damages associated with the new claims that are unfamiliar to Plaintiff.  Plaintiff has not done the same or anything close.  Fortunately, the Court has the benefit of Intervenors' work, which highlights how woefully inadequate the proposed settlement of the newly-added claims would be in relation to the potential recovery for

the class and the strength of the evidence in support of Intervenors' legal theories.

After careful scrutiny of this information, as detailed more thoroughly below, the Court should deny Plaintiff's Motion.

## II.   RELEVANT FACTS

### A.   CVS Regularly Exploits its Arbitration Policy to Escape the Consequences of Class Actions While Simultaneously Using it as Leverage to Obtain Favorable Class-Wide Settlements.

The CVS entities in this action belong to a large, Fortune 5 company that employs tens of thousands of employees in the State of California and is repeatedly sued for violating of California's Labor Code and other employment laws, including in wage-and-hour class actions.  (Declaration of Beth Gunn ("Gunn Decl.,"), ¶ 2; ECF 74; ECF 76, Ex. 13.)  CVS often avoids the full consequences of these lawsuits by using its arbitration policy – which includes a class action waiver – to defeat them. (*Id.*)  At the same time, CVS selectively waives its own obligation to arbitrate disputes when it can pressure would-be class and PAGA representatives to settle claims on a class-wide basis for an extreme discount, that, while undervaluing the claims and potential recovery of thousands of CVS employees/class members, provides a windfall for counsel and class representatives whose recovery would otherwise be limited.

### B.   The Instant Case Has Always Been Limited to Class (Not PAGA) Claims Related to CVS' Unpaid Mandatory Training Programs.

Plaintiff filed the currently pending case as a class action in California state court on July 20, 2016, and CVS removed it to federal court on December 5, 2016. (ECF 1.)  Plaintiff did not assert a Private Attorneys General Act ("PAGA") claim as part of his lawsuit, likely because his employment with CVS ended in 2013, rendering him time-barred by the PAGA statute of limitations. (ECF 20, 2:4-5.)   As the complaint and the Parties' FRCP 26(f) Joint Report made clear, the class action dealt solely with unpaid wages, including overtime wages, arising from off-the-clock time spent completing mandatory training modules required by CVS, as well as derivative claims connected to the same facts, including for failure to provide accurate itemized

wage statements and failure to pay all wages due at termination.  (ECF 1-1, 5:14-8:7, Ex. A, at pp. 2:13-19, 20:9-27.)  In September 2017, a first amended complaint added another potential plaintiff/class representative (who was compelled to arbitration), but not a PAGA claim.  (ECF 44.)  *Thus, at no point has this case included a PAGA claim.*

### C.    The Related Case Seeking Consolidation Has No PAGA Claims.

In the related case originally filed as a class action on August 3, 2017 against CVS by Sigfredo Cabrera ("Cabrera") in California state court, the factual allegations described not only CVS' mandatory training program as the basis for unpaid wages and overtime wages, it also asserted claims for failure to provide meal periods, failure to provide rest periods, failure to pay all wages owed, failure to provide accurate itemized wage statements, failure to maintain accurate records, failure to reimburse necessary business expenses (but not cell phone reimbursement), and unfair business practices.  (ECF 76, Ex. 1.)  On September 5, 2017, Cabrera filed a first amended complaint, which added an additional plaintiff/class representative Enko Telahun ("Telahun") as well as a PAGA claim based on the same violations of the California Labor Code ("Labor Code"), asserted in their attached letters to the LWDA dated June 22, 2017.  (*Id.* (ECF 1-2 p. 38 at 7:12-28; 32:19-35:18).)

On October 9, 2017, CVS removed the case to the Northern District of California, where until recently it was pending as *Cabrera, et al. v. CVS RX Services, Inc., e. al.,* Case No. 3:17-CV-05803-WHA.  (*Id.*)  On March 16, 2018, upon CVS' motion, both Cabrera and Telahun were compelled to arbitration of their individual claims, which they dismissed, but their PAGA claims remained.  (ECF 76, Ex. 2.)  At the same time, the district court, the Hon. William H. Alsup, granted Cabrera's motion for leave to file a second amended complaint that added a new class representative, Christine McNeely ("McNeely"), to the action, despite CVS' assertions that McNeely was bound by CVS' arbitration policy.  (*Id.*)  Within days, CVS filed a notice of appeal of the order granting the motion for leave to amend as to McNeely, and sought to stay the action pending appeal.  (*Id.* at Ex. 3.)  CVS' unopposed motion to stay the

proceedings pending resolution of the appeal was granted.   (*Id*. at Ex. 4.)

On September 25, 2018, the court granted CVS' motion for summary judgment as to Cabrera's and Telahun's PAGA claims on the ground that they had both waived their right to pursue the Labor Code violations underlying their PAGA claims by dismissing their class claims and opting not to arbitrate their individual Labor Code claims. (*Id*. at Ex. 5.)  In the order, the court denied the plaintiffs' request for leave to amend the second amended complaint to add another plaintiff with standing to bring the PAGA claims, on the ground that plaintiffs had already had sufficient opportunity to do so. (*Id*. at 5:19-6:2.)  McNeely was time-barred from bringing a PAGA claim, as she had stopped working for CVS in October 2016.  (*Id*. at Ex. 6.).  Judgment was entered in CVS' favor against Cabrera and Telahun as to their PAGA claims. (*Id*. at Ex. 9).  *Thus, the Cabrera case currently has no PAGA claims.*

Cabrera and Telahun subsequently appealed the judgment.  (*Id*. at Ex. 7.)  On March 3, 2020, the *Cabrera* plaintiffs and CVS mutually dismissed their appeals, and moved the Ninth Circuit to transfer venue to the Central District to consolidate it with the instant case so that Plaintiff and the *Cabrera* plaintiffs could effectuate a global settlement with CVS.  (*Id*. at Ex. 8.)

**D.    Proposed Intervenors' Lawsuit Was Filed in August 2018, Encompassing the Claims Plaintiff Now Seeks to Release.**

While the *Cabrera* case was seemingly being compelled to arbitration, Intervenor Ryan Hyams filed his lawsuit in California state court on August 21, 2018, following his submission to the LWDA exhausting his administrative remedies on July 2, 2018.  The lawsuit asserted claims for failure to provide meal periods; failure to authorize and permit rest breaks; failure to pay overtime; failure to pay minimum wages; failure to pay timely wages due at termination/waiting time penalties; failure to timely pay all wages; failure to reimburse for employment related expenses; failure to maintain required records; failure to furnish accurate itemized wage statements; failure to provide written notice of paid sick leave; failure to provide one day's rest in

seven; failure to comply with California Labor Code ("Labor Code") sections 850 and 851; and unfair and unlawful business practices.  A first amended complaint was filed on September 7, 2018 to add PAGA claims as the fourteenth cause of action, based on all of the Labor Code claims in the complaint, after Hyams had completed the administrative prerequisites as to all of those claims. (*Id*. at Ex. 11.)  These claims pursue legal theories unconnected to CVS' training modules.

CVS removed the case to federal court on October 12, 2018, where it was assigned to the Hon. Haywood S. Gilliam in the Northern District of California and remains pending.  On March 19, 2019, Regine Duhon was added as plaintiff in a second amended complaint asserting the same causes of action. CVS has not moved to compel arbitration, and it is undisputed that Hyams is not bound by the arbitration program. Although Intervenors had scheduled mediation with CVS in September 2019, which was rescheduled to December 2019, CVS canceled the mediation on October 28, 2019 (a few weeks prior to Plaintiff's second mediation with CVS on November 11, 2019) when Intervenors insisted on obtaining the class time and pay data and relevant policy documents in order to properly evaluate their claims.  (Gunn Decl., ¶ 3.)  CVS raised the possibility of mediation again on March 31, 2020, after the settlement agreement here was signed.  (*Id.*) Fact discovery is complete and Intervenors expect to move for class certification on August 27, 2020.  (*Id.*)

**E.  The Proposed Settlement Seeks to Expand the Scope of This Case to Include Multiple PAGA Claims, Including Those That Were Dismissed or Have Only Ever Been Asserted by Intervenors.**

In the proposed settlement, Plaintiff attempts to resuscitate the *Cabrera* plaintiffs' prior PAGA claims, despite the fact that judgment has been entered against them as to these claims. (ECF 76, Ex. 9.)   By incorporating the *Cabrera* plaintiffs' lawsuit into his, Plaintiff would expand the scope of the class from an estimated 1,764 employees to about 20,000 employees – inflating the class size to over 11 times its original size without adjusting for this change in volume. (ECF 1, 5:5-8; ECF 89, 41:3-6)).  Transparently, the proposed settlement also seeks to include new allegations and

8

claims that were not previously part of either this or the *Cabrera* lawsuit (and for which the PAGA administrative remedies have not been exhausted), *but have always been part of Intervenors' lawsuit against CVS*.  Specifically, the proposed settlement seeks to add – solely for the purpose of settling the lawsuit – alleged violations of Labor Code sections 850, 851, and 852, for failure to schedule employees who "sell at retail drugs and medicines" within the legal limits prescribed in those provisions.  (*Id.*)  Plaintiff also seeks to add a PAGA claim for failure to list available sick and vacation time on aggrieved employees' wage statements pursuant to Labor Code section 246(i), only to turn around and evaluate the claim as worthless.  (ECF 74, 44:17-45:17.)  The only reason to do this is because CVS asked them to – these claims were never before part of either case.  Meanwhile, Intervenors have been litigating these claims for years, believe the claims have substantial merit, and have accumulated extensive evidence to prove these and their other class claims.  (Gunn Decl., ¶ 18; ECF 76, Exs. 10-12.)  The only reason to insert these new claims into Plaintiff's lawsuit now is to remove them from Intervenors' lawsuit – a classic plan to settle with the lowest bidder.

### F.   Plaintiff's Limited Examination of CVS' Potential Liability and Risks Conflicts with Intervenors' More Comprehensive Assessments.

As the Motion illustrates, Plaintiff's discovery has encompassed only the issues alleged in his own operative complaints.  (ECF 89 at 28:6-29:7; ECF 89-1, ¶ 28.).  While the proposed settlement seeks to import claims from the *Cabrera* lawsuit, Plaintiff's description of information he examined does not include substantial evaluation, if any, of the potential damages or risks associated with the *Cabrera* claims.  In fact, the *Cabrera* plaintiffs, right before summary judgment was granted against them, stated that CVS had withheld such necessary information as "documents related to [plaintiffs'] employment, including involvement in past settlements, training records, and time record data." (Gunn Decl., ¶ 5, Ex. A.)

Intervenors, on the other hand, have completed substantial discovery related to their claims on the basis of the class and the aggrieved employees, including

propounding 40 interrogatories, 118 requests for production of documents, and 9 requests for admission. (*Id.*, ¶ 4.)  This discovery resulted in the production of key information pertaining to over 60,000 putative class members, and over 8,700 pages of documents, including relevant CVS policies and practices, training materials, and complete data sets (not sampling) of comprehensive scheduling, time punch, and pay data, that Plaintiffs will use to demonstrate grounds for class treatment, class-wide liability, and civil penalties under PAGA.  (*Id.*)  Intervenors took multiple FRCP 30(b)(6) depositions on approximately 40 topics at issue in the lawsuit, and themselves appeared for deposition.  Obtaining this discovery required extensive meet and confer efforts and multiple appearances before the magistrate judge to compel CVS' compliance with its discovery obligations.  (*Id.*, ¶ 4.)  Intervenors' team has interviewed over 45 current and former retail pharmacy employees, from eight separate regions, who fall within the scope of the class defined in the proposed settlement, to ascertain the viability of the class claims and the evidence to support Intervenors' legal theories.  Intervenors have also engaged in expert analyses of CVS' scheduling, time and pay records, including thorough damages and liability analyses.[1]

Crucially, as it pertains to the Motion, Intervenors' more extensive discovery has revealed serious flaws in the grounds Plaintiff asserts for his assessment of risk in this matter.  Among other things, the discovery in Intervenors' case[2] has revealed that:

➢ CVS' alleged arbitration agreements are not actually "executed" by employees, and CVS does not have records showing that the majority of its employees have even been made aware of its arbitration program; instead, CVS has provided a list of employees who have ostensibly completed training on its arbitration program from October 2014 to the present, as well as a class list designating employees deemed to

---

[1] Intervenors have incurred significant expenses litigating this case, including over $140,000 in costs, as well as substantial attorney time.  Gunn Decl., ¶ 7.

[2] Because the class period in Intervenors' case runs from August 21, 2014 to the present, it is roughly equivalent to the time period sought to be covered by the "Retail Pharmacy Settlement Class" period in the proposed settlement (August 3, 2014 to the present).

have opted out of arbitration.  (Gunn Decl., ¶ 6.)  CVS' alleged arbitration agreement specifically excludes from its scope any currently pending litigation, meaning that any individuals hired after the inception of the lawsuit should not be considered subject to arbitration for the asserted claims. (*Id.*, ¶ 6, Ex. B.) Thus, unlike the information relied upon by Plaintiff concluding that all but 425 individuals were bound by arbitration (ECF 89, 18:13-18), according to Intervenors' data, only about 37.9% of the pharmacy employees at issue in Intervenors' case could possibly be subject to the arbitration program, if the "agreement" is deemed valid at all. (Gunn Decl., ¶ 7; Declaration of Richard Drogin ("Drogin Decl."), ¶ 6(b).)  In Plaintiff's case, filed in July 2016, even fewer employees could possibly be bound by it.

> CVS' FRCP 30(b)(6) deponent regarding the alleged arbitration agreement admitted that "I'm not aware of any benefit that any employee might conceive that they would receive for this [arbitration agreement]." (Gunn Decl., ¶ 6, 8, Exs. B, C (46:3-5.)  At most, the only consideration provided in exchange for an employee's agreement to arbitrate is CVS' own agreement to be mutually bound by the agreement. (*Id.* at ¶¶ 6, 8, Ex. B (Section 7.a.).)  But as this proposed settlement illustrates, such consideration is illusory, as CVS chooses to proceed in court when it can gain from it, including through a favorable class settlement, whereas the absent class members and aggrieved employees do not receive the same benefits.

> Unlike Plaintiff's analysis of the limited number of shifts affected by training modules, Intervenors' evidence in support of the Labor Code sections 850 and 851 claims relies on data for *all* shifts affected by CVS' failure to limit the work times of CVS' employees who "sell at retail drugs and medicine" as mandated by Labor Code sections 850 and 851. According to CVS' FRCP 30(b)(6) witness and discovery responses, CVS made no effort to schedule these employees within the limits even when training modules were not conducted off-the-clock.  (Gunn Decl., ¶ 9, Ex. D (89:23-93:21, 185:21-186:14).)  Instead, CVS' scheduling and time punch data reflects, CVS regularly scheduled pharmacy employees for shifts greater than 9 hours

in a day, over 108 hours in every two-week period, and more than 12 consecutive days in a row, a problem that affected over 140,000 pay periods, creating liability for **over $27 million** of PAGA damages for *each* Labor Code sections 850 and 851.  (Drogin Decl., ¶¶ 6(c)(i), (c)(ii)).  By contrast, Plaintiff's limited examination of the value of this claim was only 2.6 million, less than 10% of the actual damages at stake for this claim.  Similarly, over 25,000 employee pay periods included violations of Labor Code sections 852, 551 and 552, because employees did not get one day's rest in seven, creating additional liability for over $4.4 million of PAGA damages.  *Id.* at ¶ 6(c)(iii).

➤ Regarding the rest break claim, the Motion states only that CVS had a facially compliant rest period policy.  But Intervenors' evidence contradicts this, as prior to June 2017, CVS' policy did not allow employees to leave the premises, in violation of California law as articulated in *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, (2016), *as modified on denial of reh'g* (Mar. 15, 2017) (Gunn Decl., ¶ 10.)  Both before and after that time, employees regularly worked through their rest breaks, and CVS did not pay rest break premiums for such missed rest breaks.  (*Id.*)  CVS knew that its employees could not take their rest breaks because it used a centralized program for scheduling its employees pursuant to stringent "workload" expectations of the amount of time required to complete all of the expected tasks per shift, which either ignored altogether the times required for legally-mandated rest breaks, or factored in only one 15-minute rest period for every 8-hour increment of time, which does not provide the time mandated by California's rest break provisions.  (*Id.*  at ¶ 10, Ex. E (38:7-10).)  Time punch data from Intervenors' case shows that over 7.8 million pharmacy employee shifts were affected by this problem, creating class damages liability of **over $290 million**, and over 560,000 employee pay periods were affected, creating PAGA liability of **over $55 million**.  (Drogin Decl., ¶ 6(c)(iv); 6(d)(i).)

➤ Although apparently not examined in this manner by Plaintiff, CVS' time punch data shows that CVS did not provide legally compliant meal breaks, or pay meal period premiums in lieu thereof, when no applicable waiver was in effect, for over 820,000

shifts, resulting in liability for **over $16 million** in class damages to pharmacy employees, and **over $18 million** in PAGA liability.  (*Id.* at  6(d)(ii) and c(v).)

➢ Contrary to Plaintiff's assumption that CVS' data could not capture such evidence, CVS' time punch data reveals that it regularly scheduled only one pharmacist to work at a time, such that, in conjunction with CVS' class-wide policies and other applicable laws, pharmacists were unable to take legally-compliant meal breaks in which they were relieved of all duty.  A *minimum* of  870,000 pharmacist shifts (and likely many more) were affected by this problem, creating potential liability of over **$60 million** in class damages.  *Id.*  At least 159,000 employee pay periods were affected, resulting in potential PAGA damages of **$15 million**.  (*Id.*)

➢ In addition to the off-the-clock training module time, CVS did not pay its Target pharmacists for about five minutes of work that had to be performed off-the-clock each time they either opened or closed pharmacies before CVS changed its policies to provide for automatic paid grace periods for such shifts in September 2019.  (Gunn Decl., ¶ 11.)  The potential liability for this unpaid time is approximately $1 million in class damages and $300,000 in PAGA damages.

➢ As evidenced by documents and data, CVS did not pay the correct regular rate of pay for overtime worked by employees who earned incentive bonuses, as specified by the California Supreme Court's ruling in *Alvarado v. Dart Container Corp. of Cal.*, 4 Cal. 5th 542, 560 (2018) (citing DLSE Manual calculation method), resulting in potential PAGA damages of **over $22 million**, as well as class-wide and PAGA damages for inaccurate wage statements to those employees.

➢ Besides the "derivative claim" relied upon by Plaintiff, CVS did not retain the entirety of the pay data required by Labor Code section 226 for the three years required by statute; rather CVS employees could not access pay stubs after a year passed, and the pay data provided in lieu of the wage statements lacked the information specified by Labor Code section 226, resulting in over **$50 million** in potential PAGA damages. (Drogin Decl., ¶ 6(c)(viii).)

13

➢ CVS did not pay its non-exempt pharmacy employees for the use of their cell phones when necessary for CVS' business, nor did CVS provide any method for such employees to be reimbursed for such expenses.  (Gunn Decl., ¶ 12.)  This issue affected at least 220,000 pay periods worked by pharmacists, who were regularly required to communicate via their personal cell phones with their managers and schedulers pursuant to a class-wide policy, creating potential class liability of **over $5.5 million**, and potential PAGA liability of **over $10 million**.  (Gunn Decl., ¶ 17).

➢ From August 2014 until February 2019, CVS did not provide its nonexempt employees with accurate information regarding their available sick leave on their wage statements as required by Labor Code section 246(i), which affected approximately 1 million employee pay periods, which could translate to substantial PAGA damages.

➢ In Intervenors' case, CVS has not asserted that any prior class settlements apply, and even though fact discovery has closed, CVS has not produced any applicable settlement agreements or identified them in its FRCP 26 disclosures.  (Gunn Decl., ¶ 13.)  Rather, CVS represented to the magistrate judge, when Plaintiff sought to compel such settlement agreements, that none applied.  (*Id.*, Ex. F (8:4-10:11.))

### G.  Plaintiff's Proposed Release and Class Definition Far Exceed His Claims and Damages Analysis, Requiring Court Intervention.

As Plaintiff's description of the evidence concedes, prior to entering into the proposed settlement, he was not aware of any of the above evidence or damages assessments.  Yet the proposed release strives to bar "all claims, causes of action, and legal theories of relief that were alleged **or that could have been alleged or otherwise raised in**" either the instant action (including in its proposed consolidated second amended complaint) **or the *Cabrera* action** from CVS' employees who worked in its retail pharmacies since August 3, 2014.  (*See* ECF 89-1, 15:22-16:13) (emphasis added).  This could include, for the time frame at issue in Intervenors' action, all of their claims for failure to provide legally compliant meal breaks, failure to provide legally compliant rest breaks, failure to pay all wages due, including off-the-clock

work and overtime pay at the proper regular rate, failure to pay all necessary business expenses, failure to maintain records as required by law, failure to provide accurate itemized wage statements, failure to pay all wages due at the time of termination; failure to timely pay all wages due; unfair competition, and PAGA claims for the above Labor Code provisions, as well as for failure to schedule and/or allow employees to work in excess of the legal limits imposed by Labor Code sections 850 and 851; failure to provide one day's rest in seven, as required by Labor Code sections 852, 551, and 552; and failure to provide accurate itemized information regarding available sick leave pursuant to Labor Code section 246(i).   Intervenors' superior information indicates that, for roughly the same class period and involving the same retail pharmacy employees, Plaintiff has undervalued the potential damages as follows:

| Class Claims | | | |
|---|---|---|---|
| Labor Code | Intervenors' Assessment | Adjustment for Arbitration Risk | Plaintiff's Assessment |
| 226.7, 512 (meal) | $ 96,000,000 | $ 51,000,000 | $ 2,000,000 |
| 226.7 (rest) | $ 290,000,000 | $ 100,000,000 | 0 |
| 1197.1, 510 (OTC) | $ 1,050,000 | $ 652,050 | $ 2,934,658 |
| 2802 (bus. exp) | $ 5,500,000 | $ 1,812,500 | 0 |
| 226 (pay records) | $ 50,000,000 | $ 31,050,000 | 0 |
| Totals: | $ 442,550,000 | $ 184,514,550 | $ 4,934,658 |
| Difference: | $ 437,615,342 | $ 179,579,892 | |
| | 1.12% | 2.67% | |

| PAGA Claims | | |
|---|---|---|
| Labor Code | Intervenors' Assessment | Plaintiff's Assessment |
| 850, 851 | $ 27,000,000 | $ 2,600,000 |
| 852, 551, 552 | $ 4,400,000 | $ 800,000 |
| 226.7, 512 (meal) | $ 33,000,000 | 0 |
| 226.7 (rest) | $ 55,000,000 | 0 |
| 1197.1, 510 (OTC) | $ 350,000 | $ 23,000,000 |
| 510 (reg rate) | $ 22,000,000 | 0 |
| 2802 (bus. exp) | $ 10,850,000 | 0 |
| 226 (pay records) | $ 50,000,000 | 0 |
| Totals: | $ 202,600,000 | $ 26,400,000 |
| Difference: | $ 176,200,000 | 13.03% |

(Gunn Decl., ¶17).  As these charts indicate, Plaintiff has not assessed *any* damages for several claims that would fall within the scope of the proposed settlement.

**H.  The Value of the PAGA Claims in this Case Comprises 84% of Plaintiff's Damages Assessment but Less Than 1% of the Settlement.**

The above charts also illustrate that the bulk of Plaintiff's assessed damages (84%) result from PAGA claims, whereas the assessed damages for his class claims (*i.e.*, the only claims currently part of either this action or the *Cabrera* action), are less than $5 million – about *half* of the total settlement amount.  The $75,000 allocated as PAGA damages is 0.77% of the total settlement amount of $9,750,000.  *There is no doubt that, without adding these currently nonexistent PAGA claims, Plaintiff could not achieve the settlement amount CVS was willing to pay here.*

**III.  THE COURT SHOULD DENY THE MOTION BECAUSE THE PROPOSED SETTLEMENT WOULD RESULT IN SEVERE PREJUDICE TO TENS OF THOUSANDS OF CLASS MEMBERS/ AGGRIEVED EMPLOYEES AND THE STATE OF CALIFORNIA.**

**A.  At the Preliminary Approval Stage, a Court Must Apply a Heightened Level of Scrutiny to Examine Whether the Proposed Class Settlement is Fair, Reasonable and Adequate.**

FRCP 23(e)(2) states that a court may *only* approve a proposed class action settlement "on finding that it is fair, reasonable, and adequate" for absent class members, after considering multiple factors, including whether the proposed class representatives and counsel adequately represented the class, and whether the proposed relief to the class is adequate.  FRCP 23(e)(2).  When the settlement occurs prior to a class certification determination, a heightened standard of review applies to ensure that the determination of the substantive fairness of the proposed settlement is based on reasonable findings of fact.  *See Roes, 1–2 v. SFBSC Mgmt, LLC*, 944 F.3d 1035, 1043 (9th Cir. Dec. 11, 2019).  Courts are expected to apply "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)," including "scrutinize[ing] any 'subtle signs that class counsel have allowed pursuit of their own self-interests ... to infect the negotiations.'"  *Id.* (citing *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011), *Allen v. Bedolla*, 787 F.3d 1218, 1223-24 (9th Cir. 2015)).  This review includes exploring comprehensively all factors, giving a reasoned response to

1    any non-frivolous objections, and adequately developing the factual record." *Id.*

2        **B.    The Indicia of Collusion Are Present.**

3        While Plaintiff presents evidence of his investigation and damages assessment

4    limited to the claims related to the off-the-clock work arising from training modules

5    that fell within the scope of his original case, no evidence suggests that Plaintiff has

6    done the type of work required to identify or investigate the potential new claims to

7    be added to the action as contemplated by FRCP 23(g)(1)(A)(i), including those claims

8    he seeks to consolidate from the *Cabrera* case.   For example, Plaintiff has not

9    investigated critical documents and data related to pursuing class-wide damages for

10   rest break claims, meal break claims, Labor Code section 226 claims, business expense

11   reimbursement claims for use of personal cell phones, or off-the-clock work arising

12   from other circumstances than the training modules.   As Intervenors' evidence

13   demonstrates, such documents and data exist, but Plaintiff did not discover or consider

14   them despite agreeing to a release that could cover such claims.

15       Tellingly, Plaintiff could only reach a settlement after CVS began negotiating

16   *about claims that were part of Intervenors' lawsuit and not his own lawsuit*, shortly

17   after CVS refused to provide Intervenors with more substantive information to

18   investigate their claims and cancelled its scheduled mediation with Intervenors as to

19   those very same claims.  Finding Plaintiff to be receptive to a cherry-picked sampling

20   of information, CVS was able to make the deal it wanted.   Plaintiff then agreed to

21   incorporate Intervenors' claims into his lawsuit, assign them a value of nothing or

22   greatly diminished value, solely so that the release would cover them.   These

23   circumstances suggest that the Parties impermissibly colluded in a reverse auction.

24   *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 399 (C.D. Cal. 2007) (reverse

25   auctions occur when "attorneys jockeying for position might attempt to cut a deal with

26   the defendants by underselling the plaintiffs' claims relative to other attorneys.").

27       Plaintiff's reliance on the *Cabrera* lawsuit to encompass the claims at issue does

28   not cure this problem, as the *Cabrera* plaintiffs, by their own admission, had been

                                            17

stonewalled by CVS to the extent that they did not receive necessary discovery (Gunn Decl., ¶ 8, Ex. A at 16:7-17:13), and the case was tied up in appeal over standing issues.  The Motion is completely devoid of facts that would allow the Court to examine the adequacy of the investigation, if any, conducted by the *Cabrera* plaintiffs.

Further, Plaintiff's assessment of potential available damages relies heavily on the availability of PAGA damages *that were only available to him as a result of incorporating the new claims that he did not thoroughly investigate*.  The higher attorneys' fees generated as a result of the higher dollar value settlement based on previously nonexistent PAGA claims, are, at a minimum, a "subtle sign[] that class counsel have allowed pursuit of their own self-interests ... to infect the negotiations." This type of conflict of interest necessitates denial of a preliminary approval motion.

## C.   Intervenors' Superior Evidence Establishes That the Proposed Settlement is Not Fair, Reasonable, and Adequate.

As detailed above, Plaintiff's limited investigation did not reveal key factors that the Court should consider regarding the fairness, reasonableness, and adequacy of the settlement.  FRCP 23(g)(1)(B) authorizes a court to consider any matter "pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Here, the Court should examine Plaintiff's massive, uninformed undervaluing of the claims contained in the release, which stand to affect twenty thousand CVS employees, and deprive them of potential recovery that Intervenors are actively pursuing.

### 1.   Plaintiff's Assessment of the Risk of Arbitration is Undermined by Intervenors' Evidence and Legal Authorities.

Plaintiff has dramatically overvalued the potential risk of CVS' alleged arbitration agreements here.  First, Plaintiff's original class only included opt-outs from the arbitration program.  Second, the language of the agreement itself excludes any pending litigation – which Plaintiff has not factored into his assessment of risk at all.  The Court should question whether Plaintiff's assessment of the threat of arbitration was reasonable or adequate under these circumstances.  The fairness of the proposed settlement is further challenged by the other inherent problems with the

PROPOSED INTERVENORS' OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

alleged arbitration agreements, which Intervenors do not expect to be deemed a valid contract in light of the lack of consideration provided, as well as the lack of evidence regarding those who might be bound by it. *See Nyulassy v. Lockheed Martin Corp.*, 120 Cal.4th 1267, 1287 (2004) (the "paramount consideration" in assessing substantive unconscionability, is the mutuality of the obligation to arbitrate); *Abernathy v. DoorDash, Inc.*, No. C19-07545 WHA, 2020 WL 619785 (N.D. Cal. Feb. 10, 2020) (refusing to "bless" the "hypocrisy" of the employer's request to "resort to a classwide lawsuit, the very device it denied to workers," when it wanted "to avoid its duty to arbitrate").   In Intervenors' case, CVS has waived its right to compel arbitration by, among other things, removing the case to federal court and litigating actively there, availing itself of the court system for almost two years. *See Fleming Distrib. Co. v. Younan*, 49 Cal. App. 5th 73 (2020), *as modified* (May 15, 2020).

Moreover, CVS cannot claim that retail pharmacy employees are subject to arbitration in the absence of evidence that those employees received notice of the arbitration program, evidence that CVS has not introduced in Intervenors' case, and cannot introduce at this juncture.  It would be manifestly unfair to devalue the potential value of these employees' claims by adopting Plaintiff's evaluation of the risk of arbitration, when that same risk does not apply to Intervenors' action.

**2.    Plaintiff's Assessment of the Risk of Prior Settlement Agreements Does Not Apply to Intervenors' Case.**

Similarly, Plaintiff justified a lower settlement value based on purported risks of other settlement agreements barring recovery for putative class members, when the same risk does not exist in Intervenors' case.  The evidentiary record does not contain any evidence of such settlement agreements, which were not part of CVS' FRCP 26 disclosures, and it is too late for CVS to introduce such evidence now.  CVS has already represented to the court in Intervenors' case that there are no such settlement agreements that would apply to this case, rendering this risk obsolete in Intervenors' case.  Again, it would be unfair to the putative class members to allow the threat of this nonexistent risk to justify an unreasonably low recovery in a settlement.

### 3.  Plaintiff's Assessment of the Risk of Individualized Issues Does Not Apply to Intervenors' Case.

Unlike Plaintiff's assessment of the risk of individualized inquiries to defeat class certification, Intervenors' lawsuit relies exclusively on legal theories that may proceed on the basis of uniform class-wide evidence.  Specifically:

➤ Intervenor Hyams' standing to bring the class claims is undisputed for the entire class period at issue, unlike the disparate proposed plaintiffs without currently pending claims whom Plaintiff attempts to cobble together, whose potential inability to pursue every claim compromises their capability of acting in the best interests of the class.

➤ Intervenors' rest break claim relies upon the language of the common rest break policy, which prohibits employees from leaving the premises, universal training modules regarding the rest break policy, and universally applied scheduling standards that factored in only enough time for one or less rest breaks during an eight-hour shift, combined with a failure to pay rest period premium pay.  Claims based on such evidence are certifiable.  *See Cahilig v. IKEA U.S. Retail, LLC*, 2019 WL 3852490, at *2 (C.D. Cal., June 20, 2019) (finding rest period policy requiring employees to remain onsite and "tethered" to particular locations sufficient to establish viable claim for failure to provide rest periods); *Naranjo v. Spectrum Sec. Servs.*, Inc., 40 Cal. App. 5th 444, 480–481 (2019) (as modified on denial of reh'g (Oct. 10, 2019)) (if rest breaks were not authorized, the fact that individual class members were sometimes able to take complaint breaks is not a reason to deny class certification); *Vasquez v. Leprino Foods Co.*, 2020 WL 1527922, at *15 (E.D. Cal., Mar. 31, 2020) (certifying a rest period class despite a facially compliant rest break policy, where company-wide incentives to remain "on-call" during rest breaks, such as productivity metrics and communications expectations, combined with declaration testimony from multiple class members, showed that class-wide evidence could resolve the common question).

➤ Intervenors' off-the-clock claim relies upon documents and testimony indicating that, at certain locations, pharmacists who opened or closed Target

pharmacies worked off-the-clock performing common work duties such as handling keys and alarms, and that CVS conceded this by instituting a policy that automatically paid for such time in late 2019. Such claims are certifiable. (Gunn Decl, ¶ 18, Ex. G.) *See Cervantez v. Celestica Corp.*, 253 F.R.D. 562, 571–72 (C.D. Cal. 2008) (certifying a class on questions of the compensability of pre- and post-shift time).

➢ Intervenors' meal break claim relies upon universal policy and training documents and testimony evidencing that pharmacists who worked alone could not leave the premises for meal breaks as a result of a common, class-wide policy and practice, as well as class-wide legal requirements. It also uses time data showing when pharmacists worked alone, as well as data for all pharmacy employees showing when compliant meal breaks were not recorded, when no waiver applied and no premium was paid. Such claims are certifiable. (Gunn Decl, ¶ 19, Ex. H.) *See Brewer v. Gen. Nutrition Corp.*, 2014 WL 5877695, at *6 (N.D. Cal. Nov. 12, 2014) (certifying a class based on policies and practices that pressured employees to miss meal breaks).

➢ Intervenors' claim regarding the regular rate of pay for pharmacists who received incentive bonuses is based on common evidence of CVS' nondiscretionary incentive compensation plans, and the uniform methodology CVS used when calculating the overtime rate for pharmacy employees who received the bonuses, which did not comply with California law. Such claims are certifiable. *See Chavez v. Lumber Liquidators, Inc.*, 2012 WL 1004850 (N.D. Cal., Mar. 26, 2012) (unreported) (holding that the common pay practices involved in calculating the regular rate of pay were sufficient common proof to certify a class). The wage statement claim can also be certified to the extent it relies upon CVS' listing of the incorrect rate of pay. *See Amey v. Cinemark USA Inc.*, 2018 WL 3956326 (N.D. Cal. Aug. 17, 2018) (unreported) (granting FRCP 23 class certification on issue of whether wage statements bearing the inaccurate regular rate of pay violated the Labor Code).

➢ Intervenors' claim for failure to reimburse necessary personal cell phone expenses relies upon CVS' common policy and practice of gathering employees'

personal cell phone numbers to call and text them for business purposes, common proof of contact with pharmacists on their cell phones (including contacts by schedulers ensuring that there was coverage for all shifts, a crucial element of CVS' business), and common proof that CVS did not attempt to ensure that its employees could be compensated for personal cell phone use.  Unlike Plaintiff's assessment that his business expense reimbursement claims would be "the most difficult claims to certify," (ECF 89, ¶ 49), such claims are certifiable.  *See Castro v. ABM Indus., Inc.*, 325 F.R.D. 332 (N.D. Cal. Jan. 26, 2018) (whether personal cell phone use was "necessary" can be determined on a class-wide basis, using common proof that the employer knew that required communications were occurring, and were important to the business); *Richie v. Blue Shield of Cal.*, 2014 WL 6982943 (N.D. Cal., Dec. 9, 2014) (questions asking if the reimbursement policy complied with the "reasonable percentage" requirement articulated in *Cochran*, if the personal cell phone usage was required, and if the employer acted with due diligence to ensure that its employees were compensated for their personal cell phone use are common class-wide questions).

The Motion tries to justify a low settlement amount in exchange for a release that would preclude all of these claims, arguing that individualized inquiries are necessary to examine liability.  However, Intervenors, by refusing to accept CVS' cherry-picked discovery and conducting their own thorough investigation, have discovered substantial evidence that allows them to proceed using uniform, class-wide evidence in support of their legal theories.  It would be unfair, unreasonable, and inadequate to allow Plaintiff's ignorance of the evidence to limit the potential recovery for thousands of absent class members/aggrieved employees.

### 4.   Plaintiff's Proposed Method of Notice is Not the Best Practicable Method Under the Circumstances.

Plaintiff's proposed settlement depends on mailing, via U.S. Mail, notice of the settlement to the class.  This method of notice is not "the best notice that is practicable under the circumstances" as required by FRCP 23(c)(2)(B).  CVS regularly communicates with employees on their personal cell phones, using numbers collected

upon hiring.  A more practicable, and more cost-efficient, method of reaching the class would be to send texts with a link to the class action web site, which is not part of the proposal.  *See, e.g., Roes, 1–2*, 944 F.3d at 1047 (deeming mail service not the best notice under the circumstances where alternative and/or additional electronic means were better designed to reach the putative class); (Gunn Decl., ¶ 20.)  Further, as explained below, information allowing employees to understand their potential PAGA recovery, which Plaintiff has not provided here, is also absent from the Notice.

**D.     The Proposed Settlement is Not a Genuine and Meaningful Settlement for the LWDA and Aggrieved Employees.**

Courts also must scrutinize PAGA settlements to ensure that they sufficiently protect the interests of the State of California and its articulated public policy.  *See O'Connor v. Uber Techs.*, 201 F. Supp. 3d 1110, 1134 (N.D. Cal. 2016) (requiring a court to "closely examine" the PAGA aspects of a proposed settlement, including evaluating "the adequacy of the settlement in view of the purposes and policies of PAGA").  Intervenors seek to use the information already known to them through the course of acting as the proxy of the LWDA to bring maximum benefit to the State of California and the employees the LWDA is designed to protect.  "It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public" and "unique public policy role of  the PAGA."  *Id.* (citing the LWDA's Comments on Proposed PAGA Settlement) (Gunn Decl., ¶ 21, Ex. I.)  As detailed above, Intervenors possess substantial evidence that should raise significant concern from the Court as to the genuineness or meaningfulness of the proposed settlement.

**1.     Plaintiff Does Not Have Standing to Pursue PAGA Claims.**

Plaintiff does not contend that he has standing to pursue the PAGA claims.  The only individuals Plaintiff proposes as PAGA representatives are the *Cabrera* plaintiffs Cabrera and Telahun, whose PAGA claims have been dismissed.  Basically, Plaintiff is asking this Court to circumvent the Ninth Circuit and play the role of the appeals court, assume that Cabrera and Telahun would have prevailed on their appeal, and

revive claims for which judgment has been entered against them in another court.  The sole purpose of these procedural gymnastics is to allow them to settle claims for which they have submitted no evidence of conducting due diligence.  Further, they ask to settle claims which they cannot bring under any circumstances, because they cannot exhaust their administrative remedies for the new claims they want to import from Intervenors' lawsuit.  *See Hernandez v. Houdini, Inc.,* 2017 WL 8223987, at *11 (C.D. Cal. Mar. 21, 2017) (plaintiffs may only pursue PAGA claims based on violations of the Labor Code cited in their letter to the LWDA; otherwise, PAGA's pre-filing notice and exhaustion requirements are not satisfied); *Rivas v. Coverall N. Am., Inc.*, 2019 WL 7166972, at *4 (C.D. Cal. Feb. 28, 2019) (plaintiff who did not give the LWDA notice of his intent to bring specific claims was "not entitled to litigate the claims").

Northern District of California Judge William Alsup, (who was previously assigned to the *Cabrera* action) circulates a "Notice Regarding Factors to be Evaluated For any Proposed Class Settlement" to eliminate these types of shortcomings in settlements involving expansions of the class, including claims not even in the complaint, warning that "[i]f an expansion is to occur it must come with an adequate plaintiff and one with standing to represent the add-on scope and with an amended complaint to include the new claims, not to mention due diligence as to the extended scope.  The settlement dollars must be sufficient to cover the old scope plus the new scope."  (ECF 76, Ex. 14, 3:6.)  Plaintiff cannot satisfy this standard, as his proposed expansion asserts entirely new PAGA claims, by plaintiffs with no standing, that have not exhausted the administrative prerequisites, added without any increase in the settlement value of the lawsuit.  *See, e.g., Lusby v. Gamestop Inc.*, 297 F.R.D. 400, 416 (N.D. Cal. 2013) (refusing to transfer venue to the Central District where the parties' proposed settlement seemed to be "engineered by the parties" to be a "work-around [of these rules], which has the strong smell of forum shopping.")

These mechanisms are not designed to bring genuine and meaningful relief to either the aggrieved employees or the State of California.

24

## 2. Plaintiff's $75,000 PAGA Settlement Does Not Satisfy the Criteria Required for Court Approval.

It is highly suspicious that the proposed settlement provides for only $75,000 of the $9,750,000 settlement (0.77%) to be exchanged for the release of PAGA claims. Of that amount, $56,250 (0.58% of the total proposed settlement amount) is earmarked to be paid to the LWDA, and $18,750 (0.19% of the total proposed settlement amount) is available for distribution to the aggrieved employees, even though the assessment of PAGA damages accounts for about 84% of the anticipated recovery in this case. *Conspicuously absent from the Motion are any details regarding the number of aggrieved employees who will release their PAGA claims as a result of the proposed settlement* (without the opportunity to opt out), making it impossible to determine the projected average amount that each aggrieved employee is expected to receive.  This oversight is glaring, as a Court cannot effectively determine fairness without it.  If all 20,000 proposed class members received an equal share, *it would amount to about 94 cents a person*, raising questions as to why Plaintiffs would go to the trouble of adding the PAGA claims here *just to release them for less than the cost of a lottery ticket*. Most employees would prefer the lottery ticket.

Further, the amounts to be paid to the class representative and class counsel should be examined in comparison to the overall potential value of the claims.  *See Benitez v. W. Milling, LLC*, 2020 WL 309200, at *10 (E.D. Cal., Jan. 21, 2020) ("When a negotiated class action settlement includes an award of attorney's fees, the fee award must be evaluated in the overall context of the settlement.") (citing *Knisley v. Network Assocs.*, 312 F.3d 1123, 1126 (9th Cir. 2002)).  In contrast to the amounts allocated to the PAGA aggrieved employees and the LWDA, Plaintiff's attorneys are slated to receive 30% of the proposed settlement as fees, in the amount of $2,925,000, and up to $50,000 in costs, and the proposed plaintiffs are expected to receive $10,000 each (for a total of $40,000 – more than double the entire amount allocated to all other aggrieved employees for the PAGA claim).  These numbers suggest that the PAGA

claims were impermissibly used as a bargaining chip.  *See O'Connor*, 201 F. Supp. 3d at 1134 (warning against the "temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class").

In the Motion, Plaintiff reveals that he reduced his assessment of potential PAGA damages from the high end of $26.4 million to $75,000 (only 0.28% of his initial assessment) – *less than one percent (0.74%) of its potential full value.*  (ECF 89, 13:27-14:13; 15:7-27; 89-1.)  In other words, Plaintiff assesses more than a 99% chance of *not* prevailing on *any* of the *newly added* PAGA claims.  This dramatic reduction, and Plaintiff's apparent lack of faith in the claims he seeks to add, should prompt the Court to ask if Plaintiff is best suited to act in the role of the LWDA in pursuing these claims, especially when Intervenors have been pursuing the same claims wihtout displaying any lack of confidence in their ability to succeed.  *See Murray v. Scelzi Enters., Inc.*, 2019 WL 6045146, at *13 (E.D. Cal., Nov. 15, 2019) ("The failure to adequately explain why the PAGA penalties were not considered in the calculation of the total value of the suit and the overly-excessive discounts on those penalties prevents the undersigned from any 'real evaluation of the reasonableness of this settlement.'") (citing *Gonzalez v. CoreCivic of Tenn.*, *LLC*, 2018 WL 4388425, at *9 (E.D. Cal., Sept. 13, 2018)); *Viceral v. Mistras Group, Inc.*, 2016 WL 5907869, at *9 (N.D. Cal., Oct. 11, 2016) (finding that a settlement of less than 1% of the estimated verdict value of a PAGA claims raises substantial concern because it is far less than what would be indicated by the risk factors in the case); *O'Connor*, 201 F. Supp. 3d at 1133 (rejecting a class and PAGA settlement where, without any rationale for it, the plaintiff proposed resolving the PAGA claim for "0.1% of its estimated full worth").

### 3.   The Proposed Settlement Grossly Undervalues the PAGA Penalties Available in Plaintiffs' Own Case, as Well as Those Taken From Intervenors' Case.

Plaintiff discounts the viability of his PAGA claims by contending that, at most, PAGA penalties would be available for off-the-clock time spent on training modules

for the four-month time period dictated by the *Cabrera* plaintiff's LWDA letter until the time the training module policy was changed in January 2017. (ECF 89, 30:8-12). In drawing this conclusion, Plaintiff ignores Intervenors' high value PAGA claims based on violations of Labor Code sections 850, 851, 551, 552, and 246, which the proposed release is designed to usurp from Intervenors' case. It is clear that no additional consideration has been added as recovery for aggrieved employees. As such, 25% of the possible penalties at stake in Intervenors' claims could achieve far greater recovery than what the proposed settlement provides. Instead of the $18,750 Plaintiff allocates to aggrieved employees, *the amount could be $50 million*.

The Motion also rejects, without analysis, any possibility that the PAGA penalties could be "stacked," such that multiple different Labor Code violations could result in cumulative amounts of PAGA penalties. (ECF 89, 12:5-7). However, many courts have determined that "stacking" is appropriate, especially where, as here, the PAGA penalties result from multiple different types of violations. *See Bernstein v. Virgin Am., Inc.*, Case No. 15-cv-02277-JST (Judgment, N.D. Cal., Feb. 4, 2019) (awarding almost $25 million in PAGA damages based on 1,400 aggrieved employees, stacking PAGA penalties for multiple Labor Code violations); *Magadia v. Wal-Mart Associates, Inc.*, 384 F.Supp.3d 1058, 1105–1106 (N.D. Cal. May 31, 2019) (awarding $54 million in PAGA damages for multiple PAGA violations, after allowing "double recovery" under both PAGA and the underlying Labor Code provision).

Plaintiff also seems to believe that CVS will be able to easily convince a court to drastically reduce the amount of the PAGA penalties granted if this case proceeds to trial. This perspective is not based on analogous circumstances involving defendants with multi-billions in annual profit who make no attempt to comply with the Labor Code in multiple different ways. While Labor Code section 2699(e)(2) allows a court to reduce PAGA penalties where, "based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory," Plaintiff proposes no reasoning for how CVS might

PROPOSED INTERVENORS' OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

satisfy these criteria here.  CVS has consistently violated the Labor Code to the detriment of its employees (and the public health and safety), in the name of making excessive profits while ignoring basic compliance with California's laws.   In particular, CVS remorselessly continued its scheduling practices in violation of Labor Code sections 850, 851 and 852 for almost 18 months after receiving notice of the illegal practice via Intervenors' LWDA letter in July 2018, exhibiting the type of willfulness that the penalties are designed to punish.

**E.    The Motion Is Silent Regarding Necessary Compliance with the LWDA's Reporting Requirements.**

Neither the Motion or settlement agreement reveal whether Plaintiff has complied with PAGA's requirement that Plaintiff submit the proposed settlement to the LWDA at the same time he submitted it to the Court. *See* Labot Code § 2699(l)(2); *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (a party seeking approval of a PAGA settlement must *simultaneously* submit the proposed settlement to the LWDA to allow the agency to comment on the settlement). Failing to include this evidence should result in an automatic rejection of the proposed settlement.  *See Sanchez v. Frito-Lay, Inc.*, 2019 WL 4828775, at *13 (E.D. Cal., Sept. 30, 2019) (declining to preliminarily approve a PAGA settlement where the plaintiff did not provide evidence that he provided the settlement agreement to the LWDA).

When the scope of the release is as broad as the one proposed here, and the relief attributed to the PAGA claims is so disproportionately low, a court should not find that the settlement, as a whole, is fair, adequate, and reasonable.  *See O'Connor*, 201 F. Supp. 3d at 1135 ("Given the sweeping consequences of the proposed PAGA waiver, viewed in the context of a relatively modest settlement of the non-PAGA claims, the Settlement Agreement is not as a whole fair, adequate and reasonable.").

## IV.   <u>CONCLUSION</u>

The time for the Court to protect the class members/aggrieved employees and the State of California is now.   Waiting until final approval will only confuse and further prejudice those who stand to lose from Plaintiff's excessively bad deal.  *See*

*Cotter v. Lyft*, 193 F. Supp. 3d 1030, 1035-37, (N.D. Cal. 2016) (warning of the dangers of waiting until the final approval stage to deny settlement approval); *see also O'Connor*, 201 F. Supp. 3d at 1122 (applying "close review" where "a great deal of expense would be incurred and substantial confusion could ensue were the Settlement Agreement preliminarily approved but ultimately disapproved on final review," particularly where the settlement would settle claims in other pending lawsuits).

DATED:  June 27, 2020

GUNN COBLE LLP

By:  /s/ Beth Gunn
         Beth A. Gunn
         Catherine J. Coble

Attorneys for Plaintiffs-Intervenors
RYAN HYAMS and REGINE DUHON,
on behalf of themselves, and all others
similarly situated