# EXHIBIT A

R. Craig Clark (SBN 129219)
cclark@clarklawyers.com
Monique R. Rodriguez (SBN 304223)
mrodriguez@clarklawyers.com
Paige D. Chretien (SBN 320210)
pchretien@clarklawyers.com
**CLARK LAW GROUP**
205 West Date Street
San Diego, CA 92101
Telephone: (619) 239-1321
Facsimile: (888) 273-4554

Walter Haines (SBN 071075)
**UNITED EMPLOYEES LAW GROUP**
5500 Bolsa Avenue, Suite 201
Huntington Beach, CA 92649
Telephone: (562) 256-1047
Facsimile: (562) 256-4554

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SIGFREDO CABRERA, ENKO TELAHUN, AND CHRISTINE MCNEELY, as individuals, on behalf of themselves, and all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CVS RX SERVICES, INC., a New York corporation, CVS PHARMACY, INC., a Rhode Island corporation; GARFIELD BEACH CVS, LLC, a California limited liability company; and DOES 1 to 10 inclusive,<br><br>Defendants. | CASE NO.: 3:17-cv-05803-WHA<br><br>[Assigned to Hon. William H. Alsup, Courtroom 12]<br><br>**PLAINTIFFS SIGFREDO CABRERA AND ENKO TELAHUN'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)**<br><br>Date:    September 19, 2018<br>Time:    8:00 a.m.<br>Ct Rm:  12<br><br>Complaint filed: August 3, 2017<br>Action removed: October 9, 2017 |

**<u>TABLE OF CONTENTS</u>**

**Page(s)**

I.      INTRODUCTION ……………………………………..…………….. 9

II.     STATEMENT OF FACTS ……………………………………….....… 9

A. Plaintiffs' Employment with CVS ………………………………….... 9

B. This Action ………………………………………………………… 10

C. Unrelated Previous CVS Settlements ……………………………… 11

　　　　1.　　The *Stark* Lawsuit …………………………………………... 11

　　　　2.　　The *Connell* Lawsuit …………………………………………... 12

　　　　3.　　The *Murphy/Ortiz* Lawsuit ……………………………………. 12

D. The Court's Ruling in the Related *Chalian* Case …………………… 14

III.    LEGAL STANDARD ……………………………………… 14

IV.     ARGUMENT ………………………………………………………… 15

A. Defendants' Premature Motion for Summary Judgment is an Improper
Attempt to "Railroad" Plaintiffs ……………………………………… 15

　　　　1.　*Plaintiff Sigfredo Cabrera was Not Provided with Fair Notice* ……… 15

　　　　2.　*Plaintiffs have Not had The Opportunity to Conduct Discovery* ……... 16

B. Plaintiffs' Participation in Previous Class Action Settlements Do Not Bar
their PAGA Claims in this Action ……………………………………… 17

　　　　1.　*The Claims in this Action are Different than those Raised in <u>Stark</u>
<u>Connell</u> and <u>Murphy</u>* ………………………………………… 20

　　　　　　　i.　　<u>Plaintiff Enko Telahun Did Not Resolve His Claims Through
the <i>Stark</i> Action</u> ………………………………………… 20

　　　　　　　ii.　<u>Plaintiff Enko Telahun Did not Resolve his PAGA Claims
Through the <i>Connell</i> Action</u> …………………………….…. 22

　　　　　　　iii.　<u>Plaintiffs Did Not Resolve Their Claims Through the
<i>Murphy</i> Action</u> ……………………………………….……… 22

　　　　2.　*Current Case Law Conclusively Demonstrates that Res Judicata
Does Not Bar the PAGA Claims in this Action* ………………………... 24

　　　　3.　*Defendants' Authorities are Distinguishable from the Present Action* .. 26

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON PAGA CLAIM (COUNT 9)
3:17-cv-05803-WHA

C.  Plaintiffs Are Aggrieved Employees ……………………………………..... 28

    1. *Plaintiffs Did Not Waive Their Labor Code Claim* …………………... 29

    2. *The Question of Whether Plaintiffs' are Aggrieved Employees is a Question of Fact that is Not Subject to Summary Judgment* ………….. 30

    3. *Plaintiffs are Entitled to Discovery to Identify a New Representative* ....31

D.  California Law Permits Plaintiffs to Recover Civil Penalties Pursuant to PAGA for Violations of Labor Code § 226 ……………………………… 32

V.  CONCLUSION ……………………………………………………………..... 33

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

1

2
# **TABLE OF AUTHORITIES**

3
**Page(s)**

4
**Cases**

5
*Anderson v. Liberty Lobby, Inc.*

6
    477 U.S. 242 (1986) ……………………..……………………………… 15

7
*Arias v. Superior Court*

8
    46 Cal.4th 969 (2009) ……………………………………………….. 33

9
*Bank of Cal., N.A. v. Opie*

10
    663 F.2d 977 (9th Cir. 1981) ……………………………………….... 15

11
*Bates v. United Parcel Service, Inc.*

12
    511 F.3d 974 (9th Cir. 2007) ………………………………………... 21

13
*Boeken v. Philip Morris USA, Inc.*

14
    48 Cal. 4th 788 (2010) …………………………………………… 17

15
*Brown v. Ralphs Grocery Co.*

16
    197 Cal.App.4th 489 (2011) ……………………………………… 23

17
*Cashcall, Inc. v. Superior Court*

18
    159 Cal.App.4th 273 (2008) …………………………………………… 31

19
*Celotex Corp. v. Catrett*

20
    477 U.S. 317 (1986) ……………………………………………….. 14, 15

21
*Citizens for Open Access to Sand and Tide, Inc. v. Seadrift Ass'n*

22
    60 Cal.App.4th 1053 (1998) …………………………………………... 18

23
*Cochoit v. Schiff Nutrition International, Inc.*

24
    227 F.Supp.3d 1119 (C.D. Cal. 2017) ………………………………… 26

25
*Consumer Advocacy Group, Inc. v. ExxonMobil Corp.*

26
    168 Cal.App.4th 675 (2008) …………………………………………... 18

27

28
**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)**
3:17-cv-05803-WHA

*Delgado v. New Albertson's Inc.*

    2009 U.S. Dist. LEXIS 134841 (C.D. Cal. Dec. 15, 2009) …………………..… 33

*Dunlap v. Superior Court*

    142 Cal.App.4th 330 (2006) …………………………………………………..... 23

*Federal Home Loan Bank of San Fran. v. Countrywide Financial Corporation*

    214 Cal.App.4th 1520 (2013) … 27

*First American Title Ins. Co. v. Superior Court*

    146 Cal.App.4th 1564 (2007) ………………………………………………….. 21

*Garnett v. ADT,* LLC

    139 F.Supp.3d 1121 (E.D. Cal. 2015) ………………………………………..… 33

*Hesse v. Sprint Corp.*

    598 F.3d 581 (9th Cir. 2010) …………………………………………………... 19

*Hill v. R+L Carriers, Inc.*

    690 F.Supp.2d 1001 (N.D. Cal. 2010) ………………………………………... 14, 15

*Holak v. K Mart Corp.*

    2015 U.S. Dist. LEXIS 65439 (E.D. Cal. 2015) ………………………………..… 29

*House v. Bell*

    547 U.S. 518 (2006) …………………………………………………………....... 14

*Howard v. America Online, Inc.*

    208 F.3d 741 (9th Cir. 2000) ………………………………………………...… 17

*Huff v. Securitas Sec. Servs. USA, Inc.*

    23 Cal.App.5th 745 (2018) …………………………………………………….. 29

*Jeske v. Maxim Healthcare Servs., Inc.*

    2012 U.S. Dist LEXIS 2963 (E.D. Cal. 2012) ………………………………… 29

*La Sala v. American Sav. & Loan Assn.*

    5 Cal.3d 864 (1971) ……………………………………………………………. 31

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON PAGA CLAIM (COUNT 9)

*Lopez v. Friant & Assocs., LLC*

    16 Cal.App.5th 773 (2017) ……………………………………………….... 32, 33

*Louie v. BFS Retail and Commercial Operations, LLC*

    178 Cal.App.4th 1544 (2009) ……………………………………………….. 19

*Mata v. Manpower, Inc.*

    2016 U.S. Dist. LEXIS 11761 (N.D. Cal. Mar. 14, 2016) ………………… 18, 25

*Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*

    475 U.S. 574 (1986) ……………………………………………………….... 15

*Murphy v. Kenneth Cole Productions, Inc.*

    40 Cal.4th 1094 (2007) …………………………………………………….... 33

*Mycogen Corp. v. Monsanto Co.*

    28 Cal.4th 888 (2002) …………………………………………………………. 17

*Nangle v. Penske Logistics, LLC*

    2012 WL 12996852 (S.D. Cal. Oct. 30, 2012) ………………………… 19, 25, 26

*Navarro v. Mukasey*

    518 F.3d 729 (9th Cir. 2008) ……………………………………………….... 19

*Norse v. City of Santa Cruz*

    629 F.3d 966 (9th Cir. 2010) …………………………………………….…. 15

*Petherbridge v. Atladena Fed. Sav. & Loan Assn.*

    37 Cal.App.3d 193 (1974) ………………………………………………….... 21

*Prieto v. U.S. Bank Nat. Ass'n*

    2012 U.S. Dist. LEXIS 141891 (E.D. Cal. Sept. 30, 2012) …………… 18, 19, 25

*Richardson v. Wells Fargo Bank, N.A.*

    839 F.3d 442 (5th Cir. 2016) ……………………………………………..… 28

*Safeco Ins. Co. of America v. Superior Court*

    173 Cal.App.4th 814 (2009) ……………………………………………………… 31

/ / /

*Ser Lao v. H&M Hennes & Mauritz, L.P.*
    2017 U.S. Dist. LEXIS 177135 (N.D. Cal. Oct. 25, 2017) ……………. 17, 18, 24

*Shappell Industries, Inc. v. Superior Court*
    132 Cal.App.4th 1101 (2005) ……………………………………….. 21

*Simmons v. Navajo County, Arizona*
    609 F.3d 1011 (9th Cir. 2010) ………………………………………..... 15

*State Farm Fire & Cas. Co. v. Geary*,
    699 F.Supp.756 (N.D. Cal. 1987) ………………………………………… 14

*Unova v. Acer, Inc.*
    363 F.3d 1278 (9th Cir. 2004) …………………………………………… 19

*Villacres v. ABM Industries Inc.*
    189 Cal.App.4th 562 (2010) …………………………………………..... 25, 26, 27

*Williams v. Boeing Co.*
    517 F.3d 1120 (9th Cir. 2008) …………………………………………… 19

*Williams v. Superior Court*
    3 Cal.5th 531 (2017) ……………………………………………………….18

**Statutes**

California Code of Civil Procedure
    Section 1638 ……………………………………………………………….19
    Section 1639 ……………………………………………………………….19
    Section 1641 ……………………………………………………………….19
    Section 1647 ……………………………………………………………….19

California Labor Code
    Section 226 ……………………………………………………… 32, 33
    Section 558 ……………………………………………………….. 30
    Section 2698 et seq. …………………………………………………….10
    Section 2699 …………………………………………………… 28, 32

7

Section 2699.3 …………………………………………………………… 32

Section 2699.5 …………………………………………………………… 32

Federal Rules of Civil Procedure

Rule 8 …………………………………………………………………... 15

Rule 56 …………………………………………………………………… 14

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON PAGA CLAIM (COUNT 9)

## MEMORANDUM OF POINTS AND AUTHORITIES

## II.    INTRODUCTION

It is evident that Defendants' Motion for Summary Judgment should be denied. As discussed below, Defendants' motion is premature as Defendants have failed to provide fair notice of the issues asserted in this motion. Defendants' have attempted to railroad Plaintiffs by refusing to produce information in written discovery that would have been helpful in defending this motion. Nonetheless, Defendants' reliance on outdated authority clearly and reassertion of arguments previously adjudicated indicates Defendants' desperate attempts to avoid liability. As discussed herein, recent case law clearly holds that a prior class action settlement will not bar the claims alleged in a subsequent action under the res judicata when the case involves distinct employment practices and policies; and/or the scope of the release in the previous settlement is not intended to encompass the claims in the latter one. Specifically, there is no evidence from the pleadings alone that plaintiffs in the prior class actions were not paid for training time, which means it is impossible to determine if they had standing to assert such claims. Moreover, Defendants attempt to misrepresent the facts and applicable law in this matter undoubtedly suggest that there are genuine issues of material fact to be determined. Accordingly, Plaintiffs request that this Court deny Defendants' motion in its entirety or in the alternative that the Court continue the hearing to allow Plaintiffs additional time to obtain affidavits or discovery related to the issues raised in Defendants' motion.

## III.    STATEMENT OF FACTS

### A.    Plaintiffs' Employment with CVS

Plaintiff Sigfredo Cabrera was employed by CVS from approximately January 2016 to January 2017 as a non-exempt pharmacy service associate and a non-exempt pharmacy technician. EFC No. 52-1, Second Amended Complaint ["SAC"], paragraph

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

12.  Plaintiff Enko Telahun was employed by CVS from approximately June 2010 to February 2017 as a non-exempt pharmacist and pharmacy manager. SAC, ¶13.

### B.    This Action

This matter is a class[1] and representative action for various wage and hour claims against Defendants CVS Rx Services, Inc., CVS Pharmacy, Inc. and Garfield Beach CVS, LLC ("Defendants" or "CVS") that was initially filed by Plaintiff Sigfredo Cabrera on August 3, 2017 in Alameda County Superior Court.  On September 5, 2017, Plaintiff Cabrera amended the action to include Plaintiff Enko Telahun as a named representative and an additional claim for civil penalties pursuant to the Private Attorneys General Act of 2004 (codified in Labor Code § 2698 *et seq*., "PAGA"). On or about October 9, 2018, Defendants moved this action to the United States District Court for the Northern District of California pursuant to the Class Action Fairness Action. EFC No. 1. On or about March 19, 2018, pursuant to the Court's March 16, 2018 order, Plaintiffs filed a Second Amended Complaint, the operative complaint in this action.

The operative complaint alleges that Plaintiffs and other current and former pharmacists, pharmacy managers, pharmacy service technicians, and pharmacy sales associates (collectively "pharmacy employees") were not paid minimum wages and/or overtime compensation for time spent participating in CVS mandated training modules outside of their scheduled work hours and/or during meal and rest breaks. SAC at ¶ 1. Plaintiffs also allege that Defendants had a policy, practice and/or procedure of instructing pharmacy employees to clock out, while requiring and expecting them to work during meal and rest breaks, as well as longer than their scheduled shifts in order to meet the demands of the pharmacy. *Id.* at ¶¶ 28-38, 42-45.

Plaintiffs further allege that as a policy, practice, and procedure Defendants required employees to work through their meal and rest breaks to complete mandatory

---

[1] The class action claims as to Plaintiff McNeely are currently stayed pending resolution of CVS's appeal. EFC. No. 60.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)

training modules and/or meet the needs of the pharmacy. *Id.* at ¶¶ 46-53. Additionally, when meal and/or rest breaks were taken they were often interrupted. *Id.* This is very true in the case of pharmacists, who were required to be available and remain on the premises at all times as they were often the only pharmacists scheduled to work. *Id.* Plaintiffs allege that Defendant did not provide them and other pharmacy employees with the opportunity to take a second meal period on days when they worked ten (10) or more hours. *Id.* As a result, Defendant failed to maintain accurate payroll records and Plaintiffs were not compensated appropriately, nor were they provided with adequate itemized wage statements. *Id.* at ¶¶ 56-58. Furthermore, Plaintiffs' allege that Defendants failed to compensate them for necessary work expenses when they were forced to use their own electronic device and internet to access and complete the mandatory trainings remotely and failed to reimburse pharmacy technicians for licensing and background checks. *Id.* at ¶¶ 54-55. Plaintiffs brings these claims in their representative capacity under PAGA. *Id.* at ¶¶ 162-173.

### C.    Unrelated Previous CVS Settlements

#### 1.   The *Stark* Lawsuit

The *Stark* class action lawsuit was filed in Los Angeles Superior Court on or about January 5, 2012 on behalf of "floater" pharmacists employed in Region 65 of CVS's retail operations. Defendants' Request for Judicial Notice ["Defs' RJN"], Exhibit 12. The complaint alleges that CVS failed to pay floater pharmacist for "any time spent for 'floating' between stores or reimbursed the non-commute mileage expenditures necessarily incurred" while performing their job responsibilities.[2] *Id.*, at ¶¶ 1, 18.

Specifically, the release in the *Stark* class action settlement is limited to claims related to the practice of not paying floater pharmacists for travel time and travel reimbursement:

---

[2] No other employment practices are identified or described in the complaint.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON PAGA CLAIM (COUNT 9)

All claims, causes of action, damages, restitution, penalties and other relief based on the allegations of wrongdoing, which, <u>based on the facts pled relating to the allegations that CVS pharmacists were not properly paid for their time, nor reimbursed for their expenses, when traveling between CVS stores in California during the Class Period,</u> were alleged in the operative complaint in each of the Actions for violations of any state laws (including but not limited to the California Labor Code, California Industrial Welfare Commission Wage Orders, California's Unfair Business Practices law, and PAGA), or any other claims in law or equity <u>regarding travel time and expenses,</u> to the extent the claims, causes of action, damages, restitution, penalties and other relief arose out of the alleged failure to pay minim wage, failure to pay overtime compensation, failure to reimburse all necessary expenditures, failure to timely pay wages each pay period including but not limited to final wages, the failure to provide accurate itemized wage statement, or alleged unpaid wages for <u>"off the clock" work and for travel expenses.</u> Plaintiffs' Request for Judicial Notice ["Plfts' RJN"], Exhibit 3 (emphasis added).

## 2. The *Connell* Lawsuit

The *Connell* class action lawsuit was filed in Los Angeles Superior Court on or about October 2, 2013 on behalf of pharmacists who were employed in Region 65 of CVS's retail operations. Defs' RJN, Exh. 16. The complaint alleged that CVS violated California law by employing pharmacists for more than six consecutive days. *Id.* at ¶ 1.

The release in *Connell* is specifically limited to claims based on the practice of requiring pharmacists to work seven consecutive days:

All claims, causes of action, damages, restitution, penalties and other relief <u>based on the allegations of wrongdoing, which, based on the facts plead, were allege in the operative complaints in each of the Actions</u> for violations of any state laws (including but not limited to the California Labor Code, California Industrial Welfare Commission Wage Orders, California's Unfair Business Practices law and PAGA), or any other claims in law or equity, <u>to the extent the claims,</u> causes of action, damages, restitution, <u>penalties</u> and other relief <u>arise out of the alleged seven-consecutive day schedule,</u> failure to pay overtime compensation, failure to timely pay final wages, or failure to provide accurate itemized wage statements, <u>relating to working seven days in a row</u>… Plfts' RJN, Exh. 4 (emphasis added).

## 3. The *Murphy/Ortiz* Lawsuit

The *Murphy* class action lawsuit was filed in Los Angeles Superior Court on or about July 5, 2011 on behalf of other all employees of CVS pharmacies located in

12

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

California, <u>excluding managers and pharmacists</u> who were subject to CVS's security
inspection policy and practice and the recording of confidential communications. Defs'
RJN, Exh. 3, ¶¶ 1-2, 4 (emphasis added). The *Ortiz* class action lawsuit was filed in
September 2012 in the Alameda Superior Court.  The action was later removed to the
Northern District of California. Defendants' Motion for Summary Judgment ["Defs'.
Mot."], page 6. The *Ortiz* action sought to represent non-exempt employees of CVS in
California who were also subject to CVS's unlawful policies and practices, including
<u>security searches, requiring travel to deliver merchandise, and/or engaging in work
duties off the clock</u>. Defs' RJN, Exh. 10, ¶¶ 18-20 (emphasis added).  On or about
September 2, 2016, the *Murphy* and *Ortiz* lawsuits lodged a consolidated complaint with
the Los Angeles Superior Court. *Id*., Exh. 4. The lodged complaint seeks to represent all
similarly situated employees in CVS pharmacies and retail stores located in the state of
California, excluding exempt managers, who were subject to Defendants' <u>security
inspection policy and practice of unlawfully requiring off the clock work for waiting to
undergo a security inspection before clocking in and after clocking out and leaving the
store for a meal and/or rest break</u>. *Id*., at ¶¶ 21, 26-38 (emphasis added).

The release in the *Murphy*/*Ortiz* lawsuit is limited to claims related to CVS's bag
check policy:

> [A]ny and all claims charges, demands, liens, agreements,
> contracts, covenants, actions, suits, causes of action, disputed
> wages, obligations, debts, expenses, attorneys' fees, damages,
> penalties, interest, judgments order and liabilities of whatever
> kind or nature in law, equity or otherwise, whether now known
> or unknown…<u>which are based on claims involving off the clock
> security inspections and the labeling of consumable items
> and/or merchandise during the Class Period</u> and all Claims that
> were alleged in the Actions or could have been alleged in the
> Actions <u>based on the same or similar factual allegations</u> therein,
> including without limitation, claims for: failure to pay regular
> and overtime wages, failure to provide timely and accurate
> wage statements, failure to provide compliant meal and rest
> periods, failure to comply with pay day rules and violation of
> Cal. Bus. & Prof. Code §§ 17200 et seq., and any additional
> claims for penalties, damages or wages predicated on the same,
> including but not limited to PAGA penalties… Plfts' RJN, Exh.
> 1 (emphasis added).

13

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

The Class Period for the *Murphy*/*Ortiz* settlement is July 5, 2007 to October 3, 2016. Declaration of Howard Kobey ["Kobey Decl."], Exh. 1.

### D. The Court's Ruling in the Related *Chalian* Case

In the related case of *Sevag Chalian v. CVS Pharmacy, Inc. et al.*, USDC, Central District of California, Case No. 2:16-cv-08979-AB-AGR, Defendants CVS Pharmacy Inc., CVS Rx Services, Inc., and Garfield Beach CVS, LLC moved for Judgment on the Pleadings asserting that Plaintiff Chalian's claims are were barred by res judicata because he participated in previous class action settlements. On March 22, 2018, the Court issued an order denying Defendants' CVS Pharmacy Inc., CVS Rx Services, Inc. and Garfield Beach CVS, LLC's Motion for Judgment on the Pleadings. *See* Plfts' RJN, Exh. 2. The court's ruling affirmed that that Plaintiff Chilian's claims, which are based on CVS's alleged failure to pay him for time spent on mandatory training activities, were not barred by res judicata since the factual predicate of the claims are different from the factual predicates of the claims resolved in the previous settlements. *See id.*

## IV. LEGAL STANDARD

The Federal Rules of Civil Procedure, Rule 56 governs motions for summary judgment. Generally, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Rule 56 permits generally partial summary judgment in order to limit the issues to be tried. *State Farm Fire & Cas. Co. v. Geary*, 699 F.Supp.756, 759 (N.D. Cal. 1987). The moving party "bears the burden of showing that there is no material factual dispute." *Hill v. R+L Carriers, Inc.*, 690 F.Supp.2d 1001, 1004 (N.D. Cal. 2010). At the summary judgment stage, the court does not "assess the creditability or weigh of the evidence, but merely determines whether there is a genuine factual issue for trial. *House v. Bell*, 547 U.S. 518, 559-560 (2006). A fact is "material" if it "might affect the outcome of the

14

litigation under the governing law, and a dispute as to a material fact is "genuine" if there is sufficient evidence for a trier of fact to decide in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Hill v. R+L Carriers, Inc.*, 690 F.Supp.2d at 1004 citing *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In diversity cases, such as the one here, the state law creating the right to sue governs the issues such as the elements of the causes of action, measure of damages and applicable defenses. *Bank of Cal., N.A. v. Opie*, 663 F.2d 977, 980 (9th Cir. 1981).

## V. ARGUMENT

### A. Defendants' Premature Motion for Summary Judgment is an Improper Attempt to "Railroad" Plaintiffs

In order for a motion for summary judgment to be properly before the court the non-moving party must have reasonable notice, including the opportunity for discovery. *Norse v. City of Santa Cruz*, 629 F.3d 966, 972 - 973 (9th Cir. 2010). The notice requirement is key as it prevents the opposing party from being "railroaded" by a premature motion for summary judgment. *Celotex Corp.*, 477 U.S. at 322, 326.

#### 1. Plaintiff Sigfredo Cabrera was Not Provided with Fair Notice

Pursuant to the Federal Rules of Civil Procedure, Rule 8 an answer must contain defendant's defenses to each claim asserted. Failure to raise particular affirmative defense or plead with such specificity, deprives plaintiff "fair notice" of the defense. *Simmons v. Navajo County, Arizona*, 609 F.3d 1011, 1023 (9th Cir. 2010).

In this case, Defendants failed to provide Plaintiff Cabrera with "fair notice" as to their affirmative defenses that Plaintiff Cabrera's PAGA claims are barred by res judicata and that Plaintiff Cabrera's allegedly released call claims he may have against Defendants. *See* EFC No. 61. As a result, Plaintiff Cabrera has been unable to conduct discovery on Defendants' assertions raised in this motion. This is primarily true, as the

Case 2:16-cv-08979-AB-AGR Document 96-1 Filed 06/28/19 Page 17 of 145 Page ID
#:3464
Case 3:17-cv-05803-WHA Document 75 Filed 06/26/18 Page 17 of 53 Page ID
#:3464

1  information relied upon by Defendants is in their sole possession. Accordingly,

2  Defendants' motion for summary judgment with respect to Plaintiff Cabrera is

3  premature and improper as Defendants have failed to provide him with reasonable

4  notice, including the opportunity to conduct reasonable discovery on the defenses

5  asserted by Defendants.

6  **2.  Plaintiffs have Not had The Opportunity to Conduct Discovery**

7  Defendants have unilaterally denied Plaintiffs the opportunity to conduct

8  discovery on the relevant facts on which their summary judgment motion is based.  To

9  date, Plaintiffs have propounded 10 interrogatories and 12 requests for production of

10  documents upon Defendants' however have provided boilerplate responses, meritless

11  objections, abused the meet and confer process, and has refused to produce information

12  that was promised.  (Declaration of R. Craig Clark ["Clark Decl."], paragraphs 3-10.

13  Specifically, Plaintiffs requested all documents related their employment, including

14  involvement in past settlements, training records, and time record data. *Id*. Defendants,

15  however, have failed to produce many of the documents requested including those used

16  in support of its motion, including but not limited to the notice of class action settlement

17  in the *Connell* matter. *Id*. at ¶ 10. Plaintiffs have also requested the identity, contact and

18  employment information for all allegedly aggrieved employees. *Id*. at ¶ 4. Plaintiffs'

19  written discovery further requested documents related to Defendants' policies and

20  practices surrounding the various training requirements, meal and rest periods, payment

21  of meal and/or rest period premiums, and the job responsibilities for pharmacy

22  employees in California. *Id*. at ¶¶ 3-10. Despite a number of meet and confer efforts

23  regarding the production of the sought information, and a number of false promises by

24  CVS to produce the requested information, Plaintiffs have yet to obtain any meaningful

25  discovery in this matter.  *Id*. at ¶¶ 11-12. As such, Plaintiffs are ill prepared to address a

26  number of the issues raised by Defendants' motion, including whether Plaintiffs are

27  aggrieved employees.  *Id*. at ¶ 13.

28

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON PAGA CLAIM (COUNT 9)**

In addition, to the outstanding discovery, Plaintiffs will propound discovery, which will show the location and time when Plaintiffs and other pharmacy employees conducted their mandatory trainings. *Id.* at ¶ 14. Plaintiff will also seek to depose Defendants' person most knowledgeable regarding CVS's LEARNet system, time keeping system, payroll systems, and policies and practices of compensating pharmacy employees. *Id.* Plaintiffs reasonably believe that such information will not only assist in advancing this litigation but will assist in determining whether there is a genuine issue of material fact as to whether Plaintiffs' are aggrieved employees. *Id.* at ¶ 15.

Because, Plaintiffs have been denied the reasonable opportunity to conduct discovery on the issues raised in Defendants' motion, Plaintiff respectfully requests that Defendants' motion be denied as premature, or in the alternative Plaintiffs request that this Court continue the hearing to allow Plaintiffs additional time to obtain affidavits or discovery related to the issues raised in Defendants' motion.

**B. Plaintiffs' Participation in Previous Class Action Settlements Do Not Bar their PAGA Claims in this Action**

While it is true that claim preclusion in federal court can be based on a prior state court settlement, the preclusive effect of a state court judgment is determined by state law. *See Ser Lao v. H&M Hennes & Mauritz, L.P.*, 2017 U.S. Dist. LEXIS 177135, *10 (N.D. Cal. Oct. 25, 2017), *citing Howard v. America Online, Inc.*, 208 F.3d 741, 748 (9th Cir. 2000).

Under California law, "[r]es judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or people in privity with them." *Id., quoting Mycogen Corp. v. Monsanto Co.*, 28 Cal.4th 888, 896 (2002). Res judicata applies when three conditions are met: (1) the prior proceeding resulted in a judgment on the merits; (2) the present action is on the same cause of action as the prior proceeding; and (3) the party to be precluded was a party or in privity with a party to the prior proceeding. *Id.* at *11, *citing Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th

17

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

788, 797 (2010)*; see also Mata v. Manpower, Inc.*, 2016 U.S. Dist. LEXIS 11761, *19-20 (N.D. Cal. Mar. 14, 2016).  "Even if these threshold requirements are established, res judicata will not be applied 'if injustice would result or if the public interest requires relitigation not be foreclosed.'" *Mata*, 2016 U.S. Dist. LEXIS 11761 at *20, *quoting Consumer Advocacy Group, Inc. v. ExxonMobil Corp.*, 168 Cal.App.4th 675, 686 (2008); *see also Citizens for Open Access to Sand and Tide, Inc. v. Seadrift Ass'n*, 60 Cal.App.4th 1053, 1065 (1998).

California courts typically apply the primary rights theory to determine whether a second complaint states a new cause of action.  Under the primary rights theory, a claim arises from the harm suffered as opposed to particular legal theory of recovery.  *Ser Lao*, 2017 U.S. Dist. LEXIS 177135 at *11.  In the class action[3] context, courts will refuse to apply the doctrine of res judicata where: (1) the claims arise from different employment practices and policies and/or (2) the scope of a previous class action release does not encompass the claims in the pending action.  *Id.* at *13-14 (finding no res judicata where prior class action arose from different employment practices and where scope of release was limited to facts alleged or which could have been alleged in the complaint, which did not include any of the factual allegations contained in pending class action; also holding scope of prior release to be dispositive on the issue of res judicata); *see also Mata*, 2017 U.S. Dist. LEXIS 11761 at *7 (finding no res judicata where different employment practices were involved and where release in prior case was never intended to include claims in pending action); *Prieto v. U.S. Bank Nat. Ass'n*, 2012 U.S. Dist. LEXIS 141891, *16-26 (E.D. Cal. Sept. 30, 2012) (noting that cases involving class action settlements under California law employ the doctrines of claim or issue preclusion even when using the word "release"; finding no res judicata where

---

[3] Although there are differences between a class action and an action under PAGA, there is a considerable relationship in their forms that courts draw on when assessing issues regarding PAGA. *See e.g. Williams v. Superior Court*, 3 Cal.5th 531, 547-549 (2017).

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

1    harm in pending case was misclassification and harm in prior case was refusal to pay

2    non-exempt employees); *Louie v. BFS Retail and Commercial Operations, LLC*, 178

3    Cal.App.4th 1544, 1554-55 (2009) (looking to consent decree in prior action to

4    determine res judicata effect).

5         A class action release is a contract ordinarily governed by state law.  *Navarro v.*

6    *Mukasey*, 518 F.3d 729, 733 (9th Cir. 2008).  Under California law, a contract must be

7    interpreted as to give effect to the mutual intention of the parties as it existed at the time

8    of contracting.  *See Unova v. Acer, Inc.*, 363 F.3d 1278, 1281 (9th Cir. 2004).  "'The

9    language of a contract is to govern its interpretation, if the language is clear and explicit,

10   and does not involve an absurdity,' Cal. Civ. Code § 1638, and '[t]he whole of a

11   contract is to be taken together,' *id.* § 1641. '[T]he intention of the parties is to be

12   ascertained from the writing alone, if possible ...,' *id.* § 1639, yet '[a] contract may be

13   explained by reference to the circumstances under which it was made, and the matter to

14   which it relates,' *id.* § 1647." *Id.*

15        "Even when relying on California contract principles in interpreting a class

16   release, the Ninth Circuit has cautioned that while a defendant 'may have drafted the

17   settlement agreement to include as broad a release as possible, the release would only

18   have been *enforceable* as to subsequent claims relying upon a legal theory different

19   from that relied upon in the class action complaint but depending upon the same set of

20   facts.'" *Prieto*, 2012 U.S. Dist. LEXIS 141891 at *17, *quoting Williams v. Boeing Co.*,

21   517 F.3d 1120, 1134 (9th Cir. 2008) (emphasis in original); *see also Hesse v. Sprint*

22   *Corp.*, 598 F.3d 581, 591 (9th Cir. 2010) (class action settlement agreement may only

23   preclude a party from bringing a related claim in the future if the released claim is based

24   on the identical factual predicate as that underlying the claims in the settled class

25   action); *Nangle v. Penske Logistics, LLC*, 2012 WL 12996852, *2 (S.D. Cal. Oct. 30,

26   2012).

27

28

With these principles in mind, it is clear that Plaintiffs' previous "participation" in the *Murphy, Stark*, and *Connell* settlements will not bar this action on res judicata grounds.

### 1. The Claims in this Action are Different than those Raised in *Stark Connell* and *Murphy*

A brief review of the complaints and releases in the *Stark*, *Connell*, and *Murphy* class actions reveals that the claims being asserted in this Action arise from a wholly distinct employment practices than the ones litigated and settled in the *Stark*, *Connell* and *Murphy* matters. Moreover, the releases in each of the cases are specifically tied to the employment practices and policies discussed in the complaints.

### i. Plaintiff Enko Telahun Did Not Resolve His Claims Through the *Stark* Action

As shown above, the *Stark* complaint is premised on Defendants' employment practice(s) of not paying "floater" pharmacists for travel time when travelling between stores and not reimbursing their expenses related to travel. Thus, the harm or injury in *Stark* is not being paid for travel time and not being properly reimbursed for travel expenses. By contrast, the injury in this lawsuit is not being paid for time spent on mandatory training.

With respect to the release in *Stark* they are limited to claims "based on the facts pled relating to the allegations that CVS pharmacists were not properly paid for their time, nor reimbursed for their expenses, when traveling between CVS stores in California during the Class Period". Plfts' RJN, Exh. 3, ¶ 12(a) (emphasis added). As such, there is no question that the unpaid training time claims in this case are not related to the claims that floater pharmacists were not paid for travel time or reimbursed for their travel expenses. They are separate distinct harms resulting from different employment practices. Moreover, there is no language in the release about claims "which could have been asserted" or releasing wage and hour claims "of any type." As

such, the scope of the prior release does not and cannot include the claims in this case. Certainly, any class member reviewing the *Stark* release could not have reasonably concluded that it would preclude a subsequent action based on unpaid training time. Therefore, the idea that Plaintiff Telahun waived and/or released such rights is nonsensical in light of the fact that the scope of the release - by its plain language - does not include claims arising from unpaid training time.

Equally as erroneous is CVS's argument that the unpaid training claims could have been asserted in the *Stark*. There is no indication from the pleadings alone[4] that the plaintiffs involved in the *Stark* matters were also deprived of pay related to mandatory training modules, which is required in order to have standing to assert such a claim. *See Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (in the class action context, class plaintiff must meet standing requirements, which includes a showing that the injury suffered is fairly traceable to the challenged conduct); *Petherbridge v. Atladena Fed. Sav. & Loan Assn.*, 37 Cal.App.3d 193, 2000 (1974) ("A plaintiff seeking to maintain a class action must be a member of the class he claims to represent."); *accord First American Title Ins. Co. v. Superior Court*, 146 Cal.App.4th 1564, 1573 (2007).

Suffering the same or similar injury resulting from a common employment practice is also required for purposes of manageability. Because there is no indication from the pleadings that the *Stark* plaintiff also experienced unpaid training time, there is no basis to conclude the typicality requirement could have been met if such claims were asserted. This is further reason to conclude that the unpaid training time claims could have not have been alleged in the prior class actions.

/ / /

---

[4] Issues of standing are generally determined by reference to the allegations made in the complaint. *Shappell Industries, Inc. v. Superior Court*, 132 Cal.App.4th 1101, 1111(2005).

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

Case 2:16-cv-03870-AB-GJS Document 86-1 Filed 06/28/18 Page 22 of 145 Page ID
Case 3:17-cv-05803-WHA Document 75 Filed 06/26/18 Page 23 of 33 Page ID
#:3470

### ii.     Plaintiff Enko Telahun Did not Resolve his PAGA Claims Through the *Connell* Action

The *Connell* complaint is based on Defendants' employment practice of not paying the overtime premium with respect to pharmacists who worked seven days in a row.  The *Connell* action does not involve any claim for unpaid required training time. There is also no indication based on the pleadings that the *Connell* plaintiff was not paid for his mandatory training time.  Therefore, there is no indication an unpaid training time claim could have been asserted in the prior actions.  Tellingly, Defendants do not offer an explanation as to how the *Connell* plaintiff could assert such a claim and still have standing.

In regard to the release of claims, the *Connell* release is limited to claims "<u>based on the facts plead, were alleged in the operative complaints in each of the Actions</u> for violations of any state laws…"  Plfts'. RJN, Exh. 4, ¶ 17(a). Again, there is no language in the releases about claims which "could have been asserted" or language releasing "wage and hour claims of any kind."  Accordingly, the express language of the release does not include the claims in this case relating to unpaid training time.  Moreover, a reasonable class member, such as Plaintiff Telahun, could not have been expected to understand that the scope of the prior releases included the unpaid training claims in this case given the plain meaning of the releases.[5]

### iii.     Plaintiffs Did Not Resolve Their Claims Through the *Murphy* Action

As discussed above, the operative complaint in the initial complaint *Murphy/Ortiz* action is founded upon CVS's security inspection policy and practice of unlawfully requiring off the clock work for waiting to undergo a security inspection before clocking in and after clocking out and leaving the store for a meal and/or rest break. Defs' RJN,

---

[5] The fact that no reasonable class member would have understood the scope of the releases in the previous cases to include the claims in this case means that an injustice would result if res judicata was applied, which is further grounds to deny this motion.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

Exh. 4 at ¶¶ 21, 26-38. The initial complaint in *Murphy*, specifically excluded

pharmacists. *Id.*, Exh. 2 at ¶ 1. Although the first amended complaint in the *Ortiz* action

refers to "performing training activities" the complaint for off the clock time, the

complaint fails to provide any detail as to what type of training activities it is

referencing. *Id.*, Exh. 10 at ¶ 20.  This language is vague and ambiguous as it could

include a number of training activities that do not involve the on-line training modules

asserted in this Action. Moreover, the training language is not included in the lodged

second amended complaint (Def. RJN, Exh.4), the declaration of Robert D. Newman

(*id*, at Exh 5), the Final Judgment or order granting final approval (*id.*, at Exhs. 5-6) or

the settlement agreement (Plfts' RJN, Exh. 1.)  In fact, the failure to consider the

training activities in the assessment of determining whether the settlement was fair,

reasonable and adequate suggests that such claims were not considered as part of the

consideration for which the settlement was being offered.  Accordingly, based on the

settlement documents, a reasonable class member, such as Plaintiffs in this action,

would conclude that the claims resolved in the action were those involving off the clock

time for security inspections and the labeling of consumable items and/or merchandise.

Accordingly, to find that Plaintiffs[6] resolved their claims under the *Murphy* settlement is

contrary the express language of the settlement documents. Moreover, to find otherwise,

would also be contrary to the public policy and purpose of PAGA.[7]

Even if the Court is inclined to find that the *Murphy* settlement resolved

Plaintiffs' PAGA claims, it is important to note that the Class Period for which the

---

[6] Plaintiff Cabrera did not submit a claim form and did not receive a settlement payment
under the *Murphy* settlement.  Kobey Decl., at ¶ 11. However, under the terms of the
Settlement he was deemed to have "forfeited" his rights. *Id.* at ¶ 9, Exh. 1.

[7] PAGA was adopted to empower aggrieved employees, acting as private attorneys
general to seek civil penalties for Labor Code violations. *Dunlap v. Superior Court*, 142
Cal.App.4th 330, 336-339 (2006). The relief provided by the statue is designed to
benefit the general public. *Brown v. Ralphs Grocery Co.*, 197 Cal.App.4th 489, 501
(2011).

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

release is applicable is July 5, 2007 to October 3, 2016. Since, both Plaintiff Cabrera

and Plaintiff Telahun were employed into 2017 and experienced Labor Code violations

from at least their last date of employment, Plaintiffs should not be found to have

resolved any claims from October 4, 2016 forward. As such, Plaintiffs did not resolve

all of their PAGA claims through *Murphy*.

### 2. Current Case Law Conclusively Demonstrates that Res Judicata Does Not Bar the PAGA Claims in this Action

Current case law from federal courts applying California's res judicata principles

conclusively shows that res judicata is not a bar to Plaintiff's claims in this lawsuit. For

example, in *Ser Lao v. H&M Hennes & Mauritz, L.P.*, the defendant argued, similar to

Defendants' position in this case, that a prior class action barred a subsequent class

action for waiting time penalties because the previous case asserted the same Labor

Code violation. The court disagreed and found that because the claims arose from

different employment practices, there could be no res judicata effect. As the court

noted, the first-class action was predicated on the defendant's failure to provide meal

and rest breaks. The latter case, by contrast, related to "security checks" and "unpaid

wages based on incorrect regular rate of pay or ATM cards." *Ser Lao*, 2017 U.S. Dist.

LEXIS 1777135, at *14-15.

The *Ser Lao* court also held that the scope of the release in the previous class

action did not encompass the claims in the latter class action. This was so even though

the release in the previous class action included "all claims ... that were alleged ... or

<u>could</u> have been alleged based on the facts in the First Amended Complaint." *Id.* at *14

(emphasis added). As stated by the Court, "Because [the prior class action complaint]

did not include factual allegations regarding security checks or ATM cards, the resulting

[prior class action settlement and judgment] do not preclude Plaintiff's waiting time

claim based on those allegations." *Id.* The same conclusion should be reached with

respect to action and the *Murphy* release given the different factual allegations asserted.

24

In *Mata v. Manpower, Inc.*, the defendant argued that certain claims were barred by res judicata because of a prior class action settlement involving the same claims. The *Mata* court found that the prior and pending class actions were not the same, however, because the prior class action complaint was "predicated upon the late mailing of paychecks," whereas the pending complaint "alleged a failure to pay any wages whatsoever for certain hours worked." *Mata*, 2017 U.S. Dist. LEXIS 11761, at *22. Further, the *Mata* court found that the release in the prior class action complaint was only intended to encompass claims based on untimely receipt of paychecks, not claims based on a complete failure to pay. *Id.* The same conclusion should be reached in the present class action given the different employment practices at issue in the *Murphy*, *Stark*, and *Connell* cases and the narrow releases contained in those settlements, which are specifically tied to the employment practices and policies alleged in the complaints – none of which involve compensation for mandatory training modules.

In *Prieto v. U.S. Nat. Bank Ass'n*, the court refused to apply the doctrine of res judicata to bar a subsequent class action which, like the previous class action, also raised claims for unpaid overtime, meal and rest period violations, waiting time penalties, and unfair competition on behalf of US Bank employees.  The court held that the harm in the pending class action flowed from the defendant's alleged misclassification of the plaintiff.  By contrast, the prior class action flowed from defendant's refusal to pay hourly employees the wages due under the labor code. *Prieto*, 2012 U.S. Dist. LEXIS 141891 at *26.

Finally, in *Nangle v. Penske Logistics, LLC*, the court again refused to apply the doctrine of res judicata despite the fact that a previous class action case raised the same Labor Code violations as the pending one.  The court noted that the previous case arose from a different employment practice – defendant's use it or lose it vacation policy - whereas the present action arose from defendant's practice of auto-deducting a 30-minute meal period.  *Nangle*, 2012 WL 12996852 at *1-2.  The court further held that

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON PAGA CLAIM (COUNT 9)
3:17-cv-05803-WHA

the scope of the previous class action release "does not anticipate the overtime and meal and rest break claims that are currently before the Court." *Id.* at *2. In so ruling, the court distinguished the action before it from *Villacres v. ABM Indus. Inc.*, 189 Cal. App.4th 562, 589 (2010), noting that the plaintiff in *Villacres* raised an additional claim for damages based on the same operative facts. Unlike *Villacres*, the claims before the *Nangle* court arose out of a different policy than the one at issue in the prior class action. *Id.*[8]

### 3. *Defendants' Authorities are Distinguishable from the Present Action*

Defendants' cited authorities do not support its position that res judicata bars the PAGA claims in the present action. The primary case relied on by Defendants is *Villacres v. ABM Industries Inc.*, 189 Cal.App.4th 562 (2010). In *Villacres*, the plaintiff attempted to bring an action under PAGA based on the same employment practices and policies raised in a previously settled class action that did not expressly allege or purport to settle PAGA claims. *Villacres*, 189 Cal.App.4th at 570, 573-574. The court held that despite asserting different Labor Code violations in the pending action, the PAGA claims were nevertheless barred under the doctrine of res judicata because they could have been brought in the previous class action given they were related to the subject matter and issues raised in that case. *Id.* at 416. This differs from the instant action where the claims arise from different employment practices and different facts and therefore could not have been previously raised without creating standing issues. *Villacres* is entirely consistent with Plaintiff's position that unless the claims arise from the same or similar practices, res judicata is inapplicable.

---

[8] *See also Cochoit v. Schiff Nutrition International, Inc.*, 227 F.Supp.3d 1119 (C.D. Cal. 2017) (denying res judicata under California law where different misrepresentations were at issue in the pending and previous cases even though the two advertising schemes were misleading for the same reasons).

26

The *Villacres* court also discussed the broad release contained in the prior class action settlement.  The previous settlement released "*all claims ... which could have been* asserted against the [Employer] arising out of or related to *all claims* for wages, overtime pay, pay for all time allegedly worked but not compensated, and *all other claims* of any kind for wages, *penalties ....*"  *Id.* at 586 (emphasis in original). The court held that broad language such as this released claims which were not expressly enumerated in the settlement, including claims for penalties under the PAGA.  *Id.* at 586-587.  This differs from the releases in the *Stark*, *Connell* and *Murphy* settlements, which were all expressly tied to the employment practices alleged in the complaints.

Defendants' reliance on *Federal Home Loan Bank of San Fran. v. Countrywide Financial Corporation*, 214 Cal.App.4th 1520 (2013) is also unsupported.  In that case, the bank plaintiff sought to hold Countrywide liable as a "control person" with respect to misrepresentations made in connection with residential mortgage-backed securities.  The bank conceded in its complaint that the control person liability in the present action arose out of the same facts alleged in a previous action where the bank dismissed its claims with prejudice.  In essence, both actions sought to hold Countrywide liable as a control person for Countrywide securities.  *Id.* at 1531-1532. As stated by the court, "[b]y the Bank's own admissions, the [previous action] and [current action] involve the same parties and seek compensation for the same harm.  As a result, they 'involve the same primary right' and are the same cause of action for res judicata purposes."  *Id.* at 1532.

The court also concluded that res judicata would also apply to a fifth banking transaction not alleged in the previous case because it arose from the same practices alleged to be unlawful in the first action and therefore was within "the scope of the [prior] action, related to the subject matter and relevant to the issues, so that it *could* have been raised...."  *Id.* at 1529.  Like *Villacres*, *Federal Home* stands for the unremarkable proposition that claims based on the same or similar underlying conduct

27

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

as a previously litigated case may be barred by claim preclusion.  It does not hold, contrary to what Defendants suggest, that asserting the same statutory violations as alleged in a previous case will bar subsequent claims which are unrelated to the subject matter of the previous case.  Such a result would be contrary to the legislative purpose of the Labor Code.

With respect to *Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442 (5th Cir. 2016), the issue raised in that case was whether a prior California class action case premised on the same conduct (e.g. misclassification of home mortgage consultants) precluded a subsequent action brought under the Fair Labor Standards Act (FLSA).  The plaintiffs argued that despite the fact the prior case released all FLSA claims for mortgage consultants arising out of their misclassification, they nonetheless were not precluded from asserting the identical claims because they never opted-in to the previous case.  *Id.* at 445.  In other words, the cases in *Richardson* involved the exact same unlawful practice (misclassification of home mortgage consultants) and the exact same claims (FLSA).  That is a far cry from the situation here where the previous cases are based on completely unrelated employment practices.

Ultimately, Defendants' main authorities do not even remotely resemble the circumstances present in this case. They also do not hold that res judicata applies anytime someone participates in a prior class action premised on a completely different set of facts merely because the same statutory violations were plead and resolved.  In fact, to hold otherwise would go against the public policy behind PAGA.[9]

## C.    Plaintiffs Are Aggrieved Employees

Labor Code section 2699(a) provides that "any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development against…may, as an alternative, be recovered through a civil action brought but an aggrieved employee on behalf of himself or herself and other current or

---

[9] *See* Footnote 7.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

1  former employees…" The statue goes on to define an aggrieved employee as "any

2  person who was employed by the alleged violator and against whom one or more of the

3  alleged violations was committed." Labor Code § 2699(c). The California Court of

4  Appeal as interpreted these provisions to mean that "any Labor Code penalties

5  recoverably by state authorities may be recovered in a PAGA action by <u>a person who

6  was employed by the alleged violation and affected by at least one of the violations

7  alleged in the complaint.</u>" *Huff v. Securitas Sec. Servs. USA, Inc.*, 23 Cal.App.5th 745,

8  754 (2018) (emphasis added); *see also Jeske v. Maxim Healthcare Servs., Inc.* 2012

9  U.S. Dist LEXIS 2963, *37 (E.D. Cal. 2012); *Holak v. K Mart Corp.*, 2015 U.S. Dist.

10  LEXIS 65439, *12-13 (E.D. Cal. 2015).

### 1. *Plaintiffs Did Not Waive Their Labor Code Claims*

12  Defendants assert that Plaintiffs have no viable PAGA claim because they

13  voluntarily "waived, released, or dismissed" their Labor Code claims by participating in

14  previous class action settlements. However, as discussed above, Plaintiffs did not waive

15  and/or release their rights to bring their PAGA claims as the previous settlements are

16  predicated on a different set of facts than those asserted in this action. This action is

17  primarily based on the premises that CVS failed to pay them for time spent participating

18  in mandatory training activities. Even if this Court, were to find that Plaintiffs released

19  their PAGA claims based on the *Murphy* settlement, the time period for which this

20  action is cover, only overlaps for approximately two months. Furthermore, because

21  Plaintiff Cabrera was employed by CVS up until January 2017 and Plaintiff Telahun

22  was employed up until February 2017, Plaintiffs PAGA survive Defendants' motion

23  because Plaintiffs experienced the Labor Code violations outlined in the operative

24  complaint at least until their last date of employment; which was well after the release

25  of claims period in *Murphy*. In order to be an aggrieved employee, Plaintiffs only have

26  to be affected by at least one violation alleged in the complaint. Since, the operative

27  complaint alleges facts that the *Stark*, *Connell* and *Murphy* settlements are not

28

predicated on and the release period does not fully encompass the entire period of this Action, Plaintiffs can be found to be affected by at least one of the violations alleged in the complaint.[10]

Defendants' additional contention that Plaintiffs' waived their Labor Code claims in this case is factually incorrect and procedurally impossible. As reflected in the operative complaint, Plaintiffs are seeking civil penalties pursuant to PAGA for various violations of the Labor Code arising out of Defendants' policy and practice of forcing pharmacy employees to engage in training modules. SAC at ¶¶ 162-173. The mere fact that Plaintiffs dropped their individual right to recover damages pursuant to Labor Code section 558 under PAGA does not in any way suggest that Plaintiffs waived or abandoned the underlying Labor Code claims. In fact, a plain reading of the operative complaint adequately demonstrates that Defendants' contention is simply not true. Moreover, Defendants attempt to equate settling and/or dismissing claims and dropping a method of recovery if flawed and unsupported since there is no case law that demonstrates that the conduct is one in the same. This action is unlike the cases cited by Defendants to support their position as Plaintiffs have not settled the PAGA claims asserted in this action, Plaintiffs have not resolved the PAGA claims asserted in this action by any other means, and Plaintiffs have not dismissed their representative claims pursuant to PAGA. Accordingly, Plaintiffs have viable PAGA claims.

### 2. *The Question of Whether Plaintiffs' are Aggrieved Employees is a Question of Fact that is Not Subject to Summary Judgment*

The question of whether Plaintiffs are "aggrieved employees" under PAGA is a question of fact that is to be determined by the trier of fact. At this point in the litigation, Defendants have refused to produce any information related to the claims asserted in the action, including but not limited Plaintiffs' training records, Defendants'

---

[10] As discussed below, the question of whether Plaintiffs are aggrieved employees are questions of fact that can be determined after further investigation and discovery.

policies and practices surrounding its training requirements, and its meal and rest period policies. Clark Decl., at ¶¶ 12-13. Accordingly, to determine whether Plaintiffs were actually subject to at least one of the violations asserted in the operative complaint, is not something that cannot be readily determined and asserted by Plaintiffs due to the lack of discovery on the issue. *Id*. at ¶ 13. Thus, Plaintiffs request that this court deny Defendants' premature motion or in the alternative continue the hearing to allow Plaintiffs additional time to obtain affidavits or discovery related to the issue of whether Plaintiffs are in fact aggrieved employees.

### 3. *Plaintiffs are Entitled to Discovery to Identify a New Representative*

If a plaintiff is found to be precluded from being a representative, he is entitled to substitute in another representative, who has standing, in the place of the original representative. *Cashcall, Inc. v. Superior Court*, 159 Cal.App.4th 273, 288 (2008). In *La Sala v. American Sav. & Loan Assn.*, 5 Cal.3d 864 (1971), the Court held that if a named plaintiff cannot suitably represent the class, the court should afford plaintiff the opportunity to amend their complaint or add new individual plaintiffs or both. *La Sala v. American Sav. & Loan Assn.*, 5 Cal.3d at 872. Thus, a plaintiff may seek discovery for the purposes of identifying a new representative. *Safeco Ins. Co. of America v. Superior Court*, 173 Cal.App.4th 814, 828 (2009). Here, if Plaintiffs are found to be unsuitable representatives, Plaintiffs will continue to seek the information requested in Plaintiffs' first set of written discovery and additional information to adequately identify another suitable representative[11].

/ / /

/ / /

---

[11] On or about June 25, 2018, an amended PAGA letter was submitted to the California Labor and Workforce Development Agency on behalf of Sigfredo Cabrera, Enko Telahun, and Lynn Brickman.

31

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

### D. California Law Permits Plaintiffs to Recover Civil Penalties Pursuant to PAGA for Violations of Labor Code § 226

Defendants contend that Plaintiffs' claim for civil penalties pursuant to PAGA for violations of Labor Code § 226 fail because PAGA is a "gap-filler statute," which permits recover for sections of the Labor Code other than those for which a civil penalty is specifically provided. Defendants' position is unfounded as its argument is poorly rooted in the section of the statute that outlines the types of recovery permitted.[12] Moreover, Defendants' position is contrary to the plain reading of the statue and California law.

Here, Plaintiffs' seek to recover civil penalties under PAGA for violations of Labor Code § 226 as permitted by PAGA. *See* EFC No. 52-1, ¶ 169; EFC No. 52-2; EFC No. 52-3. The PAGA statute specifically provides that an aggrieved employee may commence a civil action "alleging a violation of <u>any</u> provision listed in Section 2699.5" so long as the specific procedural requirements are satisfied. Labor Code § 2699.3 (emphasis added). Section 2699.5 provides that an aggrieved employee may commence a civil action alleging a violation of "paragraphs (1) to (5), inclusive, (7), and (9) of subdivision (a) of Section 226." In fact, the PAGA statute specifically provides employers with the right to cure potential violations of Labor Code § 226(a) within 33 calendar days of the postmark date on the notice sent by the aggrieved employee. *See* Labor Code §§ 2699.3(c)(2)(A), 2699.3(c)(2)(B)(ii). Thus, if an aggrieved employee was not permitted to seek civil penalties for violations of Labor Code § 226, there would be no need for the statute to provide employers with the opportunity to cure potential violations. Accordingly, the plain reading of the statute permits an aggrieved employee, such as Plaintiffs in this action, to pursue civil penalties under PAGA for violations of Labor Code § 226.

---

[12] Labor Code § 2699(f) is commonly referred to as the default penalty, as the section outlines the civil penalty for violations for which there is not a civil penalty specifically provided. *See e.g. Lopez v. Friant & Assocs., LLC*, 16 Cal.App.5th 773, 778 (2017).

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PAGA CLAIM (COUNT 9)

3:17-cv-05803-WHA

Moreover, California courts have commonly permitted aggrieved employees to pursue claims under PAGA for violations of Labor Code § 226. *See e.g. Garnett v. ADT,* LLC, 139 F.Supp.3d 1121 (E.D. Cal. 2015); *Arias v. Superior Court*, 46 Cal.4th 969 (2009); *Delgado v. New Albertson's Inc.*, 2009 U.S. Dist. LEXIS 134841 (C.D. Cal. Dec. 15, 2009); *Murphy v. Kenneth Cole Productions, Inc.* 40 Cal.4th 1094 (2007). Notably, the court in *Lopez v. Friant & Assocs., LLC* recently held that because a representative action seeking civil penalties under PAGA is not an action for statutory damages; thus, a plaintiff does not have to demonstrate injury as a result of a knowing and intentional violation under Labor Code § 226(e)(1). *Lopez*, 16 Cal.App.5th at 784. Accordingly, Defendants' contention that Plaintiffs cannot seek civil penalties under PAGA is meritless. As such, Plaintiffs request that this Court deny Defendants' motion for summary judgment.

## VI.    CONCLUSION

For the reasons stated herein Plaintiffs' respectfully request that this Court deny Defendants' Motion for Summary Judgment in its entirety.  In the alterative, Plaintiffs respectfully request that this Court continue the hearing to allow Plaintiffs additional time to obtain affidavits or discovery related to the issues raised in Defendants' motion.

Dated: August 23, 2018            **CLARK LAW GROUP**

By:  _/s/ R. Craig Clark_____
                R. Craig Clark
                Monique R. Rodriguez
                Paige D. Chretien
                *Attorneys for Plaintiffs*

# EXHIBIT B

# CVS HEALTH ARBITRATION AGREEMENT

1.  **Mutual Agreement to Arbitrate Claims.**  The employee named below will be referred to here as "Employee," "You" or "Your".  CVS Pharmacy, Inc., including its affiliates, successors, subsidiaries and/or parent companies will be referred to here as "CVS" or "Company".  Under this Agreement, You and CVS agree that any dispute between You and CVS that is covered by this Agreement ("Covered Claims") will be decided by a single arbitrator through final and binding arbitration only and will not be decided by a court or jury or any other forum, except as otherwise provided in this Agreement.

2.  **Claims Covered by this Agreement.**  Except as otherwise stated in this Agreement, Covered Claims are any and all claims, disputes or controversies that CVS may have, now or in the future, against You or that You may have, now or in the future, against CVS or one of its employees or agents, arising out of or related to Your employment with CVS or the termination of Your employment.  Covered Claims include but are not limited to disputes regarding wages and other forms of compensation, hours of work, meal and rest break periods, seating, expense reimbursement, leaves of absence, harassment, discrimination, retaliation and termination arising under the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act ("ERISA"), Genetic Information Non-Discrimination Act, and other federal, state and local statutes, regulations and other legal authorities relating to employment.  Covered Claims also include disputes arising out of or relating to the validity, enforceability or breach of this Agreement, except as provided in paragraph 6, below, regarding the Class Action Waiver.

3.  **Claims Not Covered by this Agreement.**  This Agreement does not apply to claims raised in litigation pending as of the date You first received the Agreement or claims by You for workers compensation, state disability insurance or unemployment insurance benefits or claims for benefits under an employee benefit plan.  This Agreement does not prevent or excuse You (either individually or together with others) or CVS from using the Company's existing internal procedures for resolution of complaints, and this Agreement is not intended to be a substitute for the use of such procedures.  This Agreement does not prohibit You or CVS from filing: a motion in court to compel arbitration; a motion in court for temporary or preliminary injunctive relief in connection with an arbitrable controversy; or an administrative charge or complaint with any federal, state or local office or agency, including but not limited to the U.S. Department of Labor, Equal Employment Opportunity Commission or National Labor Relations Board.  Also excluded from this Agreement are disputes that may not be subject to a pre-dispute arbitration agreement as provided by the Dodd-Frank Wall Street Reform and Consumer Protection Act or any other binding federal law or legal authority.

4.  **Arbitration Proceedings.**

a.  **Initiation of a Claim.**  All claims in arbitration are subject to the same statutes of limitation that would apply in court. To initiate a claim, You or CVS must make a written demand for arbitration and deliver it (i) by hand or first class mail to the other party <u>and</u> (ii) by hand or first class mail or electronically to the American Arbitration Association ("AAA") within the applicable statute of limitations period.  Otherwise, the claim will be waived as provided for by applicable law.  An Employee may seek assistance from the AAA regarding the initiation of a claim by calling 877-495-4185 or sending an email to <u>casefiling@adr.org</u>.

b.  **The Written Demand.**  The written demand for arbitration must: identify the parties; state the legal and factual basis of the claim(s); and state the specific remedy or damages sought.  Any written demand for arbitration made to CVS must be directed to the CVS Legal Department (ATTN: VP, Employment Law), One CVS Drive, Woonsocket, RI 02895.  Any written demand for arbitration to the Employee will be sent to the last home address on file with the Company.  The arbitrator will resolve all disputes regarding the timeliness of the demand for arbitration.

c.  **Rules and Procedures.**  The arbitration will be administered by the American Arbitration Association ("AAA") and will be conducted in accordance with the Employment Arbitration Rules and Mediation Procedures of the AAA ("AAA Rules") then in effect. The AAA Rules can be found at the AAA website (<u>www.adr.org</u>), by calling the AAA at 800-778-7879, or by requesting a copy from the CVS Human Resources Department.  Pursuant to the AAA Rules, the parties will select the arbitrator by mutual agreement and will have the opportunity to conduct discovery, bring dispositive motions, be represented by attorney(s) (or not, as they prefer) and present witnesses and evidence at a hearing.  Unless You and CVS agree otherwise, the location of the arbitration hearing will be no more than 45 miles from the place where You are or were last employed by CVS.  The Federal Rules of Evidence will apply.  The arbitrator will follow the substantive law applicable to the case and may award only those remedies that would have been available had the matter been heard in court. Judgment may be entered on the arbitrator's decision and enforced in any court having jurisdiction.

d.  **Costs and Fees.**  CVS will pay all costs and expenses charged by the AAA or the arbitrator, including but not limited to the arbitrator's fees, except that, for claims You initiate, You will be responsible to pay the claim initiation fee charged under the AAA Rules; however, if Your claim initiation fee exceeds what a court in the jurisdiction would have charged You for filing a lawsuit based on Your claims, then You will be responsible only for the amount that the court would have charged, and CVS will pay the remaining amount to the AAA.  Each party will pay its own litigation costs and attorneys' fees, if any.  However, if any party prevails on a claim which affords the prevailing party attorneys' fees and litigation costs, the arbitrator is authorized to award attorneys' fees and/or litigation costs under the same standards a court would apply under applicable law.

**5.    Pre-Hearing Mediation.**  Prior to the arbitration hearing of any Covered Claim, You and CVS may engage in non-binding mediation under the employment mediation procedures of the AAA. If You and CVS agree to participate in mediation, CVS will pay all fees and costs charged by the AAA or the mediator.

**6.    Waiver of Class, Collective and Representative Actions ("Class Action Waiver").**  You and CVS agree to bring any Covered Claims in arbitration <u>on an individual basis only</u>; You and CVS waive any right or authority for any Covered Claims to be brought, heard or arbitrated as a class, collective, representative or private attorney general action.  The Class Action Waiver does not apply to any claim you bring as a private attorney general solely on your own behalf and not on behalf of or regarding others.  Notwithstanding any other provision of this Agreement or the AAA Rules, disputes regarding the validity, enforceability or breach of the Class Action Waiver will be resolved only by a civil court of competent jurisdiction and <u>not</u> by an arbitrator.  If, despite this Class Action Waiver, You file or participate in a class, collective or representative action in any forum, You will not be retaliated against, disciplined or threatened with discipline.  However, CVS will seek enforcement of this Agreement and the Class Action Waiver under the Federal Arbitration Act and seek dismissal of such class, collective or representative actions or claims.

**7.    Your Right to Opt Out of Arbitration.**    Arbitration is not a mandatory condition of Your employment at CVS.  If You wish, You can opt out of this Agreement for a limited time and, by doing so, not be bound by its terms.  To opt out, You must mail a written, signed and dated letter stating clearly that You wish to opt out of this Agreement to CVS Health, P.O. Box 969, Woonsocket, RI 02895.  <u>In order to be effective, Your opt out notice must be postmarked no later than **30 days** after the date you agree to the Agreement below.</u>

**8.    Other Provisions.**

**a.    Adequate Consideration.**  Both parties agree that the promises made in this Agreement by You and by CVS to arbitrate disputes, rather than litigate them before courts or other bodies, provide good and sufficient consideration for each other.

**b.    Entire Agreement.**  This Agreement is the full and complete agreement between You and CVS relating to the formal resolution of Covered Claims.  Neither party is relying on any representations, oral or written, about the effect, enforceability or meaning of this Agreement, except as specifically set forth in this Agreement.

**c.    Severability.**  If any portion of this Agreement is adjudged to be unenforceable, the remainder of this Agreement will remain valid and enforceable. In any case in which (a) a dispute is filed as a class, collective, representative or private attorney general action and (b) a civil court of competent jurisdiction finds part of the Class Action Waiver unenforceable, the action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Class Action Waiver that is enforceable will be enforced in arbitration.  If the Class Action Waiver is adjudged completely unenforceable, You and CVS agree that this Agreement is otherwise silent as to any party's ability to bring a class, collective or representative action in arbitration.

**d.    Governing Law.**  This Agreement is governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and evidences a transaction involving commerce.

**e.    Effective Date and Term.**  This Agreement takes effect immediately upon agreement by You and, unless you opt out as specified above, survives the termination of employment with CVS.

**f.    Non-Retaliation.**  It is against CVS policy for any Employee to be subject to retaliation if he or she exercises his or her right to assert claims under this Agreement, to opt out of this Agreement or to challenge this Agreement.  If You believe that You have been retaliated against, You should immediately report it to the CVS Human Resources Department or Ethics Line.  This Agreement does not in any way alter the at-will employment status between You and CVS.

**9.    Statement of Assent and Understanding.  By signing below, You acknowledge that You have carefully read this Agreement, that you understand and agree to its terms, that You have had the chance to ask questions about the Agreement, and that you have had or will have the chance to consult with your own legal counsel before the end of the opt out period described above.  You enter into the Agreement voluntarily and not in reliance on any promises or representations made by CVS other than those in the Agreement itself.  <u>You understand that by agreeing to this Agreement and not opting out, You and CVS are giving up the right to go to court to resolve Covered Claims and giving up the right to bring or participate in a class, collective or representative action brought on behalf of or regarding others on Covered Claims</u>.**

**AGREED:** CVS Pharmacy, Inc.

_____          _____          _____
Printed Name                                    Signature                                      Date

# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case No. 4:18-cv-06278-HSG
                              Volume I
                              Page 1 to 66
                              Exhibits: (22-28)

----------------------------------------------
RYAN HYAMS, an Individual, on behalf of himself,
and all others similarly situated,
                  Plaintiffs,

                    -VS-

CVS Health Corporation, a Rhode Island
Corporation, CVS PHARMACY, INC., a Rhode Island
Corporation, GARFIELD BEACH, CVS, LLC, a
California Corporation, and CVS RX SERVICES,
INC., a New York Corporation, DOES 1 through 25,
Inclusive,
                  Defendants.
------------------------------------------------

              *  *  *  *  *  *  *  *

        DEPOSITION of LORNE W. DUNKERTON, called

as a witness by and on behalf of the Plaintiffs,

pursuant to the applicable provisions of the

Rhode Island Rules of Civil Procedure, before

Lisa L. Gross, Registered Professional Reporter

and Notary Public in and for the State of Rhode

Island, held at:  Hampton Inn and Suites, 58

Weybosset Street, Providence, Rhode Island, on

November 21, 2019, commencing at 10:00 a.m.

Page 4

1                    P R O C E E D I N G S

2              ---------------------------------
                 LORNE W. DUNKERTON, SWORN.
3              ---------------------------------

4              DIRECT EXAMINATION BY MS. GUNN

5      Q.  Good morning, Mr. Dunkerton.  You and I

6    have met before, so you know who I am.  This

7    is actually a different case than the one we

8    met, we met in before.

9              My name is Beth Gunn, for the

10   record.  I'm an attorney who represents the

11   plaintiff Ryan Hyams in a class action that

12   has been filed against CVS.

13             There's a co-plaintiff and class

14   representative named Regine Duhone, and I

15   represent both of them in the class action

16   and their clams in a class action lawsuit

17   against CVS.

18             I understand that you are here today

19   to act as a federal rule of civil procedure

20   30(b)6 witness; is that correct?

21     A.  Yes.

22     Q.  And I believe that you are familiar with

23   what it means to be a federal rule of civil

24   procedure 30(b)6 witness?

1      A.   Yes.

2      Q.   So you and I met maybe two weeks ago in

3    another deposition, and I know that you were

4    deposed then, and I also know about your

5    background from that deposition, so I'm going

6    to skip a lot of those questions.

7      A.   Great.

8            MS. GUNN:  Can we maybe enter into a

9      stipulation that I can use any background

10     questions from a different deposition?

11           MS. ZARGAROF:  Sure, that's fine.

12           MS. GUNN:  So in the interest of

13     saving time today, okay, and we can cover, if

14     you have any issues about what those are.

15     Q.   But to the extent that it's necessary to

16    refer to your background at any time, I would

17    like to incorporate the questions that I

18    asked you about your background in the prior

19    deposition in a different matter, the matter

20    of Ryan Hyams versus CVS, that is a

21    discrimination case, as opposed to this

22    pending case; is that okay with you?

23     A.   Sure.

24     Q.   And I'm assuming no changes in your

1      the topics, so that's fine.

2        Q.   Mr. Dunkerton, if you can look at the

3      caption on this, it lists several CVS

4      entities, and I believe there's another CVS

5      entity that is RX Drug Services, LLC, that

6      may also be part of this lawsuit, and I just

7      want to confirm you are here to testify on

8      behalf of all those defendants here today; is

9      that correct?

10       A.   Yes.

11       Q.   And if you can turn to the document that

12     has attached as an exhibit, that is the

13     amended deposition notice, that's where the

14     categories of deposition are contained.

15           I just want to confirm that you are

16     here for the categories that we have marked

17     as No. 25 and No. 26; so just going to read

18     them and so that we have them clearly on this

19     record.

20           Category No. 25 is the circumstances

21     surrounding defendants obtaining, or

22     attempting to obtain, arbitration agreement

23     from plaintiff or members of the class, and

24     members of the class consist of employees in

Page 10

1    California; are you the person most qualified

2    designated to speak on that topic today?

3        A.   Yes.

4        Q.   And topic 26 is the arbitration

5    agreement signed by defendant's employees in

6    the State of California; and are you the

7    person most knowledgeable designated to speak

8    on that topic today?

9        A.   Yes.

10       Q.   Okay.   Thank you.   Okay.   You can set

11   that aside.

12            Did you do anything to prepare for

13   your deposition today?

14       A.   Yes.

15       Q.   And what was that?

16       A.   I met with counsel and my supervisor.

17       Q.   Okay.   And when did you do that?

18       A.   Tuesday.

19       Q.   And how long did you spend in that

20   meeting?

21       A.   20 minutes to a half hour.

22       Q.   Did you have any other meetings to

23   prepare for this deposition?

24       A.   No.

Page 16

```
 1      Relevance, grounds as to what happened
 2       outside of California.
 3      A.  We initially test marketed, and probably
 4    in -- that was probably July or August of
 5    2014, to a select few markets.  I don't
 6    believe California was one of them.
 7      Q.  Okay.  And then at some point after
 8    that?
 9      A.  It got rolled out officially
10    company-wide October 2014.
11      Q.  Was it the same date that it went out to
12    California employees as it went out to
13    everybody else?
14      A.  I believe so.
15      Q.  Okay.  And you is said that it was
16    rolled out through Learn Net, which is CVS's
17    internal training system; is that right?
18      A.  Correct.
19      Q.  How exactly did employees learn about
20     the arbitration program and then what -- I
21    want to find out, what was the first
22    communication about the arbitration program?
23      A.  I believe they would have received an
24     email from our compliance department
```

Rhode Island Court Reporting

1    notifying them of the required training.

2      Q.  Okay.  And what was supposed to happen

3    next?

4      A.  They are to log into Learn Net using

5    their own specific log-on credentials, their

6    own specific password, and click on the

7    training.

8              In this case the arbitration

9    credentials, I believe it was a PowerPoint

10   presentation that you read and click through

11   until you complete the course.

12     Q.  Okay.  Were employees given a timeframe

13   by which they were to complete this?

14     A.  There usually is with required training.

15   It was probably 30 to 60 days.  And then they

16   are sent reminder emails, if it hadn't been

17   completed.

18     Q.  Okay.  And is that what happened in this

19   case for California employees?

20     A.  As far as them getting the emails, yes.

21     Q.  And did you search for any of those

22   emails, either the email that originally went

23   out to the employees in California, or the

24   reminder emails that went out?

Page 18

1    A.  No.

2     Q.  Okay.  And presumedly, then, the

3    expectation is that the employees were all

4    required to take this training, and we can

5    talk about the training.  What if they

6    didn't?

7     A.  A letter was generated in June of 2015

8    to all current employees who were identified

9    that should have taken the arbitration

10   training and did not, and that would be the

11   letter that I think that you just received,

12   basically stating that we have not received

13   your training, here's where you have to go to

14   do it.  And you have x-number of days to do

15   it.  By continuing your employment, we will

16   consider you to be in the arbitration

17   program.

18    Q.  Okay.  I have not had an opportunity to

19   read all of the information that was provided

20   to me this morning, so at some point we can

21   take a break and then I can ask you more

22   specific questions about that information.

23         But for now, I just want to go

24      forward with the things that I had

                                      before

Page 19

1    today's deposition for California employees

2     who were not Target employees, who I

3     understand that they were obligated to take

4     the training in October of 2014; is that

5     right?

6       A.  Yes.

7       Q.  And then after, if they joined after

8    October of 2014, how did they learn about the

9    arbitration program?

10      A.  It was part of their onboarding document

11   through Star Source.

12      Q.  What is Star Source?

13      A.  It's our online hiring management tool.

14      Q.  Okay.

15      A.  My best description.

16      Q.  And is that done through internal CVS,

17   is that in an internal CVS source?

18      A.  I believe so.

19      Q.  What's the process for onboarding

20   through Star Source?

21      A.  So if you are hired you are sent an

22   email with the link to Star Source saying,

23   here's your new hires documents and

24   requirements, and they would go in and they

Page 44

1      Q.  Is that a no?

2      A.  Yeah, I have no knowledge of plaintiffs'

3    fee agreements.

4      Q.  So other than it, in your mind

5    potentially being less expensive because of

6    attorneys fees, is there anything else of

7    value that CVS expects for employees to

8    receive as a result of signing this policy?

9            MS. ZARGAROF:  Objection.  Beyond

10             the scope.  Calls for speculation.

11     A.  I think that's out of my scope.

12     Q.  Well --

13     A.  What one person considers value, another

14    person may not.

15     Q.  Okay.  So I'm just going to go back to

16    the fact that you are here today to testify

17    on behalf of CVS about the arbitration.

18     A.  On the policy.

19     Q.  On the --

20     A.  And procedure.

21            MS. ZARGAROF:  I caution you, I

22    understand what you are doing it for, for the

23    sake of the court reporter, but wait for her

24    to finish before you speak and give me a

Rhode Island Court Reporting

Page 45

1    beat, because I may need to interpose an

2    objection.  And I suspect I will, based on

3    what I heard.

4        Q.  So this is part of the process, you are

5    here today, in my mind, to testify about the

6    policy, and I'm asking you a specific  question

7    about the policy.  And on that basis  I would

8    like to get an answer to my question.

9            MS. ZARGAROF:  There's no question

10   pending.

11       A.  You are asking --

12           MS. ZARGAROF:  There's no question

13    pending.  Nothing to answer.

14           MS. GUNN:  So could you read back

15   the question to which the answer was, "it's

16   beyond my scope."

17                  (Record read.)

18           MS. ZARGAROF:  Objection.  Beyond

19    the   scope.      Calls   for  Vague and

20    speculation.  ambiguous.

21       A.  I am not aware.

22       Q.  You are not aware of anything else that

23    an employee would get that would be of value;

24   is that correct?

Rhode Island Court Reporting

Page 46

1          MS. ZARGAROF:   Same objections.

2        Calls for an expert opinion potentially.

3      A.   I'm not aware of any benefit that any

4    employee might conceive that they would

5    receive for this.

6      Q.   Okay.   Thank you.   As part of the

7    policy, does CVS designate a specific

8    arbitration provider?

9      A.   To handle, yes.

10     Q.   And I think that you meant to handle all

11   actions that CVS has; is that right?

12     A.   I believe so.

13     Q.   And who is that arbitration provider?

14     A.   I believe it's the American Arbitration

15   Association.

16     Q.   Triple A.

17     A.   Yes, I guess it's Triple A.

18     Q.   I think that's the driving company would

19   -- there's maybe a little bit of confusion in

20   certain circumstances.

21     A.   Yeah.

22     Q.   So I'm going to refer to that as Triple

23   A, if that's all right with you?

24     A.   Okay.

1                   STATE OF RHODE ISLAND

2        I, Lisa Lee Gross, Registered Professional

3     Reporter and Notary Public duly commissioned and

4     qualified in and for the State of Rhode Island,

5     do hereby certify that there came before me on

6     the 21st day of November, the person hereinbefore

7     named, who was by me duly sworn to testify to the

8     truth and nothing but the truth of there

9     knowledge touching and concerning the matters in

10    controversy in this cause; that they were

11    thereupon examined upon there oath, and there

12    examination reduced to typewriting under my

13    direction and that the deposition is a true

14    record of the testimony given by the deponent.

15        In Witness Whereof, I have hereunto set my

16    hand and affixed my seal this 16th day of

17    December, 2019.

18

19    _____

20                   Notary Public

21                   My Commission Expires:

22                   April 13, 2023

23

24

# EXHIBIT D

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case No. 4:18-cv-06278-HSG
Volume I
Page 1 to 190
Exhibits: (9-16)

-----------------------------------------------
RYAN HYAMS, an Individual, on behalf of himself,
and all others similarly situated,
                    Plaintiffs,

                    -VS-

CVS HEALTH CORPORATION, a Rhode Island
Corporation, CVS PHARMACY, INC., a Rhode Island
Corporation, GARFIELD BEACH, CVS, LLC, a
California Corporation, and CVS RX SERVICES,
INC., a New York Corporation, DOES 1 through 25,
Inclusive,
                    Defendants.
-----------------------------------------------

                    *   *   *   *   *   *   *   *


            DEPOSITION of BRIAN NEAL, called as a

witness by and on behalf of the Plaintiffs,

pursuant to the applicable provisions of the

Rhode Island Rules of Civil Procedure, before

Lisa L. Gross, Registered Professional Reporter

and Notary Public in and for the State of Rhode

Island, held at:  Hampton Inn and Suites, 58

Weybosset Street, Providence, Rhode Island, on

November 20, 2019, commencing at 10:00 a.m.

Page 4

```
1              P R O C E E D I N G S

2              ---------------------
               BRIAN NEAL, SWORN.
3              ---------------------

4         DIRECT EXAMINATION BY MS. GUNN

5    Q.  Good morning, Mr. Neal.

6    A.  Good morning.

7    Q.  My name is Beth Gunn.  I'm an attorney

8  that represents the representative plaintiffs

9  in a class action that was filed against CVS

10 and its affiliated entities by Ryan Hyams and

11 Regine Duhon.

12           We are here today to take your

13  testimony as to what is called a federal rule

14  of civil procedure 30(b)6 witness.

15           Before we go down the road of

16  explaining what all that means and finding

17  out your background, can you just for the

18  record state and spell your full name.

19   A.  Sure.  First name is Brian,

20 B-R-I-A-N.  Last name is Neal, N-E-A-L.

21   Q.  Thank you.  What is your date of birth?

22   A.  April 20th, 1973.

23   Q.  And your current address?

24   A.  106 Fairhaven Road, that's in
```

Rhode Island Court Reporting

Page 6

1    abide by when we are taking and giving

2    depositions, particularly in the State of

3    California.

4            So throughout the day I'm going to

5    be asking you some questions, and those

6    questions need to be answered to the best of

7    your ability.  Even though we are in an

8    informal setting here today, this is actually

9    a formal court proceeding, and your testimony

10   is pursuant to the penalties of perjury and

11   you are under an oath today.

12           So I will be excepting you to be

13   answering all the questions as accurately as

14   you can; do you understand.

15    A.  I do.

16    Q.  And we talked earlier about how you are

17   here today in the capacity of a federal rule

18   of civil procedure 30(b)6 witness.  I'm going

19   to represent to you that you are here today

20   to testify on behalf of the company that is

21   CVS and other affiliated CVS entities; is

22   that your understanding as well?

23    A.  It is.

24    Q.  Okay.  Throughout the course of the

Rhode Island Court Reporting

Page 10

1     memory or otherwise affect your ability to

2     testify today?

3      A.  No.

4      Q.  And is there any other reason you could

5     not provide me with your best and most

6     accurate testimony today?

7      A.  There is not.

8      Q.  Thank you.  Mr. Neal, I would call your

9     attention to Exhibit No. 9.  This is the

10    deposition notice, this is actually an

11    amended deposition notice, the amended

12    deposition notice of FRCP 30(b)(6) of

13    defendants.  It has today's date, November

14    20th.

15              Before we move forward, I would like

16      to call your attention to the caption on that

17      page, where it says, CVS Health Corporation,

18      CVS pharmacy, Inc., Garfield, Inc., CVS LLC,

19      and CVS RX Services, Inc. Are you here to

20      testify on behalf of all of those

21      corporations today or companies.

22      A.  Yes.

23     Q.  Are you also here to testify on Long's

24    Drugs?

Rhode Island Court Reporting

1     A.  No.

2               MS. ZARGAROF:  I can state for the

3     record, not to interfere with the answer, we

4     are producing this deponent on behalf of CVS

5     entities, not a different deponent or

6     different answers, so while the witness is

7     probably not familiar with each entity and

8     what they do and all of that, I can say that

9     CVS's position is that the witness is on

10    these topics for all defendants including

11    Long's Drug stores California, LLC, not

12    currently named.

13              MS. GUNN:  Thank you very much for

14    that clarification.

15     Q.  Okay.  So throughout the course of the

16    deposition when I use the term "CVS," or

17    "Defendants," or anything like that, I would

18    be referring to all of the entities together;

19    do you understand that?

20     A.  Yes.

21     Q.  Okay.  Did you do anything to prepare

22    for this deposition today?

23     A.  Yes.

24     Q.  What did you do?

1    scheduler access the mySchedule database?

2      A.  No.

3      Q.  Okay.

4      A.  May I clarify?

5      Q.  Yes.

6      A.  Actually, I would appreciate it if

7    you could reread that, or repeat that, so I

8    can give a more specific answer.

9      Q.  I believe the question was, can a

10   California employee who is not a scheduler

11   access the mySchedule database?

12     A.  Yes.  Beyond just the schedulers,

13   those folks who I had mentioned before, our

14   colleagues in stores who have the ability

15   to go to look at mySchedule and make edits,

16   those team members, also, would have access

17   to the mySchedule as well.

18     Q.  Since August 22nd, of 2014, have

19   schedules, or California employees been

20   created through anything other than

21   mySchedule?

22     A.  To my knowledge, no.

23     Q.  We talked earlier about the schedules of

24   California pharmacists and how they are

Page 90

1      usually set as part of a template; is that

2     correct?

3         A.  That's correct.

4         Q.  At any point in the process of creating

5      the template does CVS examine whether

6     pharmacists are scheduled for shifts of

7     greater than nine hours in length?

8         A.  No.

9         Q.  At any point in the process of creating

10      the templates, does CVS examine whether

11     California pharmacists are scheduled for more

12     than 108 hours in two weeks?

13         A.  No.

14         Q.  At any point during the process of

15      creating those templates, does CVS examine

16     whether pharmacists are working seven days a

17     in a row?

18         A.  No.

19         Q.  At any point after the templates are

20      created, does CVS examine whether pharmacists

21     are scheduled for shifts of greater than nine

22     hours in length?

23         A.  No.

24         Q.  At any point after the tenplates are

1     created, does CVS examine whether there are

2     more than 108 in two weeks?

3         A.  No.

4         Q.  Is the same true for technicians working

5     in California pharmacies?  Let me give you a

6     more specific question.

7               At any point at all during the

8     scheduling process does CVS examine whether

9     pharmacy employees of any type are working

10    shifts of greater than nine hours in length?

11        A.  No.

12        Q.  At any point at all during the

13    scheduling process did CVS examine whether

14    pharmacy employees in California are

15    scheduled for more than 108 hours in two

16    weeks?

17        A.  No.

18        Q.  At any point at all during the

19    scheduling process does CVS examine whether

20    other non-exempt employees are working shifts

21    of greater than nine hours in length?

22        A.  No.

23        Q.  At any point during the entire

24    scheduling process does CVS examine whether

Page 92

1    non-exempt employees in California are

2    working more than 108 hours in two weeks?

3        A.  No.

4        Q.  Earlier we were talking about the

5    pharmacists scheduling so that there was

6    always at least one pharmacist on duty; do

7    you remember that?

8        A.  Yes.

9        Q.  And I think you also testified that

10   sometimes there would be two pharmacists

11   scheduled at the same time for overlap

12   periods; is that correct?

13       A.  Yes, that can be true.

14       Q.  It can be, but not always true; is that

15   right?

16       A.  That's right.

17       Q.  Are there specific circumstances in

18   which CVS attempts to schedule two

19   pharmacists working at the same time?

20       A.  Yes.  Where its observed pharmacist's

21   specific workload for a particular store

22   would necessitate that, there's more than

23   one pharmacist working at that one moment,

24   yes.

1     Q.  Is there any other reason why CVS would

2   attempt to schedule two pharmacists at the

3   same time?

4          MS. ZARGAROF:  Object, to the extent

5   that calls for speculation.

6     A.  No.

7     Q.  And when you are talking about the

8   workload, I think you are talking about the

9   number of prescriptions that are expected to

10  come in and how quickly those would be

11  processed; is that accurate?

12    A.  Yes.  It would be the workload that  is

13  attached to the number of prescriptions  that

14  that store would see.

15    Q.  So, in other words, the workload is

16  designed to accommodate the number of

17  prescriptions that need to be filled within a

18  certain number of time, based on the

19  projections that CVS has generated; is that

20  right?

21    A.  That's correct.

22    Q.  And those projections are based on the

23  number of prescriptions that are typically

24  filled during that time frame as gathered

Page 96

1    -- these are some of the key driving factors,

2    though.

3      Q.  Are there any other key driving factors

4    that inform the workload numbers or

5    projections?

6      A.  There are literally dozens of

7    factors.  We have got a labor engineering

8    team, an industrial engineering team within

9    our organization that helps us define a lot

10   of those factors.

11            And we take those inputs, and that

12    sort of precision from my group and -- and we

13    use it to give a better informed number of

14    hours per the store and the anticipated

15    workload.

16     Q.  All of those factors, they depended on

17   making sure that the number of prescriptions

18   that come in, can be adequately handled and

19   in the time frames that are required for

20   pharmacists; is that correct?

21            MS. ZARGAROF:  Objection.  Lacks

22    foundation.  Vague and ambiguous.

23     A.  The underlying labor that is, that

24   informs the budget, the underlying workload

Page 97

1    that informs the labor budget, would follow

2    suit to meet the needs of the pharmacist's

3    specific workload throughout the course of

4    a week, yes.

5      Q.  Okay.  For non-pharmacists, what factors

6    are considered in determining the workload

7    projections?

8      A.  Some of the same factors that I

9    mentioned earlier, those are not only

10   factors that are pharmacist specific, they

11   are germane to the entire pharmacy

12   operation.

13          So those factors are taken into

14    consideration as well, to provide a total

15    pharmacy budget, not just a

16    pharmacist-specific budget.

17      Q.  Okay.  And we have been talking -- does

18   that apply to the front store employees as

19   well?

20      A.  It does.  Through a different

21   process.

22          We don't have the labor engineering.

23    We don't have the industrial engineering

24    standards fully, fully complete on the front

Page 98

1    store side.

2              So there's a certain measure of

3    historical product activities that come into

4    play when we are budgeting the front store.

5         Q.   Is there anything that comes into play

6    when you are budgeting the front store that

7    doesn't come into play when you are budgeting

8    for the pharmacy part of the operations?

9              MS. ZARGAROF:    Objection.

10        A.   No.

11        Q.   So it sounds like the pharmacy

12   operations have more data that you use when

13   determining workload than the front store

14   data that you use; is that correct?

15        A.   That's correct.

16        Q.   Okay.   But other than the fact that the

17   pharmacy has additional data that is

18   considered, the data that is considered for

19   the front of store is the same as for the

20   pharmacy; is that correct?

21        A.   They are close.   There are different

22   drivers.   For instance, the point of sale

23   experience on the front store side, is far

24   more of a factor in the ultimate budget

Page 100

1    Q.   Okay.  So we are talking about pharmacy

2    operations and how it goes through a process

3    where workload projections are determined

4    based on certain data, and you have testified

5    as to what that data is; is that correct?

6    A.   That is correct.

7    Q.   Okay.  And then we also talked about

8    front of store workload projections, and how

9    that is based on -- or front of store

10   workload, and how that is based on

11   projections that are created using certain

12   types of data.  And you have testified about

13   what that data is; is that correct?

14   A.   That's correct.

15   Q.   Okay.  And with the exception of the

16   fact that the pharmacy operations has more

17   data, and has some additional criteria that

18   are put into the projections for workload,

19   the process by which CVS determines workload

20   is essentially the same; is that correct?

21            MS. ZARGAROF:  Same objection.

22   A.   They are quite similar.  Yes.

23   Q.   And is it your team that handles that

24   process of determining what the workload

1    numbers are?

2       A.  My team receives those workload

3    projections that come from our industrial

4    engineering team, and translate those

5    workload projections into labor hours for

6    budgeting and demand load purposes.

7       Q.  Okay.  And the process of doing that,

8    from your team's perspective, is that any

9    different for pharmacy operations than it is

10   for front of store operations?

11      A.  Besides the precision that I had

12   mentioned before, with what we know about

13   the pharmacy and our workflow in the

14   pharmacy, no, they are -- they are similar.

15      Q.  Well, if I'm understanding you

16   correctly, the precision would have to do

17   with how accurate you think that your

18   workload numbers are; is that right?

19      A.  That is correct.

20      Q.  It won't change the process by which the

21   workload numbers are generated, would it?

22      A.  No, that's true.

23      Q.  So the process would be the same for

24   both the pharmacy operations and the front of

1    my role.

2       Q.   Actually, I was asking at CVS, because

3    you were not there at exactly the time of the

4    transition, were you?

5       A.   That's correct.

6       Q.   So do you know who was in your role at

7    CVS at the time of the transition?

8       A.   My role was not a role that was in

9    place prior to my arrival on the team, so

10   I'm unable to answer with a specific

11   contact.

12      Q.   Who would have been responsible for

13   making decisions about handling the

14   scheduling of CVS employees following the

15   transition from Target to CVS?

16      A.   I don't know the answer to that.

17              (Discussion off the record.)

18              MS. GUNN:  Take a five minute break.

19                    (Recess taken.)

20              MS. GUNN:  Back on the record.

21      Q.   At any point during the time period of

22   August 22nd, 2014, to the present, did CVS

23   make efforts to ensure that non-exempt

24   California employees worked no more than nine

Rhode Island Court Reporting

Page 186

1    hours per shift?

2        A.  Not that I'm aware of.

3        Q.  And at any point during the time period

4    of August 22nd, 2014, to the present, did CVS

5    make any efforts to ensure that non-exempt

6    California employees worked not more than 108

7    hours every two weeks in a two week period?

8        A.  Not that I'm aware of.

9        Q.  And at any point during the time period

10   of August 22nd, 2014, to the present, did CVS

11   make efforts to ensure that non-non-exempt

12   California employees received one day's rest

13   in seven?

14       A.  No.

15       Q.  Who is responsible for ensuring

16   compliance with California Labor Code?

17           MS. ZARGAROF:  Object as vague,

18    vague and ambiguous.  And also calls for

19    speculation.

20       A.  I don't know the answer to that.

21       Q.  Is there a department that you would

22   formally expect to handle compliance issues?

23           MS. ZARGAROF:  Same objections.

24       A.  Not that I'm aware of.

STATE OF RHODE ISLAND

I, Lisa Lee Gross, Registered Professional Reporter and Notary Public duly commissioned and qualified in and for the State of Rhode Island, do hereby certify that there came before me on the 20th day of November, the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of there knowledge touching and concerning the matters in controversy in this cause; that they were thereupon examined upon there oath, and there examination reduced to typewriting under my direction and that the deposition is a true record of the testimony given by the deponent.

In Witness Whereof, I have hereunto set my hand and affixed my seal this 14th day of December, 2019.



Notary Public

My Commission Expires:

April 13, 2023

# EXHIBIT E

1          THE REPORTER:  My name is Jessica Arias, a

2     California certified shorthand reporter, and this

3     deposition is being held via videoconferencing

4     equipment.  The witness and reporter are not in the

5     same room.  The witness will be sworn in remotely

6     pursuant to agreement of all parties.  The parties

7     stipulate that the testimony is being given as if the

8     witness was sworn in person.

9          Does everyone agree?

10          MS. GUNN:  Yes.

11          MS. ZARGAROF:  Yes.

12          MS. GUNN:  Good afternoon.  My name is Beth

13     Gunn, and I'm an attorney who represents plaintiffs and

14     a proposed class in a class action lawsuit that was

15     filed in California against CVS, and it is proceeding

16     with the plaintiffs Ryan Hyams and Regine Duhon.  The

17     class period at issue is August 21st 2014 to the

18     present, and we are here today as part of that lawsuit.

19          Are you aware that that's why we're here

20     today, Mr. O'Hara.

21     A.  Yes, I am.

22     Q.  Okay.  And I think your first name is Adam.

23     Is that correct?

24     A.  Yes.

7   today to testify on behalf of CVS as it relates to

8   certain topics?

9       A.   Yes.

10      Q.   Okay.  And just so we're clear about a couple

11   of the definitions that I'm going to be using during

12   this deposition, we have a class period that ranges

13   from the time period of August of 2014 to the present.

14   So if I refer to a class period or the relevant time

15   period or really any of my questions, they all relate

16   to the entirety of the time period.

17          So if something doesn't if one of your answers

18   makes a difference because of timing, please let me

19   know, but, otherwise, my questions are all going to be

20   related to that time period of August 2014 to the

21   present.

22          Do you understand that?

23      A.   Yes, I do.

24      Q.   Okay.  And I'm also obtaining your testimony

25   today on behalf of CVS.  There are multiple CVS

                        9


ROUGH DRAFT ONLY - DO NOT CITE


1   entities that are involved in this case.  It's my

2   understanding that you are here to testify on behalf of

3   all of the CVS entities that are involved in this case.

4          Is that your understanding as well?

5    A.  Yes, it is.

6    Q.  Okay.  Did you do anything to prepare for your

7   deposition today?

8    A.  I had a discussion with Jennifer and Sonya.

9    Q.  Okay.  Other than conversations with counsel,

10  did you do anything to prepare for your deposition?

11    A.  No, I did not.

12    Q.  Did you talk to anybody else at CVS regarding

13  the your deposition or the substance of the testimony

14  that you anticipate providing today?

15    A.  No, I did not.

16    Q.  Did you review any documents in preparation

17  for your deposition today?

18    A.  Just the document that was turned over, the

19  Excel spreadsheet.

20    Q.  So I think you are referring to a document

21  that was Bates labeled as CVS 008133.  Is that correct?

22    A.  It's on the file that you sent me, but yes,

23  that's the document.

24    Q.  Okay.  And I have marked I have in the copy

25  that I sent to your counsel, and which I believe she
                                10


                ROUGH DRAFT ONLY - DO NOT CITE




1   forwarded to you, I have marked that as Exhibit 114,

2   and I would like to mark that for the record as well.

3   This is a new exhibit that has not been previously

4   introduced in this matter.  So this will be Exhibit 114

5   that we are talking about when we refer to an Excel

6   spreadsheet in today's testimony.

7       Do you understand that to be the case, Adam?

8     A.  Yes, I do.

9   BY MS. GUNN:

10    Q.  Okay.  Other than reviewing Exhibit 114, did

11   you review any other documents in preparation for

12   today's testimony?

13    A.  No, I did not.

14    Q.  Okay.  The topic that is my understanding that

15   you are here to testify about are topic Nos. 62 and 63

16   that were specified in the Deposition Notice.

17       Is that your understanding?

18    A.  Yes, it is.

19       MS. ZARGAROF:  I'll object to the extent that

20   it's limited by the court that those are the topic

21   numbers.

22   BY MS. GUNN:

23    Q.  So I'm going to read the topic numbers, the

24   categories or the subjects of the topics or the

25   information that we're going to be asking you questions

11

ROUGH DRAFT ONLY - DO NOT CITE

1   about, and just make sure that you agree that you are a

2   person who is qualified to testify about this topic.

3         So I'm going to start with Topic 62.  Topic 62

4   is looking for, The factors examined by CVS's

5   industrial engineering team when setting anticipated

6   workload numbers and/or projections for the members of

7   the nonexempt employee subclass during the class

8   period, including but not limited to, for each job

9   position in the subclass, the times assigned for

10   various job duties, the key driving factors, the

11   inflation factor applied for meal and/or rest breaks,

12   and the 'personal fatigue and delay' factor applied.

13         And I'm going to also let you know that the

14   court limited the testimony that I would be able to

15   seek to that testimony that has to do with meal and/or

16   rest breaks as it relates to Category No. 62.

17         Is it your understanding that you are here to

18   testify about that topic today?

19   A.   Yes, it is.

20   Q.   And

21         MS. ZARGAROF:  And I'll just add that an

22   objection that I think the limitation by the court was

23   a little more specific as to the newly produced

24   documents.

25         MS. GUNN:  Right.  That's your objection, but

12

ROUGH DRAFT ONLY - DO NOT CITE

1   there's not an agreement with the parties about that.

2        MS. ZARGAROF:  Okay.  So then that might

3   result in some instructions not to answer and the like.

4   Just giving you fair notice.

5   BY MS. GUNN:

6        Q.   Okay.  So this might be redundant, because I

7   don't know if I asked you.  I'm just going to ask you

8   again.

9            Are you a person who is qualified to provide

10   testimony on Topic 62 as I have just described it?

11        A.   Yes, I am.

12        Q.   Okay.  Topic 63 is, The methodology by which

13   CVS's industrial engineering team sets the anticipated

14   workload numbers and/or projections for the members of

15   the nonexempt employee subclass during the class

16   period, including but not limited to, for each job

17   position and subclass, the assignment of time for

18   various job duties, the weighting of key driving

19   factors, the calculation of the inflation factor

20   applied for meal and/or rest breaks, and the

21   calculation of the 'personal fatigue and delay' factor.

22            And, again, this topic was limited by the

23   court to be related only to information related to meal

24   and rest breaks.

25      Do you understand that you are here to testify
                                    13


                    ROUGH DRAFT ONLY - DO NOT CITE



1   about that topic?

2      A.   Yes, I do.

3      Q.   Okay.  And are you qualified

4         MS. ZARGAROF:  And for clarity go ahead.  Ask

5   that question, and I'll make my clarification.

6   BY MS. GUNN:

7      Q.   And are you qualified to provide testimony as

8   to that topic as I've just defined it?

9      A.   Yes, I am.

10        MS. ZARGAROF:  So for the record, CVS'

11   position, as I think you know, is that the court

12   essentially limited the depositions that could go

13   forward, and that that deposition is limited to the

14   additional documents that were produced regarding meal

15   and rest periods, specifically the spreadsheet.

16        MS. GUNN:  And just for the record, I will

17   reiterate that the parties do not have an agreement

18   about that limitation defined in that exact same

19   manner.

20        THE WITNESS:  I'm having a contact lens issue.

21   Is it okay if I go off to fix it?

2  question.

3     Q.  I think you just answered the question.  I

4  just wanted to know if that was accurate, if I was

5  using the term anticipated workload in an accurate way?

6     A.  I believe you were.

7     Q.  Okay.  And is it correct, based on what you

8  just told me, that anticipated workload, the way I just

9  described it, could also be referred to as demand

10  hours?

11     A.  Yes.

12     Q.  Okay.  Is demand hours the term that you are

13  more familiar with using?

14     A.  I am.

15     Q.  Okay.  It's also my understanding that the

16  information regarding demand hours is developed by the

17  industrial engineering team and provided to the

18  Workforce Management team to create the labor budgets.

19         Is that your understanding as well?

20         MS. ZARGAROF:  I'm going to object that this

21  is beyond the scope of the deposition.  We don't think

22  there can be a debate, and the court's order was very

23  clear as to what limited deposition can go forward.

24  And I understand that there's some context to the

25  document, but if this deposition is maybe more about

22

ROUGH DRAFT ONLY - DO NOT CITE

1   the document, then I'm going to have to instruct not to

2   answer, and we may need we may need court's

3   involvement.

4         I don't realize we had a disagreement as to

5   what the proper scope of the deposition was before now.

6         MS. GUNN:  All right.  Are you going allow the

7   deponent to answer the question?

8         MS. ZARGAROF:  Is there a question pending

9   that he hasn't answered?

10        MS. GUNN:  Jessica, could you read my last

11  question?

12        THE REPORTER:  Of course.

13        MS. GUNN:  Jennifer, I'm just trying to lay

14  some foundation here, because I'm going to ask

15  questions about this document that was used in this

16  process.

17        MS. ZARGAROF:  He can answer.

18        THE WITNESS:  Yes, it is.

19  BY MS. GUNN:

20    Q.  Okay.  And that process has been in place

21  since August of 2014.  Is that right?

22    A.  I can't speak to understanding the entire

23  process before I came to work for CVS.

24    Q.  The document that we marked as Exhibit 114 do

25  you know what date that document was created?

23

ROUGH DRAFT ONLY - DO NOT CITE

1    A.  I'm allowed to reference the document, yes?

2    Q.  Yes.

3    A.  We created beginning April of 2017.

4    Q.  And do you know whether there was another

5  document similar to this document that was in existence

6  prior to April of 2017?

7    A.  They would have been using information

8  furnished to them by The Connors Group.

9    Q.  Do you know whether there were any documents

10  that reflected the information that The Connors Group

11  had provided to CVS?

12    A.  I believe there to be, but I'm not aware.

13    Q.  Do you know who authored the document that is

14  Exhibit 114?

15    A.  I do.

16    Q.  And did you create the information in the

17  document from scratch?

18    A.  Not from scratch, no.  The document is a

19  template that was provided provided by sorry.  All

20  right.  I'm sorry about that.

21    Q.  No worries.

22    A.  I did not create the template.  I simply used

23  the template to fill in the information as it pertains

24    to the work at CVS.

25        Q.   Did somebody provide you with a template did
                                24


                    ROUGH DRAFT ONLY - DO NOT CITE


1    somebody provide you with a template of this document?

2        A.   It's a template that I brought with me when I

3    came to CVS.  I used it in previous roles.  I believe

4    the template was created by JD & Associates.

5        Q.   Is that a person from your prior employment

6    experience?

7        A.   Yes.  It is a template we used at our yes,

8    this template was used in my prior employment.

9        Q.   Okay.  Thanks.  So can you explain to me what

10   exactly document Exhibit No. 114 is?

11       A.   Sure.  So it is a reference worksheet that is

12   meant to calculate the PF&D, personal, fatigue and

13   delay allowances, for each of the work stations within

14   the pharmacy.

15       Q.   And what does PF&D include?

16       A.   So personal fatigue and delay are allowances

17   that are made to engineer's standards to account for

18   people's personal needs, so, you know, restroom breaks

19   or, you know, stopping to take a sip of water, for

20   example; fatigue allowances are determined based off of

21  the content of the work that is being done and taking

22  into account both physical and psychological components

23  to allow for the fact that people get fatigued due to

24  their work throughout the day; and then delay

25  allowances are unavoidable occurrences that happen

25


ROUGH DRAFT ONLY - DO NOT CITE


1  throughout the course of the day that we are otherwise

2  unable to measure and account for within our standards

3  that we make allowances for in our time.

4     Q.  Okay.  Okay.  And you said that the worksheet

5  is a reference worksheet regarding each work station in

6  the pharmacy.  To your knowledge, are there any

7  documents that would reflect the PF&D for other job

8  positions besides those in the pharmacy?

9     A.  What do you mean by other job positions?

10    Q.  So CVS has positions of people who work in the

11  pharmacy, like the pharmacists and the pharmacy

12  technicians and those positions, and then there are

13  also some positions that are in the front store, such

14  as the cashiers and the people who stock the shelves

15  and the managers there.

16        And I understood your testimony to mean that

17  the worksheet has to do with the work stations that

18  were in the pharmacy section of a CVS location and is

19   that accurate?

20     A.   So the worksheet has sections in there for

21   both pharmacy and front store.  My understanding was

22   that we were only talking about pharmacy for today.

23     Q.   My understanding was that we'd be talking

24   about all the positions today, so I will continue to

25   ask you questions about that.

26

ROUGH DRAFT ONLY - DO NOT CITE

1          Is that something that you have knowledge of?

2     A.   Yes.

3     Q.   So other than the positions that are in the

4   pharmacy and the work stations that are in the

5   pharmacy, what other positions have been analyzed for

6   the PF&D at CVS?

7     A.   So PF&D isn't unique to the position.  If

8   you're talking about pharmacists or technicians or

9   front store colleagues, it is common to the work that

10   is taking place.  That's why we talk about in terms of

11   the work stations and categories and not the colleague

12   that is performing the task.

13          In that capacity, it has been analyzed for all

14   pharmacies and front store activities.

15     Q.   And are those all included in the worksheet

14      A.  It's the analysis of doing data entry.  The

15   indication of having a technician here is just

16   indicating that it is normally technicians who perform

17   this task, but not limited to.

18      Q.  Who else could it be?

19      A.  Pharmacists often perform data entry as well.

20      Q.   Okay.  And it says here, Personal and fatigue

21   time allowances are based on the entire shift duration,

22   including paid rest breaks.

23         Can you explain what that means?

24      A.   It means that when we are looking at the

25   amount of time to which we are acquiring the allowance,

28

ROUGH DRAFT ONLY - DO NOT CITE

1   we are taking into consideration both the time that we

2   assume they are working and being productive as well as

3   the time that they are on a paid break.

4      Q.   And does that mean you're not including the

5   time when they are on an unpaid meal break?

6      A.   That's correct.

7      Q.   Okay.  And then the next line down from that

8   says, Unavoidable delay allowances are based on

9   productive time only and paid rest breaks are not

10   included.

11        What does that mean?

12      A.  It means that when we are making allowances

13   for unavoidable delays, we are only applying those

14   allowances to the time where the colleague will be

15   working, and, therefore, not applying that allowance to

16   the time when they are on paid break.

17      Q.  Okay.  And can you explain to me when you get

18   to row six, there's a percentage there for personal

19   allowance.

20        How is that percentage generated?

21      A.  That is a common percentage that we hold

22   constant for all of our allowances across CVS.  The

23   personal allowance is always 5 percent.

24      Q.  So it's 5 percent is the personal allowance?

25      A.  Correct.

                          29


                ROUGH DRAFT ONLY - DO NOT CITE



1      Q.  And does that mean that it's 5 percent of the

2   entire shift duration including the paid rest breaks?

3      A.  Yes.

4      Q.  Okay.  And then the fatigue allowance, can you

5   explain to me what the calculations are here?

6      A.  Sure.  So in each of the boxes in Column O

7   where you see a border around a number that's either a

8   zero or a 1 or some other numbers on other worksheets,

1   there are values that can be selected and then there

2   would be a value selected and put into the the cell

3   that has a box around it.  Is that correct?

4       A.   That's correct.

5       Q.   Is the goal of all of this to come up with a

6   percentage of time of the total shift length that will

7   then be used to increase the amount of time that is

8   the that will become the scheduled hours for the

9   anticipated workloads?

10      A.   Yes.

11      Q.   Okay.  And so you just described to me

12  physiological factors.  And then underneath that there

13  are psychological factors.  It looks like it

14  follows follows the same type of analysis where there

15  are certain considerations that are looked at, and

16  there are a range of possibilities and those

17  possibilities a number is selected from among those

18  possibilities based on the nature of the work involved

19  and put into the cells that have boxes around them.  Is

20  that correct?

21          THE REPORTER:  Oh, no.  Timeout.  I lost the

22  call.  Can anyone hear me?

23          THE REPORTER:  I'm so sorry.  I don't know

24  what happened.  It just decided to end the call.

25          Okay.  I got the full question, I just didn't

33

ROUGH DRAFT ONLY - DO NOT CITE

1   get the answer.

2        MS. GUNN:  Can you repeat the question again,

3   please, Jessica.

4   BY MS. GUNN:

5        Q.   Can you answer it again, Adamn?

6        A.   Yeah, that is correct.

7        Q.   Thank you.  So is it correct that the purpose

8   of gathering this information and putting it in the

9   boxes is to add those together to come up with a number

10   that is the total personal and fatigue allowance?

11        A.   Yes, it is.

12        Q.   And is the personal and fatigue allowance a

13   percentage of the time of the shift that is expected to

14   be worked by an employee in that position that is then

15   added on well, I'm sorry.  Let's just keep it to that.

16        Is it is the total personal and fatigue

17   allowance intended to be a percentage of the amount of

18   time of the shift that is allocated for working in that

19   position?

20        MS. ZARGAROF:  I'll object as vague and

21   ambiguous.

22        You can still answer.

23        THE WITNESS:  Yeah.  It's not how I would

24   define it.

25   ///

ROUGH DRAFT ONLY - DO NOT CITE

1  BY MS. GUNN:

2     Q.   How would you define it?

3     A.   I would define it I would define it as the

4  percentage of time that needs to be added that needs to

5  be accounted for within a shift that will not be

6  productive time due to fatigue that is experienced by

7  the colleague or personal needs that come up during

8  their shift.

9     Q.   So how does it get added?

10    A.   So upstream a bit, we have established a labor

11  standard to describe that there is paid entry tasks.

12  Once we arrive at that standard, that amount of time

13  then gets added as a percentage on top of that standard

14  to inflate the number so that when we use those

15  standards to determine the total number of hours

16  required, we are accounting for both these personal

17  needs and fatigue allowances.

18    Q.   Okay.  So if we go to the other side of this

19  spreadsheet and starting in Column P and going over

20  through Column X, there is some more information.

21       What what is the information that's included

22  in this first section that spans rows 1 through 15?

23   A.   Any of the cells that have a blue box are

24   inputs we make into the calculator.  Any of the cells

25   that have a black box, and referring to Column U here,

35

ROUGH DRAFT ONLY - DO NOT CITE

1   are calculations that the worksheet is making based off

2   of those inputs and the previously determined

3   allowances.

4   Q.   Okay.  I'm not I'm not seeing any boxes in

5   Column U.  Can you point me to the specifics, though,

6   where there's a box in Column U?

7   A.   Sorry.  I may have misspoken when I said, Box.

8   I was just trying to refer to any of the cells where

9   the fonts is either blue as inputs or black as

10   calculations that the worksheet was completed.

11   Q.   Okay.  Okay.  The very first line at the top

12   looks like it is the personal fatigue allowance that

13   was carried over from the calculations that were done

14   in Columns A through O.  Is that correct?

15   A.   That's correct.

16   Q.   And that reflects the percentage of time that

17   needs to be accounted for within the total shift.  Is

18   that right?

19   A.   Correct.

20   Q.   And then the paid shift duration, it looks

21   like the input here is 480 minutes.  Is that right?

22      A.  That is correct.

23      Q.  And that's an input that you put in to

24   reflect was that supposed to reflect an average shift?

25      A.  Yes, per budgeting purposes, when we look at
                           36


                    ROUGH DRAFT ONLY - DO NOT CITE




 1   how to allocate our hours, we assume roughly an

 2   eight-hour shift.

 3      Q.  Okay.  And then can you explain to me how this

 4   calculation works.  It looks like you take the

 5   percentage that is in the cell X-1, and you multiply

 6   that times the number that was input in cell U-2.  Is

 7   that accurate?

 8      A.  Correct.

 9      Q.  And then you divide it by 100?

10      A.  The divide by 100 is just to take the number

11   that is 9 and turn it into a percentage.

12      Q.  Oh, okay.  Okay.  And then how does it

13   become is 43.2 minutes does that reflect the 9 percent

14   of the 480 minutes?

15      A.  Correct.

16      Q.  Okay.  And then it says, Paid Rest Breaks, and

17   then it says paid rest breaks is in, it looks like, the

18   cell that is P-6.  And then across from that, there is

19   a value of 15 that is entered into the cell that is

20   U-6.  Is that correct?

21       A.   Correct.

22       Q.   And is that supposed to be a 15-minute rest

23   break?

24       A.   Yes.

25       Q.   Okay.  What does it mean where it says, Only

                          37


                ROUGH DRAFT ONLY - DO NOT CITE


1   if deducted in software?

2       A.   I'm not entirely sure.  The template was

3   derived for use with a software at my previous company

4   that we actually don't use here at CVS, but I believe

5   it was to make note that those 15-minute breaks were

6   accounted for within the system.

7       Q.   Okay.  And if I'm reading this correctly, it

8   looks like one 15-minute break is accounted for in a

9   shift of 480 minutes.  Is that right?

10       A.   That is correct.

11       Q.   And then two rows down, where it says,

12   A equals 15 minutes, is that is that adding together

13   all of the potential breaks that you would expect to be

14   included in the 480-minute shift?

15       A.   Yes, it is.  It's adding the two cells above

# EXHIBIT F

PAGES 1 - 47

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**BEFORE THE HONORABLE ROBERT M. ILLMAN, MAGISTRATE JUDGE**

| | | |
|---|---|---|
| RYAN HYAMS, AN INDIVIDUAL, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) | |
| PLAINTIFFS, | ) ) | NO. C-18-06278 HSG (RMI) |
| VS. | ) ) | TUESDAY, MARCH 31, 2020 |
| CVS HEALTH CORPORATION, ET AL., | ) ) ) | MCKINLEYVILLE, CALIFORNIA |
| DEFENDANTS. | ) ) | DISCOVERY HEARING |

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND RECORDING VIA AT&T**

**TELEPHONIC APPEARANCES:**

**FOR PLAINTIFFS:**          GUNN COBLE, LLP
                            101 S. FIRST STREET, SUITE 407
                            BURBANK, CALIFORNIA 91502
                    BY:  BETH A. GUNN, ESQUIRE


**FOR DEFENDANTS:**          MORGAN, LEWIS & BOCKIUS LLP
                            300 S. GRAND AVENUE, 22ND FLOOR
                            LOS ANGELES, CALIFORNIA 90071
                    BY:  JENNIFER B. ZARGAROF, ESQUIRE
                            SONIA VUCETIC, ESQUIRE



**TRANSCRIBED BY:**          DIANE E. SKILLMAN, TRANSCRIBER

1    TUESDAY, MARCH 31, 2020

2          T E L E P H O N I C   P R O C E E D I N G S

3                           O0O

4          THE CLERK:  CALLING HYAMS VERSUS CVS HEALTH

5    CORPORATION.  CASE NO. 4-18-CV-6278 HSG (RMI).

6       PARTIES STATE THEIR APPEARANCES FOR THE RECORD.

7          MS. GUNN:  ON BEHALF OF PLAINTIFFS, BETH GUNN.

8          MS. ZARGAROF:  ON BEHALF OF DEFENDANTS, JENNIFER

9    ZARGAROF AND SONIA VUCETIC IS ALSO ON THE LINE.

10         THE COURT:  ALL RIGHT.  GOOD MORNING, EVERYONE.

11      SO WE ARE HERE ON A COUPLE OF JOINT LETTER BRIEFS.  THE

12   FIRST ONE REVOLVING AROUND THE PREVIOUS HEARING WE HAD AND

13   CONFUSION IN THE -- WHAT THE PROPOSED ORDER WAS SUPPOSED TO

14   LOOK LIKE.

15      SINCE THAT WAS FILED, THE OFFICIAL TRANSCRIPT CAME OUT,

16   AND I HOPE YOU GUYS HAD A CHANCE TO REVIEW THAT AND TALK ABOUT

17   IT.  HAVE YOU GUYS DONE THAT?

18         MS. ZARGAROF:  THIS IS JENNIFER ZARGAROF, YOUR HONOR.

19   WE HAVE REVIEWED THE TRANSCRIPT BUT WE HAVE NOT BEEN ABLE TO

20   DISCUSS IT WITH OPPOSING COUNSEL.

21         THE COURT:  OKAY.  ALL RIGHT.

22      SO LET'S SEE WHERE WE ARE ON THAT NOW, AND ALSO TIME HAS

23   PASSED WITH REGARD TO SOME OF THE DEADLINES AND SOME OF THE

24   ROLL-OUT, AND YOU GUYS WERE GOING TO HAVE A MEET AND CONFER, I

25   THINK, FOLLOWING OUR LAST HEARING, IF I REMEMBER RIGHT, TO

1    PROTECT JUST THE ISSUE, WE PUT IT IN A SUBSEQUENT LETTER BRIEF

2    SO EVEN IF THE -- EVEN IF PROCEDURALLY THEY ARE GIVEN AN

3    OPPORTUNITY TO AMEND THE RESPONSES AND WE STILL WANT TO PURSUE

4    THEM, THE CORE ISSUE IS THAT WE CAN'T AGREE AS TO WHETHER OR

5    NOT THEY SHOULD BE REQUIRED TO PRODUCE SOME SETTLEMENT

6    DOCUMENT.

7        AND IT IS PLAINTIFFS' POSITION THERE ARE SETTLEMENT

8    DOCUMENTS THAT ARE INTENDED TO BAR RECOVERY FROM PUTATIVE

9    CLASS MEMBERS THAT FOR PURPOSES OF THIS CLASS ACTION, WE

10   CURRENTLY ARE IN THE PROCESS OF REPRESENTING OR ATTEMPTING TO

11   REPRESENT, AND IF WE ARE GOING TO COMPLETE DISCOVERY ON THAT,

12   WE NEED TO KNOW WHO WOULD BE INCLUDED IN THE CLASS AND WHO

13   WOULDN'T.  AND WE NEED TO KNOW WHETHER OR NOT THERE IS A

14   SETTLEMENT AGREEMENT THAT IS VALID AND THAT COVERS THE CLAIMS

15   AT ISSUE.  AND IN ORDER TO KNOW THAT, WE HAVE TO SEE THE

16   SETTLEMENT AGREEMENTS.

17       WE ARE ALSO AWARE THAT THERE WAS A SETTLEMENT AGREEMENT

18   REACHED IN A CLASS ACTION THAT HAS OVERLAPPING CLASS

19   DEFINITIONS, AND THAT IS OBVIOUSLY SOMETHING THAT WE WOULD

20   NEED TO LOOK AT TO UNDERSTAND HOW IT AFFECTS THE SCOPE OF THE

21   CLASS IN QUESTION.

22       SO, WE BELIEVE THAT WE SHOULD SEE THOSE DOCUMENTS AND CVS

23   THINKS THAT -- WELL, I'LL LET CVS SPEAK FOR ITSELF ON WHAT

24   THEIR POSITION IS.

25           **THE COURT:**  THANK YOU.

1          **MS. ZARGAROF:**  SO, YOUR HONOR, THE IDEA OF WHAT CVS

2     UNDERSTOOD THE COURT'S RULING WOULD BE WAS TO PROVIDE

3     RESPONSES THAT WEREN'T SIMPLY OBJECTIONS, BUT WERE RESPONSES

4     ABOUT WHAT CVS CONTENDS IS ESSENTIALLY BARRED BY THE WAY OF

5     OTHER SETTLEMENTS.

6          AND THE *PRESS* CASE TO WHICH COUNSEL IS REFERRING, THERE

7     ACTUALLY AREN'T ANY DOCUMENTS YET TO PRODUCE ON THAT.  THAT

8     CASE IS PENDING IN THE EASTERN DISTRICT, AND PLAINTIFFS HAVE A

9     MOTION TO INTERVENE PENDING IN THAT CASE AND, OF COURSE, ANY

10    SETTLEMENT DOCUMENTS WOULD BE PUBLICLY AVAILABLE ONCE THERE'S

11    A MOTION FOR PRELIMINARY APPROVAL ON FILE.  THERE'S NOTHING

12    SIGNED AS OF THIS MOMENT.

13         BUT WITH RESPECT TO THE RESPONSES, WHAT WE EXPECTED WOULD

14    BE TO DISCLOSE AT LEAST A LIST OF ALL OF THE PEOPLE.  THEY ALL

15    HAVE VARYING SETTLEMENT AGREEMENTS.  WE ARE TALKING THE

16    ARGUABLE CLASS PERIOD HERE GOES BACK TO 2014.  SO YOU CAN

17    IMAGINE WITH A POPULATION OF OVER 60,000 PEOPLE THERE'S A

18    VARIETY OF CIRCUMSTANCES WHERE PEOPLE HAVE LEFT CVS OR

19    OTHERWISE RESOLVED CLAIMS, AGENCY CLAIMS, LAWSUITS, ET CETERA.

20         MOST TYPICALLY, THE VAST MAJORITY OF THEM THROUGH COUNSEL.

21    MANY OF THEM HAVE CONFIDENTIALITY PROVISIONS.  I CERTAINLY

22    HAVEN'T REVIEWED ALL OF THEM.  THEY VARY.  THEY ARE ALL

23    INDIVIDUALLY NEGOTIATED.  AND, YOU KNOW, GIVEN THIS IS NOT,

24    YOU KNOW, A NUMEROSITY ISSUE, FOR EXAMPLE, IT'S NOT LIKE THIS

25    IS A 50-PERSON POTENTIAL CLASS AND I COULD BRING IT, YOU KNOW,

1   SOLO THAT IT AFFECTS CERTIFICATION; HAVING TO DISCLOSE ALL OF

2   THOSE, YOU KNOW, THE DETAILS OF ALL THE SETTLEMENTS THAT AT

3   THIS POINT IN THE CASE SEEMS UNNECESSARY AND JUST A TREMENDOUS

4   AMOUNT OF WORK.

5       AND, AGAIN, YOU KNOW, AS I SAID, THERE'S CONFIDENTIALITY

6   PROVISIONS.  THESE ARE FOLKS WHO CHOSE TO BE SEPARATELY

7   REPRESENTED.  YOU KNOW, DEALING WITH A HUNDRED OR COUPLE

8   HUNDRED AGREEMENTS OUT OF 60,000 DOESN'T SEEM LIKE TIME WELL

9   SPENT PRIOR TO A CLASS BEING CERTIFIED.

10      AND I'LL -- IN CLASS ACTIONS, I'VE NEVER SEEN THAT BEFORE.

11  IT'S ALWAYS, YOU KNOW, PUT OFF.

12          THE COURT:  SO THE TWO-PART CATEGORIES WOULD BE

13  PROVIDING THE AMENDED RESPONSES AND THE OTHER WOULD BE TO

14  PRODUCE THE RESPONSIVE DOCUMENTS, RIGHT?

15          MS. ZARGAROF:  RIGHT.

16          THE COURT:  YOUR CONTENTION IS THAT THE PRODUCTION OF

17  RESPONSIVE DOCUMENTS WOULD BE MORE WORK THAN PROVIDING THE

18  AMENDED RESPONSES?

19          MS. ZARGAROF:  YES.  AND I THINK THE AMENDED

20  RESPONSES COULD, YOU KNOW, PROVIDE ENOUGH INFORMATION AT THIS

21  POINT.

22      YOU KNOW, I DON'T KNOW WHAT COUNSEL IS THINKING IF THERE

23  WOULD BE AN AGREEMENT-BY-AGREEMENT LOOK AS TO WHETHER THE

24  CLAIMS IN THIS CASE ARE, IN FACT, BARRED BY EACH INDIVIDUAL

25  1542 WAIVER AND THE LIKE.

1       IT JUST DOESN'T SEEM LIKE WORK THAT NEEDS TO BE DONE AT

2   THIS POINT IN THE CASE, GIVEN THAT, AGAIN, IT'S GOING TO BE

3   SUCH A SMALL PART OF THE CLASS, OF THE POTENTIAL CLASS.   BUT

4   IN THE SUPPLEMENTAL RESPONSES, WE WOULD IDENTIFY WHO THOSE

5   FOLKS ARE WHO WE BELIEVE ARE IMPACTED.   I THINK THE

6   SUPPLEMENTAL RESPONSES WOULD GET US A LONG WAY.

7           **MS. GUNN:**   YOUR HONOR, ONE THING TO BE AWARE OF IN

8   THIS CASE IS THAT THERE IS NO PRE-CERTIFICATION AND

9   POST-CERTIFICATION DISCOVERY.

10      SO WHEN WE TALK ABOUT WHETHER OR NOT SOMETHING IS

11  LEGITIMATE AT THIS POINT IN THE CASE, WE HAVE TO COMPLETE

12  DISCOVERY BY A CERTAIN POINT IN TIME.   AND EVEN THOUGH THERE'S

13  A POSSIBILITY THAT JUDGE GILLIAM, AS PART OF GETTING INVOLVED

14  IN THIS CASE IN THE MANNER THAT WE DISCUSSED LAST WEEK, WILL

15  ALTER SOME OF THAT, IT'S CURRENTLY NOT ALTERED.

16      SO OUR OBLIGATION AS CLASS COUNSEL IS TO OBTAIN ALL THE

17  INFORMATION THAT IS REQUIRED TO PROTECT THE INTERESTS OF THE

18  CLASS PRIOR TO THE CLOSE OF DISCOVERY, AND THAT IS NOT SET AT

19  A DATE THAT IS AFTER CLASS CERTIFICATION.   IT IS SET PRIOR TO

20  CLASS CERTIFICATION.

21      SO WE DON'T HAVE THE LUXURY OF WAITING TO SEE WHETHER OR

22  NOT A CLASS IS CERTIFIED OR THESE PEOPLE WOULD BE INCLUDED IN

23  IT; IF IT'S DISCOVERY THAT IS NECESSARY IN THE CASE, WE NEED

24  TO DO IT NOW AND JUDGE GILLIAM MADE IT CLEAR THAT THAT'S OUR

25  OBLIGATION.

1        SO THAT'S SOMETHING TO BE CONSIDERED WHEN WE'RE -- WE ARE

2   NOT TAKING THE STANCE TO BE DIFFICULT, WE ARE JUST TAKING THE

3   STANCE BECAUSE WE FEEL THAT WE NEED TO LOOK OUT FOR THE

4   INTERESTS OF THE CLASS.

5        THE OTHER THING THAT I WANTED TO ADDRESS AND WHAT

6   MS. ZARGAROF SAID IS THAT REGARDING A CLASS ACTION THAT WAS

7   SETTLED WITH OVERLAPPING CLAIMS, IT'S MY UNDERSTANDING THAT

8   THERE IS A MEMORANDUM OF UNDERSTANDING IN THAT CASE THAT HAS

9   BEEN SIGNED, AND SO THAT IS A DOCUMENT THAT WOULD BE

10  RESPONSIVE TO OUR DOCUMENT REQUEST AND IS SOMETHING THAT WE

11  SHOULD HAVE EVEN BEFORE THE PUBLICLY-AVAILABLE DOCUMENTS ARE

12  REVEALED OR AVAILABLE.

13       SO, THAT'S THE TYPE OF DOCUMENT THAT COULD BE AT ISSUE

14  THAT WOULD AFFECT A LARGE NUMBER OF PUTATIVE CLASS MEMBERS

15  THAT ARE IN THE CLASS THAT WE ARE ATTEMPTING TO REPRESENT IN

16  THIS CASE.

17           **MS. ZARGAROF:** JUST A COUPLE MORE THINGS, IF I MAY --

18  GO AHEAD.

19                    (SIMULTANEOUS COLLOQUY)

20           **THE COURT:** LET ME ASK YOU THIS FIRST.

21       IS IT CVS'S POSITION THAT ONCE THE CLASS IS CERTIFIED,

22  THEN THESE DOCUMENTS ARE REQUIRED TO BE TURNED OVER?

23           **MS. ZARGAROF:** I'VE NEVER SEEN THAT, BUT I THINK

24  IT'S -- I THINK IT'S -- AT LEAST THEN I COULD SEE THE

25  ARGUMENT.

1          ONE THING I DID WANT TO CORRECT BUT I DIDN'T WANT TO BE

2     INSINUATING BY OMISSION, THERE'S -- THERE IS NOT A MEMORANDUM

3     OF UNDERSTANDING SIGNED.   THERE'S ONE IN THE WORKS THAT'S

4     NEARLY FINISHED; I WOULD SAY, YOU KNOW, THE LAST YARD, BUT

5     THERE IS NOT A SIGNED DOCUMENT.

6          SORRY, YOUR HONOR, TO ANSWER YOUR QUESTION, YOU KNOW, I

7     SUPPOSE -- I HAVEN'T SEEN IT, BUT I SUPPOSE WHEN IT COMES TIME

8     TO NOTIFY IF THERE'S A CLASS CERTIFIED AND THERE ARE PEOPLE IN

9     IT WHO HAVE EXECUTED GENERAL RELEASES, FOR EXAMPLE, IN

10    CONNECTION WITH THEIR, YOU KNOW, WRONGFUL TERMINATION CLAIM,

11    OR SOMETHING LIKE THAT, OR THEIR OWN WAGE AND HOUR CLAIM, SO

12    THOSE PEOPLE IN MY EXPERIENCE HAVE ALWAYS JUST BEEN CARVED

13    OUT.   BUT IF PLAINTIFFS' COUNSEL THINKS THEY NEED TO LOOK AT

14    THEM TO SEE IF THEY ARE GOING TO, YOU KNOW, SUPPLANT THE

15    COUNSEL THAT THE PERSON ALREADY HAD, OR WHATEVER IT MIGHT BE,

16    THEN I COULD SEE THOSE ARGUMENTS.   BUT, AGAIN, THAT WOULD BE

17    ONLY AT THE CLASS NOTICE STAGE.

18              **THE COURT:**  WHAT ABOUT THE AMENDED RESPONSES?   WHERE

19    ARE YOU WITH THAT?

20              **MS. ZARGAROF:**  WITH RESPECT TO THIS ISSUE IN

21    PARTICULAR OR IN GENERAL?

22              **THE COURT:**  CORRECT, WITH THIS ISSUE.

23              **MS. ZARGAROF:**  SO THERE IS A LOT OF RESPONSES THAT WE

24    HAD AGREED TO AMEND BECAUSE ADDITIONAL DOCUMENTS WERE

25    REQUESTED OR FOUND FOR A VARIETY OF DIFFERENT CIRCUMSTANCES.

1   SO THOSE ARE ALL UNDERWAY.

2       I THINK GIVEN THE VOLUME, WHAT WE HAVE DECIDED TO DO,

3   ALTHOUGH I HAVEN'T HAD A CHANCE TO TALK TO OPPOSING COUNSEL

4   ABOUT THIS YET, IS TO, MUCH LIKE THE DOCUMENT PRODUCTION,

5   PROVIDE THE SUPPLEMENTAL RESPONSES IN PIECEMEAL INSTEAD OF ALL

6   TOGETHER BECAUSE THIS IS ALL TOGETHER, THEN THAT WILL DELAY

7   ALL OF THEM UNTIL SORT OF THE LAST DOCUMENT IS PRODUCED.

8       SO WITH RESPECT TO PROVIDING SUPPLEMENTAL RESPONSES ON THE

9   SETTLEMENT ISSUE, IT WOULD PROBABLY TAKE US A COUPLE OF WEEKS

10  TO MAKE SURE WE HAD THE COMPLETE LIST OF EVERYBODY, BUT I

11  THINK THAT WOULD BE, YOU KNOW, MAYBE THREE WEEKS WOULD BE SAFE

12  TO GET THOSE RESPONSES OUT.

13      **THE COURT:**  ALL RIGHT.

14      SO THIS IS WHAT I'M GOING TO DO.  I'M GOING TO ORDER THAT

15  THE SUPPLEMENTAL RESPONSES WILL BE MADE.  YOU GUYS WILL WORK

16  ON THAT AS PART OF YOUR... THE INFORMATION YOU ARE GOING TO

17  GIVE TO JUDGE GILLIAM AS FAR AS YOUR TIMELINES ARE CONCERNED.

18      I'M NOT GOING TO ORDER THAT THE DOCUMENTS BE GIVEN OVER

19  WITH THE SETTLEMENT DOCUMENTS.  HOWEVER, I WILL ORDER THAT

20  PLAINTIFFS CAN RE-RAISE THIS ISSUE AFTER THE CLASS HAS BEEN

21  CERTIFIED.

22      NOW, I UNDERSTAND THAT THAT SOUNDS A LITTLE WEIRD SINCE

23  JUDGE GILLIAM HAS ORDERED THAT IT ALL BE DONE NOW, BUT HE HAS

24  GIVEN ME JURISDICTION OVER DISCOVERY.  AND SO I WILL ORDER

25  THAT YOU GUYS CAN RE-RAISE THIS ISSUE AFTER THE CLASS HAS BEEN

## **CERTIFICATE OF TRANSCRIBER**

I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY, OF THE ABOVE PAGES OF THE OFFICIAL ELECTRONIC SOUND RECORDING PROVIDED TO ME BY THE U.S. DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, OF THE PROCEEDINGS TAKEN ON THE DATE AND TIME PREVIOUSLY STATED IN THE ABOVE MATTER.

I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE ACTION IN WHICH THIS HEARING WAS TAKEN; AND, FURTHER, THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

*Diane E. Skillman*

DIANE E. SKILLMAN, TRANSCRIBER

THURSDAY, JUNE 18, 2020

# EXHIBIT G

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3

4  RYAN HYAMS and REGINE DUHON,  )
    individuals, on behalf of    )
5  themselves, and all others   )
    similarly situated,        )
6                        )
         Plaintiffs,     )
7                      )
      VS.          ) NO.  4:18-cv-06271-PJH
8                      )
    CVS HEALTH CORPORATION, A   )
9  Rhode Island Corporation,   )
    GARFIELD BEACH CVS, LLC, a  )
10 California Corporation, and CVS)
    RX SERVICES, INC., a New York  )
11 Corporation, DOES 1 through 25,)
    Inclusive,            )
12                     )
         Defendants.     )
13  _____)

14

15

16          VIDEOCONFERENCE DEPOSITION OF

17              DIANA IBRAHIM

18           LOS ANGELES, CALIFORNIA

19         THURSDAY, JUNE 11, 2020

20

21

22  ATKINSON-BAKER, INC.
    (800) 288-3376
23  www.depo.com

24  REPORTED BY:  LAURI PULLMAN, CSR. NO. 8985

25  FILE NO:  AE0400D

1  class action, and my understanding is that you are here

2  today to speak on behalf of all of the entities that are

3  involved in this lawsuit.  Is that your understanding as

4  well?

5      A.   I mean, if that means -- can you clarify?  Does

6  that mean I am speaking on behalf of CVS or?  I don't

7  know who all of the entities involved are.

8      Q.   Okay.  So there are multiple CVS entities

9  involved.

10      A.   Okay.

11      Q.   So CVS Pharmacy, Inc., CVS Health Corporation,

12  CVS RX Services, Inc., and Garfield Beach, LLC, and some

13  Longs Drugs subsidiaries I believe are all the entities

14  that are involved in this lawsuit.

15      A.   Okay.

16      Q.   So is it your understanding that you're here to

17  speak on behalf of those entities today?

18      A.    It is my understanding that I am here to speak

19  on behalf of the umbrella that I fall under.

20          MS. GUNN:  Let me ask a slightly different

21  question to try to get us on track.  Let's talk first,

22  before we talk about the entities that you're here to

23  testify on behalf of, let's talk first about the fact

24  that it is my understanding that you are here as a

25  witness pursuant to Federal Rule of Civil Procedure

 1   30(b)(6), which means that you are a person that's been

 2   designated to speak on behalf of a company.

 3            Do you understand that to be the case?

 4       A.   I do, yes.

 5       Q.   And it's also my understanding that you're here

 6   to speak on behalf of the company as to a specific

 7   topic, and that specific topic is the policies,

 8   practices, procedures and protocols related to opening

 9   and closing duties at Target pharmacies that are

10   operated by CVS.

11            Is that your understanding as well?

12       A.   Yes.

13       Q.   Okay.  And knowing that that's the topic that

14   you are here to testify about, is it also your

15   understanding that you are here to testify on behalf of

16   any CVS entities that are involved in the ownership or

17   operation of the Target chain of pharmacies?

18       A.   Yes.

19       Q.   Okay.  Thanks.

20       A.   No problem.

21       Q.   All right.  Since you've never given a

22   deposition before, have you ever testified in court

23   before?

24       A.   No.

25       Q.   Have you ever testified in any sort of

1   shift -- the start of the shift is actually 15 minutes

2   before the store opens to allow for them to complete all

3   of those tasks, and the same thing applies to the

4   closing process.

5        Q.   Okay.  So let me break this down a little bit.

6   So it sounds like the opening duties are to disable an

7   alarm; is that correct?

8        A.   Correct.  Yes.

9        Q.   To boot up computers; is that correct?

10       A.   Yes.

11       Q.   And do they have to also unlock any doors?

12       A.   Yes.

13       Q.   And is there anything I am missing?

14       A.   Not that I can think of, no.

15       Q.   Do they have to get money in some way?

16       A.   Some locations do.  So this is the other set of

17   stores.  So the stores where the gate is located -- I am

18   sorry, the register is located behind the gate, meaning

19   that there is no access to the register unless we open

20   up the pharmacy.  So in that circumstance, Target cannot

21   put cash in the registers because obviously it's secured

22   and armed and only CVS employees are allowed in.

23            So in those circumstances, the pharmacist would

24   disarm, unlock the pharmacy, clock in, and then retrieve

25   the money or contact a Target manager to bring the money

1    to them.

2        Q.   Okay.  And how many of the Target pharmacies

3    have the registers located behind the gate?

4        A.   I don't have an exact number for you, but I can

5    tell you it's less than the number of stores that have a

6    register outside of the gate.

7        Q.   Can you break it down into approximate

8    percentages?  So if you were to tell me the percentage

9    of stores that have registers located behind the gate,

10   could you let me know what the percentage of stores --

11   of all of the stores in California -- all of the

12   pharmacies in California are?

13       A.   If I were to estimate, I would say maybe 20

14   percent.

15       Q.   So the other 80 percent then are the ones where

16   the register is not located behind the gate; is that

17   correct?

18       A.   Correct.  Yes.

19       Q.   Okay.  And in that instance, the employees who

20   are opening need to obtain the money in some manner; is

21   that correct?  Before they can --

22       A.   Yes.

23       Q.   Okay.  So they just need to obtain the money --

24   before they can open the store, they need to obtain the

25   money in some manner; is that correct?

1  and the regional directors.  And that information could

2  vary depending on the market as well.  So, for example,

3  I would imagine this document probably didn't go to my

4  pharmacy supervisors in Arizona because it doesn't

5  pertain to them.

6      Q.   So was this the first weekly communication that

7  you're aware of that dealt with paying California

8  nonexempt employees for a pay grace period associated

9  with the opening and closing duties?

10     A.   Not necessarily.  Only because -- there's

11  always been an underlying expectation that any

12  off-the-clock work needed to be reported so that punches

13  could be adjusted.

14          So that has always been very clearly

15  communicated, but I -- I don't know what document that

16  is if that's what you're asking.

17     Q.   Are you aware of any document that specifically

18  communicated how to handle paying for opening and

19  closing duties at pharmacies prior to this one?

20     A.   Not really, no.

21     Q.   Um -- do you know what prompted this document?

22     A.   No.  Only because -- I don't know if this date

23  is accurate, but according to this document, it says it

24  was updated April 2019, so I hadn't had any

25  conversations about the matter until later that year.

 1   So I am not specifically sure what prompted this

 2   specific document.

 3      Q.   Okay.  It says, "send date Monday 9/30/2019."

 4      A.   Oh, okay.

 5      Q.   Does that date seem like the date that that

 6   communication was sent?

 7      A.   That seems accurate.

 8      Q.   Okay.  And this document appears to me to refer

 9   to a system where managers would start checking their

10   employees' time, and whenever an employee had covered an

11   opening or closing shift, they would manually alter that

12   employee's time to reflect a paid grace period.

13           Is that your understanding of what happened

14   following September 30th, of 2019?

15      A.   Yes.

16      Q.   Okay.  And prior to that, was there any

17   official policy about how the opening or closing time

18   would be handled?

19      A.   No.  Not that I am aware of anyway.

20      Q.   And it's my understanding that the paid grace

21   period is the amount of time that CVS expects it to take

22   to open or close the pharmacy; is that accurate?

23           MS. ZARGAROF:  Objection, compound, lacks

24   foundation.

25           THE WITNESS:  I was just going to ask, what

Atkinson-Baker, Inc.
www.depo.com

1    Q.    Yes.

2    A.    Yes, this is correct.

3    Q.    Do you know why the five minutes was applied

4   for the opening and closing paid grace periods at the

5   Target pharmacies?

6    A.    Um -- I don't know exactly.  I can tell you

7   that, you know, I believe legal -- you know, had

8   conversations about it.  We were also involved -- when I

9   say we, I mean myself, my peer, and a Target liaison who

10  works for CVS -- kind of had conversations to kind of

11  get a general idea of how long it takes to open and

12  close the pharmacy.

13          And, you know, based on our research, we kind

14  of determined -- and based on pharmacists' feedback, we

15  determined to -- we determined that it takes

16  approximately anywhere from one -- like I mentioned

17  earlier, one minute for the most part, because you're

18  thinking about someone -- disarming the pharmacy,

19  getting the key if they don't have a key, which the

20  majority of pharmacists do have a key, getting the key

21  and then entering the pharmacy.  Like, that doesn't take

22  more than a minute.

23          So we kind of looked at that and said okay,

24  just to be on the safe side, five minutes is appropriate

25  in case there is any lag for any reason.

1      A.   Sure.

2      Q.   Um -- when we first started today, we were

3    talking about the setup of the POS being outside the

4    gate to get into the pharmacy, and then the POS being

5    inside the gate after you had already gotten into the

6    pharmacy.

7           Do you remember that?

8      A.   Uh-huh.  Yes.

9      Q.   Okay.  And I think I was confused about the

10   percentage of stores that had the POS outside the gate

11   versus the percentage of stores that had the POS inside

12   the gate.  So I just want to make sure I am clear:  For

13   the Target pharmacies in the State of California, what

14   is your estimate of the percentage of pharmacies that

15   have the POS outside the gates?

16     A.   I believe that it's the majority, so about 60

17   to 70 percent.

18     Q.   And then would the remainder have the POS

19   inside the gate?

20     A.   Yes.

21     Q.   Okay.  And -- now that I've heard you give

22   testimony on all of these different documents, it's my

23   understanding that your testimony is that opening or

24   closing duties that would happen outside the gate should

25   all be on the clock; is that accurate?

Atkinson-Baker, Inc.
www.depo.com

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, LAURI PULLMAN, Certified Shorthand Reporter,

 4   Certificate No. 8985, hereby certify:

 5        That the foregoing proceedings were taken before me

 6   at the time and place therein set forth, at which time

 7   the witness was put under oath by me;

 8        That the testimony of the witness, the questions

 9   propounded, and all objections and statements made at

10   the time of the examination were recorded

11   stenographically by me and were thereafter transcribed;

12        That the foregoing is a true and correct transcript

13   of my shorthand notes so taken;

14        I further certify that I am not a relative or

15   employee of any attorney of the parties, nor financially

16   interested in the action.

17        I declare under penalty of perjury under the laws of

18   California that the foregoing is true and correct.

19

20

21   Dated  June 25, 2020.

22                        _Lauri Pullman_

23                        _____

                          LAURI PULLMAN,
24                        CSR NO. 8985

25   Review and signature was requested.
```

# EXHIBIT H



# § 4115. Pharmacy technicians; nondiscretionary tasks; direct supervision of pharmacists; ratios; duties in health care facilities

CA BUS & PROF § 4115 | West's Annotated California Codes | Business and Professions Code | Effective: January 1, 2016

## Document Details

| | |
|---|---|
| KeyCite: | **KeyCite Yellow Flag - Negative Treatment**<br>Proposed Legislation |

## Search Details

| | |
|---|---|
| Search Query: | cal bus prof 4115 |
| Jurisdiction: | California |

## Delivery Details

| | |
|---|---|
| Date: | June 2, 2020 at 2:56 PM |
| Delivered By: | Beth Gunn |
| Client ID: | RYAN HYAMS |
| Status Icons: | |

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Annotated California Codes
  Business and Professions Code (Refs & Annos)
    Division 2. Healing Arts (Refs & Annos)
      Chapter 9. Pharmacy (Refs & Annos)
        Article 7. Pharmacies (Refs & Annos)

West's Ann.Cal.Bus. & Prof.Code § 4115

§ 4115. Pharmacy technicians; nondiscretionary tasks; direct supervision of pharmacists; ratios; duties in health care facilities

Effective: January 1, 2016

Currentness

(a) A pharmacy technician may perform packaging, manipulative, repetitive, or other nondiscretionary tasks only while assisting, and while under the direct supervision and control of, a pharmacist. The pharmacist shall be responsible for the duties performed under his or her supervision by a technician.

(b) This section does not authorize the performance of any tasks specified in subdivision (a) by a pharmacy technician without a pharmacist on duty.

(c) This section does not authorize a pharmacy technician to perform any act requiring the exercise of professional judgment by a pharmacist.

(d) The board shall adopt regulations to specify tasks pursuant to subdivision (a) that a pharmacy technician may perform under the supervision of a pharmacist. Any pharmacy that employs a pharmacy technician shall do so in conformity with the regulations adopted by the board.

(e) A person shall not act as a pharmacy technician without first being licensed by the board as a pharmacy technician.

(f)(1) A pharmacy with only one pharmacist shall have no more than one pharmacy technician performing the tasks specified in subdivision (a). The ratio of pharmacy technicians performing the tasks specified in subdivision (a) to any additional pharmacist shall not exceed 2:1, except that this ratio shall not apply to personnel performing clerical functions pursuant to Section 4116 or 4117. This ratio is applicable to all practice

settings, except for an inpatient of a licensed health facility, a patient of a licensed home health agency, as specified in paragraph (2), an inmate of a correctional facility of the Department of Corrections and Rehabilitation, and for a person receiving treatment in a facility operated by the State Department of State Hospitals, the State Department of Developmental Services, or the Department of Veterans Affairs.

(2) The board may adopt regulations establishing the ratio of pharmacy technicians performing the tasks specified in subdivision (a) to pharmacists applicable to the filling of prescriptions of an inpatient of a licensed health facility and for a patient of a licensed home health agency. Any ratio established by the board pursuant to this subdivision shall allow, at a minimum, at least one pharmacy technician for a single pharmacist in a pharmacy and two pharmacy technicians for each additional pharmacist, except that this ratio shall not apply to personnel performing clerical functions pursuant to Section 4116 or 4117.

(3) A pharmacist scheduled to supervise a second pharmacy technician may refuse to supervise a second pharmacy technician if the pharmacist determines, in the exercise of his or her professional judgment, that permitting the second pharmacy technician to be on duty would interfere with the effective performance of the pharmacist's responsibilities under this chapter. A pharmacist assigned to supervise a second pharmacy technician shall notify the pharmacist in charge in writing of his or her determination, specifying the circumstances of concern with respect to the pharmacy or the pharmacy technician that have led to the determination, within a reasonable period, but not to exceed 24 hours, after the posting of the relevant schedule. An entity employing a pharmacist shall not discharge, discipline, or otherwise discriminate against any pharmacist in the terms and conditions of employment for exercising or attempting to exercise in good faith the right established pursuant to this paragraph.

(g) Notwithstanding subdivisions (a) and (b), the board shall by regulation establish conditions to permit the temporary absence of a pharmacist for breaks and lunch periods pursuant to Section 512 of the Labor Code and the orders of the Industrial Welfare Commission without closing the pharmacy. During these temporary absences, a pharmacy technician may, at the discretion of the pharmacist, remain in the pharmacy but may only perform nondiscretionary tasks. The pharmacist shall be responsible for a pharmacy technician and shall review any task performed by a pharmacy technician during the pharmacist's temporary absence. This subdivision shall not be construed to authorize a pharmacist to supervise pharmacy technicians in greater ratios than those described in subdivision (f).

(h) The pharmacist on duty shall be directly responsible for the conduct of a pharmacy technician supervised by that pharmacist.

(i) In a health care facility licensed under subdivision (a) of Section 1250 of the Health and Safety Code, a pharmacy technician's duties may include any of the following:

(1) Packaging emergency supplies for use in the health care facility and the hospital's emergency medical system or as authorized under Section 4119.

(2) Sealing emergency containers for use in the health care facility.

(3) Performing monthly checks of the drug supplies stored throughout the health care facility. Irregularities shall be reported within 24 hours to the pharmacist in charge and the director or chief executive officer of the health care facility in accordance with the health care facility's policies and procedures.

**Credits**

(Added by Stats.1996, c. 890 (A.B.2802), § 5. Amended by Stats.1997, c. 549 (S.B.1349), § 67; Stats.1999, c. 900 (S.B.188), § 3, eff. Oct. 10, 1999; Stats.2001, c. 352 (A.B.536), § 1; Stats.2001, c. 728 (S.B.724), § 29.2; Stats.2004, c. 695 (S.B.1913), § 35; Stats.2005, c. 621 (S.B.1111), § 53; Stats.2012, c. 24 (A.B.1470), § 4, eff. June 27, 2012; Stats.2014, c. 319 (S.B.1039), § 1, eff. Jan. 1, 2015; Stats.2015, c. 303 (A.B.731), § 5, eff. Jan. 1, 2016.)

Notes of Decisions (8)

West's Ann. Cal. Bus. & Prof. Code § 4115, CA BUS & PROF § 4115
Current with urgency legislation through Ch. 3 of 2020 Reg.Sess

      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

   © 2020 Thomson Reuters. No claim to original U.S. Government Works.



# Technician to Pharmacist Ratio Laws



**Self-Paced Guide**

March 2016

Course Code: 202125

CVS 003582

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

# Table of Contents

Introduction ........................................................................................................................ 3

Overview ............................................................................................................................ 4
    What is a Technician to Pharmacist Ratio? ............................................................ 4
    Penalties for Violation........................................................................................... 6

Ratio and On-the-Job Training.......................................................................................... 7

Your Role .......................................................................................................................... 9

State-Specific Requirements ........................................................................................... 10

Scenarios ......................................................................................................................... 11

Course Completion .......................................................................................................... 13

Next Steps ....................................................................................................................... 13

Appendix A ...................................................................................................................... 14
    State-Specific Ratios .......................................................................................... 14

Appendix B ...................................................................................................................... 41
    Knowledge Check Answer Key ........................................................................... 41



CVS 003583

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

## Introduction

In this course, you will learn about Technician to Pharmacist ratio laws and how these requirements impact your role in the pharmacy. You will also learn about how ratio requirements affect on-the-job training for new hires.**

Upon completion of this self-paced guide, you will be able to:

- Explain the importance of maintaining Technician to Pharmacist ratios in the Pharmacy

- Describe the potential violations when pharmacies are not in compliance with ratio regulations, where applicable

- Explain how ratio requirements impact on-the-job-training (OJT)

- Define your role in meeting ratio laws

- Identify the state-specific ratio requirements in your pharmacy

This training is provided in a self-paced format. Answers to knowledge checks are in the Appendix at the end of this guide.

   This icon indicates a knowledge check.

It will take you approximately **15 minutes** to complete this training.

** The information contained in this course is specific to Technician:Pharmacist ratios. It does not address Intern:Pharmacist ratios. Please refer to your state specific regulations regarding Intern:Pharmacist ratio requirements.



CVS 003584

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

## Overview

Technician to Pharmacist ratios exist to help ensure that pharmacies can operate without sacrificing *safety* and *quality*. Following ratio laws in your state helps maintain quality and patient safety while helping you best support customers on their path to better health.

## What is a Technician to Pharmacist Ratio?

Technician to Pharmacist ratio simply refers to the number of Pharmacy Technicians that can work in the pharmacy for each Pharmacist that is currently working.

Individual states try to find the balance between providing the Pharmacist necessary operational and dispensing assistance while not overpowering the Pharmacist with too many staff to supervise.

> **Example**
>
> A 3:1 ratio would mean that three Pharmacy Technicians can work in the Pharmacy for every one Pharmacist on duty.

The goal is to ensure that Pharmacist workload, prescription volume, and staffing allow them to maintain a focus on patient safety, quality controls, and Pharmacy Technician oversight.

Each state manages their requirements to ensure that the ratio laws meet the individual needs and concerns of each state Board of Pharmacy. Not all states have ratios. Depending on the state, ratios may not be necessary to ensure patient safety.

**Important!** Ratios can be written and expressed as **Technician to Pharmacist** (3:1) or **Pharmacist to Technician (1:3)**. Pay close attention to how the language is written to ensure you understand the correct ratio.



**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

## Knowledge Check #1

 Complete the following questions to review what you have learned in this section.

1. What is a Technician to Pharmacist ratio in the pharmacy?

   _____

   _____

2. Why is it important to maintain Technician to Pharmacist ratios in the Pharmacy?

   _____

3. If a pharmacy has a 2:1 ratio requirement, how many Technicians can be in the pharmacy for every Pharmacist working at a given time?

   A.  1
   B.  2
   C.  3
   D.  4



CVS 003586

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

## Penalties for Violation

Ratio requirements must be taken very seriously. Aside from risking patient safety, there are also rigorous penalties for violation.

Failure to follow the laws and regulations can result in:

- **Civil and criminal penalties:**
  - Monetary fines
  - Other administrative sanctions, such as, suspension or revocation of the Store's license or the Pharmacy's DEA registration or license

- **Criminal, civil or administrative remedies for colleagues:**
  - Suspension or revocation of Pharmacists' licenses
  - Fines or arrest for failure to comply with the law
  - Disciplinary action, up to and including termination of employment

### Knowledge Check #2

 Read the scenario and answer the questions.

The CVS pharmacy in store 1234 is really busy today. They are required to maintain a 2:1 ratio in their state. There are two Technicians working with the Pharmacist now. The Technician who is scheduled to come in for the next shift comes in ½ hour early to help out.

Will this Pharmacy be out of ratio?

_____

_____

What penalties might this pharmacy incur if the ratio laws are violated?

_____

_____



CVS 003587

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

## Ratio and On-the-Job Training

Guidelines have been created to aid you in meeting state-specific ratio requirements
while effectively coaching during OJT. The OJT process allows for states with and
without Technician:Pharmacist ratio laws to provide coaching while staying within
state-specific requirements.

| Step | Coach | Learner |
|---|---|---|
| Step 1A<br>**(States with Technician:Pharmacist ratio requirements)** | **Explain *only***<br>• Explain the workstations tasks to the learner<br>• Use the discussion points in the coach's checklist to check for learner understanding of workstation concepts | **Listen**<br>• Learner listens and asks any questions they may have |
| Step 1B<br>**(States with *no* Technician:Pharmacist ratio requirements)** | **Explain and demonstrate**<br>• Explain and demonstrate workstation tasks<br>• Use the discussion points in your coach's checklist to check for learner understanding of workstation concepts | **Observe and listen**<br>• Learner listens and asks any questions they may have<br>• The learner observes the coach perform the tasks at the workstation |
| Step 2 | **Coach learner**<br>o Provide feedback as the learner is trying the tasks<br>  ▪ Praise what the learner did well<br>  ▪ Be specific about what behavior or skill needs to be improved<br>  ▪ Emphasize the impact of the team member's actions on the customer<br>o Provide encouragement to boost learner confidence | **Try**<br>• Learner tries the tasks at the workstation under the coach's guidance |
| Step 3: | **Provide feedback**<br>o Continue to provide feedback, as needed<br>o Monitor learner performance and provide assistance, as necessary | **Perform**<br>• Learner performs the tasks at the workstation on their own with minimum feedback |



CVS 003588

## Technician to Pharmacist Ratio Laws:  Self-Paced Guide

### States with Ratios

For pharmacies located in states where there are Technician:Pharmacist ratio laws, coaches will modify step 1 in the OJT process to ensure that they are not counted in the pharmacy's ratio. Coaches follow **step 1A**.

In order to ensure that the coach is not perceived as part of the Technician to Pharmacist ratio while coaching, they must:

- Wear business casual attire (no lab coats or scrubs)
- Remove current name badge and wear "Coach" name badge
- Coach cannot do any tasks associated with the role of a Pharmacy Technician. This includes, but is not limited to:
  - o  Answering the phone
  - o  Touching the computer
  - o  Handling drugs
  - o  Assisting patients
  - o  Using credentials
  - o  Putting away truck
  - o  Assisting at other workstations

The coach:

- Strictly limits interactions to coaching learners
- **Explains** the steps in the tasks/activities
  - o  Breaks tasks down into logical, manageable chunks
  - o  Provides only the level of detail which the learner can absorb
- Explains **why** we complete tasks/activities to provide context
- Describes the **benefits** of completing tasks/activities, as outlined

*Remember!* *Violations of Technician to Pharmacist ratio can result in severe penalties.*

### States without Ratios

For Pharmacies located in states without Technician:Pharmacist ratio laws, coaches should follow **step 1B** in the OJT process.

The learner observes the coach complete the tasks at the workstation. The coach:

- **Explains** the steps of the tasks/activities while **demonstrating** them
  - o  Breaks tasks down into logical, manageable chunks
  - o  Provides only the level of detail which the learner can absorb
- Explains **why** we complete tasks/activities to provide context
- Describes the **benefits** of completing tasks/activities as outlined



CVS 003589

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

## Your Role

We all play a role in ensuring the health and safety of patients. Let's review your role as it relates to state-specific ratio laws in the pharmacy and during training.

### Pharmacy Supervisor and Field Management Team

- Hold all groups accountable for management of the ratio requirements to drive patient safety and compliance
- Make note of ratios during store visits to ensure teams are adhering to ratio appropriately
- Provide guidance and coaching, as needed, when ratio issues arise
- Communicate any ratio related issues that are stemming from OJT to your Human Resource Business Partner (HRBP) and Field Training Manager (FTM) for resolution

### Pharmacy Manager

- Recognize your state-specific ratio laws
- Lead by example by never allowing your Pharmacy team to violate ratio
- Provide guidance and coaching, as needed, when ratio issues arise
- At Learning Stores and Skill Development Stores, ensure that coaches and new hires are compliant with the OJT process to ensure teams do not violate ratio

### Coach

- Recognize your state-specific ratio laws
- Lead by example by never allowing yourself or your Pharmacy team to violate ratio
- Educate other team members and explain why you are unable to demonstrate tasks in the pharmacy, in states where there are ratio laws
  - Ensure that the coach is not perceived as part of the Pharmacist to Technician ratio while coaching
- At Learning Stores and Skill Development Stores, ensure that coaches and new hires are compliant with the OJT process to ensure teams do not violate ratio



CVS 003590

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

## State-Specific Requirements

This section helps you better understand your state-specific ratio laws. The map below shows a snapshot of which states currently have ratio laws in place (data current as of 12/9/15).



For a full list of each state and ratio requirements, refer to Appendix A at the end of this guide. Ratios and requirements may change at any time.  For the most current information, please refer to RxNet.



CVS 003591

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

# Scenarios

To apply what you have learned, let's look at a few scenarios relating to ratio laws in the pharmacy. Let's review your role and steps you should take.

### Knowledge Check #3



Read the scenario and complete the following questions to apply what you have learned in this training.

**In this scenario, a new colleague arrives at the Pharmacy for on-the-job training. You notice the Pharmacy is extremely backed up (in state with ratio).**

1. What should the coach do?

_____

_____

2. How should the Pharmacy Manager respond?

_____

_____



CVS 003592

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

### Knowledge Check #4



Read the scenario and complete the following questions to apply what you have learned in this training.

**In this scenario, a Skill Development Store has a learner scheduled for OJT. A Technician calls out for their shift, which overlaps with the learner OJT (in a state with ratio).**

1.  What should the Pharmacy Manager do?

_____

_____

2.  What happens if the learner reports and there is no qualified coach to deliver the OJT due to the call out and it is a minimum hours paid state?

_____

_____

### Knowledge Check #5



Read the scenario and complete the following questions to apply what you have learned in this training.

**In this scenario, a Skill Development Store has a learner scheduled for OJT. A coach in the Skill Development Store calls out sick.**

1.  What should the store do?

_____

_____

**CVS/pharmacy** ®

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

## Course Completion

Congratulations!  You have completed the Technician to Pharmacist Ratio Laws course.  You should be able to:

- Explain the importance of maintaining Technician to Pharmacist ratios in the Pharmacy
- Describe the potential violations when pharmacies are not in compliance with ratio regulations, where applicable
- Explain how ratio requirements impact on-the-job-training (OJT)
- Define your role in meeting ratio laws
- Identify the state-specific ratio requirements in your pharmacy

## Next Steps

In order to receive credit for the completion of this training, you need to complete the acknowledgement located on the course description page on LEARNet.

Follow the steps below to complete the acknowledgement:

| Step | Action |
|------|--------|
| 1 | Log onto LEARNet. |
| 2 | Search for the course #202125. |
| 3 | From the course description page, click the link to "Complete the Acknowledgment". |



CVS 003594

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

## Appendix A

## State-Specific Ratios

Use the table below as a reference.  **Note**: Information current as of 12/9/2015. Ratios and requirements may be changed at any time.  For the most current information in any state please refer to RxNet.

| State | Ratio (Technician:RPh) | Technician Duties (under the supervision of a licensed Pharmacist) |
|---|---|---|
| Alabama | ➔ 3:1 (If one Technician is certified by any credentialing organization approved by the Board)<br>➔ 2:1 (If none are certified, then ratio is 2:1) | ➔ Perform any function that does not require the professional judgment of the licensed Pharmacist<br>➔ Assist with compounding<br>➔ Sell ephedrine, pseudoephedrine, their sales or optical isomers, or salts of optical isomers<br>➔ Technician must be registered |
| Alaska | Not addressed in the laws. Presumption is that the ratio is at the Pharmacist's discretion; verify with Board before instituting high ratios. | ➔ Assist in performing manipulative, non-discretionary functions associated with the practice of pharmacy<br>➔ Any support staff member assigned to work in the dispensing area of a pharmacy must be licensed as a Pharmacy Technician<br>➔ Perform cashier and bookkeeping duties<br>➔ Technician-in-training must complete a minimum of 40 hours on-the-job training before regularly performing associated tasks of sterile pharmaceutical preparation |
| Arizona | No maximum ratio requirement. | ➔ Assist a Pharmacist, Graduate Intern, or Pharmacy Intern in compounding prescriptions if verified by the Pharmacist before dispensing<br>➔ Record on the original prescription order the prescription serial; number and date dispensed<br>➔ Initiate or accept refills authorization from a medical practitioner or medical |



CVS 003595

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

| State | Ratio (Technician:RPh) | Technician Duties (under the supervision of a licensed Pharmacist) |
|---|---|---|
| | | ➔ Record patient information in electronic system<br>➔ Off-site order entry<br>➔ Obtain patient information and enter into computer |
| California | ➔ 1:1 (If pharmacy has only 1 Pharmacist)<br>➔ 2:1 (If additional Pharmacists at the pharmacy)<br>➔ 1:1 (Technician in training) | ➔ Manipulative and repetitive tasks<br>➔ Other non-discretionary tasks including:<br>• Removing the drug or drugs from stock<br>• Counting pouring or mixing pharmaceuticals<br>• Placing the product into a container<br>• Affixing the label or labels to the container<br>• Packaging and repackaging |
| Colorado | 3:1<br><br>One of the three must either be:<br>➔ Nationally Certified Technician<br>➔ Possess a Pharmacy Technician degree<br>➔ Be a Technician who has completed 500 hours of experiential training at the pharmacy<br>➔ Be a Pharmacy Intern (up to 2 of the 3 can be Interns) | ➔ Preparation, mixing, assembling, packaging, labeling or delivery of a drug or device<br>➔ Proper and safe storage of drugs or devices<br>➔ Maintenance of proper records for such drugs and devices<br>➔ Entering refill prescription order information if no interpretation is required<br>➔ Placement of a prescription into another outer container and labeling of the container with the patient's name or any other identifying information<br>➔ Receiving of patient information from a Pharmacist<br>➔ Transferring an order for the purpose of redispensing it |
| Connecticut | ➔ 2:1<br>➔ 3:1 (If at least one of the Technicians is certified)<br>➔ Pharmacist may refuse to supervise three Technicians at a time if request is made in writing | ➔ Assist in dispending of drugs and devices under the direct supervision of a Pharmacist<br>➔ Obtain prescription renewal authorizations<br>➔ Technicians must receive training prior to regular performance of task<br>• May perform tasks as part of training |
| Delaware | Law is silent. However, at least | ➔ Receive and triage incoming calls |



CVS 003597

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

## Appendix B

## Knowledge Check Answer Key

Answers to the knowledge check questions are listed below. For multiple choice questions, correct answers are bold.

**Knowledge Check #1**

1. **What is a Technician to Pharmacist ratio in the pharmacy?**

   Technician to Pharmacist ratio simply refers to the number of Pharmacy Technicians that can work in the pharmacy for each Pharmacist that is currently working.

2. **Why is it important to maintain Technician to Pharmacist ratios in the Pharmacy?**

   Ratio requirements are important as they set a goal to ensure that Pharmacist workload, prescription volume, and staffing allow them to maintain a focus on patient safety, quality controls, and Pharmacy Technician oversight. Aside from risking patient safety, there are also rigorous penalties for violation.

3. If a pharmacy has a 2:1 ratio requirement, how many Technicians can be in the pharmacy for every Pharmacist working at a given time?

   A. 1
   **B. 2**
   C. 3
   D. 4

**Knowledge Check #2**

1. **Will this Pharmacy be out of ratio?**
   Yes, this Pharmacy will likely be out of ratio if an unscheduled team member works when they are not scheduled even if it is only a ½ hour.

2. **What penalties might this pharmacy incur if the ratio laws are violated?**
   Although this may seem helpful, the Pharmacy may be out of ratio if that Technician comes in early. It is important that Pharmacy teams are aware of the schedule and ratio at all times.



CVS 003622

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

**Knowledge Check #3**

**In this scenario, a new colleague arrives at the Pharmacy for on-the-job training. You notice the Pharmacy is extremely backed up (in a state with ratio laws).**

1. **What should the coach do?**
   - Have the colleague observe the coach's work until the Pharmacy is caught up and they can focus on OJT
   - Remember, the coach is considered part of the ratio if they are actively working in the Pharmacy. The coach cannot do any tasks associated with the role of a Pharmacy Technician while coaching OJT

2. **How should the Pharmacy Manager respond?**
   - Monitor the store's activities and communicate to the new colleague how long you think it will be until the Pharmacy is caught up and why they are unable to assist in the Pharmacy (due to ratio laws)
   - Have the colleague observe the coach's work until the Pharmacy is caught up and they can focus on OJT

**Knowledge Check #4**

**In this scenario, a Skill Development Store has a learner scheduled for OJT and a Technician calls out for their shift, which overlaps with the learner OJT (in a state with ratio).**

1. **What should the Pharmacy Manager do?**
   - Attempt to replace the Technician that called out with another Pharmacy team member or with a cross trained colleague from the Front Store
   - If the colleague has already completed Pick-up training, have them work their shift at Pick-Up in the Skill Development Store (paying them out  of operational payroll) and reschedule their OJT
   - Contact the learner immediately to reschedule their OJT prior to them arriving at the store

2. **What happens if the learner reports and there is no qualified coach to deliver the OJT due to the call out and it is a minimum hours paid state?**
   - Attempt to replace the Technician that called out with another Pharmacy team member or with a cross trained colleague from the Front Store
   - If the colleague has already completed Pick-up training, have them work their shift at Pick-Up in the Skill Development Store (paying them out  of operational payroll) and reschedule their OJT
   - Send the colleague home and pay them the minimum hours required



CVS 003623

**Technician to Pharmacist Ratio Laws:  Self-Paced Guide**

**Knowledge Check #5**

**In this scenario, a Skill Development Store has a learner scheduled for OJT. A coach in the Skill Development Store calls out sick.**

1. **What should the store do?**
   - Immediately call the new hire to reschedule their OJT
   - If the new colleague has been trained at Pick-up, ask them if they would like to work the shift and reschedule their OJT



# EXHIBIT I

1  JOHN CUMMING, SBC #068796
   jcumming@dir.ca.gov
2  State of California, Department of Industrial Relations
   OFFICE OF THE DIRECTOR
3  1515 Clay Street, 17th Floor
   Oakland, CA 94612
4  Telephone: (510) 286-7087
   Fax: (510) 62232650
5
   Counsel for Department of Industrial Relations
6  appearing specially for the Labor and Workforce
   Development Agency
7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  DOUGLAS O'CONNOR, et al.,                    Case No. 13-cv-03826-EMC

12              Plaintiffs,

13         v.                                    **CALIFORNIA LABOR AND
                                                 WORKFORCE DEVELOPMENT
14  UBER TECHNOLOGIES, et al.,                   AGENCY'S COMMENTS ON
                                                 PROPOSED PAGA SETTLEMENT**
15              Defendants.

16

17

18         The California Labor and Workforce Development Agency (the "LWDA") respectfully files

19  this brief in response to the Court's Order Inviting Comments on Proposed PAGA Settlement

20  [Document 725] issued on June 30, 2016.  Although LWDA expresses no position on the merits of the

21  underlying dispute in this matter, it reserves its right to take a position on questions of employment

    involving the defendant and drivers.

22         The primary purpose of the California Private Attorneys General Act of 2004, Labor Code

23  sections 2698 – 2699.5 ("PAGA"), is to advance the state's policy of vigorously enforcing minimum

24  labor standards.  (See Cal. Lab. Code § 90.5.)  When PAGA was originally enacted in 2003, the

25  Legislature made the following findings:

26         (a) Adequate financing of essential labor law enforcement functions is necessary to
           achieve maximum compliance with state labor laws in the underground economy and to
27         ensure an effective disincentive for employers to engage in unlawful and anticompetitive
           business practices.
28

DEPARTMENT OF
INDUSTRIAL RELATIONS   CA LWDA COMMENTS ON PROP PAGA SETTLEMENT          Case 13-cv-03826-EMC
OFFICE OF THE DIRECTOR

(b) Although innovative labor law education programs and self-policing efforts by industry watchdog groups may have some success in educating some employers about their obligations under state labor laws, in other cases the only meaningful deterrent to unlawful conduct is the vigorous assessment and collection of civil penalties as provided in the Labor Code.

(c) Staffing levels for state labor law enforcement agencies have, in general, declined over the last decade and are likely to fail to keep up with the growth of the labor market in the future.

(d) It is therefore in the public interest to provide *that civil penalties for violations of the Labor Code may also be assessed and collected by aggrieved employees acting as private attorneys general,* while also ensuring that state labor law enforcement agencies' enforcement actions have primacy over any private enforcement efforts undertaken pursuant to this act.

(Calif. Stats. 2003, ch. 906, § 1 [uncodified], emphasis added; see also *Arias v. Superior Court* (2009) 46 Cal.4th 969, 986 ["An employee plaintiff suing . . . under [PAGA] does so as the proxy or agent of the state's labor law enforcement agencies. The act's declared purpose is to supplement enforcement actions by public agencies, which lack adequate resources to bring all such actions themselves."].)

By creating a cause of action under which private plaintiffs may recover civil penalties otherwise recoverable by the state, PAGA benefits the public by augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance.  This furthers the state's policy to protect workers from substandard and unlawful conditions and also to protect employers "who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards."  (Lab. Code § 90.5, subd. (a).)   In serving the state's public policy, however, the LWDA emphasizes that PAGA is not intended to be used in connection with unmeritorious claims in order to leverage settlements under threat of excessive litigation costs, attorneys' fees.

A PAGA judgment binds all nonparty employees, even outside the class action context.  (See *Arias, supra,* 46 Cal. 4th at p. 986 ["Because an aggrieved employee's action under the Labor Code Private Attorneys General Act of 2004 functions as a substitute for an action brought by the government itself, a judgment in that action binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government."].)  It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the

PAGA.

Because the primary focus of a court's inquiry is the protection of absent class members, the LWDA recognizes that claims asserted and to be settled under PAGA are somewhat distinct from the other claims encompassed within the proposed settlement.  This is so because, as noted, the primary purpose of PAGA is to benefit the public, not just the class members, and the monetary relief under PAGA is in the form of civil penalties that would otherwise be recoverable by the state, 75 percent of which must be paid to the LWDA.  (See Labor Code §2699, subd. (i).)  The penalties available to the state and to plaintiffs who bring PAGA actions are distinct from the penalties available to employees in conjunction with their private claims. (Compare Labor Code § 226, subd. (e)(1) [damages due employee for wage stub violations] with Labor Code § 226.3 [penalties that can be assessed by State Labor Commissioner for wage stub violations].)  For that reason, when reviewing the monetary relief allocated to PAGA claims under a settlement, the LWDA recognizes that the PAGA sum need not necessarily be viewed through the same lens as the relief obtained by absent class members on other claims (i.e., the percentage of recovery-to-exposure on the PAGA claims need not necessarily equal the percentage of recovery on the other claims).  This is because, as noted, the PAGA settlement primarily serves the important purpose of benefitting the public, whereas the court is charged with considering the interests of the absent class members.

With the foregoing observations as background, the LWDA makes the following specific observations about the proposed PAGA allocation and class action settlement in this case.  First, based on the limited information contained in the moving papers about the numbers of workers and claims, the LWDA believes it is accurate to estimate the potential PAGA penalty exposure as in excess of $1 billion.  Second, the Agency can discern no rationale for allocating $1 million of the proposed settlement fund to the PAGA claim (out of a total settlement fund of $84 or $100 million), other than that this is a "round" number and a large figure in comparison to other PAGA settlements.  However, the underlying assumption that this fits within some sort of benchmark test is not necessarily accurate. The LWDA is not aware any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action.[1]  And for the reasons noted above, there may be no clear basis for establishing such a bright line rule in light both of the unique nature and purposes of PAGA, and the myriad of facts and circumstances that may

---

[1] Plaintiffs' have argued here that *Amaral v. Cintas Corp*. No.2 (2008) 163 Cal.App.4th 1157, set a standard of limiting PAGA penalties to one-third of the damages recovered.  The *Amaral* decision, however, is not susceptible to that interpretation.  The court simply cited this proportionality as a reason for rejecting the defendant's contention that the penalty in that case was "confiscatory."  (*Id*. at p. 1214.)

DEPARTMENT OF
INDUSTRIAL RELATIONS
OFFICE OF THE DIRECTOR

exist in each proposed class action settlement.  In most class action settlement negotiations, class counsel attempt to maximize the recovery for their clients and for their attorneys' fees and costs, while defense counsel seek to limit their clients' overall exposure.  The easiest claim to compromise in such a negotiation may well be the PAGA claim.  As such, examples of other settlements with limited PAGA penalty allocations are evidence of nothing more than that parties agreed to set penalties in those amounts, and the reviewing courts had no basis for looking behind the agreement.

The LWDA tracks the receipt of PAGA penalty checks, and while this would be one of the higher settlement amounts, it is not the highest PAGA penalty recovery within the past 18 months. In May of 2015, the LWDA received PAGA penalties in the amount of $975,930.75 from a $2 million settlement in *Padilla v. Staffmark Investment LLC*, San Bernardino Superior Court No. CIVDS1408641, and in May of this year, the LWDA received penalties in the amount of $2,979,422.13 from a $6.25 million settlement in *Dutt v. Lowe's HIW, Inc.*, Los Angeles Superior Court Nos. BC553191, et al.  From the limited information available to the LWDA, it appears that both cases were focused solely on enforcing violations and recovering penalties through PAGA rather than on any claims for private relief.  These examples are offered not for the purpose of suggesting a different benchmark, but rather to further illustrate the point that PAGA penalties must be evaluated in terms of their public policy objective and not just through the prism of what private relief has been sought or obtained.

The LWDA recognizes that this Court does not review the PAGA allocation in isolation, but rather reviews the settlement as a whole, to determine whether it is fundamentally fair, reasonable and adequate, with primary consideration for the interests of absent class members. The LWDA also recognizes and respects that this determination is ultimately committed to the Court's discretion, and that the Court is in the best position to evaluate the merits of the claims asserted, the evidence in the case, the risks to the class of proceeding to trial, and the overall benefits conferred by the settlement. (*Churchill Vill., L.L.C. v. Gen. Elec.* (9th Cir. 2004) 361 F.3d 566, 575; *Hanlon, supra,* 150 F.3d at

//
//
//
//
//
//
//

CA LWDA COMMENTS ON PROP PAGA SETTLEMENT                    Case No. 13-cv-03826-EMC

p. 1026.)  Ultimately, the LWDA emphasizes the need to take into account the unique public policy role of the PAGA in this evaluation.

Dated: July 29, 2016                    Respectfully submitted,


                                            /s/ John Cumming
                                        _____

                                        John Cumming
                                        Counsel for Department of Industrial Relations
                                        appearing specially for the Labor and Workforce
                                        Development Agency

O'Connor v. Uber Technologies, Inc.,
Case No. 13-cv-03826-EMC (N.D. Cal.)

## PROOF OF SERVICE

### RE: U.S. Mail Service Parties

I am employed in the County of Alameda, California.  I am over the age of eighteen years and not a party to the within action; my business address is 1515 Clay Street, 17th Floor, Oakland, CA 94612.  On July 29, 2016 I caused to be served the following documents:

### CALIFORNIA LABOR AND WORKFORCE DEVELOPMENT AGENCY'S COMMENTS ON PROPOSED PAGA SETTLEMENT

on the parties listed below, through their attorneys of record, for service as designated below:

(A) **By personal service**. I personally delivered the documents to the persons at the addresses listed below. For a party represented by an attorney, delivery was made to the attorney or at the attorney's office by leaving the documents in an envelope or package clearly labeled to identify the attorney being served with a receptionist or an individual in charge of the office.

(B) **By United States mail**. I enclosed the documents in a sealed envelope or package addressed to the persons at the address below and:

(1) ☐ deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid.

    (a) ☐ and the sealed envelope was prepared for Certified Mail, Return Receipt Requested, with appropriate fees for such service fully prepaid.

    (b) ☐ and the sealed envelope was prepared for Registered Mail, with appropriate fees for such service fully prepaid.

(2) ☒ placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

    (a) ☐ and the sealed envelope was prepared for Certified Mail, Return Receipt Requested, with appropriate fees for such service fully prepaid.

    (b)☐ and the sealed envelope was prepared for Registered Mail, with appropriate fees for such service fully prepaid.

I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at Oakland, California.

(C) **By overnight delivery**:

(1) ☐ I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses below. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

(2) ☐ The documents were delivered to an authorized courier or driver authorized to receive documents by an overnight delivery carrier, in an envelope or package designated by the carrier with delivery fees  paid or provided for, addressed to the person to whom it is to be served, at the office address as last given by that person on the document filed in the cause and served on the party making service.


John Doe
1319 Washington Avenue #163
San Leandro, CA 94577

Theane D. Evangelis
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


Date:  July 29, 2016            _Regina Schneider_
                          _____
                                    Declarant

PROOF OF SERVICE                         Case No. 13-cv-03826-EMC (N.D. Cal.)