**ALEXANDER KRAKOW + GLICK LLP**
Michael S. Morrison (State Bar No. 205320)
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
T: 310.394.0888 | F: 310.394.0811
E: mmorrison@akgllp.com

Attorneys for Plaintiffs SEVAG CHALIAN,
SIGFREDO CABRERA, ENKO TELAHUN, and
CHRISTINE MCNEELY and the Putative Class

(*Additional Counsel Listed on Following Page*)

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

SEVAG CHALIAN, an Individual, et al.,
on behalf of themselves and all others
similarly situated and the general public,

                   Plaintiffs,

    v.

CVS PHARMACY, INC., a Rhode Island
corporation; CVS RX SERVICES, INC.,
a New York corporation; GARFIELD
BEACH CVS, LLC, a California limited
liability company; and DOES 1 through
100, inclusive,

                   Defendants.

---

SIGFREDO CABRERA, ENKO
TELAHUN and CHRISTINE
MCNEELY, as individuals, on behalf of
themselves, and all other persons similarly
situated,

                   Plaintiffs,

    v.

CVS RX SERVICES, INC., a New York
corporation; CVS PHARMACY, INC., a
Rhode Island corporation; GARFIELD
BEACH CVS, LLC, a California limited
liability company; and DOES 1 thru 10,
inclusive,

                   Defendants.

Case No.: 2:16-cv-08979-AB-AGR

*Consolidated with Case No.: 2:20-cv-02401-AB-AGR*

*Assigned to Hon. André Birotte Jr.*

**DECLARATION OF MICHAEL MORRISON RE: PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AND DIRECTION OF NOTICE UNDER RULE 23(E) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

[*Filed concurrently with Plaintiffs' Reply Brief in Support of Motion for Preliminary Approval*]

Date: July 24, 2020
Time: 10:00 am
Location: Courtroom 7B
          350 West First Street.
          Los Angeles, California

State Case No.: BC627757
State Action Filed: July 20, 2016
Removal Date: December 5, 2016
Consolidated: July 1, 2020

---

DECLARATION OF MICHAEL MORRISON RE: REPLY TO MPA MOTION

Michael H. Boyamian, SBN 256107
Armand R. Kizirian, SBN 293992
**BOYAMIAN LAW, INC.**
550 N. Brand Blvd., Suite 1500
Glendale, CA 91203
T: (818) 547-5300 | F:(818) 547-5678
E-mail: michael@boyamianlaw.com
        armand@boyamianlaw.com

R. Craig Clark, SBN 129219
**CLARK LAW GROUP**
3258 4th Ave.
San Diego, CA 92103
T: (619) 239-1321 | F: (888) 273-4554
E-mail: cclark@clarklawyers.com

Thomas W. Falvey, SBN 65744
**LAW OFFICES OF THOMAS W. FALVEY**
550 N. Brand Blvd., Suite 1500
Glendale, CA 91203
Telephone:  (818) 547-5200
Facsimile:    (818) 500-9307
E-mail: thomaswfalvey@gmail.com

Walter Haines, SBN 071075
**UNITED EMPLOYEES LAW GROUP**
5500 Bolsa Avenue, Suite 201
Huntington Beach, CA 92649
Telephone: (562) 256-1047
Facsimile: (562) 256-4554

Attorney for Plaintiffs SEVAG CHALIAN,
SIGFREDO CABRERA, ENKO TELAHUN, and
CHRISTINE MCNEELY and the Putative Class

DECLARATION OF MICHAEL MORRISON RE: REPLY TO MPA MOTION

# DECLARATION OF MICHAEL MORRISON

I, Michael Morrison, declare as follows:

1.     I am an attorney-at-law and of-counsel at the law firm of Alexander Krakow + Glick LLP.  I am duly admitted to practice before this Honorable Court and am one of the attorneys of record for Plaintiff in this action.  I have personal knowledge of the facts set forth herein, (except where indicated upon information and belief) and if called as a witness, could and would testify competently thereto.  I am making this declaration in support of Plaintiffs' Reply Brief to the Motion for Preliminary Approval of Settlement and Direction of Notice Under Rule 23(e) of the Federal Rules of Civil Procedure.

## ADDITIONAL FACTS RE: CVS ARBITRATRION

2.     As detailed in CVS's declarations submitted with their motion to compel arbitration in this case, in October 2014, CVS implemented an arbitration program where all current employees were required to review CVS's arbitration program in a training module.  *See* Declaration of Robert Bailey, ¶¶ 3-4 [ECF No. 47-1].  Based on Plaintiffs' analysis, only 425 people from the *Cabrera* class opted out of this program before the *Cabrera* lawsuit was filed.

3.     In addition, CVS also required new hires as part of the on-boarding process to log onto StarSource and click on the link to the arbitration agreement. *See* Declaration of Susan McClure, ¶¶ 11 [ECF No. 47-6].  This is completely omitted from Proposed Intervenors' analysis.  Finally, the Collective Bargaining Agreement for CVS pharmacists and pharmacist techs contains an arbitration clause and provides for the wages, hours of work, and working conditions of the employees, and provides premium wage rates for all overtime hours worked and a regular hourly rate of pay for those employees of not less than 30 percent more than the state minimum wage. Attached as Exhibit "1" is a true and correct copy of the relevant Collective Bargaining Agreements for CVS pharmacists and pharmacist techs. Thus, at a

minimum, union Class Members' overtime claims are subject to arbitration pursuant to Labor Code section 514, which would include any claims that off-the-clock work led to overtime pay violations. These claims would likely have to be arbitrated on an individual basis <u>first</u> before the other claims could be litigated in court.  See Cal. Code of Civil Procedure section 1284.1.  Proposed Intervenors ignore this as well.

4.     Based on Plaintiffs' analysis, 2,997 employees in the pharmacy were hired after Cabrera's lawsuit was filed.  Of these, more than 1,154 are unionized pharmacists and pharmacy techs subject to arbitration. Any Class Member employed before the *Cabrera* lawsuit who did not opt-out is bound by the arbitration agreement. This means, at most, 1,843 Class Members who were hired after August 2017 have claims which <u>may</u> not be subject to arbitration – a point CVS vehemently disputes. However, because the off-the-clock training issue was rectified by this point (January 2017), <u>none</u> of these Class Members would have suffered cognizable off-the-clock training violations and the resulting derivative violations, which is most of Plaintiffs' case.

## **THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE.**

5.     Proposed Intervenors spend much of their analysis discussing their case as opposed to the *Chalian* and *Cabrera* actions. When the claims and defenses at issue in Plaintiffs' cases are analyzed, it is clear this Settlement falls well-within the range of reasonableness such that notice can be given to the Class.

6.     <u>Off-the-Clock Claims:</u> Proposed Intervenors say nothing about Plaintiffs' off-the-clock training claims.  These claims, which are the heart of the case, pose difficult challenges both factually and legally, as described in Plaintiffs' moving papers.  The only criticism Proposed Intervenors make is that Plaintiffs in this action did not account for another source of off-the-clock work related to 5 minutes of opening and closing activities related to a subset of Class Members <u>who worked at Target</u>.  Assuming the scope of the release covers this type of off the clock claim, the total sum of lost wages according to Proposed Intervenors' is at maximum

2

$1,000,000 – a sum which does not call into question the fairness of the Settlement given the difficulty of certifying and prevailing on these claims.  *See, e.g., Brewer v. General Nutrition Corp.*, 2014 WL 5877695 at *11 (N.D. Cal. November 12, 2014) (declining to certify off-the-clock class for unpaid closing activities; recognizing that where the employee is clocked out, the presumption is the employee was not working; also requiring substantial evidence that employer knew of off-the-clock work where there is a policy prohibiting off-the-clock work).  It is also unclear whether Proposed Intervenors accounted for arbitration when analyzing the value of this claim, which could reduce the amounts recoverable even more.

7.   Reimbursement Claims:  Proposed Intervenors say nothing about the type of unreimbursed business expenses detailed in the complaints, SAC, and PAGA letters related to travel, background checks, use of home computers for training, and professional licenses.  *See* SAC ¶¶ 158-164 [ECF No. 104]. Instead, they focus on their cell phone reimbursement claim. Plaintiffs have not plead a cell phone reimbursement claim. Given the unique facts necessary to plead such a claim, it likely does not arise from the same factual predicate.  *See Morales v. Pachen Management Corp.*, 2019 WL 4544421 at *6 (C.D. Cal. July 9, 2019) (motion to dismiss granted where cell phone reimbursement claim failed to allege employer knew or had reason to know the expense was incurred and willfully failed to reimburse it), citing *Nelson v. Dollar Tree Stores, Inc.*, 2011 WL 3568498 at *2 (E.D. Cal. Aug. 15, 2011).

8.   Plaintiffs' counsel do not believe these claims could be certified or litigated without causing substantial manageability issues because of (1) the facially valid reimbursement policies submitted with Plaintiffs moving papers, (2) the factual dispute over whether a home computer was a necessary business expense, and (3) the fact that professional licenses are not a recoverable expense.  Further, they do not believe a court would award substantial PAGA penalties in light of these factors. Plaintiffs maintain that recovery on these claims was extremely unlikely.

9.   Overtime Claims: Proposed Intervenors criticize Plaintiffs for failing to

DECLARATION OF MICHAEL MORRISON RE: REPLY TO MPA MOTION

analyze an overtime claim based on use of an incorrect regular rate of pay which does not account for incentive bonuses.  Plaintiffs have never asserted such a claim premised on incentive bonuses, which clearly arises from a unique and completely different factual predicate. *See* SAC ¶¶ 86-99 [ECF No. 104].  Proposed Intervenors do not criticize any other portion of the overtime claim, which is derivative of the off-the-clock claims.

10.    Wage Statements: Proposed Intervenors claim that CVS does not retain the entirety of pay data for the three-year period as required by Labor Code section 226, nor does it list all applicable hourly rates.  This type of wage statement claim arises from a different factual predicate from Plaintiffs' case. The wage statement claims in Plaintiffs' cases focus on the failure of CVS to include all hours worked and gross/net wages earned due to off-the-clock time not being accounted for in the time records.  *See* SAC ¶¶ 138-157 [ECF No. 104].

11.    Labor Code sections 850-851:  In their moving papers, Plaintiffs provided the Court with an overview of CVS's defenses to the section 850-851 PAGA claims.  Based on a spreadsheet provided by CVS, there were 26,000 pay periods where pharmacists exceed the time limits imposed in these statutes, resulting in a maximum expose of $2.6 million. The analysis did not distinguish the reasons for the alleged violations, however.

12.    As alleged in the SAC, Plaintiffs' legal theory is that off-the-clock training time caused members of the Class to exceed the limits proscribed in these statutes. With respect to violations caused by off-the-clock training incurred prior to the policy prohibiting remote training, the maximum PAGA penalties for 11,998 pharmacy employees (not just pharmacists) are $4,292,100.  This is based on a finding that 23% of the pay periods had such a violation caused by remote training – i.e. 42,921 pay periods of the 190,599.  Because these are derivative claims, they will succeed or fail for the same reasons as the off-the-clock claims.  Further, Plaintiffs do not believe it is likely that for one off-the-clock training violation the court will award

4

wages, liquidated damages in an equal amount, penalties for minimum wage violations, penalties for overtime violations, penalties for non-compliant wage statements, waiting time penalties, Labor Code 210 penalties, and section 850-851 penalties.  This type of stacking has been discouraged by Courts.  *See Snow v. United Parcel Service, Inc.*, 2020 WL 1638250 at \*3 (C.D. Cal. April 1, 2020) (in context of a motion for remand, court only considers one penalty for each violation and not for each statutory violation alleged);  *Smith v. Lux Retail North America, Inc.*, 2013 WL 2932243 at \*4 (N.D. Cal. June 13, 2013) (rejecting stacking a penalties for the same violation); Accordingly, Plaintiffs believe that a Court will substantially reduce the penalties here and that the likely recovery of penalties for this derivative violation will range from $0 to $800,000 (approximately 20% of the maximum exposure).

13.   Labor Code section 550-551:  As with the Labor Code section 850-851 cases, Plaintiffs presented in their moving papers CVS's defenses with respect to these potential violations.  Based on the data provided by CVS, the PAGA exposure was $800,000 irrespective of the reason for the violations.  However, Plaintiffs' legal theory with respect to these claims is that off-the-clock training may have occasionally caused Class Members to work seven consecutive days in the same week.  Pursuant to this legal theory, in the sample analyzed by Plaintiffs, there were zero observed violations of these Labor Code sections caused by off-the-clock work.  Thus, Plaintiffs value these claims based on their theory at $0.

14.   Labor Code section 246(i) claims: Proposed Intervenors fail to assign a dollar value to this claim.  There is perhaps a good reason for this. Courts have not found that this type of violation warrants PAGA penalties.  *See Stearne v. Heartland Payment Sys. LLC*, 2018 WL 746492, \* 2-3, 6 (E.D. Cal. February 6, 2018) (no PAGA civil penalties for violation of Healthy Workplaces, Healthy Families Act of 2014 based on language in Labor Code section 248.5 that states "**any person or entity enforcing this article on behalf of the public as provided for under applicable state law shall, upon prevailing, be entitled only to equitable,**

5

**injunctive, or restitutionary relief, and reasonable attorney's fees and costs**"
[emphasis in original]); *Titus v. McLane Foodservice, Inc.*, 2016 WL 4797497, *5,
11-12 (E.D. Cal. September 14, 2016) (finding no penalties recoverable for violations
of 246's notice requirements by virtue of Labor Code section 2699(g)(2)). This
provision states that "[n]o action shall be brought under this part for any violation of
a posting, notice, agency, reporting, or filing requirement of [the Labor Code], except
where the filing or reporting requirement involves mandatory payroll or workplace
injury reporting.").

15.    <u>Rest Period Claims:</u> Proposed Intervenors argue the rest period claims
are potentially worth $100 million in unpaid premium wages when accounting for
arbitration and $55 million in PAGA penalties.  See ECF No. 97, ¶¶ 6(c)(iv) and 6
(d)(i). With respect to the wage potion, this is presumably based on Proposed
Intervenors' assumption that almost 63% of Class Members are not subject to
arbitration agreements covering the claims in this case.  Plaintiffs estimate, when
accounting for all sources of arbitration, that between 4% (those who opted-out of
arbitration and members of *Chalian* class = 825) and arguably 18% (including the
2,997 new hires after *Cabrera* was filed) are not subject to arbitration.  This would
result in damages ranging from $18,412,698 to $82,857,142 before any deductions
for liability, damages, and class certification issues.

16.    Looking at the merits and damages analysis, Proposed Intervenors state
that Class Members were not permitted to leave the store during rest periods up
through June 2017.  Proposed Intervenors damages calculations run from August 21,
2014 to **September or December 30, 2019** (ECF No. 97, ¶ 6(d)(i)) – more than two
years after Proposed Intervenors say the policy on remaining in the store for rest
periods was changed. ECF No. 95, p. 12.  The precise time period is unclear from
Drogin's declaration, so Plaintiffs will rely upon the September 30, 2019 date.
Therefore, the amount of unpaid wages based on this theory should be lowered by at
least 40%, resulting in a range of $11,047,618.80 and $49,714,285. A further

DECLARATION OF MICHAEL MORRISON RE: REPLY TO MPA MOTION

reduction is warranted <u>because anyone hired after June 2017 would not be affected by this policy</u> – nearly 3000 employees.  The $49 million figure, which is based on new hires after *Cabrera*, should be eliminated.  In addition, the PAGA period analyzed by Proposed Intervenors' expert begins <u>after</u> the policy change (ECF No. 97, ¶ 6(c)(iv)) – so this cannot be the basis for the $55 million in civil penalties.

17.   Moreover, the actual rest break policy in effect before June of 2017 does not state employees were prohibited from leaving the store. It is silent about where the rest period can be taken but does state that an employee "must be relieved of all work duties and responsibilities."  This is consistent with the law – meaning the policy on its face is lawful.  Attached as Exhibit "2" are true and correct copies of CVS's rest period policy (two documents).  The first program is CVS's training program on rest periods.  The second is an updated rest period policy from 2017.

18.   Even if Proposed Intervenors are correct that CVS' policy prohibited Class Members from leaving the store during rest periods, this does not automatically translate into a victory for Plaintiffs.  Proposed Intervenors rely on *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257 (2016).  *Augustus* concerned security guards who lacked the opportunity for lawful rest breaks because they had to remain at their workstations and be reachable via radio and pager to quickly respond to calls requesting, for example, an escort out to the parking lot. *Id.* at 268-72. Given this requirement, rest breaks could not be used to complete personal tasks. *Id.* Unlike in *Augustus*, this case does not involve on-call security guards who must respond to emergency assignments during rest breaks. Pharmacists are not required to carry pagers or radios during rest breaks and respond to work.

19.   In *Augustus*, the Supreme Court further held that under Wage Order Number 4 an employer could not "satisfy its obligation to relieve employees from duties and employer control during rest periods when the employer nonetheless require[d] its employees to remain on call." *Id.* In that case, however, the Supreme Court specifically noted that **"[b]ecause rest periods are 10 minutes in length . . .**

7

1   **one would expect that employees will ordinarily have to remain on site or**

2   **nearby,"** and that this constraint alone **"is not sufficient to establish employer**

3   **control."** *Id.* at 270 (emphasis added). Thus, *Augustus* turned on the "additional

4   constraints imposed by on-call arrangements," which "compel employees to remain

5   at the ready and capable of being summoned to action . . . ." *Id.* Consistent with this

6   analysis, in *Bell*, Home Depot lawfully required cashiers to remain on premises for

7   every rest break. *Bell v. Home Depot U.S.A., Inc.*, No. 212CV02499JAMCKD, 2017

8   WL 1353779, at *2 (E.D. Cal. Apr. 11, 2017).  According to the Court, it did not

9   matter that the policy restricted the cashier's movement—there was no requirement

10  that they remain "on call" and "Augustus did not directly consider an on-premises

11  rest break policy…" *Id.*   Based on Plaintiffs' interviews with Class Members, the

12  ability of Class Members to take rest periods, as well as where they could take rest

13  periods, varied from store to store and depended in large part on the supervisors in

14  charge.  This undercuts Proposed Intervenors' argument that CVS's scheduling tool

15  uniformly prohibited pharmacists from taking rest periods. This is also why

16  Plaintiffs' counsel in *Chalian* did not assert these claims in the original action

17  (*Cabrera* first asserted the rest period claim). One must also keep in mind that CVS

18  has hundreds of pharmacies and employed over 20,000 persons throughout the state

19  during the relevant time period in a retail setting.  These claims are inherently

20  difficult to certify and prevail on due to individualized differences, manageability

21  issues, etc.  When settling this claim, Plaintiffs were aware of the case authority

22  denying class certification under similar circumstances.  Indeed, several years ago,

23  one of Plaintiffs' attorneys, Thomas W. Falvey, helped prosecute a state-wide wage

24  and hour action on behalf of CVS pharmacists where the court declined to grant class

25  certification.  *See Hadjavi v. CVS Pharmacy, Inc.*, 2011 WL 3240763, at *4 (C.D.

26  Cal. July 25, 2011) ("In this present action, Plaintiffs have failed to demonstrate that

27  Defendants had a uniform or common policy in place that "prevented" employees

28  from taking meal and rest breaks and did not provide overtime wages throughout all

DECLARATION OF MICHAEL MORRISON RE: REPLY TO MPA MOTION

California locations. Defendants proffered declarations from pharmacists employed at various locations that contradict Plaintiffs' claim that a system wide policy or practice was in place that prevented pharmacists from taking rest or meal breaks."). The *Hadjavi* decision is why the *Chalian* matter asserted a putative class only on behalf of the CVS regions that Mr. Chalian worked in, as opposed to on a state-wide basis; counsel's goal was to make class certification more tenable given the prior court's ruling in *Hadjavi*. Other cases also illustrate the difficulty of maintaining class certification in a retail setting. *See Summer York v. Starbucks Corp.*, No. CV0807919GAFPJWX, 2012 WL 12507388, at *5 (C.D. Cal. Nov. 1, 2012) ("If there was a thirty minute period where the two partner rule did not apply, Plaintiff could have taken a perfectly legal off-duty break then. And if she did not do so, it is a highly individualized inquiry as to why that was the case."); *Ordonez v. Radio Shack, Inc.*, 2013 WL 210223, at *11 (C.D. Cal. Jan. 17, 2013) ("Because of the competing testimony before the Court, plaintiff's evidence that defendant *may* have an illegal, written rest break policy is insufficient for this Court to find that common issues predominate. Unlike other cases where a defendant had a purportedly illegal rest or meal break policy and courts found that common issues predominated, there is substantial evidence in this case that defendant's actual practice was to provide rest breaks in accordance with California law") (emphasis in original).

20. Ultimately, taking into account arbitration, merits, and class certification issues, as well as Proposed Intervenors' evidence, Plaintiffs will revise their estimate to reflect a 10 to 25% chance of certifying a statewide class and winning a favorable judgment. Using the $11 million figure above (which is at least potentially tethered to a class wide policy), this would mean the unpaid premium wages would range from just over $1 million to just under $3 million.

21. <u>Meal Periods:</u> Proposed Intervenors' analysis of the meal period claims contains several flaws. First, they assert the time punch data reveals $16 million in unpaid premium pay for the arbitration subgroup. As shown above, the Parties have

9

widely different estimates of the number of persons subject to arbitration. Plaintiffs believe the $16 million number should be substantially reduced. Second, Proposed Intervenors do not state what the violation rate is. According to their expert, there are 23.99 million shifts, but only 820,000 shifts where a meal period violation was observed (and only 400,000 shifts for the arbitration subgroup).  ECF No. 97, ¶¶ 5, 6(d)(2).  That would be a violation rate of well under **3.3%!** There is no plausible way a practice of not providing meal periods can be inferred from such a miniscule violation rate.  *See, e.g., York v. Starbucks Corp.*, No. CV 08-07919 GAF PJWX, 2011 WL 8199987, at *26 (C.D. Cal. Nov. 23, 2011) (declining to certify class where meal breaks were taken by plaintiff on 569 of 580 shifts).  This is especially true in light of CVS's facially valid meal period policy.

22.   As for the single pharmacist theory, CVS ignores that during the relevant time period, CVS updated its policies to explicitly allow single pharmacists in their discretion to take a break and leave the pharmacy open, or close it down if they believe the security of the drugs would be at risk to take a meal period.  Attached as Exhibit "3" is a true and correct copy of the meal period policy for single-pharmacist operated pharmacies. More importantly, even before this policy update, the records simply do not show a high violation rate.  Thus, anecdotal evidence would be required to determine if CVS dissuaded or discouraged the pharmacists from taking a meal period when the prior policy was silent as to whether solo pharmacists could step away for such a break. Given this is a huge employer with hundreds of California locations employing thousands of workers, certification and manageability issues could easily derail these claims.

23.   The time punches in Plaintiffs' possession could not reveal if the pharmacist was the lone pharmacist during a particular shift.  CVS has claimed their scheduling tool does not account for this as not all stores use the tool. Crediting Proposed Intervenors' evidence, as said above, this does not change the analysis given the low observable violation rate for meal periods.

1

**CASSAS v. VICTORIA'S SECRET STORES, LLC MPA MOTION**

2

24.     Attached as Exhibit "4" is a true and correct copy of the Motion for

3

Preliminary Approval in the class action case *Cassas, et al. v. Victoria Secret Stores,*

4

*LLC, et al*.  Lead counsel for Defendants in this case is Proposed Intervenors' counsel

5

Beth Gunn.  The motion shows that Ms. Gunn participated in a settlement where only

6

$50,000 out of $12 million was designated as PAGA penalties.

7

**NOTICE TO THE LWDA**

8

25.     Plaintiffs provided notice of this Settlement (and motion for preliminary

9

approval) to the LWDA on June 22, 2020.  The LWDA has not objected or opposed

10

the Settlement despite having notice as of the date of this filing.  Attached as Exhibit

11

"5" is proof of submission of the Settlement and MPA motion to the LWDA.

12

13

I declare, under penalty of perjury of the laws of California, the foregoing to be

14

true and correct.  Executed this 6th day of July, 2020 in Los Angeles, CA.

15

  /s/Michael Morrison

16

Michael Morrison

17

18

19

20

**ATTESTATION**

21

I hereby attest that the concurrence in the filing of this document has been

22

obtained from Michael S. Morrison of Alexander Krakow + Glick LLP, Attorneys for

23

Plaintiffs.

24

Dated: July 6, 2020                    By:   /s/ Armand R. Kizirian

25

Armand R. Kizirian

26

Attorneys for Plaintiffs SEVAG CHALIAN, SIGFREDO CABRERA, ENKO TELAHUN,

27

CHRISTINE MCNEELY, PATRICK

28

BRENNAN, and the Putative Class

11

Exhibit "1"

# RETAIL DRUG AGREEMENT

July 1, 2017 - June 30, 2021

between

## CVS PHARMACY

and

## UFCW LOCALS
135, 324, 770, 1167, 1428, 1442, 5 and 648

INDEX

Page

**ARTICLE 1 - MANAGEMENT RIGHTS** .................................................................................. 1

**ARTICLE 2 - BARGAINING UNIT** ......................................................................................... 1

    A.   UNION RECOGNITION ........................................................................................ 1
        1.   *Covered Employees.* .................................................................................. 1
        2.   *Excluded Employees.* ................................................................................ 1
        3.   *Geographic Area.* ..................................................................................... 2
        4.   *Workplaces.* ............................................................................................ 2
        5.   *Limitation.* .............................................................................................. 2
    B.   INCLUDED BARGAINING UNIT WORK. ....................................................... 2
        1.   *Current Work.* ......................................................................................... 2
        2.   *Future Work* ............................................................................................ 2
        3.   *Employee Definitions* .............................................................................. 2
    C.   EXCLUDED BARGAINING UNIT WORK ....................................................... 3
        1.   *Management Exclusions* .......................................................................... 3
        2.   *Outside Employees* .................................................................................. 4
    D.   INDIVIDUAL AGREEMENTS ........................................................................... 4
        1.   *All Employees* ......................................................................................... 4
        2.   *New Employees* ....................................................................................... 4

**ARTICLE 3 - UNION AFFAIRS** ............................................................................................. 4

    A.   REQUIRED UNION MEMBERSHIP .................................................................. 4
        1.   *Union Shop* ............................................................................................. 4
        2.   *Seven Day Notice.* ................................................................................... 5
    B.   INFORMATION FOR UNION .............................................................................. 5
        1.   *New/Transferred Employees.* .................................................................. 5
        2.   *Store Employee Lists* ............................................................................... 5
        3.   *Payroll Data* ........................................................................................... 5
        4.   *Time Records* .......................................................................................... 5
    C.   STORE VISITS ...................................................................................................... 5
    D.   UNION BULLETIN BOARDS ............................................................................. 6
    E.   UNION PRINCIPLES ........................................................................................... 6
        1.   *New Employees* ....................................................................................... 6
        2.   *Union Principles/Picket Lines* ............................................................... 6
    F.   UNION BUSINESS ............................................................................................... 6
    G.   EMPLOYEE ORIENTATION .............................................................................. 6

**ARTICLE 4 - DISCIPLINE/VOLUNTARY QUITS** .............................................................. 7

    A.   REGISTER SHORTAGES/IRREGULARITIES ................................................. 7
    B.   INVESTIGATION/INTERVIEW ......................................................................... 7
    C.   DISCIPLINE ......................................................................................................... 7
        1.   *Good Cause* ............................................................................................. 7
        2.   *Discharge for Incompetency* .................................................................. 8
        3.   *Notice* .................................................................................................... 8
        4.   *Legal Violations* ..................................................................................... 8
    D.   DEMOTION .......................................................................................................... 8
    E.   NOTICE OF INTENTION TO QUIT ................................................................... 8

**ARTICLE 5 - TRANSFERS/SENIORITY** .............................................................................. 8

    A.   EMPLOYER TRANSFER OF EMPLOYEES ...................................................... 8
    B.   INTER-UNION TRANSFER ................................................................................ 9
    C.   SENIORITY ........................................................................................................... 9
        1.   *Definition* ............................................................................................... 9
        2.   *Promotion to Pharmacy Technician* ...................................................... 9

I

D.      ABILITY AND SKILL .................................................................................9
E.      LAYOFFS/RECALLS/HOURS REDUCTIONS ...........................................9
    1.      Layoffs ...............................................................................................9
    2.      Layoff Timing ....................................................................................9
    3.      Recall ...............................................................................................10
F.      FULL-TIME POSITIONS ........................................................................10

**ARTICLE 6 - WORKDAY/WORKWEEK/SCHEDULES** .........................................**10**

A.      STORE HOURS .......................................................................................10
B.      WORKDAY DEFINED .............................................................................10
C.      WORKDAY GUARANTEES ....................................................................10
    1.      Full-Time/Scheduled Day ................................................................10
    2.      Full-Time/Predesignated Day Off ....................................................10
    3.      Part-Time .........................................................................................11
    4.      On Call .............................................................................................11
D.      WORKWEEK GUARANTEES ..................................................................11
    1.      Full-Time ..........................................................................................11
    2.      Part-Time .........................................................................................11
    3.      Part-Time Guarantee .......................................................................12
E.      NON-APPLICABILITY OF GUARANTEES ............................................13
F.      WORK SCHEDULE .................................................................................13
    1.      Ready for Work .................................................................................13
    2.      Work Schedule ..................................................................................13
    3.      Part-Time Scheduled Hours .............................................................14
    4.      Rest Periods .....................................................................................14
    5.      Meal Period ......................................................................................14
    6.      Sixth/Seventh Day ............................................................................14
    7.      Sunday Ratio ....................................................................................15
    8.      Holiday Ratio ...................................................................................15
    9.      Holiday Scheduling ..........................................................................15
    10.     Overtime Preference ........................................................................15
    11.     Inventory Work .................................................................................15
    12.     Full-time/Part-time Ratio .................................................................15
    13.     Working Employees Past Scheduled Hours ......................................16

**ARTICLE 7 - WAGES** ............................................................................................**16**

A.      ALL EMPLOYEES ...................................................................................16
    1.      Base Rates ........................................................................................16
    2.      Prior Industry Experience. ..............................................................16
    3.      Christmas Extra Employees ..............................................................17
    4.      Journeyman ......................................................................................17
B.      PREMIUMS ..............................................................................................17
    1.      Evening Premium ..............................................................................17
    2.      Night Premium ..................................................................................17
    3.      Sunday Premium ...............................................................................17
C.      SPECIALTY CLASSIFICATIONS ..........................................................17
D.      OVERTIME. .............................................................................................17
    1.      Daily/Weekly Overtime .....................................................................17
    2.      Sixth Day Overtime/Full-Time ..........................................................17
    3.      Seventh Consecutive Day Overtime/Full-Time .................................17
    4.      Predesignated Day Off Overtime/Full-Time ....................................18
    5.      Sixth Day Overtime/Part-Time .........................................................18
    6.      Early/Late Meal Periods ..................................................................18
    7.      Overtime Basis .................................................................................18
    8.      Nonpyramiding .................................................................................18
E.      PAY PERIOD AND WAGE STATEMENT ...............................................18
F.      TIME RECORDS ......................................................................................18
    1.      Daily Records ...................................................................................18
    2.      Collusion or Coercion ......................................................................18

G.    TRAVEL TIME PAY ......................................................................................................19
H.    INJURY ON THE JOB ..................................................................................................19
I.    LEGAL PROCEEDINGS. ............................................................................................19
    *1.    Required Appearance* ........................................................................................19
    *2.    Requested Appearance* ......................................................................................19
    *3.    Work Related Appearance* .................................................................................19
J.    STORE/EMPLOYER/VENDOR MEETING PAY. ......................................................19
    *1.    Store Meetings/Employer Meetings* ..................................................................19
    *2.    Vendor Meetings* ...............................................................................................19
K.    AUTO ALLOWANCE ...................................................................................................19
L.    TRAINING SCHOOL FEES .........................................................................................20
M.    BOND FEES ..................................................................................................................20
N.    REQUIRED HEALTH EXAM FEES ...........................................................................20
O.    NO REDUCTION IN RATES .......................................................................................20
P.    WAGE/PRICE CONTROLS .........................................................................................20
Q.    CHARITY ......................................................................................................................20

**ARTICLE 8 - VACATIONS** ....................................................................................................**20**

A.    ENTITLEMENT ............................................................................................................20
    *1.    One Year* ............................................................................................................20
    *2.    Two Years* ..........................................................................................................20
    *3.    Five Years* ..........................................................................................................20
    *4.    Fifteen Years* ......................................................................................................20
    *5.    Twenty Years* ......................................................................................................20
    *6.    Continuous Employment Defined* ......................................................................21
B.    PAY ................................................................................................................................21
    *1.    Full-Time Vacation Pay* .....................................................................................21
    *2.    Part-Time Vacation Pay* .....................................................................................21
    *3.    Payment Date* .....................................................................................................21
    *4.    At Termination* ...................................................................................................21
    *5.    No Carryover* .....................................................................................................22
C.    INDUSTRY VACATION ..............................................................................................22
D.    SCHEDULING ..............................................................................................................22
    *1.    Posting/Selection/Scheduling* ...........................................................................22
    *2.    No Accumulation* ...............................................................................................23
    *3.    Holiday During Vacation* ...................................................................................23

**ARTICLE 9 - HOLIDAYS** ......................................................................................................**23**

A.    PAID HOLIDAYS .........................................................................................................23
    *1.    Eligibility* ...........................................................................................................23
B.    HOLIDAY PAY .............................................................................................................24
    *1.    Worked Holiday Rate* .........................................................................................24
    *2.    Full-Time Holiday Week Pay and Schedule* ......................................................24
    *3.    Part-Time Holiday Pay* .......................................................................................25
C.    VOLUNTARY HOLIDAY CLOSING .........................................................................25

**ARTICLE 10 - SICK LEAVE PAY** .........................................................................................**25**

**ARTICLE 11 - BEREAVEMENT LEAVE AND/OR PAY** .....................................................**27**

**ARTICLE 12 - JURY DUTY LEAVE AND/OR PAY** .............................................................**27**

**ARTICLE 13 - OTHER LEAVES OF ABSENCE** ..................................................................**28**

A.    EMERGENCY LEAVE .................................................................................................28
B.    AUTHORIZED LEAVE ................................................................................................28
    *1.    Death in Family* .................................................................................................28
    *2.    Illness/Injury* ......................................................................................................28
    *3.    Workers' Compensation* .....................................................................................28
    *4.    Family Care Leave of Absence* ..........................................................................28
C.    UNION BUSINESS .......................................................................................................29

D.   LEAVES IN WRITING ................................................................30
E.   REINSTATEMENT AFTER A LEAVE ......................................30
F.   EMPLOYMENT DURING LEAVE ............................................30
G.   TERMINATION AFTER A LEAVE ...........................................30

**ARTICLE 14 - MEDICAL AND RETIREMENT BENEFITS** ................30

SECTION I - TRUST FUNDS ............................................................30
A.   BENEFIT FUND ........................................................................31
B.   PENSION FUND ........................................................................32
C.   RESOLUTION OF DIFFERENCES ..........................................33
D.   PAYMENT OF CONTRIBUTIONS ..........................................34
E.   BUSINESS EXPENSES .............................................................35
F.   PENSION AND BENEFIT FUND APPOINTMENTS ...............35
G.   ACCEPTANCE OF TRUSTS .....................................................35
SECTION II - COMPANY MEDICAL AND RETIREMENT BENEFITS .....35
SECTION III - MOVING BETWEEN STORES ................................36

**ARTICLE 15 - GENERAL CONDITIONS** ...........................................37

A.   NONDISCRIMINATION ...........................................................37
B.   UNIFORMS/NAME TAGS .........................................................37
C.   RESTROOMS .............................................................................37
D.   WEIGHT LIMIT ........................................................................37
E.   POLYGRAPH TEST ...................................................................37
F.   SUBSTANCE ABUSE REHABILITATION ..............................37
G.   SUCCESSORS AND ASSIGNS .................................................37
H.   SEPARABILITY CLAUSE .........................................................37
I.   TITLES ........................................................................................38
J.   AMENDMENTS/ADDITIONS/WAIVERS .................................38
K.   EFFECTIVE DATES ..................................................................38
L.   CERTIFICATION TO WORK ....................................................38

**ARTICLE 16 - GRIEVANCE, MEDIATION OR ARBITRATION** .........38

A.   DISPUTES OR QUESTIONS .....................................................38
B.   GRIEVANCE FILING/STEPS ...................................................38
    1.   *Discharge/Layoff* ............................................................38
    2.   *Wage Discrepancy* ..........................................................38
    3.   *Reporting Monetary Discrepancies* ...............................39
    4.   *Grievance Steps* .............................................................39
C.   TIME PERIODS .........................................................................40
D.   MEDIATION ..............................................................................40
E.   ARBITRATOR'S AUTHORITY .................................................41
F.   NO STRIKE/NO LOCKOUT .....................................................41
G.   INDIVIDUAL WAIVERS ..........................................................41

**ARTICLE 17 - EXPIRATION AND RENEWAL** ................................42

**APPENDIX A - WAGES** ...................................................................43

**APPENDIX B- MEDIATION PROCEDURE** ......................................46

**APPENDIX C- AMERICANS WITH DISABILITIES ACT** ...............47

**APPENDIX D - SUBSTANCE ABUSE REHABILITATION** ...............48

**APPENDIX E – RATIFICATION PAYMENTS** ..................................51

**APPENDIX F- REPRESENTED STORES AS OF 12/31/12** ................52

**SIDE LETTER** ...................................................................................55

**RECOGNITION SIDE LETTER** .......................................................56

**LETTER OF AGREEMENT** ...............................................................57

**PROMOTIONAL DRUG TESTS AND LEAVE OF ABSENCE POSTER**.................................................**57**

**LETTER OF AGREEMENT** ...............................................................................................................**58**

**JOINT LABOR-MANAGEMENT COMMITTEE**.............................................................................**58**

**PART-TIME AVAILABILITY FORM** .............................................................................................**59**

RETAIL DRUG AGREEMENT

July 1, 2017 - June 30, 2021

This Agreement is entered into and effective as of this $^{1st}$ day of July 2017, between CVS Pharmacy, hereinafter referred to as "Employer," and UFCW LOCALS 135, 324, 770, 1167, 1428, 1442, 5 and 648, chartered by United Food & Commercial Workers International Union, hereinafter referred to as the "Union" and the parties agree as follows:

## ARTICLE 1 - MANAGEMENT RIGHTS

The Employer retains the exclusive right to manage the business, to direct and control the business and workforce, and to make any and all decisions affecting the business, including, but not limited to the following: the exclusive right to plan, determine, direct and control the nature and extent of all its operations and commitments; to determine, install, introduce, remove, discontinue or modify the methods, procedures, materials and operations to be used or to discontinue their use by employees of the Employer; to maintain efficient operations; to hire, train, promote employees; to set standards and methods of performance; to create, modify, and abolish work shifts, the starting and ending times of the work shifts and work schedules; to promulgate, amend and enforce reasonable work rules, regulations, policies and procedures; to determine, modify, change and otherwise set the work duties of employees; to determine, modify, change and otherwise set job content and qualifications; to determine whether to offer light duty and to determine employee eligibility for light duty; to change job content and qualifications; to change job descriptions; to modify the methods, procedures, materials and operations to be used or to discontinue their use by employees of the Employer; to change standards and methods of performance; and in all respects to carry out, in addition, the ordinary and customary functions of management, whether exercised or not.  The rights and waivers herein shall extend beyond the expiration of this Agreement until a successor agreement is reached.

Should a specific provision of this Agreement or State or Federal Law directly conflict with, modify or restrict an enumerated right under this Article, the specific provision of the Agreement or the State or Federal Law shall prevail over the enumerated right.

## ARTICLE 2 - BARGAINING UNIT

A.      UNION RECOGNITION.  The Employer recognizes the Union as the sole collective bargaining agent with respect to work, rates of pay, hours, and terms and conditions of employment for the appropriate bargaining unit composed of all employees, except as limited below, who perform work within drug stores operated under contract with UFCW Locals 135, 324, 770, 1167, 1428, 1442, 5 and 648 on January 1, 2018.

        1.      Covered Employees.   Full-Time and part-time beauty advisors, clerks, cashiers, pharmacy technicians, pharmacy lead technicians, pharmacy service associates, shift supervisors, stock room supervisors in Ymas stores, photo lab technicians and photo lab supervisors.

        2.      Excluded Employees.   All managers (including store team leaders), assistant managers, shift supervisor A, pharmacists, nurse practitioners, physician assistants, guards, and all employees not situated in CVS/pharmacy retail stores.

3.      Geographic Area.      The geographic area covered by this Agreement shall be the following counties in California:  San Diego, Alameda, Marin, San Francisco, San Mateo, Santa Clara, San Bernardino, Santa Barbara, Imperial, San Luis Obispo, Ventura, Los Angeles, Orange and Riverside.  All employees outside these counties are excluded from the bargaining unit and this Agreement.

4.      Workplaces.      This Agreement shall apply only to CVS/pharmacy retail stores.  It shall not include distribution centers, call centers, specialty pharmacies, MinuteClinics, or any other facilities operated by CVS.

5.      Limitation.      The parties acknowledge and agree that this Agreement shall not apply to any employees, any workplaces or geographic areas except as specifically set forth in this Article 2 (A).

B.      INCLUDED BARGAINING UNIT WORK.

1.      Current Work.  All work performed on the premises in the nature of work generally performed by employees of the bargaining unit shall not be assigned to any person not in the bargaining unit or contracted for with any other union.

2.      Future Work.  Any future work of the nature generally performed by bargaining unit employees which is created by the Employer within the drug stores shall be performed by members of the bargaining unit as herein set forth.

3.      Employee Definitions.  For the purpose of this Agreement, the following definitions shall apply:

a.      An intern pharmacist is a registered non-licensed pharmacist permitted to practice pharmacy under the direct supervision of a licensed pharmacist.

b.      A retail clerk includes all other employees covered by this Agreement.

c.      Hereinafter "employees" or "all employees" shall mean employees covered by this Agreement.

d.      Probationary Employees.  The first (1st) ninety (90) calendar days of employment shall be considered a probationary (trial) period.  During such probationary period an employee may be terminated for any reason and the employee shall have no recourse to the grievance procedure set forth in this Agreement.

e.      Pharmacy Service Associates.  Selection of Pharmacy Service Associates shall be determined by giving factors such as seniority, qualifications, performance and intent to remain with the Employer full consideration.  Pharmacy Service Associates are those clerks who are assigned to assist in clerical and pharmacy related duties (including the running of the pharmacy register if it is in combination with clerical pharmacy duties), directly connected with the pharmacy and under the supervision of the pharmacist.  A clerk who works in a pharmacy to operate a cash register, retrieve prescriptions or direct customers, shall not be considered a pharmacy service associate.  Pharmacy Service Associates employed as of July 1, 1995 shall not be adversely affected by such clerks.

      f.      <u>Special Classifications</u>.  Selection of the Photo Lab Supervisor, Shift Supervisor B, Beauty Advisor, and Coordinator shall be determined by giving factors such as seniority, qualifications, performance and intent to remain with the Employer full consideration.  The Employer shall not employ less than an average of two (2) Special Classifications per store covered by this Agreement.  There shall be no demotion of employees classified as Special Classifications except as provided for in Article 4-D. This Article shall not apply in new store openings until one hundred eighty (180) days after the date the new store opens to the public.

      g.      <u>Pharmacy Technicians</u>.  Pharmacy Technicians shall be licensed by the California Board of Pharmacy pursuant to current laws and regulations.  Employees shall be selected for the position of pharmacy technician on the basis of ability and skill, and where they are relatively equal, seniority shall govern.  The Employer believes that the safety of its customers and the public is the fundamental guiding concern behind the establishment of this classification.  To this end, the Employer shall provide mandatory training, on Employer time, as required by the regulation, for those individuals who are selected for the classification of pharmacy technician. Because of safety and quality control factors, the pharmacy technicians will be subject to the immediate and personal supervision of a registered pharmacist.  Immediate and personal supervision in the case of a pharmacy technician requires that a pharmacist verify and document any function performed by a pharmacy technician in connection with all activities surrounding the dispensing of a prescription.  It is understood and agreed that pharmacists, as trained professionals, have the ultimate responsibility for dispensing prescriptions.  If any of the above becomes a conflict with the regulations of the California Board of Pharmacy, regulation shall control.  The Employer agrees to provide additional training at its own cost in the event new laws or regulations mandate such training.

      h.      <u>Lead Technician</u>.  The Employer, in its sole discretion, may select Pharmacy Technicians to become Lead Technician, whose additional duties may include, but not limited to: training and development of personnel for/in pharmacy; assist or be responsible, as directed by a Pharmacy Manager, for workflow processes, product ordering, inventory control, returns, financial record keeping, price changes, third party administration, customer service programs, special projects or any other duties as may be assigned. Minimum requirements are an EE rating or higher, 1 year as a pharmacy technician and successful completion of the Employer's training and certification program(s). Lead Technician positions shall remain at the Employer's sole discretion.  After successfully completing the Employer's Lead Technician program and being assigned an available Specialist position, CVS Pharmacy shall provide a $.75 per hour premium to Lead Technicians in this position.

C.      EXCLUDED BARGAINING UNIT WORK.  The following individuals shall be excluded from the coverage of this Agreement:

      1.      <u>Management Exclusions</u>.

      a.      Store managers (including store team leaders), assistant managers and shift supervisor A's shall be excluded from the coverage of this Agreement at the sole discretion of the Employer and shall be allowed to perform any and all work designated by the Employer within a store or any department without restriction so long as the total number of excluded management personnel does not exceed an average of four (4) exclusions per store covered by this Agreement.  The Employer will automatically provide the list of exclusions along with store number and local union number at the same time as the Full-time/Part-time list is provided.

b.      It is agreed that only two (2) excluded supervisory management employees shall be permitted to perform bargaining unit work on Sunday or holidays (excluding load day) where the combined working hours of the store's full-time and part-time employees total less than one thousand (1,000) hours per week.

2.     <u>Outside Employees</u>.  It is agreed that the Employer and the Union have a common interest in protecting work opportunities for all employees covered by this Agreement.  It is further agreed that the displaying, servicing, ordering and demonstrating of merchandise for sale can be handled at the Employer's discretion by nonbargaining unit displaymen, salesmen, vendor representatives, or any other employee of vendors which are servicing their merchandise to the Employer.

In no event, however, shall any bargaining unit employee be laid off or reduced in hours as a result of work being performed by any salesman, vendor or displayman described above.

3.     Demonstrators who do not make sales or display merchandise for pick-up by customers.

4.     Inventory employees whose function is strictly limited to taking inventories.

5.     Office employees who are limited to office-clerical work and whose combination of duties does not include any of the clerks' work.

6.     Future concessionaires or sublessees or their employees whose duties do not include work generally performed by members of the bargaining unit.

7.     Licensed Pharmacists, including one (1) Pharmacy Manager per pharmacy.

8.     Should any of the classifications hereinabove excluded in Paragraphs 2, 3, 4, 5, and 6, designate by a majority thereof the undersigned Union as their bargaining agent, the Employer agrees to recognize and bargain for said employees in accordance with the law.

D.    INDIVIDUAL AGREEMENTS.

1.     <u>All Employees</u>.  The Employer agrees not to enter into any agreement or contract, either orally or written, with its employees covered by this Agreement, individually which in any way conflicts with the terms and provisions of this Agreement.

2.     <u>New Employees.</u>  During the period an employee is not a member of the Union, the regular wages, as herein specified for the classification of said employee and all other provisions of this Agreement shall apply.

ARTICLE 3 - UNION AFFAIRS

A.    REQUIRED UNION MEMBERSHIP.

1.     <u>Union Shop</u>.  All employees shall, as a condition of employment, become members of the Union not later than the thirty-first (31st) day of their employment or the thirty-first (31st) day following the date of signature or the effective date of this Agreement, whichever is later, and shall remain members in good standing as a condition of continued employment.

2.      Seven Day Notice.  The Union will advise the Employer in writing when any employee has failed to acquire or maintain Union membership as required by this Agreement.  Immediately upon receipt of said notice, the Employer shall advise said employee(s) that they will no longer be scheduled for hours of work on the subsequent weekly schedule until said employee(s) give evidence of compliance or the Union notifies the Employer of such compliance.  Failure to comply within seven (7) days after removal from the schedule said employee(s) shall be terminated, if such termination is not in violation of existing law.

B.      INFORMATION FOR UNION.

1.      New/Transferred Employees.  The Employer's general office shall mail a list of new employees hired in a preceding month to the Union.  Said list shall contain the name of such employees, their dates of employment, Social Security number, store number and initial rate of pay.  The Employer will provide the new hire reports electronically on a weekly basis.

The Employer will provide weekly initiation fees and regular union dues electronically to all Southern California Union Locals.

2.      Store Employee Lists.  The Employer agrees to permit the Union to check the list of employees covered by this Agreement, and their respective wage rates of preceding months, and to furnish the Union a complete payroll list for all employees covered by this Agreement and wage rates effective the first (1st) payroll period each January and September.  Said lists shall include hire dates, birth dates, and Social Security numbers from current records.

3.      Payroll Data.  In case of a dispute over wages the Union representative shall, upon request, have the right to a copy of the necessary payroll information relative to employees covered by this Agreement.  The Union reserves the right to require, in such disputed instances as it deems necessary, that owed wages of employees be paid through the office of the Union or a notarized statement submitted to the Union of gross amounts paid and deductions made.  Either method may be used by the Employer.

4.      Time Records.  Time cards or other time records which the employee shall be required to record work on a daily basis shall be available for inspection upon request by the Union representative entitled to such information.

C.      STORE VISITS.  In order to observe conditions existing under this Agreement and to settle grievances, representatives of the Union shall have the right to visit the stores.

It is the general policy of the Union for its representatives not to visit the stores during the busy afternoon hours, Saturdays or days preceding holidays.  However, upon receipt of a reported violation, a Union representative shall have the right to visit such store at any time for the purpose of investigating such violation.

The Union further agrees that it will arrange with the Store Manager for such investigation of reported grievances and that any meetings between employees and Union representatives shall be limited to one (1) employee at a time and shall be conducted with the least possible interference with store operations.  Such meetings shall be held on the premises in a place designated by the Store Manager.  In instances where employees are working during hours that the stores are closed to the public, the Union may request a list of the employees involved, and the hours worked.

D.     UNION BULLETIN BOARDS.  The Union may supply each store with one (1) bulletin board not to exceed two (2) feet by three (3) feet in size for the purpose of posting notices of official Union business.  Bulletin boards shall not be used to post notices of a political or adversarial nature.  The implementation of this program shall be coordinated by the Employer's Regional Human Resource Manager.

E.     UNION PRINCIPLES.

1.     <u>New Employees</u>.  When new or additional employees are needed, the Employer may immediately notify the Union of said need.  The Employer reserves the right to select the particular applicant to be hired, but there shall be no discrimination against any applicant by reason of membership or nonmembership in the Union or in any way affected by Union membership, bylaws, rules, regulations, constitutional provisions, or any other aspect or obligation of Union membership, policies, or requirements.

2.     <u>Union Principles/Picket Lines</u>.  The Employer shall not discharge or discriminate against any employee for upholding Union principles, as long as such act does not constitute a violation of this Agreement, and nothing herein shall be so construed as to abrogate an employee's rights under the law, including the right individually to refuse to cross a bona fide picket line established in a bona fide dispute by any bona fide labor organization.  For the purpose of this Paragraph, a sanctioned picket line shall be one which is sanctioned by the Local Union signatory to this Agreement and the Food and Drug Council or the appropriate County Federation of Labor, AFL-CIO.

F.     UNION BUSINESS.  Employees shall be granted time off without pay for the purpose of attending negotiations, adjustment or arbitration hearings or for other bona fide Union business.

The Employer agrees to schedule any employee who is an officer, or representative of the Union in any capacity, for hours of work that will permit the employee to attend meetings of the Union where the Union has given such notice in writing to the Employer, provided it involves not more than one (1) employee per store.  The Union agrees to give the Employer no less than ten (10) days' notice of such meetings.

While the employee/representative of the Union serves in this capacity, they will not be subject to Article 5(A), Employer Transfer of Employees, or Article 5(B), Inter-Union Transfer.

The Employer recognizes the right of the Local Union to appoint two (2) stewards per store. The Union will notify the Labor Relations Department of the names and store number of the stewards. Upon three (3) weeks' notice to CVS's Labor Relations Department, one (1) Union steward per store will be designated by the Union to attend a one (1) day stewards' training seminar per calendar year and will receive one (1) day of pay by the Employer upon proof of attending such training seminar, provided CVS organizing activity is not solicited at such training seminar.  One (1) day of pay for the union steward annual meeting is only for maximum of one steward per store of the stores per Local Union covered by this labor agreement.

G.     EMPLOYEE ORIENTATION.  The Employer agrees to allow a union representative up to ten (10) minutes to discuss the Union's role and to obtain signatures on applications and dues forms at the end of New Hire Orientation Meetings.

<u>ARTICLE 4 - DISCIPLINE/VOLUNTARY QUITS</u>

A.      REGISTER SHORTAGES/IRREGULARITIES.

1.      No employee may be required to make up cash register shortages, unless the employee is given the privilege of checking the change and daily receipts upon starting and completing the work shift, and unless the employee has exclusive access to the cash register during the work shift, except as specified below.

2.      No employee may be required to make up register shortages when management exercises its rights to open the register during the employee's work shift, unless the register is opened in the presence of the employee and the employee is given the opportunity to verify all withdrawals and/or deposits.

3.      When, as the result of a shopper's report, an employee, subsequent to the shopping incident, is called upon for an interview by a security agent, the employee may, upon receipt of such advice or during such interview, request the presence of a Union representative during the interview. Such Union Representative must be available within a reasonable period of time but in no event later than twenty-four (24) hours after such request, or the interview may proceed without a Union Representative.

When an employee is the subject of a shopper's report or multiple reports and is to be counseled on said report or reports by the Employer, the counseling will take place within a reasonable time period not to exceed thirty (30) days from the date of the last report affecting the employee.  The employee and the Union Representative will, by request, be given an opportunity to read said reports during counseling.

4.      An employee discharged for cash register irregularities resulting from a shopper's report or multiple reports shall at the time of the discharge be provided with a copy of such reports, including the observer's report, together with the shopper's report.  Failure to provide such reports shall convert any discharge into a ten (10) day layoff.

5.      A warning notice shall not be required in the case of a discharge for cash register irregularities but such alleged irregularities must constitute good cause for the purpose of sustaining said discharge.  Such alleged irregularities shall not constitute good cause for discharge when the Employer fails to follow the procedures set forth in Article 4, Paragraphs A-1 and A-2, unless the alleged irregularities are not affected by failure to follow said procedures.

B.      INVESTIGATION/INTERVIEW.  In any instance where an employee is to be interviewed and/or interrogated by the Employer or an Employer representative in respect to any alleged violation of the collective bargaining agreement or alleged infraction of Employer policies which may result in disciplinary action, the employee shall be afforded the opportunity of calling a Union Representative and having a Union Representative present during such interview or interrogation.

C.      DISCIPLINE.

1.      <u>Good Cause</u>.  Non-probationary employees shall not be discharged except for good and sufficient cause such as dishonesty, insubordination, incompetency, intoxication, unbecoming conduct or failure to perform work as required.  Non-probationary employees who are discharged for

incompetency or failure to perform work as required (including excessive absenteeism or excessive tardiness) shall first have had two (2) prior warnings in writing within twelve (12) months preceding the discharge of such incompetency or of related or similar failure to perform work as required, with a copy sent to the Union.  The employee so notified shall be required to sign such notice, but such signing shall in no way constitute agreement with the contents of such notice.  Age, sex, creed or color shall not be grounds for the termination of an otherwise qualified employee.

      2.   <u>Discharge for Incompetency</u>.  It is understood that a discharge for incompetency shall occur only at the end of an employee's weekly schedule after the employee has completed the probationary period.

      3.   <u>Notice</u>.  Any employee who is discharged shall be informed in writing at the time of discharge of the immediate cause of discharge, with a copy sent to the Union within ninety-six (96) hours thereafter, excluding Saturday, Sunday and holidays.

      4.   <u>Legal Violations:</u>   Any employee who violates any federal, state or local law or regulation while working may be terminated without prior warning.

D.     DEMOTION.  No Special Classification employee, Pharmacy Service Associate, or Pharmacy or Lead  Technician  shall be demoted from his or her position because of deficient performance in the job without first (1st) having received a prior warning notice in writing, copy to the Union, spelling out the deficiencies.

E.     NOTICE OF INTENTION TO QUIT.  An employee who intends to quit the job shall, to the extent possible, give two (2) weeks' notice of the intention to quit.  An employee who gives any notice of the intention to quit his job shall not be terminated or otherwise discriminated against during the current workweek and the workweek following the date on which the employee gives such notice, but in no event can the employee insist upon working later than the designated quit date if a replacement employee has already been hired.

<u>ARTICLE 5 - TRANSFERS/SENIORITY</u>

A.     EMPLOYER TRANSFER OF EMPLOYEES.  The Employer may transfer employees to meet the necessities of the business as long as, in so doing, the employee does not exceed the mileage time limits set forth below.  Reasonable tolerance of these time limits shall be allowed for temporary transfers such as vacation relief and store openings.  For good and sufficient reason, an employee may refuse a transfer from the jurisdictional area of one (1) Local Union to another or any store on the basis of seniority.  An employee with more than one (1) year's continuous service with the Employer may file an application for transfer within the Employer to a store near his or her home.  The Employer will give full consideration to such requests and attempt to grant them if it does not have an adverse affect on the business of the Employer.  The requests will not be refused arbitrarily.

When the transfer of an employee becomes necessary, due to slackening of business, the Employer shall not require said employee to travel one (1) way more than fifteen (15) miles (radius) between the employee's place of residence and the new location.  In making transfers under this Paragraph, the Employer will make every effort to assign employees on a nondiscriminatory basis to the store which would cause the least hardship to the employee and require the least travel time.  Such transfer shall not be used for disciplinary purposes.

B.      INTER-UNION TRANSFER.  If an employee is transferred from one (1) UFCW Union's area to another in Southern California, the employee shall retain all seniority, but during a period of six (6) months from date of transfer, shall not displace any other employee, or reduce the employee's hours. This clause shall not be applicable in the event of the application of Article 5(E).

C.      SENIORITY.

        1.      Definition.  Seniority is the length of continuous employment of an employee with an individual Employer.  Seniority shall apply across the Southern California UFCW Clerk bargaining units.  Temporary absence from work in accordance with the provisions of this Agreement shall not break seniority.  Seniority can be broken only by the following:

                a.      Quit.

                b.      Discharge.

                c.      Layoff for more than nine (9) months.

                d.      Failure to return in accordance with the terms of a leave of absence or when recalled after a layoff.

        2.      Promotion to Pharmacy Technician.  Drug Clerks and Pharmacy Service Associates promoted to Pharmacy Technicians shall receive the next higher rate of pay of Pharmacy Technicians and shall progress through the remaining progression steps based on additional months worked.

D.      ABILITY AND SKILL.  When seniority is invoked by an employee, the employee's ability and skill in performing the work claimed shall be the determining factors in establishing such rights.

E.      LAYOFFS/RECALLS/HOURS REDUCTIONS.

        1.      Layoffs.  An employee subject to layoff or reduction from Full-Time shall have the choice of displacing either the least senior employee in the same classification (classification includes Full-Time status) within the Employer's business district.  If there is no less senior Full-Time employee in the same classification within the Employer's business district the employee will displace the least senior clerk/cashier in the employee's current store, or may opt to take the layoff.

Section 1 Employees (as defined in Article 14) will first be reviewed separately within the business district and follow the steps described above until such time the least senior Section 1 Employee is to be laid off.  At that time the Section 1 Employee will have a right to bump the least senior clerk cashier within the Section 2 (as defined in Article 14) stores provided that the Section 1 Employee has higher seniority than the least senior clerk/cashier within the Section 2 stores.

        2.      Layoff Timing.  A layoff shall occur only at the end of an employee's weekly schedule after the employee has completed the probationary period.

3.     Recall.  Laid off employees shall be recalled within their store on the basis of the last laid off shall be the first (1st) recalled.

a.     A laid off employee who becomes eligible to return to work under the seniority provision must appear for work within ninety-six (96) hours, excluding Saturday and Sunday, after the Employer has made a good faith effort to notify the employee in writing of recall to work.  The Employer will simultaneously notify the union of the employee's eligibility to return to work.

b.     A full-time employee who has been reduced to part-time employment because of legitimate business reasons or for medical reasons, must be offered the first (1st) full-time job that opens in the store in which the employee is employed, provided that the employee is able to fill that job.

F.     FULL-TIME POSITIONS.  A part-time employee shall have the right to claim a full-time position when one becomes available within the Employer's operating district, based upon seniority, provided such part-time employee has the qualifications and ability with the Employer to perform the duties of the claimed position.

When a full-time position becomes available within the Employer's operating district a posting will be placed in each operating district store's break room and on-line for two (2) weeks and the most senior and qualified union employee will be considered for the job.  Full-time employees who have been reduced to part-time status due to lack of work shall have priority over part-time employees who have not been full-time and involuntarily reduced.  If no qualified applicants apply, the Employer will take applicants from outside the bargaining unit to fill the full-time position.

## ARTICLE 6 - WORKDAY/WORKWEEK/SCHEDULES

A.     STORE HOURS.  The Employer shall have the sole right to fix and determine the opening and closing hours of its stores.

B.     WORKDAY DEFINED.  For the purposes of this Agreement a working day is the period from midnight to midnight.  Where shifts overlap into two (2) working days, payment shall be made for the hours worked on each working day in accordance with the rates established for such days.

C.     WORKDAY GUARANTEES.

1.     Full-Time/Scheduled Day.  All full-time employees reporting for work on their scheduled workday shall be guaranteed a full day's work of eight (8) hours with pay; except if a full-time employee is scheduled to work six (6) days in any workweek, the employee shall be guaranteed four (4) hours' work on the sixth (6th) day.  The four (4) hour day need not be the actual sixth (6th) day, but may be, in the Employer's discretion, any one (1) of the workdays in the weekly work schedule except Sunday.

The integrity of the eight (8) hour full-time day shall be preserved and all time worked shall be paid for.  Part-time jobs shall not be created or scheduled for the purpose of destroying the eight (8) hour full-time day.

2.     Full-Time/Predesignated Day Off.  Any full-time employee called for work on the employee's predesignated day off, as established in the work schedule provisions, shall be guaranteed eight (8) hours' work at the overtime rate of pay.

3.      Part-Time.  Upon reporting for work, all part-time employees and those replacing employees in an emergency shall be guaranteed not less than four (4) hours' work with pay.  Only registered school students who are under age eighteen (18) shall be allowed to work less than four (4) hours per shift during the period the student is attending school.  "Employees who are called in to cover an absence or illness of another bargaining unit employee or an emergency may work less than a four (4) hour minimum on that shift.

4.      On Call.  If the Employer requires an employee to remain at home "on call" the Employer shall guarantee the employee four (4) hours' pay at the appropriate rate for such day.  All Employer requests for an employee to remain available for "on call" duty shall be in writing to the employee.

D.      WORKWEEK GUARANTEES.

1.      Full-Time.  The workweek shall be Sunday through Saturday.  Eight (8) hours shall constitute a regular day's work, and forty (40) hours, consisting of five (5) eight (8) hour days shall constitute a regular week's work.  All employees hired to work on a full-time basis or who are scheduled and work at least forty (40) hours in ten (10) consecutive weeks shall be guaranteed forty (40) hours' work per week, except in a holiday week, in which it shall be thirty-two (32) hours, provided the employee is available and able to work the required work schedule.  Part-time jobs shall not be created or scheduled for the purpose of destroying the full-time forty (40) hour week principle.

a.      A full-time employee is one employed and/or scheduled to work forty (40) hours per week.  Any employee who is scheduled and works ten (10) consecutive weeks at forty (40) hours per week will be classified as a full-time employee.  This requirement shall not apply during the Christmas (November 1 - January 15) or vacation season (June 1 - August 31) or where an employee is scheduled forty (40) hours due to the absence of another employee in excess of three (3) consecutive weeks.  Provided, however, that forty (40) hour weeks worked immediately prior to any of the above exceptions and those worked immediately following the exception shall be considered continual for the purpose of calculating the ten (10) consecutive weeks.

b.      A part-time employee (intern pharmacist or retail clerk) is one employed and/or scheduled to work less than forty (40) hours per week.

2.      Part-Time.  All non-probationary part-time employees shall be guaranteed a minimum of twelve (12) hours work per workweek unless it is operationally unfeasible.  Unfeasible shall be defined as follows:

a.      The employee is called in to cover an absence or illness of another bargaining unit employee or an emergency.

b.      The employee is unable to work the scheduled hours or declines to work twelve (12) hours per workweek.

c.      The employee working more than twelve (12) hours per workweek declines or refuses to work additional hours when requested to do so.

3.      <u>Part-Time Guarantee</u>. All Section 1 part-time employees shall, after six (6) months of service, be scheduled a minimum of twenty-four (24) hours per workweek provided the employee is available to work the schedule hours.  The employee must have a completed Availability Form on record with the Employer.  This minimum guarantee is subject to the following conditions:

a.      The employee must be available for five (5) out of seven (7) days including Saturdays and Sundays; and five (5) evening shifts (up to one (1) hour after store closing) or up to 11 p.m. if employed in a 24-hour store, but not scheduled to work overnight.

b.      The employee is guaranteed at least two (2) weekend days off per month.

c.      An associate may occasionally seek one (1) day or one (1) partial day off in advance of the schedule without reducing the twenty-four (24) hour guarantee.  The twenty-four (24) hour guarantee shall include paid time off (such as holidays, jury pay, funeral pay, etc.) and shall not apply as provided in Article 6(E).  The associate must work as scheduled.

d.      The twenty-four (24) hour guarantee will not apply to an associate who is only available to work four (4) hours per day (thereby triggering a sixth (6th) day at overtime).

e.      Past scheduling practices regarding an associate are not controlling.  Example, a person who has not been working evenings would have to be available for evening work to be guaranteed twenty-four (24) hours.  Management reserves the right to schedule the person twenty-four (24) or more hours without evening hours.

f.      The twenty-four (24) hour guarantee shall not require an increase in overall hours.

g.      Grievances regarding the twenty-four (24) hour guarantee must be filed forty eight (48) hours after the schedule is posted or shall be forever waived.

h.      If hours at a store need to be reduced due to business reasons, the part-time associates with the twenty-four (24) hour guarantee may be transferred to another location pursuant to Article 5(A) or waive the twenty-four (24) hour guarantee in lieu of transfer.

i.      Schedule changes shall not arise due to disciplinary reasons, however, the Company reserves the right to determine associate schedules**.**

j.      Eligible employees may elect to work less than twenty-four (24) hours per workweek.  Such election must be in writing with a copy to the Union.  In such cases the employee will be scheduled pursuant to the twelve (12) hour minimum provided for above.  An employee who waives the right to the 24-hour guarantee may revoke this decision with a two (2) week notice, up to a maximum of two (2) times in a rolling twelve (12) month period.

4.      a.      All Section 2 employees will be guaranteed thirty (30) hours after thirty six (36) months of service effective January 1, 2018.

b.      The twenty-four (24) and twelve (12) hour guarantee would stay in effect until the thirty (30) hour guarantee kicks in.

   c. Current Section 2 Employees with twenty-four (24) hour minimum guarantees who are ineligible to work thirty (30) hours shall be guaranteed twenty-four (24) hours per week until the time that they are eligible for thirty (30) hour minimum.

   d. Effective January 1, 2018 Section 2 Employees ineligible or unavailable to work thirty (30) hours per week, shall be guaranteed a minimum of sixteen (16) hours per week.  In order to be eligible for sixteen (16) minimum, employees must provide their work availability.

   e. Section 2 Employees are not subject to flat line provisions in the contract.  Flat line is only subject to Section 1 Employees.

   f. Modify the Unfeasible language to reflect sixteen (16) hour guarantee to include: Employee is unable to work the scheduled hours available that remain on the store schedule or declines to work sixteen (16) hours per week.

E. NON-APPLICABILITY OF GUARANTEES.  In the event operations cannot commence or continue for reasons beyond the control of the Employer including, but not limited to, acts of God, fire, flood, insurrection, war, nuclear alarm or disaster, civil disturbance, governmental shut down, or failure of public utilities, the foregoing guarantees shall not be applicable.

F. WORK SCHEDULE.

  1. <u>Ready for Work</u>.  All employees shall report for and be ready for work at their scheduled starting time.  The term "ready for work" shall include appropriate or required dress.

  2. <u>Work Schedule</u>.  The Employer shall post a work schedule for a one (1) week period in advance in ink for all employees, showing their surname and first initial, not later than 1 p.m. on the Wednesday preceding the first (1st) day of the following workweek.  The work schedule shall not be changed after posting, except as provide for below.  An employee shall be guaranteed pay for the specific days in a workweek upon which the employee is scheduled to work, provided the employee is available for such work, subject to Article 6-E of this Agreement.  The schedule may be changed after 1 p.m. on Wednesday but no later than 1 p.m. on Thursday to accommodate an employee returning from leave of absence.  The schedule may also be changed with the Union's agreement in response to a grievance filed pursuant to Article 6(D)(3)(g) or Article 6(F)(3).

   All employees shall be included on one (1) schedule or two (2) schedules (one pharmacy schedule and one non-pharmacy schedule) which are posted alongside one another.  The schedules shall show total number of hours scheduled for each employee.  Information shall be posted alongside the schedule indicating employee classification and full-time/part-time status.  The Employer will post an agreed upon notice reminding employees to raise schedule issues no later than forty eight (48) hours following the schedule posting.  Such notice will be posted in the same area where the schedule is posted.

   In the event that a new schedule is not posted, the previous weeks' schedule shall apply.  In formulating the work schedule of any employee, a minimum of ten (10) hours shall have elapsed between the two (2) consecutive work shifts unless the weekly rotation of Sunday and night shifts is involved, provided, however, that this provision shall not apply to an employee designated by the Store Manager to act in the Store Manager's absence, nor shall it apply in the event of emergencies.  Work performed prior to the ten (10) hours' elapsed time in violation of this Paragraph shall be paid at the rate of time and one-half (1½).

The Employer shall endeavor to rotate all clerks on night and Sunday work, except where such rotation adversely affects the Employer's operation, and provided such rotation is agreeable to the employee.

All five (5) day full-time employees shall have one (1) weekend (Saturday and Sunday) off each month except November and December.  Any employee not wishing to be scheduled for one (1) weekend off per month shall give notice to this effect in writing to the Store Manager.  (In such instances, Article 7- D-3 will apply.)

3.      Part-Time Scheduled Hours.  More senior part-time employees shall not be scheduled fewer hours in a store than less senior part-time employees, who are qualified to perform the same work in the same store when availability is equal.  Alleged violations of this Paragraph must be grieved by 1 P.M. on Friday or shall be forever waived.  Reduction of hours of a less senior employee necessitated by the scheduling of more hours to a senior employee shall not give rise to any schedule/pay grievance by a less senior employee.  The Employer agrees that it will not flat schedule all part-time employees in any store.

4.      Rest Periods.

a.      More Than 6 Hours.  An employee working more than six (6) hours in a day shall receive two (2) fifteen (15) minute uninterrupted rest periods during such day.  Each fifteen (15) minute rest period includes travel time.  The first (1st) rest period shall be given in the first (1st) half of the shift and the second (2nd) period during the second (2nd) half of such shift.

b.      More Than 2 Hours.  An employee working more than two (2) hours and not more than six (6) hours shall receive one (1) fifteen (15) minute uninterrupted rest period.  Each fifteen (15) minute rest period includes travel time.  This shall be given during the first (1st) four (4) hours of the employee's shift.

c.      All Employees.  All employees who are required to work a minimum of an additional one (1) hour of overtime shall be entitled to a ten (10) minute rest period as the total elapsed time away from performing assigned duties prior to the start of such overtime work.  Insofar as practicable, rest periods shall be in the middle of each work period.  The rest period shall be considered uninterrupted when the employee is not ordered back to work by someone in charge.  Should an employee's rest period be interrupted, the employee shall be given a new uninterrupted rest period as soon as possible.

5.      Meal Period.  All hours shall be worked consecutively, except for a meal period which shall be one (1) hour.  No eight (8) hour employee shall be scheduled for more than five (5) hours or less than three (3) hours before a meal break.  However, by mutual agreement in writing between the Store Manager and the employee, less than one (1) hour may be established to meet business conditions, but in no event may less than one-half (½) hour be given.  If the Union becomes aware of abuse it reserves the right to revoke the option at any location(s) after first covering the Steps 1 and 2 of the grievance procedure contained in Article 16.

6.      Sixth/Seventh Day.  No employee shall be required to work seven (7) days in any workweek except in an emergency.  It shall not be a violation of this contract, nor shall it constitute cause for discharge, if an employee declines to work on the sixth (6th) day of the workweek unless scheduled to work on such day.

      7.     <u>Sunday Ratio</u>.  The Employer may schedule no more than three (3) short shifts [less than eight (8) hours] for every one (1) eight (8) hour shift scheduled.

      8.     <u>Holiday Ratio</u>.

      a.     <u>Shift Ratio</u>.  The Employer may schedule no more than three (3) short shifts [less than eight (8) hours] for every one (1) eight (8) hour shift scheduled.

      b.     <u>Less Than 9 Hour Stores</u>.  In those stores open for less than nine (9) hours on holidays, full-time employees who have been scheduled for four (4) eight (8) hour days will be permitted to work less than eight (8) hours on the holiday, but will be guaranteed the number of hours the store is open, less a lunch hour if the shift exceeds six (6) hours.  Such employees shall receive no less than five (5) hours' pay at the holiday premium rate.  If said employees perform work before the store opening and/or after the store closing, the eight (8) hour guarantee at the holiday premium rate of pay shall apply, and all hours worked in excess of eight (8) hours shall be compensated at the holiday premium rate of pay.  This exemption from the holiday guarantee shall apply to full-time employees only, unless no full-time employees are available.

      9.     <u>Holiday Scheduling</u>.

      a.     <u>Christmas Eve and New Year's Eve</u>.  Employees working on the day of December 24th or December 31st shall be scheduled on the basis of inverse seniority to allow the most senior employee(s) the early shift on Christmas and New Year's Eves.

      b.     For all employees, work on Thanksgiving and Christmas Day shall be voluntary.  If the Employer is unable to staff the store with qualified employees on a voluntary basis, the Employer will by inverse seniority schedule qualified employees to work on Thanksgiving and Christmas Day, and if the work schedule has been posted the employee shall be required to work said day.

      c.     <u>Holiday Work Preference</u>.  Written requests by the employee made to the Store Manager prior to the posting of the schedule to work on any holiday shall be given first (1st) preference based on seniority.  Written requests must be turned in to the person in charge five (5) days prior to the posting of the work schedule.  This provision shall not be a requirement on the Employer to create overtime work.

      10.     <u>Overtime Preference</u>.  Employees shall be given preference for overtime and holiday work by seniority, provided they are qualified to perform such work and available on a timely manner based upon the needs of the business.  This provision shall not be a requirement on the Employer to create overtime work.

      11.     <u>Inventory Work</u>.  The present inventory taking practice shall continue; provided, however, that employees covered by this Agreement shall be paid for all time spent taking inventory at the appropriate contractual rate.  No inventory work shall be required to be performed by employees covered by this Agreement on the evenings before Thanksgiving, Christmas and New Year's Day.

      12.     <u>Full-time/Part-time Ratio</u>.  The Employer agrees to a ratio that will provide an overall ratio of thirty-seven percent (37%) full-time employees and sixty-three percent (63%) part-time employees, throughout the jurisdiction of this Agreement.  It is agreed that all UFCW bargaining unit employees shall be included within the calculation, excluding only employees classified as Christmas

extras.  The Employer acknowledges that this ratio shall be accomplished through attrition or as provided for in Article 5(E) of this Agreement.

The full-time ratio shall be determined on an all Southern California UFCW Locals basis for clerks.  The Employer shall provide to the Union Locals a semi-annual list of bargaining unit employee names, social security number, full-time or part-time status, store and Local Union number. The Employer shall provide to the Union Locals a semi-annual list of the names and store number of non-bargaining unit full-time pharmacists employed at clerk represented stores for ratio verification purposes only.  These semi-annual lists shall only be run for the second (2nd) payroll week ending each March and second (2nd) payroll week ending each September and shall automatically be provided to the Union locals.

It is expressly understood by the parties that the Employer may count all full-time pharmacists employed in the bargaining unit stores in the full-time ratio for the purpose of this Section.

13.     Working Employees Past Scheduled Hours.  Employees shall not be required to stay past their scheduled hours provided the employee has a valid reason and the Employer can obtain another qualified employee to volunteer or through inverse seniority.  The Employer shall attempt to provide notice as early in the shift circumstances permit, but in no event less than one (1) hour before the shift ends.  Also, no employee required to stay shall be required to stay longer than one (1) hour beyond the scheduled quitting time.  Both one (1) hour requirements do not apply in case of emergency.

## ARTICLE 7 - WAGES

A.     ALL EMPLOYEES.

1.     Base Rates.  Attached to and made a part of this Agreement is Appendix A which sets forth the straight-time hourly rates for all employees covered by this Agreement.

2.     Prior Industry Experience.

a.     New hires shall be credited with prior experience and paid at no less than the wage rate they were last receiving prior to leaving the industry.  The number of years employed at the previous Employer shall be counted toward an employee's six (6) year increase and seven (7) year top rate entitlement [five (5) year top rate entitlement for Pharmacy Technicians].

b.     New hires not previously employed by the Employer or its predecessor Company who are entitled to prior experience shall receive the entry level wage rate during the first (1st) thirty (30) days of employment and the six (6) month rate during the next ninety (90) days of employment. Thereafter the employee shall be paid in accordance with paragraph (a) above.

c.     New hires previously employed by the Employer shall receive full credit for prior experience with the Employer in the type of work to be performed.

d.     Definition of Prior Experience.  Prior industry experience is defined as experience under UFCW collective bargaining agreements in the State of California in the drug and discount industry or general merchandise in the food agreement during the ten (10) year period prior to employment under this Agreement.  Only such experience stated on the employee's application and confirmed by the Employer or acceptable proof shall be credited.

3.      Christmas Extra Employees.  Clerks hired specifically to work during the period of November 1st through January 15th shall be paid at the clerk minimum rate(s).

4.      Journeyman.  With reference to clerks hired prior to July 1, 1986, the Employer agrees not to replace them with employees hired on or after July 1, 1986, for the purpose of taking advantage of the lower rates effective on or after July 1, 1986.

B.      PREMIUMS.

1.      Evening Premium.  This Section shall not apply to employees hired on or after July 5, 2004.  For all time worked by employees, after 7 P.M. and before 10 P.M., a premium of twenty-five cents (25¢) per hour shall be paid.

2.      Night Premium   For all time worked by employees after 10 P.M. and before 7 A.M., a premium of one dollar ($1.00) per hour shall be paid.

3.      Sunday Premium.  For all time worked on Sunday by employees, a premium of one dollar ($1.00) per hour shall be paid.  This provision shall not apply to employees hired on or after July 1, 1986.

C.      SPECIALTY CLASSIFICATIONS. Each Pharmacy Service Associate, Photo Lab Supervisor, Shift Supervisor B, Coordinator and Beauty Advisor, as defined in Article 2-B-3-g and h, who is primarily and regularly responsible for such activity, will be compensated in accordance with Appendix A Wages-Position Premiums.

D.      OVERTIME.

1.      Daily/Weekly Overtime.  All work performed in excess of the regular day's work of eight (8) straight-time hours in any one (1) day, or in excess of the regular forty (40) straight-time hours in any one (1) regular workweek, or thirty-two (32) straight-time hours in any holiday week exclusive of work on the holiday, shall be deemed overtime and paid for at the overtime rate of time and one-half (1½) the employee's regular straight-time rate of pay, or at a higher premium rate, if such is applicable.

2.      Sixth Day Overtime/Full-Time.  Time and one-half (1½) shall be paid to a full-time employee who works on said sixth (6th) day in a workweek, provided the employee completes the scheduled workweek.

3.      Seventh Consecutive Day Overtime/Full-Time.  When a five (5) day, full-time employee is scheduled to work more than six (6) consecutive days in any combination of workweeks, said employee shall receive time and one-half (1½) (or such higher premium as may apply) for all time worked after the sixth (6th) consecutive day, until such time as the consecutive days of work have been interrupted by a prescheduled day off.  The above shall not apply to regularly scheduled six (6) day employees, provided that overtime or premium rates are paid where applicable.  The sixth (6th) day of work within one (1) workweek, whether prescheduled or not, shall act as an interruption in the continuity of consecutive days worked.  Where the application of this sixth (6th) day provision would interfere with the rotation of days off, overtime shall be paid after the seventh (7th) consecutive day.  This paragraph shall not apply when the seventh (7th) consecutive day is necessary to accommodate the employee's written request for specific days off.

4.     Predesignated Day Off Overtime/Full-Time.  Time and one-half (1½) pay shall be paid to a full-time employee for work on the employee's predesignated day off as established in the work schedule.

5.     Sixth Day Overtime/Part-Time.  Part-time employees shall be paid time and one-half (1½), or such premium rate as may apply, for all work performed on the sixth (6th) day of work as such, in any regular workweek, or on the fifth (5th) day of work in any week in which a holiday falls, excluding the holiday, as provided in this contract, except that this Paragraph shall not apply when a part-time employee desires, in writing, additional work, including work on a sixth (6th) workday and the Employer accommodates said employee.  If the Union becomes aware of abuse it reserves the right to revoke the option at any location(s) after first covering the Steps 1 and 2 of the grievance procedure contained in Article 16.

6.     Early/Late Meal Periods.  Eight (8) hour employees who are required to work less than three (3) hours before commencing their meal period shall receive overtime pay for the time between the start of the meal period and the three (3) hour mark.  An eight (8) hour employee who is required to work in excess of five (5) hours without a meal period shall receive overtime pay from the end of the fifth (5th) hour until the meal period commences.

7.     Overtime Basis.  The overtime rate for employees who receive a wage scale in excess of the rates in this contract shall be based on said employee's actual rate of pay.

8.     Nonpyramiding.  The following are penalty rates:  overtime rates, premium rates (night and Sunday), and holiday rates.  No penalty rate of any kind shall be pyramided or paid in addition to any other penalty rates, and only the single highest applicable penalty rate shall be paid for any given hour of work.

E.     PAY PERIOD AND WAGE STATEMENT.  All employees shall be paid on a weekly or biweekly basis.  The Employer shall designate a payday not to exceed six (6) days following the completion of the applicable pay period, and employees must be paid on that day.  The Employer agrees to furnish each employee with a weekly itemized wage statement showing the name of the employee, period covered, straight-time and overtime or premium hours worked, total amount of straight-time, overtime and premium wages paid, the hourly rate of pay and for apprentices the accumulated hours worked to date, and all deductions made.  An employee scheduled off on a payday shall be paid on the employee's last scheduled working day before the payday, if checks are available.

It is understood and agreed that the Employer contemplates changing the method of payment to employees from the present weekly method to a biweekly method of payment.  The Union agrees that such a method of payment will be permissible during the term of this Agreement so long as the Employer gives the Union and the employees no less than six (6) weeks' notice in writing.

F.     TIME RECORDS.

1.     Daily Records.  The Employer shall furnish forms, either timecards or other time records, on which the employee shall be required daily to record time worked on each day.  Such daily record shall be verified by the Employer and employee at least weekly.

2.     Collusion or Coercion.  In the event of falsification of time records through collusion or coercion, where it is established that both the employee and the Employer had knowledge of such falsification, the employee shall be paid for all time worked, by check mailed to the Union.

18

G.      TRAVEL TIME PAY.  Whenever an employee is required by the Employer to change from one store to another during the same day, all time consumed by said employee in going either to or from one store to another shall be considered and paid for as part of the employee's regular duties.

H.      INJURY ON THE JOB.  When an employee is injured on the job, there shall be no deduction from the employee's pay for the day in which the employee was injured and reported for medical care. When such employee returns to work following the injury, and is certified as ready and able to perform all regular duties, but requires medical treatment as a result of the same injury, the Employer shall adjust the work schedules without penalty to the employee, to provide both the time for medical care and the number of hours of work for which the employee is regularly scheduled.

I.      LEGAL PROCEEDINGS.

        1.      Required Appearance.  Any employee served with a legal notice, citation or subpoena which involves any facet of the Employer's operation, or which may require the employee to appear in legal proceedings during scheduled work time, shall immediately inform the Employer of such service.

        2.      Requested Appearance.  Employees shall be paid as time worked under the terms of this Agreement for time spent at appearances in legal proceedings at the request of the Employer.

        3.      Work Related Appearance.  In addition, employees shall be paid as time worked under this contract for time spent at appearances or required standby in legal proceedings under subpoena issued by the court when the event, or events, giving rise to the issuance of the subpoena occurred while the employee was on duty working for the Employer, and so long as the Employer is not a party defendant or respondent in such proceeding, and no relief of any kind is sought against the Employer nor the imposition of any penalty or punishment upon the Employer.

        4.      Former employees who at the time of the legal appearance are no longer employed by the Employer, shall be paid by such Employer at the rate of straight time for the time spent at the legal appearance, with a minimum guarantee of four (4) hours per day.  In no sense is it to be construed that the former employee becomes an employee as a result of such payment.

J.      STORE/EMPLOYER/VENDOR MEETING PAY.

        1.      Store Meetings/Employer Meetings.  No store and/or Employer meetings shall be held as to conflict with the regular meetings of the Union, and upon three (3) days' notice to the Employer of a special meeting, the Employer agrees to hold no store meetings in conflict therewith.  Time spent at store meetings shall be considered as time worked and paid for in accordance with this Agreement, but shall not constitute hours worked with respect to overtime provisions of Article 7-D-2, 3, 4 and 5 or any other premium pay and report-in pay provisions of Article 6-C-1, 2 and 3 for the first (1st) four (4) store meetings held in each calendar year.  The Employer will consider reasonable excuses by employees for not attending a meeting on their scheduled day off.

        2.      Vendor Meetings.  If the Employer requests an employee to attend a meeting of any vendor, the Employer shall pay the employee as time worked.

K.      AUTO ALLOWANCE.  Personnel who travel in behalf of the Employer and who are members of the bargaining unit shall receive all improvements in auto allowance for other personnel who travel for the Employer, but no less than the amount they are presently receiving.

L.     TRAINING SCHOOL FEES.  Where, as a condition of employment, the Employer requires attendance at a school or training establishment, and where a fee is charged for such instruction or training, the fee shall be borne by the Employer.

M.     BOND FEES.  Whenever the Employer requires the bonding of any employee or the carrying of any insurance for the indemnification of the Employer, the premiums for the same shall be paid for by the Employer.  Should an employee be refused bond by a bonding company, after the first (1st) thirty (30) days of employment, the Employer agrees to make a reasonable effort to secure a bond in an appropriate case without added cost to the Employer.

N.     REQUIRED HEALTH EXAM FEES.  The Employer shall pay the cost for any city, county or state health examination required of employees who are covered by this Agreement.

O.     NO REDUCTION IN RATES.  It is further agreed that no employee shall suffer any reduction in rates or general working conditions by reason of the signing of this Agreement.  No employee receiving hourly rates in excess of the rates herein shall be replaced by another employee at a lesser hourly rate for the purpose of avoiding any of the provisions of this Agreement.

P.     WAGE/PRICE CONTROLS.  If by Presidential decree or legislative enactment, wage and price controls are instituted which cause any provisions of this Agreement to affect either of the parties adversely, such provisions may be reopened for negotiations.  The party adversely affected must give fifteen (15) days' written notice to the other party in order to so reopen this Agreement.  Any issues unresolved as a result of such reopening may be submitted to final and binding arbitration by either party under the procedures set forth in Article 16.

Q.     CHARITY.  The Employer shall not conduct or handle any campaign or drive for charitable purposes among the employees except where the cooperation and contributions of the employees are voluntary.

<u>ARTICLE 8 - VACATIONS</u>

A.     ENTITLEMENT.

       1.     <u>One Year</u>.  All full-time employees who have been continuously employed by the Employer for one (1) year shall receive one (1) weeks' vacation with full pay.

       2.     <u>Two Years</u>.  All full-time employees who have been continuously employed by the Employer for two (2) years shall receive two (2) weeks' vacation with full pay.

       3.     <u>Five Years</u>.  All full-time employees who have been continuously employed by the Employer for five (5) years shall receive three (3) weeks' vacation with full pay.

       4.     <u>Fifteen Years</u>.  All full-time employees who have been continuously employed by the Employer for fifteen (15) years shall receive four (4) weeks' vacation with full pay.

       5.     <u>Twenty Years</u>.  All full-time employees who have been continuously employed by the Employer for twenty (20) years shall receive five (5) weeks' vacation with full pay.

6.     _Continuous Employment Defined_.  Continuous employment for the purpose of this Article shall be measured from the last date of hire with the Employer.  However, where there has been continuous leave of absence in excess of one (1) year, the period of continuous employment shall be reduced by the number of full years of such absence.  When a first (1st) contract is signed, the period of employment for vacation eligibility shall be measured from the last date of hire with the Employer.

B.     PAY.

1.     _Full-Time Vacation Pay_.  The term "full pay" shall be defined as forty (40) hours' pay at the employee's straight-time hourly rate which was in effect at the time the vacation became due on the employee's anniversary date provided, however, that if the Employer does not pay the vacation pay on the anniversary date, the payment of vacation pay shall be based on straight-time hourly rate of pay in effect at the time the employee takes the vacation.

Absence from work up to seven (7) weeks or 280 (two hundred eighty) straight-time hours within the period of fifty-two (52) consecutive weeks, immediately preceding the employee's anniversary date, due to sickness, injury or temporary layoff, or other bona fide emergencies, shall be considered as time worked for the purpose of determining eligibility for full vacation pay.  In the event that an employee is absent from work in excess of seven (7) weeks, as set forth above, whatever vacation pay the employee is entitled to shall be prorated according to the ratio that the straight-time hours actually worked bear to 2,080 (two thousand eighty) hours.  Hours worked shall include paid holidays, paid vacations and paid jury duty.

2.     _Part-Time Vacation Pay_.  Part-time employees shall be entitled to vacation pay on each anniversary date of their employment, prorated on the basis of the average straight-time hours worked during the preceding year, according to the vacation formula set forth in this Article 8-A.  Said vacation pay shall be based on the straight-time hourly rate in effect on the employee's anniversary date provided, however, that if the Employer does not pay the vacation pay on the anniversary date, the payment shall be based on the straight-time hourly rate of pay in effect at the time the employee takes the vacation.

3.     _Payment Date_.  Employees receive vacation pay at the time the vacation is taken.  If the employee wishes to be paid in advance of their vacation, the employee may request payment for their vacation two (2) weeks prior to their vacation week.  The payment of an employee's vacation pay shall be by separate check or computed at the same tax rate schedule as the computation of regular wages per week.  Termination vacation pay is due in accordance with California State Law.

4.     _At Termination_.

a.     General.  Upon termination of employment for any reason other than discharge for proven or admitted dishonesty, an employee shall receive whatever vacation pay is due, prorated on the basis of the number of straight-time hours worked, provided that the employee has been in the continuous employ of the Employer for six (6) months or longer.  Said vacation pay shall be prorated according to the ratio that the straight-time hours actually worked bear to 2,080 (two thousand eighty) hours.  Employees terminated for proven or admitted dishonesty shall forfeit all vacation pay.

b.     After 6 Months.  Employees whose employment is terminated, and who have been in the continuous employ of the Employer more than six (6) months, but less than one (1) year, shall not be entitled to such pro rata pay where termination of employment is due to a discharge or to a voluntary quit, but shall receive prorated vacation only where termination of employment is due to a layoff.

c.      After 12 Months.  Any employee who has been in the employ of the same Employer for twelve (12) consecutive calendar months, but not to exceed eighteen (18) consecutive calendar months, shall upon termination of employment be entitled to receive a pro rata of the earned vacation on the basis of one (1) workweek consisting of forty (40) hours at straight-time pay for all months for which no vacation has been paid.

d.      After 18 Months.  When an employee has been in the employ of the same Employer in excess of eighteen (18) consecutive calendar months, the employee shall receive upon termination, a pro rata of accrued vacation pay on the basis of eighty (80) hours at straight-time pay for all months for which no vacation has been paid, but in no event shall vacation pay for the first (1st) year's employment exceed one (1) week's pay.  It is further provided that employees who voluntarily quit after eighteen (18) consecutive calendar months of employment with the same Employer, and prior to two (2) years' employment with the same Employer, shall receive pro rata of accrued vacation pay on the basis of forty (40) hours at the straight-time rate of pay.

e.      After 5 Years.  An employee who has been in the employ of the same Employer for five (5) years or more shall, upon termination, receive accrued vacation pay on the basis of three (3) weeks per year for all time in excess of five (5) years for which no vacation pay has been received.

f.      After 15 Years.  An employee who has been in the employ of the same Employer for fifteen (15) years or more shall, upon termination, receive accrued vacation pay on the basis of four (4) weeks per year for all time in excess of fifteen (15) years for which no vacation pay has been received.

g.      After 20 Years.  An employee who has been in the employ of the same Employer for twenty (20) years or more shall, upon termination, receive accrued vacation pay on the basis of five (5) weeks per year for all time in excess of twenty (20) years for which no vacation pay has been received.

5.      <u>No Carryover</u>.  Vacation may not be waived by an employee, nor may extra pay be received for work during that period; provided, however, that by prior mutual agreement between the Employer, the employee and the Union, this provision may be waived.

C.      INDUSTRY VACATION.  Additional vacation pay based on industry experience shall be provided in accordance with the provisions of the Trust Fund set forth in Article 14.  Said additional vacation pay shall be paid to the employee by the Trust Fund.  Any employee entitled to vacation pay as herein provided shall not suffer any loss of credits for health and welfare benefits or pension benefits that are provided under Article 14 of this Agreement.

D.      SCHEDULING.

1.      <u>Posting/Selection/Scheduling</u>.  The Employer shall prepare and post in each store a vacation schedule not later than January 15th of each year and such vacation schedule shall remain posted until March 1st for the purpose of enabling the employees to select their vacation period.  Vacation periods shall be fixed by the Employer to suit the requirements of the business, but as far as possible and practicable, vacations will be given during the summer months (through October if requested by the employee), and for employees with school-age children during the school summer vacation.  In scheduling a vacation of an employee, the Employer shall give as much notice as possible prior to the date of beginning the vacation but not less than thirty (30) days.  Vacation period shall be unbroken except by mutual consent between Employer and employee.

Vacation periods other than those listed above may be applied for to management and full consideration will be given to grant the request unless it has an adverse effect on the Employer's business.

The Employer shall be required to give vacation time off based on the number of weeks of vacation due the employee from the Employer and from the vacation trust fund. Within the limits set forth in this Paragraph, vacations shall be scheduled by seniority.

2.  <u>No Accumulation</u>.  Vacations may not be cumulative from one (1) year to another.

3.  <u>Holiday During Vacation</u>.  If a holiday named under Article 9 of this Agreement falls within the vacation period of an employee, the employee shall be granted an additional day of vacation with full pay, or an additional day's pay in lieu of the holiday. The additional day of vacation shall be counted as a day worked for the purpose of weekly overtime computation during the week in which the employee returns to work.

<u>ARTICLE 9 - HOLIDAYS</u>

A.  PAID HOLIDAYS.

1.  <u>Eligibility</u>.  The following days shall be holidays (although the Employer may be open for business on any or all of them notwithstanding Paragraph 2 below) and granted without reduction in pay except during the first six (6) months of their employment, employees shall not be entitled to pay for time not worked on the holiday, or to overtime for the first (1st) eight (8) hours on the fifth (5th) day of such week.

|  |  |
|---|---|
| New Year's Day | Christmas Day |
| Memorial Day |  |
| Independence Day |  |
| Labor Day | Three (3) Personal Holidays |
| Thanksgiving Day |  |

Employees shall be eligible for personal holidays in accordance with the schedule below:

(a)  An employee, who completes 1 year of employment shall be eligible for a personal holiday that shall be taken any time during the remainder of the year except for the month of December;

(b)  An employee, who completes 2 years of employment shall be eligible for 2 personal holidays that shall be taken any time during the remainder of the year except for the month of December;

(c)  An employee, who completes 3 years of employment shall be eligible for 3 personal holidays that shall be taken any time during the remainder of the year except for the month of December;

(d)  Effective January 1st each year, employees who have completed three or more years of service as of that date shall be eligible for 3 personal holidays that shall be taken any time during the calendar year except for the month of December.

Personal holidays are expected to be scheduled and taken.  Each employee shall give the Employer no less than 2 weeks' advance notice of the date on which he wishes to observe his personal holidays.  Personal holidays may not be celebrated in the month of December.  In the event an employee is unable to schedule and take a personal holiday(s), the pay for that holiday(s) will be paid in December each year.

Any unused personal holiday pay, will be paid upon termination.

No employee shall receive pay for any holidays not worked unless such employee has reported for work on the regular working day next preceding and next following said holiday. Employees shall be deemed to have reported for work if absence on said day before and said day after said holiday is due to express permission from or action of the Employer, provided the employee has worked during the holiday week, except that if the employee is absent during the entire holiday week due to illness or injury, then the employee must have worked at least one (1) day during the week immediately preceding the holiday week in order to be entitled to holiday pay.

2. All contractual holidays shall be observed on the holiday itself.

B.   HOLIDAY PAY.

1. <u>Worked Holiday Rate</u>.  Work as such on a holiday shall be compensated for at two and one-half (2½) times the straight-time hourly rate of pay for all hours worked after an employee's first (1st) six (6) months of employment.  Said two and one-half (2½) times shall include any premium pay or overtime that may be applicable, and includes pay for the holiday itself.

2. <u>Full-Time Holiday Week Pay and Schedule</u>.  A regular holiday workweek shall consist of the holiday itself and four (4) other eight (8) hour days.  All full-time employees shall receive forty (40) hours of straight-time pay for thirty-two (32) straight-time hours of work excluding the holiday.  A full-time employee, not working on a holiday, shall receive eight (8) hours' pay for the holiday, in addition to the pay specified in this Agreement for the other four (4) days referred to above.  All time worked over the thirty-two (32) hours, exclusive of the holiday, shall be paid for at the rate of time and one-half (1½) the employee's regular rate of pay.

The following hypothetical examples accurately reflect the intention of the parties set forth above with respect to employees after one (1) year of employment.

| | Su | (Holiday) M | Tu | W | Th | F | Sa | Total Hours Worked | Hours of Pay at Straight Time |
|---|---|---|---|---|---|---|---|---|---|
| Example #1 | | | | | | | | | |
| Hrs. wkd. | 0 | 0 | 8 | 8 | 8 | 8 | 0 | 32 | |
| Pay for | 0 | 8 | 8 | 8 | 8 | 8 | 0 | | 40 |
| Example #2 | | | | | | | | | |
| Hrs. wkd. | 0 | 0 | 8 | 8 | 8 | 8 | 8 | 40 | |
| Pay for | 0 | 8 | 8 | 8 | 8 | 8 | 12 | | 52 |
| Example #3 | | | | | | | | | |
| Hrs. wkd. | 0 | 8 | 8 | 8 | 8 | 8 | 0 | 40 | |
| Pay for | 0 | 20 | 8 | 8 | 8 | 8 | 0 | | 52 |
| Example #4 | | | | | | | | | |
| Hrs. wkd. | 8 | 0 | 8 | 8 | 8 | 8 | 8 | 48 | |
| Pay for | 8 | 8 | 8 | 8 | 8 | 12 | 12 | | 64 |
| Example #5 | | | | | | | | | |
| Hrs. wkd. | 0 | 8 | 8 | 8 | 8 | 8 | 8 | 48 | |
| Pay for | 0 | 20 | 8 | 8 | 8 | 8 | 12 | | 64 |
| Example #6 | | | | | | | | | |
| Hrs. wkd. | 0 | 4 | 8 | 8 | 8 | 8 | 0 | 36 | |
| Pay for | 0 | 14 | 8 | 8 | 8 | 8 | 0 | | 46 |
| Example #7 | | | | | | | | | |
| Hrs. wkd. | 0 | 4 | 8 | 8 | 8 | 8 | 8 | 44 | |
| Pay for | 0 | 14 | 8 | 8 | 8 | 8 | 12 | | 58 |
| Example #8 | | | | | | | | | |
| Hrs. wkd. | 0 | 9 | 8 | 8 | 0 | 8 | 8 | 41 | |
| Pay for | 0 | 22½ | 8 | 8 | 0 | 8 | 8 | | 54½ |

3.   <u>Part-Time Holiday Pay</u>.  Part-time employees with six (6) months or more continuous service with the Employer shall receive holiday pay of five (5) hours if they do not work on the holiday. All hours worked on the holiday will be paid in accordance with Article 9.B.1.  If the Employer's accounting period consists of less than four (4) weeks, the Employer and Union shall discuss said developments for the purpose of this Article.

C.   VOLUNTARY HOLIDAY CLOSING.  When the Employer voluntarily closes the store to the public because of any commemoration day or celebration day, or on any holiday other than those set forth in Paragraph A, above, it is agreed that the employees shall suffer no reduction in straight-time weekly earnings on account of such closing.

<u>ARTICLE 10 - SICK LEAVE PAY</u>

A.   <u>Eligibility</u>.  All employees covered by this Agreement who have been continuously employed by the Employer for a period of at least one year shall be entitled to forty-eight (48) hours of sick leave with pay, and on each anniversary date of employment thereafter they shall be entitled to forty-eight (48) hours of paid sick leave (subject to Paragraph 10(F) of this Article).  Sick leave shall be payable

only for bona fide illness or injury beginning with the first (1st) working day's absence.  Any working day on which an employee works more than four (4) hours shall not be considered the first (1st) day of absence.

B.      Pro Rata.  Part-time employees, and full-time employees who failed to work the full year, shall be entitled to sick leave on the basis set forth above on a pro rata of total hours worked or paid for during the year preceding the anniversary date as a ratio to two thousand eighty (2,080) hours.

C.      California Health Families Act of 2014.  The Company will comply with the California Health Families Act of 2014.

D.      Supplementary Disability Benefits.  Supplementary Disability Benefits will be provided in accordance with provisions of Article 14 hereof.  The Company will comply with the California Health Families Act of 2014.

E.      Sick Leave Integration.  Sick leave pay shall be integrated with the Supplementary Disability Benefits provided under the Trust Fund and California Disability Insurance or California Workers' Compensation Temporary Disability Benefits, or both, so that the sum of the sick leave pay hereunder, and the aforesaid State disability daily benefits which may be payable to an employee shall not exceed one hundred percent (100%) of the employee's daily wage at straight time.  If the sick leave pay allowable to an employee hereunder when so combined with any such Supplementary Disability Benefits from the Trust Fund and California Disability Insurance or California Workers' Compensation Temporary Disability Benefits, or both, exceeds one hundred percent (100%) of the employee's daily wage at straight time for any one (1) day, then such sick leave pay for that day shall be reduced accordingly.  Any portion of the day's sick leave pay not received by the employee by reason of any such reduction shall be retained as part of the accumulated sick leave pay credit subject to the provisions of Paragraph 10 (F), Unused Sick Leave Pay, of this Article.

F.      Sick Pay Defined.  For the purpose of this Paragraph sick pay shall mean pay at the employee's regular classification rate for those days and hours which the employee would have worked had the disability not occurred, calculated at straight time.

G.      Unused Sick Leave Pay.  Commencing with the employee's second (2nd) and succeeding anniversary dates of employment, any sick leave not utilized by the employee during the anniversary year shall accumulate to a maximum of two hundred forty (240) hours.  Earned sick leave hours in excess of two hundred forty (240) will be paid out annually on the employee's anniversary date.  All accumulated sick leave shall be available for use by employees who are unable to work because of illness or injury as specified in Paragraph 10 (A) of this Article.  Employees who retire from the company will receive a payout of all accumulated sick leave hours.

For purposes of this Article in regard to the payment of unused sick leave pay, "retirement" shall apply to an associate who is at least 50 years old, has at least 5 years of continuous service with the Employer, immediately qualifies for a pension under the Southern California UFCW and Drug Employers Pension Plan and advises the Employer, in writing, at least 14 days in advance, that the employee is retiring.

For stores that become represented by the Union for the purpose of collective bargaining and recognized by the Company as such and covered by this Agreement after December 31, 2012, in accordance with Article 10(B), employees will be credited with sick leave based on the following

formula: forty-eight (48) hours for the employee's anniversary year in which the store is covered by this Agreement minus sick hours taken in the same anniversary year. For example, an employee who used twenty-four hours of sick leave during the anniversary year would have twenty-four (24) hours remaining in sick leave bank.

## ARTICLE 11 - BEREAVEMENT LEAVE AND/OR PAY

Leave for all employees shall be provided because of death of a member of the employee's immediate family provided, however, that employees shall not be entitled to bereavement pay during their probationary period, but will be given up to three (3) days off without pay. Pay for such leave shall be at the straight-time rate for the hours scheduled for each workday lost because of such absence to a maximum of three (3) calendar days within a period of fourteen (14) calendar days beginning with the day of death. Verification of time required for such paid leave shall be supplied to the Employer by the employee, if requested. Immediate family shall be defined as the employee's spouse, child, mother, father, stepparent, brother, sister, mother-in-law, father-in-law, grandchild, grandparent, stepchild, legal guardian, domestic partner, or other relative living in the employee's home.

## ARTICLE 12 - JURY DUTY LEAVE AND/OR PAY

When a full-time employee is required to be in any court or courthouse for jury service the full-time employee shall be scheduled for a day shift from the hours of 8:00 A.M. to 5:00 P.M. on each day that the full-time employee is scheduled for jury service, and on a Monday-through-Friday workweek and shall receive pay during such workweek for each day on such jury service at the rate of eight (8) hours times his straight-time hourly rate. A full-time employee shall be entitled to receive jury duty benefits after the probationary period of employment.

If such full-time employee in addition works for the Employer on Saturday, the full-time employee shall be paid at the rate of straight time. If the full-time employee works for the Employer on Sunday, the full-time employee shall be paid at the Sunday rate of pay.

If a full-time employee is excused, temporarily or permanently from jury service on any scheduled day, i.e., Monday through Friday, the full-time employee shall immediately report for work to complete the remaining hours of the scheduled work shift. Failure to so report shall disqualify a full-time employee from any pay for jury duty for the day in question as long as the transportation time will permit the full-time employee to return to work prior to one (1) hour before the end of the shift.

When a non-probationary, part-time employee is required to report for jury service and such service deprives the employee of pay he otherwise would have earned during the workweek, he shall be paid lost pay based on his average hours worked in the four (4) weeks immediately preceding the first (1st) week of jury service less any compensation received by him for such jury service. Hours paid for jury service will be counted as hours worked toward the minimum weekly hour guarantee. No part-time employee will be required to work on a day in which they have served jury duty.

The Employer may require proof of attendance for jury service. A non-probationary employee must report immediately that he or she has been called for jury service and shall cooperate with the Employer in securing release from such service as appropriate in the circumstances then existing and with regard to the work performed by the individual concerned.

A non-probationary employee shall be eligible for jury duty pay for a maximum of thirty (30) days only during the life of this Agreement.  Jury duty pay shall not be required for Grand Jury service.  In the event a non-probationary employee is called for a second (2nd) tour of duty during the term of this Agreement, the Employer shall join the non-probationary employee in seeking the non-probationary employee's excuse from service if such service would cause a financial hardship to the non-probationary employee.

## ARTICLE 13 - OTHER LEAVES OF ABSENCE

A.      EMERGENCY LEAVE.  Non-probationary employees may take an automatic emergency leave of absence not to exceed two (2) weeks in the event of certified, serious illness or injury of the employee, or serious illness, injury or death in the employee's immediate family without prior notice; provided that the employee makes every reasonable effort to notify the Store Manager, or in his or her absence, notice to the Assistant Store Manager within twenty-four (24) hours of the commencement of said leave.  Said two (2) weeks automatic emergency leave of absence shall be a part of the time limits set forth in Paragraph B below.

B.      AUTHORIZED LEAVE.  Employees with six (6) months seniority shall be entitled to leaves of absence for the following reasons provided they submit required paperwork to the Company Leave of Absence Department up to the following maximum periods:

        1.      Death in Family.  Death in the employee's immediate family or other personal reasons deemed sufficient by the Employer up to a three (3) month period, except when covered by Paragraph 4 below.  (Family Care Leave of Absence)

        2.      Illness/Injury.  Certified illness, injury, or pregnancy of the employee requiring absence from work up to six (6) months renewable for up to an additional six (6) month period.

        3.      Workers' Compensation.  In absences covered by Workers' Compensation, the employee's leave of absence shall be continuous until such time as the employee has been released from his period of temporary disability and is available and qualified for work, provided, however, such leave of absence shall not exceed fifteen (15) months.

        4.      Family Care Leave of Absence.  Any employee with at least six (6) months of continuous service, shall be eligible to receive a family care leave of absence without pay.  The employee may be eligible for up to four (4) months of leave for the following reasons: the birth of an employee's child; the adoption and placement of a child with the employee;  the serious health condition or death of the employee's spouse, domestic partner, child, step-child, parent, step-parent, sister or brother; or of the mother-in-law, father-in-law, grandparent, grandchild, legal guardian or other relative by blood or marriage, provided that such person resides in the same household as the employee; or due to a "qualifying exigency" for military operations arising out of a spouse's, child's or parent's Armed Forces (including the National Guard and Reserves) active duty or call to active duty in support of a "contingency operation", as these terms are defined by the Family Medical Leave Act of 1993 and its amendments ("FMLA").  The employee may be eligible for up to twenty six (26) weeks of leave in a twelve (12) month period to care for a spouse, child, parent or next of kin (nearest blood relative of an individual) who is an Armed Forces member with a serious injury or illness incurred in the line of duty while on active duty that may render the individual medically unfit to perform his/her military duties, as those terms are defined by the FMLA.

The leave of absence may be taken in one (1) or more periods of at least one (1) payroll week each [not to exceed a total of four (4) months] within a twenty-four (24) month period from the date the leave began, unless otherwise agreed upon by the employee and the Employer. When combined with a maximum pregnancy-related disability leave, a family care leave would be limited to one (1) additional month.

Leaves may not be granted to both parents of a child at the same time [or at a time when one (1) parent is unemployed] or may be limited to a four (4) month period between both parents.

The Employer may deny a request for family care leave if the leave would cause undue hardship to the Employer.

In cases where the leave is foreseeable, employees must provide the Employer with reasonable advance notice. The Employer can require employees to schedule family care leave so as to minimize disruption of its operations, provided the need for family care leave is foreseeable and the health care provider approves the schedule.

Before approving a leave request, the Employer may request a certificate from a health care provider containing the following information:

    a.    The date the serious health condition began.

    b.    Probable length of the condition.

    c.    A time estimate from the health care provider on how long the employee needs to care for the individual. (The Employer may request re-certification upon expiration of the time estimate provided by the health care provider.)

    d.    A statement that the serious health condition requires a family member to provide care to the individual.

Family care leaves must be requested in writing by the employee on available Employer forms and approved by the Human Resource Manager prior to the beginning of the leave period.

An approved family care leave of absence and return to active employment permits the employee to retain his employment date and continuous service date. An employee returning from an approved leave of absence will receive the same or comparable position as he had prior to the leave.

C.    UNION BUSINESS. An employee in good standing with the Employer, whose acceptance of employment with the Union takes him from his employment with the Employer, shall, upon written request to the Employer by the Union, receive a leave of absence for the period of his service with the Union, of not less than thirty (30) days, nor more than six (6) months. A Union's request for such a leave of absence, and for the return of an employee to work at the conclusion of such a leave, shall each be served upon the involved Employer, in writing, a minimum of four (4) calendar weeks immediately preceding the date of the proposed commencement of the requested leave and the proposed return to work respectively. Not more than one (1) employee shall be given such a leave from the same store during the same period of time, nor shall more than seven (7) employees in the Company be on such a leave at one (1) time. An eligible employee shall not be granted more than one such leave of absence during the term of this Agreement, nor shall such a leave of absence be granted the employee, who, at

the time of his request for such leave of absence, is on a leave of absence from the Employer for any other reason.  Upon his return, he shall be reemployed at work similar to that in which he was engaged immediately prior to his leave of absence in accordance with Article 13, Section E.  During the period of the authorized leave of absence, the Union shall be obligated to make Trust Fund contributions on behalf of the involved employee.  An employee granted a union business leave shall not engage in any union activity involving his or her Employer.

D.      LEAVES IN WRITING.  All leaves of absence shall be in writing and copies shall be given the Union and the employee.

E.      REINSTATEMENT AFTER A LEAVE.  Upon a return from a leave of absence the employee shall be restored to the job and location the employee left.  If this is impractical, the employee shall be restored to as comparable a job as possible, or to a store which is as close to the person's home as geographically possible within the travel limitations.  In said event, if the employee desires to work at his original store after reinstatement at another store, he shall submit a written transfer request to the Store Manager of his original store or shall have the right to claim an open position or the position of a probationary employee in the original store.

F.      EMPLOYMENT DURING LEAVE.  If an employee works for remuneration during a leave of absence, without receiving written permission from both the Employer and the Union, the employee shall be considered a quit.

G.      TERMINATION AFTER A LEAVE.  Any employee on a leave of absence who fails to return to work at the expiration of said leave, shall be automatically terminated by the Employer and shall then forfeit all vacation pay and sick leave pay owed under the contract.  However, this forfeiture shall not arise if the employee gives written notice, prior to the end of the leave, to the Employer of the employee's decision not to return to work.

ARTICLE 14 - MEDICAL AND RETIREMENT BENEFITS.

SECTION I - TRUST FUNDS

The provisions of this Section I shall apply only to those stores whose employees were represented by the Union for purposes of collective bargaining and recognized by the Company as such, either as the result of an NLRB certification or a written grant of recognition, as of December 31, 2012, and were covered by this Agreement as of December 31, 2012.  To eliminate any doubt as to the identity of such stores, they are all listed on Appendix F attached to this Agreement and incorporated herein.

The provisions of this Section I shall not apply to employees in any other stores that hereafter become represented by the Union for purposes of collective bargaining and recognized by the Company as such, and covered by this Agreement.  All employees in any other stores that hereafter become represented by the Union for purposes of collective bargaining and recognized by the Company as such, and covered by this Agreement, shall be eligible only for the benefits described in Section II of this Article.  Under no circumstances shall any of the provisions of this Section I apply to such newly covered employees, including without limitation the provisions of subsection C (RESOLTION OF DIFFERENCES) and subsection D(2) (Audits/Collections).

A.     BENEFIT FUND

1.     The existing Health and Welfare Trust Fund known as the Southern California Drug Benefit Fund (hereinafter "Benefit Fund") shall be continued, as modified herein.

2.     Benefits and Eligibility.   The Trustees are instructed to continue the benefits and eligibility rules in effect as of July 1, 2017, for the duration of this Agreement.

The Trustees may maintain other plan options for other employers provided that the employers whose employees participate in such plans contribute at the rate established by the Trustees that will fund that plan and maintain the reserve required by Paragraph 3 below.

Retirees and their dependents, whether retired before or after August 8, 2004, are not vested in the Benefits provided by the Benefit Fund.  There is no obligation on the Employer to continue to contribute or on the Trust Fund to continue to provide retiree benefits after the expiration of this Agreement unless a successor agreement provides for continuation of such coverage.

3.     Contributions and Reserves.

a.     Maintenance of Benefits Contributions.     As of July 1, 2017, the Employer shall contribute $5.7740 per hour for the Platinum Plan and $4.3305 per hour for the Gold Plan.  The Trustees of the Benefit Fund shall adjust these Employer contribution rates as necessary to maintain throughout the duration of this Agreement the benefits and eligibility rules as in effect on July 1, 2017, and maintain the Reserves required in Paragraph 3 b.

b.     Reserves.     If the projected reserves exceed three (3) months during the last year of the contract, the trustees shall take action to temporarily reduce contributions (so as to achieve the three (3) month reserve target at the end of the contract).  Notwithstanding any other provision of this agreement, the contribution for the last month of the contract shall be equal to no less than the current cost of the plan.

c.     Cost Containment.   The Benefit Fund Trustees are directed to explore all reasonable methods of cost containment to minimize the Employer contribution obligations under the contract.  In the event Medicare becomes secondary in the application of the retiree benefit plan, the Trustees will take immediate and remedial action to protect the financial integrity of the Plan.

4.     Other Benefit Plans.  It is understood that the Employer retains any existing rights which he may have, in his exclusive discretion, to alter, amend, cancel, or terminate any existing employee benefit plan or plans or part thereof.

5.     Excluded Employees.  Employees excluded from the bargaining unit who work for an Employer signatory to this Agreement may participate in any of the foregoing benefits under rules and regulations established by the Trustees.  The contributions required for such benefits shall be determined by the Trustees.

6.     National Health and Welfare Coverage.  In the event that there is passage of National Health and Welfare legislation, the parties agree to reopen the agreement for negotiations, the sole purpose of which shall be to negotiate language instituting prevention of duplicate costs for both the Employer and the employees involved.

7.     <u>Amendments</u>.  The Trustees are directed to amend the Trust Agreement to be consistent with the provisions of this Agreement The Trustees shall have the discretion in acting on claims for benefits under the plan subject to review only in accordance with the arbitrary and capricious standard.

B.     PENSION FUND.

1.     <u>Trust Fund and Pension Plan</u>.  The Southern California UFCW and Drug Employers Pension Fund (hereinafter "Pension Fund") shall be continued for the life of this Agreement, Contributions shall be made to the Pension Fund as set forth below and shall be for the sole purpose of providing pensions for eligible employees as defined in the Pension Plan employed in stores under contract as of December 31, 2012.

2.     <u>Reciprocity</u>.  The Trustees are authorized to enter into reciprocal agreements with the Trustees of the other Retail Clerks Unions or UFCW and Retail Employer trust funds to provide for the transfer or preservation of credited service of employees working under the coverage of the Pension Fund and any such other trust.

3.     <u>Contributions</u>.

a.     The contributions credited for a given fiscal year shall be for hours worked in the twelve month period beginning August and ending July of the following year.  For example, contributions for the 2008 fiscal year shall be contributions due for work months August 2008 through July 2009.

b.     For the period from July 1, 2012 through June 30, 2017, the Employer shall contribute the base contribution rate of forty-eight and one-half cents ($0.485) per hour.  Additional contributions shall be paid as provided below in B.3.d.

c.     To comply with the Pension Protection Act (PPA), the Pension Plan actuary shall provide a certification to the Trustees on an annual basis within ninety (90) days of the start of each plan year, starting in 2008, stating whether or not the Pension Plan is in endangered status or critical status for the plan year.  If the certification in any given year shows the Pension Plan to be either in endangered or critical status for the plan year the Trustees shall develop a Funding Improvement or Rehabilitation Plan, as required by PPA.

d.     On March 30, 2012, the Pension Plan was certified by its actuary to be in critical status for the plan year beginning January 1, 2012.  In advance of the formal adoption of a Rehabilitation Plan, the Trustees have approved the terms of a default schedule and two alternative schedules that they have agreed to include in the Rehabilitation Plan.  The schedules include revised benefit structures, revised contribution structures, or both.  One of these schedules, Alternative Schedule #2, provides for no changes to pension benefits, continuation of the current employer contribution rate of forty-eight and one-half cents ($0.485) per hour, additional Employer contributions of 3.9¢ ($0.039) per hour effective January 1, 2013 (a total contribution of 52.4¢ ($.524) per hour), and additional contributions of 3.9¢ ($0.039) per hour effective January 1 of each subsequent year during the Rehabilitation Period.

The Employer and the Union hereby adopt Alternative Schedule #2.  It is acknowledged and agreed that Alternative Schedule #2 requires increases to the Employer's pension contribution rate on January 1st of each and every year of the Agreement in the amount of 3.9¢ ($0.039) per hour, and that it does not provide for changes to the plan of benefits.  Pursuant to Alternative Schedule #2 the Employer

will contribute the following amounts, which amounts include the base contribution rate of forty-eight and one-half cents ($0.485) per hour, for hours for which contributions are required as of each respective Effective Date:

| Effective Date | Contribution Rate |
|---|---|
| January 1, 2017 | $0.680 |
| January 1, 2018 | $0.719 |
| January 1, 2019 | $0.758 |
| January 1, 2020 | $0.797 |
| January 1, 2021 | $0.836 |

e.) Employers shall not pay any amount in excess of the maximum deductible amount for the year in which contributions are paid by the Employer.

f.) As Alternative Schedule #2 applies to Rite Aid, Inc. and CVS Pharmacy, the Trustees are directed to include only the Default Schedule and Alternative Schedule #2, in the Rehabilitation Plan and are directed to require all other Employers to accept Alternative Schedule #2 as a condition of participation in the Pension Fund.  Alternative Schedule #2 may be designated the "Preferred Schedule."

g.) Notwithstanding the foregoing, the Employer and Union agree to be bound by any changes in Employer contribution rates and/or benefit changes included in updates to the Preferred Schedule of the Rehabilitation Plan adopted by the Board of Trustees during the term of this Agreement.

4. <u>Other Pension Plan</u>.  It is understood that the Employer retains any existing rights which he may have, in his exclusive discretion to alter, amend, cancel, or terminate any existing Employer pension or profit sharing plan or plans or part thereof.

5. <u>Laws and Regulations</u>.  The Trust Agreement and the benefits to be provided under the Pension Plan referred to above and all acts pursuant to this Agreement, the Trust Agreement and the Pension Plan shall conform in all respects to the requirements of the Treasury Department, Internal Revenue Service, and to any other applicable state or federal laws and regulations.  If any part of the Pension Plan is determined by a court of competent jurisdiction or an appropriate regulatory agency not to be in accord with the provisions of the Employee Retirement Income Security Act of 1974 or the regulations pertaining to such Act or any amendments thereto, the Trustees are authorized to modify the Pension Plan to conform with such Act or regulations.

6. <u>Amending Agreement</u>.  The Trustees are directed to amend the Trust Agreement to be consistent with the provisions of this Agreement.  The Trustees shall have discretion in acting on claims for benefits under the plan subject to review only in accordance with the arbitrary and capricious standard.

7. <u>Supplemental Benefits</u>.  The Trustees are to continue the current one hundred dollar ($100) bonus program as a general obligation of the Pension Trust for the term of the Agreement.

C. RESOLUTION OF DIFFERENCES.  Differences between the Employer and the Union as to the interpretation or application of the provisions of the Trust Agreement providing for the establishment and maintenance of the Southern California Drug Benefit Fund and the Declaration of Trust providing for establishment and maintenance of the Southern California UFCW and Drug

Employers Pension Fund, relating to employee benefits, shall not be subject to the grievance or arbitration procedure established in this Agreement or any Collective Bargaining Agreement. All such differences shall be resolved in the manner specified in the applicable Trust Agreement.

D.     PAYMENT OF CONTRIBUTIONS.

1.     Payments.  Payment of contributions by the Employer required to be made to the trusts established under this Article 14 shall be made on or before the twentieth (20th) day of each month based upon all straight-time hours worked or paid for not to exceed forty (40) hours in any one (1) week during the preceding month by each employee covered by this Agreement.  Such payments shall be accompanied by a list of names of the employees for whom such contribution is made, showing the number of hours worked or paid for as set forth above by each employee during the preceding month. Time during vacation periods (including vacation pay upon termination), sick leave, jury duty, bereavement leave and holiday absences which is paid for as provided for under this Agreement and all work performed on Sundays and holidays, exclusive of daily or weekly overtime, shall be considered as time worked, to which the provisions of this Article shall apply.

No fringe contributions shall be made on behalf of Christmas extra employees. However, should they be employed on or after January 16, the Trust Fund shall credit them with all hours worked for health and welfare purposes retroactive to the date of hire as a Christmas extra, but no retroactive contribution shall be required from the Employer.

Contributions shall not be made for vacation payments made on the basis of industry experience as set forth in Article 8-C and unused sick leave paid in accordance with Article 10-F. The Employer, by payments of the amounts provided for in this Article, shall be relieved of any further liability and shall not be required to make any further contributions to the cost of the benefits, either in connection with the administration of the plans or otherwise.  The last payment due under this Agreement shall be made on or before the twentieth (20th) day of July 2021 for the month of June 2021 except as may be required under Paragraph A-3-b, above.

2.     Audits/Collections.  The Trustees are hereby authorized to institute periodic audits of Employer's contributions to ascertain whether such contributions have been and are being made, fully and accurately.

If any such audit should disclose either an under-reporting or non-reporting of required contributions, the Trustees, at their sole discretion, may assess all or a portion of the audit expenses against such Employer, which the Employer hereby agrees to pay.  The Trustees may add reasonable interest charges to any unpaid contributions and such interest charges shall also be paid by the Employer.

If it should become necessary to institute legal action against a contributing Employer to collect unpaid contributions, the Trustees, in their sole discretion, may assess all or a portion of attorneys' fees and court costs against the Employer, in addition to any audit expenses.  The Employer hereby agrees to pay such attorneys' fees and court costs.  The Trustees are authorized and directed to establish a method to encourage regular and prompt payment by instituting the imposition of liquidated damages to those Employers who are delinquent in their payments.

The Employer agrees to make all pertinent books and payroll records available to the Trustees, or their agents, for their inspection in the conduct of any audit performed pursuant to this Article.

E.     BUSINESS EXPENSES.  It is understood that the provisions of this Article are being entered into upon the condition that the payments made by the Employer hereunder shall be deductible as business expenses under the Internal Revenue Code as it presently exists or as it may be amended subsequent to the date of this Agreement and under any similar applicable state revenue or tax laws.

F.     PENSION AND BENEFIT FUND APPOINTMENTS.

       1.     Designation of Trustees.

              a.     Employer Trustees.  For the Pension and Benefit Fund, the number of Employer Trustees shall be four (4), Kaiser-Permanente Foundation, CVS Pharmacy, Thrifty PayLess Inc. d/b/a Rite Aid, and Vons, a Safeway Company, each entitled to appoint a Trustee and his successors.

              b.     Union Trustees.  For the Pension and Benefit Fund, the number of Union Trustees shall be six (6), with Locals 135, 324, 770, 1167, 1428, and 1442, each entitled to appoint a Trustee and his successors.

              c.     The Union Trustees and Employer Trustees shall have equal voting power.

G.     ACCEPTANCE OF TRUSTS.

       1.     The Employer and the Union hereby accept the terms of the existing Health and Welfare Trust, and the Pension Trust Agreements.  By this acceptance, the Employer agrees to and shall become a party to both of said Trusts with the same force and effect as though the Employer had executed each original Declaration of Trust.

       2.     Any amendments that from time to time may be made thereto, including the creation of supplementary trusts to handle any of the funds referred to in this Agreement, shall be binding upon the Employer.

       3.     The Employer hereby specifically ratifies the appointment of Trustees made by the Employers as set forth in Section F above, designates and appoints them or their successors, as his

Trustees, and authorizes them to act in such capacity.  Successor Trustees shall be appointed by the same parties as their predecessors.

SECTION II - COMPANY MEDICAL AND RETIREMENT BENEFITS

The provisions of this Section II shall apply to those stores whose employees were not represented by the Union for purposes of collective bargaining and recognized by the Company as such, either as the result of an NLRB certification or a written grant of recognition, and covered by this Agreement, as of December 31, 2012.

A.     COMPANY MEDICAL BENEFITS.  Eligible full-time employees, as defined in the Company plan, will have the opportunity to participate in the Company insurance plans in the following areas: Medical Insurance, Dental Insurance, and provided with Flexible Spending Accounts for Medical and Dental in accordance with the terms of the Employer's benefit plan as it shall from time-to-time provide.

Part-time employees, as defined in the Company plan, are eligible for part-time health benefits in accordance with the terms of the Employer's benefit plan as it shall from time-to-time provide.

Part-time employees who convert to full-time status will qualify for full-time benefits the 1st of the month after ninety (90) days after assignment to a full-time position.

Company Medical Plan Bonus

| 6/1/18 | 6/1/19 | 6/1/20 |
|---|---|---|
| $35/pay period | $35/pay period | $42/pay period |

B.      COMPANY RETIREMENT BENEFITS.  Bargaining unit employees will be eligible to receive 401(K) benefits in accordance with the terms of the Employer's plan, as it shall from time-to-time provide.

C.      The Company shall have the right to make prospective changes to any of the benefits described in Section II.  The Company shall give written notice to the Union of any such changes.  Such changes will not be grievable or otherwise litigable; provided, that the Union shall have the right to grieve if the Company makes a change to a benefit described in this Section II but fails to make the same change for similarly situated non-bargaining unit employees in its California retail stores.

SECTION III - MOVING BETWEEN STORES

A.      For an employee moving from a store covered by Section I of Article 14 to a store covered by Section II of Article 14:

1.      Immediately upon the employee leaving the Section I store, the Company shall have no obligation to make any further contributions on behalf of the employee pursuant to Section I.

2.      Immediately upon the employee leaving the Section I store, the employee shall have no further rights to benefits pursuant to Section I, except for vested pension benefits and except as may be required by COBRA or any other applicable federal or state health benefit law.

3.      To the extent the employee is otherwise eligible for Section II benefits, the Company will waive any applicable waiting periods so that the employee has Section II benefits immediately upon working at the Section II store.

B.      For an employee moving form a store covered by Section II of Article 14 to a store covered by Section I of Article 14:

1.      The Company's obligation to make Section I contributions and the employee's right to Section I benefits shall be the same as for a new employee of the store.

2.      To the extent there is a waiting period for Section I medical benefits, and if the employee was participating in the Section II medical benefits plan at the prior store, the employee will continue to participate in the Section II medical benefits plan and the Company will continue to pay its share of the premium for such Section II medical benefits for the duration of the Section I waiting period.

<u>ARTICLE 15 - GENERAL CONDITIONS</u>

A.    NONDISCRIMINATION.

The Employer and the Union agree not to discriminate against any employee on the basis of their age, gender, gender identity or expression, marital status, sexual orientation, race, color, religion, national origin, veteran status, military status, disability, genetics or any other characteristic protected by federal, state or local law.

B.    UNIFORMS/NAME TAGS.  The Employer shall furnish all required uniforms and, except where the garment is of a drip-dry material, shall pay for the laundering and upkeep of same.  The Union members shall have the right to wear a Union button.  Dress will be in accordance with reasonable and appropriate standards of attire (no blue jeans) for retail employees.

Name tags shall not include the last names but may include the initial of the last name of the employee.

C.    RESTROOMS.   Restroom facilities shall comply with requirements under applicable regulations or laws.

D.    WEIGHT LIMIT.  No employee shall at any time be permitted or required to lift any item weighing more than the limit allowed by law.

E.    POLYGRAPH TEST.  No employee or applicant for employment covered by this Agreement shall be requested or required by any representative of the Employer to be the subject of a Polygraph (lie detector) test for any reason whatsoever.  The Employer agrees to refrain from any direct or indirect action that violates this understanding.

F.    SUBSTANCE ABUSE REHABILITATION.  The Union and the Employer have established a Substance Abuse Rehabilitation Program set forth in Appendix E of this Agreement.

G.    SUCCESSORS AND ASSIGNS.  This Agreement shall be binding upon the successors and assigns of the parties hereto.  Should a bona fide sale or transfer of any store occur during the term of this Agreement, the new owner or transferee shall be notified of the existence of this Agreement and the terms and provisions of such Agreement and advised that the new owner or transferee be required to be bound by all of its terms and provisions.  Further, such new owner or transferee shall execute a copy of this Agreement so that a record of such transfer may be maintained in the files of the parties.

All obligations of the selling owner pursuant to this Agreement up to the date of sale shall be the responsibility of the selling owner.  All obligations required to be performed after the date of sale will be the obligation of new owner and/or transferee.

H.    SEPARABILITY CLAUSE.  The provisions of this Agreement are deemed to be separable to the extent that if and when a court of last resort adjudges any provisions of this Agreement in its application between the Union and the undersigned Employer to be in conflict with any law, such decision shall not affect the validity of the remaining provisions of this Agreement, but such remaining provisions shall continue in full force and effect, provided further, that in the event any provision or provisions are so declared to be in conflict with a law, both parties shall meet immediately for the purpose of renegotiation and agreement on provision or provisions so invalidated.

I.      TITLES.  The titles and subtitles used in this Agreement are for the sole purpose of identification and shall have no bearing on the construction or meaning of the paragraphs to which they refer.

J.      AMENDMENTS/ADDITIONS/WAIVERS.   This Agreement is subject to amendment, alteration or addition only by a subsequent written agreement between and executed by the Employer and the Union.  The waiver of any breach, term or condition of this Agreement by either party shall not constitute a precedent in the future enforcement of any such term or condition.

K.      EFFECTIVE DATES.  Wages for hours worked, holidays, and vacations only shall be effective May 27, 2012.  Except where an express effective date is otherwise stated in this Agreement with regard to a particular provision, changes in other economic and all operational terms and conditions shall be effective not later than the date of execution of this Agreement.

L.      CERTIFICATION TO WORK  In the event an employee is listed on a Federal or State excluded parties list, that employee will be removed from the schedule until such time as they are removed from such list.  If, after ninety (90) days, they remain on the excluded parties list, their employment will be terminated.  In the event that an employee requires a certification or license in order to work, and that certification or license is expired or suspended, that employee will be removed from the schedule until such time that they are eligible to work.  If, after ninety (90) days, they are not eligible to work, their employment will be terminated.  On a regular basis, the Company will contract to have the appropriate databases reviewed to determine work eligibility verified for all employees.

## ARTICLE 16 - GRIEVANCE, MEDIATION OR ARBITRATION

A.      DISPUTES OR QUESTIONS.  Any and all matters of controversy, dispute or disagreement of any kind or character existing between the parties arising out of or in any way involving the interpretation and/or application of the terms of this Agreement shall be settled and resolved by the procedures and in the manner as set forth herein.

B.      GRIEVANCE FILING/STEPS.

        1.      Discharge/Layoff.  A discharged or laid off employee has ten (10) days from the date of discharge or layoff, excluding Saturday, Sunday and holidays, within which to file written protest with the Union (with notice to the Employer).  Said discharge shall then be subject to this Article.  If no protest is filed within said ten (10) day period, or within ten (10) days of the notice specified in Article 4-C-3, all rights possessed by said employee or the Union to protest the discharge or layoff are waived.

        2.      Wage Discrepancy.  If a wage discrepancy is claimed to exist, the representative of the Union shall first attempt to settle it with the representative designated by the Employer.

                Failing settlement at this level, the Union shall in writing notify the Employer of the alleged discrepancy and the names of the employees involved, and the period of time that such discrepancy is claimed to cover.  Upon receipt of such written notice, the Employer agrees to promptly furnish the representative of the Union wage data pertaining to the alleged wage discrepancy.  If the parties fail to settle such wage discrepancy, said discrepancy shall be subject to the provisions of this Article.

3.　　　Reporting Monetary Discrepancies.  A claim for unpaid wages, holidays, vacation, jury duty, sick leave, bereavement pay, or night, Sunday, or for any other direct compensation, must be filed with the Union by the employee, promptly upon discovery.  The Union shall, thereafter, if it believes such claim has validity, promptly notify the Employer.  A claim not filed by the employee with the Union within ten (10) days after discovery and not filed by the Union with the Employer within an additional ten (10) days, shall be deemed null and void.  (The Union has twenty (20) days from the employee's date of discovery to file notice with the Employer.)  Notwithstanding the foregoing, no wage or other direct compensation claim not involving interpretation of the contract can cause such Employer to pay such claim or any portion thereof retroactively for a period of more than six (6) months immediately prior to the date of the Employer's receipt of notice from the Union of the claim.  In any event, the Employer's obligation to compensate an employee for unpaid time worked under Article 7-G, shall not be limited in any way by the foregoing, except for the six (6) month limitation.

4.　　　Grievance Steps.

Step 1 - Store Level.  Employees, either directly or with their Union representative, shall attempt to settle or resolve any dispute with their Store Manager or supervisor within ten (10) days after discovery of the event giving rise to the grievance.  In the event the matter or dispute is not settled or resolved, the employee shall have ten (10) days in which to file a grievance with the Union with a notice to the Employer.

Step 2 - District Level.  Upon receipt of the Union's grievance, as detailed in Step 1, either party may request a formal grievance meeting.  Upon receipt of written notice from either party, representatives of the Employer and representatives of the Union shall try to meet within one (1) calendar week in order to attempt to settle or resolve the matter.  Any request for a formal grievance meeting must be submitted within ten (10) days after receipt of the employee's written protest.

Step 3 - Corporate Level.  If the grievance is not satisfactorily adjusted in Step 2, or if no decision is reached within ten (10) days of the meeting, the union may then present the grievance to the Area HR Director.  The grievance will be discussed by a representative or representatives of the Union, and a representative or representatives of the employer within ten (10) days in an attempt to resolve the grievance.  The decision of the Employer will be then stated in writing and sent to the Union fourteen (14) days of the discussion date.

Step 4 - Arbitration.  Any matter not settled or resolved in Step 3 may be submitted to arbitration by either party to this Agreement, i.e., the Employer or the Union, provided that written demand for arbitration must be made within ninety (90) days from the date of filing of the grievance but not prior to the Step 2 grievance meeting.  Failure to comply within the time limits contained in this Paragraph and/or in Steps 1 and 2 shall render the grievance null and void.  Any rights possessed by either the Union or the employee with respect to arbitration shall be irrevocably waived.  The Employer and the Union agree that with respect to arbitration procedure, past practices will be limited to only those in effect since June 18, 2006, except those pertaining to Article 14.

Upon the receipt of the written demand for arbitration, the parties shall endeavor to select an impartial arbitrator.  However, if the parties fail to agree upon an arbitrator who is willing and able to serve within fourteen (14) calendar days after service of the demand for arbitration, the party demanding arbitration, within seven (7) calendar days thereafter, shall submit the demand for arbitration to the Federal Mediation and Conciliation Service to request a list of arbitrators. Upon receipt of this list, an authorized representative of the Union shall strike a name from the panel.  Thereafter, the parties

shall alternately strike one name each until only one name remains.  The person whose name remains shall be the selected arbitrator.  The arbitrator shall be requested to provide a minimum of five (5) available dates in five (5) separate calendar weeks (excluding Saturdays and Sundays) over a period not to exceed ninety (90) days from the arbitrator's selection date.  If the Union and Employer fail to mutually agree upon an available arbitration date provided by the arbitrator, the arbitrator shall select a binding arbitration date and advise the parties of said date.  The arbitration date selected by the parties or mandated by the arbitrator shall not be changed unless mutually agreed upon by the Union and Employer's Labor Relations representative.

The hearing shall be held within ninety (90) days after the arbitrator is selected, contingent upon the arbitrator's availability, with the further understanding that the arbitrator's award will be issued no later than forty-five (45) days after the hearing is completed.

C.    TIME PERIODS.  The time periods set forth above may only be extended by mutual written agreement between the parties.

D.    MEDIATION.

1.    Within fifteen (15) calendar days following the Step 2 grievance meeting, either party may request that the dispute be submitted to mediation.  Mediation shall be voluntary by both the Employer and the Union and any objections to mediation must be made in writing within seven (7) calendar days following receipt of the above request.

2.    The adjustment and arbitration provisions shall be stayed for not more than eighty (80) days pending mediation.

3.    Mediation shall take place on the first (1st) Tuesday after the first (1st) Monday of every odd-numbered month (January, March, etc.).  Subsequent days for mediation will be scheduled, if necessary.

4.    The mediator shall be provided by FMCS.

In September of each year, the parties will meet and mutually agree upon a new list of mediators, which may include either or both of the individuals currently on the panel.

5.    The procedures set forth in Appendix B attached to this Agreement shall be the rules for the parties and the mediator.

6.    All costs of the mediator shall be borne equally by both the Employer and the Union.

7.    If the parties agree to be bound by the mediator's recommendation, the decision shall be codified and signed by the Employer and the Union.

8.    Any matter not resolved pursuant to this provision may be submitted to arbitration within fifteen (15) days following the mediation.  Failure to adhere to the fifteen (15) day time limit will waive any right to arbitration.

E.     ARBITRATOR'S AUTHORITY.

1.     The arbitrator shall determine the arbitrability of any dispute, should it arise.

2.     The arbitrator shall not have the power to alter, change or modify this Agreement in any respect. The rights of the parties to make any changes, modifications or amendments to this Agreement shall be reserved to themselves only, and shall not be subject to the arbitrator's authority. Without in any way limiting the generality of the foregoing, no arbitrator shall have the authority to:

a.     alter or expand the provisions and limitations described in Article 2 (A), including without limitation by applying the Agreement to more or different employees, workplaces or geographic areas than specifically delineated therein; or

b.     alter or expand the provisions and limitations described in Article 14, including without limitation by applying the terms of Article 14, Section I (TRUST FUNDS) to employees other than those at stores whose employees were represented by the Union for purposes of collective bargaining and recognized by the Company as such, either as the result of an NLRB certification or a written grant of recognition, as of December 31, 2012, and covered by this Agreement as of December 31, 2012, as more specifically identified on Appendix F attached to this Agreement and incorporated herein.

Any such purported action by an arbitrator shall be void *ab initio* and immediately vacated by a court of competent jurisdiction upon application by either party.

3.     With the exception of arbitrations involving discipline, the expenses of the arbitrator shall be borne equally by both the Employer and the Union.  All jointly incurred expenses (i.e., transcripts, reporters' costs, arbitrator's fees, room rental) of arbitrations involving discipline shall be borne by the loser.  Unless the grievance which has been submitted to the arbitrator is totally sustained or denied, it shall be deemed split and the jointly incurred expenses shall be borne equally between the Employer and the Union.

4.     The arbitrator's decision shall be final and binding on all parties hereto.

F.     NO STRIKE/NO LOCKOUT.  Matters subject to the procedures of this Article shall be settled and resolved in the manner provided herein.  During the term of this Agreement, there shall be no cessation or stoppage of work, lockout, picketing or boycotts, except that this limitation shall not be binding upon either party hereto, if the other party refuses to perform any obligation under this Article or refuses or fails to abide by, accept or perform a decision or award of an arbitrator, and fails to appeal to a court of competent jurisdiction.

G.     INDIVIDUAL WAIVERS  The Employer may approach individual employees and propose an agreement between the Employer and the employee regarding submitting individual legal claims not covered by this CBA to binding private arbitration rather than court.  The Employer will approach all active employees as of the date of ratification within ninety (90) days of ratification.  The decision made by these active employees will supersede any previous decision made by the employee.  The Employer will approach all new employees covered by this CBA within ninety (90) days of hire.  Such an agreement to arbitrate individual legal claims, if made, would not affect the employees' rights under this CBA.

41

<u>ARTICLE 17 - EXPIRATION AND RENEWAL</u>

This Agreement shall be in effect from July 1, 2017 to and including June 30, 2021, and shall continue from year to year thereafter unless either party shall give written notice to the other at least sixty (60) days prior to the expiration date of June 30, 2021 or at least sixty (60) days prior to any subsequent June 30 of any succeeding year of its desire to alter, amend, or terminate this Agreement.


Signed this _____ day of _____, 2018.


FOR THE EMPLOYER:
CVS PHARAMCY


By   _____
        Rob Francin, Senior Director of
        Labor Relations and HR Compliance


By   _____
        Stephanie Sciurba
        Director of Labor Relations

FOR THE UNION:


By   _____
        UFCW Local 135
        Mickey Kasparian, President


By   _____
        UFCW Local 324
        Greg M. Conger, President


By   _____
        UFCW Local 770
        John M. Grant, President


By   _____
        UFCW Local 1167
        Rick Bruer, President


By   _____
        UFCW Local 1428
        Mark Ramos, President


By   _____
        UFCW Local 1442
        Michael Straeter, President


By   _____
        UFCW Local 5
        John Nunes, President


By   _____
        UFCW Local 648
        Dan Larson, President

APPENDIX A - WAGES

Minimum Rates:

|  | Jul-17 | Jan-18 | Jan-19 | Jan-20 | Jan-21 |
|---|---|---|---|---|---|
| Clerk | $10.70 | $11.20 | $12.20 | $13.20 | $14.20 |
| Photo Lab Supervisor, PSA, Coordinator | $11.05 | $11.55 | $12.55 | $13.55 | $14.55 |
| Beauty Advisor | $11.70 | $12.20 | $13.20 | $14.20 | $15.20 |
| Shift Supervisor , Ymas Supervisor | $11.70 | $12.20 | $13.20 | $14.20 | $15.20 |
| Pharmacy Tech | $11.70 | $12.20 | $13.20 | $14.20 | $15.20 |
| Lead Tech | $12.45 | $12.95 | $13.95 | $14.95 | $15.95 |
| Pharmacy Trainer | $13.70 | $14.20 | $15.20 | $16.20 | $17.20 |

Position Premiums:  Upon promotion to a higher classification, employees will either move to the minimum rate for that position or be given the following promotional premiums whichever is greater:

| | |
|---|---|
| Photo Lab Supervisor, PSA Coordinator | $.35 |
| Beauty Advisor | $1.00 |
| Shift Supervisor / Y mas Supervisor | $1.00 |
| Pharmacy Tech | $1.00 |
| Lead Technician (Pharmacy Tech + $.75) | $1.75 |
| Pharmacy Trainer | $2.00 |
| Six (6) month increase - (applicable only to those employees hired in at the minimum rates) | $.25 |

Wage Adjustments:

Employees who are on the payroll on the dates of increase shall receive the following wage increases.

**Clerk, Photo Lab Supervisor, Coordinator, Clerk Rx**

| 7/2/17 | 7/8/18 | 7/7/19 | 7/12/20 |
|---|---|---|---|
| $0.30 | $0.30 | $0.30 | $0.30 |

**Top Rate Clerk, Photo Lab Supervisor, Coordinator, Clerk Rx**

| 7/2/17 | 7/8/18 | 7/7/19 | 7/12/20 |
|---|---|---|---|
| $0.50 | $0.50 | $0.50 | $0.50 |

**Shift Supervisor, Beauty Advisor, Y Mas**

| 7/2/17 | 7/8/18 | 7/7/19 | 7/12/20 |
|---|---|---|---|
| $0.50 | $0.50 | $0.50 | $0.50 |

**Pharmacy Tech Trainee PSA**

| 7/2/17 | 7/8/18 | 7/7/19 | 7/12/20 |
|---|---|---|---|
| $0.50 | $0.50 | $0.50 | $0.50 |

**Pharmacy Tech / Lead Tech**

| 7/2/17 | 7/8/18 | 7/7/19 | 7/12/20 |
|--------|--------|--------|---------|
| $0.75  | $0.65  | $0.65  | $0.75   |

**\* All increases are after the minimum wage adjustments**

**Top Rates**

|  | 7/2/17 | 7/8/18 | 7/7/19 | 7/12/20 |
|---|--------|--------|--------|---------|
| **Clerks, Clerk Rx-Hired prior to 8/8/04** | $16.55 | $17.05 | $17.55 | $18.05 |
| **Photo Lab Supervisor Coordinator, Rx Clerk Hired prior to 8/8/04** | $16.90 | $17.40 | $17.90 | $18.40 |
| **Clerks, Clerk Rx-Hired on or after 8/8/04 (after 6 years Effective 1/1/18)** | $15.55 | $16.05 | $16.55 | $17.05 |
| **Phot Lab Supervisor Coordinator, Rx Clerk Hired on or after 8/8/04 (after 6 years) Effective 1/1/18** | $15.90 | $16.40 | $16.90 | $17.40 |
| **Supervisor, Beauty Advisor, Y Mas Supervisor (after 6 Years effective 1/1/18)** | $18.95 | $19.45 | $19.95 | $20.45 |
| **Pharmacy Tech (after 5 years** | $20.60 | $21.25 | $21.90 | $22.65 |
| **Lead Tech (after 5 Years as a Tech)** | $21.35 | $22.00 | $22.65 | $23.40 |

California Minimum Wage Rates (Municipalities with higher minimum wage rates follow the same pattern):

| Clerks | 1/1/18 | 1/1/19 | 1/1/20 | 1/1/21 |
|---|---|---|---|---|
| First 6 months | $11.20 | $12.20 | $13.20 | $14.20 |
| After 6 months | $11.45 | $12.45 | $13.45 | $14.45 |
| **Supervisors After 6 months with CVS** | $12.45 | $13.45 | $14.45 | $15.45 |

All Intern Pharmacists/Undergraduate Interns will be paid the following amounts:

| | 7/2/17 |
|---|---|
| 1st year of RPh School | $18.50 |
| 2nd year of RPh School | $19.50 |
| 3rd year of RPh School | $20.50 |
| 4th Year of RPh School | $21.50 |
| Pharmacy Graduate | $27.00 |

No employee now receiving an hourly wage as shown by the books of the Employer in excess of the minimum rates applicable as herein set forth, shall suffer any reduction in compensation by virtue of the minimum wage provision set forth provided nothing contained herein shall prevent the payment of greater compensation than the minimum herein specified.

All employees, including over scale will receive first year increase.

For the 2nd, 3rd & 4th year of contract employees making a rate above top rate for their position, a *lump sum* payment equal to the amount of the agreed upon across the board increase times the hours paid during the past quarter will be made on a quarterly basis (August thru October, November thru January, February thru April, & May thru July).  These quarterly payments will be paid in the first pay period of the month following the quarters defined above.

Any employee who received less than a full across the board increase to bring them to the top rate for their position will receive a *lump sum* payment for the difference between the top rate for their position and the amount that they received in the same manner as described above.

If an employee works in a municipality with a higher minimum wage and then transfers involuntarily to a store in another municipality, (s)he shall continue to earn the higher wage.

Effective January 1, 2019, Techs who transfer into the Pharmacy from a Front Store position and have at least six (6) years of total service shall be at least equal to the Top Clerk rate.

## APPENDIX B - MEDIATION PROCEDURE

The mediation procedure is entirely informal in nature.  The relevant facts should be elicited in a narrative fashion to the extent possible, rather than through examination and cross-examination of witnesses.  The rules of evidence will not apply and no record of the proceedings will be made.  All persons involved in the events giving rise to the grievance should be encouraged to participate fully in the proceedings, both by stating their views and by asking questions of the other participants at the mediation hearing.

The primary effort of the mediator should be to assist the parties in settling the grievance in a mutually satisfactory fashion.  In attempting to achieve a settlement, the mediator is free to use all of the techniques customarily associated with mediation, including private conferences with only one party.  If settlement is not possible, the mediator should provide the parties with an immediate opinion, based on the Collective Bargaining Agreement, as to how the grievance would be decided if it went to arbitration.  That opinion would not be final and binding, but would be advisory.  It would be delivered orally and would be accompanied by a statement of the reasons for the mediator's opinion.  The advisory opinion could be used as the basis for further settlement discussions or for withdrawal or granting of the grievance.  If the grievance is not settled, granted or withdrawn, the parties are free to arbitrate.  If they do, the mediator could not serve as arbitrator, and nothing said or done by the parties or the mediator during mediation could be used against a party during arbitration.

Neither non-Employer attorneys nor court reporters or any other type of notetaker shall be allowed to be present at the proceedings.

## APPENDIX C- AMERICANS WITH DISABILITIES ACT

When issues arise involving the duty to provide a disabled applicant or employee with reasonable accommodation under the Americans with Disabilities Act (ADA) and regulations issued pursuant to it, the Union and Employer agree to meet within five (5) days of such request or such extended time as reached by mutual agreement in a good-faith effort to enable the Employer to meet its reasonable accommodation obligation in a manner which least conflicts with this Agreement.

If the Union and Employer are unable to reach such a mutual agreement, such dispute shall be subject to the Grievance and Arbitration procedure set out in Article 16.  Notwithstanding the foregoing, any employee claiming a violation of the Employer's duty of reasonable accommodation may submit his or her claim to any state or federal tribunal or agency authorized to settle such claim.

## APPENDIX D - SUBSTANCE ABUSE REHABILITATION

A.      The Employer and the Union agree that use of unprescribed controlled substances which causes intoxication or impairment on-the-job poses risks to the employee, his co-workers, and to the Employer. Recognizing that in a given situation drug abuse may be an illness, it is the parties' intent that the Employer shall offer one (1) rehabilitation opportunity rather than terminating the employee on the first occasion.

B.      Use or abuse of prescribed controlled substances may pose the same risks identified in Paragraph 1 above.  However, if the prescribing physician certifies that his orders regarding frequency and strength of dosage were followed by the employee, the matter shall not warrant discipline.  If the physician reports to the contrary, then the same process shall apply as to use of unprescribed controlled substances.

C.      Use, consumption, sale or purchase of controlled substances on Employer premises or during the period from the start to the finish of a shift (including overtime, if any) shall result in dismissal, unless consumption is pursuant to the prescribing physician's prior specific orders.

D.      All employees shall be informed of this policy before testing is administered. Employees will be provided with contact information on each Local's MAP program by the Union. Managers, supervisors, and Union stewards shall be trained to recognize the symptoms of drug abuse, impairment, and intoxication.

E.      No employee shall be tested for drug metabolites unless there exists a reasonable suspicion that the employee to be tested is under the influence of drugs.  Random or mass testing is strictly prohibited. The term "reasonable suspicion" shall, for the purpose of this policy and Paragraph be defined as follows:

Aberrant or unusual on-duty behavior of an individual employee which:

1.      is observed on-duty by the employee's immediate supervisor or another supervisor or manager and is confirmed, if present on the premises, by the observation of another supervisory employee, managerial employee or loss prevention employee;

2.      is the type of behavior which is recognized and accepted as symptoms of intoxication or impairment caused by controlled substances or alcohol or addiction to or dependence upon said controlled substances; or

3.      results in a work-related accident causing damage to property in an amount exceeding five hundred dollars ($500.00) or in physical injury to any individual requiring medical treatment other than minor cuts or bruises arising in the normal course of employment.

Reports of drug abuse or aberrant behavior which are not confirmed by supervisory observations shall not constitute reasonable suspicion.  Accidents defined in Paragraph E-3 constitute reasonable suspicion.

F.      1.      When a supervisor has reasonable suspicion to believe that an employee is using, consuming, or under the influence of an alcoholic beverage or controlled substance, the supervisor shall notify another member of management for the purpose of observation and confirmation of the employee's condition.  The employee shall be offered an opportunity to give an explanation of his/her

48

condition, such as reaction to a prescribed drug, fatigue, lack of sleep, exposure to noxious fumes, reaction to over-the-counter medication or illness.  A Union representative, store steward, if on the store's premises at the time of observation, or employee witness shall be present during such explanation, and shall be entitled to confer with the employee before the explanation is requested.  If both supervisors and/or managers, after observing the employee still have reasonable suspicion to believe that the employee is using, consuming, and/or under the influence of an alcoholic beverage, non-prescribed controlled substance, or non-prescribed narcotic drug while on duty, then, by a written order signed by both the employee's immediate supervisor, if he is present or by another supervisor or manager if he is not, and another member of management, if present, the employee shall be ordered to submit to a 5 Panel NIDA Drug Screen designed to detect the presence of amphetamines, cocaine metabolites, marijuana metabolites, opiate metabolites, and phencyclidine in accordance with the procedure set forth below, and/ or blood alcohol test.

2.      Refusal to submit to toxicology testing after being ordered to do so shall result in discharge.

G.      The following procedure shall apply to blood and urine tests administered to employees:

1.      No employee of the Employer shall draw blood from an employee.

2.      The testing shall be done by a laboratory certified by the State of California as a medical and forensic laboratory which complies with the Scientific and Technical Guidelines for Federal Drug Testing Programs and the Standards for Certification of Laboratories engaged in Urine Drug Testing for Federal Agencies issued by the Alcohol, Drug Abuse and Mental Health Administration of the U.S. Department of Health and Human Services.

3.      The standards used to determine what levels of detected substances shall be considered as positive are the most recently published federal guidelines.  State guidelines apply to alcohol only. Levels, which are below those set above, shall be determined as negative indications.

4.      Any sample, which has been adulterated or is shown to be a substance other than urine shall be reported as such.

5.      At the laboratory, a sample of the specimen shall be tested using the EMIT procedure. In order to be considered positive, the sample must also show a positive result on the GCMS confirmatory test. This specimen shall be made available to the union upon request for testing by a laboratory selected by the Union.

H.      If the results of the test administered by the Employer on the sample show that the employee, while on duty, was under the influence of or drank, smoked, ingested, inhaled, or injected alcoholic beverages, non-prescribed narcotics, marijuana, cocaine, PCP, or non-prescribed amphetamines, or other tested drug the following procedure shall be followed:

The employee and the Union shall be presented with a copy of the results before any discipline is imposed.  The Union and the employee shall then have seventy-two (72) hours to present to the Employer any different results from the test of the sample conducted by a laboratory selected by the Union; however, the failure of the Union or the employee to have the third (3rd) test performed or to present the results to the Employer shall not be used against the employee as a basis for discipline or in any arbitration proceeding,  The laboratory selected by the Union must meet the standards set forth in

49

Paragraph G-2. At the employee's request, the Employer will ask the Drug Trust to recommend rehabilitation agencies. Failure to sign a "last chance" agreement and to complete a rehabilitation program shall result in dismissal. Dismissal shall also result if there is another confirmed substance abuse occurring within a twenty-four (24) month period.

I.      Employees who seek voluntary assistance for alcohol and substance abuse before reasonable suspicion arises shall not be disciplined for seeking such assistance. Also, if reasonable suspicion later results in testing, which show use of unprescribed controlled substances, the employee shall still be entitled to one (1) more opportunity for rehabilitation and a last chance agreement. The Employer shall use its best efforts to keep confidential an employee's decision to seek assistance provided such assistance is sought prior to the occurrence of work performance or behavior difficulties. Employees enrolled in substance abuse programs shall be subject to all Employer rules and regulations, and job performance standards.

J.      Results of urine and blood tests performed hereunder shall be considered medical records and held confidential to the extent permitted by law. Test shall only be performed for alcohol, chemical adulteration, marijuana metabolites, cocaine metabolites, opiates, amphetamines, and phencyclidine, or other drugs tested pursuant to Federal Drug Testing Guidelines and the laboratory shall only report on the presence or absence of these substances. Test for other drugs shall not be performed and, if such tests are performed, the results of such other test shall not be reported to the employer.

K.      The unpaid suspension for positive results shall be limited to four (4) full days, provided the employee has agreed to immediately enter a drug/alcohol rehabilitation program as recommended. If results are negative, days of suspension shall be paid.

L.      Nothing contained herein shall be deemed to waive the Union's right to grieve and arbitrate the enforcement and application of this policy by the Employer, including any discipline so issued hereunder.

M.      Nothing contained herein is intended to violate any federal or state law, rule, or regulation, and if found to do so in part by any court of competent jurisdiction, then that part shall be made null and void and the parties agree that they will, within thirty (30) days, begin negotiations to replace such void part with a valid provision.

## APPENDIX E – RATIFICATION PAYMENTS

1.      Payments will be made to eligible employees as described below in consideration of the ratification of the collect bargaining agreement, and the existence of labor stability until July 2017.

2.      Payments will be made in six (6) month intervals beginning January 2013.

3.      Payments will be made to a particular store only once during the term of this Agreement.

4.      No Payment will be made to any employees in a store at which the Union and/or bargaining unit employees have breached Article 16(F) of this Agreement ("NO STRIKE/NO LOCKOUT") at any time during the term of the Agreement.

5.      <u>Payment Schedule</u>:     Payments will be made as follows, as further described on the chart below:

        a.      *Last day January, last day of February and last day of April 2017* – Payments to bargaining unit employees in currently unionized stores.  **To be eligible for payment, the employee must have been employed <u>both</u> in January 2017 and at the time of each payment.**

        b.      *Last day of December-February-April 2017, 2018, 2019 and 2020.* Payments to bargaining unit employees in stores organized between January and June 2017, 2018, 2019, and 2020, respectively.  **To be eligible for payment, the employee must have been employed <u>both</u> in in the previous June and at time of each payment.**

        c.      *Last day of June-August-October 2018, 2019 and 2020.  Payments to bargaining unit employees in stores organized between July and December 2017, 2018 and 2019, respectively.* **To be eligible for payment, the employee must have been employed <u>both</u> in the previous December and at time of each payment.**

        d.      *Last day of June 2021.  Payments to bargaining unit employees in stores organized between July and December 2020.*  **To be eligible for payment, the employee must have been employed <u>both</u> in December 2020 and at the time of payment.**

| *Employees* | *Payments* |
|---|---|
| Stores organized January to June in 2017, 2018, 2019 and 2020 | $200/$200/$200 in December/February/April of 2017, 2018, 2019 and 2020 |
| Stores organized July to December in 2017, 2018 and 2019 | $200/$200/$200 in June/August/October of 2017, 2018 and 2019 |

## APPENDIX F- REPRESENTED STORES AS OF 12/31/12

| Store # | Union | Address | City | State | Zip |
|---------|-------|---------|------|-------|-----|
| 08829 | 1442 | 219 S. Lincoln Blvd. | Venice | CA | 90291 |
| 08831 | 1442 | 3880 W. Rosecrans Ave | Hawthorne | CA | 90250 |
| 08835 | 770 | 3710 Tweedy Boulevard | South Gate | CA | 90280 |
| 08837 | 770 | 222 N. Market St | Inglewood | CA | 90301 |
| 08838 | 324 | 2130 N. Bellflower Blvd. | Long Beach | CA | 90815 |
| 08839 | 770 | 150 West Carson St | Carson | CA | 90745 |
| 08841 | 324 | 11623 Rosecrans Ave. | Norwalk | CA | 90650 |
| 08844 | 324 | 6510 South Street | Lakewood | CA | 90713 |
| 08847 | 1442 | 3010 South Sepulveda Boulevard | Los Angeles | CA | 90034 |
| 08849 | 324 | 1545 West 17th Street | Santa Ana | CA | 92706 |
| 08850 | 324 | 19121 Beach Boulevard | Huntington Beach | CA | 92648 |
| 08852 | 1442 | 4235 Pacific Coast Highway | Torrance | CA | 90505 |
| 08854 | 324 | 1750 North Grand Avenue | Santa Ana | CA | 92701 |
| 08855 | 324 | 228 North Harbor Boulevard | Santa Ana | CA | 92703 |
| 08858 | 770 | 7101 Atlantic Avenue | Bell | CA | 90201 |
| 08860 | 1442 | 11831 Hawthorne Boulevard | Hawthorne | CA | 90250 |
| 08861 | 324 | 8850 Valley View Street | Buena Park | CA | 90620 |
| 08862 | 324 | 12031 Brookhurst Street | Garden Grove | CA | 92640 |
| 08867 | 324 | 7915 Florence Avenue | Downey | CA | 90240 |
| 08868 | 1442 | 5020 West 190th Street | Torrance | CA | 90503 |
| 08871 | 1442 | 13171 Mindinao Way | Marina Del Rey | CA | 90292 |
| 08881 | 324 | 1020 Irvine Avenue | Newport Beach | CA | 92660 |
| 08883 | 324 | 3911 South Bristol Street | Santa Ana | CA | 92704 |
| 08884 | 324 | 24372 Rockfield Blvd | Lake Forest | CA | 92630 |
| 08886 | 1442 | 8601 South Sepulveda Boulevard | Los Angeles | CA | 90045 |
| 08891 | 324 | 26851 Trabuco Rd | Mission Viejo | CA | 92691 |
| 08892 | 770 | 5822 South Vermont Avenue | Los Angeles | CA | 90044 |
| 08893 | 324 | 602 N. El Camino Real | San Clemente | CA | 92672 |
| 09103 | 135 | 318 W El Norte Parkway | Escondido | CA | 92026 |
| 09106 | 135 | 1656 Garnet Ave | San Diego | CA | 92109 |
| 09137 | 135 | 7393 Jackson Dr. | San Diego | CA | 92119 |
| 09140 | 135 | 555 Broadway Ste 1054 | Chula Vista | CA | 91910 |
| 09141 | 135 | 3151 University Ave. | San Diego | CA | 92104 |
| 09165 | 135 | 3327 Rosecrans  Blvd. | San Diego | CA | 92110 |
| 09187 | 135 | 683 Lomas Santa Fe Dr. | Solana Beach | CA | 92075 |
| 09475 | 1442 | 4320 Redondo Beach Boulevard | Torrance | CA | 90504 |
| 09477 | 770 | 5399 West Centinela Avenue | Los Angeles | CA | 90045 |
| 09478 | 770 | 3020 Sepulveda Boulevard | Torrance | CA | 90505 |
| 09481 | 324 | 12444 Beach Boulevard | Stanton | CA | 90680 |
| 09483 | 324 | 10011 Adams Avenue | Huntington Beach | CA | 92647 |
| 09485 | 324 | 25272 Marguerite Pkwy | Mission Viejo | CA | 92675 |
| 09489 | 324 | 13303 East South Street | Cerritos | CA | 90701 |
| 09491 | 324 | 5822 Edinger Avenue | Huntington Beach | CA | 92647 |
| 09493 | 1442 | 12315 Venice Boulevard | Los Angeles | CA | 90066 |

| | | | | | |
|---|---|---|---|---|---|
| 09495 | 324 | 220 East Compton Boulevard | Compton | CA | 90220 |
| 09496 | 1442 | 2900 N. Sepulveda Blvd. | Manhattan Beach | CA | 90266 |
| 09497 | 324 | 14330 Culver Drive | Irvine | CA | 92714 |
| 09501 | 770 | 2655 Santa Ana Street | South Gate | CA | 90280 |
| 09507 | 770 | 650 East El Segundo Boulevard | Los Angeles | CA | 90059 |
| 09510 | 324 | 15421 Brookhurst Street | Westminster | CA | 92683 |
| 09512 | 324 | 15466 Whittier Blvd. | Whittier | CA | 90603 |
| 09564 | 770 | 15700 South Western Avenue | Gardena | CA | 90247 |
| 09569 | 324 | 17136 Magnolia Avenue | Fountain Valley | CA | 92708 |
| 09571 | 770 | 950 North Western Avenue | San Pedro | CA | 90732 |
| 09579 | 324 | 4570 Atlantic Avenue | Long Beach | CA | 90807 |
| 09580 | 770 | 5101 Rodeo Road | Los Angeles | CA | 90016 |
| 09598 | 324 | 455 North State College Boulevard | Fullerton | CA | 92631 |
| 09601 | 770 | 1015 N. San Fernando Boulevard | Burbank | CA | 91504 |
| 09602 | 770 | 21051 Sherman Way | Canoga Park | CA | 91303 |
| 09603 | 770 | 201 North Los Angeles Street | Los Angeles | CA | 90012 |
| 09609 | 1428 | 9920 East Garvey Avenue | El Monte | CA | 91733 |
| 09611 | 770 | 19424 Soledad Canyon Rd. | Canyon Country | CA | 91351 |
| 09613 | 770 | 23357 Mulholland Drive | Woodland Hills | CA | 91364 |
| 09615 | 770 | 19353 Victory Blvd. | Reseda | CA | 91335 |
| 09617 | 770 | 2103 South Atlantic Boulevard | Monterey Park | CA | 91754 |
| 09619 | 1167 | 9840 Sierra Ave | Fontana | CA | 92335 |
| 09621 | 770 | 18247 Sherman Way | Reseda | CA | 91335 |
| 09625 | 770 | 9089 Woodman Ave. | Arleta | CA | 91331 |
| 09626 | 770 | 1701 South Western Avenue | Los Angeles | CA | 90006 |
| 09629 | 1428 | 861 North Hacienda Boulevard | La Puente | CA | 91744 |
| 09637 | 1428 | 367 N Citrus Ave | Azusa | CA | 91702 |
| 09639 | 1428 | 11940 Garvey Avenue | El Monte | CA | 91732 |
| 09641 | 1428 | 206 N. Azusa Avenue | Covina | CA | 91722 |
| 09643 | 770 | 8425 Laurel Canyon Blvd. | Sun Valley | CA | 91352 |
| 09645 | 770 | 8225 Garvey Avenue | Rosemead | CA | 91770 |
| 09647 | 770 | 2037 Verdugo Blvd. | Montrose | CA | 91020 |
| 09651 | 770 | 12717 Glenoaks Blvd. | Sylmar | CA | 91342 |
| 09655 | 770 | 1028 Balboa Blvd. | Granada Hills | CA | 91344 |
| 09661 | 770 | 6360 West Third Street | Los Angeles | CA | 90036 |
| 09667 | 1428 | 300 South Diamond Bar Boulevard | Diamond Bar | CA | 91765 |
| 09669 | 770 | 2530 Glendale Boulevard | Los Angeles | CA | 90039 |
| 09672 | 1428 | 14503 Ramona Blvd | Baldwin Park | CA | 91706 |
| 09675 | 770 | 12143 Ventura Blvd | Studio City | CA | 91604 |
| 09677 | 770 | 17320 Ventura Blvd | Encino | CA | 91316 |
| 09679 | 770 | 1485 E. Valley Blvd. | Alhambra | CA | 91801 |
| 09682 | 770 | 22968 Victory Blvd. | Woodland Hills | CA | 91367 |
| 09685 | 770 | 2240 Fair Park Ave. | Los Angeles | CA | 90041 |
| 09686 | 770 | 4707 Venice Blvd | Los Angeles | CA | 90019 |
| 09689 | 770 | 950 West Foothill Blvd | Monrovia | CA | 91016 |
| 09698 | 1428 | 100 W. Foothill Blvd. | Upland | CA | 91786 |
| 09707 | 770 | 14735 Ventura Blvd. | Sherman Oaks | CA | 91403 |

| 09709 | 1428 | 1479 Foothill Boulevard | La Verne | CA | 91750 |
| 09715 | 770 | 2791 Agoura Rd. | Thousand Oaks | CA | 91361 |
| 09716 | 770 | 5585 N Rosemead Blvd. | Temple City | CA | 91780 |
| 09717 | 770 | 13021 Victory Blvd. | North Hollywood | CA | 91606 |
| 09719 | 770 | 5259 Mission Oaks Blvd. | Camarillo | CA | 93012 |
| 09721 | 770 | 1401 S. Baldwin Ave. | Arcadia | CA | 91007 |
| 09738 | 324 | 11735 Whittier Boulevard | Whittier | CA | 90601 |
| 09744 | 324 | 1535 East Katella Avenue | Orange | CA | 92667 |
| 09747 | 324 | 150 East Yorba Linda Boulevard | Placentia | CA | 92870 |
| 09748 | 1428 | 3670 S. Nogales St. | West Covina | CA | 91792 |
| 09753 | 324 | 5735 E. La Palma Avenue | Anaheim Hills | CA | 92807 |
| 09759 | 324 | 270 West Lincoln Avenue | Anaheim | CA | 92805 |
| 09785 | 770 | 2006 West Avenue J | Lancaster | CA | 93536 |
| 09857 | 770 | 800 W. Whittier Blvd. | Montebello | CA | 90640 |

SIDE LETTER

<u>Side Letter</u>.    Excluded Delivery Drivers who are employed by CVS shall only be allowed to receive prescriptions from store locations for delivery to customer's homes or businesses and return payment for such to same store locations as needed.  Excluded Delivery Drivers shall not perform any other bargaining work.

Signed this _____ day of _____, 2018.


FOR THE EMPLOYER:                                 FOR THE UNION:
CVS PHARAMCY


By   _____     By   _____
        Rob Francin, Senior Director of               UFCW Local 135
        Labor Relations and HR Compliance         Mickey Kasparian, President


By   _____     By   _____
        Stephanie Sciurba                                  UFCW Local 324
        Director of Labor Relations                     Greg M. Conger, President

                                                                By   _____
                                                                        UFCW Local 770
                                                                        John M. Grant, President

                                                                By   _____
                                                                        UFCW Local 1167
                                                                        Rick Bruer, President

                                                                By   _____
                                                                        UFCW Local 1428
                                                                        Mark Ramos, President

                                                                By   _____
                                                                        UFCW Local 1442
                                                                        Michael Straeter, President

                                                                By   _____
                                                                        UFCW Local 5
                                                                        John Nunes, President

                                                                By   _____
                                                                        UFCW Local 648
                                                                        Dan Larson, President

RECOGNITION SIDE LETTER

The recognition language in the collective bargaining agreement shall revert to the following on January 1, 2018 and the list of stores in Appendix F shall then be updated to reflect the full list of recognized stores, incorporating all stores added during the Cooperation Agreement.

Signed this _____ day of _____, 2018.

FOR THE EMPLOYER:                          FOR THE UNION:
CVS PHARAMCY

By  _____       By  _____
    Rob Francin, Senior Director of            UFCW Local 135
    Labor Relations and HR Compliance        Mickey Kasparian, President


By  _____       By  _____
    Stephanie Sciurba                           UFCW Local 324
    Director of Labor Relations                Greg M. Conger, President


                                                 By  _____
                                                   UFCW Local 770
                                                     John M. Grant, President


   By  _____
   UFCW Local 1167
   Rick Bruer, President


   By  _____
   UFCW Local 1428
   Mark Ramos, President


   By  _____
   UFCW Local 1442
   Michael Straeter, President


   By  _____
   UFCW Local 5
   John Nunes, President


   By  _____
   UFCW Local 648
   Dan Larson, President

LETTER OF AGREEMENT
BETWEEN
UFCW LOCALS 135, 324, 770, 1167, 1428, 1442, 5 AND 648
AND
CVS PHARMACY

<u>Promotional Drug Tests and Leave of Absence Poster</u>:

Any employee promoted into a shift supervisor position or into the pharmacy from a front store position must successfully pass a drug test screening in order to be eligible for the promotion.  Employees currently in shift supervisor or pharmacy positions are exempt from this testing.  Those individuals who do not successfully pass the drug test screening shall be denied the promotion, and enter into the rehabilitation procedures outlined in Appendix D.

The Company shall post in each store its Leave of Absence policies so that bargaining unit members can follow Company procedures to ensure that benefit and seniority rights are not delayed or interrupted.

LETTER OF AGREEMENT
BETWEEN
UFCW LOCALS 135, 324, 770, 1167, 1428, 1442, 5 AND 648
AND
CVS PHARMACY

<u>Joint Labor-Management Committee:</u>

The parties agree to create a joint labor-management committee ("Committee") to discuss benefits issues during the term of this Agreement.  The Committee will be comprised of no more than ten (10) representatives appointed by the Union and ten (10) representatives appointed by the Company.  The Committee will meet upon mutual agreement of the parties.  Before the Company changes any employee eligibility requirements for its Medical Insurance, Dental Insurance or Flexible Spending Accounts plans that would be applicable to bargaining unit employees, the Company shall notify the Union and shall agree to a meeting of the Committee upon the Union's request to discuss the change(s); provided, it is understood that neither the Union nor the Committee will have the right to delay or prevent such change(s).

<u>PART-TIME AVAILABILITY FORM</u>

<u>TO BE COMPLETED BY ASSOCIATE</u>

1)      I am NOT available to work the following days and hours on a weekly basis.  Indicate those hours which you are NOT available each day with A.M. or P.M. designation.

| From: To: | Sunday _____ | Monday _____ | Tuesday _____ | Wednesday _____ | Thursday _____ | Friday _____ | Saturday _____ |
|---|---|---|---|---|---|---|---|

2)      I can work a maximum of _____ hours per week.

I understand that the number of hours for which I am scheduled is based upon business needs, qualification, availability and seniority.  I also understand that if my availability changes it is my responsibility to complete a new Availability Information Form that I will submit to my Store Manager.

<u>TO BE SIGNED BY ALL PART-TIME ASSOCIATES</u>

By: _____      Date: _____
      Associate Name (print)                        Month/Day/Year

_____             _____
      Associate Signature                        Date of Hire (month/year)

<u>TO BE COMPLETED BY STORE MANAGER</u>

I agree that this associate in NOT available to work the above stated days and hours on a weekly basis.  I also agree the employee does not want more than the maximum number of hours per week as stated above.

By: _____      Date: _____
      Store Manager (print)                        Month/Day/Year

_____
      Store Manager Signature

<u>FOR PART-TIME ASSOCIATE WITH SIX (6) OR MORE MONTHS OF CONTINUOUS SERVICE / 24 HOUR WAIVER</u>

I understand that in order to be scheduled the 24 hour minimum guarantee, I need to be available to work at least a shift on 5 out of 7 days , including Saturday & Sundays; and at least 5 evening shifts (up to (1) hour after store closing) or up to 11 p.m. if employed in a 24 - hour store.  I understand that if I am <u>not</u> available to work these times, I may not be scheduled 24 hours each week and therefore may not qualify for health care coverage.  I understand that health care coverage is currently available to eligible associates who work or are paid an average of 23 hours per week over a defined period of time.

This associate hereby waivers the 24 hour guarantee.  (To be signed only by associates who cannot work the above times.)

By: _____          _____
      Associate Name (print)                Associate Signature

Store Managers must fax a copy of this form to Union immediately if associate is waiving 24 hour guarantee.

I have faxed a copy to the union: _____    _____
                                  Store Manager Signature        Date

<u>NOTES</u>

# PHARMACIST AGREEMENT

## JULY 1, 2017 – JUNE 30, 2021

### between

### CVS / PHARMACY

### and

### UFCW LOCALS 135, 324, 770, 1167, 1428 AND 1442

<u>**I N D E X**</u>

**Page**

ARTICLE 1 - MANAGEMENT RIGHTS.................................................................................................1

ARTICLE 2 - BARGAINING UNIT ....................................................................................................1
   A. UNION RECOGNITION..................................................................................................... 1
   B. INCLUDED BARGAINING UNIT WORK............................................................................ 2
     1.   Current Work.......................................................................................................... 2
     2.   Future Work. .......................................................................................................... 2
     3.   Employee Definitions. ............................................................................................ 2
       f.   Probationary Employees. ................................................................................. 2
   C. EXCLUDED BARGAINING UNIT WORK. ......................................................................... 2
     1.   Pharmacy Managers. ............................................................................................. 2
   D. INDIVIDUAL AGREEMENTS.......................................................................................... 3
     1.   All Employees. ....................................................................................................... 3
     2.   New Employees. ..................................................................................................... 3

ARTICLE 3 - UNION AFFAIRS..........................................................................................................3
   A. REQUIRED UNION MEMBERSHIP. ................................................................................ 3
     1.   Union Shop............................................................................................................. 3
     2.   Seven Day Notice. .................................................................................................. 3
   B. INFORMATION FOR UNION. .......................................................................................... 3
     1.   New/Transferred Employees. ................................................................................ 3
     2.   Store Employee Lists.............................................................................................. 3
     3.   Payroll Data. .......................................................................................................... 4
   C. STORE VISITS.................................................................................................................. 4
   D. UNION BULLETIN BOARDS. .......................................................................................... 4
   E. UNION PRINCIPLES. ....................................................................................................... 4
     1.   New Employees. ..................................................................................................... 4
     2.   Union Principles/Picket Lines. ............................................................................... 4
   F. UNION BUSINESS............................................................................................................ 4
   G. EMPLOYEE ORIENTATION............................................................................................ 5

ARTICLE 4 - DISCIPLINE/VOLUNTARY QUITS ........................................................................5
   A. REGISTER SHORTAGES/IRREGULARITIES.................................................................... 5
   B. INVESTIGATION/INTERVIEW. ...................................................................................... 5
   C. DISCIPLINE..................................................................................................................... 6
     1.   Good Cause. ........................................................................................................... 6
     3.   Discharge for Incompetence. ................................................................................. 6
     4.   Notice. ................................................................................................................... 6
     5.   Legal Violations..................................................................................................... 6
   D. NOTICE OF INTENT TO QUIT........................................................................................ 6

ARTICLE 5 - TRANSFERS/SENIORITY .........................................................................................6
   A. EMPLOYER TRANSFER OF EMPLOYEES. ...................................................................... 6
     2.   Transfer Travel Limits. .......................................................................................... 6
   B. INTER-UNION TRANSFER.............................................................................................. 7
   C. SENIORITY..................................................................................................................... 7
     1.   Definition. ............................................................................................................. 7
     2.   Transfer to Higher Category. ................................................................................. 7
     3.   Vacation Relief. ..................................................................................................... 7
   D. QUALIFICATIONS. ......................................................................................................... 7
   E. LAYOFFS/RECALLS/HOURS REDUCTIONS. .................................................................. 7
     1.   Full-Time Over Part-Time. .................................................................................... 7
     2.   Full-Time............................................................................................................... 7

I

3.   *Part-Time.* ........................................................................................................ *8*
4.   *Layoff, Transfer and Recall.* .............................................................................. *8*
5.   *Recall.* ............................................................................................................... *8*

**ARTICLE 6 - WORKDAY/WORKWEEK/SCHEDULES** ...............................................**8**

A.  *STORE HOURS.* ..................................................................................................... *8*
B.  *WORKDAY/WORKWEEK DEFINED.* ..................................................................... *8*
C.  *GUARANTEES.* ...................................................................................................... *9*
1.   *Full-Time/Scheduled Day.* .................................................................................. *9*
2.   *Full-Time/Predesignated Day Off.* ..................................................................... *9*
3.   *Part-Time.* ........................................................................................................ *9*
4.   *On Call.* ............................................................................................................. *9*
D.  *WORKWEEK GUARANTEES.* ................................................................................. *9*
E.  *NON-APPLICABILITY OF GUARANTEES.* ............................................................. *9*
F.  *WORK SCHEDULE.* ............................................................................................... *9*
1.   *Ready for Work.* ................................................................................................. *9*
2.   *Work Schedule.* ................................................................................................. *9*
3.   *Rotation of Work.* ............................................................................................ *10*
4.   *Rest Periods.* .................................................................................................... *10*
5.   *Lunch Period.* .................................................................................................. *10*
     On-Call Meal Period ......................................................................................... *10*
6.   *Sixth/Seventh Day.* .......................................................................................... *11*
8.   *Holiday Ratio.* ................................................................................................. *11*
9.   *Holiday Scheduling.* ........................................................................................ *11*
10.  *Overtime and Holiday Preference.* ................................................................... *11*
11.  *Inventory Work.* .............................................................................................. *11*

**ARTICLE 7 - WAGES** ...................................................................................................**11**

A.  *ALL EMPLOYEES.* ............................................................................................... *11*
B.  *NIGHT PREMIUM.* .............................................................................................. *11*
C.  *OVERTIME.* .......................................................................................................... *12*
1.   *Over-time for Non-Alternative Workweeks.* ..................................................... *12*
3.   *Nonpyramiding.* ............................................................................................... *12*
D.  *PAY PERIOD AND WAGE STATEMENT.* ............................................................. *12*
E.  *TIME RECORDS.* .................................................................................................. *12*
1.   *Daily Records.* .................................................................................................. *12*
2.   *Collusion or Coercion.* ..................................................................................... *12*
F.  *BONUS PAYMENTS.* ............................................................................................ *12*
G.  *TRAVEL TIME.* ..................................................................................................... *13*
H.  *INJURY ON THE JOB.* .......................................................................................... *13*
I.  *LEGAL PROCEEDINGS.* ....................................................................................... *13*
1.   *Required Appearance.* ...................................................................................... *13*
2.   *Requested Appearance.* .................................................................................... *13*
3.   *Work Related Appearance.* ............................................................................... *13*
J.  *STORE/COMPANY MEETINGS.* ........................................................................... *13*
1.   *Store Meetings.* ................................................................................................ *13*
2.   *Company Meetings.* .......................................................................................... *14*
K.  *AUTO ALLOWANCE.* ........................................................................................... *14*
L.  *TRAINING SCHOOL FEES.* .................................................................................. *14*
M. *BOND FEES.* ......................................................................................................... *14*
N.  *REQUIRED HEALTH EXAM FEES.* ....................................................................... *14*
O.  *NO REDUCTION IN RATES.* ................................................................................. *14*
P.  *WAGE/PRICE CONTROLS.* ................................................................................... *14*
Q.  *CHARITY.* ............................................................................................................ *14*

**ARTICLE 8 - VACATIONS** ..........................................................................................**14**

A.  *ENTITLEMENT.* ................................................................................................... *14*
1.   *One Year.* .......................................................................................................... *14*

2.   Two Years. ....................................................................................................................14
3.   Five Years. ....................................................................................................................14
4.   Fifteen Years. ...............................................................................................................15
5.   Twenty Years. ...............................................................................................................15
6.   Continuous Employment Defined. ...............................................................................15
B.  PAY. ....................................................................................................................................15
1.   Full-Time Vacation Pay. ..............................................................................................15
Absence. .................................................................................................................................15
2.   Part-Time Vacation Pay. ..............................................................................................15
3.   Payment Date. ..............................................................................................................15
4.   At Termination. .............................................................................................................15
     a.   General. ..................................................................................................................15
     b.   After 6 Months. ......................................................................................................16
     c.   After 12 Months. ....................................................................................................16
     d.   After 18 Months. ....................................................................................................16
     e.   After 5 Years. .........................................................................................................16
     f.   After 15 Years. ........................................................................................................16
     g.   After 20 Years. .......................................................................................................16
5.   No Carryover. ...............................................................................................................16
C.  INDUSTRY VACATION. .....................................................................................................16
D.  SCHEDULING. ...................................................................................................................16
1.   Posting/Selection/Scheduling. .....................................................................................16
4.   No Cumulation. ............................................................................................................17
5.   Holiday During Vacation. ............................................................................................17

**ARTICLE 9 – HOLIDAYS** ..........................................................................................................**17**

A.  PAID HOLIDAYS. ..............................................................................................................17
1.   Eligibility. ....................................................................................................................17
4.   Personal Holiday. ........................................................................................................17
B.  HOLIDAY PAYMENT. .........................................................................................................18
1.   Holiday Allowance. ......................................................................................................18
2.   Holiday Work. ..............................................................................................................18
3.   Guarantee. ....................................................................................................................19
C.  VOLUNTARY HOLIDAY CLOSING. ..................................................................................19

**ARTICLE 10 - SICK LEAVE PAY** ..............................................................................................**19**

**ARTICLE 11 - BEREAVEMENT LEAVE AND/OR PAY** .............................................................**20**

**ARTICLE 12 - JURY DUTY LEAVE AND/OR PAY** ...................................................................**20**

**ARTICLE 13 - OTHER LEAVES OF ABSENCE** ........................................................................**21**

A.  EMERGENCY LEAVE. ........................................................................................................21
B.  AUTHORIZED LEAVE. .......................................................................................................21
1.   Death in Family. ...........................................................................................................21
2.   Illness/Injury. ...............................................................................................................21
3.   Workers' Compensation. ..............................................................................................21
4.   Family Care Leave of Absence. ....................................................................................21
C.  LEAVES IN WRITING. ........................................................................................................22
D.  REINSTATEMENT AFTER A LEAVE. .................................................................................22
E.  EMPLOYMENT DURING LEAVE. ......................................................................................23
F.  TERMINATION AFTER A LEAVE. ......................................................................................23

**ARTICLE 14 - TRUST FUNDS** ....................................................................................................**23**

A.  BENEFIT FUND. .................................................................................................................23
B.  PENSION FUND. .................................................................................................................24
C.  RESOLUTION OF DIFFERENCES. ....................................................................................24
D.  PAYMENT OF CONTRIBUTIONS. .....................................................................................24

III

E.  BUSINESS EXPENSES..............................................................................................................25
F.  PENSION AND BENEFIT FUND APPOINTMENTS.....................................................................25
G. ACCEPTANCE OF TRUSTS....................................................................................................25

**ARTICLE 15 - GENERAL CONDITIONS** ..........................................................................................**26**

A.  NONDISCRIMINATION...........................................................................................................26
B.  NEW CONTRACT....................................................................................................................26
C.  GENDER REFERENCE.............................................................................................................26
D.  UNIFORMS.............................................................................................................................26
E.  RESTROOMS..........................................................................................................................26
F.  WEIGHT LIMIT......................................................................................................................26
G. POLYGRAPH TEST.................................................................................................................26
H. SUCCESSORS AND ASSIGNS...................................................................................................26
   1.   Partnership Dissolution......................................................................................................26
   2.   New Owner..........................................................................................................................26
   3.   Accrued Vacation................................................................................................................26
   4.   Sale or Transfer..................................................................................................................27
I.  SEPARABILITY CLAUSE.........................................................................................................27
J.  TITLES...................................................................................................................................27
K. AMENDMENTS, ADDITIONS, WAIVERS..................................................................................28
L.  EFFECTIVE DATES.................................................................................................................28
M. CERTIFICATION TO WORK.....................................................................................................28

**ARTICLE 16 - GRIEVANCE, MEDIATION OR ARBITRATION**........................................................**28**

A.  DISPUTES OR QUESTIONS......................................................................................................28
B.  GRIEVANCE FILING/STEPS.....................................................................................................28
   1.   Discharge/Layoff................................................................................................................28
   2.   Wage Discrepancy..............................................................................................................28
   3.   Reporting Monetary Discrepancies....................................................................................28
   4.   Grievance Steps..................................................................................................................29
       Step 1 - Store Level...............................................................................................................29
       Step 2 – District Level...........................................................................................................29
       Step 3 – Corporate Level.......................................................................................................29
       Step 4 - Arbitration...............................................................................................................29
C.  TIME PERIODS.......................................................................................................................30
D.  MEDIATION............................................................................................................................30
E.  ARBITRATOR'S AUTHORITY...................................................................................................30
F.  WORK STOPPAGES.................................................................................................................31
G. INDIVIDUAL WAIVERS...........................................................................................................31

**ARTICLE 17 - THE EMPLOYER AND PHARMACIST RESPONSIBILITIES** ...................................**31**

A.  PRINCIPLES...........................................................................................................................31
B.  DECLARATIONS.....................................................................................................................31
   7.   Professional Rights.............................................................................................................32
C.  PROFESSIONAL WORK STANDARDS.......................................................................................32

**ARTICLE 18 - EXPIRATION AND RENEWAL** ...............................................................................**33**

**APPENDIX A - WAGES**...................................................................................................................**34**

**APPENDIX B - MEDIATION PROCEDURE** .....................................................................................**35**

**APPENDIX C – SUBSTANCE ABUSE REHABILITATION** ................................................................**36**

IV

## RETAIL PHARMACIST AGREEMENT
July 1, 2017 – June 30, 2021

This Agreement is entered into and effective as of this 1st day of July 2017 between CVS Pharmacy, hereinafter referred to as the "Employer," and UFCW LOCALS 135, 324, 770, 1167, 1428 and 1442, chartered by United Food and Commercial Workers International Union, hereinafter referred to as the "Union" and the parties agree as follows:

## ARTICLE 1 - MANAGEMENT RIGHTS

The Employer retains the exclusive right to manage the business, to direct and control the business and workforce, and to make any and all decisions affecting the business, including, but not limited to the following: the exclusive right to plan, determine, direct and control the nature and extent of all its operations and commitments; to determine, install, introduce, remove, discontinue or modify the methods, procedures, materials and operations to be used or to discontinue their use by employees of the Employer; to maintain efficient operations;  to hire, train, promote employees; to set standards and methods of performance; to create, modify, and abolish work shifts, the starting and ending times of the work shifts and work schedules; to promulgate, amend and enforce reasonable work rules, regulations, policies and procedures; to determine, modify, change and otherwise set the work duties of employees; to determine, modify, change and otherwise set job content and qualifications; to determine whether to offer light duty and to determine employee eligibility for light duty; to change job content and qualifications; to change job descriptions; to modify the methods, procedures, materials and operations to be used or to discontinue their use by employees of the Employer; to change standards and methods of performance; and in all respects to carry out, in addition, the ordinary and customary functions of management, whether exercised or not.  The rights and waivers herein shall extend beyond the expiration of this Agreement until a successor agreement is reached.

Should a specific provision of this Agreement or State or Federal Law directly conflict with, modify or restrict an enumerated right under this Article, the specific provision of the Agreement or the State or Federal Law shall prevail over the enumerated right.

## ARTICLE 2 - BARGAINING UNIT

A.      UNION RECOGNITION.

1.      The Employer recognizes the Union as the sole collective bargaining agent for staff pharmacists who perform work within the pharmacy department within Stores 8831, 8860, 8891, 9478, 9509, 9510, 9564, 9580, 9609, 9620, 9709, 9715, 9716 and 9719 with respect to work, rates of pay, hours, and terms and conditions of employment.

2.      The Union agrees that it will not make claim to any employees of present concessionaires or sublessees who work in the present or future store or stores of the Employer, unless the Union can show its majority representation of such employees within an appropriate bargaining unit.  In that event, the Union may take economic action without violating this Agreement.

B.      INCLUDED BARGAINING UNIT WORK.

        1.      <u>Current Work</u>.  All work performed on the premises in the nature of work generally performed by employees of the bargaining unit shall not be assigned to any person not in the bargaining unit or contracted for with any other union.

        2.      <u>Future Work</u>.  Any future work of the nature generally performed by pharmacists is created by the Employer shall be performed by members of the bargaining unit as herein set forth.

        3.      <u>Employee Definitions</u>.  For the purpose of this Agreement, the following definitions shall apply:

                a.      A pharmacist is a professional employee to whom a license to practice pharmacy in the State of California has been issued by the California State Board of Pharmacy.

                b.      A graduate pharmacist is a professional employee as described in Paragraph a., above, during his first year of employment as a licentiate in pharmacy.

                c.      A full-time pharmacist is one who is scheduled and works forty (40) hours in a workweek.  Any employee who is scheduled and works ten (10) consecutive weeks at forty (40) hours or more will be classified as a full-time employee.  This requirement shall not apply during the Christmas or vacation season or where an employee is scheduled forty (40) hours due to the absence of another employee in excess of three (3) consecutive weeks.  Provided however, that forty (40) hours or more in a workweek worked immediately prior to any of the above exceptions and those worked immediately following the exception shall be considered continual for the purpose of calculating the ten (10) consecutive workweeks.

                d.      A part-time pharmacist is one who is scheduled to work less than forty (40) hours in a workweek.

                e.      Hereinafter "employees" or "all employees" shall mean employees covered by this Agreement.

                f.      <u>Probationary Employees</u>.  The first sixty (60) calendar days of full-time employment and ninety (90) calendar days of part-time employment, shall be considered a probationary period.  During such probationary period, an employee may be terminated for any reason and shall have no recourse to the grievance procedure set forth in Article 16.

C.      EXCLUDED BARGAINING UNIT WORK.  The following individuals shall be excluded from the coverage of this Agreement:

        1.      Pharmacy Managers.

                a.      All pharmacy departments located within the stores described in Article 2-A-1 shall be allowed the exclusion of the Pharmacy Manager as designated by the Employer.  In addition, the Pharmacy Manager shall be permitted to perform any and all work designated by the Employer without restrictions.

                The Employer shall determine selection of Pharmacy Managers.

b.       Managers and assistant managers excluded as set forth in the Retail Drug Agreement, shall be permitted to perform any work within the pharmacy department without restriction, except as limited by law.

2.       Inventory employees whose function is strictly limited to taking inventories.

D.       INDIVIDUAL AGREEMENTS.

1.       <u>All Employees</u>.  The Employer agrees not to enter into any agreement or contract, either orally or written, with its employees covered by this Agreement, individually or collectively which in any way conflicts with the terms and provisions of this Agreement.

2.       <u>New Employees</u>.  During the period an employee is not a member of the Union, the regular wages, as herein specified for the classification of said employee and all other provisions of this Agreement shall apply.

## ARTICLE 3 - UNION AFFAIRS

A.       REQUIRED UNION MEMBERSHIP.

1.       <u>Union Shop</u>.  All employees shall, as a condition of employment, become members of the Union not later than the thirty-first (31st) day of their employment or the thirty-first (31st) day following the date of signature or the effective date of this Agreement, whichever is later, and shall remain members in good standing as a condition of continued employment.

2.       <u>Seven Day Notice</u>.  The Union will advise the Employer in writing when any employee has failed to acquire or maintain Union membership as required by this Agreement.  Immediately upon receipt of said notice, the Employer shall advise said employee(s) that they will no longer be scheduled for hours of work on the subsequent weekly schedule until said employee(s) give evidence of compliance or the Union notifies the Employer of such compliance.  Failure to comply within seven (7) days after removal from the schedule said employee(s) shall be terminated, if such termination is not in violation of existing law.

B.       INFORMATION FOR UNION.

1.       <u>New/Transferred Employees</u>.  The Employers general office shall mail a list of new employees hired in a preceding month to the Union.  Said list shall contain the name of such employees, their dates of employment, social security number, store number and initial rate of pay.  The Employer will provide the new hire reports electronically on a weekly basis.

The Employer will provide weekly initiation fees and regular union dues electronically to all Southern California Union Locals.

2.       <u>Store Employee Lists</u>.  The Employer agrees to permit the Union to check the list of employees covered by this Agreement, and their respective wage rates of preceding months, and to furnish the Union a complete payroll list for all employees covered by this Agreement and wage rates effective the first payroll period each January and September.  Said lists shall include hire dates, birth dates, and Social Security numbers from current records.

3. <u>Payroll Data</u>. In case of a dispute over wages the Union representative shall, upon request, have the right to a copy of the necessary payroll information relative to employees covered by this Agreement. The Union reserves the right to require, in such disputed instances as it deems necessary, that owed wages of employees be paid through the office of the Union or a notarized statement submitted to the Union of gross amounts paid and deductions made. Either method may be used by the Employer.

C. STORE VISITS. In order to observe conditions existing under this Agreement and to settle grievances, representatives of the Union shall have the right to visit the stores.

It is the general policy of the Union for its representatives not to visit the stores during the busy afternoon hours, Saturdays or days preceding holidays. However, upon receipt of a reported violation, a Union representative shall have the right to visit such store at any time for the purpose of investigating such violation.

The Union further agrees that it will arrange with the Pharmacy Manager for such investigation of reported grievances and that any meetings between employees and Union representatives shall be limited to one employee at a time and shall be conducted with the least possible interference with store operations. Such meetings shall be held on the premises in a place designated by the Pharmacy Manager. In instances where employees are working during hours that the stores are closed to the public, the Union may request a list of the employees involved, and the hours worked.

D. UNION BULLETIN BOARDS. The Union may supply each store with one (1) bulletin board not to exceed two (2) feet by three (3) feet in size for the purpose of posting notices of official Union business. Bulletin boards shall not be used to post notices of a political or adversarial nature. The implementation of this program shall be coordinated by the Employer's Industrial Relations Department. This provision shall not be in addition to the current bulletin board required in the Retail Drug Agreement.

E. UNION PRINCIPLES.

1. <u>New Employees</u>. When new or additional employees are needed, the Employer may immediately notify the Union of said need. The Employer reserves the right to select the particular applicant to be hired; but there shall be no discrimination against any applicant by reason of membership or nonmembership in the Union, or an applicant with previous employment experience in the Retail Drug industry with an Employer covered by a collective bargaining agreement in the State of California.

2. <u>Union Principles/Picket Lines</u>. The Employer shall not discharge or discriminate against any employee for upholding Union principles, as long as such act does not constitute a violation of this Agreement, and nothing herein shall be so construed as to abrogate an employee's rights under the law, including the right individually to refuse to cross a bona fide picket line established in a bona fide dispute by any bona fide labor organization. For the purpose of this Paragraph, a sanctioned picket line shall be one which is sanctioned by the Local Union signatory to this Agreement and the Food and Drug Council or the appropriate County Federation of Labor, AFL-CIO.

F. UNION BUSINESS.

1. Employees shall be granted time off without pay for the purpose of attending negotiations, adjustment or arbitration hearings or for other bona fide Union business.

G.      EMPLOYEE ORIENTATION.

1.      The Employer agrees to allow a union representative up to ten (10) minutes to discuss the Union's role and to obtain signatures on applications and dues forms at the end of New Hire Orientation Meetings.

2.      The Employer agrees to schedule any employee who is an officer, or representative of the Union in any capacity, for hours of work that will permit the employee to attend meetings of the Union, provided it involves not more than one (1) employee per store, except where such absence unnecessarily interferes with the operation of a single shift closed case pharmacy.

3.      The Union agrees to give the Employer no less than ten (10) days' notice of such meetings.

## ARTICLE 4 - DISCIPLINE/VOLUNTARY QUITS

A.      REGISTER SHORTAGES/IRREGULARITIES.

1.      No employee may be required to make up cash register shortages, unless the employee is given the privilege of checking the change and daily receipts upon starting and completing the work shift, and unless the employee has exclusive access to the cash register during the work shift, except as specified below.

2.      No employee may be required to make up register shortages when management exercises its rights to open the register during the employee's work shift, unless the register is opened in the presence of the employee and the employee is given the opportunity to verify all withdrawals and/or deposits.

3.      When, as the result of a shopper's report, an employee, subsequent to the shopping incident, is called upon for an interview by a security agent, the employee may, upon receipt of such advice or during such interview, request the presence of a Union representative during the interview.  Such Union Representative must be available within a reasonable period of time but in no event later than twenty-four (24) hours after such request, or the interview may proceed without a Union representative.

When an employee is the subject of a shopper's report or multiple reports and is to be counseled on said report or reports by the Employer, the counseling will take place within a reasonable time period not to exceed thirty (30) days from the date of the last report affecting the employee.  The employee and the Union Representative will, by request, be given an opportunity to read said reports during counseling.

4.      A warning notice shall not be required in the case of a discharge for cash register irregularities but such alleged irregularities must constitute good cause for the purpose of sustaining said discharge.  Such alleged irregularities shall not constitute good cause for discharge when the Employer fails to follow the procedures set forth in Article 4, Paragraph A-1 and 2, unless the alleged irregularities are not affected by failure to follow said procedures.

B.      INVESTIGATION/INTERVIEW.  In any instance where an employee is to be interviewed and/or interrogated by the Employer or an Employer representative in respect to any alleged violation of the collective bargaining agreement or alleged infraction of Employer policies which may result in disciplinary action, the employee shall be afforded the opportunity of calling a Union Representative and having a Union Representative present during such interview or interrogation.

C.      DISCIPLINE.

1.      <u>Good Cause</u>.   Non-probationary employees shall not be discharged except for good and sufficient cause such as dishonesty, insubordination, incompetence, intoxication, unbecoming conduct or failure to perform work as required.   Age, sex, creed or color shall not be grounds for the termination of an otherwise qualified employee.

2.      Non-probationary employees who are discharged for incompetence or failure to perform work as required (including excessive absenteeism or excessive tardiness) shall first have had two (2) prior warnings in writing within twelve (12) months preceding the discharge of such incompetence or of related or similar failure to perform work as required, with a copy sent to the Union.   The employee so notified shall be required to sign such notice, but such signing shall in no way constitute agreement with the contents of such notice.

3.      <u>Discharge for Incompetence</u>.   It is understood that a discharge for incompetence shall occur only at the end of an employee's weekly schedule after the employee has completed the probationary period.

4.      <u>Notice</u>.   Any employee who is discharged shall be informed at the time of discharge of the immediate cause of discharge.   The cause to be confirmed in writing, with a copy sent to the Union and affected employee, within ninety-six (96) hours thereafter, excluding Saturday, Sunday and holidays.

5.      <u>Legal Violations.</u>      Any employee who violates any federal, state or local law or regulation while working may be terminated without prior warning.

D.      NOTICE OF INTENT TO QUIT.   An employee who intends to quit the job shall, to the extent possible, give two (2) weeks' notice of the intention to quit.   An employee who gives any notice of the intention to quit his job shall not be terminated or otherwise discriminated against during the current workweek and the workweek following the date on which the employee gives such notice, but in no event can the employee insist upon working later than the designated quit date if a replacement employee has already been hired.

## **ARTICLE 5 - TRANSFERS/SENIORITY**

A.      EMPLOYER TRANSFER OF EMPLOYEES.

1.      An employee with more than one (1) year's continuous service with the Employer may file an application for transfer within the Company to a store near their home.   The Employer will give full consideration to such requests and attempt to grant them if it does not have an adverse affect on the business of the Employer.   The requests will not be refused arbitrarily.

2.      <u>Transfer Travel Limits</u>.   When the transfer of an employee becomes necessary, due to slackening of business, the Employer shall not require said employee to travel one way more than twenty-five (25) miles between his place of residence and the new location.   In making transfers under Paragraph 1 of this Article and this Paragraph, the Employer will make every effort to assign employees on a nondiscriminatory basis, to the store which would cause the least hardship to the employee and require the least travel time.   Such transfer shall not be used for disciplinary purposes.

3.      Pharmacists who desire to transfer to a higher rated prescription department shall put their requests in writing to the Pharmacy Supervisor.   The Employer will give full consideration to such requests and grant them if they do not have an adverse effect on the business of the Employer.   Such requests shall not be refused arbitrarily.

6

B.     INTER-UNION TRANSFER.  If an employee is transferred from one UFCW Union's area to another in Southern California, the employee shall retain all seniority, but during a period of six (6) months from date of transfer, shall not displace any other employee, or reduce his hours.

C.     SENIORITY.

1.     Definition.  Seniority is the length of continuous employment of an employee with an individual Employer.  Temporary absence from work in accordance with the provisions of this Agreement shall not break seniority.  Seniority can be broken only by the following:

a.     Quit.

b.     Discharge

c.     Layoff for more than nine (9) months

d.     Failure to return in accordance with the terms of a leave of absence or when recalled after a layoff.

2.     Transfer to Higher Category.  When an employee is transferred from one job classification to another, the seniority acquired with the store and the Company shall be retained, and new seniority in the new classification shall commence as of the time of transfer.  Transfers shall not be made for the purpose of displacing another employee.  Should a layoff or reduction in hours occur in his new job classification, he shall be permitted to reclaim the position he formerly vacated, or whatever equivalent job he is able to perform and to which he is entitled by his combined seniority in his old and new classification.

3.     Vacation Relief.  The seniority of a newly hired employee shall not take effect until the employee has completed the probationary period as provided under Article 2-B-3-f of this Agreement and shall then be retroactive to date of hire.  However, the seniority of employees hired for vacation relief periods shall not take effect until sixty (60) days of employment and then shall be retroactive to date of hire.  Said sixty (60) day period shall be between May 1 and August 31.

D.     QUALIFICATIONS.  When seniority is invoked by an employee, the employee's ability and skill on performing the work claimed shall be the determining factors in establishing such rights.

E.     LAYOFFS/RECALLS/HOURS REDUCTIONS.

1.     Full-Time Over Part-Time.  Full-Time employees shall have seniority rights over part-time employees as provided herein this Agreement.

2.     Full-Time.  A full-time employee who is to be laid off or reduced to part-time status due to legitimate business reasons may either:

a.     Claim, in writing, the least senior part-time position in the employee's store at the time of the layoff, or

b.     Claim, in writing, the least senior full-time position within the Employer's district in which the employee is employed, at the time of the layoff.

3.      Part-Time.

a.      A part-time employee shall have the right to claim within his own store all part-time hours when such hours become available up to eight (8) hours per day and forty (40) hours per week based upon seniority over other part-time employees provided such part-time employee has the qualifications and ability to perform the duties of the position claimed.

b.      After first having notified, in writing, the home store manager and the Union, a part-time employee shall also have the right to request additional available hours up to forty (40) hours per week at no more than three (3) other stores within the Union's jurisdiction.  Said part-time employee shall notify, in writing, the manager of such stores of the request, and said manager shall endeavor to comply with such request on a seniority basis.

4.      Layoff, Transfer and Recall.  In the event of layoff of a part-time employee, the affected employee may claim the position of the least senior employee within the Employer's District.  In the event of a recall, the employee with the greatest seniority within the Employer's District will be the first recalled, provided that no employee will be required to travel more than twenty-five (25) miles from their residence.

5.      Recall.  A laid off employee who becomes eligible to return to work under the seniority provision must appear for work within ninety-six (96) hours, excluding Saturday and Sunday, after the Employer has made a good faith effort to notify the employee in writing of recall to work.   The Employer will simultaneously notify the union of the employee's eligibility to return to work.

6.      A full-time employee who has been reduced to part-time employment because of legitimate business reasons, or for medical reasons, must be offered the first full-time job that opens in the store in which he is employed and the first opportunity to claim available hours as provided above, provided that he has the qualifications and ability to fill that job.

7.      No new part-time or extra employees shall be hired until or unless said part-time employee has been afforded the opportunity to work such additional hours on a seniority basis as set forth above.

8.      A layoff shall occur only at the end of an employee's weekly schedule after the employee has completed the probationary period.

## ARTICLE 6 - WORKDAY/WORKWEEK/SCHEDULES

A.      STORE HOURS.  The Employer shall have the sole right to fix and determine the opening and closing hours of its stores.

B.      WORKDAY/WORKWEEK DEFINED.  For the purposes of this Agreement, a working day is the period from midnight to midnight.  Where shifts overlap into two (2) working days, payment shall be made for the hours worked on each working day in accordance with the rates established for such days.  A workweek as used in the Agreement shall be a consecutive seven (7) day period, as designated by the Employer, provided that any change of the workweek is done for all stores in the bargaining unit.

C.      GUARANTEES.

1.      <u>Full-Time/Scheduled Day</u>.  A full-time pharmacist is one who is regularly scheduled to work forty (40) hours or more per week.

With written agreement by the Employer, the Union and the employee, an employee may work an alternate work schedule consisting of not more than twelve (12) hour shifts at straight time.  In such cases, any work over the twelve (12) hours shall be at double time (2x) and any work over forty (40) hours in a workweek shall be at time and one half (1½).

The integrity of the eight (8) hour day shall be preserved and all time worked shall be paid for.  Part-time jobs shall not be created or scheduled for the purpose of destroying the eight (8) hour day principle.

2.      <u>Full-Time/Predesignated Day Off</u>.  Any full-time employee called for work on his predesignated day off, as established in the work schedule provisions, shall be guaranteed not less than four (4) hours work at the overtime rate of pay.

Where employees exchange days off for their convenience, the overtime provision shall not apply.

3.      <u>Part-Time</u>.  Upon reporting for work, all part-time employees and those replacing employees in an emergency shall be guaranteed not less than four (4) hours' work with pay.

4.      <u>On Call</u>.  If the Employer requires an employee to remain at home "on call," the Employer shall guarantee the employee four (4) hours' pay at the appropriate rate for such day.  All Employer requests for an employee to remain available for "on call" duty shall be in writing to the employee.

D.      WORKWEEK GUARANTEES.  Part-time jobs shall not be created or scheduled for the purpose of destroying the full-time principle.

E.      NON-APPLICABILITY OF GUARANTEES.  In the event operations cannot commence or continue when so recommended by civil authorities; or public utilities fail to supply electricity, water or gas, or the interruption of work is caused by an Act of God, the foregoing guarantees shall not be applicable.

F.      WORK SCHEDULE.

1.      <u>Ready for Work</u>.  All employees shall report for and be ready for work at their scheduled starting time.  The term "ready for work" shall include appropriate or required dress.

2.      <u>Work Schedule</u>.  The Employer shall post a work schedule for a one (1) week period in advance, in ink, for all employees, showing their surname and first initial, not later than 1 p.m. on the Wednesday preceding the first (1st) day of the following workweek.  The work schedule shall not be changed after posting, except as provided for below.  An employee shall be guaranteed pay for the specific days in a workweek upon which the employee is scheduled to work, provided the employee is available for such work, subject to Article 6(E) of this Agreement.  The schedule may be changed after 1 p.m. on Wednesday but no later than 1 p.m. on Thursday to accommodate an employee returning from leave of absence.  The schedule may also be changed with the Union's agreement in response to a grievance filed pursuant to Article 6(D)(3)(f) or Article 6(F)(3).

The schedules shall show total number hours scheduled for each employee. Information shall be posted alongside the schedule indicating employee classification and full-time/part-time status. The Employer will post an agreed upon notice reminding employees to raise schedule issues no later than forty eight (48) hours following the schedule posting. Such notice will be posted in the same area where the schedule is posted.

3.    Rotation of Work.  For regularly scheduled employees, (including Pharmacy Managers) work on nights, Sundays, and holidays shall be rotated equally and on a periodic basis to the extent possible. Variation from such rotation shall occur only if approved by the Employer and the Union to meet problems of the individual employee and in cases of emergency.

4.    Rest Periods.

a.    An employee working more than six (6) hours in a day shall receive two (2) ten-minute uninterrupted rest periods during such day. The first rest period shall be given in the first half of the shift and the second period during the second half of such shift.

b.    An employee working more than two (2) hours and not more than six (6) hours shall receive one (1) ten-minute uninterrupted rest period. This shall be given during the first four (4) hours of the employee's shift.

c.    Insofar as practicable, rest periods shall be in the middle of each work period.

d.    All employees who are required to work a minimum of an additional one (1) hour of overtime shall be entitled to a ten-minute rest period prior to the start of such overtime work.

e.    The term uninterrupted means not being called to perform work. If the employee is called back to work during the break, the employee will be given a new uninterrupted break period to replace that which was interrupted as soon as possible.

5.    Lunch Period.  All hours shall be worked consecutively, except for a meal period which shall be not less than one-half (½) hour. No eight (8) hour employee shall be scheduled for more than five (5) hours or less than three (3) hours before a meal break. However, by mutual agreement in writing between the Manager and the employee, less than one (1) hour may be established to meet business conditions, but in no event may less than one-half (½) hour be given. If the Union becomes aware of abuse it reserves the right to revoke the option at any location(s) after first covering the Steps 1 and 2 of the grievance procedure contained in Article 16.

On-Call Meal Period  When a pharmacist is scheduled six (6) or more hours in a workday and there is no overlap during the third (3rd) and fifth (5th) hour, the Company may allow pharmacists to take an on-call meal period of one-half (½) hour between the third (3rd) and before the fifth (5th) hour on the Employer's time. When a pharmacist works more than eight (8) hours in a workday and there is no overlap during the third (3rd) to seventh (7th) hour, the Company may allow pharmacists to take an on-call meal period of one-half (½) hour between the third (3rd) and seventh (7th) hour on the Employer's time. The pharmacist shall remain within the store during the on-call meal period and shall not be called upon to perform any duties during this on-call meal period except in the case of a bona fide emergency. Any pharmacist who takes an on call meal period shall receive one (1) additional hour of pay.

The one-half (½) hour on-call pay shall be counted as time worked in the calculation of daily and / or weekly overtime, and pharmacists must sign an "on duty" meal period agreement to be eligible for the on-call meal period.

10

On-call meal periods will comply with the rules and regulations of the California State Board of Pharmacy.  The Employer shall not be required to take any action that is in violation of California law regarding meal periods.

6. <u>Sixth/Seventh Day</u>.  No employee shall be required to work seven (7) days in any workweek except in an emergency.  It shall not be a violation of this contract, nor shall it constitute cause for discharge, if an employee declines to work on the sixth (6th) day of the workweek unless scheduled to work on such day.

7. <u>Sunday Ratio</u>.  The Employer may schedule no more than three (3) part-time shifts for every one (1) eight (8) hour shift scheduled.

8. <u>Holiday Ratio</u>.  An employee who works on a holiday shall be guaranteed not less than the number of hours regularly worked on such day, unless the pharmacy department is open less than its regular hours, in which case a four (4) hour minimum is provided.

9. <u>Holiday Scheduling</u>.  Work on Thanksgiving and Christmas shall be assigned by the Employer on a voluntary basis.  Should the Employer be unable to staff its store with volunteering employees the Employer may assign employees to work the holiday by inverse seniority.  Once an employee has agreed to work on Thanksgiving or Christmas and the work schedule has been posted, he shall be required to work said days.  Written requests to work on any holiday shall be given first preference based on seniority.  Employees working on the day of December 24 and/or December 31 shall be scheduled on the basis of inverse seniority to allow the most-senior employee the early shift on Christmas Eve and New Year's Eve.

10. <u>Overtime and Holiday Preference</u>.  Employees shall be given preference for overtime work by seniority provided they are qualified to perform such overtime work.  This provision shall not be a requirement on the Employer to create overtime work.  Employees preferring to work the holiday must notify the Employer of their preference prior to the posting of the holiday week schedule.  Written requests to work on any holiday shall be given first preference based on seniority.

11. <u>Inventory Work</u>.  The present inventory taking practice shall continue; provided, however, that employees covered by this Agreement shall be paid for all time spent taking inventory at the appropriate contractual rate.  No inventory work shall be required to be performed by employees covered by this Agreement on the evenings before Thanksgiving, Christmas and New Year's Day.

## **ARTICLE 7 - WAGES**

A. ALL EMPLOYEES.

<u>Base Rates</u>.  Attached to and made a part of this Agreement is Appendix A which sets forth the straight-time hourly rates for all employees covered by this Agreement.

B. NIGHT PREMIUM.  A premium of five dollars and fifty cents ($5.50) per hour in addition to the applicable straight-time rate shall be paid on all hours worked by employees between the hours of 10:00 P.M. and 7:00 A.M.

C.    OVERTIME.

1.    <u>Over-time for Non-Alternative Workweeks.</u>  The overtime rate of one and one-half (1½ x) the hourly rate of pay will be paid for all hours worked:

a.    In excess of eight (8) work hours per day.

b.    In excess of forty (40) hours per week.

c.    During the first eight (8) work hours on the seventh consecutive workday in the Employer's workweek.

2.    The overtime rate of two times (2x) the hourly rate of pay will be paid for all hours worked:

a.    In excess of twelve (12) hours in a workday.

b.    In excess of eight (8) work hours on a seventh (7th) consecutive workday in the Employer's workweek.

With written agreement by the Employer, the Union and the employee, a full-time employee may work an alternate work schedule consisting of not more than twelve (12) hour shifts at straight time.  In such cases, any work over twelve (12) hours shall be at double time (2 x) and any work over forty (40) hours in a workweek shall be at time and one-half (1½ x).  Such agreement may be revoked by any party with a notice of not less than thirty (30) days.

3.    <u>Nonpyramiding</u>.  The following are penalty rates:  overtime rates, night premium rates and holiday rates.  No penalty rate of any kind shall be pyramided or paid in addition to any other penalty rates, and only the single highest applicable penalty rate shall be paid for any given hour of work.

D.    PAY PERIOD AND WAGE STATEMENT.  All employees shall be paid on a weekly or biweekly basis.  The Employer shall designate a pay day not to exceed six (6) days following the completion of the applicable pay period and employees must be paid on that day.  The Employer agrees to furnish each employee with a weekly itemized wage statement showing the name of the employee, period covered, straight-time and overtime or premium hours worked, total amount of straight-time, overtime and premium wages paid and all deductions made.  An employee scheduled off on a payday shall be paid on his or her last scheduled working day before the payday, if checks are available.

E.    TIME RECORDS.

1.    <u>Daily Records</u>.  The Employer shall furnish forms, either time cards or other time records, on which the employee shall be required daily to record time worked on each day.  Such daily record shall be verified by the Employer and employee at least weekly and shall be available for inspection upon request by the Union representative entitled to such information.

2.    <u>Collusion or Coercion</u>.  In the event of falsification of time records through collusion or coercion, where it is established that both the employee and the Employer had knowledge of such falsification, the employee shall be paid for all time worked, by check mailed to the Union.

F.    BONUS PAYMENTS.  All bonuses and commissions paid to the employee shall not be considered as wages but are to be considered for the purpose of this Agreement as extra compensation over and above the

minimum wage provided for in this Agreement. All bonuses and commissions are at the option of the Employer and may be changed or discontinued at any time without notice, except as provided herein in this Agreement. Bonuses and commissions shall not be used to defeat the wage provisions of this Agreement.

G.      TRAVEL TIME.  Whenever an employee is required by the Employer to change from one store to another during the same day, all time consumed by said employee in going either to or from one store to another shall be considered and paid for as part of the employee's regular duties.

H.      INJURY ON THE JOB.  When an employee is injured on the job, there shall be no deduction from the employee's pay for the day in which the employee was injured and reported for medical care.  When such employee returns to work following the injury, and is certified as ready and able to perform all regular duties, but requires medical treatment as a result of the same injury, the Employer shall adjust the work schedules without penalty to the employee, to provide both the time for medical care and the number of hours of work for which the employee is regularly scheduled.

I.      LEGAL PROCEEDINGS.

        1.      Required Appearance.  Any employee served with a legal notice, citation or subpoena which involves any facet of the Employer's operation, or which may require the employee to appear in legal proceedings during scheduled work time, shall immediately inform the Employer of such service.

        2.      Requested Appearance.  Employees shall be paid as time worked under the terms of this Agreement for time spent at appearances in legal proceedings at the request of the Employer.

        3.      Work Related Appearance.  In addition, employees shall be paid as time worked under this contract for time spent at appearances or required standby in legal proceedings under subpoena issued by the court when the event, or events, giving rise to the issuance of the subpoena occurred while the employee was on duty working for the Employer, and so long as the Employer is not a party defendant or respondent in such proceeding, and no relief of any kind is sought against the Employer nor the imposition of any penalty or punishment upon him.

        4.      Former employees who at the time of the legal appearance are no longer employed by the Employer, shall be paid by such Employer at the rate of straight time for the time spent at the legal appearance, with a minimum guarantee of four (4) hours per day.  In no sense is it to be construed that the former employee becomes an employee as a result of such payment.

J.      STORE/COMPANY MEETINGS.

        1.      Store Meetings.  No store and/or Company meetings shall be held as to conflict with the regular meetings of the Union, and upon three (3) days' notice to the Employer of a special meeting, the Employer agrees to hold no store meetings in conflict therewith.  Employees may be called in on their predesignated scheduled day off to attend store meeting(s).  Such payment however, for the first two meetings within a calendar year, shall be paid at straight time pay, and for not less than two hours.  Additional meetings shall be paid at the overtime rate.  Actual time spent at store meetings shall be considered as time worked and paid for in accordance with this Agreement, but shall not constitute hours worked with respect to overtime or any other premium pay and report-in pay provisions of Article 7-C-1 and Article 6-C-1, 2 and 3 shall not be applicable. Should the Company have more than one (1) store meeting per quarter all time spent at store meetings in excess of the one (1) per quarter shall be considered as time worked and paid for in accordance with this Agreement, including all premiums, overtime and report-in pay.

13

2.    Company Meetings.  Attendance at Company meetings (as distinguished from store meetings) shall not be required, but shall be completely voluntary on the part of the employee.

K.    AUTO ALLOWANCE.  The current mileage allowance will remain in effect until such time as the Employer adjusts such allowance for all employees.  Such amount will then automatically apply to all employees.  This provision shall not be subject to Article 16 of this Agreement.

L.    TRAINING SCHOOL FEES.  Where, as a condition of employment, the Employer requires attendance at a school or training establishment, and where a fee is charged for such instruction or training, the fee shall be borne by the Employer.

M.    BOND FEES.  Whenever the Employer requires the bonding of any employee or the carrying of any insurance for the indemnification of the Employer, the premiums for the same shall be paid for by the Employer.  Should an employee be refused bond by a bonding company, after the first thirty (30) days of employment, the Employer agrees to make a reasonable effort to secure a bond in an appropriate case without added cost to the Employer.

N.    REQUIRED HEALTH EXAM FEES.  The Employer shall pay the cost for any city, county or state health examination required of employees who are covered by this Agreement.

O.    NO REDUCTION IN RATES.  It is further agreed that no employee shall suffer any reduction in rates or general working conditions by reason of the signing of this Agreement.  No employee receiving hourly rates in excess of the rates herein shall be replaced by another employee at a lesser hourly rate for the purpose of avoiding any of the provisions of this Agreement.

P.    WAGE/PRICE CONTROLS.  If by Presidential decree or legislative enactment, wage and price controls are instituted which cause any provisions of this Agreement to affect either of the parties adversely, such provisions may be reopened for negotiations.  The party adversely affected must give fifteen (15) days' written notice to the other party in order to so reopen this Agreement.  Any issues unresolved as a result of such reopening may be submitted to final and binding arbitration by either party under the procedures set forth in Article 16.

Q.    CHARITY.  The Employer shall not conduct or handle any campaign or drive for charitable purposes among the employees except where the cooperation and contributions of the employees are voluntary.

## ARTICLE 8 - VACATIONS

A.    ENTITLEMENT.

1.    One Year.  All full-time employees who have been continuously employed by the Employer for one (1) year shall receive one (1) weeks' vacation with full pay.

2.    Two Years.  All full-time employees who have been continuously employed by the Employer for two (2) years shall receive two (2) weeks' vacation with full pay.

3.    Five Years.  All full-time employees who have been continuously employed by the Employer for five (5) years shall receive three (3) weeks' vacation with full pay.

4.      Fifteen Years.  All full-time employees who have been continuously employed by the Employer for fifteen (15) years shall receive four (4) weeks' vacation with full pay.

5.      Twenty Years.   All full-time employees who have been continuously employed by the Employer for twenty (20) years shall receive five (5) weeks' vacation with full pay.

6.      Continuous Employment Defined.  Continuous employment for the purpose of this Article shall be measured from the last date of hire with the Employer.  However, where there has been continuous leave of absence in excess of one (1) year, the period of continuous employment shall be reduced by the number of full years of such absence.

B.      PAY.

1.      Full-Time Vacation Pay.  The term "full pay" shall be defined as forty (40) hours' pay at the employee's straight-time hourly rate which was in effect at the time the vacation became due on the employee's anniversary date provided, however, that if the Employer does not pay the vacation pay on the anniversary date, the payment of vacation pay shall be based on straight-time hourly rate of pay in effect at the time the employee takes the vacation.

Absence.  Absence from work up to seven (7) weeks or two hundred eighty (280) straight-time hours within the period of fifty-two (52) consecutive weeks, immediately preceding the employee's anniversary date, due to sickness, injury or temporary layoff, or other bona fide emergencies, shall be considered as time worked for the purpose of determining eligibility for full vacation pay.  In the event that an employee is absent from work in excess of seven (7) weeks, as set forth above, whatever vacation pay the employee is entitled to shall be prorated according to the ratio that the straight-time hours actually worked bear to two thousand eighty (2,080) hours.  Hours worked shall include paid holidays, paid vacations and paid jury duty.

2.      Part-Time Vacation Pay.  Part-time employees shall be entitled to vacation pay on each anniversary date of their employment, prorated on the basis of the average straight-time hours worked during the preceding year, according to the vacation formula set forth in this Article 8-A.  Said vacation pay shall be based on the straight-time hourly rate in effect on the employee's anniversary date provided, however, that if the Employer does not pay the vacation pay on the anniversary date, the payment shall be based on the straight-time hourly rate of pay in effect at the time the employee takes the vacation.

3.      Payment Date.  Employees receive vacation pay at the time the vacation is taken.  If the employee wishes to be paid in advance of their vacation, the employee may request payment for their vacation two (2) weeks prior to their vacation week.  The payment of an employee's vacation pay shall be by separate check or computed at the same tax rate schedule as the computation of regular wages per week.  Termination vacation pay is due in accordance with California state law.

4.      At Termination.

a.      General.  Upon termination of employment for any reason other than discharge for proven or admitted dishonesty, an employee shall receive whatever vacation pay is due, prorated on the basis of straight-time hours worked, provided that the employee has been in the continuous employ of the Employer for six (6) months or longer.  Said vacation pay shall be prorated according to the ratio that the straight--time hours actually worked bear to two thousand eighty (2,080) hours.  Employees terminated for proven or admitted dishonesty shall forfeit all vacation pay.

15

b.      <u>After 6 Months</u>.  Employees whose employment is terminated, and who have been in the continuous employ of the Employer more than six (6) months, but less than one (1) year, shall not be entitled to such pro rata pay where termination of employment is due to a discharge or to a voluntary quit, but shall receive prorated vacation only where termination of employment is due to a layoff.

c.      <u>After 12 Months</u>.  Any employee who has been in the employ of the same Employer for twelve (12) consecutive calendar months, but not to exceed eighteen (18) consecutive calendar months, shall upon termination of employment be entitled to receive a pro rata of the earned vacation on the basis of one (1) workweek consisting of forty (40) hours at straight-time pay for all months for which no vacation has been paid.

d.      <u>After 18 Months</u>.  When an employee has been in the employ of the same Employer in excess of eighteen (18) consecutive calendar months, the employee shall receive upon termination, a pro rata of accrued vacation pay on the basis of eighty (80) hours at straight-time pay for all months for which no vacation has been paid, but in no event shall vacation pay for the first year's employment exceed one (1) week's pay.  It is further provided that employees who voluntarily quit after eighteen (18) consecutive calendar months of employment with the same Employer, and prior to two (2) years' employment with the same Employer, shall receive pro rata of accrued vacation pay on the basis of forty (40) hours at the straight-time rate of pay.

e.      <u>After 5 Years</u>.  An employee who has been in the employ of the same Employer for five (5) years or more shall, upon termination, receive accrued vacation pay on the basis of three (3) weeks per year for all time in excess of five (5) years for which no vacation pay has been received.

f.      <u>After 15 Years</u>.  An employee who has been in the employ of the same Employer for fifteen (15) years or more shall, upon termination, receive accrued vacation pay on the basis of four (4) weeks per year for all time in excess of fifteen (15) years for which no vacation pay has been received.

g.      <u>After 20 Years</u>.  An employee who has been in the employ of the same Employer for twenty (20) years or more shall, upon termination, receive accrued vacation pay on the basis of five (5) weeks per year for all time in excess of twenty (20) years for which no vacation pay has been received.

5.      <u>No Carryover</u>.  Vacation may not be waived by an employee, nor may extra pay be received for work during that period; provided, however, that by prior mutual agreement between the Employer, the employee and the Union, this provision may be waived.

C.      INDUSTRY VACATION.  Additional vacation pay based on industry experience shall be provided in accordance with the provisions of the Trust Fund set forth in Article 14.  Said additional vacation pay shall be paid to the employee by the Trust Fund.  Any employee entitled to vacation pay as herein provided shall not suffer any loss of credits for health and welfare benefits or pension benefits that are provided under Article 14 of this Agreement.

D.      SCHEDULING.

1.      <u>Posting/Selection/Scheduling</u>.  The Employer shall prepare and post in each store a vacation schedule not later than January 15th of each year and such vacation schedule shall remain posted until March 1st for the purpose of enabling the employees to select their vacation period.  Vacation periods shall be fixed by the Employer to suit the requirements of the business, but as far as possible and practicable, vacations will be given during the summer months (through October if requested by the employee), and for employees with school-age children during the school summer vacation.  Vacation periods other than those listed above may be applied for to management and full consideration will be given to grant the request unless it has an adverse

effect on the Employer's business.  Vacation period shall be unbroken except by mutual consent between Employer and employee.

2.       The Employer shall be required to give vacation time off based on the number of weeks of vacation due the employee from the Employer and from the vacation trust fund.  Within the limits set forth in this Paragraph, vacations shall be scheduled by seniority.

3.       In scheduling a vacation of an employee, the Employer shall give as much notice as possible prior to the date of beginning the vacation but not less than thirty (30) days.

4.       <u>No Cumulation</u>.  Vacations may not be cumulative from one year to another.

5.       <u>Holiday During Vacation</u>.  If a holiday named under Article 9 of this Agreement falls within the vacation period of an employee, the employee shall be granted an additional day of vacation with full pay, or an additional day's pay in lieu of the holiday.

## ARTICLE 9 – HOLIDAYS

A.       PAID HOLIDAYS.

1.       <u>Eligibility</u>.  The following days shall be holidays and granted without reduction in pay.

| | |
|---|---|
| New Year's Day | Christmas Day |
| Memorial Day | Personal Holiday |
| Independence Day | Personal Holiday |
| Labor Day | Personal Holiday |
| Thanksgiving Day | |

No employee shall receive pay for any holidays not worked unless such employee has reported for work on the regular working day next preceding and next following said holiday.  Employees shall be deemed to have reported for work if absence on said day before and said day after said holiday is due to express permission from or action of the Employer, provided the employee has worked during the holiday week, except that if the employee is absent during the entire holiday week due to illness or injury, then the employee must have worked at least one (1) day during the week immediately preceding the holiday week in order to be entitled to holiday pay.

2.       All contractual holidays shall be observed on the holiday itself.

3.       During the first six (6) months of their employment, employees shall not be entitled to pay for time not worked on the holiday.

4.       <u>Personal Holiday</u>.  An employee requesting a given workday date as the personal holiday must do so at least fourteen (14) calendar days in advance.  The Employer shall endeavor to grant such requests subject to store operational requirements.  The Employer will grant such holiday time off with pay to the senior requesting employee(s).  Personal holiday dates, once granted for that year, will become permanent fourteen (14) calendar days prior, and no senior employee(s) shall have a right to such date.

Personal holidays are expected to be scheduled and taken.  In cases where an employee has been scheduled for a personal holiday, and the Employer cancels such holiday, the employee will receive holiday pay in accordance with the provisions of Paragraph B, below.  Mutual rescheduling may be undertaken in lieu of holiday pay.

5.      Employees shall be eligible for personal holidays in accordance with the schedule below:

(a)     An employee, who completes 1 year of employment shall be eligible for a personal holiday that shall be taken any time during the remainder of the year except for the month of December;

(b)     An employee, who completes 2 years of employment shall be eligible for 2 personal holidays that shall be taken any time during the remainder of the year except for the month of December;

(c)     An employee, who completes 3 years of employment shall be eligible for 3 personal holidays that shall be taken any time during the remainder of the year except for the month of December;

(d)     Effective January 1st each year, employees who have completed three or more years of service as of that date shall be eligible for 3 personal holidays that shall be taken any time during the calendar year except for the month of December.

Personal holidays are expected to be scheduled and taken.  Each employee shall give the Employer no less than 2 weeks' advance notice of the date on which he wishes to observe his personal holidays.  Personal holidays may not be celebrated in the month of December.  In the event an employee is unable to schedule and take a personal holiday(s), the pay for that holiday(s) will be paid in December each year.

Any unused personal holiday pay will be paid upon termination.

6.      With respect to any of the holidays listed in this Agreement which may, by virtue of controlling legislation be celebrated on Monday, this Agreement will be changed automatically to permit such Monday observance, coincident with the dates specified in such legislation.

B.      HOLIDAY PAYMENT.

1.      <u>Holiday Allowance</u>.     Full-time employees with six (6) months or more continuous service with the Employer, shall receive eight (8) hours.  Part-time employees with six (6) months or more continuous service with the Employer shall receive five (5) hours for holidays not worked. In addition, all hours worked on the holiday will be paid at two and one half (2½).

2.      <u>Holiday Work</u>. All employees scheduled to work on a holiday shall receive two and one half (2½) hours straight time pay for each hour worked on said holiday, plus such holiday allowance set forth in Paragraph 1 above.

3.      Guarantee.  Any employee called in on a holiday which is his predesignated day off shall be guaranteed eight (8) hours' work at the overtime rate of pay as provided in Article 7-C in addition to his holiday allowance for each hour worked.

C.      VOLUNTARY HOLIDAY CLOSING.  When the Employer voluntarily closes his store to the public because of any commemoration day or celebration day, or on any holiday other than those set forth in Paragraph A, above, it is agreed that the employees shall suffer no reduction in straight-time weekly earnings on account of such closing.

## ARTICLE 10 - SICK LEAVE PAY

A.      ELIGIBILITY

All employees covered by this Agreement who have been continuously employed by the Employer for a period of at least one year shall be entitled to forty-eight (48) hours of sick leave with pay, and on each anniversary date of employment thereafter they shall be entitled to forty-eight (48) hours of paid sick leave (subject to Paragraph 10(F) of this Article).  Sick leave shall be payable only for bona fide illness or injury beginning with the first working day's absence. Any working day on which an employee works more than four (4) hours shall not be considered the first day of absence.

B.      PRO RATA

Part-time employees and full-time employees who failed to work the full year, shall  be entitled to sick leave on the basis set forth above on a pro rata of total hours worked or paid for during the year preceding the anniversary date as a ratio to two thousand eighty (2,080) hours.

C.      SUPPLEMENTARY DISABILITY BENEFIT

Supplementary Disability Benefits will be provided in accordance with provisions of Article 14 hereof.

D.      SICK LEAVE INTEGRATION

Sick leave pay shall be integrated with the Supplementary Disability Benefits provided under the Trust Fund and California Disability Insurance or California's Workers' Compensation Temporary Disability Benefits, or both, so that the sum of the sick leave pay hereunder, and the aforesaid State disability daily benefits which may be payable to an employee shall not exceed one hundred percent (100%) of the employee's daily wage at straight time.  If the sick leave pay allowable to an employee hereunder when so combined with any such Supplementary Disability Benefits from the Trust Fund and California Disability Insurance or California Workers' Compensation Temporary Disability Benefits, or both, exceeds one Hundred percent (100%) of the employees daily wage at straight time for any one (1) day, then such sick leave pay for that day shall be reduced accordingly.  Any portion of the day's sick leave pay not received by the employee by reason of any such reduction shall be retained as part of the accumulated sick leave pay credit subject to the provisions of Paragraph 10(F), Unused Sick Leave Pay, of this Article.  The Company will comply with the California Health Families Act of 2014.

E.      SICK PAY DEFINED

For the purpose of this Paragraph sick pay shall mean pay at the employee's regular classification rate for those days and hours which the employee would have worked had the disability not occurred, calculated at straight time.

19

F.    UNUSED SICK LEAVE PAY

Commencing with the employee's second (2nd) and succeeding anniversary dates of employment, any sick leave not utilized by the employee during the anniversary year shall accumulate to a maximum of two hundred and forty (240) hours. Earned sick leave hours in excess of two hundred and forty (240) will be paid out annually on the employee's anniversary date. All accumulated sick leave shall be available for use by employees who are unable to work because of illness or injury as specified in Paragraph 10 (A) of this Article. Employees who retire from the Company will receive a payout of all accumulated sick leave hours.

For purposes of this Article in regard to the payment of unused sick leave pay, "retirement" shall apply to an associate who is at least fifty (50) years old, has at least five (5) years of continuous service with the Employer, immediately qualifies for a pension under the Southern California UFCW and Drug Employers Pension Plan and advises the Employer, in writing, at least fourteen (14) days in advance, that the employee is retiring.


## ARTICLE 11 - BEREAVEMENT LEAVE AND/OR PAY

Leave for all non-probationary employees shall be provided because of death of a member of the employee's immediate family provided, however, that employees shall not be entitled to bereavement pay during their probationary period, but will be given up to three (3) days off without pay. Pay for such leave shall be at the straight-time rate for the hours scheduled for each workday lost because of such absence to a maximum of three (3) calendar days within a period of fourteen (14) calendar days beginning with the date of death. Verification of time required for such paid leave shall be supplied to the Employer by the employee, if requested. Immediate family shall be defined as the employee's spouse, child, mother, father, stepparent, brother, sister, mother-in-law, father-in-law, grandchild, grandparent, stepchild, legal guardian, domestic partner, or other relative living in the employee's home.


## ARTICLE 12 - JURY DUTY LEAVE AND/OR PAY

When a full-time employee is required to be in any court or courthouse for jury service the employee shall be scheduled for a day shift from the hours of 8:00 A.M. to 5:00 P.M. on each day that the employee is scheduled for jury service, and on a Monday-through-Friday workweek and shall receive pay during such workweek for each day on such jury service at the rate of eight (8) hours times his straight-time hourly rate. An employee shall be entitled to receive jury duty benefits after the probationary period of employment.

If such employee in addition works for the Employer on Saturday, the employee shall be paid at the rate of straight time. If the employee works for the Employer on Sunday, the employee shall be paid at the Sunday rate of pay.

If an employee is excused, temporarily or permanently from jury service on any scheduled day, i.e., Monday through Friday, the employee shall immediately report for work to complete the remaining hours of the scheduled work shift. Failure to so report shall disqualify an employee from any pay for jury duty for the day in question as long as the transportation time will permit the employee to return to work prior to one (1) hour before the end of the shift.

When a non-probationary, part-time employee is required to report for jury service and such service deprives the employee of pay he otherwise would have earned during the workweek, he shall be paid lost pay based on his average hours worked in the four (4) weeks immediately preceding the first (1st) week of jury service

less any compensation received by him for such jury service. No employee will be required to work on a day in which they have served jury duty.

The Employer may require proof of attendance for jury service. A non-probationary employee must report immediately that he or she has been called for jury service and shall cooperate with the Employer in securing release from such service as appropriate in the circumstances then existing and with regard to the work performed by the individual concerned.

A non-probationary employee shall be eligible for jury duty pay for a maximum of thirty (30) days only during the life of this Agreement. Jury duty pay shall not be required for Grand Jury service. In the event a non-probationary employee is called for a second (2nd) tour of duty during the term of this Agreement, the Employer shall join the non-probationary employee in seeking the non-probationary employee's excuse from service if such service would cause a financial hardship to the non-probationary employee.

## ARTICLE 13 - OTHER LEAVES OF ABSENCE

A.      EMERGENCY LEAVE. Non-probationary employees may take an automatic emergency leave of absence not to exceed two (2) weeks in the event of certified, serious illness or injury of the employee, or serious illness, injury or death in the employee's immediate family without prior notice; provided that the employee makes every reasonable effort to notify the Pharmacy Supervisor within twenty-four (24) hours of the commencement of said leave. Said two (2) weeks automatic emergency leave of absence shall be a part of the time limits set forth in Paragraph B below.

B.      AUTHORIZED LEAVE. Employees with six (6) months' seniority shall be entitled to leaves of absence for the following reasons, provided they submit required paperwork to the Company LOA Department, up to the following maximum periods:

1.      <u>Death in Family</u>. Death in the employee's immediate family or other personal reasons deemed sufficient by the Employer up to a three (3) month period.

2.      <u>Illness/Injury</u>. Certified illness, injury, or pregnancy of the employee requiring absence from work up to six (6) months renewable for up to an additional six (6) month period.

3.      <u>Workers' Compensation</u>. In absences covered by Workers' Compensation, the employee's leave of absence shall be continuous until such time as the employee has been released from his period of temporary disability and is available and qualified for work, provided, however, such leave of absence shall not exceed fifteen (15) months. This provision is subject to the requirements of Article 15-I of this Agreement.

4.      <u>Family Care Leave of Absence</u>. Any employee with at least six (6) months of continuous service, shall be eligible to receive a family care leave of absence without pay for up to four (4) months of leave for the following reasons: the birth of an employee's child; the adoption and placement of a child with the employee; the serious health condition or death of the employee's spouse, domestic partner, child, step-child, parent, sister or brother; or of the mother-in-law, father-in-law, grandparent, legal guardian or other relative by blood or marriage, provided that such person resides in the same household as the employee; or due to a "qualifying exigency" for military operations arising out of a spouse's child's, or parent's Armed Forces (including the National Guard and Reserves) active duty or call to active duty in support of a "contingency operation," as these terms are defined by the Family Medical Leave Act of 1993 and its amendments ("FMLA"). The employee may be eligible for up to 26 weeks of leave in a 12-month period to care for a spouse, child, parent or next of kin (nearest blood relative of an individual) who is an Armed Forces member with a serious injury or illness incurred in the line of duty while on active duty that may render the individual medically unfit to perform his/her military duties, as those terms are defined by the FMLA.

21

The leave of absence may be taken in one (1) or more periods of at least one (1) payroll week each (not to exceed a total of four (4) months) within a twenty-four (24) month period from the date the leave began, unless otherwise agreed upon by the employee and the Employer. When combined with a maximum pregnancy-related disability leave, a family care leave would be limited to one (1) additional month.

Leaves may not be granted to both parents of a child at the same time (or at a time when one (1) parent is unemployed) or may be limited to a four (4) month period between both parents.

The Employer may deny a request for family care leave if the leave would cause undue hardship to the Employer.

In cases where the leave is foreseeable, employees must provide the Employer with advance notice. The Employer can require employees to schedule family care leave so as to minimize disruption of its operations, provided the need for family care leave is foreseeable and the health care provider approves the schedule.

Before approving a leave request, the Employer may request a certificate from a health care provider containing the following information:

a.    The date the serious health condition began.

b.    Probable length of the condition.

c.    A time estimate from the health care provider on how long the employee needs to care for the individual. (The Employer may request recertification upon expiration of the time estimate provided by the health care provider.)

d.    A statement that the serious health condition requires a family member to provide care to the individual.

Family care leaves must be requested in writing by the employee on available Employer forms and approved by the Human Resource Manager prior to the beginning of the leave period.

An approved family care leave of absence and return to active employment permits the employee to retain his employment date and continuous service date. An employee returning from an approved leave of absence will receive the same or comparable position as he had prior to the leave.

C.    LEAVES IN WRITING. All leaves of absence shall be in writing and copies shall be given the Union and the employee.

D.    REINSTATEMENT AFTER A LEAVE. Upon a return from a leave of absence the employee shall be restored to the job and location the employee left. If this is impractical, the employee shall be restored to as comparable a job as possible, or to a store which is as close to the person's home as geographically possible within the travel limitations. Further, said employee, upon written request, shall have the right of first refusal for any openings in their prior store. In no event shall a probationary employee be a bar to the returning employee.

E.      EMPLOYMENT DURING LEAVE.  If an employee works for remuneration during a leave of absence, without receiving written permission from both the Employer and the Union, the employee shall be considered a quit.

F.      TERMINATION AFTER A LEAVE.  Any employee on a leave of absence who fails to return to work at the expiration of said leave, shall be automatically terminated by the Employer and shall then forfeit all vacation pay and sick leave pay owed under the contract with written notice of termination sent to the employee and the Union.

## ARTICLE 14 - TRUST FUNDS

A.      BENEFIT FUND.

     1.      The existing Health and Welfare Trust Fund known as the Southern California Drug Benefit Fund (hereinafter "Benefit Fund") shall be continued, as modified herein.

     2.      Benefits and Eligibility.  The Trustees are instructed to continue the benefits and eligibility rules in effect as of July 1, 2017, for the duration of this Agreement.

       The Trustees may maintain other plan options for other employers provided that the employers whose employees participate in such plans contribute at the rate established by the Trustees that will fund that plan and maintain the reserve required by Paragraph 3 below.

       Retirees and their dependents, whether retired before or after August 8, 2004, are not vested in the Benefits provided by the Benefit Fund.  There is no obligation on the Employer to continue to contribute or on the Trust Fund to continue to provide retiree benefits after the expiration of this Agreement unless a successor agreement provides for continuation of such coverage.

     3.      Contributions and Reserves

       a.      Maintenance of Benefits Contributions. As of July 1, 2017, the Employer shall contribute $5.7740 per hour for the Platinum Plan and $4.3305 per hour for the Gold Plan.  The Trustees of the Benefit Fund shall adjust these Employer contribution rates as necessary to maintain throughout the duration of this Agreement the benefits and eligibility rules as in effect on July 1, 2017, and maintain the Reserves required in Paragraph 3 b.

       b.      Reserves.  Reserves shall be targeted at three (3) months of projected expenses.  If the projected reserves exceed the three (3) months during the last year of the contract, the trustees shall take action to temporarily reduce contributions (so as to achieve the three (3) month reserve target at the end of the contract).  Notwithstanding any other provision of this agreement, the contribution for the last month of the contract shall be equal to no less than the current cost of the plan.

       c.      Cost Containment.  The Benefit Fund Trustees are directed to explore all reasonable methods of cost containment to minimize the Employer contribution obligations under the contract.  In the event Medicare becomes secondary in the application of the retiree benefit plan, the Trustees will take immediate and remedial action to protect the financial integrity of the Plan.

     4.      Other Benefit Plans.  It is understood that the Employer retains any existing rights which he may have, in his exclusive discretion, to alter, amend, cancel, or terminate any existing employee benefit plan or plans or part thereof.

23

5.    <u>Excluded Employees</u>.  Employees excluded from the bargaining unit who work for an Employer signatory to this Agreement may participate in any of the foregoing benefits under rules and regulations established by the Trustees.  The contributions required for such benefits shall be determined by the Trustees.

6.    <u>National Health and Welfare Coverage.</u>  In the event that there is passage of National Health and Welfare legislation, the parties agree to reopen the agreement for negotiations, the sole purpose of which shall be to negotiate language instituting prevention of duplicate costs for both the Employer and the employees involved.

7.    <u>Amendments.</u>  The Trustees are directed to amend the Trust Agreement to be consistent with the provisions of this Agreement The Trustees shall have the discretion in acting on claims for benefits under the plan subject to review only in accordance with the arbitrary and capricious standard.

B.    PENSION FUND.  Employees shall participate in the CVS Pharmacist 401(k) plan as may be amended, modified or replaced by the Employer.  Bargaining unit pharmacists shall be offered participation in said plan on the same basis as store staff pharmacists in Southern California who are not covered by a collective bargaining agreement.

C.    RESOLUTION OF DIFFERENCES.  Differences between the Employer and the Union as to the interpretation or application of the provisions of the Trust Agreement providing for the establishment and maintenance of the Southern California Drug Benefit Fund and the Declaration of Trust providing for establishment and maintenance of the Southern California UFCW and Drug Employers Pension Fund, relating to employee benefits, shall not be subject to the grievance or arbitration procedure established in this Agreement or any collective bargaining agreement.  All such differences shall be resolved in the manner specified in the applicable Trust Agreement.

D.    PAYMENT OF CONTRIBUTIONS.

1.    <u>Payments.</u>  Payment of contributions by the Employer required to be made to the trusts established under this Article 14 shall be made on or before the twentieth (20th) day of each month based upon all straight-time hours worked or paid for not to exceed eighty (80) hours in any consecutive two (2) week time period.  Such payments shall be accompanied by a list of names of the employees for whom such contribution is made, showing the number of hours worked or paid for as set forth above by each employee during the preceding month.  Time during vacation periods (including vacation pay upon termination), sick leave, jury duty, bereavement leave and holiday absences which is paid for as provided for under this Agreement and all work performed on Sundays and holidays, exclusive of daily or weekly overtime, shall be considered as time worked, to which the provisions of this Article shall apply.

No fringe contributions shall be made on behalf of Christmas extra employees.  However, should they be employed on or after January 16, the Trust Fund shall credit them with all hours worked for health and welfare purposes retroactive to the date of hire as a Christmas extra, but no retroactive contribution shall be required from the Employer.

Contributions shall not be made for vacation payments made on the basis of industry experience as set forth in Article 8-C and unused sick leave paid in accordance with Article 10-F.  The Employer, by payments of the amounts provided for in this Article, shall be relieved of any further liability and shall not be required to make any further contributions to the cost of the benefits, either in connection with the administration of the plans or otherwise.  The last payment due under this Agreement shall be made on or before the twentieth (20th) day of July 2008 for the month of June 2008 except as may be required under Paragraph A-3-b, above.

24

2.  Audits/Collections.  The Trustees are hereby authorized to institute periodic audits of Employer's contributions to ascertain whether such contributions have been and are being made, fully and accurately.

If any such audit should disclose either an under-reporting or non-reporting of required contributions, the Trustees, at their sole discretion, may assess all or a portion of the audit expenses against such Employer, which the Employer hereby agrees to pay.  The Trustees may add reasonable interest charges to any unpaid contributions and such interest charges shall also be paid by the Employer.

If it should become necessary to institute legal action against a contributing Employer to collect unpaid contributions, the Trustees, in their sole discretion, may assess all or a portion of attorneys' fees and court costs against the Employer, in addition to any audit expenses.  The Employer hereby agrees to pay such attorneys' fees and court costs.  The Trustees are authorized and directed to establish a method to encourage regular and prompt payment by instituting the imposition of liquidated damages to those Employers who are delinquent in their payments.

The Employer agrees to make all pertinent books and payroll records available to the Trustees, or their agents, for their inspection in the conduct of any audit performed pursuant to this Article.

E.  BUSINESS EXPENSES.  It is understood that the provisions of this Article are being entered into upon the condition that the payments made by the Employer hereunder shall be deductible as business expenses under the Internal Revenue Code as it presently exists or as it may be amended subsequent to the date of this Agreement and under any similar applicable state revenue or tax laws.

F.  PENSION AND BENEFIT FUND APPOINTMENTS.

1.  Designation of Trustees.

a.  Employer Trustees.  For the Benefit Fund, the number of Employer Trustees shall be four (4), Kaiser-Permanente Foundation, CVS Pharmacy Drug, Rite Aid, Inc., Vons, a Safeway Company, each entitled to appoint a Trustee and his successors.

b.  Union Trustees.  For the Benefit Fund, the number of Union Trustees shall be six (6), with Locals 135, 324, 770, 1167, 1428, and 1442, each entitled to appoint a Trustee and his successors.

c.  The Union Trustees and Employer Trustees shall have equal voting power.

G.  ACCEPTANCE OF TRUSTS.

1.  The Employer and the Union hereby accept the terms of the existing Health and Welfare Trust, and the Pension Trust Agreements.  By this acceptance, the Employer agrees to and shall become a party to both of said Trusts with the same force and effect as though the Employer had executed each original Declaration of Trust.

2.  Any amendments that from time to time may be made thereto, including the creation of supplementary trusts to handle any of the funds referred to in this Agreement, shall be binding upon the Employer.

3.  The Employer hereby specifically ratifies the appointment of Trustees made by the Employers as set forth in Section F above, designates and appoints them or their successors, as his Trustees, and authorizes them to act in such capacity.  Successor Trustees shall be appointed by the same parties as their predecessors.

## **ARTICLE 15 – GENERAL CONDITIONS**

A.      NONDISCRIMINATION.

The Employer and the Union agree not to discriminate against any employee on the basis of their age, gender, gender identity or expression, marital status, sexual orientation, race, color, religion, national origin, veteran status, military status, disability, genetics or any other characteristic protected by federal, state or local law.

B.      NEW CONTRACT.  When a first contract is signed, the period of employment for vacation and sick leave eligibility shall be measured from the last date of hire with the Employer.

C.      GENDER REFERENCE.  All references in this Agreement to sex; for example, any reference to "his," "he," or "him" shall also apply to "her," "she," or "hers" and vice versa.  References to "they," "them," and "their" shall apply equally to both sexes.

D.      UNIFORMS.  The Employer shall furnish all required uniforms and, except where the garment is of a drip-dry material, shall pay for the laundering and upkeep of same.  The Union members shall have the right to wear their Union buttons.  The Employer will permit its female employees to wear pantsuits or slacks (not blue jeans) in accordance with reasonable and appropriate standard of attire for retail employees.

E.      RESTROOMS.  Restroom facilities shall comply with requirements under applicable regulations or laws.

F.      WEIGHT LIMIT.  No employee shall at any time be permitted or required to lift any item weighing more than the limit allowed by law.

G.      POLYGRAPH TEST.  No employee or applicant for employment covered by this Agreement shall be requested or required by any representative of the Employer to be the subject of a Polygraph (lie detector) test for any reason whatsoever.  The Employer agrees to refrain from any direct or indirect action that violates this understanding.

H.      SUCCESSORS AND ASSIGNS.

1.      Partnership Dissolution.  In cases of dissolution of a partnership, the remaining partner shall be expressly obligated to carry out the terms of this Agreement, regardless of whether or not he was signatory to the original Agreement.

2.      New Owner.  This Agreement shall be binding upon the successors and assigns of the parties hereto.  In the event of bona fide sale or transfer of any store covered by this Agreement during the period hereof, the new owner or such transferee shall be notified of the obligation of this Agreement and be required to become a party hereto.  The former owner shall be required to meet any and all monetary benefits that employees have accumulated under this Agreement.

3.      Accrued Vacation.  Upon sale or transfer of ownership of any store, or upon dissolution of business, vacation pay for all months worked for which no vacation pay has been given, shall be immediately paid to all employees coming under this Agreement, regardless of length of time said employee has been with the Employer.

4.      Sale or Transfer.

a.      In the event of a sale or transfer of a store or stores, an employee shall be allowed a seven (7) day period from the date of announcement to the employees of the sale or transfer during which time he may determine whether he wishes to stay with the seller or whether he wishes to make application for employment with the new owner or transferee.  In the event the employee chooses to remain with the seller, such choice shall not be construed as any guarantee of employment over and beyond the terms of this Agreement.

b.      In the event of a sale or transfer of a store or stores, the new owner or transferee shall make every effort to fill his employment needs in such store or stores from those employees of the seller or transferor who were employed in the stores sold or transferred.

c.      Such new owner or transferee, however, shall not be required to retain in his employ any of the employees of the seller or transferor.  Any employee of the seller or transferor who is employed within the thirty (30) day period referred to immediately below by the new owner or transferee shall be employed on a probationary basis for a period of thirty (30) days from the date the new owner or transferee assumes responsibility for the management and operation of the store or stores, subject to termination within such thirty (30) days with or without cause and without reference to seniority.  Any termination within such thirty (30) day period shall not be reviewable through the grievance or arbitration procedures, except for a violation of Paragraph H-4-b of this Article 15.

d.      Any employee of the seller or transferor who is employed by the new owner or transferee within such thirty (30) day period and who is retained on the payroll of the new owner or transferee for a period in excess of such thirty (30) day period, shall be credited with and retain all seniority acquired while in the employ of the seller or transferor since his most recent date of hire by such seller or transferor for the purpose of determining benefits to which he is entitled under the collective bargaining agreement with the new owner or transferee by virtue of such seniority as if his employment were continuous, including retention of anniversary date of employment, provided that the employees of the seller or transferor shall for the purposes of termination be credited with no more seniority than that of the most senior employee employed by the new owner or transferee covered by an agreement with a UFCW Local on the date of assumption of responsibility, and provided further that the new owner or transferee shall not be liable for any benefits or payments owed to the employee because of employment with the seller or transferor.  "Seller or transferor" is defined to include prior owners of the same store since January 1, 1956.

e.      The seller or transferor shall pay all vacation and sick leave accrued for time worked as of the date the sale or transfer becomes effective for all employees who have completed at least six (6) months with the Employer on the effective date of the sale or transfer, and said date shall become the date of employment with the new Employer for the purpose of vacation and sick leave only.

I.      SEPARABILITY CLAUSE.  The provisions of this Agreement are deemed to be separable to the extent that if and when a court of last resort adjudges any provisions of this Agreement in its application between the Union and the undersigned Employer to be in conflict with any law, such decision shall not affect the validity of the remaining provisions of this Agreement, but such remaining provisions shall continue in full force and effect, provided further, that in the event any provision or provisions are so declared to be in conflict with a law, both parties shall meet immediately for the purpose of renegotiation and agreement on provision or provisions so invalidated.

J.      TITLES.  The titles and subtitles used in this Agreement are for the sole purpose of identification and shall have no bearing on the construction or meaning of the Paragraphs to which they refer.

27

K.      AMENDMENTS, ADDITIONS, WAIVERS.  This Agreement is subject to amendment, alteration or addition only by a subsequent written agreement between and executed by the Employer and the Union.  The waiver of any breach, term or condition of this Agreement by either party shall not constitute a precedent in the future enforcement of any such term or condition.

L.      EFFECTIVE DATES.  All economic terms and conditions of this Agreement shall be effective July 13, 2008 except as otherwise specified herein.  All operational terms and conditions which change previously existing practices shall be effective not later than the date of execution of this Agreement.

M.      CERTIFICATION TO WORK.  In the event an employee is listed on a Federal or State excluded parties list, that employee will be removed from the schedule until such time as they are removed from such list.  If, after ninety (90) days, they remain on the excluded parties list, their employment will be terminated.  In the event that an employee requires a certification or license in order to work, and the certification or license is expired or suspended, that employee will be removed from the schedule until such time that they are eligible to work.  If, after ninety (90) days, they are not eligible to work, their employment will be terminated.  On a regular basis, the Company will contact to have the appropriate databases reviewed to determine work eligibility verified for all employees.


## ARTICLE 16 - GRIEVANCE, MEDIATION OR ARBITRATION

A.      DISPUTES OR QUESTIONS.   Any and all matters of controversy, dispute or disagreement of any kind or character existing between the parties arising out of or in any way involving the interpretation and/or application of the terms of this Agreement shall be settled and resolved by the procedures and in the manner as set forth herein.

B.      GRIEVANCE FILING/STEPS.

        1.      Discharge/Layoff.  A discharged or laid off employee has ten (10) days from the date of discharge or layoff, excluding Saturday, Sunday and holidays, within which to file written protest with the Union (with notice to the Employer).  Said discharge shall then be subject to this Article.  If no protest is filed within said ten (10) day period, or within ten (10) days of the notice specified in Article 4-C-4, all rights possessed by said employee or the Union to protest the discharge or layoff are waived.

        2.      Wage Discrepancy.  If a wage discrepancy is claimed to exist, the representative of the Union shall first attempt to settle it with the representative designated by the Employer.

                Failing settlement at this level, the Union shall in writing notify the Employer of the alleged discrepancy and the names of the employees involved, and the period of time that such discrepancy is claimed to cover.  Upon receipt of such written notice, the Employer agrees to promptly furnish the representative of the Union wage data pertaining to the alleged wage discrepancy.  If the parties fail to settle such wage discrepancy, said discrepancy shall be subject to the provisions of this Article.

        3.      Reporting Monetary Discrepancies.  A claim for unpaid wages, holidays, vacation, jury duty, sick leave, bereavement pay, or night, Sunday, or for any other direct compensation, must be filed with the Union by the employee, promptly upon discovery.  The Union shall, thereafter, if it believes such claim has validity, promptly notify the Employer.  A claim not filed by the employee with the Union within ten (10) days after discovery and not filed by the Union with the Employer within an additional ten (10) days, shall be deemed null and void.  (The Union has twenty (20) days from the employee's date of discovery to file notice with the Employer.)  Notwithstanding the foregoing, no wage or other direct compensation claim not involving

interpretation of the contract can cause such Employer to pay such claim or any portion thereof retroactively for a period of more than six (6) months immediately prior to the date of the Employer's receipt of notice from the Union of the claim.  In any event, the Employer's obligation to compensate an employee for unpaid time worked under Article 7-E, shall not be limited in any way by the foregoing, except for the six-month limitation.

4.      <u>Grievance Steps</u>.

      <u>Step 1 - Store Level</u>.  Employees, either directly or with their Union representative, shall attempt to settle or resolve any dispute with their General Manager or supervisor within ten (10) days after discovery of the event giving rise to the grievance.  In the event the matter or dispute is not settled or resolved, the employee shall have ten (10) days in which to file a grievance with the Union with a notice to the Employer.

      <u>Step 2 - District Level</u>.  Upon receipt of the Union's grievance, as detailed in Step 1, either party may request a formal grievance meeting.  Upon receipt of written notice from either party, representatives of the Employer and representatives of the Union shall try to meet within one (1) calendar week in order to attempt to settle or resolve the matter.  Any request for a formal grievance meeting must be submitted within ten (10) days after receipt of the employee's written protest.

      <u>Step 3 - Corporate Level</u>.  If the grievance is not satisfactorily adjusted in Step 2, or if no decision is reached within ten (10) days of the meeting, the union may then present the grievance to the Area HR Director.  The grievance will be discussed by a representative or representatives of the Union, and a representative or representatives of the employer within ten (10) days in an attempt to resolve the grievance.  The decision of the Employer will be then stated in writing and sent to the Union fourteen (14) days of the discussion date.

      <u>Step 4 - Arbitration</u>.  Any matter not settled or resolved in Step 3 may be submitted to arbitration by either party to this Agreement, i.e., the Employer or the Union, provided that written demand for arbitration must be made within ninety (90) days from the date of the filing of the grievance but not prior to the Step 2 grievance meeting.  Failure to comply within the time limits contained in this Paragraph and/or in Steps 1 and 2 shall render the grievance null and void.  Any rights possessed by either the Union or the employee with respect to arbitration shall be irrevocably waived.  The Employer and Union agree that with respect to arbitration procedure, past practices will be limited to only those in effect since June 18, 2006, except those pertaining to Article 14.

      Upon the receipt of the written demand for arbitration, the parties shall endeavor to select an impartial arbitrator.  However, if the parties fail to agree upon an arbitrator who is willing and able to serve within fourteen (14) calendar days after service of the demand for arbitration, the party demanding arbitration, within seven (7) calendar days thereafter, shall submit the demand for arbitration to the Federal Mediation and Conciliation Service to request a list of arbitrators.  Upon receipt of this list, an authorized representative of the Union shall strike a name from the panel.  Thereafter, the parties shall alternately strike one name each until only one name remains.  The person whose name remains shall be the selected arbitrator.  The arbitrator shall be requested to provide a minimum of five (5) available dates in five (5) separate calendar weeks (excluding Saturdays and Sundays) over a period not to exceed ninety (90) days from the arbitrator's selection date.  If the Union and Employer fail to mutually agree upon an available arbitration date provided by the arbitrator, the arbitrator shall select a binding arbitration date and advise the parties of said date.  The arbitration date selected by the parties or mandated by the arbitrator shall not be changed unless mutually agreed upon by the Union and Employer's Labor Relations representative.

The hearing shall be held within ninety (90) days after the arbitrator is selected, contingent upon the arbitrator's availability, with the further understanding that the arbitrator's award will be issued no later than forty-five (45) days after the hearing is completed.

C.      TIME PERIODS.  The time periods set forth above may only be extended by mutual written agreement between the parties.

D.      MEDIATION.

1.      Within fifteen (15) calendar days following the Step 2 grievance meeting, either party may request that the dispute be submitted to mediation.  Mediation shall be voluntary by both the Employer and the Union and any objections to mediation must be made in writing within seven (7) calendar days following receipt of the above request.

2.      The adjustment and arbitration provisions shall be stayed for not more than eighty (80) days pending mediation.

3.      Mediation shall take place on the first Tuesday after the first Monday of every odd-numbered month (January, March, etc.).  Subsequent days for mediation will be scheduled, if necessary.

4.      The mediator shall be provided by FMCS.

In September of each year, the parties will meet and mutually agree upon a new list of mediators, which may include either or both of the individuals currently on the panel.

5.      The procedures set forth in Appendix B attached to this Agreement shall be the rules for the parties and the mediator.

6.      All costs of the mediator shall be borne equally by both the Employer and the Union.

7.      If the parties agree to be bound by the mediator's recommendation, the decision shall be codified and signed by the Employer and the Union.

8.      Any matter not resolved pursuant to this provision may be submitted to arbitration within fifteen (15) days following the mediation.  Failure to adhere to the fifteen (15) day time limit will waive any right to arbitration.

E.      ARBITRATOR'S AUTHORITY.

1.      The arbitrator shall determine the arbitrability of any dispute, should it arise.

2.      The arbitrator shall not have the power to alter, change or modify this Agreement in any respect.  The rights of the parties to make any changes, modifications or amendments to this Agreement shall be reserved to themselves only, and shall not be subject to the arbitrator's authority.

3.      With the exception of arbitrations involving discipline, the expenses of the arbitrator shall be borne equally by both the Employer and the Union.  All jointly incurred expenses (i.e., transcripts, reporter's costs, arbitrator's fees, room rental) of arbitrations involving discipline shall be borne by the loser.  Unless the grievance which has been submitted to the arbitrator is totally sustained or denied, it shall be deemed split and the jointly incurred expenses shall be borne equally between the Employer and the Union.

4.      The arbitrator's decision shall be final and binding on all parties hereto.

F.      WORK STOPPAGES.  Matters subject to the procedures of this Article shall be settled and resolved in the manner provided herein.  During the term of this Agreement, there shall be no cessation or stoppage of work, lockout, picketing or boycotts, except that this limitation shall not be binding upon either party hereto, if the other party refuses to perform any obligation under this Article or refuses or fails to abide by, accept or perform a decision or award of an arbitrator, and fails to appeal to a court of competent jurisdiction.

G.      INDIVIDUAL WAIVERS.  The Employer may approach individual employees and propose an agreement between the Employer and the employee regarding submitting individual legal claims not covered by this CBA to binding private arbitration rather than court.  The Employer will approach all active employees as of the date of ratification within ninety (90) days of ratification.  The decision made by these active employees will supersede any previous decision made by that employee.  The Employer will approach all new employees covered by this CBA within ninety (90) days of hire.  Such an agreement to arbitrate individual legal claims, if made, would not affect the employees' rights under this CBA.

## ARTICLE 17 - THE EMPLOYER AND PHARMACIST RESPONSIBILITIES TO THE PUBLIC AND THE PHARMACY PROFESSION

A.      PRINCIPLES.  The foremost obligation of the Employer and the pharmacist is to assure the public that prescriptions and related matters are handled in accordance with the highest professional standards of pharmacy. The Employer and the pharmacist pledge full cooperation in such mutual undertaking.

B.      DECLARATIONS.  To make possible the fullest attainment of the above-stated objective, the following declarations shall apply:

1.      The Employer shall make every possible endeavor to provide work surroundings and conditions which will prevent the pharmacist from being interrupted or distracted unnecessarily while compounding prescriptions.  Such conditions will specifically include, but not be limited to:

a.      Prescription compounding area shall be separated from the public by barriers of appropriate height and distance.

b.      A sign shall be posted on entrance to pharmacy departments restricting entry to authorized persons only.

2.      The pharmacist shall have full control over the pharmaceutical case and shall see that cleanliness and organization are maintained therein in accordance with State and Federal laws and Employer policies.  The Employer agrees that it will not assign maintenance duties to pharmacists, except housekeeping duties consistent with their professional status.

3.      The pharmacist shall be expected to keep himself informed of developments in the pharmaceutical field.  Therefore, he will be expected to participate in necessary interviews during working hours with Employer-approved medical sales representatives.  He will also be expected to consult trade publications and books of reference, available in the store, concerning matters of importance and immediate concern, as needed.  To assist in the foregoing, the Employer will make available in the store publications containing up-to-date product information, including cross-referencing.

31

4.      The Pharmacist shall compound and dispense prescriptions, sell pharmaceuticals, medicines and related drug items, do patient consultation and shall be required to perform any and all other duties within the normal scope of his/her professional duties.  He may in his individual discretion, but shall not be required to perform, additional functions outside the prescription and drug departments.

5.      On all matters relating to the ethical practice of pharmacy including those set forth in this Article, pharmacists shall be responsible within the Company only to supervisors who are pharmacists.

6.      The Employer will carry an insurance policy in the amount of $500,000 for each person, per accident, and in the aggregate, $1,000,000 per twelve (12) month period, in order to protect the pharmacist while working on the job against any civil losses for incorrect compounding of prescriptions, or for the performance of any usual and customary professional services authorized by the Employer.  The Employer shall send evidence of such coverage to the Union or be self-insured.

7.      <u>Professional Rights</u>.  A pharmacist in his or her professional judgment may delay or refuse to fill or refill any prescription if there is reason to believe that such action would protect the health of the patient or where reasonable doubt exists as to the legality of said prescription or the legal use thereof, after first having established the fact by having consulted the prescriber if said prescriber is available.

8.      There shall be established a Professional Relations Committee composed of an equal number of Union and Employer representatives.

The purpose of this Committee will be to consider, discuss, and mutually agree upon, if possible, matters of concern and common interest relating to the practice of pharmacy.  In no event shall any action of this Committee interfere with or abridge the legal and ethical duty and responsibility of the individual pharmacist in his practice of pharmacy.

The Committee shall have the right to establish its own rules and procedures, including but not limited to the selection of Chairman, Secretary, meeting dates, places and the agenda for each meeting of the Committee.

The duties and functions of the Committee shall not abridge or preclude either the Union or the Employer from taking unresolved grievances arising under the terms of this Agreement through arbitration as set forth in Article 16 of this Agreement.

C.      PROFESSIONAL WORK STANDARDS.  Both the Union and the Employer recognize that sufficient ancillary staffing is necessary in order to maintain professional work standards, increase efficiency, productivity and profits.

1.      Ancillary hours shall be selected by the Pharmacy Manager and Regional Pharmacy Manager, using the Employer's guidelines and/or as set forth in the C.B.A.  Staff Pharmacists shall be consulted with respect to the needs of the pharmacy.

2.      The Employer agrees that when an employee is assigned as a pharmacy technician in the pharmacy that employee shall not be arbitrarily removed except in the event of an emergency.

## ARTICLE 18 - EXPIRATION AND RENEWAL

This Agreement shall be in effect from July 1, 2017, to and including June 30, 2021, and shall continue from year to year thereafter unless either party shall give written notice to the other at least sixty (60) days prior to the expiration date of June 30, 2021, or at least sixty (60) days prior to any subsequent June 30th of any succeeding year of its desire to alter, amend, or terminate this Agreement.

Signed this _13TH_ day of _February_, 2018.

FOR THE EMPLOYER

CVS PHARMACY

By _____
    Rob Francin, Senior Director of
    Labor Relations and HR Compliance

By _____
    Stephanie Sciurba
    Director of Labor Relations

FOR THE UNIONS:

By _____
    Mickey Kasparian, President
    UFCW Local 135

By _____
    Greg M. Conger, President
    UFCW Local 324

By _____
    John M. Grant, President
    UFCW Local 770

By _____
    Rick Bruer, President
    UFCW Local 1167

By _____
    Mark Ramos, President
    UFCW Local 1428

By _____
    Michael A. Straeter, President
    UFCW Local 1442

**APPENDIX A - WAGES**

A.      SCHEDULE OF RATES.

        Wage Increases.  The following wage increases apply to all pharmacists and shall be effective on the dates noted below.

| 7/2/2017 | 7/8/2018 | 7/7/2019 | 7/12/2020 |
|----------|----------|----------|-----------|
| $68.70   | $70.00   | $71.30   | $72.70    |

## APPENDIX B - MEDIATION PROCEDURE

The mediation procedure is entirely informal in nature. The relevant facts should be elicited in a narrative fashion to the extent possible, rather than through examination and cross-examination of witnesses. The rules of evidence will not apply and no record of the proceedings will be made. All persons involved in the events giving rise to the grievance should be encouraged to participate fully in the proceedings, both by stating their views and by asking questions of the other participants at the mediation hearing.

The primary effort of the mediator should be to assist the parties in settling the grievance in a mutually satisfactory fashion. In attempting to achieve a settlement, the mediator is free to use all of the techniques customarily associated with mediation, including private conferences with only one party. If settlement is not possible, the mediator should provide the parties with an immediate opinion, based on the Collective Bargaining Agreement, as to how the grievance would be decided if it went to arbitration. That opinion would not be final and binding, but would be advisory. It would be delivered orally and would be accompanied by a statement of the reasons for the mediator's opinion. The advisory opinion could be used as the basis for further settlement discussions or for withdrawal or granting of the grievance. If the grievance is not settled, granted or withdrawn, the parties are free to arbitrate. If they do, the mediator could not serve as arbitrator, and nothing said or done by the parties or the mediator during mediation could be used against a party during arbitration.

Neither attorneys nor court reporters or any other type of note-taker shall be allowed to be present at the proceedings.

## APPENDIX C – SUBSTANCE ABUSE REHABILITATION

1.     The Employer and the Union agree that use of unprescribed controlled substances which causes intoxication or impairment on-the-job poses risks to the employee, his co-workers, and to the Employer. Recognizing that in a given situation drug abuse may be an illness. It is the parties' intent that the Employer shall offer one (1) rehabilitation opportunity rather than terminating the employee on the first occasion.

2.     Use or abuse of prescribed controlled substances may pose the same risks identified in Paragraph 1 above.  However, if the prescribing physician certifies that his orders regarding frequency and strength of dosage were followed by the employee, the matter shall not warrant discipline.  If the physician reports to the contrary, then the same process shall apply as to use of unprescribed controlled substances.

3.     Use, consumption, sale or purchase of controlled substances on Employer premises or during the period from the start to the finish of a shift (including overtime, if any) shall result in dismissal, unless consumption is pursuant to the prescribing physician's prior specific orders.

4.     All employees shall be informed of this policy before testing is administered. Employees will be provided with contact information on each Local's MAP program by the Union.  Managers, supervisors, and Union stewards shall be trained to recognize the symptoms of drug abuse, impairment and intoxication.

5.     No employee shall be tested for drug metabolites unless there exists a reasonable suspicion that the employee to be tested is under the influence of drugs.  Random or mass testing is strictly prohibited.  The term "reasonable suspicion" shall, for the purpose of this policy and Paragraph be defined as follows:

Aberrant or unusual on-duty behavior of an individual employee which:

a.     is observed on-duty by the employee's immediate supervisor or another supervisor or manager and is confirmed, if present on the premises, by the observation of another supervisory employee, managerial employee or loss prevention employee;

b.     is the type of behavior which is recognized and accepted as symptoms of intoxication or impairment caused by controlled substances or alcohol or addiction to or dependence upon said controlled substances; or

c.     results in a work-related accident causing damage to property in an amount exceeding $500.00 or in physical injury to any individual requiring medical treatment other than minor cuts or bruises arising in the normal course of employment.

Reports of drug abuse or aberrant behavior which are not confirmed by supervisory observations shall not constitute reasonable suspicion.  Accidents defined in Paragraph 5-c constitute reasonable suspicion.

6.     a.     When a supervisor has reasonable suspicion to believe that an employee is using, consuming, or under the influence of an alcoholic beverage or controlled substance, the supervisor shall notify another member of management for the purpose of observation and confirmation of the employee's condition.  The employee shall be offered an opportunity to give an explanation of his/her condition, such as reaction to a prescribed drug, fatigue, lack of sleep, exposure to noxious fumes, reaction to over-the-counter medication or illness. A Union representative, store steward, if on the premises at the time of observation, or employee witness shall be present during such an explanation, and shall be entitled to confer with the employee before the explanation is requested. If both supervisors and/or managers, after observing the employee still have

36

reasonable suspicion to believe that the employee is using, consuming, and/or under the influence of an alcoholic beverage, non-prescribed controlled substance, or non-prescribed narcotic drug while on duty, then, by a written order signed by both the employee's immediate supervisor, if he is present or by another supervisor or manager if he is not, and another member of management, if present, the employee shall be ordered to submit to a 5 Panel NIDA Drug Screen designed to detect the presence of amphetamines, cocaine metabolites, marijuana metabolites, opiate metabolites, and phencyclidine in accordance with the procedure set forth below, and/or blood alcohol test.

      b.      Refusal to submit to toxicology testing after being ordered to do so shall result in discharge.

7.      The following procedure shall apply to blood and urine tests administer to employees:

      a.      No employee of the Employer shall draw blood from an employee.

      b.      The testing shall be done by a laboratory certified by the State of California as a medical and forensic laboratory which complies with the Scientific and Technical Guidelines for Federal Drug Testing Programs and the Standards for Certification of Laboratories engaged in Urine Drug Testing for Federal Agencies issued by the Alcohol, Drug Abuse and Mental Health Administration of the U.S. Department of Health and Human Services.

      c.      The standards used to determine what levels of detected substances shall be considered as positive are the most recently published federal guidelines. State guidelines apply to alcohol only. Levels which are below those set above shall be determined as negative indications.

      d.      Any sample which has been adulterated or is shown to be a substance other than urine shall be reported as such.

      e.      At the laboratory, a sample of the specimen shall be tested using the EMIT procedure. In order to be considered positive, the sample must show a positive result on the GCMS confirmatory test. This specimen shall be made available to the Union upon request for testing by a laboratory selected by the Union.

8.      If the results of the test administered by the Employer on the sample show that the employee, while on duty, was under the influence of or drank, smoked, ingested, inhaled or injected alcoholic beverages, non-prescribed narcotics, marijuana, cocaine, PCP or non-prescribed amphetamines, or other tested drug the following procedure shall be followed.

      The employee and the Union shall be presented with a copy of the results before any discipline is imposed. The Union and the employee shall then have seventy-two (72) hours to present to the Employer any different results from the test of the sample conducted by a laboratory selected by the Union; however, the failure of the Union or the employee to have the third test performed or to present the results to the Employer shall not be used against the employee as a basis for discipline or in any arbitration proceeding. The laboratory selected by the Union must meet the standards set forth in Paragraph 7-b. At the employee's request, the Employer will ask the Drug Trust to recommend rehabilitation agencies. Failure to sign a "last chance" agreement and to complete a rehabilitation program shall result in dismissal. Dismissal shall also result if there is another confirmed substance abuse occurring within a twenty-four (24) month period.

9.      Employees who seek voluntary assistance for alcohol and substance abuse before reasonable suspicion arises shall not be disciplined for seeking such assistance. Also, if reasonable suspicion later results in testing which show use of unprescribed controlled substances, the employee shall be entitled to one (1)

more opportunity for rehabilitation and a last chance agreement.  The Employer shall use its best efforts to keep confidential an employee's decision to seek assistance provided such assistance is sought prior to the occurrence of work performance or behavior difficulties. Employees enrolled in substance abuse programs shall be subject to all Employer rules and regulations, and job performance standards.

10.    Results of urine and blood tests performed hereunder shall be considered medical records and held confidential to the extent permitted by law.  Test shall only be performed for alcohol, chemical adulteration, marijuana metabolites, cocaine metabolites, opiates, amphetamines, and phencyclidine, or other drugs tested pursuant to Federal Drug Testing Guidelines and the laboratory shall only report on the presence or absence of these substances.  Test for other drugs shall not be performed and, if such tests are performed, the results of such other test shall not be reported to the Employer.

11.    The unpaid suspension for positive results shall be limited to four (4) full days, provided the employee has agree to immediately enter a drug/alcohol rehabilitation program as recommended.  If results are negative, days of suspension shall be paid.

12.    Nothing contained herein shall be deemed to waive the Union's right to grieve and arbitrate the enforcement of application of this policy by the Employer, including any discipline so issued hereunder.

13.    Nothing contained herein is intended to violate any federal or state law, rule or regulation, and if found to do so in part by any court of competent jurisdiction, then that part shall be made null and void and the parties agree that they will, within thirty (30) days, begin negotiations to replace such void part with a valid provision.

# Exhibit "2"

# Meal and Rest Period Policy Training for Non-Exempt California Colleagues

## Course # 410001
## August 2015



**♥CVS**Health

CVS_CHALIAN_0000800

# Table of Contents

Introduction................................................................... Page 3

Meal Periods................................................................. Page 4

Waivers........................................................................ Page 5

Rest Periods.................................................................. Page 6

Responsibilities and Non-compliance............................. Page 7

Special Rules for Pharmacists...................................... Page 8

Appendix B – Questions and Complaints........................ Page 8

Conclusion.................................................................... Page 9

2

CVS_CHALIAN_0000801

# Introduction

**Introduction**

As colleagues of CVS Health, our purpose is to help people on their path to better health. This includes both customers and our colleagues.  Therefore, it is important that colleagues have adequate opportunities for meal and rest breaks throughout the work day. This training provides an overview of the CVS Meal and Rest Period Policy for Non-Exempt California Employees.

**About the Policy**

CVS Health provides meal and rest periods for non-exempt California colleagues who work shifts that exceed a certain number of hours per day. The Meal and Rest Period Policy For Non-Exempt California Employees will prevail unless the employee is subject to different rules under an applicable collective bargaining agreement.

**Training Expectations**

This Meal and Rest Period policy governs meal and rest breaks for all hourly paid (non-exempt) colleagues in the state of California; however, all colleagues working in the state of California are required to complete this training.

**Learning Objectives**

After completing this course, you should be able to:

- Describe the rights of our non-exempt colleagues in California regarding meal and rest breaks
- Understand how to complete a voluntary meal period waiver
- Assume your responsibilities concerning meal and rest periods
- State the consequences of non-compliance with the Meal and Rest Period Policy for Non-Exempt California Employees

**Time to Complete**

15 Minutes

CVS_CHALIAN_0000802

# Meal Periods

| | |
|---|---|
| **Introduction** | Let us begin by talking about Meal Periods. |
| **Colleague Rights Under the Policy** | All California non-exempt **colleagues who work more than 5 hours** in a shift are entitled to an unpaid, uninterrupted, off-duty meal period of at least 30 minutes.<br><br>All California non-exempt **colleagues who work more than 10 hours** in a shift are entitled to a second unpaid, uninterrupted, off-duty meal period of at least 30 minutes. |
| **Meal Period Expectations** | • Colleagues must be relieved of all work duties and responsibilities during meal periods<br><br>• Colleagues may leave the store during a meal period |
| **Roles and Responsibilities** | Both Store Management and non-exempt colleagues have a role in ensuring that we are meeting our requirement with regard to meal periods in California.<br><br>• Managers are responsible for scheduling colleague meal periods.<br><br>• Colleagues are responsible for taking their meal periods as scheduled (unless otherwise directed by the Manager on Duty) |
| **When to Take Your Meal Period** | Review the timing for meal periods and the examples provided below:<br><br>• Colleagues who work more than 5 hours in a shift must begin their meal period *no later* than the end of the end of the 5th hour.<br>     o E.g., If you started your shift at 8:00 a.m. your meal period **must** begin no later than 1:00 p.m.<br><br>• Colleagues who work more than 10 hours in a shift must take their second meal period *no later* than the end of the 10th hour.<br>     o E.g. If you start an 11 hour shift at 8:00 a.m. the first meal period **must** begin no later than 1:00 p.m. and the second **must** begin no later than 6:00 p.m.<br><br>• Refer to the policy for additional examples of meal period timing. |
| **Recording Time for Meal Periods** | A meal period must last at least a full 30 minutes. Colleagues are required to punch out and back in for meal periods as described below:<br><br>• Once a colleague has punched out to begin his/her meal period, the time clock will not allow the colleague to punch back in less than 30 minutes later without a manager override.<br><br>• Colleagues may not under any circumstances perform any work until they have punched back in, regardless of who asks them. |

4

CVS_CHALIAN_0000803

# Waivers

| | |
|---|---|
| **Introduction** | Colleagues have the right to waive a meal period as long as certain criteria are met.  This section reviews the criteria and the process for waiving a meal period in California. |

**Waiver Criteria**

Colleagues may have the right to waive a meal period depending on the length of the shift.

- A colleague may voluntarily waive his/her meal period for shifts in which he/she works between 5 and 6 hours.

- Any colleague may waive his/her second meal period for shifts in which he/she works more than 10 hours provided that:
  1. The colleague does not work more than 12 hours.
  2. The colleague took his/her first meal period in a timely manner (as scheduled).

**How to Waive a Meal Period**

Colleagues who choose to waive a meal period must inform their Store Manager of the waiver **before missing any meal period**.

Colleagues must then elect a waiver in the SMART System with the Manager present.

**NOTE**:  A waiver is only valid in the store it was elected in.

**How Long Are Waivers in Effect?**

Waivers will be in effect until revoked by the colleague.

- A colleague may revoke the waiver at any time by informing the Manager on Duty of the revocation and electing a revocation through SMART with the Manager present.

- The revocation will become effective on the next calendar day following the election.

- A revocation is only valid in the store where the revocation took place.

5

CVS_CHALIAN_0000804

# Rest Periods

| | |
|---|---|
| **Colleague Rights Under the Policy** | All California non-exempt colleagues are authorized and permitted to take a paid 10-minute rest break during each 4 hours or major fraction of 4 hours that they work. |
| **When are rest periods taken** | Rest breaks shall be provided in the middle of each 4-hour work period to the extent this is possible. |
| **Limitations** | • Rest periods may not be combined. <br> • Rest periods may not be added to a meal period (before or after). |
| **Rest Period Expectations** | A colleague on a rest period must be relieved of all work duties and responsibilities. |

6

CVS_CHALIAN_0000805

# Responsibilities and Non-Compliance

---

**Colleague Responsibilities**

Colleagues are responsible for complying with all of the requirements in this policy, including:

- Taking their full scheduled meal breaks in a timely manner in accordance with this policy, unless specifically told by the Manager on Duty to skip the scheduled meal break due to unavoidable operational needs or in accordance with the special rules for Pharmacists (refer to the next page for details);

- Alerting their supervisor or the Manager on Duty if it appears that they are not scheduled for or will not be able to take a meal period or rest period in accordance with this policy;

- Contacting Human Resources immediately if they are instructed or encouraged not to take a meal or rest break in accordance with this policy or are instructed to perform any work at any point during the meal break;

- Keeping any meal break waivers up-to-date;

- Punching out for meal breaks and punching in before returning to work.

- Performing all work while clocked into the timekeeping system. Colleagues must not work "off-the-clock" and must notify their supervisor or Manager on Duty immediately if they worked hours that they believe were not recorded in the timekeeping system.

**Note**: Exempt managers are responsible for making sure they take their own regular and adequate breaks.

---

**Consequence for Non-Compliance**

CVS Health non-exempt colleagues must be provided with all required meal and rest periods and must be paid for all hours worked. Therefore, it is critical that non-exempt colleagues and Store Management strictly comply with this policy.

- If a colleague fails to comply with this policy, he/she may be subject to disciplinary action, up to and including termination.

- Managers who fail to provide meal or rest periods, fail to schedule appropriately for meal or rest periods, discourage or impede colleagues from taking meal or rest periods, or fail to pay colleagues for all hours worked may be subject to discipline, up to and including termination.

---

CVS_CHALIAN_0000806

# Special Rules for Pharmacists

**Expectations For Pharmacists**

If a Pharmacist is the only Pharmacist on duty, the nature of the pharmacy operations and the work performed by the Pharmacist may prevent him/her from taking a meal period where he/she is relieved of *all* duty.

However, Pharmacists are required to take meal breaks in accordance with this policy when there is more than one pharmacist working at the time of the meal break.

**Action Required When a Pharmacist is Working Alone**

If a Pharmacist is unable to take an uninterrupted, off-duty, 30 minute meal break in accordance with this policy because he/she is the only Pharmacist on duty (or for some other reason), the Pharmacist must notify his/her Supervisor as soon as possible.

# Questions and Concerns

**What to Do If You Have Questions or Concerns**

Colleagues may bring any questions or concerns regarding their meal or rest period rights to the attention of their Supervisor or, if they prefer, the Human Resources Department.

Store Managers, Pharmacists and Field Managers do NOT have the authority to alter this policy. If a colleague is told that he/she is not entitled to meal or rest breaks as set forth under this policy, the colleague should contact the Human Resources Department immediately.

**When are Meal and Rest Period Premiums Applied?**

Colleagues who believe they have not been provided with a meal or rest break as required by this policy may be entitled to a meal period premium or rest period premium.  Colleagues who believe they may be entitled to a premium should contact their Supervisor or Human Resources representative.

8

CVS_CHALIAN_0000807

# Conclusion

**Course Completion**

Congratulations, you have finished the course!

Having completed the course, you should now be able to:

- Describe the rights of our non-exempt colleagues in California regarding meal and rest periods

- Understand how to complete a voluntary meal period waiver

- Assume your responsibilities concerning mean and rest periods

- State the consequences of non-compliance with the meal and rest period policy

**Recap**

It is important to CVS that colleagues have adequate opportunities for meal and rest periods throughout the work day in order to deliver on our purpose of helping people on their path to better health.

- CVS Health provides Meal and Rest Periods for non-exempt California Colleagues who work shifts that exceed a certain number of hours per day.

- Some Meal Periods may be waived by employees in certain circumstances.

- All colleagues are expected to comply with the Meal and Rest Period policy.

**Next Steps**

Now that you have completed the course you must complete the acknowledgement.  Follow the steps below:

| Step | Action |
|------|--------|
| 1 | Log onto LEARNet (https://cvslearnet.cvs.com). |
| 2 | In the "My Curriculum" section of your LEARNet home page, click on the *California Meal and Rest Break Policy Training* link. (The course description will display.) |
| 3 | Once you have read the training, complete the course by clicking on the "Complete the Acknowledgement" link. |

9

CVS_CHALIAN_0000808

CONFIDENTIAL

CVS CHALIAN 000788

| Document ID: | Title: |
|---|---|
| DOC-048812 | Meal and Rest Period Policy for Non-Exempt California Employees |

All California non-exempt Employees are authorized and permitted to take a paid 15-minute Rest Period during each 4 hours or major fraction of 4 hours that they work. If the Employee's total daily work time is less than 3.5 hours, however, no Rest Period is required. Rest breaks shall be provided in the middle of each 4-hour work period insofar as is practicable. Rest breaks may not be combined with each other or added to a Meal Period.

Employees must be relieved of all work duties and responsibilities during Rest Periods and are not responsible for remaining on call or monitoring any work-related communications of any kind during Rest Periods. Employees may leave their work site during a Rest Period. If an Employee is interrupted during a Rest Period, the Rest Period may be rescheduled. If an Employee is unable to take a Rest Period consistent with this policy, he/she may be entitled to a Rest Period premium. If an Employee believes that he/she is entitled to such a premium, the Employee should contact his/her supervisor, manager or Human Resources Business Partner immediately.

The number of authorized and permitted rest breaks is as follows:

| If the shift is: | Number of Rest Breaks: |
|---|---|
| Less than 3.5 hours | 0 |
| 3.5-6 hours | 1 |
| 6-10 hours | 2 |
| 10-14 hours | 3 |

### III. EMPLOYEE RESPONSIBILITIES

Employees are responsible for complying with all of the requirements in this policy, including:

| | |
|---|---|
| ✓ | Taking their full scheduled Meal Periods in a timely manner in accordance with this policy, unless specifically told by the supervisor or manager to skip the scheduled Meal Period due to operational needs or in accordance with special rules for pharmacists; |
| ✓ | Alerting their supervisor or manager if it appears that they are not scheduled for or will not be able to take a Meal or Rest Period in accordance with this policy. |
| ✓ | Contacting Human Resources immediately if they are instructed or encouraged not to take a Meal or Rest Period in accordance with this policy, or if they are instructed or encouraged to perform any work, remain at their work site, or be on call at any point during a Meal or Rest Period; |
| ✓ | Keeping any meal break waivers up-to-date in myHR and informing their supervisor(s) or manager(s) of their intent to waive or revoke waivers prior to doing so; |
| ✓ | Clocking out for Meal Periods and clocking in before returning to work; and |
| ✓ | Performing all work while clocked into the timekeeping system. Employees must not work "off-the-clock" and must notify their supervisor or manager immediately if they worked hours that they believe were not recorded in the timekeeping system. |

Employees who believe they have not been provided with a Meal or Rest Period as required by this policy, may be entitled to a Meal Period premium or Rest Period premium. Employees who believe they may be entitled to a Meal Period premium or Rest Period premium should contact their supervisor, manager or a Human Resources representative.

### IV. CONSEQUENCES OF NON-COMPLIANCE

CVS Health Employees must be paid for all hours worked and must be provided with all required Meal and Rest Periods consistent with this policy. Therefore, it is critical that non-

Confidential and Proprietary
©2017 CVS Health and/or one of its affiliates. All rights reserved.
Not to be Reproduced Or Disclosed to Others Without Prior Written Approval
Page 4 of 6

Exhibit "3"

**California Guidelines for Pharmacy Operations During Absence of Pharmacist for Meal and Rest Breaks**

1. In any pharmacy that is staffed by a single pharmacist, the pharmacist may leave the pharmacy temporarily for rest breaks and meal periods in accordance with CVS policy without closing the pharmacy and removing ancillary staff from the pharmacy if the pharmacist reasonably believes that the security of the dangerous drugs and devices will be maintained in his or her absence. If in the professional judgment of the pharmacist, the pharmacist determines that the pharmacy should close during his or her absence, then the pharmacist shall close the pharmacy and remove all ancillary staff from the pharmacy during his or her absence. In this event, the pharmacist must notify the pharmacy supervisor as soon as the pharmacist determines that the pharmacy should close during his or her absence to discuss any changes that could be made to ensure the security of the dangerous drugs and devices and thereby avoid future closures.

2. During the pharmacist's temporary absence, no prescription medication may be provided to a patient or to a patient's agent unless the prescription medication is a refill medication that the pharmacist has checked, released for dispensing to the patient and was determined not to require the consultation of a pharmacist.

3. During such times that the pharmacist is temporarily absent from the pharmacy, the ancillary staff may continue to perform the non-discretionary duties authorized to them by pharmacy law. However, any duty performed by any member of the ancillary staff shall be reviewed by a pharmacist upon his or her return to the pharmacy.

4. When a pharmacist is temporarily absent during a meal or rest period, an intern pharmacist may not perform any discretionary duties nor otherwise act as a pharmacist.

5. The temporary absence authorized by this section is limited to the 30-minute meal period and a 10 minute rest period. A pharmacist who is on break is not required to remain in the pharmacy area during the break period.

6. Ancillary staff includes an intern pharmacist, a pharmacy technician, non-licensed personnel, and a pharmacy technician trainee.

CVS_CHALIAN_0000769

Exhibit "4"

Case 2:16-cv-08972-AB-AGR   Document 106-1   Filed 07/06/20   Page 139 of 172   Page ID #:4047
Case 2:14-cv-06412-GW-VBK   Document 86-1   Filed 06/08/17   Page 1 of 31   Page ID #:979
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 1 of 31

1  **MARLIN & SALTZMAN, LLP**
2  Stanley D. Saltzman, Esq. (SBN 90058)
   ssaltzman@marlinsaltzman.com
3  29800 Agoura Road, Suite 210
4  Agoura Hills, California 91301
   Telephone:  (818) 991-8080
5  Facsimile:   (818) 991-8081

6  Attorneys for Plaintiffs MAYRA CASAS and
7  JULIO FERNANDEZ, individually, and on behalf
   of all other similarly situated individuals

8

9                **UNITED STATES DISTRICT COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11

12  MAYRA CASAS, JULIO              **Case No. 2:14-CV-06412-GW(VBKx)**
    FERNANDEZ, individuals, on behalf of   (Assigned to Judge George H. Wu)
13  themselves  and all others similarly
    situated,                        **CLASS ACTION**
14
                    Plaintiffs,
15  v.                               **PLAINTIFFS' NOTICE OF MOTION**
                                     **AND MOTION (UNOPPOSED) FOR**
16  VICTORIA'S SECRET STORES, LLC,   **PRELIMINARY APPROVAL OF**
17  a business entity of unknown form, L   **CLASS ACTION SETTLEMENT**
    BRANDS (f/k/a LIMITED BRANDS), a
18  business entity of unknown form, and   DATE:       July 6, 2017
    DOES 1 through 100, inclusive,   TIME:       8:30 a.m.
19                                   CTRM:       9D
20              Defendants.
                                     Complaint Filed:  July 9, 2014
21

22

23

24

25

26

27

28

Case 2:16-cv-08072-AB-AGR   Document 106-1   Filed 07/06/20   Page 140 of 172   Page ID
#:4048
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 2 of 31

## **TABLE OF CONTENTS**

I.      INTRODUCTION TO THE LITIGATION ...................................................1

II.     SUMMARY OF THE LITIGATION .........................................................3

        A.      Complaint Filed in Los Angeles County Superior Court and Removed to the
                Central District of California ...................................................... 3

        B.      Mediation and Settlement Agreement Reached By the Parties ............... 4

        C.      Investigation ................................................................................ 5

III.    THE TERMS OF THE SETTLEMENT .....................................................6

IV.     THE SETTLEMENT CLEARLY MEETS, AND IN FACT EXCEEDS, THE
        STANDARDS FOR PRELIMINARY APPROVAL ......................................9

        A.      The Settlement Resulted from Arm's-Length Negotiations .................. 10

        B.      The Settlement Has No Obvious Deficiencies ................................... 11

        C.      The Settlement Represents a Fair Resolution of the Claims Presented ......... 13

V.      NATURE AND METHOD OF CLASS NOTICE.........................................17

VI.     CLAIMS ADMINISTRATION ...............................................................18

VII.    ATTORNEYS' FEES AND COSTS .........................................................18

VIII.   ENHANCEMENT AWARD FOR NAMED PLAINTIFFS .............................19

IX.     THE PROPOSED SETTLEMENT CLASS SHOULD BE PRELIMINARILY
        CERTIFIED FOR THE FOR PURPOSES OF SETTLEMENT ........................21

        A.      Fed.R.Civ.P. 23 (a) Requirements Are Met for the Settlement Class.......... 21

                1.      Numerosity ........................................................................ 21

                2.      Commonality....................................................................... 21

                        a.      Whether time spent making mandatory calls is
                                compensable; ..........................................................22

                        b.      Whether off-the-clock time worked is compensable;..............22

                        c.      Whether telephone expenses are reimburseable;....................22

                        d.      Whether the wage statements comply with the law; and, .......22

                        e.      For the Unfair Competition Law causes of action, whether
                                the Defendant has acted unfairly, illegally, or deceptively,
                                as those terms are defined for Unfair Competition Law
                                purposes. ................................................................22

Case 2:16-cv-08972-AB-AGR   Document 106-1   Filed 07/06/20   Page 141 of 172   Page ID #:4049
Case 2:14-cv-06412-GW-VBR   Document 806-1   Filed 06/08/20   Page 3 of 31   Page ID #:9281
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 3 of 31

|  |  | 3. | Typicality ............................................................................ 22 |
|  |  | 4. | The Adequacy Requirements Are Satisfied ................................ 22 |
|  | B. | The Fed.R.Civ.P 23(b) Standards Are Satisfied ...................................... 23 |
|  |  | 1. | Common Issues Predominate ........................................................ 23 |
|  |  | 2. | The Class Action Device Is Superior to Other Available Methods of Adjudication ........................................................................ 24 |
|  |  | 3. | No Manageability Issues Preclude Certification .......................... 24 |
| X. | PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS "SETTLEMENT CLASS COUNSEL" ....................................................................................................24 |
| XI. | CONCLUSION ..........................................................................................................25 |

Case 2:16-cv-08972-AB-AGR   Document 106-1   Filed 07/06/20   Page 142 of 172   Page ID #:4050
Case 2:14-cv-06412-GW-VBR   Document 80-1   Filed 06/08/17   Page 4 of 32   Page ID #:982
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 4 of 31

**TABLE OF AUTHORITIES**

**Federal Cases**

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. Cal. 2001) ................................................................21

*Class Plaintiffs v. Seattle,*
    955 F.2d 1268 (9th Cir. 1992) ...............................................................9, 10

*Comcast Corp. v. Behrend,*
    133 S. Ct. 1426 (2013) ...........................................................................23

*Cook v. Niedert,*
    142 F.3d 1004 (7th Cir. 1998) ................................................................19

*Gatreaux v. Pierce,*
    690 F.2d 616 (7th Cir. 1982) ..................................................................10

*Grant v. Capital Mgmt. Servs., L.P.,*
    2013 WL 6499698 (S.D. Cal. 2013) .........................................................24

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) .......................................................9, 10, 23

*In re Heritage Bond Litigation,*
    2005 WL 1594403 (C.D. Cal. 2005) ...........................................................9

*In re Surebeam Corp. Secs. Litig.,*
    2004 WL 5159061 (S.D. Cal. 2004) ..........................................................22

*Lazarin v. Pro Unlimited, Inc.,*
    2013 WL 3541217 (N.D. Cal. 2013) ..........................................................24

*Leyva v. Medline Indus.,*
    716 F.3d 510 (9th Cir. 2013) ..................................................................23

*Linney v. Cellular Alaska P'ship,*
    151 F.3d 1234 (9th Cir. 1998) ................................................................12

*Nat'l Rural Telecommunication Cooperative v. Directv, Inc.,*
    221 F.R.D. 523 (C.D. Cal. 2004) .............................................................10

*Officers for Justice v. Civil Service Commission,*
    688 F. 2d 615 (1982) .............................................................................10

*Rodriguez v. Hayes,*
    591 F.3d 1105 (9th Cir. Cal. 2010) ...........................................................22

*Rodriguez v. West Publishing Corp.,*
    563 F.3d 948 (9th Cir. 2009) ..............................................................10, 19

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ..................................................................19

iv

Case 2:16-cv-08079-AB-AGR   Document 106-1   Filed 07/06/20   Page 143 of 172   Page ID #:4051
Case 2:14-cv-06412-GW-AGR   Document 806-1   Filed 06/08/20   Page 5 of 31   Page ID #:9283
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 5 of 31

*Tierno v. Rite Aid Corp.,*
    2006 WL 2535056 (N.D. Cal. 2006) ........................................................22

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.,*
    593 F.3d 802 (9th Cir. Cal. 2010) ...........................................................21

### **State Cases**

*Brinker Restaurant Corp. v. Superior Court,*
    53 Cal.4th 1004 (2012) .........................................................................23

### **Statutes and Rules**

Fed.R.Civ.P. Rule 23 ............................................................................. passim

Labor Code § 203 ...................................................................................14

### **Other Authorities**

*Manual for Complex Litigation,*
    Fourth, § 21.632 (2004) ..........................................................................9

*Manual for Complex Litigation,*
    Fourth, § 22.661 ....................................................................................10

v

Plaintiff's Notice of Motion and Motion (Unopposed) for Preliminary Approval of Class Action Settlement
Case No. 2:14-CV-06412GW

1   **TO:   ALL PARTIES HEREIN AND TO THEIR COUNSEL OF RECORD:**

2   **PLEASE TAKE NOTICE** that on July 6, 2017, at 8:30 a.m. or as soon thereafter

3   as the matter can be heard in Courtroom No. 9D of the above entitled courthouse located

4   at 350 W. 1st Street, Los Angeles, California 90012 (the "1st Street Courthouse"),

5   Representative Plaintiffs Mayra Casas and Julio Fernandez ("Plaintiffs") will move this

6   Court for an order: (1) approving the filing of the Proposed Fourth Amended Complaint;

7   (2) preliminarily certifying a Settlement Class, (3) preliminarily approving the Class

8   Action Settlement embodied in the Settlement Agreement and Stipulation, (4) approving

9   and directing distribution of the Notice of Class Action Settlement, and (5) setting a Final

10  Approval Hearing.

11  Defendant Victoria's Secret Stores, LLC ("Defendant") does not oppose this

12  Motion.

13  Said Motion shall be based upon this Notice of Motion, the accompanying

14  Memorandum of Points & Authorities filed herewith, the declaration of Stanley D.

15  Saltzman, Esq., the Settlement Agreement and Stipulation entered into by the Parties, and

16  upon such further evidence, both documentary and oral, as may be presented at the

17  hearing of said motion.

18

19  DATED:  June 8, 2017                    **MARLIN & SALTZMAN, LLP**

20

21                                           By:  /s/  Stanley D. Saltzman
22                                                Stanley D. Saltzman, Esq.
23                                                Attorneys for Plaintiffs and the
                                                 Plaintiff Class
24

25

26

27

28

Plaintiff's Notice of Motion and Motion (Unopposed) for Preliminary Approval of Class Action Settlement
Case No. 2:14-CV-06412GW

## I.      __INTRODUCTION TO THE LITIGATION__

Casas originally filed this putative class action against Victoria's Secret Stores, LLC (hereafter, "VS" or "Defendant"), alleging that Defendant's Call-In Scheduling Policy violated California's reporting time law.  Subsequently Fernandez also joined the lawsuit, as a second proposed Representative Plaintiff.  Together, they are referred to herein as the Plaintiffs.  Essentially, Plaintiffs alleged that because there was no meaningful distinction between traditional scheduled shifts and Call-In scheduled shifts,[1] the employees were regularly "reporting for work" for their Call-In shifts under California's reporting time law.  As a result of not receiving the "reporting time" pay for these cancelled Call-In Shifts, the suit was filed.  While other claims were also alleged as set forth below, the Call-In scheduling practice was at the heart of the litigation.

At the time the action was filed, Call-In scheduling affected thousands of non-exempt VS employees in the State of California.  For five years, Casas worked as a non-exempt employee of Victoria's Secret.  Fernandez worked as a non-exempt employee of VS for approximately two and a half years during the proposed class period.  Approximately 40,000 co-employees were subjected to the same scheduling practices during the class period.

Plaintiffs allege that, throughout their tenure with VS, they were required to adhere to two scheduling policies that affected them in a functionally identical manner.  Traditionally scheduled shifts required them to physically appear at their store at the scheduled time.  These traditional shifts are but a minor piece of the litigation puzzle.  For the Call-In shifts, instead of being required to physically appear at a store, Plaintiffs allege that they were required to report for work by calling their manager about two hours before the shift in order to be told by their manager whether or not they were needed that day.

---

[1] Call-In shifts occurred whenever the VS employees called their manager as instructed, and declared themselves ready, willing, and able/available to work the scheduled shift.

Calling in for the Call-In shifts was alleged to be mandatory, and the employees alleged that they were subject to discipline if they failed to do so, or were late getting to the store after being told to come in, or were otherwise unavailable to work a Call-In shift when directed to do so.  The primary issue addressed in the lawsuit was Plaintiffs' allegation that when the employees were told that their services were not needed, and thus were not permitted to work the Call-In shifts for which they had been scheduled, that they did not receive "reporting time" pay.  In addition, Plaintiffs alleged that they and the class members had to take time out of their day to make the mandatory phone calls to the store manager at the appointed time.

Plaintiffs allege that this scheduling practice required them to mold their lives around the **possibility** that they **might** have the chance to work more hours, but that often did not occur.  It was thus alleged that they could not plan any other pursuits during that time – such as scheduling work hours with another job, attending classes, or making plans with friends and family.

This lawsuit has now resulted in a meaningful and substantial proposed settlement.  Moreover, less than a year after the filing of the lawsuit, in about July of 2015, VS ceased utilizing the Call-in shift practice entirely, so that its employees were no longer subject to this highly dysfunctional (from the employee's standpoint) business model.  As discussed hereafter, the settlement calls for Victoria's Secret to make a totally non-reversionary payment of $12,000,000.00 to the participating class members, to resolve all the claims presented.  Moreover, **no claim forms of any kind are required in order for the thousands of class members to participate in the settlement.**  Unless a Class Member affirmatively elects to opt out of the class, a settlement check mailed to them.

Consequently, Plaintiffs Mayra Casas and Julio Fernandez now move this Court for an Order: (1) Preliminarily Certifying a Settlement Class, (2) Preliminarily Approving the Class Settlement embodied in the Joint Stipulation Re. Class Action Settlement (hereafter "the Settlement Agreement" or simply "the Agreement") (attached as Exhibit "A" to the Declaration of Stanley D. Saltzman, "Saltzman Decl."); (3) approving

2

1   and directing distribution of the Notice of Class Action Settlement (attached as
2   Exhibit "A" to the Settlement Agreement which is attached to the Saltzman Decl. ¶ 14);
3   and (4) setting a Final Approval Hearing.

## II.   SUMMARY OF THE LITIGATION

### A.   Complaint Filed in Los Angeles County Superior Court and Removed to the Central District of California

Casas filed the instant Action, entitled *Mayra Casas, et al. v. Victoria's Secret Stores, LLC, et al.*, in Los Angeles County Superior Court on July 9, 2014.  Therein, Casas alleged causes of action for: (1) Failure to pay reporting time on regularly scheduled shifts (8 Cal. Code Regs. § 11070(5); Cal. Lab. Code § 558); (2) Failure to pay reporting time on "call-in" shifts (8 Cal. Code Regs. § 11070(5); Cal. Lab. Code § 558); (3) Failure to pay for all time worked (Cal. Lab. Code §§ 510, 1194, 1194.2, 1197, and 1198; Wage Order); (4) Failure to maintain required business records (Cal. Lab. Code §§ 1174, 1174.5; Wage Order); (5) Failure to provide accurate itemized wage statements (Cal. Lab. Code §§ 226, 226.3; Wage Order); (6) Unfair business practices (Bus. & Prof. Code §§ 17200, *et seq.*); and (7) Civil penalties under the Private Attorneys General Act (Cal. Lab. Code §§ 2698, *et seq.*).

Defendant removed the Action to the Central District of California, where it was assigned Case No. 2:14-cv-06412-GW (VBKx).  On September 5, 2014, Plaintiffs filed a First Amended Complaint ("FAC"), adding Julio Fernandez, a then former employee, as a class representative and thus adding a waiting time claim under Labor Code sections 200 through 203.

Thereafter, Defendant moved to dismiss Plaintiffs' FAC, which Plaintiffs opposed.  Following supplemental briefing, the Court granted the motion in part on December 29, 2014.  Thereafter, Plaintiffs filed a Second Amended Complaint ("SAC"), alleging causes of action for: (1) Failure to pay reporting time pay (8 Cal. Code Regs. § 11070(5); Cal. Lab. Code § 558); (2) Failure to pay overtime (Cal. Lab. Code §§ 510, 1194; Wage Order); (3) Failure to pay minimum wage (Cal. Lab. Code §§ 1182.11,

Case 2:16-cv-02379-AB-AGR   Document 106-1   Filed 07/06/20   Page 149 of 172   Page ID #:4056
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/19   Page 9 of 31   Page ID #:1208
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 10 of 31

1182.12, 1194, 1194.2, 1197; Wage Order); (4) Failure to maintain required business records (Cal. Lab. Code §§ 1174, 1174.5; Wage Order); (5) Failure to provide accurate itemized wage statements (Cal. Lab. Code §§ 226, 226.3; Wage Order); (6) Failure to pay all wages earned at termination (Cal. Lab. Code §§ 200–203); (7) Unlawful business practices (Bus. & Prof. Code §§ 17200, *et seq.*); (8) Unfair business practices (Bus. & Prof. Code §§ 17200, *et seq.*); and (9) Civil penalties under the Private Attorneys General Act (Cal. Lab. Code §§ 2698, *et seq.*).  VS then moved to dismiss Plaintiffs' SAC, which Plaintiffs opposed.

Following the Court's partial grant of the motion to dismiss, Plaintiffs also moved this Court, pursuant to 28 U.S.C. § 1292(b), to certify for interlocutory appeal its order dismissing certain claims from the FAC, which motion Defendant opposed.  Thereafter, the Court, on February 13, 2015, granted in part Defendant's motion to dismiss the SAC, and they then filed a Third Amended Complaint ("TAC"), which is currently the operative complaint, alleging the same claims and causes of action set forth in the SAC.  Defendant moved to dismiss the TAC, which Plaintiffs opposed.  Before ruling on said motion, this Court granted Plaintiffs' motion to certify for interlocutory appeal its order dismissing, in part, Plaintiffs' FAC.  The Ninth Circuit then granted Plaintiffs' petition for interlocutory appeal, following which the parties lodged formal merits briefing, and the parties participated in oral argument on October 5, 2016.  Defendant generally denies Plaintiffs' claims, including the allegations in the Complaint, FAC, SAC, and TAC.

### B.   Mediation and Settlement Agreement Reached By the Parties

Prior to the scheduled oral argument before the Ninth Circuit, the Parties agreed to attend a mediation session, which was to take place only **after** the oral argument.  The oral argument took place on October 5, 2016, and on October 25, 2016, a formal mediation session before Steven G. Pearl, Esq., of ADR Services, Inc., took place in Los Angeles, California.

At the conclusion of the mediation, the Parties reached an agreement to resolve the

4

Plaintiff's Notice of Motion and Motion (Unopposed) for Preliminary Approval of Class Action Settlement
Case No. 2:14-CV-06412-GW

Case 2:16-cv-08979-AB-AGR   Document 106-1   Filed 07/06/20   Page 149 of 172   Page ID
#:4057
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/16   Page 11 of 31   Page ID #:1209
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 11 of 31

1   Action and signed a Memorandum of Understanding, which then resulted in the
2   Settlement Agreement now before this Court.

3   **C.   Investigation**

4   Plaintiffs conducted a detailed legal and factual investigation of the claims asserted
5   against Defendant.  Although the Action – including discovery – has been stayed during
6   portions of the extensive district court briefing and appellate proceedings, the Parties
7   agreed to engage in extensive informal discovery to prepare for mediation. Thus, in
8   anticipation of mediation, the Plaintiffs have engaged in the following litigation actions,
9   amongst many:

10  (a) they have engaged in extensive motion work throughout this matter and equally
11  extensive and comprehensive appellate briefing.  They have conducted
12  extraordinary and extensive research and briefing into all the issues involved in
13  this matter of first impression;

14  (b) Plaintiffs ordered and paid for extensive legislative histories to be pulled on the
15  statutes involved, all of which has been thoroughly studied;

16  (c) Defendant provided and the Class analyzed extensive payroll records, time
17  records, scheduling records, and other related records and policies pertaining to the
18  claims;

19  (d) Defendant also identified all current and former non-exempt putative class
20  member employees in the relevant job categories during the relevant time period;

21  (e) Plaintiffs also researched other areas of law applicable to Plaintiffs' claims and
22  Defendant's affirmative defenses, as well as the damages alleged by Plaintiffs;

23  (f) Plaintiffs thoroughly examined additional information and documents; and

24  (g) Plaintiffs gave full consideration to all information and positions disclosed both
25  prior to and at the mediation.

26  Based on all of the foregoing, the Plaintiffs were thoroughly prepared for the
27  mediation, as was Defendant, and the Parties were able to reach the settlement now
28  presented for approval.  The final Settlement Agreement is the product of extensive

5

Case 2:16-cv-08979-AB-AGR   Document 106-1   Filed 07/06/20   Page 150 of 172   Page ID #:4058
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/19   Page 12 of 31   Page ID #:1290
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 12 of 31

negotiations between the Parties conducted at arms-length and is free from collusion, negotiated by experienced class counsel on both sides with the aid of an experienced mediator.  Both sides were of course required to make reasonable compromises in light of the facts, issues, and risks presented in this Action.   In particular, in reaching the Settlement, Class Counsel considered the uncertainty and risks of further litigation, and the difficulties inherent in such litigation, including the fact that this Court had dismissed the primary claim relating to call-in shifts. Class Counsel also considered the burdens of proof necessary to achieve certification of the case, and then to establish liability against Defendant and to defeat its defenses.  All of these factors indicated that the settlement was a fair and reasonable resolution of the Action. (Saltzman Decl. ¶ 12).

## III.    THE TERMS OF THE SETTLEMENT

The terms of the Settlement are set forth in the Settlement Agreement, which is attached to the Saltzman Declaration at ¶ 14, and referred to therein as Exhibit "A" to the Saltzman Declaration.  It is incorporated herein by reference and includes the following principal terms:

**Settlement Classes:**

**Class Members**:  The Class is comprised of:

All current and former employees of Defendant, who worked in California during the Class Period; who were classified as non-exempt from overtime pay, excluding Defendant, its owners, directors, officers, executives, and all management personnel whose responsibility it was to maintain and/or enforce the policies, procedures, customs and/or business practices complained of in the Action; who do not timely submit a Request for Exclusion; and to whom a Notice was mailed pursuant to Paragraph 19, subparagraph (b) of the  Settlement Agreement.

**Maximum Settlement Amount**:  The Maximum Settlement Amount ("MSA") that Defendant will pay is Twelve Million Dollars and no cents ($12,000,000.00).  This sum includes payments made to Class Members, Enhancement Payments to Plaintiffs, Administration Costs, a Fee and Expense Award, and a PAGA payment.  (Saltzman Decl.

Case 2:16-cv-08979-AB-AGR   Document 106-1   Filed 07/06/20   Page 151 of 172   Page ID #:4059
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/20   Page 13 of 31   Page ID #:1291
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 13 of 31

¶ 15).

**Non-Reversionary**:  No portion of the MSA will revert to Defendant under any circumstances.  (Saltzman Decl. ¶ 15).

**Enhancement Payment to Plaintiff**:  An Enhancement Payment of Ten Thousand Dollars ($10,000.00) will be paid to each of the two Representative Plaintiffs, if approved by the Court, for their role in initiating this Action and acting as the Class Representatives.  This is thoroughly addressed *infra*, at Section VIII herein.

**PAGA Payment**:  The Settlement allocates Fifty  Thousand Dollars ($50,000.00) to settle the portion of the case brought under the California Labor Code's Private Attorney General Act of 2004 ("PAGA").  Seventy-Five percent (75%) of the total PAGA Payment (or, Thirty Seven Thousand and Five Hundred Dollars ($37,500.00)) will be paid to the California Labor & Workforce Development Agency.  The remainder of the PAGA payment, twenty-five percent (25%) or Twelve Thousand and Five Hundred Dollars ($12,500.00), shall be included in the Class Fund for distribution to the Class Members. (Saltzman Decl. ¶ 16).

**Fee and Expense Award**:  As discussed in Section VII herein, Class Counsel shall seek an amount equal to thirty percent (30%) of the Maximum Settlement Amount (*i.e.*, $3,600,000.00) as the Fee Award, plus reimbursement of reasonable and actual expenses, not to exceed $20,000.00, as the Expense Award.  (Saltzman Decl. ¶ 17).

**Net Settlement Amount ("NSA") and Allocation Of Amount**:   The Net Settlement Amount is equal to the funds remaining from the MSA following deductions of the Court-approved awards for the following items:  (1) the Settlement Administration Costs – not to exceed $200,000.00; (2) the Fee and Expense Award – not to exceed $3,620,000.00; (3) the Enhancement Payments to Plaintiffs – not to exceed $20,000.00; and (4) the PAGA Payment – ¾ of the agreed $50,000.00 PAGA payment, or $37,500. (Saltzman Decl. ¶ 16).

Based on the foregoing total deductions, the projected NSA is estimated to be eight million one hundred and ten thousand dollars ($8,110,000.00). The NSA will be

Case 2:16-cv-02979-AB-AGR Document 106-1 Filed 07/06/20 Page 152 of 172 Page ID #:4060
Case 2:14-cv-06412-GW-VBK Document 80 Filed 06/08/19 Page 9 of 31 Page ID #:1292
Case 1:19-cv-00449-DAD-BAM Document 49-1 Filed 05/29/20 Page 14 of 31

distributed to Settlement Class Members on a proportional basis based on the amount of weeks each Class Member worked, since the number of call-in shifts worked by each Class Member is roughly proportional to the total workweeks incurred by each class member. Based upon all of the foregoing, the terms of the proffered Settlement represent a fair and reasonable mechanism for the resolution of the claims.

**Class Member Claims Released:**

Pursuant to the agreed Settlement Agreement, the Class Members shall release the following claims, all of which are directly tied to the claims asserted in the action:

Any and all claims, actions, demands, causes of action, suits, debts, obligations, damages, rights or liabilities that have been asserted by Plaintiffs, or the Class Members or any of their respective heirs, executors, administrators, beneficiaries, predecessors, successors, attorneys, assigns, agents, and/or representatives arising out of any claims that were encompassed in the Action, and any claims which reasonably flow from the facts alleged in Plaintiffs' Complaint, First Amended Complaint, Second Amended Complaint, Third Amended Complaint, or Fourth Amended Complaint, including, but not limited to: claims for unpaid wages (including claims for minimum wage and overtime compensation); reimbursement of business expenses pursuant to Labor Code section 2802; interest; penalties (including waiting time penalties pursuant to Labor Code section 203, pay stub penalties pursuant to Labor Code section 226, and civil penalties pursuant to the Labor Code Private Attorneys General Act of 2004 (Labor Code sections 2698, *et seq.*) ("PAGA")); claims pursuant to Labor Code sections 200, 201, 202, 218.5, 226, 510, 558, 1174, 1194, 1197, 1198, and 1199; the Industrial Welfare Commission Wage Orders relating to claims for unpaid reporting time pay premiums, unpaid hours worked, recordkeeping, and split shift pay; and claims under Business and Professions Code sections 17200, *et seq.*, claims for attorneys' fees and costs, conversion, fraud, common count, and unfair business practices. Released Class Claims include all claimed or unclaimed compensatory, consequential, incidental, liquidated, punitive and exemplary damages, restitution, interest, costs and fees, injunctive or equitable relief, and any other remedies available at law or equity allegedly owed or available to the Class arising or reasonably flowing from the Complaint, First Amended Complaint, Second Amended Complaint, Third Amended Complaint, or Fourth Amended Complaint against the Released Parties for the time period from the beginning of each claim's applicable statute of limitations, up to and including the Date of Final Approval.

**Notice:** The Parties have agreed on the form of the Notice to be mailed to the Class Members, which is attached as Exhibit 1 to the Settlement Agreement – the "Notice." Moreover, the Parties intend to use reasonable means to locate Class Members. The Settlement Administrator will perform one skip trace on returned mail and re-mail

Case 2:16-cv-02379-AB-ASR   Document 106-1   Filed 07/06/20   Page 153 of 172   Page ID
#:4061
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/15   Page 15 of 31   Page ID #:1293
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 15 of 31

1   Claim Forms to any updated address located by that search.

2   The Settlement Administrator will also maintain a website for Class Members that

3   provides a link to the Settlement Agreement, the Notice, the Motions for Final Approval

4   and the Motion for Award of Fees, Expenses and Enhancements, and any other agreed

5   important documents in the case.  (Saltzman Decl. ¶ 21).  Upon Final Approval of the

6   Settlement by the Court, the Settlement Class, comprised of all Class Members to whom

7   mailing has been duly completed or attempted, and who have not submitted a timely and

8   valid Exclusion Letter, shall be held to have agreed to release Defendant from the

9   Released Claims, and they will be mailed a settlement check.

10   If the Court grants Preliminary Approval, the timetable of events is presented as

11   Exhibit "B" to the Saltzman declaration, and would result in the settlement being ready

12   for a final approval hearing on Monday, October 30, 2017.  (*See* Saltzman declaration,

13   Exhibit "B" thereto, and referred to at Paragraph 23 of said declaration).

14   **IV.   THE SETTLEMENT CLEARLY MEETS, AND IN FACT EXCEEDS,**

15   **THE STANDARDS FOR PRELIMINARY APPROVAL**

16   A district court has broad discretion to grant approval of Rule 23 class action

17   settlements, and should do so where the proposed settlement is "fair, adequate,

18   reasonable, and not a product of collusion."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

19   1026 (9th Cir. 1998); *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000).  The Ninth

20   Circuit has a "strong judicial policy that favors settlement, particularly where complex

21   class action litigation is concerned."  *In re Heritage Bond Litigation*, 2005 WL 1594403

22   (C.D. Cal. June 10, 2005), citing *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir.

23   1992).  Court approval involves a two-step process in which the Court first determines

24   whether a proposed class action settlement deserves preliminary approval so that notice

25   of the same can be disseminated, and then after notice has been given, it decides whether

26   final approval is warranted.  *Manual for Complex Litigation*, Fourth, § 21.632 (2004); *see*

27   *Hanlon, supra*, at 1019.

28   / / /

1   At the preliminary approval stage, the Court need only "determine whether the
2   proposed settlement is within the range of possible approval." *Gatreaux v. Pierce*, 690
3   F.2d 616, 621 n.3 (7th Cir. 1982). Ultimately, a class action settlement should be
4   approved if "it is fundamentally fair, adequate and reasonable." *Class Plaintiffs*, 955
5   F.2d at 1276. There is a "strong initial presumption that the compromise is fair and
6   reasonable." *Hanlon, supra*, at 1019. Courts strongly favor settlement, particularly in
7   complex class actions. *See, e.g.*, *Class Plaintiffs*, 955 F.2d at 1276.

8   At this stage of preliminary approval, the Court is not expected to engage in the
9   more rigorous analysis that is required for final approval (*see Manual for Complex*
10  *Litigation*, Fourth, § 22.661 at 438). Nonetheless, the Court's ultimate fairness
11  determination will include balancing several factors, including some or all of the
12  following:

13      … the strength of plaintiffs' case; the risk, expense, complexity and likely
14      duration of further litigation; the risk of maintaining class action status
15      throughout the trial; the amount offered in settlement; the extent of
16      discovery completed, and the stage of the proceedings; the experience and
17      views of counsel; the presence of a governmental participant; and the
18      reaction of the Class Members to the proposed settlement.

19  *Officers for Justice v. Civil Service Commission,* 688 F. 2d 615 (1982).

20  Not all of the above factors apply to every class action settlement, and one factor
21  alone may prove determinative in finding sufficient grounds for court approval. *Nat'l*
22  *Rural Telecommunication Cooperative v. Directv, Inc.*, 221 F.R.D. 523, 525-26 (C.D.
23  Cal. 2004*)*. It is submitted that this Settlement not only satisfies the criteria for
24  Preliminary Approval, but also that this Court should be comfortable that it will also meet
25  the criteria for Final Approval.

26  **A.    The Settlement Resulted from Arm's-Length Negotiations**

27  The Ninth Circuit has long supported settlements reached through arm's length
28  negotiation by capable opponents. In *Rodriguez v. West Publishing Corp.*, 563 F.3d 948

10

Case 2:16-cv-08979-AB-AGR   Document 106-1   Filed 07/06/20   Page 155 of 172   Page ID
#:4063
Case 2:14-cv-06412-GW-VBR   Document 80   Filed 06/08/19   Page 31 of 31   Page ID #:1295
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 17 of 31

1   (9th Cir. 2009), the Ninth Circuit expressly opined that courts should defer to the "private

2   consensual decision of the [settling] parties." *Id.* at 965, citing *Hanlon, supra,* at 1027.

3   The primary reason for deferring to such settlements is the experience of counsel and the

4   participation of a neutral, both of which factors are present here.

5         The proposed Settlement here is clearly the product of arm's-length negotiations.

6   (Saltzman Decl. ¶ 13). Plaintiffs conducted significant investigation of the facts and law,

7   discussed above, both prior to filing the lawsuit and during the prosecution of this action.

8         Class Counsel also considered the strengths and weaknesses of the case, this

9   Court's rulings thereon, all of the appellate briefing, and the actual hearing in the Ninth

10   Circuit of the Interlocutory Appeal.

11         When negotiating this settlement, the Parties had to take into account the costs and

12   risks of continued litigation. The opinion of experienced counsel, as are involved on both

13   sides of this case, who are both supportive of the Settlement, is entitled to considerable

14   weight. Plaintiffs and Class Counsel have also taken into account the uncertainty and

15   risk of the outcome of further litigation, the appellate posture of the case and the

16   difficulties and delays inherent in such litigation. Undoubtedly, Defendant did so as well,

17   prior to agreeing to undertake the substantial payment called for herein.

18         Based on the foregoing, Plaintiffs and Class Counsel submit that the settlement set

19   forth in the Settlement Agreement is fair, adequate and reasonable, and is in the best

20   interests of Plaintiffs and the Class Members. (Saltzman Decl. ¶ 37). Defendant's

21   agreement to the substantial MSA reflects its concurrence.

22   **B.   The Settlement Has No Obvious Deficiencies**

23         The proposed Settlement has no obvious deficiencies, involving as it does a non-

24   reversionary payment of $12,000,000.00. The Settlement Agreement provides no

25   preferential treatment for Plaintiffs or other Class Members. Plaintiffs will receive a

26   distribution from the settlement proceeds that is calculated in the same manner as the

27   distributions to other Class Members, and in fact the policy challenged in the lawsuit has

28   been discontinued by VS. In fact, as discussed herein, numerous other retailers have also

11

Case 2:16-cv-02879-AB-AGR   Document 106-1   Filed 07/06/20   Page 156 of 172   Page ID #:4064
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/03/19   Page 19 of 31   Page ID #:1296
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 18 of 31

1    discontinued their use of the same or similar policies.

2    In April of 2015, following the filing of this case in July 2014, and publicity

3    generated about the same, the Attorney General for the State of New York sent letters to

4    13 retailers operating in that state, demanding that the retailers provide information

5    regarding similar on-call scheduling practices. *See* Articles 1, 2 and 3, at Saltzman Decl.

6    ¶ 23. These retailers operate more than 16,000 stores and are all household names. *Id*.

7    In June of 2015, VS announced it was ending its on-call scheduling practices. By

8    the end of 2015, Pier 1 had also announced that it was ending on-call scheduling; the list

9    of other retailers following suit soon included Abercrombie & Fitch Co., The Gap Inc., J.

10   Crew Group Inc., Urban Outfitters Inc. and Bath & Body Works LLC. *See* Articles 3 and

11   4, at Saltzman Decl. ¶ 23.

12   In April 2016, New York's Attorney General was joined by eight other attorneys

13   general (from California, Connecticut, Illinois, Maryland, Massachusetts, Minnesota,

14   Rhode Island, and the District of Columbia) in demanding that another group of retailers

15   provide information regarding subjecting their employees to uncompensated on-call

16   shifts. *See* Article 5, at Saltzman Decl. ¶ 23.

17   In December, 2016, The Walt Disney Co., Carter's Inc., Aeropostale, Inc., David's

18   Tea, Inc., Pacific Sunwear of California, Inc., and Zumiez, Inc. also agreed to end on-call

19   shifts. *See* Article 6, at Saltzman Decl. ¶ 23.

20   Thus, this case not only brought about significant positive change for the thousands

21   of hourly employees of VS, it also played a role in doing so for literally hundreds of

22   thousands of retail employees across the country, working for the many other retailers

23   identified above. (Saltzman Decl. ¶ 23)

24   In making its determination here, the Court should weigh the benefits that the

25   settlement will realize for the class against the uncertainty of litigation and the possibility

26   that the class members would obtain no relief in the absence of a settlement. *See, Linney*

27   *v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("...it is the very

28   uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation

12

1   that induce consensual settlements.")  Of course, in a situation where the primary claim
2   has been dismissed, the risks of litigation are even more clearly heightened.

3         When this case is long over, and hopefully the settlement is long approved and
4   carried out, the thousands of VS employees and hundreds of thousands of other
5   employees across the nation will continue to benefit from the filing of this case, its
6   pursuit through the district court and the court of appeals, and this resolution. (Saltzman
7   Decl. ¶ 23)

8         **C.    The Settlement Represents a Fair Resolution of the Claims Presented**

9         On a very elementary average payment basis, before consideration of reductions
10   for fees, costs, etc., the overall average payment for all of the class members will be
11   $300.00 ($12MM divided by ~40,000).  A more relevant and refined way to consider
12   average payments, in order to account for the large turnover rate which is so typical in
13   large retail environments, is to analyze the average payments tied to what is sometimes
14   referred to as the number of "full time equivalent" (or FTE) employees.   This is
15   determined by analyzing the employment data to discern how many class member
16   employees were working for VS **at any given time** during the class period – the so-called
17   "snapshot" of employee numbers.  Thus, if there had been no turnover whatsoever (a
18   difficult thing to imagine in the close to minimum wage retail world), the data in this case
19   reveals that there were normally about 4,204 workers holding the class positions at any
20   given time during the class period, and therefore if they all worked throughout the class
21   period they would all receive a full time equivalent settlement award.  Analyzed this way,
22   the average settlement amount to be received herein on a "per position" FTE basis would
23   be $2,854.00 ($12MM divided by 4,204 employees).  Thus, any employees who happen
24   to have remained with VS throughout the class period, as non-exempt retail staff falling
25   within the Class Definition, would stand to receive a gross settlement allocation of
26   $2,854.00 each.

27         This represents an extraordinary result for a failure to pay "reporting time pay",
28   which is the primary claim in the case.  The global average, as clearly exemplified via the

13

Plaintiff's Notice of Motion and Motion (Unopposed) for Preliminary Approval of Class Action Settlement
Case No. 2:14-CV-06412-GW

Case 2:16-cv-08979-AB-AGR   Document 106-1   Filed 07/06/20   Page 158 of 172   Page ID #:4066
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/19   Page 20 of 31   Page ID #:1298
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 20 of 31

comparison between the average for the total number of employees and the average for each of the FTE employees, is diluted solely by virtue of the large turnover and thus the short tenures of the average employees.

The compensation that Class Members will receive reflects a reasonable discount of the potential recovery at trial, assuming that (1) the primary claim which had been dismissed by this Court and was still pending on appeal at the time the settlement was consummated was actually reinstated by the Ninth Circuit; (2) the case then obtained certification, which was upheld through any further challenges; (3) the claims survived the sure to be filed motion for summary judgment; and (4) the Class then prevailed at trial. While Class Counsel felt positive about the Ninth Circuit argument, it goes without saying that there was always the chance that said optimism was misplaced, and that the ruling of this Court might have been affirmed by the Ninth Circuit.

In terms of claims presented and settled herein, the following discussion addresses the potential claim values, **before any consideration of risk factors**, including in this case the overall and rather obvious risk that this Court had in fact already dismissed all but the smallest claim. Before addressing each of the claims, it behooves the moving party to address what are often referred to as derivative claims. In this case, those claims include the Labor Code § 203 "failure to pay wages at separation" claim and the PAGA claims. The 203 claim requires a verdict finding that the alleged violations were intentional, often interpreted to mean without good faith. Any PAGA award, if a violation is eventually found, is entirely within the discretion of the Court. Counsel for the Plaintiffs herein, being amongst those few class action attorneys who have actually tried such cases to verdict (five times for this firm; Saltzman Decl. ¶ 33) is particularly sensitive to those defenses at trial. In this case, without pre-judging what this Court might have eventually determined if presented with those two claims at trial, Class Counsel must nonetheless evaluate them for settlement purposes at the "most likely" scenario.

/ / /

Plaintiff's Notice of Motion and Motion (Unopposed) for Preliminary Approval of Class Action Settlement
Case No. 2:14-CV-06412GW

Case 2:16-cv-02979-AB-AGR   Document 106-1   Filed 07/06/20   Page 159 of 172   Page ID #:4067
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/19   Page 21 of 31   Page ID #:1299
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 21 of 31

1    Here, that analysis begins with the fact that this Court already dismissed the

2 primary "reporting time" claim, albeit concluding that it was a close call.  That stated,

3 Class Counsel therefore was always cognizant that if the case did proceed to trial, the

4 very court which had agreed with the Defendant at the motion phase would then be asked

5 to find Defendant's conduct to have been without good faith in order to find it to be an

6 intentional violation – a possibly very large boulder for Plaintiffs to push uphill.

7 Additionally, even if a PAGA violation was to be found, the same Court would then have

8 its full discretion available to it, when deciding whether or not to order penalties under

9 the PAGA, or to simply find that a trial verdict for wages owed was sufficient

10 punishment and not award any penalties.  Again, Class Counsel did not, and does not,

11 conclude that either scenario was a foregone conclusion, but they certainly heavily

12 discounted the values of these two claims when approaching settlement valuations.

13 (Saltzman Decl. ¶ 28).

14    That stated, the claim which survived the motion to dismiss, for the time spent on

15 the phone calls, was valued inclusive of pre-trial interest, at $1,800,000.00.  This was

16 based on an assumed average phone call duration of ten minutes.  Some evidence

17 indicated that such calls might take less than three to four minutes.  This claim alone

18 could easily have ended up in the four- to five-minute range, thus cutting its value in half.

19 (Saltzman Decl. ¶ 25).

20    The various reporting time claims, both front-end (before a regular shift) and back-

21 end (following a regular shift and prior to a possible second shift), were valued at full

22 value, inclusive of interest, at $22,500,000.00.  Again, while a higher number could be

23 painted for these claims, the frequency of them occurring was likely going to be less, so

24 that a logical full value was probably in the stated range.  (Saltzman Decl. ¶ 26).

25    The wage statement claim, yet another derivative claim, was valued at

26 approximately $11,000,000.00.  Again, such claims can be higher and/or lower, but for a

27 full value number to be negotiated from, this number made sense.  (Saltzman Decl. ¶ 27).

28 / / /

Plaintiff's Notice of Motion and Motion (Unopposed) for Preliminary Approval of Class Action Settlement
Case No. 2:14-CV-06412-GW

1    The aforementioned claims for Section 203 waiting time penalties and for PAGA
2    penalties, were quite difficult to value, for the reasons stated, and for true negotiation
3    purposes were viewed as being nominal claims, at best.  A full value from which to
4    negotiate them both was probably in the $250,000 range for each of them.  (Saltzman
5    Decl. ¶ 28).

6    Finally, additional claims were included within the case, and included for
7    mediation purposes, which were developed during the appellate stay as a result of
8    continuous efforts by Class Counsel to strengthen the global claims.  While none of the
9    additional claims rose to the level of the reporting time claims that drove the settlement –
10   the very claims which had been dismissed by this Court – they did add value.

11   The first of the additional claims now included in the settlement process was for
12   off-the-clock time spent when actually showing up early for shifts and then off-the-clock
13   time spent at the end of actual worked shifts.  This was estimated to be a few minutes
14   (perhaps five) at either or both ends, but while alleged, it would be a problematic claim to
15   certify, given the unique issues such claims present.  Moreover, it was only occasional in
16   frequency, estimated to be a few times per week.  With such assumptions in place, the
17   claim was valued at full value, and assuming it could be certified and then won at trial, as
18   having a value of $5,766,514.00, inclusive of interest.  (4,204 FTE's, at two shifts per
19   week, equaling 8,408 shifts per week, times 10 minutes each time, equaling 84,080
20   minutes per week, times 52 weeks, equaling 4,372,160 minutes, divided by 60 minutes to
21   determine total hours per year, resulting in 72,869 hours per year, times 7 years equaling
22   510,085 hours, times the $8.50 hourly wage, equaling $4,335,725.00, times .33 for the
23   add-on for interest for 7 years, yielding a grand total of $5,766,514.00).  (Saltzman Decl.
24   ¶ 29).

25   Finally, the ongoing case work-up during the appellate stay resulted in the
26   Plaintiffs adding on a claim at and for mediation, through the proposed Fourth Amended
27   Complaint, for unreimbursed business expenses – telephonic use for the mandatory phone
28   calls.  While such claims are difficult to prove and equally difficult to certify, and also

16

Case 2:16-cv-08979-AB-AGR   Document 106-1   Filed 07/06/20   Page 161 of 172   Page ID
#:4069
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/17   Page 23 of 31   Page ID #:1301
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 23 of 31

difficult to value for damage purposes, if those steps were all accomplished, then a reasonable value for settlement purposes for all 40,000 class members could be stated as $100.00 per person for use of their personal cell phones. This would add on a value of an additional $4,000,000.00.  (Saltzman Decl. ¶ 30).

In total, the claims discussed above resulted in the Plaintiffs entering the mediation with a global damage presentation in the range of $45,566,514.00.  Some of the claims had already been dismissed by this Court, and others were moving forward, while others were to be alleged and added in.   The largest total, for the reporting time claims, represented one half of the total value and were the dismissed claims.   Others were included, but would be difficult to certify.   As with every case, prevailing at trial is always problematic.

Of the driving claims, the reporting time claims, the settlement reimburses fully 50% of that projected value.  When we then add on other claims, the percentage of the total exposure at trial becomes diluted, but never reduces below the 25% level – a fully respectable settlement value, especially with the driving claims having been dismissed by this Court.

In sum, this is not only an unusual settlement in that it occurred before the Ninth Circuit ruling, but an outstanding settlement even if all the claims were actually still before the Court.  Certification, summary judgment and trial lay ahead, and the value of obtaining this substantial "all-in" non-reversionary settlement at this point in time cannot be underestimated.  The settlement merits preliminary approval on all grounds.

## V.    NATURE AND METHOD OF CLASS NOTICE

"For any class certified under Rule 23(b)(3), the court must direct that Class Members receive the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. Rule 23(c)(2)(B). Here, the Parties have agreed upon a direct mail Notice plan, so that the Notice will be mailed to the last-known addresses for all the class members in the Defendant's records, updated as necessary and possible via post office

Case 2:16-cv-08979-AB-AGR   Document 106-1   Filed 07/06/20   Page 162 of 172   Page ID #:4070
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/19   Page 24 of 31   Page ID #:1302
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 24 of 31

1   change of address forms.  This is the most efficient and effective method for notifying
2   Class Members.

3   As for the content of the notice, the proposed Notice (attached as Exhibit 1 to the
4   Settlement Agreement, which is Exhibit A to the Saltzman declaration) meets all of the
5   criteria set forth in Rule 23(c)(2).  The Notice informs prospective Class Members of (i)
6   the nature of the action; (ii) the definition of the classes to be conditionally certified; (iii)
7   the class claims and settlement class periods; (iv) that a Class Member may enter an
8   appearance through counsel if the member so desires; (v) that the Court will exclude from
9   the Settlement Class any Class Member who timely requests exclusion; (vi) the time and
10  manner for requesting exclusion; and (vii) the binding effect of a class judgment on
11  Settlement Class Members under Rule 23(c)(3).  It also informs them of their right to
12  object to the Settlement approval, and how to do so.  As such, the Parties request that the
13  Notice be approved.

14  ## VI.   CLAIMS ADMINISTRATION

15  The Parties have agreed to the appointment of CPT Group, Inc. (hereafter "CPT")
16  as the Settlement Administrator.   CPT is an experienced settlement administrator, and
17  has acted as claims administrator in numerous wage and hour cases throughout the
18  country.  CPT has provided an estimate, following a request for multiple bids) that its
19  expenses will not exceed $200,000.00, for all the work required to properly handle all the
20  settlement administration tasks. (Saltzman Decl. ¶ 21).

21  ## VII.   ATTORNEYS' FEES AND COSTS

22  The Settlement Agreement contemplates that Class Counsel will apply to the Court
23  for an award of fees to be paid from the MSA established for the benefit of the Class
24  Members.  Class Counsel will seek fees not to exceed thirty percent (30%) of the MSA,
25  as well as costs and expenses not to exceed $20,000.00.  The request for this award is set
26  forth in the proposed Notice.  Class Counsel will file their motion for an award of fees
27  and costs in a timely manner such that Class Members will have access to the motion

28

Case 2:16-cv-08979-AB-AGR    Document 106-1    Filed 07/06/20    Page 163 of 172    Page ID #:4071
Case 2:14-cv-06412-GW-VBK    Document 80    Filed 06/08/17    Page 25 of 31    Page ID #:1303
Case 1:19-cv-00449-DAD-BAM    Document 49-1    Filed 05/29/20    Page 25 of 31

1    through the settlement website at least fourteen (14) days prior to the deadline for them to

2    either object to or opt out of the Settlement.

3        Preliminary Approval is obviously not the time for Class Counsel to submit their

4    arguments in support of the requested fee. That will be done at final approval. At this

5    time, cognizant of the benchmark awards, counsel ask only for preliminary approval of

6    the same so that they be authorized to include the requested thirty percent (30%) fee

7    request in the Notice to be mailed to the Class Members, thus allowing them to have a

8    full opportunity to consider that award prior to the deadline to either object to or opt out

9    of the Settlement. In support of the eventual motion for final approval of the fee award,

10   counsel will be asking the Court to consider the following factors, amongst others: (1) the

11   outstanding result obtained; (2) the extensive pleading and appellate work done to further

12   this case of essentially "first impression"; (3) the impact of the case and the case workup

13   not only on VS, but also as to so many others in the retail industry, who have also elected

14   since the filing of this case to eliminate entirely the prior universally followed practice of

15   using on-call shifts; (4) the positive impact of this case on the lives of the Class Members

16   and so many others employed in this field; (5) the fact that the settlement calls for a

17   totally non-reversionary payment of the substantial amount of $12,000,000.00; (6) the

18   fact that Class Counsel and the Representative Plaintiffs were able to obtain this result

19   even after this Court had dismissed the primary claim in the case, and while the appeal of

20   the case was pending; and (7) the hours devoted to the litigation.

21   **VIII.  <u>ENHANCEMENT AWARD FOR NAMED PLAINTIFFS</u>**

22       "[N]amed plaintiffs… are eligible for reasonable incentive payments." *Staton v.*

23   *Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). The district court must evaluate

24   individual awards using "relevant factors includ[ing] the actions the plaintiff has taken to

25   protect the interests of the class, the degree to which the class has benefitted from those

26   actions,…the amount of time and effort the plaintiff expended in pursuing the

27   litigation…and reasonabl[e] fear[s of] workplace retaliation." *Id.*, citing *Cook v. Niedert*,

28   142 F.3d 1004, 1016 (7th Cir. 1998); *see also, Rodriguez v. West Publ. Corp.,* No. CV05-

19

Plaintiff's Notice of Motion and Motion (Unopposed) for Preliminary Approval of Class Action Settlement
Case No. 2:14-CV-06412GW

Case 2:16-cv-08979-AB-AGR   Document 106-1   Filed 07/06/20   Page 164 of 172   Page ID #:4072
Case 2:14-cv-06412-GW-VBK   Document 80-1   Filed 06/08/19   Page 29 of 31   Page ID #:1304
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 26 of 31

1   3222 R(MCx), 2007 WL 2827379 (C.D. Cal. Sept. 10, 2007), aff'd in part, rev'd in part

2   *sub nom. Rodriguez v. West Publ. Corp.* 563 F.3d 948 (9th Cir. 2009) (incentive awards

3   should compensate for risks taken, such as "retaliation . . . , discrimination, trouble

4   finding employment, and significant financial risk.").

5        Here, the Class Representatives were not simply bystanders in the prosecution of

6   this Action.  From the time that Ms. Casas first brought this matter to the attention of

7   counsel and met with them, through the present, she has been actively involved in

8   providing information and evidence.  (See Saltzman Decl. ¶ 19)  The same is true of

9   Mr. Fernandez, from the time that he joined the lawsuit as the second named plaintiff

10  only two months into the case. The Class Representatives were always available to

11  consult with, and regularly did consult with counsel.  (*Id.*).  The Class Representatives

12  were also actively involved in discussions regarding the resolution of this matter and

13  approved the Settlement terms on behalf of themselves and the Class Members.  (*Id.*).

14  Moreover, the Representatives will also be called upon to agree to releases of a broader

15  scope than that required of the Class Members.  Finally, in taking the lead for the benefit

16  of the Class Members, these representatives have exposed themselves to the possibility of

17  facing problematic hiring in the future from any other potential employers who might do

18  simple "Google" searches of all job applicants, and who might therefore learn that they

19  stood up to a prior employer by filing a class action.

20       Based on all of the foregoing, the Settlement Agreement contemplates that the

21  Class Representatives will apply to the Court for an Enhancement Payment to be paid

22  from the MSA, in the amount of $10,000.00 each.  The request for this Enhancement

23  Payment is clearly disclosed in the proposed Notice.  The named Plaintiffs will file their

24  motion for this Enhancement Payment in a timely manner such that Class Members will

25  have access to the motion for at least fourteen (14) day prior to the deadline for them to

26  decide whether to object to the settlement or opt out.

27  / / /

28  / / /

Plaintiff's Notice of Motion and Motion (Unopposed) for Preliminary Approval of Class Action Settlement
Case No. 2:14-CV-06412GW

Case 2:16-cv-08979-AB-AGR   Document 106-1   Filed 07/06/20   Page 165 of 172   Page ID #:4073
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/19   Page 29 of 31   Page ID #:1305
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 27 of 31

## IX. THE PROPOSED SETTLEMENT CLASS SHOULD BE PRELIMINARILY CERTIFIED FOR THE FOR PURPOSES OF SETTLEMENT

The parties seek preliminary certification of the following classes:

"Class Members" shall mean all current and former employees of Defendant, who worked in California during the Class Period; who were classified as non-exempt from overtime pay, excluding Defendant, its owners, directors, officers, executives, and all management personnel whose responsibility it was to maintain and/or enforce the policies, procedures, customs and/or business practices complained of in the Action; who do not timely submit a Request for Exclusion; and to whom a Notice was mailed pursuant to Paragraph 19, subparagraph (b) of the Settlement Agreement.

### A. Fed.R.Civ.P. 23 (a) Requirements Are Met for the Settlement Class

In certifying a class pursuant to Rule 23, plaintiffs have the burden of showing the four requirements of Rule 23(a) as well as one of the requirements of Rule 23(b). The four requirements of Rule 23(a) are typically referred to as: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co*., 593 F.3d 802, 806 (9th Cir. Cal. 2010). In this case, the Parties agree to certification of the Settlement Class, for settlement purposes, under Rule 23(b)(3) which has the added requirement of "predominance." *Id.*

#### 1. Numerosity

Rule 23(a)(1) is typically referred to as "numerosity" in that it requires a class that is "so numerous that joinder of all members is impracticable." Courts have regularly certified classes with less than one hundred members. Here, Defendant's records reveal that there are around 40,000 class members, such that numerosity is easily established. (Saltzman Decl. ¶ 31).

#### 2. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." The Ninth Circuit has held that commonality exists "where the lawsuit challenges

21

Plaintiff's Notice of Motion and Motion (Unopposed) for Preliminary Approval of Class Action Settlement
Case No. 2:14-CV-06412GW

Case 2:16-cv-08979-AB-AGR   Document 106-1   Filed 07/06/20   Page 166 of 172   Page ID #:4074
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/17   Page 28 of 31   Page ID #:1306
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 28 of 31

1   a system-wide practice or policy that affects all of the putative class members."
2   *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. Cal. 2001).

3        Here, Plaintiffs challenge Defendant's company-wide practice of utilizing Call-in
4   scheduling, and then not paying "show-up" pay to those who are told that they are not
5   going to be needed.  This is a classic common question, perfectly suited to class
6   litigation.

7        Additional common questions generated by this lawsuit include:

8          a.    Whether time spent making mandatory calls is compensable;

9          b.    Whether off-the-clock time worked is compensable;

10         c.    Whether telephone expenses are reimburseable;

11         d.    Whether the wage statements comply with the law; and,

12         e.    For the Unfair Competition Law causes of action, whether the
13             Defendant has acted unfairly, illegally, or deceptively, as those terms
14             are defined for Unfair Competition Law purposes.

15       These common issues satisfy Rule 23(a)(2)'s requirements.  *See, e.g.*, *Tierno v.*
16  *Rite Aid Corp.*, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) (certifying a class of retail
17  store managers with common wage and hour claims).

18         **3.**    **Typicality**

19       Rule 23(a)(3) requires that "the claims or defenses of the representative parties are
20  typical of the claims or defenses of the class."  This requirement is "permissive" and
21  requires only that the representative's claims are reasonably related to those of the absent
22  class members. *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. Cal. 2010*).* That test
23  is easily met here, for all the reasons stated.

24         **4.**    **The Adequacy Requirements Are Satisfied**

25       The proposed Class Representatives and Class Counsel contend they have and will
26  continue to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P.
27  23(a)(4).  The adequacy requirement has two prongs, the first being "that the
28  representative party's attorney be qualified, experienced, and generally able to conduct

Case 2:16-cv-08879-AB-AGR   Document 106-1   Filed 07/06/20   Page 167 of 172   Page ID #:1307
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/19   Page 29 of 31   Page ID #:4075
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 29 of 31

the litigation." *In re Surebeam Corp. Secs. Litig.*, 2004 WL 5159061, *5 (S.D. Cal. 2004). Here Plaintiffs' counsel at Marlin & Saltzman LLP have litigated this case to a successful resolution during the appeal of the District Court's order dismissing the primary claim, and have successfully resolved numerous wage and hour class actions in the past and ongoing at the present. (See Saltzman Declaration, ¶ 6, 7 and 33-36).

The second prong of the adequacy test is "that the suit not be collusive and the representative plaintiff's interests not be antagonistic to those of the remainder of the class." *In re Surebeam Corp.*, 2004 WL 5159061, at *1-2. Here, there is no evidence of antagonism between the Class Representatives' interests and those of the Class Members, and the lack of collusion has already been demonstrated above.

**B.    The Fed.R.Civ.P 23(b) Standards Are Satisfied**

**1.    Common Issues Predominate**

In addition to the Rule 23(a) requirements, a district court must also find that common issues of law or fact "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The proposed Class Members in this case are sufficiently cohesive to warrant adjudication by representation. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1436 (2013). Furthermore, because the "predominance" factor concerns liability, any variation in damages, which here would only be a function of longevity with the Defendant, is plainly insufficient to defeat class certification. *Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013). Accordingly, Plaintiffs contend that all claims in this litigation arise from Defendant's common, class-wide scheduling and other policies and procedures, and that liability could accordingly be determined on a class-wide basis, without dependence on individual assessments of liability. *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th 1004, 1033 (2012) ("Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment.").

Additionally, Plaintiffs allege, and Defendant denies, that the Class's wage statement claims also likewise arise from Defendant's alleged common practice, and

Case 2:16-cv-08979-AB-AGR Document 106-1 Filed 07/06/20 Page 169 of 172 Page ID #:4076
Case 2:14-cv-06412-GW-VBR Document 80 Filed 06/03/19 Page 30 of 31 Page ID #:1308
Case 1:19-cv-00449-DAD-BAM Document 49-1 Filed 05/29/20 Page 30 of 31

1    therefore also presents common and predominate issues.

2           **2.**     **The Class Action Device Is Superior to Other Available**

3                  **Methods of Adjudication**

4        The class action device proposed herein is "superior to other available methods for

5  the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

6  Provisional certification of the Class will allow Class Members' claims to be fairly,

7  adequately, and efficiently resolved to a degree that no other mechanism or forum would

8  provide. As in *Hanlon*, the alternative methods of resolution are individual claims for a

9  relatively small amount of damages. *Hanlon v. Chrysler Corp.*, 150 F. 3d 1011, 1019-20

10  (9th Cir. 1998). These claims "'would prove uneconomic for potential plaintiffs' because

11  'litigation costs would dwarf potential recovery.'" *Id.* at 1023.

12           **3.**     **No Manageability Issues Preclude Certification**

13        Finally, no issues of manageability would preclude certification of the Settlement

14  Class. A court faced with a request for a settlement-only class as herein <u>need not</u> inquire

15  whether the case would present problems of trial management, even though other

16  requirements under Rule 23 must still be satisfied. *See, e.g.*, *Lazarin v. Pro Unlimited,*

17  *Inc.*, 2013 WL 3541217, *5 (N.D. Cal. 2013). Given the settlement, no trial will occur

18  and thus trial management is not a consideration. In any event, within the limited sphere

19  of this settlement class certification, and as discussed above, Plaintiffs believe the

20  proposed plan of distribution and settlement process are both efficient and manageable.

21  **X.**   **PLAINTIFFS' COUNSEL SHOULD BE APPOINTED AS "SETTLEMENT**

22       **CLASS COUNSEL"**

23        Federal Rule of Civil Procedure 23(g) requires that courts consider the following

24  four factors when appointing settlement class counsel: (1) whether counsel has

25  investigated the class claims; (2) whether counsel is experienced in handling class actions

26  and complex litigation; (3) whether counsel is knowledgeable regarding the applicable

27  law; and (4) whether counsel will commit adequate resources to representing the class.

28  *See Grant v. Capital Mgmt. Servs., L.P.,* 2013 WL 6499698, *2-3 (S.D. Cal. 2013).

Case 2:16-cv-02979-AB-AGR   Document 106-1   Filed 07/06/20   Page 169 of 172   Page ID #:4077
Case 2:14-cv-06412-GW-VBK   Document 80   Filed 06/08/19   Page 31 of 31   Page ID #:1309
Case 1:19-cv-00449-DAD-BAM   Document 49-1   Filed 05/29/20   Page 31 of 31

1    Here, Marlin & Saltzman, the law firm selected by the Representative Plaintiffs is

2  highly experienced and knowledgeable regarding complex federal and state wage and

3  hour class actions like this one.  (See Saltzman Declaration, ¶ 6, 7 and 33-36).  Indeed,

4  Plaintiffs' Counsel has successfully resolved literally dozens of wage and hour class

5  actions, including bench, jury, and arbitration trials of wage and hour class actions, and

6  here the firm has fully committed its resources to represent the Class.

7  **XI.    CONCLUSION**

8    The Parties have negotiated a fair and reasonable settlement of a case that provides

9  relief that would definitely never have been realized but for this class action.

10  Accordingly, Plaintiffs move the Court to preliminarily approve the Settlement

11  Agreement, and direct that the proposed Notice be mailed to Class Members.

12  Additionally, the Parties request that the Court order the filing of the proposed Fourth

13  Amended Complaint and that a Final Approval hearing be scheduled at the earliest

14  available date on the Court's calendar.  Based on the proposed timeline of settlement

15  process events as set forth in the Settlement Approval Timeline attached as Exhibit B to

16  the Saltzman declaration, the case would be ready for a Final Approval Hearing on

17  October 30, 2017.

18

19  DATED:  June 8, 2017            **MARLIN & SALTZMAN, LLP**

20

21                  By:  /s/  Stanley D. Saltzman
22                        Stanley D. Saltzman, Esq.
23                        Attorneys for Plaintiffs and the
                          Plaintiff Class
24
25
26
27
28

25

Plaintiff's Notice of Motion and Motion (Unopposed) for Preliminary Approval of Class Action Settlement
Case No. 2:14-CV-06412GW

Exhibit "5"

## Thank you for your Other Response or Document Submission

FormAssembly <no-reply@formassembly.com>
on behalf of
DIR PAGA Unit <lwdadonotreply@dir.ca.gov>

Mon 6/22/2020 12:46 PM

**To:** Gustin Ham <gham@akgllp.com>

06/22/2020 12:46:11 PM

Thank you for your submission to the Labor and Workforce Development Agency.

Item submitted: Other Response or Document

If you have questions or concerns regarding this submission or your case, please send an email to pagainfo@dir.ca.gov.

DIR PAGA Unit on behalf of
Labor and Workforce Development Agency

Website: http://labor.ca.gov/Private_Attorneys_General_Act.htm

## Thank you for your Proposed Settlement Submission

FormAssembly <no-reply@formassembly.com>
on behalf of
DIR PAGA Unit <lwdadonotreply@dir.ca.gov>
Mon 6/22/2020 12:27 PM
**To:** Gustin Ham <gham@akgllp.com>
06/22/2020 12:27:02 PM

Thank you for your submission to the Labor and Workforce Development Agency.

Item submitted: Proposed Settlement

If you have questions or concerns regarding this submission or your case, please send an email to pagainfo@dir.ca.gov.

DIR PAGA Unit on behalf of
Labor and Workforce Development Agency

Website: http://labor.ca.gov/Private_Attorneys_General_Act.htm