BETH A. GUNN, CA Bar No. 218889
beth@gunncoble.com
CATHERINE J. COBLE, CA Bar No. 223461
cathy@gunncoble.com
GUNN COBLE LLP
303 N. Glenoaks Blvd., Suite 200
Burbank, CA 91502
Telephone:   818.900.0695
Facsimile:   818.900.0723

JENNIFER KRAMER, CA Bar No. 203385
jennifer@laborlex.com
BARBARA DUVAN-CLARKE, CA Bar No. 259268
barbara@laborlex.com
ASHLEY H. CRUZ, CA Bar No. 306235
ashley@laborlex.com
JENNIFER KRAMER LEGAL, APC
5015 Eagle Rock Blvd., Suite 202
Los Angeles, CA 90041
Telephone:   213.955.0200
Facsimile:   213.226.4358

Attorneys for Settlement Class Members
TRENT ANDREWS, VICTORIA COSIO,
ELIZABETH GARCIA and CYNTHIA CARDENAS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEVAG CHALIAN, an Individual, Individually and on behalf of all others similarly situated and the general public,<br><br>         Plaintiffs,<br>         *v.*<br><br>CVS PHARMACY, INC., a Rhode Island corporation; CVS RX SERVICES, INC., a New York corporation; GARFIELD BEACH CVS, LLC, a California limited liability company; and DOES 1 thru 100, inclusive,<br>         Defendants. | CASE NO.: 2:16-cv-08979-AB-AGR<br>Assigned to Hon. Andre Birotte Jr.<br>*Related Case No.:2:20-cv-02401-AB-AGR*<br><br>**OBJECTION TO CLASS ACTION SETTLEMENT**<br><br>DATE:   December 4, 2020<br>TIME:   10:00 a.m.<br>PLACE:  Courtroom 7B<br>        650 West First Street<br>        Los Angeles, CA<br><br><br>Complaint Filed: July 20, 2016<br>Action Removed: December 5, 2016 |

# I.      **INTRODUCTION**

The Parties seek approval of a settlement that would release almost every possible claim under the California Labor Code (and other federal and state statutes) for more than 24,000[1] CVS pharmacists and pharmacy technicians covering class periods of 8 and 6 years.  According to Plaintiffs' Motion for Final Approval and accompanying declarations, the average amount to be distributed to each class member is $284.42 (ECF 180-2).  These amounts translate to an average of $2.32 per workweek[2] to class members/aggrieved employees in exchange for releasing a substantial number of claims.  Would-be settlement class members who have opted out stated that they did so because the amounts of the settlement – which were often a few dollars, or even less than a dollar per week in which these multiple violations occurred – seemed insufficient and unfair compared to their potential recovery and the toll that CVS' illegal business practices took on them, and do nothing to deter CVS from relying on the same practices in the future.

The proposed settlement of class claims is unfair and inadequate for multiple reasons beyond the excessively low settlement amounts, including:

➢ Insufficient investigation supports the valuation and risk assessments of the multiple claims sought to be released;

➢ The scope of the release is impermissibly overbroad;

➢ The procedural posture of the settlement bears all the hallmarks of collusion between Plaintiffs and CVS, including last-minute expansions of the claims and class members to be included, without additional investigation or consideration;

➢ The attorneys' fees agreed to without objection from CVS exceed the benchmark in this Circuit and are unjustified by the work done, the time spent, and the comparison to the class members' relief;

---

[1] *See* Declaration of Michael Morrison, ECF 156-1, ¶ 29, Page ID # 4702.

[2] Plaintiffs claim that the amount is $3.31 per workweek, but that includes attorneys' fees, costs, and other settlement payments prior to reaching the Net Settlement amount.  Objectors' amount has removed the portion that is attorneys' fees.

➤ The enhancement fees to class representatives are unwarranted in light of the disproportionate recovery by the settlement class; and

➤ Deficient notice that does not constitute the best practicable means of providing notice to the settlement class members consistent with their due process rights.

Pursuant to Federal Rule of Civil Procedure ("FRCP") 23(e)(5), Objectors hereby object to the proposed settlement on behalf of all putative settlement class members for the specific reasons set forth below, and respectfully ask the Court to conduct a searching inquiry into the substantive fairness of this pre-certification proposed settlement to ensure that it is in the best interests of absent class members. *See Vargas v. Lott*, 787 F. App'x 372, 374 (9th Cir. 2019).

## II.   <u>ARGUMENT IN FAVOR OF SUSTAINING OBJECTIONS.</u>

"[S]ettlement approval that takes place prior to formal class certification requires a higher standard of fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  A district court's procedural duty when reviewing a proposed pre-certification settlement is to: (1) explore comprehensively all factors; (2) give a reasoned response to all non-frivolous objections; (3) adequately develop the record to support the final approval decision; and (4) look for and scrutinize any "subtle signs that "subtle signs that class counsel have allowed pursuit of their own self interests ... to infect the negotiations." *See id.* at 374; *Roes, 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1043 (9th Cir. 2019) (citing *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) ("However, we hold district courts to a higher *procedural* standard when making that determination of substantive fairness..."); *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)).  Comprehensive review of all factors here, including those raised in this Objection, should result in the denial of Plaintiffs' Final Approval Motion as not meeting the Federal Rule of Civil Procedure ("FRCP") 23 criteria.

### A. <u>The Proposed Settlement is Neither Fair, Reasonable, nor Adequate to Absent Class Members and Should Not Be Approved.</u>

FRCP 23(e)(2) authorizes a court to approve a proposed settlement binding class

members "only on finding that it is fair, reasonable, and adequate" after considering multiple factors, including whether the representation of the class has been adequate; the proposal was not the result of collusion with the defendant; and the relief for the class is adequate (taking into account risks, distribution methodology, and proposed attorneys' fees).   Examination of these factors does not result in a finding that the proposed settlement is fair, reasonable or adequate.

### 1. The Representation to the Class Has Been Inadequate.

Plaintiffs have not provided the Court with evidence of their investigation of each of the class claims to be released in the proposed settlement to show the requisite due diligence.  Plaintiffs' Attorneys' Fees Motion (ECF 160), Final Approval Motion (ECF 180), and accompanying declarations (ECF 160-3-160-13, 180-2, and 180-1), specify information that was analyzed or reviewed in relation to the pursuit of class claims focused on training modules and related off-the-clock work, but does not justify releasing claims unrelated to that investigation.  It appears that no formal discovery responses were received from CVS, no depositions were taken, and the only documents and data CVS produced were cherry-picked to advance its own position. Even though knowledge of such subject matter is necessary to evaluate the claims to be released, there is no evidence of pre-settlement efforts to suggest a reasonably thorough investigation of:

➢ Claims other than those related directly to the off-the-clock claims, including data or analysis regarding the number of work weeks/time frame at issue, the number of employees affected, the frequency of potential violations, and/or the availability of common proof;
➢ CVS' staffing policies and practices;
➢ The occurrence of non-compliant meal breaks or payment in lieu thereof;
➢ CVS' directive for pharmacists to work solo shifts without leaving the pharmacy;
➢ Class members' ability to take and/or leave the premises for rest breaks or the payment of rest break premium pay when breaks were missed;

➤ Class members' personal cell phone usage, CVS' policies pertaining to expense reimbursements for it, or evidence of reimbursements;

➤ CVS' provision of one day of rest in seven;

➤ The manner in which CVS maintains its business records or otherwise complies with Labor Code sections 226(a) or 246(i);

➤ CVS' payment of overtime wages at the correct regular rate of pay;

➤ The substance of CVS' alleged arbitration agreements or CVS' records pertaining to employees who allegedly submitted to arbitration; or

➤ The practices in Regions 65 and 72 as compared to those affecting the rest of the Pharmacist class.

Plaintiffs also did not provide an explanation of the data expert's[3] analysis sufficient to understand what claims were included in it, the size of or methodology used in generating sample data, the statistical reliability of the sample, or other information used to extrapolate the findings from the sample data to the entirety of the class. (ECF 160 at 18:11-22). Without such information, it is impossible to determine the extent to which potential damages associated with the proposed released claims were examined (if at all), and whether the assumptions made are fair to the absent class employees. *See Lusk v. Five Guys Enterprises LLC*, 2019 WL 7048791, at *10 (E.D. Cal., Dec. 23, 2019) (refusing to approve a class settlement where the proposed settlement released defendants from all liability on all claims in the lawsuit, but the motion "utterly failed to discuss" multiple claims that were being released, and instead suggests that no compensation was being provided to the class for such claims; as a result, the release of those claims was overly broad). Considering that multiple claims for over 24,000 people are at stake, such information should be presented to justify the result of the settlement.

It is apparent that the necessary investigatory evidence does not exist because

---

[3] Objectors note that the expert fees were minimal – less than $5,000 total paid to "Berger Consulting" for a class of over 24,000 and that no expert declaration has been submitted to the Court. (ECF 160-3, Page ID 5060; 160-4, Page ID 5127.)

Plaintiffs did not bother to challenge CVS' information in any meaningful way as expected through an adversarial process.  For example, Plaintiffs attach, as Exhibit 6 to Mr. Morrison's Declaration (ECF 180-1 at 176, Page ID 5692), a suspicious-looking unofficial document unauthenticated by CVS as an alleged "policy update," regarding pharmacists' ability to take meal breaks while working alone during a shift, without any other information.  This same evidence was presented to plaintiffs in a similar class action pending against CVS in the Northern District of California, *Hyams v. CVS Health Corporation*, Case No. 4:18-cv-02678-HSG, (the "*Hyams* plaintiffs").  They discovered through FRCP 30(b)(6) deposition testimony that CVS does not know who created or disseminated this document, how it was disseminated, who received it, where it is kept or can be found at CVS, whether any official policy or training referred to it, or if it was provided to Pharmacists in California or posted in California CVS locations during the class period.  CVS knew only of a plan at some point before May 2012 to post the document on physical bulletin boards (in contravention of CVS' usual policy distribution practices); it did not know about any follow-up. [4]  Yet Plaintiffs rely entirely on this unreliable, untested evidence to conclude that there is **zero** potential value associated with pursuing a meal break claim based on CVS' class-wide policy containing "Special Rules for Pharmacists" requiring them to take on-duty meal breaks when they are the only pharmacist working during a shift.  Plaintiffs also stated that they could not estimate how frequently pharmacists worked alone, as CVS' data did not reflect such information, when the information is available through analysis of CVS' timekeeping data.[5]  Plaintiffs' willingness to accept this type of faulty evidence from CVS without testing it indicates that they have not reasonably investigated the

---

[4] *See* Declaration of Beth Gunn ("Gunn Decl."), ¶ 2, Ex. A ([Seymour 1] at 81:22-91:20).  (*Id.*; ¶ 3, Ex. B [Kelly] 143:12-149:13).

[5] Plaintiffs stated that they reviewed an (one) "Excel spreadsheet" containing information in this case, when the entire set of timekeeping data was voluminous.  From this description, it appears that only a miniscule fraction of CVS' available data was reviewed prior to the settlement.  Review of Plaintiffs' minimal costs expended in expert work reflect only a very cursory analysis, as analyzing data for a proposed settlement class of this size should have been far more extensive in order to reach a reliable conclusion.

full scope of potential claims that "could have been asserted" as part of the Lawsuits before agreeing to release those claims.

### 2.   The Scope of the Release is Impermissibly Overbroad.

The scope of the release is not limited to claims arising from the facts and circumstances alleged in the *Chalian* or *Cabrera* cases.  It broadly covers:

> [A]ll claims, causes of action, and legal theories of relief that were alleged **or that could have been alleged or otherwise raised in the Lawsuits**, from August 3, 2014 until the date of the Preliminary Approval Order for Retail Pharmacy Settlement Class members and from July 20, 2012 until the date of the Preliminary Approval Order for Pharmacist Class members (the "Released Claims").  The Released Claims include, **but are not limited to**: (a) failure to pay minimum wages; (b) failure to pay overtime wages; (c) failure to pay all wages or amounts due under the Labor Code and/or federal Fair Labor Standards Act; (d) failure to comply with Labor Code Sections 850, 851, 851.5, 852 and/or 29 U.S.C. §201 et seq.; (e) failure to provide proper meal periods, or premium pay for non-compliant meal periods; (f) failure to authorize and permit rest periods, or premium pay for non-compliant rest periods; (g) failure to provide complete, accurate, and/or properly formatted wage statements; (h) failure to reimburse all necessary business expenses; (i) failure to timely pay wages due or final wages due; (j) all claims under PAGA….; and (k) all damages, penalties, including penalties under Labor Code sections 203 and 558, interest, costs (including attorney's fees) and other amounts recoverable under said claims or causes of action **as to the facts and/or legal theories alleged or which could have been alleged in the Lawsuits**…

This type of overbroad release violates the due process rights of absent class members, who cannot possibly understand what claims might be released in this expansive language.  *Gonzalez v. CoreCivic of Tennessee, LLC*, 2018 WL 4388425, at *11 (E.D. Cal. Sept. 12, 2018) (finding the release overbroad where it sought to release all claims under several provisions of the Labor Code, including those that "could have been asserted," as "[w]hile these release provisions might arguably be limited slightly by the language narrowing the released claims to those based on facts asserted in the complaint, the language expanding this definition to those "that could have been asserted based on the facts ascertained ... in the Actions" renders that uncertain," and

"creates serious due process issues with respect to absent class members" because they cannot know what "could have been asserted" in the case); *see also Hadley v. Kellogg Sales Company,* 2020 WL 836673, at *2 (N.D. Cal., Feb. 20, 2020) (refusing to approve settlement attempting to release all claims "which have been, or which could have been asserted in the Actions," or "could have been brought" as impermissibly overbroad and not tethered to the factual predicate alleged in the action).

While Plaintiffs have claimed that the allegations in their consolidated second amended complaint are carefully tailored to revolve around the off-the-clock training module allegations, the release does not recognize such a limitation.  It does not comport with the directive in *Hesse v. Sprint Corp.,* 598 F.3d 581, 584 (9th Cir. 2010), that settlements may not release claims that are "not based on the identical factual predicate as that underlying the claims in the settled class action."  By including all claims that could have been asserted in any manner related to the released claims, Plaintiffs have substantially expanded the scope of the release beyond the scope of the lawsuit itself.

In *Sanchez v. Frito-Lay, Inc.*, 2019 WL 4828775, at *11 (E.D. Cal., Sept. 30, 2019), the court deemed overbroad release "language stating that the release covers claims that could have been pled "based on the factual allegations in the complaint,'" where the release included claims not pled in the action and not litigated in the action prior to the settlement, including PAGA violations and FLSA claims. *Id.*  The court also found that other language in the release, applying to claims "that might have been asserted," rendered any language narrowing the release to claims "based on the factual allegations in the complaint" so unclear that it created "due process issues for absent class members if they do not know the extent of the claims they are releasing based on the language of the settlement agreement." *Id. (citing Gonzalez v. CoreCivic of Tennessee, LLC*, 2018 WL 4388425, at *11 ("Without knowing what facts were ascertained during this case, an absent class member has no way of knowing what claims they are agreeing to release. This raises significant due process concerns.")).

This is precisely what the release here purports to do, rendering it too unclear to pass muster as consistent with class members' due process rights.

### 3. Compared to the Scope of the Release, the Value of the Released Claims is Grossly Understated.

Before approving a settlement, **"[t]he most important factor to consider is plaintiffs' expected recovery balanced against the value of the settlement offer."** *Cotter v. Lyft, Inc.,* 176 F.Supp.3d 930, 935 (N.D. Cal. April 7, 2016) (internal quotation omitted) (emphasis added); *see also Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 611 (E.D. Cal. 2015) ("To determine whether the settlement amount is reasonable, the Court must consider the amount obtained in recovery against the estimated value of the class claims if successfully litigation."). "The primary way a court determines whether the settlement's value is sufficient is by (1) making a rough estimate of what the class would have received had it prevailed at trial (or at other endpoints) and then (2) discounting that value by the risks that the class would face in securing that outcome." *Lusk v. Five Guys Enterprises LLC*, 2019 WL 7048791, at *10 (citing *Newberg on Class Actions* § 13:51 (5th ed.) (citing as an example the Seventh Circuit's "Net Expected Value Methodology" in *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002))).

According to Plaintiffs' Preliminary Approval Motion,[6] Plaintiffs valued the released class claims as follows:

| Class Claims | |
| --- | --- |
| Labor Code Claim | Plaintiff's Assessment |
| 226.7, 512 (meal) | $ 2,000,000 |
| 226.7 (rest) | 0 |
| 1197.1, 510 (OTC) | $ 2,934,658 |
| 2802 (bus. exp) | 0 |
| 226 (pay records) | 0 |
| Totals: | $ 4,934,658 |

By contrast, the *Hyams* plaintiffs' expert data analysis, using CVS' complete

---

[6] Plaintiffs seem to expect this Court to accept evaluations of potential damages made after the settlement agreement was executed; obviously such after-the-fact evaluations were not considered as part of the settlement evaluation and cannot be considered here.

timekeeping data, indicated that the high end of potential damages for these claims – based on the facts and theories investigated in their case, but not in this case, reflect vastly different high-end damages numbers.[7]

### (a) Plaintiffs Did Not Evaluate the "Solo Pharmacist" Meal Break Theory

The *Cabrera* and *Hyams* actions[8] both assert a theory that when a pharmacist was the only pharmacist on duty, they missed meal breaks as a result of CVS' class-wide policies and practices requiring them to remain available.[9]  Plaintiffs have not provided information assessing the potential value of the meal break claim based on this theory,[10] stating instead that CVS did not have data to show when pharmacists worked these "solo" shifts.  The high-end potential damages based on this theory underlying the meal break claim, both with and without a reasonable adjustment for potential arbitration agreements, is as follows:

| Drogin Decl., Tables 1, 2a, 2c, 3a, 3b | # of Ees | # of Shifts | Amt of Potential Damages | Risk Adjustment | |
|---|---|---|---|---|---|
| **Missed Meal Breaks** | | | | 10% | 25% |
| All Solo Pharmacists | 4,672 | 647,676 | $ 44,777,062 | $ 4,477,706 | $ 11,194,266 |
| Solo Pharmacists w/o potential arbitration agreemen | 1,939 | 288,194 | $ 19,955,498 | $ 1,995,550 | $ 4,988,875 |
| **Missed Rest Breaks** | | | | 10% | 25% |
| All Solo Pharmacists | 5,902 | 873,396 | $45M + | $4.5M + | $12M + |
| Solo Pharmacists w/o potential arbitration agreemen | 2,640 | 414,825 | $20M + | $2M + | $5M + |

While obviously risk adjustments need to be made for multiple potential risks, those risk adjustments should be made off of the high-end potential damages numbers, based on actual data pertaining to the members of the class who realistically would have experienced the potential violations during the relevant time period.[11] For example, a 10-25% discount of these potential damages, as Plaintiffs suggest is reasonable, would

---

[7]  All estimates are derived from the *Hyams*' plaintiffs' expert's data analysis, which included adjustments for individuals allegedly bound by CVS' arbitration program. (Gunn Decl.,¶5, Ex. D).

[8]  The evidence in support of these theories, the result of thorough investigation, is described in the *Hyams* motion for class certification.  (Gunn Decl., ¶ 4 Ex. C).

[9]  Objectors note that, even though this claim is part of the "factual predicate" alleged in the *Cabrera* complaints and the *Chalian* operative complaint, no independent investigation was done as to the viability of the alleged facts.

[10]  In the Final Approval Motion, Plaintiffs conflate the *Hyams* data pertaining to this theory to data pertaining to the number of times that CVS did not pay employees for recorded non-compliant meal breaks in contravention of its stated policy, which Plaintiffs also have not evaluated.

[11]  Note that the *Hyams* plaintiffs' data is limited to the time period of August 21, 2014 to December 20, 2019, so it does not cover the entire time frame proposed in the settlement here.

command a settlement in the range of $2M - $11.2M for each the meal break claims and the rest break claims of pharmacists who worked solo shifts.  Instead, Plaintiffs assessed potential damages only related to meal breaks missed for off-the-clock training module work, and used a high-end damages number of $2M.  This is the lowest reasonable number *after* risk adjustment, demonstrating how the failure to properly calculate potential high-end damages consistent with the scope of the release led to improper discounting and an unfair, inadequate settlement amount.

### (b) Plaintiffs Have Not Evaluated Off-the-Clock Claims Based on Opening and Closing Shifts

The *Hyams* action asserts a theory that off-the-clock work occurred at the beginning and end of shifts worked by certain employees, as identified by CVS in discovery.  Plaintiffs have not evaluated the potential damages arising from this theory, despite having assessed damages for the off-the-clock training period work.  The high-end damages based on this theory of recovery, which would be folded into the current release, is as follows:

| Drogin Decl., Tables 8, 9 | # of Shifts | Amout of Potential Damages | Risk Adjustment | |
|---|---|---|---|---|
| | | | 10% | 25% |
| Off-the-Clock Time for Opening and Closing Shifts (Non-Target Stores Only) | | | 10% | 25% |
| All Pharmacists | 1,652,293 | $ 458,106 | $ 45,811 | $ 114,527 |
| Pharmacists w/o potential arbitration agreements | 684,143 | $ 188,407 | $ 18,841 | $ 47,102 |
| Off-the-Clock Time for Opening and Closing Shifts (Target Stores Only) | | | 10% | 25% |
| All Pharmacists | 561,832 | $ 3,213,746 | $ 321,375 | $ 803,437 |
| Pharmacists w/o potential arbitration agreements | 520,882 | $ 2,988,326 | $ 298,833 | $ 747,082 |

Not including these potential damages, while endeavoring to release claims for them, similarly results in an unfair, inadequate settlement.

### (c) Plaintiffs Have Not Evaluated the "Understaffing" Rest Break Theory

The *Cabrera* and *Hyams* actions both assert a theory that, due to CVS' deliberate understaffing, all pharmacy employees regularly missed rest breaks. Plaintiffs dismiss this theory as completely unviable, despite having done no discovery pertaining to it (other than review CVS' official rest break policies).  Through discovery in the Hyams matter, evidence surfaced that CVS had a class-wide practice of scheduling work to occupy every minute of available employee time, but for one 15-minute rest break in an 8-hour shift, creating potential liability for failure to provide

---

11

compliant rest breaks under California law.  Plaintiffs did not assess the potential value of the rest break claim based on this theory, despite attempting to release it in the settlement.  In fact, Plaintiffs valued this claim as worth zero value. The high-end potential damages based on this theory, with and without a reasonable adjustment for potential arbitration agreements, is as follows:

| Drogin Decl., Tables 1, 2a, 2c, 3a, 3b | # of Ees | # of Shifts | Amt of Potential Damages | Risk Adjustment | |
|---|---|---|---|---|---|
| Missed Rest Breaks 3.5+ hrs, no RPP All | | | | 10% | 25% |
| All  Pharmacists | 22,903 | 10,351,916 | $ 356,104,316 | $ 35,610,432 | $ 89,026,079 |
| Pharmacists w/o potential arbitration agreements | 14,204 | 4,645,195 | $ 135,306,844 | $ 13,530,684 | $ 33,826,711 |

| Drogin Decl., Tables 1, 2a, 2c, 3a, 3b | # of Ees | # of Shifts | Amt of Potential Damages | Risk Adjustment | |
|---|---|---|---|---|---|
| Missed Rest Breaks 6.0+ hrs, no RPP All | | | | 10% | 25% |
| All  Pharmacists | 22,489 | 7,815,668 | $ 290,396,554 | $ 29,039,655 | $ 72,599,139 |
| Pharmacists w/o potential arbitration agreements | 13,840 | 3,312,670 | $ 106,581,583 | $ 10,658,158 | $ 26,645,396 |

Even a significant discount for risk would result in a much higher settlement value than zero for this claim.  Class members have specifically highlighted the number of rest breaks they missed as instrumental in them finding the low settlement offered to them as extremely unfair and insufficient to alter CVS' illegal practices.

### (d) Plaintiffs Have Not Evaluated the "Failure to Maintain Business Records" Theory

The *Hyams* action asserts a theory that CVS did not properly maintain business records as required by Lab. Code § 226.  Plaintiffs have not investigated this theory of recovery, which would be included in the current release, yet deemed it worth zero value.  The potential high-end damages based on this theory is:

| Drogin Decl., Tables 4, 5 | # of PayPeriods | Amt of Potential Damages | Risk Adjustment | |
|---|---|---|---|---|
| Failure to Maintain Business Records Under 226 | | | 10% | 25% |
| All Pharmacists | 636,291 | $ 47,883,150 | $ 4,788,315 | $ 11,970,788 |
| Pharmacists w/o potential arbitration agreements | 341,574 | $ 26,688,200 | $ 2,668,820 | $ 6,672,050 |

This theory would also apply class-wide and would not be at great risk of not being certified.

### (e) Plaintiffs Have Not Evaluated the "Cell Phone Business Expense Reimbursment" Theory

The *Hyams* action asserts a theory that CVS did not comply with California law regarding reimbursing cell phone expenses for employees who were required to use their personal cell phones for work.  Plaintiffs do not explore the multiple ways in

which personal cell phones might have been used, or examine CVS' class-wide policy to **not** pay any class members for personal cell phone use, as explored through discovery in the *Hyams* case. Instead, Plaintiffs have lumped it into the proposed settlement and assigned it zero worth. The high-end damages number for this theory of recovery, which was not considered by Plaintiffs but would be included in the release, is as follows:

| Drogin Decl., Table 6a, 7 | # of Months | Amt of Potential Damages | Risk Adjustment | |
|---|---|---|---|---|
| **Failure to Reimburse Cell Phone Expenses** | | | 10% | 25% |
| All  Pharmacists | 387,216 | $          27,016,034 | $          2,701,603 | $   6,754,009 |
| Pharmacists w/o potential arbitration agreements | 205,746 | $          12,374,165 | $          1,237,417 | $   3,093,541 |

### (f) Plaintiffs Have Not Provided Necessary Context to Evaluate Potential Damages.

Plaintiffs have not provided any information to give context to their evaluation of the claims at issue so that the Court or class members can assess whether the settlement is fair, reasonable, and adequate. For example, Plaintiffs have not provided information regarding the average rate of pay for Pharmacists ($69.09) as opposed to other members of the Retail Pharmacy Class ($16.95). Nor do Plaintiffs analyze Plaintiffs' own damages in light of the potential risks to determine whether the amounts of their recovery (without the enhancement fees) seem fair in relation to the 6-8 years of claims being released. Class members who objected and opted out provided some of this comparative information, with the results that the proposed settlement amount was typically less than one week's worth of potential damages, and was typically (always) less than 1% of the expected value of the claims if they were to prevail.[12] This amount is so low that it should give the Court pause – how is a settlement that gives an over 99% discount on the potential value of a claim worth releasing?

### 4.    The Procedural Background Bears Multiple Hallmarks of Collusion.

This action began as a much smaller case than it is now. Before consolidating

---

[12] *See* Declarations of Andrews, Cosio, Garcia, Cardenas, Hyams, Declarations of Andrews, Cosio, Garcia, Cardenas, Hyams, Zand, Cabrera, Gerges, Bailey, Helgerson, Schmidt.

with *Cabrera*, *Chalian* originally dealt with off-the-clock work arising from CVS requiring its employees to take training modules while not at work, as well as other claims arising from the same circumstances.  It included no PAGA or FLSA cause of action. The *Chalian* plaintiffs then started working with the *Cabrera* plaintiffs.  Two of those plaintiffs had been compelled to arbitration and could no longer pursue the class claims at issue here; they dismissed their individual claims and decided to pursue PAGA claims only, based on letters sent to the LWDA in June and August 2017.  The Court then entered judgment against the original *Cabrera* plaintiffs dismissing PAGA claims pursuant to FRCP 56, which they appealed; at the same time CVS appealed an order denying its motion to compel arbitration of the third plaintiff, and the action was stayed pending the outcome.  The *Chalian* and *Cabrera* cases became one by virtue of the Global Settlement Agreement here, which contained a provision requiring Plaintiffs to file a new consolidated complaint.

As a result, the procedural posture of Plaintiffs at the time the settlement was agreed upon contains several indicia of a weakened bargaining position:

➢ Due to the date on which he left CVS, the *Chalian* plaintiff could not have pursued any PAGA claims or the broad class claims in the proposed settlement unless his lawsuit incorporated the claims from the *Cabrera* lawsuit;

➢ Two of the *Cabrera* plaintiffs could not have pursued *any* class claims, and could only pursue their PAGA claims after prevailing on appeal;

➢ The other *Cabrera* plaintiff could not proceed with discovery or other litigation until she prevailed on appeal;

➢ Due to the procedural posture of the case, the *Cabrera* plaintiffs had not engaged in any discovery as to the substantive issues in their case, as they had battled CVS regarding their ability to proceed with their case at all – stating that "[d]efendants have unilaterally denied Plaintiffs the opportunity to conduct discovery" and despite "a number of false promises by CVS to produce the requested information, Plaintiffs have yet to obtain any meaningful discovery in this matter," admitting

"Plaintiffs are ill prepared to address a number of the issues raised by Defendants' motion."  (*Cabrera* ECF 75, 16:7-8, 22-27).

Meanwhile, the competing class and representative *Hyams* action was actively litigating some of the same claims in the *Cabrera* case, **as well as claims never asserted in either case**, which became Plaintiffs' new PAGA claims.

After settlement negotiations with CVS, Plaintiffs agreed to a settlement that required them to file a new complaint that, for the first time, alleged claims for violation of Lab. Code §§ 246(i), 550-551, and 850-852.  It is problematic that those new PAGA claims, as well as other claims being litigated in the *Hyams* action, are proposed to be settled in Plaintiffs' consolidated case in exchange for zero additional consideration.  *Murray v. Scelzi Enterprises, Inc.,* 2019 WL 6045146, at *11 (E.D. Cal., Nov. 15, 2019), *report and recommendation adopted,* 2019 WL 6840411 (E.D. Cal., Dec. 16, 2019) (finding problematic the release of claims valued as worth zero dollars, as "alleging claims that Plaintiff believes are meritless and 'largely worthless in litigation' may violate Rule 11.") (citing Fed. R. Civ. P. 11(b)(2)).

Plaintiffs also admit that they intend to release several claims for zero consideration (Lab. Code §§ 226, 226.7, 2802).  This is impermissible.  The court in *Molski v. Gleich*, 318 F.3d 937, 953–54 (9th Cir. 2003), *overruled on different grounds by Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010), explains why:

> In sum, the class members received nothing; the named plaintiff and class counsel received compensation for his injury and their time; and the defendant escaped paying any punitive or almost any compensatory damages. *Id.* ('[A]ll the settlement does for ... [the absent class members] is cut them off at the knees.'). This outcome is particularly problematic because only a minimal amount of discovery occurred in this case, and the primary components of the agreement were reached prior to filing of the class action. See *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 626 (9th Cir.1982) (noting that the district court's assessment of the fairness of the settlement is 'nearly assured when all discovery has been completed and the case is ready for trial') (citation omitted).

A settlement agreement is not fundamentally fair under FRCP 23(e)(2) if it is "the

---

15

product of collusion among the negotiating parties." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000) (citing *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992)). **One indication of collusion is an overbroad release of claims, wherein claims that are not within the "identical factual predicate" of the claims alleged in the complaint are released**. *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010). Therefore, any claims arising from uninvestigated facts and theories Plaintiffs valued as worth zero value should not be included in this settlement. *See Belew v. Brink's, Inc.*, 721 Fed.Appx. 734, 735 (9th Cir. 2018) (excising claims that were deemed to have zero value from the proposed release, as there was no consideration supporting the release); *Hendricks v. Starkist Co*., 2016 WL 692739, at *4 (N.D. Cal., Feb. 19, 2016) (concluding that "the Court cannot approve a settlement in which the scope of the release differs significantly from the scope of the liability alleged," where no additional consideration was provided in exchange for a release that was "not tailored to the relief provided in the Settlement Agreement. There has been no showing that class members 'have been independently compensated for the broad release of claims' related to" newly-inserted release terms) (citing *McKeen-Chaplin v. Franklin Am. Mortgage Co.*, 2012 WL 6629608, at *5 (N.D. Cal. Dec. 19, 2012) (holding release was overbroad where there was no "showing that Plaintiffs [were] independently compensated for the broad release of claims unrelated to any dispute regarding FLSA coverage or wages due, including, among others, claims for discrimination under Title VII, intentional infliction of emotional distress, and 'outrageous conduct'"); *Ambrosino v. Home Depot U.S.A, Inc.*, 2014 WL 1671489, at *3 (S.D. Cal. Apr. 28, 2014) (same). [13]

The procedural posture is indicative of a "reverse auction," in which a defendant selects among attorneys for competing classes and negotiates an agreement with the attorneys who are willing to accept the lowest class recovery (typically in

---

[13] As another act of collusion, Plaintiffs quietly inserted a post-settlement FLSA claim for no additional consideration, to be released when checks are cashed, which is expressly forbidden.

exchange for generous attorney fees). *See*, Manual for Complex Litigation, Section 952; *see, e.g., Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 839 (7th Cir. 1999) (suggesting that "[p]erhaps [defendant] found a plaintiff (or lawyer) willing to sell out the class"); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 283 (7th Cir. 2002) (finding that "[a]lthough there is no proof that the settlement was actually collusive in the reverse-auction sense, the circumstances demanded closer scrutiny than the district judge gave it"); *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 882 (7th Cir. 2000) (rejecting class settlement because "Crawford and his attorney were paid handsomely to go away; the other class members received nothing").

Review of Plaintiffs' counsel's time entries illustrates the unfairness and inadequacy that would result from releasing such claims here.  For example, despite seeking to release class-wide claims for meal and rest break violations, having valued them as worth nothing, the only time entries reflecting any work in connection with these claims occurred on two days, for a total of approximately 6 hours, which took place *after* the parties had already agreed to a settlement that valued the claims as worthless.  It is clear that the purpose of the work was not to investigate the true value the case but to justify the parties' prior failure to investigate the claims at all before making an uninformed and collusive deal with CVS to release them.

### 5. The Treatment of Class Members Who Opted Out of Arbitration Raises Concerns of Collusion and Inequitable Treatment of Different Subsets of Class Members.

In addition to the unwarranted expansion of the scope of the release, the exponential expansion of the class covered by the post-settlement iteration of the case also indicates collusion.  Instead of limiting the class members to those who had "opted out" of CVS' arbitration program, as alleged in both the *Chalian* and *Cabrera* pre-settlement complaints, the post-settlement complaint encompasses all CVS employees who worked as pharmacists or retail pharmacy employees, including those who allegedly had arbitration agreements.  Plaintiffs have not revealed the number of individuals involved in the original analysis of their claims (reflecting only the class

members who opted out of CVS' arbitration program), but the *Hyams* plaintiffs have obtained, through discovery in that case, such information for the time period alleged in the *Hyams* action.  According to that data, 357 out of 4,274 (8.35%) Pharmacists opted out of the arbitration program, and 869 out of 16,680 (5.21%) other pharmacy employees opted out of the arbitration program.

Through the settlement, Plaintiffs expanded the number of class members included in their case to be **seventeen times** its original size (and seventeen times the attorneys' fees available).  They did this by agreeing to a settlement that heavily discounted the settlement value of the case based on the risk that class members would be bound by arbitration agreements, and then distributing the risk equally among all class members, even those for whom the arbitration agreements were not a risk.  In this way, Plaintiffs exchanged a more significant recovery for the arbitration opt-out class members for an increased overall settlement amount, with its commensurately increased attorneys' fees and enhancement payments, that was heavily discounted when distributed to class members.

Plaintiffs also inappropriately adjusted for the risk of arbitration.  It does not appear that Plaintiffs ever examined the language of the arbitration agreement to determine the extent to which it applied in this case.  CVS' alleged arbitration agreement states that it "does not apply to pending claims."[14]  As one court has already determined, this language does not allow the arbitration agreement to force arbitration of any claims that existed as of the time of the signing of the agreement. *See Woods v. Caremark PHC, LLC,* 198 F. Supp. 3d 1046, 1049 (W.D. Mo. Aug. 2, 2016).  As a result, it was not fair to any CVS employees who began working at CVS after the respective dates the *Chalian* and *Cabrera* lawsuits were filed for Plaintiffs to factor the risk of arbitration so substantially into the value of those "pending claims" to which the arbitration program did not apply.  This creates another conflict between the subset of the class that opted out of the arbitration program and those who did not.  The

---

[14] Gunn Decl., ¶ 6.

settlement formula does not contain a methodology to reflect these inequitable positions. As the Advisory Notes to the 2018 amendments to FRCP 23 warn, the amended FRCP 23(e)(2)(D) "calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others. Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23 2018 Advisory Committee Note Subdivision (e)(2). The manner in which some class members are treated disproportionately to others renders the settlement unfair and inadequate.

The same problem arises from the two classes contained in the settlement.[15] The proposed settlement is structured so that pharmacists must share with the rest of the retail pharmacy class members the amount of potential damages without differentiating between the types of claims that would apply to them. For example, there is no situation in which a non-pharmacist would be eligible to recover damages arising from the class-wide "solo" pharmacist meal break claim. Pharmacists should not release these claims for no consideration or distribute settlement recovery equally with individuals who are only nominally releasing claims they cannot possibly bring. This is not fair to the pharmacists, as they will receive less when the pool of class members is diluted with non-pharmacists. It is also not fair to the other retail pharmacy employees, as their recovery is not linked to their potential damages and the claims they are releasing. As a result, the settlement amount is both overinclusive and

---

[15] Plaintiffs have not even attempted to establish that either of these two classes meet the criteria of FRCP 23, especially as to the breadth of the claims included in the release. Rather, they provide ample reasoning for why the class-wide claims are so weak that they deserve to be discounted at about 99%. This failure to satisfy the FRCP 23 factors is an independent basis for denying approval of the settlement. The ability to satisfy the class-wide criteria is intended to be more than a sham. *See Hadley v. Kellogg Sales Co.*, 2020 WL 836673 at *10 (N.D. Cal. Feb. 20, 2020) ("The parties must more clearly explain how the settlement class satisfies the predominance requirement of Federal Rule of Civil Procedure 23(b)(3), or define the settlement class more narrowly.").

underinclusive, and creates a conflict within the class members. *See Orbitz v. Fibreboard Corporation et al.*, 527 U.S. 815, 854, (1999) (denying approval of a settlement with intraclass conflicts).

Similarly, the proposed settlement is structured to include two different classes whose individual settlement amount depends on two separate statute of limitations dates (presumably based on the applicability of the class claims to such employees), it does not explain how pharmacists were selected to be in one class or the other, or why the claims of some pharmacists (in certain regions) are treated differently than others. There is no explanation for why pharmacists who do not work in those regions are treated more like other retail pharmacies, which appears to be inequitable.

**6.    The Proposed Attorneys' Fees are Disproportionate to the Level of Representation Provided and the Result Obtained.**

In determining whether a class settlement is fair and reasonable, "the court should assess the reasonableness of the attorney's fee award because an inordinate fee may be the sign that counsel sold out the class's claims at a low value in return for the high fee." *Newberg on Class Actions* § 13:54 (5th ed.) The basic concern is that there has been "a tradeoff between merits relief and attorney's fees." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) (quoting *Evans v. Jeff D.*, 475 U.S. 717, 732 (1986)); *see also Newberg on Class Actions* § 13:54 (5th ed.). "A defendant's willingness to pay high fees may also indicate that the relief in the settlement undervalues the class's claims, because otherwise it would not be in the defendant's interest to pay that much." *Id.* Here, Plaintiffs' counsel seek an attorneys' fee award of $3,111,403.98, 30% of the gross settlement amount of $10,371,460.60, which obviously exceeds the Ninth Circuit 25% benchmark for a reasonable fee award under the percentage-of-recovery method.  (Butler Decl., ECF 180-2 par. 13, page ID 5978); s*ee Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002) (recognizing 25% fee as the accepted "benchmark" in common fund cases); *Kerr v. Screen Extras*

*Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975) (lodestar approach); *In re Bluetooth*, 654 F.3d at 942.

Nothing in Plaintiffs' counsel's motion for attorneys' fees justifies their exorbitant fee request. Rather, because counsel is receiving a disproportionate distribution of the settlement and the parties negotiated a clear sailing agreement, the settlement presents "subtle signs of collusion" requiring heightened scrutiny by the Court. *See Roes, supra,* at 1040). While at first blush a $7,029,556.85 net class settlement fund sounds substantial, when evaluated in the context of **24,695** class members with an average settlement share of **$284.42**, the apparent value to the class quickly erodes. This is particularly so when pharmacist class members earned hourly rates ranging from $69-$76 per hour and the proposed settlement amounts fail to compensate both technician and pharmacist members for even one weeks' worth of rest break premium payments. (Butler Decl., Hyams Decl., ¶ 20, Schmidt Decl., ¶ 14, Zand Decl., ¶ 12, Gerges Decl., ¶ 7, Andrews Decl., ¶ 14.). *See* Fed. R. Civ. P. 23 2018 Advisory Committee Note Subdivision (e)(2) ("The relief actually delivered to the class can be a significant factor in determining the appropriate fee award; *Perez v. All Ag, Inc.*, 2020 WL 1904825, at *8 (E.D. Cal., Apr. 17, 2020) ("[a]n explanation, however, is necessary when the court departs from the 25% benchmark.") (citing *Powers v. Eiche*n, 229 F.3d 1249, 1256–57 (9th Cir. 2000)).

The settlement's clear sailing agreement, whereby "CVS will not oppose Class Counsel's request for, attorneys' fees in an amount not to exceed 30% of the Maximum Settlement Amount" also deprived the class of the usual adversarial process and raises a warning flag the Court cannot ignore. (ECF 180-1, Ex. 1, page ID 5560, Par. 3.2 a.).

> Although clear sailing provisions are not prohibited, they by their nature deprive the court of the advantages of the adversary process' in resolving fee determinations and are therefore disfavored. More importantly, we have repeatedly explained that **clear sailing agreements on attorneys' fees are important warning signs of collusion** because the very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class. As a result, **when confronted with a clear sailing provision, the district court has a**

**heightened duty to scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding unreasonably high fees simply because they are uncontested**.

*Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1050–51 (9th Cir. 2019) (internal citations and quotations omitted, emphasis added.)

In addition to the low value to class members and clear sailing agreement, an analysis of the attorney time records submitted to the Court further reveal the following marks of an overgenerous award:

➢ Very little time devoted to discovery and investigation with not one deposition taken and the majority of time billed (59.2% of Mr. Morrison's hours) occurring after the settlement agreement had been signed.

➢ No discovery regarding meal and rest breaks until June 2020, *after* Proposed-Intervenors objected to the proposed settlement in this matter. Even then only 6.4 hours of discovery on this incredibly valuable claim was conducted:

| 6/29/2020 | Reviewed Discovery + documents produced by CVS re meal and rest period policy | Alicja A. Urtnowski | 3.1 |
| 6/30/2020 | Legal Research and review of further review of discovery re rest period policy + emails | Alicja A. Urtnowski | 2.6 |
| 6/30/2020 | Emails + correspondence re review of Discovery re rest period policy | R. Craig Clark | 0.6 |
| 6/30/2020 | Corr. - AAU re Rest Period Poicy | Falvey | 0.1 |

➢ Only 2.1 hours of work performed regarding Labor Code Sections 850 and 851, in June 2020 after the parties agreed to settle the claim never before asserted in either *Chalian* or *Cabrera*:

| 06/01/2020 | Work on mpa (research on 850, 851, seventh day for MPA motion) | Michael Morrison | 2.10 |

➢ High hourly rate of $950 equating to $22,040 for attending two days of mediation.

| Attorney | Date | Description | Hours | Hourly Rate | Total |
|---|---|---|---|---|---|
| Falvey | 7/28/2019 | Travel time for and mediation | 12.6 | $950.00 | $11,970.00 |
| Falvey | 7/29/2019 | Mediation, San Francisco, return to L.A. | 10.6 | $950.00 | $10,070.00 |
| | | | | | $22,040.00 |

➤ Even with high hourly rates and questionable entries for internal conferences, a lodestar which is only 59.7% of the requested fee amount.

| | HOURS | Fees |
|---|---|---|
| Boyamian | 345.9 | $207,540.00 |
| Clark | 1334.6 | $729,128.00 |
| Falvey | 241.8 | $229,710.00 |
| Kizirian | 496.4 | $223,380.00 |
| Morrison | 689 | $470,077.50 |
| **Grand Total** | **3107.7** | **$1,859,835.50** |

Thirty percent fee awards are typically only approved when there is a negative lodestar amount following plaintiffs' counsel vigorous prosecution of a case, including through class-certification. *See, Schneider, at al. v. Chipotle Mexican Grill, Inc.*, 2020 WL 6484833, at *9-11 (N.D. Cal. Nov. 4, 2020) (where the court was  not "entirely enthusiastic about the prospect of granting request for nearly two million dollars in fees" and approved the amount only after finding amount was 61% of lodestar in post class-certification case where parties completed broad fact and expert discovery, which included propounding or responding to hundreds of discovery requests, producing and reviewing hundreds of thousands of pages of documents, producing or reviewing five expert reports, taking or defending 17 depositions, engaging in numerous discovery meet-and-confers, and seeking judicial intervention multiple times.)  Here, Plaintiffs' counsel conducted no such discovery or investigation. Pursuant to this Circuit's guidelines for pre-certification class action settlements and requests for attorneys' fees which present warning signs of collusion, counsel's fee request must be denied as neither fair nor reasonable to the over 24,000 CVS employees in this class. *See Roes*, 944 F.3d at 1056 ("the district court had an obligation to question the disproportionate cash distribution to attorneys' fees, substantively address concerns that the settlement value was inflated, and clearly explain why the total benefits to the class justified the fees awarded.") (internal citations and quotations omitted).

### 7. The Proposed Enhancement Fees are Disproportionate to the Level of Representation Provided and the Result Obtained.

Incentive  awards  to  named  plaintiffs  must  be  justified  by  "evidence

demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).  "[D]istrict courts must be vigilant in scrutinizing all incentive awards." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013).  This is particularly true where "the proposed service fees greatly exceed the payments to absent class members." *Id.* The district court must evaluate an incentive award using "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions,...[and] the amount of time and effort the plaintiff expended in pursuing the litigation...." *Id.* at 977.  "[D]istrict courts have declined to approve incentive awards that represent an unreasonably high proportion of the overall settlement amount or are disproportionate relative to the recovery of other class members. *Conti v. L'Oreal USA S/D, Inc.*, 2020 WL 416403, at *13 (E.D. Cal., Jan. 27, 2020), *report and recommendation adopted*, 2020 WL 820155 (E.D. Cal., Feb. 19, 2020) (citing *Ontiveros v. Zamora*, 303 F.R.D. 356, 365–66 (E.D. Cal. 2014) (finding an incentive award of $20,000, comprising 1% of the common fund, to be excessive under the circumstances, and reducing the award to $15,000, where class representative spent 271 hours on the litigation and relinquished the opportunity to bring several of his own claims in order to act as class representative); *see also Ko v. Natura Pet Prods.*, Inc., 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012) (holding that an incentive award of $20,000, comprising one percent of the approximately $2 million common fund was "excessive under the circumstances" and reducing the award to $5,000); *Wolph v. Acer Am. Corp.*, 2013 WL 5718440, at *6 (N.D. Cal. Oct. 21, 2013) (reducing the incentive award to $2,000 where the class representatives did not demonstrate great risk to finances or reputation in bringing the class action)). "In reducing the award, courts have noted that overcompensation of class representatives could encourage collusion at the settlement stage of class actions by causing a divergence between the interests of the named

plaintiff and the absent class members, destroying the adequacy of class representatives." *Conti, supra,* at *13 (citing *Staton,* 327 F.3d at 977–78; *Radcliffe,* 715 F.3d at 1165).

Here, the proposed class representatives are slated to receive $10,000 each (with the exception of Brennan, who is to receive only $3,000, presumably because he was not a named plaintiff and did not do much work). The average settlement payment is $294, about 3% of what the class representatives are receiving. Based on the objector and opt-out declarations, the high-end amounts of their potential damages for released meal and rest break claims range from about $20,000 to $130,000, and their settlement amounts reflect about 1% of their potential damages.[16] The class representatives are receiving **34 times more** from this settlement than the average class member. When taken together, the five class representatives are receiving **143 times more** than the average class member. These representatives were not deposed, and there is no evidence that the information they contributed led to counsel's increased understanding of the facts in this case or provided any increased leverage to obtain a favorable settlement from CVS. To the contrary, as Plaintiffs concede, each of these potential representatives in this case had weaknesses in their ability to proceed, which *increased* the risk that the class would not be certified or receive greater recovery. (Final Approval Motion, ECF 180, Page ID#s 5470-5473). This disproportionate rate of settlement distribution, combined with the other indicia of collusion listed above, contribute to the overall unfairness of the proposed settlement terms. The Ninth Circuit's concern that "if class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard" is present here. *See Staton v. Boeing Co.*, 327 F.3d 938 at 975.

---

[16] *See* Declarations of Andrews, Cosio, Garcia, Cardenas, Hyams, Zand, Cabrera, Gerges, Bailey, Helgerson, Schmidt).

**B.      Mailed Notice to the Class During a Pandemic and Postal Crisis was not the Best Practicable Method and Lacked Due Process.**

FRCP 23(c)(2) requires that class members receive the "best notice that is practicable under the circumstances." "To meet the constitutional guarantee of procedural due process, 'notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."'" *Roes, 1-2 v. SFBSC Management, LLC*, 944 F.3d at 1045–1046. "That is, the means employed to provide notice must be such as a person desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* (internal quotations omitted). As the Advisory Committee Notes explain, in 2018, the notice provision of FRCP 23 (c)(2) was specifically amended to recognize contemporary methods of giving notice to class members, to account for technological changes that make "first class mail not always as reliable as additional or alternative means of giving notice." *See* Fed. R. Civ. P. 23- 2018 Amendment Advisory Committee Note Subdivision (c)(2). The *Roes* court echoed this sentiment, finding that first class mail notice was not well-designed to provide notice to class members in the manner they were most likely to receive it. *See Roes, supra*, at 1047 (noting the various technological means such as email, web site, and social media that could have been used to supplement the notice provided so that it was "reasonably calculated to apprise all class members of the settlement").

Here, notice to the class was sent via first class mail only, at a time when the U.S. Postal Service was notoriously unprepared to process mail, especially as it was handling election ballots for an unprecedented amount of mail voting.[17] No web site was set up through the Settlement Administrator (even though the notice implies that there will be one). CVS regularly communicates with its employees via text, email, and other internal electronic means, and none of those were deployed. (*See* Bailey

---

[17] *See, Los Angeles Times,* September 15, 2020 "The Los Angeles Times tested first-class U.S. Postal Service delivery. The results? Spotty at best, dismal at worst." by Maria L. La Ganga, Rong-Gong Lin II.  https://www.latimes.com/california/story/2020-09-15/usps-crisis-survey-more-than-half-letters-delayed.  Gunn Decl., ¶ 8, Ex. E.

Decl. ¶¶ 5-6).  The putative class is not a heavily mail-dependent workforce, and the notice was mailed during election season when it is common for people to be inundated with mailers so that their attention would not be called to the notice.[18]  Under these circumstances, at least one supplemental electronic means should have been used to reach the class, or some means to notify current employees, as CVS has done in the past.

The absence of a web site created other due process concerns for class members who wanted to obtain information.  Even though other cases with overlapping claims were mentioned in the notice, it was unclear what claims from those cases were overlapping and the extent to which class members' participation in those cases would be affected or how to obtain such information. (*See* Andrews Decl., Ex. B.)  Plaintiffs contend that merely providing the case name and number is sufficient, but fail to explain how an unsophisticated non-lawyer would know how to access documents regarding those cases through the Court's PACER system (which would also require an account and charge for access).[19]  A web site should have also contained opt-out forms to make it easy for class members to exercise their rights to opt out.  *See Stoddart v. Express Servs.*, 2020 WL 5944449, at *13 (E.D. Cal. Oct. 7, 2020) (citing Ann. Manual Complex Lit. § 21.312 (4th ed.) ("In a Rule 23(b)(3) class, the notice and any Internet Web site should include opt-out forms."); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("[D]ue process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court.")).

The settlement also intends to bar settlement class members who never received the notice to be bound by it, which does not afford due process.  *See Conti, supra*, at

---

[18] At least 10 class members informed us that they did not receive the notice or understand what it was.  It remains unclear how many others were not alerted to the settlement in accordance with their constitutional due process rights.  (Gunn Decl., ¶ 7).

[19] Class members were also confused about whether they needed to appear in person for the final approval hearing during a pandemic.  The Notice contains language that would dissuade some class members from objecting, as it indicates that lawyers need to be hired and paid, which Plaintiffs knew was not the case here.  (Andrews Decl., Ex. B.)

*14 (finding that the proposed settlement did not afford "minimum due process to each of the putative class members" where the settlement attempted to bind absent class members whose notices were returned as undeliverable after the second attempt, instead of excluding them ); *see* Butler Declaration, ECF 180-2 (stating that 145 notices were returned as undeliverable after a skip trace).  As a substantive matter, the 6 page small font notice lists the scope of the release as well as the methodology for distributing the settlement awards in extremely confusing language difficult for even an experienced practitioner to decipher.  The estimated settlement amounts to be paid to class were listed in small plain (not bolded and underlined) font and largely went unnoticed by class members.  (*See* e.g., declarations of Cosio, Andrews and Bailey).  The omission of several key facts, such as the number of class members falling into each class or the PAGA settlement, makes it difficult for class members to determine the relative fairness of the settlement.

## III.   <u>CONCLUSION</u>

CVS has a pattern and practice of paying a few lawyers in class action settlements rather than its tens of thousands of California employees.[20]  CVS employees have already been deprived a safe and legal workplace.  They should not be denied due process of law in yet another class action settlement which absolves CVS of liability and only compensates lawyers willing to assist them in that process while CVS' employees receive insulting settlement amounts in keeping with how little CVS values them.  It is beyond time for a California Court to say enough is enough and protect CVS employees from predatory class settlements.  Objectors request that the Court follow Ninth Circuit precedent and not rubber stamp this stipulated pre-certification settlement, but make sure absent class members are treated fairly.  *See Stanton v. Boeing Co.,* 327 F.3d at 959-60.

---

[20] "Plaintiffs Cabrera, Telahun, McNeely, Chalian, and Brennan were all settlement class members in prior class action settlements with CVS."  (ECF 180-1 Page ID # 5553)

DATED:  November 13, 2020

Respectfully sumbitted,

By: /s/ Beth Gunn

Beth Gunn
Catherine J. Coble
Jennifer Kramer
Barbara DuVan-Clarke
Ashley Cruz

Attorneys for Settlement Class Members
TRENT ANDREWS, VICTORIA
COSIO, ELIZABETH GARCIA and
CYNTHIA CARDENAS