BETH A. GUNN, CA Bar No. 218889
beth@gunncoble.com
CATHERINE J. COBLE, CA Bar No. 223461
cathy@gunncoble.com
GUNN COBLE LLP
303 N. Glenoaks Blvd., Suite 200
Burbank, CA 91502
Telephone:  818.900.0695
Facsimile:   818.900.0723

JENNIFER KRAMER, CA Bar No. 203385
jennifer@laborlex.com
BARBARA DUVAN-CLARKE, CA Bar No. 259268
barbara@laborlex.com
ASHLEY H. CRUZ, CA Bar No. 306235
ashley@laborlex.com
JENNIFER KRAMER LEGAL, APC
5015 Eagle Rock Blvd., Suite 202
Los Angeles, CA 90041
Telephone:    213.955.0200
Facsimile:     213.226.4358

Attorneys for Settlement Class Members
TRENT ANDREWS, VICTORIA COSIO,
ELIZABETH GARCIA and CYNTHIA CARDENAS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEVAG CHALIAN, an Individual, Individually and on behalf of all others similarly situated and the general public,<br><br>           Plaintiffs,<br><br>           *v.*<br><br>CVS PHARMACY, INC., a Rhode Island corporation; CVS RX SERVICES, INC., a New York corporation; GARFIELD BEACH CVS, LLC, a California limited liability company; and DOES 1 thru 100, inclusive,<br><br>           Defendants. | CASE NO.: 2:16-cv-08979-AB-AGR<br>Assigned to Hon. Andre Birotte Jr.<br>*Related Case No.:2:20-cv-02401-AB-AGR*<br><br>**DECLARATION OF BETH GUNN IN SUPPORT OF OBJECTION TO CLASS ACTION SETTLEMENT**<br><br>DATE:  December 4, 2020<br>TIME: 10:00 a.m.<br>PLACE:  Courtroom 7B<br>         650 West First Street<br>         Los Angeles, CA |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF BETH GUNN

I, Beth Gunn, declare as follows:

1.      I am an attorney duly licensed to practice in the State of California, and admitted to practice before this court.  I am counsel of record for the Objectors Trent Andrews, Victoria Cosio, Elizabeth Garcia snd Cynthia Cardenas (collectively, "Objectors"), as well as Proposed Intervenors Ryan Hyams and Regine Duhon ("Proposed Intervenors").  I have firsthand and personal knowledge of the facts set forth in this declaration, as well as information obtained from my law firm's documents, and publicly available documents, and if called to testify regarding the facts set forth herein, I could and would do so competently and under oath.  I make this declaration in support of Objectors' Objection to Class Action Settlement.

### Authentication of Deposition Transcripts and Exhibits

2.      On June 18, 2020, in the matter of *Ryan Hyams et al. v. CVS Health Corp., et al.*, Northern District of California Case No.  4:18-cv-06278-HSG (the "*Hyams* action," I took the deposition of CVS' FRCP 30(b)(6) witness **John Seymour, Advisor.**  I have reviewed the deposition transcript of Mr. Seymour and am familiar with that testimony.  Attached as **Exhibit A** is a true and correct copy of relevant excerpts from the deposition transcript. Mr. Seymour was designated to testify on behalf of CVS on the topics of training provided to nonexempt employees and managers of nonexempt employees regarding meal periods and rest breaks during the *Hyams* class period.

3.      On February 25, 2020, my partner, Catherine Coble, took the deposition of CVS' FRCP 30(b)(6) witness **Maura Kelly, Senior Director, Human Resources** in the *Hyams* matter. I have reviewed the deposition transcript of Ms. Kelly and am familiar with that testimony.  Attached as **Exhibit B** are true and correct copies of relevant excerpts from the deposition transcript. Ms. Kelly was designated to testify on behalf of CVS on the topics of: timekeeping; changes to timekeeping entries;  the provision of rest breaks; payment of premiums to plaintiff and/or members of the non-

exempt employee subclass for non-compliant rest breaks and/or Defendants' failure to authorize and permit rest breaks  and/or for non-compliant meal period; payment of minimum wages; payment of overtime wages; payment of  wages owed at the time of separation of  employment; reimbursement of  business  expenses;  relating  to cellular/mobile phones; notice of paid sick leave balance; training provided to plaintiff and/or members of the class regarding paid sick leave; training provided to managers of  plaintiff  and/or  members  of  the  class  regarding  reimbursement  of  business expenses; and  training provided to managers of Plaintiff and/or members of the class regarding paid sick leave  to/for Plaintiff and members of the non-exempt employee subclass which have been in effect during the class period.  *See* Ex. B [Kelly] 40:2-43:19, 46:10-56:13.  Although Ms. Kelly purported to make changes to her deposition transcript, those changes are not reflected in the testimony provided because they were not authorized by FRCP 30(e)(1) as a result of the failure of Ms. Kelly, her counsel, or anyone else acting on behalf of CVS to request review of the transcript prior to the close of the deposition.

4.    Attached hereto as **Exhibit C** is a true and correct copy of the Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23 filed in the *Hyams* action.

5.    Attached hereto as **Exhibit D** is a true and correct copy of the Declaration of Richard Drogin, Ph.D. in support of the Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23 filed in the *Hyams* action.

6.    In the course of discovery in the  *Hyams* action, I reviewed the arbitration agreement CVS represented as applying to class members during the time period of October 2014 to the present.  The arbitration agreement states that it does not apply to claims pending at the time the agreement is signed.

7.    I have been informed by my team that, during the course of  conversations with  potential objectors and opt-outs of the *Chalian* settlement, at least 10  class members informed us that they did not receive the notice or understand what it was.

It remains unclear how many others were not alerted to the settlement in accordance with their constitutional due process rights.

8.    Attached hereto as **Exhibit E** is a true and correct copy of an article accessed from the Los Angeles Times web site, https://www.latimes.com/california/story/2020-09-15/usps-crisis-survey-more-than-half-letters-delayed, entitled "The Los Angeles Times tested first-class U.S. Postal Service delivery. The results? Spotty at best, dismal at worst." by Maria L. La Ganga, Rong-Gong Lin II, dated September 15, 2020.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 13, 2020, in Manchester, Missouri.

_____/s/ Beth Gunn_____

Beth Gunn

DECLARATION OF BETH GUNN IN SUPPORT OF OBJECTION TO CLASS ACTION SETTLEMENT

# **<u>EXHIBIT A</u>**

Atkinson-Baker, Inc.
www.depo.com

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                      - - -

4    RYAN HYAMS and REGINE DUHON,       )
     individuals, on behalf of          )
5    themselves, and all others         )
     similarly situated,                )
6                                        ) No. 4:18-cv-06278-HSG
              Plaintiffs,               )
7                                        )
         vs.                            )
8                                        )
                                         )
9    CVS HEALTH CORPORATION, a Rhode     )
     Island Corporation, CVS PHARMACY,  )
10   INC., a Rhode Island Corporation;  )
     GARFIELD BEACH CVS, LLC, a         )
11   California Corporation, and        )
     CVS RX SERVICES, INC., a New York  )
12   Corporation, DOES 1 through 25,    )
     inclusive,                         )
13                                       )
                                         )
14            Defendants.               )
     _____)

15

16                  DEPOSITION OF

17             FRCP 30(b)(6) WITNESS

18           JOHN SEYMOUR, VOLUME I

19           MORENO VALLEY, CALIFORNIA

20              JUNE 18, 2020

21

22   Atkinson-Baker
     (800)288-3376
     www.depo.com
23

24   REPORTED BY:  NATALIE BALLESTERO, CSR NO. 10149

25   FILE NO:   AE04239

Atkinson-Baker, Inc.
www.depo.com

1  because it sort of goes along with what the California

2  Board of Pharmacy requirements are.

3           Yeah.  California Guidelines For Pharmacy

4  Operations.

5           I'm sorry.  That's probably one of the

6  documents that was sent to me.  Let me discover where it

7  is here.

8           It is -- I'm sorry.  I don't know what your

9  numbers are, but this is called California Guidelines For

10  Pharmacy Operations During the Absence of a Pharmacist,

11  and it says CVS 4112.

12     Q.    I'm going to find that document so that we

13  can discuss it.

14     A.    Certainly.

15  MS. GUNN:  Now might be a good time for us to take

16  a short break because we've been going for a little bit,

17  and that way I can pull that document, and we can discuss

18  it.  So why don't we take ten minutes and then come back.

19           All right.  Thanks everybody.

20           (Whereupon a recess was taken.)

21  BY MS. GUNN:

22     Q.    Okay.  So this exhibit needs to be marked

23  and entered into the record as Exhibit 123.  It's Bates

24  labeled CVS 004112.  The words at the top page say

25  "California Guidelines For Pharmacy Operations During

Atkinson-Baker, Inc.
www.depo.com

1    Absence of Pharmacist For Meal and Rest Breaks."

2                    (Whereupon Plaintiffs' Exhibit 123

3                     was marked for identification.)

4    BY MS. GUNN:

5        Q.    John, you referred to this document earlier.

6    Do you now have it available to you?

7        A.    I do.

8        Q.    Do you know what the date of this document

9    is?

10       A.    I do not.

11       Q.    Do you know who received this document?

12       A.    I believe it's referenced in some of the

13   trainings to click on the guidelines for your particular

14   state, and it brings up this document.  So that would be

15   the pharmacists who were doing the training.

16       Q.    Can you point me to where it is referenced?

17       A.    I'm trying to pull up one of the trainings

18   where it has a hyperlink.

19       Q.    Do you mean you're pulling up a version of

20   the trainings that is different than the one that I have?

21       A.    No, I don't mean that at all.  I'm recalling

22   that some of the trainings said "Hey, if you're in

23   California, click here for guidelines for your particular

24   state" like the last training we were looking at, I

25   think.

Atkinson-Baker, Inc.
www.depo.com

1              I'm sorry.  I lost what the last training

2    was we were looking at.  That's where I was going to.

3         Q.    I think the last one we were looking at was

4    121.

5         A.    Okay.  I found 121.

6              I'm sorry.  It would not have been this one

7    because this one was not California specific.  I may be

8    mistaken.  Perhaps it's not hyperlinked.  I was under the

9    impression that one of the green presentations we looked

10   at had a link that we talked about, you know, you choose

11   the various options, and one of them is to supervise

12   non-exempt people in California.  I thought there was one

13   for pharmacists.  I may be mistaken.

14        Q.    Well, I do want to get your testimony on it

15   so I don't want to -- I mean, you know, I don't want you

16   to try to change testimony later when I don't have an

17   opportunity to ask you questions about it.  So I want to

18   get your testimony on what this document is now while

19   we're here to talk about it.

20             If you think it's part of the trainings in

21   some way and you think there's something that you can do

22   to determine that, then is that -- you know, is there

23   something that you can do to determine whether or not

24   it's part of the trainings?

25        A.    It may not be part of the trainings.  It was

Atkinson-Baker, Inc.
www.depo.com

1  something that we asked stores to post in the stores or

2  the pharmacies, and it may not have been an actual part

3  of the training.  It may have been a supplemental

4  guideline, if you will, a single-page guideline you put

5  on the bulletin board.  I'm sorry.  I don't recall.

6       Q.    What do you know about this document?  Do

7  you know who created it?

8       A.    No.

9       Q.    Do you know who disseminated it?

10      MS. ZARGAROF:  I object as vague and ambiguous.

11      THE WITNESS:  The actual document, who sent it out?

12  BY MS. GUNN:

13      Q.    Yes.

14      MS. ZARGAROF:  Same objection.

15      THE WITNESS:  I'm sorry.  I don't know who sent out

16  specific documents to our stores.

17  BY MS. GUNN:

18      Q.    Do you know the manner in which it was

19  disseminated?

20      A.    No.

21      Q.    Do you know who the recipients were?

22      MS. ZARGAROF:  I object as vague and ambiguous,

23  lacks foundation.

24      THE WITNESS:  So our HR Partner and I gave

25  direction during our region meeting that this document

 1   was to be posted in all the break rooms.  I don't know

 2   specifically if we handed it out to people at that point

 3   in time or if it was part of a -- what we talked about --

 4   Hub or Workload Manager task, if it was part of an e-mail

 5   that was sent to the stores.  I do recall having the

 6   discussion that our expectations were this was posted in

 7   the store.

 8   BY MS. GUNN:

 9        Q.    And who was that discussion with?

10        A.    With field leaders, like the district

11   managers.

12        Q.    And do you know what the district managers

13   did with this document?

14        A.    Not individually, no.

15        Q.    When was this discussion that you had with

16   the district managers?

17        A.    This document was when I was still in the

18   training role.  So it would have been sometime prior to

19   2012.

20        Q.    And do you know whether --

21              And when did you stop being in the training

22   role?

23        A.    May of 2012.

24        Q.    Do you know whether after May of 2012

25   anything was done with this document to make sure that it

Atkinson-Baker, Inc.
www.depo.com

```
 1   was in the California pharmacies?

 2         A.    I'm not sure I understand what you mean by

 3   your question.  I mean did we go and make sure that

 4   everybody had it posted?  No.  If that's what you're

 5   asking.

 6         Q.    It wasn't part of an audit; right?

 7         A.    Actually it may have been part of our HR

 8   audit that took place in July.  I don't recall

 9   specifically, and in my trying to understand where this

10   information was from, I looked at the HR audit, and I

11   don't see it listed, but I don't have HR audits going

12   back to, you know, when I first started doing them in

13   2007.

14         Q.    Well, yeah, during the time period of 2014

15   to the present, it's not listed as part of the HR audits,

16   is it?

17         A.    I don't know.  I'm not part of the HR audits

18   after 2012.

19         Q.    And I think you said it was your expectation

20   that this would be posted in the pharmacies.

21               Did I get that right?

22         A.    The store or the pharmacy.  Excuse me.

23         Q.    Where in the store would you expect it to be

24   posted?

25         A.    We have various bulletin boards usually in
```

Atkinson-Baker, Inc.
www.depo.com

```
 1   the break room where all required posters whether they're
 2   federal or state posters and any important corporate
 3   communications would be posted as well.  I think there's
 4   like seven bulletin boards in our break rooms.
 5        Q.    Is there any place else where you would
 6   expect it to be posted?
 7        A.    Or in the pharmacy.
 8        Q.    Where in the pharmacy?
 9        A.    I'm sure every store probably has a
10   different location where they post notes or e-mails or
11   bulletins.
12        Q.    Do you have any documents associated with
13   instructions to provide this document that is Exhibit 123
14   to any pharmacists in California?
15        A.    Do I have a document that says to give this
16   document to somebody?  Is that what you're asking?
17        Q.    I'm asking if you are aware of any documents
18   that have instructions regarding providing this document
19   to pharmacists in California?
20        A.    No.
21        Q.    Do you know who would have that information?
22        A.    No.
23        Q.    Do you know one way or the other whether
24   this document is posted in the stores in pharmacies in
25   California during the time period of 2014 to the present?
```

1        A.      Not from 2014 to the present, no.

2        Q.      Are you aware of any policy that refers to

3    this document?

4        MS. ZARGAROF:   I object as vague and ambiguous.

5        THE WITNESS:   I would have to review line by line

6    on the policies.  I don't recall a policy that -- I'm

7    sorry.  I don't know.

8    BY MS. GUNN:

9        Q.      Do you know whether there is any internal

10   tracking of this document and whether employees have

11   become aware of it?

12       MS. ZARGAROF:   I object as compound, vague and

13   ambiguous.

14       THE WITNESS:   I don't believe it appears on a

15   transcript anywhere.

16   BY MS. GUNN:

17       Q.      Do you know whether there is any other place

18   where CVS has recorded that this document has been

19   provided to California employees during the relevant time

20   period?

21       A.      Not to my knowledge.

22       Q.      Did you have this document in your

23   possession?

24       MS. ZARGAROF:   I object as vague and ambiguous.

25       THE WITNESS:   I'm sorry.  In my possession when?

Atkinson-Baker, Inc.
www.depo.com

1   BY MS. GUNN:

2        Q.    Excellent point.

3             Prior to reviewing documents in preparation

4   for this deposition, was this a document that you had in

5   your possession?

6        A.    I was aware of it.  I did not have the

7   document, no.

8        Q.    And how were you aware of it?

9        A.    Because we told all the district leaders at

10  a meeting that they needed to make sure that this was

11  posted in the stores or in the pharmacies themselves.

12       Q.    Sometime prior to 2012?

13       A.    I would think so because that's when I was

14  the training manager prior to 2012, yes.

15       Q.    So do you know where this document is

16  regularly housed at CVS?

17       A.    No.

18       Q.    I imagine you're familiar with the way that

19  CVS's training documents look; is that accurate?

20       A.    Yes.

21       Q.    And I've seen several training documents,

22  and they have a heading at the top that has some

23  standardized material, and then they have usually a chart

24  at the end that lists the dates that policies were

25  revised and, you know, sometimes it provides some

Atkinson-Baker, Inc.
www.depo.com

```
 1    information about what those revisions were.
 2              Do you know what I'm talking about?
 3         A.    I believe so.
 4         Q.    Are CVS's official policies -- do they
 5    appear in that form?
 6         MS. ZARGAROF:  I object as vague and ambiguous.
 7         THE WITNESS:  A policy that's on the policy and
 8    procedure portal has a fairly standard format, not all of
 9    them are that way, but then there are guidelines; there's
10    supplements; there's appendixes.  There is various other
11    documents that may not be in the standard format of a
12    policy.
13    BY MS. GUNN:
14         Q.    And do you know whether this document that
15    is Exhibit 123 is on CVS's policies and procedures
16    portal?
17         A.    I don't know.
18         Q.    It doesn't look like one of the standardized
19    policies that appears on that portal though, does it?
20         MS. ZARGAROF:  I object as vague and ambiguous,
21    misstates prior testimony.
22         THE WITNESS:  It doesn't have the same format as
23    what I would -- it doesn't have the format as most
24    policies do, that's correct.
25    ///
```

Atkinson-Baker, Inc.
www.depo.com

```
 1    BY MS. GUNN:
 2         Q.    I think you said there were some guidelines
 3    also.  Are those guidelines on the portal?
 4         MS. ZARGAROF:  I object as vague and ambiguous.
 5         THE WITNESS:  I'm actually not sure that I know the
 6    answer to that, and here's why:  It's because many of the
 7    policies have hyperlinks built into the policy.  So you
 8    click on it, and, for instance, it would bring up -- and
 9    I don't know that this is a fact in this case, but it
10    would bring up the California guidelines, maybe this
11    policy, but I don't know if that policy itself is housed
12    on the policy and procedure portal or if it's, you know,
13    on some hard drive somewhere else in the business.
14    BY MS. GUNN:
15         Q.    Other than it having been posted at some
16    point prior to 2012, are you aware of this being linked
17    to any particular document that was provided to
18    California non-exempt employees during the time period of
19    2014 to the present?
20         A.    I'm not aware of that, no, ma'am.
21         Q.    Can you open the one that is marked as
22    Exhibit 122.  This one will also have to be entered into
23    the record.  It is Bates numbered CVS 005309 to 5310.
24              (Whereupon Plaintiffs' Exhibit 122
25               was marked for identification.)
```

1                REPORTER'S CERTIFICATE

2

3

4       I, NATALIE BALLESTERO, CSR No. 10149, Certified

5  Shorthand Reporter, certify:

6       That the foregoing proceedings were taken before

7  me at the time and place therein set forth, at which

8  time the witness was put under oath by me;

9       That the testimony of the witness, the questions

10  propounded, an all objections and statements made at

11  the time of the examination were recorded

12  stenographically by me and were thereafter transcribed;

13       That the foregoing is a true and correct

14  transcript of my shorthand notes so taken;

15       I further certify that I am not a relative or

16  employee of any attorney of the parties, nor

17  financially interested in the action.

18       Reading and signing was requested.

19       I declare under penalty of perjury under the laws

20  of California that the foregoing is true and correct.

21       Dated this 7th day of July, 2020.

22

23

24  _____

      Natalie Ballestero, CSR No. 10149

25

# **<u>EXHIBIT B</u>**

Atkinson-Baker, Inc.
www.depo.com

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                        - - -

4  RYAN HYAMS, an individual, on   )
   behalf of himself and all       )
5  others similarly situated,      )
                                    )
6             Plaintiff,            )
                                    )
7  vs.                             )  Case No.
                                    )  4:18-cv-06278-HSG
8  CVS HEALTH CORPORATION, a Rhode )
   Island Corporation, CVS         )
9  PHARMACY, INC., a Rhode Island  )
   Corporation, GARFIELD BEACH     )
10 CVS, LLC, a California          )
   Corporation, and CVS RX         )
11 SERVICES, INC., a New York      )
   Corporation, DOES 1 through 25, )
12 inclusive,                      )
                                    )
13            Defendants.           )
   _____)

14

15

16                    VOLUME 1

17           RULE 30(b)(6) DEPOSITION OF

18                  MAURA KELLY

19              BURBANK, CALIFORNIA

20              FEBRUARY 25, 2020

21

22
   Atkinson-Baker, Inc.
23 (800) 288-3376
   www.depo.com
24 Reported by:  Aileen Neitzert, RDR, CRR, CSR No. 5318

25 File No.:     AE01851

1 says "Reason for Change":  "Annual review; Template

2 update; Policy language revised."  Do you see that?

3     A.   Yes.

4     Q.   And then under that, July 20th, 2017, "Policy

5 language revised under C. Waivers" and then "Section

6 C."  Do you see that?

7     A.   Yes.

8     Q.   OK.  Can you tell -- is it your understanding

9 that the one that we're looking at is this July 20th,

10 '17, policy since it lists this revision history?

11     A.   That would be my best guess, yes.

12     Q.   OK.  So usually -- HR protocol usually you can

13 look at the revision history, and the last revision

14 listed is usually the document that you're looking at;

15 is that right?

16     A.   Yes.

17     Q.   OK.  What policy language was revised under C.

18 Waivers?  I guess they mean section C.

19     A.   Yeah, I wouldn't be able to answer that unless

20 I was comparing policies.

21     Q.   OK.  Maybe we can do that.

22     A.   From the 2015 version?

23     Q.   Uh-huh, yes, that would be -- apart from

24 looking at these now, do you have any knowledge

25 regarding what changes were made in 2017 to the waiver

1 policy?

2    A.   No.  Unfortunately, since California wasn't

3 part of my territory, this wouldn't have been on my

4 radar.

5    Q.   OK.  And did you do anything prior to today's

6 deposition to become familiar with what changes were

7 made to the waiver policy for California non-exempt

8 employees?

9    A.   No.

10    Q.   OK.  Well, then we won't -- I don't think we

11 need to kind of do this in realtime.  That's fine.

12        We keep kind of marching through this document.

13 If you can turn to page 353, this is also a meal period

14 policy that was produced in this case, but it looks

15 different to me than the one ones that we just

16 reviewed.  It's different in format and it doesn't have

17 a date.  Do you know the origin of this document?

18    A.   I do not.

19    Q.   Have you seen this document before?

20    A.   I don't know that I have.  And you're saying

21 that this goes to page 355, correct?

22    Q.   It looks that way to me.  These were all

23 produced just in a group, so I can't speak to that

24 other than that.  Are you -- or do you think maybe it

25 keeps going?

1      A.   Well, I wasn't sure if this last instructional

2  page was part of it where it kind of gives you a

3  highlight.

4      Q.   Which page are you referring to as the

5  instructional page?  OK.  Is that 356?

6      A.   Yes.

7      Q.   OK.  Oh, that could be.  So you think that

8  might be part of this one --

9      A.   If this is part of it, my educated guess is

10 it's going to be that it's store manager development

11 because you see SMD, so probably -- at the end of this

12 last page, so this would be a document that would

13 reinforce our policies around California stores' meal

14 and rest periods.

15     Q.   OK.  So is the -- store manager development,

16 what does that mean?

17     A.   Curriculum.

18     Q.   So this 353 to 356, if it is part of SMD, is

19 something that would be distributed to store managers?

20     A.   It would -- my guess would be it would be

21 California only store managers since it's California

22 specific, but it would be -- what I'm looking at, based

23 on that last page, if it's all together, looks like

24 curriculum.

25     Q.   OK.  And then -- kind of begs the question.

1 For the -- for other policies that we've reviewed in

2 this Exhibit 93, the ones that have the document number

3 and the title and the chart on the top, are those

4 distributed to -- or who are those given to?

5    A.   Depends.  So a lot of the materials when you

6 see it listed like this is a policy.  There will be

7 complementary materials as well, whether it's a LEARNet

8 module where they actually go in and they give them

9 almost like a role play scenario.  During that module

10 they'll actually have an opportunity to pull that

11 policy, acknowledge that they've reviewed it, read it,

12 and then they continue on with the module, is typically

13 what I've seen.

14          We also house policies and procedures on a

15 website.  I believe that the access would probably

16 be -- what you could access would be based off of what

17 your level of access is in our system overall.  Guess

18 on my part, but --

19    Q.   Would a non-exempt California employee be able

20 to view the policies that are in Exhibit 93, the one

21 that begins that at page 332 or the one that begins at

22 page 342, for example?

23    A.   Yeah, this would be something that I -- that is

24 part of their curriculum, their sign-offs for

25 compliance.  And any of our non-exempt colleagues could

Atkinson-Baker, Inc.
www.depo.com

1 reach out to their local HRVP to request a copy of a

2 policy or also to speak with somebody if they have

3 questions on a policy or procedure at the store, along

4 with the other avenues of myHR or Advice and Counsel.

5    Q.   But if I understood your testimony correctly,

6 you're saying that the employees probably receive

7 training on the underlying policy but may not have

8 received the policy itself as we see it here on, like,

9 for example, page 332 to page 341?

10    A.   In the majority of the modules -- and I'd have

11 to look specifically for the one that you're

12 referencing, but in that LEARNet training course, with

13 something like this, there should be -- at the

14 beginning of the course they'll acknowledge the policy.

15 It actually pulls it up as a PDF where they can review

16 it and acknowledge that they've received it in.  Any of

17 these big ones like meal and rest period or even for,

18 like, HR procurement, they give us all of the policies

19 and procedures during that training.

20    Q.   OK.  And LEARNet is CVS's computerized training

21 program?

22    A.   Yes.  And also in the employee handbook for

23 every new hire that gets hired there's also an

24 acknowledgment around the general policies as well.

25 And I think California would probably -- I'd have to

Atkinson-Baker, Inc.
www.depo.com

1  look at it, but I think California would also probably

2  have this specific information in their colleague

3  handbook for every new hire.

4     Q.   And a new hire, as far as receiving the

5  employee handbook, how do they receive that?  Is that

6  electronically?

7     A.   Electronically.

8     Q.   And is your knowledge based on July 2019

9  forward as far as employees acknowledging an employee

10 handbook electronically in California?

11    A.   In California, yes.

12    Q.   OK.  So you don't know if prior to July 2019 if

13 California non-exempt employees acknowledged handbooks

14 electronically; is that right?

15    A.   My assumption would be that they did.  I

16 don't -- I don't know that we've made any major

17 changes.

18    Q.   You don't have a basis of knowledge for it?

19    A.   Correct.

20    Q.   OK.  Are the employee acknowledgments of

21 handbooks, as far as you know -- is that data

22 maintained somewhere?

23    A.   Yes.

24    Q.   Where is that maintained?

25    A.   I couldn't tell you what system that it's

1 maintained, but we're able to look at acknowledgments

2 by colleagues.

3    Q.   OK.

4    A.   Actually, each learner has their own

5 transcript.

6    Q.   What does that mean?

7    A.   So as -- for myself as an employee with CVS, I

8 have a transcript of every course and every

9 acknowledgment that I've taken in CVS.

10    Q.   OK.  And that's electronic?

11    A.   Um-hum.

12    Q.   Is that yes?

13    A.   Yes.  Sorry.  Yes.

14    Q.   Have you ever heard of any employee complaints

15 regarding managers moving their meal period clock-out

16 time so that it looked like it -- editing it so that it

17 looked like they had taken the meal period before the

18 fifth hour when they have not?

19    A.   I have not had exposure to that.

20    Q.   And, again, is that based on July 2019 to

21 present?

22    A.   Correct.

23    Q.   OK.  We could go back to page 340 of Exhibit

24 93.  Is there any way to -- do you see anywhere on this

25 page 340 a method for the employee to revoke a meal

Atkinson-Baker, Inc.
www.depo.com

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, AILEEN NEITZERT, CSR No. 5318, Certified

 4  Shorthand Reporter, certify:

 5          That the foregoing proceedings were taken

 6  before me at the time and place herein set forth, at

 7  which time the witness was put under oath by me;

 8          That the testimony of the witness, the

 9  questions propounded, and all objections and statements

10  made at the time of the examination were recorded

11  stenographically by me and were thereafter transcribed;

12          That signature by the witness was not requested.

13          That the foregoing is a true and correct

14  transcript of my shorthand notes so taken.

15          I further certify that I am not a relative or

16  employee of any attorney of the parties nor financially

17  interested in the action.

18          I declare under penalty of perjury under the

19  laws of California that the foregoing is true and

20  correct.

21          Dated this 10th day of March, 2020.

22

23

24          _____

25          AILEEN NEITZERT, CSR NO. 5318
```

# **<u>EXHIBIT C</u>**

BETH A. GUNN, CA Bar No. 218889
beth@gunncoble.com
CATHERINE J. COBLE, CA Bar No. 223461
cathy@gunncoble.com
GUNN COBLE LLP
101 S. 1st Street, Suite 407
Burbank, CA 91502
Telephone:      818.900.0695
Facsimile:      818.900.0723

JENNIFER KRAMER, CA Bar No. 203385
jennifer@laborlex.com
BARBARA DUVAN-CLARKE, CA Bar No. 259268
barbara@laborlex.com
ASHLEY H. CRUZ, CA Bar No. 306235
ashley@laborlex.com
JENNIFER KRAMER LEGAL, APC
5015 Eagle Rock Blvd., Suite 202
Los Angeles, CA 90041
Telephone:      213.955.0200
Facsimile:      213.226.4358

Attorneys for Plaintiffs
RYAN HYAMS and REGINE DUHON,
on behalf of themselves and others
similarly situated

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND

| | |
|---|---|
| RYAN HYAMS, and REGINE DUHON, individuals, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CVS HEALTH CORPORATION, a Rhode Island Corporation, CVS PHARMACY, INC., a Rhode Island Corporation, GARFIELD BEACH CVS, LLC, a California Corporation, and CVS RX SERVICES, INC., a New York Corporation, DOES 1 through 25, inclusive,<br><br>Defendants | Case No. 4:18-cv-06278-HSG<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23**<br><br>Action Filed:     August 21, 2018<br>Removal Date:  October 12, 2018<br>Trial Date:        Not set<br><br>DATE:      December 3, 2020<br>TIME:       2:00 pm<br>PLACE:    Courtroom 2, 4th Floor<br>                 1301 Clay Street<br>                 Oakland, CA 94612 |

1

Chambers Copy - Do Not File

**TO THE COURT, TO DEFENDANTS CVS HEALTH CORPORATION, CVS PHARMACY, INC., GARFIELD BEACH CVS, LLC, and CVS RX SERVICES, INC. (collectively, "CVS"), AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on December 3, 2020, at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2 of the above referenced Court located at 1301 Clay Street, Oakland, California 94612, Plaintiffs Ryan Hyams and Regine Duhon ("Plaintiffs"), on behalf of themselves and all other similarly situated employees, in relation to their claims for violations of the California Labor Code ("Labor Code") against CVS, will and hereby do move the Court for certification under Rule 23 of the Federal Rules of Civil Procedure ("FRCP") of a Class and subclasses as defined below, and the appointment of class counsel.

The Retail Pharmacy Class is defined as all individuals who worked as non-exempt CVS retail employees in California at any time during the period from August 21, 2014 (four years from the filing of the original Complaint) through the date established by the Court for notice of certification of the Class (the "Class Period"). The subclasses are defined as follows:

| Claim | Proposed Class/Subclass |
|---|---|
| Failure to Authorize and Permit Rest Breaks | All Non-Exempt California Retail Employees ("Retail Pharmacy Class") |
| Failure to Provide Meal Breaks | Pharmacists who worked at least one shift in which they were the only pharmacist on duty ("Solo Pharmacist Subclass") |
| Failure to Provide Meal Breaks | All California Non-Exempt Employees whose time records do not show a timely meal break and who did not receive a meal period premium in compliance with CVS' policy ("Meal Break Subclass") |
| Failure to Pay the Regular Rate of Compensation for Meal Break/Rest Break Premium Pay | All California Non-Exempt Employees whose time records show a meal period premium ("MPP") or rest period premium ("RPP") was paid ("Premium Pay Subclass") |
| Failure to Pay All Wages Due (including Overtime Wages) | All California Non-Exempt Employees in the Position of Shift Supervisor, Operations Supervisor, Operations Manager, Store Team Leader, Pharmacist or Pharmacy Manager who worked opening and closing shifts ("Off-the-Clock Subclass") |
| Failure to Pay Overtime Wages at the Proper Regular Rate of Pay | All California Non-Exempt Employees who worked overtime ("Regular Rate Subclass") |
| Failure to Pay Overtime Wages at the Proper Regular Rate of Pay | All California Bonus-Eligible Employees who worked overtime ("Regular Rate/Bonus Subclass") |

1

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

| Failure to Reimburse for Necessary Business Expenses | Retail Pharmacy Class |
|---|---|
| Failure to Maintain Business Records/Issue Accurate Itemized Wage Statements | Retail Pharmacy Class |
| Failure to Pay All Wages Due at Termination | Former California Non-Exempt Employees who did not receive all wages upon termination ("Former Employee Subclass") |

This Motion is made on the grounds that the proposed Class is sufficiently numerous that joinder is impracticable; there are questions of law and fact common to the Class; the named Plaintiffs' claims are typical of the Class' claims; and the named Plaintiffs will adequately represent the Class. FRCP 23(a). Certification of the Class under FRCP 23(b)(3) is appropriate because common questions predominate over any questions affecting only individual class members, and class resolution is superior to other available methods for the fair and efficient adjudication of the controversy.

The motion is based upon the Memorandum of Points and Authorities, the concurrently-filed Appendix of Evidence and supporting exhibits, the pleadings, documents, and records on file herein, and upon such other further oral argument or evidentiary matters as may be presented at the hearing for this motion or as otherwise permitted by the Court.

DATED: August 27, 2020

GUNN COBLE LLP

By: /s/ Beth Gunn
    Beth Gunn
Attorneys for Plaintiffs RYAN HYAMS and REGINE DUHON, on behalf of themselves and others similarly situated

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

# **TABLE OF CONTENTS**

I. INTRODUCTION.......................................................................................... 8

II. FACTUAL BACKGROUND ....................................................................... 8

    A.    CVS is a Thriving Retail Pharmacy Business. ................................... 8

    B.    CVS' Employees Are Required to Meet Stringent Work Demands. ............. 8

    C.    CVS Controls its Business Results Using Demanding Metrics. .................... 9

    D.    CVS Uniformly Schedules Employees to its Lean Labor Budget. ............... 11

    E.    CVS' Official Policies Conflict With Its Actual Business Practices. ........... 13

        1.    CVS Has Centralized Policies and Practices.................................... 13

        2.    CVS' Meal Break Policies and Practices. ........................................ 13

        3.    CVS' Rest Break Policies and Practices. ........................................ 15

        4.    CVS' Payroll and Wage Statement Policies and Practices. ............. 17

        5.    CVS' Timekeeping/Off-the-Clock Policies and Practices. ............... 17

        6.    CVS' Personal Cell Phone Usage and Related Policies and Practices........................................................................................ 18

    F.    Time and Pay Data for CVS' Non-Exempt Employees Can Identify the Number of Shifts, Pay Periods, or Months Worked Sufficient to Provide Common Proof.................................................................... 19

    G.    Plaintiffs are Typical and Adequate Class Representatives. ......................... 20

III. LEGAL STANDARD TO CERTIFY A CLASS PURSUANT TO FRCP 23.................. 20

IV. THE CLASS CLAIMS SHOULD BE CERTIFIED........................................................... 21

    A.    Each of Plaintiffs' Claims in This Motion Fulfill the FRCP 23(a) Factors. ............................................................................................. 21

        1.    The Proposed Class/Subclasses are Numerous and Ascertainable. ................................................................................ 22

        2.    Common Questions of Law and Fact Exist...................................... 22

        3.    Plaintiffs' Claims are Typical of the Class........................................ 23

        4.    The Representatives Will Adequately Represent the Class' Interests. ........................................................................................ 24

3

B.     Each of Plaintiffs' Claims in This Motion Fulfill the FRCP 23(b) Factors. ..................................................................................... 24

        1.     Separate Actions Would Create a Risk of Inconsistent Adjudications....................................................................... 24

        2.     Common Questions of Law and Fact Predominate and a Class Action is the Superior Means of Adjudicating the Controversy. ....................................................................... 24

V. CONCLUSION .................................................................................... 32

---

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

5

*Alvarado v. Dart Container Corp. of Cal.*,
4 Cal.5th 542 (2018)........................................................................................................29

6

7

*Amey v. Cinemark USA Inc.*,
2018 WL 3956326 (N.D. Cal. Aug. 17, 2018)...............................................................31

8

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
568 U.S. 455 (2013).........................................................................................................21

9

10

*Augustus v. ABM Security Servs., Inc.*,
2 Cal.5th 257 (2016).........................................................................................................25

11

*Brinker Rest. Corp. v. Super. Ct.*,
53 Cal. 4th 1004 (2012)......................................................................................25, 26, 27

12

13

*Cahilig v. IKEA U.S. Retail, LLC*,
2019 WL 3852490 (C.D. Cal., June 20, 2019)...............................................................26

14

15

*Cal. v. Infineon Techs. AG*,
2008 WL 4155665 (N.D. Cal. Sept. 5, 2008)..................................................................32

16

*Castro v. ABM Indus., Inc.*,
325 F.R.D. 332 (N.D. Cal. Jan. 26, 2018) .....................................................................30

17

18

*Chavez v. Lumber Liquidators, Inc.*,
2012 WL 1004850 (N.D. Cal., Mar. 26, 2012) ..............................................................31

19

20

*Cochran v. Schwan's Home Serv., Inc.*,
228 Cal. App. 4th 1137 (2014) ..................................................................................29, 30

21

22

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) .....................................................................................................21, 32

23

*Ferra v. Loews Hollywood Hotel*,
257 Cal. Rptr. 3d 591 (Cal. Jan. 22, 2020) ...................................................................28

24

25

*Frlekin v. Apple Inc.*,
8 Cal.5th 1038 (2020) (reh'g denied (May 13, 2020))...................................................28

26

27

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .......................................................................................23

28

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) .........................................................................................23

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

*Herrera v. Zumiez, Inc.*,
   953 F.3d 1063 (9th Cir. 2020) ............................................................................ 29

*Iljas v. Ripley Entertainment Inc.*,
   403 F.Supp.3d 793 (N.D.Cal. 2019) .................................................................. 31

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017) ............................................................................ 32

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
   305 F.R.D. 164 (N.D. Cal., Feb. 3, 2015) .................................................... 22, 32

*Lao v. H&M Hennes & Mauritz, L.P.*,
   2018 WL 3753708 (N.D. Cal., Aug. 8, 2018) .................................................... 28

*Lilly v. Jamba Juice Co.*,
   308 F.R.D. 231 (N.D. Cal., Sept. 18, 2014) ...................................................... 22

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................ 20

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ............................................................................ 24

*Mendiola v. CPS Sec. Sols., Inc.*,
   60 Cal.4th 833 (2015) ........................................................................................ 25

*Moore v. Ulta Salon Cosmetics & Fragrance Inc.*,
   311 F.R.D. 590 (C.D. Cal., Nov. 16, 2015) ...................................................... 28

*Parra v. Bashas', Inc.*,
   536 F.3d 975 (9th Cir. 2008) ............................................................................ 23

*Provine v. Office Depot, Inc.*,
   2012 WL 2711085 (N.D. Cal. July 6, 2012) ...................................................... 29

*Richie v. Blue Shield of Cal.*,
   2014 WL 6982943 (N.D. Cal., Dec. 9, 2014) .................................................... 30

*Ridgeway v. Walmart Inc.*,
   946 F.3d 1066 (9th Cir. 2020) ............................................................................ 25

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ............................................................................ 23

*Safeway, Inc. v. Superior Court*,
   238 Cal. App. 4th 1138 (2015) ..................................................................... 31, 32

*Sevilla v. Aaron's, Inc.*,
   No. 2019 WL 2879874 (C.D. Cal. Mar. 25, 2019) ............................................ 31

6

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ........................................................24, 25

*Vasquez v. Leprino Foods Co.*,
    2020 WL 1527922 (E.D. Cal., Mar. 31, 2020)...............................26

*Villalpando v. Exel Direct Inc.*,
    2016 WL 1598663 .......................................................................27

*Villalpando v. Exel Direct Inc.*,
    303 F.R.D. 588 (N.D. Cal., Nov. 20, 2014) ...............................22

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................20, 21, 23

**Statutes**

Cal. Bus. & Prof. Code § 4115(f)(1) ............................................26

Cal. Code Regs., tit. 16, § 1714.1 ...............................................27

FLSA ...............................................................17, 18, 29

Labor Code section 203 ...............................................................31

Labor Code section 226 ...........................................................30, 31

Labor Code section 226.7 ............................................................28

Labor Code sections 226.7(b) ......................................................25

Labor Code section 510(a) ...........................................................28

Labor Code section 512 ...........................................................25, 26

Labor Code sections 1182.12 .......................................................28

Labor Code sections 1194 ............................................................28

Labor Code section 2802 ..............................................................29

**Other Authorities**

FRCP 23 ..............................................................................*passim*

FRCP 30(b)(6) ...........................................................15, 16, 17

## I.   **INTRODUCTION**

This case is well-suited to class certification. There are approximately 58,000 current and former non-exempt retail employees at CVS who have all suffered the same harm at the hands of CVS' universal policies and practices regarding wage and hour issues. The proof Plaintiffs rely upon to support their claims is based on CVS' standardized processes, applicable across-the-board. Employees who fall into each subclass are easily ascertained by reference to time and pay data. As thoroughly detailed below, the FRCP 23 factors are all satisfied, no individualized inquiries are necessary to determine liability, and the Court should certify a class accordingly.

## II.   **FACTUAL BACKGROUND**

### A.   **CVS is a Thriving Retail Pharmacy Business.**

As a profitable drugstore chain with over 300,000 employees and 9,900 retail locations nationwide, CVS owns a large portion of the market, dispensing about 27% of the nation's total retail pharmacy prescriptions, about 1.4 billion a month. (AE 99 at 4-5, 98 at 7; 101; 100 at 2, 5, 7.)[1] After entering California in the mid-2000s, CVS has grown exponentially, currently operating 11% of its total U.S. operations in its 1,175 California locations. (AE 102.) CVS boasts about "working to create the most consumer-centric health company by being consumer obsessed," but stressed-out employees bear the brunt of CVS' relentless pursuit of increased profits and consumer responsiveness while understaffing its stores – practices that risk employees' and patients' health and safety. (AE 100, 102.)

### B.   **CVS' Employees Are Required to Meet Stringent Work Demands.**

CVS' California Pharmacy employees include Pharmacy Managers, who are licensed Pharmacists and Pharmacy Technicians ("Techs"). (AE 69 [Seymour 2], 9:3-24; 11:4-18; AE 70-71.) While on duty, pharmacy employees work at one of five "WorkStations" to complete their work tasks, which include (among other detailed job duties), accepting and data-entering prescriptions (called "scripts"), filling and verifying scripts, handling doctor and insurance inquiries, providing consultations, dispensing immunizations, handling pick-up and check out, incoming and outgoing calls for prescription refills, organizing the workstation and workflow, and working the drive-through

---

[1] Unless otherwise noted, all exhibits are to the concurrently filed Appendix of Evidence ("AE"). Deposition testimony is cited as (AE[#] [Witness Last Name], [page:line].)

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

(where applicable). (AE 42 [Kershaw 2] 37:14-41:2; AE 45; AE 49 [Neal 1] 171:23-174:22.) Techs must be "proficient" on each WorkStation, which limits the employees who can handle each separate job responsibility. (AE 49 [Neal 1] *id.*; 175:3-176:10; AE 42 [Kershaw 2] 40:2-13.)

Non-exempt Front Store employees include multiple job positions, including Store Associate, Shift Supervisor, Operations Supervisor, Operations Manager, and Store Team Leader. (AE 69 [Seymour 2] 36:22-38:25, 56:14-58:9, 59:1-60:9, 65:1-17; AE 71.) Store Associates' duties include cashiering, stocking inventory, pricing merchandise, setting up holiday displays, providing customer service, and performing opening and closing duties. (AE 69 [Seymour 2] 11:4-18, 16:23-3:17, 19; 33:12-36:21; 39:1-24; 48:25-50:16; 53:25-56:8; AE 71.) Store Associates are supervised by Shift Supervisors, who begin the chain of Front Store supervisory employees, which continues with Operations Supervisors, Operations Managers, and Store Team Leaders. (AE 72 [Turner] 41:19-46:10; AE 73.) CVS classifies these employees as nonexempt, as they regularly spend much of their time on the same tasks as lower-level employees, including cashiering and assisting customers. (AE 69 [Seymour 2] 53:25-60:9, 63:16-64:15, AE 71.) Certain Front Store employees are also trained on pharmacy-specific procedures so they can perform duties within the pharmacy section of the business. (AE 69 [Seymour 2] 36:13-21, 38:15-25, 57:12-20, 58:10-17, AE 71.)

C.    **CVS Controls its Business Results Using Demanding Metrics.**

During the class period, CVS has used several different types of metrics to evaluate the success of its business. AE 42 [Kershaw 2] 11:13-25, 24:9-17.) Each year, targets are set to increase results. (AE 42 [Kershaw 2] 17:3-20:9, 54:9-13.) The metrics have two main sources: customer surveys pertaining to its entire operations, and data analyzing the efficiency of the prescription filling process. (AE 36 [Kershaw 1] 25:4-26:19.) Until 2019, CVS used its "WeCARE" scorecard to measures the factors CVS considers key to its pharmacy operations, including whether prescriptions are filled in the designated amount of time set by CVS, by the time requested by the customer, within 15 minutes if the customer is willing to wait for it, whether doctors, customers and insurers were called within required timeframes, and whether the voicemail is checked every 15 minutes. (AE 36 [Kershaw 1] 23:24-34:24, 35:21-55:17; AE 42 [Kershaw 2] 65:21-66:2, 60:4-20; AE 46.) These action items display in CVS' RxConnect pharmacy software system, which orders and color-codes the tasks according to when they need to be

9

Chambers Copy - Do Not File

done: past-due items are orange, waiting customers are yellow, and acute items are blue, to clarify the urgency of pending tasks. (AE 36 [Kershaw 1] 42:13-44:8.) Prescriptions generally are expected to be filled within 30 minutes of the time of receipt (35 minutes after 2018), 15 minutes if the customer is willing to wait in the store. (AE 36 [Kershaw 1] 44:19-52:17, 58:5-59:8; AE 37-41.) Because these criteria are meant to differentiate CVS from its competitors, targets are associated with each metric, and points awarded accordingly, which are easier to attain with sufficient staffing. (AE 36 [Kershaw 1] 47:12-17, 49:17-51:2, 63:1-66:17.) The results are constantly updated and available, and are monitored on at least a monthly basis. (*id.*, 88:5-89:13; AE 42 [Kershaw 2] 24:18-27:21.) Meeting or exceeding the targets affects the incentive bonuses generated. (AE 2 [Ashton] 36:18-25.) In 2019, the metrics were altered to focus on whether prescriptions were ready when customers came to pick them up. (AE 36 [Kershaw 1] 73:13-77:9.) The other criteria continued to be monitored, but did not officially factor into incentive bonuses. *Id.* Failure to meet the metrics for an 8-week period could result in being marked as a "challenge store," with the potential for escalating discipline. (AE 47 [Kouyoumijian] 67:3-71:20.)

Since 2019, CVS' "myCustomer Connection" scorecard, generated from customer survey data, measures (for pharmacies) if customers are satisfied with inventory (scripts in stock), the script fill time, the pick-up time, and the care exuding from employees. (AE 36 [Kershaw 1] 23:23-24:23; AE 42 [Kershaw 2] 65:21-66:2, 60:4-20; AE 46.) For Front Store, the survey measures satisfaction with inventory, neatness, check-out time, employee friendliness, and if the employee offered to help or walk the customer to an item. (AE 36 [Kershaw 1] 78:12-79:17, 80:4-86:9; AE 36, 41.) Negative comments are displayed for all employees, and are attributed to the employees on duty. (AE 42 [Kershaw 2] 29:1-20.) These factors appear on the store's myHealth scorecard, which affects incentive bonuses. (AE 42 [Kershaw 2] 36:5-37:11, 43:7-48:18, 64:-65:20.) CVS' prior customer survey scorecard, "myCustomer Experience," measured the same criteria and was used in predominantly the same way. (AE 42 [Kershaw 2] 9:18-37:13; AE 43-44.) The metrics emphasize availability to customers without delay. (AE 42 [Kershaw 2] 12:1-17:2, 30:1-35:21; AE 44.) When setting the metrics, CVS considers only the prior history of the stores – not whether there is sufficient staffing to reach those targets; CVS relies on its Labor Engineering Team for that (even though its adequacy has not been audited). (AE 42 [Kershaw 2] 51:8-52:23; AE 55 [Neal 2] 52:17-21.)

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

CVS' 2014-2019 incentive plans grant annual non-discretionary bonuses ranging from about $1,350-$6,600 for Pharmacists and about $6,600-$19,800 for Pharmacy Managers, if certain metrics are met or exceeded, depending on the size and volume of the pharmacy and the targets set by CVS management. (AE 2 [Ashton] 23:13-36:25, 40:17-49:22, 51:12-15, 57:12-59:24, 63:1-74:12; AE 3-17.) The bonuses depend on the pharmacy's speed and efficiency, incentivizing filling a lot of scripts, as well as customer availability. (*Id.*) Store Managers have similarly-structured non-discretionary incentive plans, awarding a percentage of the amount of profit within the manager's control, which includes labor costs such as meal and rest break premium pay (about $2,500-$5,000, but potentially much more). (AE 2 [Ashton] 76:16-78:8, 80:9-92:25, 94:22-95:1; AE 18-20; AE 47 [Kouyoumijian] 53:9-55:10.) District Leaders also earn bonuses based on the metrics. (AE 47 [Kouyoumijian] *id.,* 64:24-67:2.) Failure to meet the targets leads to escalating discipline, up to potential termination within 3-6 months. (AE 47 [Kouyoumijian] 36:14-45:5, 48:13-50:22.)

D.  **CVS Uniformly Schedules Employees to its Lean Labor Budget.**

CVS' proprietary scheduling software, mySchedule, generates its nonexempt California employees' schedules. (AE 49 [Neal 1] 40:10-42:14, 45:10-20, 89:18-22, 149:9-13.) The program displays district-wide availability, as CVS employees can work at any CVS store. (AE 49 [Neal 1] 123:9-124:4). Labor budgets, created annually by CVS' internal Workforce Management and Labor Engineering Teams, are the basis for the scheduling model. (AE 49 [Neal 1] 61:23-64:22, 69:8-70:6, 71:13-74:10, 125:24-126:16, 162:5-17; AE 55 [Neal 2] 15:16-18:11, 21:13-22:1, 40:8-41:19.) The Labor Engineering Team, using point-of-sale data, script data, and many other data points, creates "anticipated workload" expectations for how long it should take to complete expected tasks. (AE 49 [Neal 1] 72:11-76:7, 93:7-100:22, 118:6-23; AE 55 [Neal 2] 22:21-26:18.) These workload expectations translate into the amount of labor hours that CVS assigns to handle anticipated demand, without distinguishing between job positions. (AE 49 [Neal 1] 72:11-76:7, 100:23-102:11, 115:19-116:6; AE 47 [Kouyoumijian] 61:11-64:5.) CVS also predicts demand based on similar data reflecting each location's activity during 15-minute increments of time while open. (AE 49 [Neal 1] 105:19-106:10, 107:20-24, 117:17-118:2.) This "scheduling optimization" data feeds into mySchedule to dictate the number of employee hours to schedule at all times during the workday, which CVS expects

11

Chambers Copy - Do Not File

managers to check every week. (AE 49 [Neal 1] 108:1-5, 117:12-16, 157:24-159:7, 161:11-162:4; AE 47 [Kouyoumijian] 55:20-57:11.) Work schedules are created weekly, using entered information about employees' availability. (AE 49 [Neal 1] 54:11-57:20, 60:13-22, 70:7-71:8, 142:13-15.) Managers must review the optimization data and tweak the schedules to eliminate any "overs or shorts," meaning too much or too little labor to cover the anticipated demand. (AE 49 [Neal 1] 127:3-130:19, 162:18-163:5.) Otherwise, CVS expects the computer-generated schedules to be followed. (AE 49 [Neal 1] 171:14-22; AE 54.) Afterwards, all levels of management must analyze, at least weekly, the "worked optimization" data to ensure that the exact right amount of labor was scheduled to meet the demand. (AE 49 [Neal 1] 158:17-162:1.) The goal is to schedule employees to handle exactly the amount of anticipated workload while staying within the projected constraints of the labor budget. (AE 49 [Neal 1] 161:11-162:1, 171:14-22.) Failure to schedule for optimization leads to escalating disciplinary action, up to removal in 2-4 months. (AE 47 [Kouyoumijian] 55:20-61:2.) This creates a Catch-22: Understaffed stores can increase labor hours only if the target goals are met; if not, labor hours will be reduced, putting the goals further out of reach. (AE 47 [Kouyoumijian] 46:7-48:12, 61:3-63:11.)

Pharmacy Schedulers contact Pharmacists to ensure coverage at all times at all pharmacies, as the California Board of Pharmacy requires pharmacies to have at least one Pharmacist on duty in order to operate. (AE 49 [Neal 1] 58:10-60:18, 64:23-66:22; AE 176 [Greensword] ¶ 4, 11, 13, 16, 19, 20; AE 177 [Ruby] ¶ 4, 10-11, 15-16.) Schedulers call Pharmacists from nearby locations – whether they are on or off duty – to see if they will work one of the open shifts. (AE 176 [Greensword] ¶¶ 4, 5, 9-13, 16, 19-20; AE 177 [Ruby] ¶¶ 5, 8-9, 11-12, 15-16, 18; AE 177A [Flores] ¶¶ 4-7, 9-13.) Pharmacy Schedulers regularly spend large amounts of time calling and texting Pharmacists on their personal cell phones during this process until the schedule is finalized and generated, often filling multiple shifts at once. (AE 176, 177, 177A.) CVS emphasizes the importance of this process to its business, as it increases optimization when Pharmacist shifts are filled, better serves customer needs, decreases potential payroll overspending from overscheduling Techs, and produces better customer survey results. (AE 49 [Neal 1] 138:11-139:24; AE 94; AE 176 [Greensword] ¶¶ 8, 11, 18, 20-21; AE 177 [Ruby] ¶¶ 9, 12, 16-17; AE 177A [Flores] ¶¶ 4-7, 9-13.)

Managers frequently complain that their labor budgets are insufficient to handle the expected

12

Chambers Copy - Do Not File

workload. (AE 55 [Neal 2] 49:6-51:15.) Labor budgets are set annually and failing to stay within them negatively affects the metrics in the bonus plans. (AE 55 [Neal 2] 40:8-41:7; AE 56; AE 2 [Ashton] 35:3-9, 36:18-25, 80:14-23.) Meal and rest break premium pay is an unwanted labor cost to be avoided. (AE 47 [Kouyoumijian] 53:19-55:10.) Thus, employees felt pressured to satisfy the ambitious metrics and feared negative consequences for taking breaks or asking for premium pay. (AE 178.)

### E. CVS' Official Policies Conflict With Its Actual Business Practices.

#### 1. CVS Has Centralized Policies and Practices.

CVS has centralized functions for payroll, scheduling, staffing, human resources, policy-making, training and implementation. (AE 62 [Seymour 1] 19:17-28:6-25; AE 59 [Picard] 20:2-17,; AE 47; AE 31 [Kelly] 24:23-28:5; AE 32-33; AE 72 [Turner] 40:22-41:4, 64:22-66:7; AE 43.) The Human Resources function is centralized, with two Senior Directors overseeing four Human Resources Business Partners who handle human resources issues for employees throughout the state. (AE 72 [Turner] 27:17-29:21; AE 73; AE 31 [Kelly] 28:6-31:21.) When employee policies are introduced or updated, they are typically "rolled out" with streamlined guidance to CVS' leadership team, and combined with training modules for employees. (AE 72 [Turner] 34:16-37:24, 68:10-69:12; AE 31 [Kelly] 145:25-146:18; AE 62 [Seymour 1] 24:11-30:10, 79:18-23.)

#### 2. CVS' Meal Break Policies and Practices.

CVS has various iterations of its meal and rest break policies ranging over the class period, both nationwide and state-specific. (AE 31 [Kelly] 129:1-131:15, 134:7-135:3, 141:17-143:16; AE 33.) Since 2014, CVS' national meal break policy has contained a chart specifying California's meal break laws, as well as a California-specific written meal period policy. (AE 31, 33 (*id.*).) These policies all have a "Special Rules for Pharmacists" section, which states:

> If a pharmacist is the only pharmacist on duty, the nature of the pharmacy operations and the work performed by the pharmacist may prevent the pharmacist from taking a meal period in which she/he is relieved of all duty. However, pharmacists are required to take meal breaks in accordance with this policy when there is more than one pharmacist working at the time of the meal break.

(AE 31 [Kelly] 135:4-138:6; AE 33.) CVS' 2014 national meal and rest break policy states "For Pharmacists, there may be Board of Pharmacy requirements about how and when Pharmacists can leave the Pharmacy to take a Meal Break, if at all…" (*Id.*) Meal break trainings since 2014 reinforce this

13

Chambers Copy - Do Not File

concept – CVS' 2017 meal and rest break training course for non-exempt California employees refers to this, noting meal breaks must be taken "in accordance with special rules for pharmacists." (AE 33.)

As a result, Pharmacists have a limited ability to take legally-compliant meal breaks. Within all the relevant meal break policies CVS produced, no official written rules for how the pharmacy should operate in the temporary absence of a pharmacist, as required by the Board of Pharmacy, exist. (AE 62 [Seymour 1] 79:10-84:5, 96:5-97:6, 98:9-99:1; AE 72 [Turner] 56:3-11; AE 81-82.) Pharmacists are frequently scheduled to work when no other pharmacist is on duty ("Solo Pharmacists"); CVS' time data shows that this occurred over 870,000 times during the class period. (AE 76 [Hyams] 54:3-17; AE 189 [Drogin] Table 2a.) While Solo Pharmacists are expected to oversee, with a supervision ratio of 1:1 at all times, the work of Techs, who have limits on the work they can do in a pharmacists' absence, CVS has no written guidance for handling the ratios in the absence of a pharmacist. (AE 55 [Neal 2] 28:9-24, 36:14-18; AE 72 [Turner] 52:2-58:25; AE 85.) California's mandate that pharmacists counsel patients before dispensing medication makes it difficult to shut the pharmacy. (AE 69 [Seymour 2] 21:24-22:8; AE 71; AE 76 [Hyams] 210:12-214:13.) Solo Pharmacists had trouble leaving the premises for a meal break while responsibly juggling their professional duties. (AE 179.) Employees feared not being perceived as team players who were helping to reach the target metrics if they received premium pay that would adversely affect the location's labor budget. (AE 31 [Kelly] 127:3-14; AE 178, 180.) Managers knew that Solo Pharmacists were frequently interrupted during their breaks, but did not ensure that premiums were paid; instead, employees who had "too many" meal or rest break penalties were disciplined. (AE 180; AE 75 [Duhon] 90:18-95:14, 105:17-19, 111:14-112:2; AE 76 [Hyams] 210:12-212:8; AE 89 (firing Pharmacist who left the pharmacy during breaks).)

During the class period, CVS has had a policy to pay its non-exempt employees a meal period premium ("MPP"), at the employee's hourly rate of pay, for any shift over 5 hours in length (or 6 hours if there was a meal break waiver), when a timely, 30-minute meal period did not occur according to the employee's time punch records. (AE 31 [Kelly] 122:18-126:24, 158:10-20; AE 59 [Picard] 68:1-14.) CVS deviated from that policy by not paying the allegedly automatic meal period premium for approximately 1.6 million shifts under these circumstances, according to the time punch records CVS

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

produced. (AE 189 [Drogin] Table 2a[2].)

3. **CVS' Rest Break Policies and Practices.**

From August 2014 to June 3, 2017, CVS' national rest break policy stated that "Employees are required to remain on CVS premises during their Rest Periods." (AE 31 [Kelly] 129:1-132:22; AE 33.) The chart within that policy containing state-specific requirements did not identify any difference for California employees, as it did for other differences in state-specific rules. (*Id.*) CVS' California-specific rest break policy was silent as to whether employees could leave the premises for rest breaks. (AE 33.) Until June 2017, California employees took the national training on rest breaks, which stated that employees must remain on the premises during their rest breaks, with no reference to any California-specific rules; the California-specific training did not teach otherwise, despite emphasizing that employees must be allowed to leave the premises for meal breaks. (AE 62 [Seymour 1] 40:23-45:15, 48:6-10, 51:3-55:21, 57:6-64:5, 66:18-73:4, 77:21-78:23, 91:21-94:23; AE 63-68.) Managers took the same training even after June 2017, which tested their understanding that employees could not leave the premises for rest breaks. (AE 62 [Seymour 1] 70:6-73:4; AE 67.)

On June 3, 2017, CVS updated its rest break policy to include a provision that, for the first time, ostensibly authorized employees to leave the premises during their rest breaks. (AE 62 [Seymour 1] 61:14-62:15; AE 66.) Training regarding this policy was rolled out in July/August 2017, however, since that time, CVS employees regularly missed rest breaks without being paid premium pay – they have not known that rest break premiums should be paid for missed or interrupted rest breaks, and CVS does not record or pay such missed rest breaks (as it does for missed meal breaks) – tellingly, CVS' FRCP 30(b)(6) witnesses, long-term CVS employees, were unfamiliar with the concept of rest break premiums. (AE 31 [Kelly] 160:10-161:14; AE 47 [Kouyoumijian] 75:8-25; AE 62 [Seymour 1] 61:14-62:15; AE 66; AE 181, 182.) The class data shows that **only 8 rest break premiums have been paid throughout the class period consisting of 22 million shifts**. (AE 189 [Drogin] ¶ 27, Table 2a.) By contrast, 321,316 meal period premiums have been paid. *Id.* In July 2018, CVS' Advice & Counsel

---

[2] Plaintiffs' expert calculated the number of shifts affected by various criteria, which can be organized into data subsets, including job position and legal theories as to when violations occur. References herein refer to the broadest data subset, but other data configurations are also available.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

1    department advised that "colleagues may leave the building for their lunch, however they need to stay
2    at CVS for their rest break, as they are clocked in." (AE 88.)

3         In fact, CVS was well aware that employees were scheduled such that they could not perform
4    the tasks required of them during their shifts. (AE 31 [Kelly] 102:24-105:1; AE 49 [Neal 1] 154:7-
5    159:7, 147:2-149:13, 169:23-171:22, 176:12-184:17; AE 52-54.) Pharmacy employees knew that
6    leaving a WorkStation might mean that no one proficient was available to handle the station, which
7    would back up the queue and jeopardize the ability to satisfy the metrics. (AE 31 [Kelly] 109:25-110:18,
8    159:14-160:9; AE 36 [Kershaw 1] 42:13-44:8, 45:21-47:17; AE 42 [Kershaw 2] 40:2-13, 42:9-43:6;
9    AE 49 [Neal 1] 171:23:174:8.) CVS' understaffing was a constant refrain in its "Engagement Surveys"
10   conducted in 2016-2018, which solicited feedback from employees regarding chronic issues, and CVS'
11   California HR Director read "every comment." (AE 72 [Turner] 86:2-20, 88:12-90:23; AE 74; AE 31
12   [Kelly] 112:20-116:21, 118:25-119:4; AE 90-92.) Despite her awareness of employees complaining
13   about difficulties in taking rest breaks, the issue was not addressed through any official guidance. (AE
14   72 [Turner] 61:5-62:18.)  Nor did CVS monitor any aspect of compliance with California's rest break
15   laws as part of its HR Compliance Audits – including if employees could leave the premises, if there
16   was sufficient coverage to take rest breaks, or if rest break premiums were being paid – even though the
17   audits were meant to cover the most important compliance areas– instead targeting subjects like meal
18   break compliance where CVS' records might reveal its non-compliance. (AE 21 [Bailey] 51:20-52:1,
19   60:18-23, 70:19-72:7, 82:16-24, 104:23-105:6.)  Nor did CVS create a sign-off/attestation system for
20   employees to acknowledge that they took their rest breaks. (AE 31 [Kelly] 106:1-107:22.)

21        **Critically, CVS' Labor Engineering Team based the anticipated workload numbers used**
22   **to schedule employees on assumptions that workers would not take rest breaks as California law**
23   **requires: When allocating the amount of work to be completed in an 8-hour shift, *CVS factored in***
24   ***only 15 minutes as rest break time per 8-hour shift.*** (AE 57 [O'Hara] 26:2-28:1, 29:8-30:2, 31:2-16,
25   32:19-34:3, 37:5-40:10, 41:10-42:19, 43:2-11; AE 58; AE 49 [Neal 1] 105:10-108:24, 109:19-111:24.)
26   This applied to all non-exempt California retail employee positions. (AE 57 [O'Hara] 31:2-16, 58:22-
27   59:9.) There is no evidence that CVS, in its rigorous data-driven scheduling efforts, ever tried to factor
28   in ten minutes for every four hours worked, to occur as close as possible to the mid-point of the four-

16

Chambers Copy - Do Not File

hour period. (*id*.; AE 31 [Kelly] 103:2-19; AE 81 (RFPs 71, 72, 73, 77).) To the contrary, CVS'
carefully-configured scheduling, optimization goals, and workload expectations made it impossible to
take breaks if employees did their jobs as expected.

### 4.   CVS' Payroll and Wage Statement Policies and Practices.

CVS has bi-weekly pay periods for non-exempt employees and issues the same format of wage
statements to all of its employees nationwide. (AE 59 [Picard] 22:12-25:5, 35:23-36:18, 99:1-100:1;
AE 60.) While employees may log onto CVS' internal database, called myHR, to view pay statements,
they are only accessible on a rolling basis for one year. (AE 59 [Picard] 22:12-26:3, 26:9-23, 40:16-
41:16; AE 60.) CVS produced pay data in this case, which purportedly reflects the information
contained on the wage statements received by its California employees. (AE 84; 186) That data lists
multiple earnings codes but does not list the corresponding hourly rates of pay for those codes or the
total number of hours worked at each rate of pay. (AE 189[Drogin] ¶38.) Plaintiff Hyams' wage
statements do not specify the hourly rate of pay for each separate earnings code. (AE 79.)

CVS' FRCP 30(b)(6) witness designated to testify about CVS' payroll policies and practices
testified that CVS uses the FLSA method of calculating the regular rate of pay, not the California
method (using *all* hours worked as the denominator, instead of all *regular (non-overtime)* hours
worked); yet the documents allegedly containing this information refer only to paying overtime
pursuant to an employee's base pay rate. (AE 59 [Picard] 61:24-62:8; 48:12-57:24; AE 95; AE 84.)
Plaintiff Hyams' wage statements and pay records do not reflect adjustments made to his overtime to
reflect an adjusted regular rate of pay. (AE 78-79.) While CVS changed its practices in September 2018
to adjust overtime pay amounts to include bonus amounts, which previously had not been done, its
adjustment used the FLSA method of computing the regular rate of pay. (AE 95, 96, 97.) CVS' guidance
does not instruct overtime pay adjustments to be made for all overtime paid during the prior year in
which the annual non-discretionary bonus was earned, instead requiring adjustment only of overtime
amounts paid in the one pay period in which the bonus was paid. (AE 59 [Picard] 62:11-23; AE 2
[Ashton] 50:3-22; 86:4-87:23; AE 3-17.)

### 5.   CVS' Timekeeping/Off-the-Clock Policies and Practices.

CVS expects tasks to be done while opening and closing its locations that can only occur before

17

Chambers Copy - Do Not File

clocking in or after clocking out. (AE 29 [Ibrahim] 26:11-27:14; AE 47 [Kouyoumijian] 76:17-84:3.)
For example, employees must disable an alarm, use keys to unlock and enter the premises, and boot up
a computer at the start of a shift, and they must shut down the computer, lock up the location, and arm
the alarm at the end of a shift, all off-the-clock for an estimated 1-2 minutes. (*Id.*; AE 47 [Kouyoumijian]
76:17-80:7, 81:12-84:8; AE 29 [Ibrahim] 36:22-37:12, 53:20-54:13; AE 184.) At Target pharmacies
behind a gate, during opening shifts, Pharmacists must first disarm an alarm, unlock the pharmacy,
clock in, and then retrieve the money or have a Target manager bring the money to them; for closing
shifts, they must do this in reverse – tasks that are estimated to take an average of at least 1-2 minutes
on either end. (AE 29 [Ibrahim] 26:11-27:14, 36:22-37:17, 42:16-43:14; AE 48; AE 159 [Gallardo] ¶¶
7, 8; AE 155 [Etzler] ¶ 6; AE 156 [Faris] ¶¶ 6, 7; AE 158 [Francisco] ¶¶ 5, 6; AE 163 [Romo] ¶¶ 7, 8; AE
151 [Bermingham] ¶¶ 6, 7; AE 153 [Dohse] ¶¶ 6, 7; AE 162 [Lawrence] ¶¶ 6, 7.)

Until April 2020, CVS' official timekeeping policies and trainings had no guidance informing
employees that time spent on these tasks was compensable, or how to be compensated for such off-the-
clock time. (AE 72 [Turner] 92:21-95:9, 100:9-21; AE 29 [Ibrahim] 25:17-26:10, 51:10-52:20; AE 47
[Kouyoumijian] 84:13-85:8.) Previously, CVS' official policy was for employees to alert their
managers if they spent more than 5 minutes on opening or closing tasks. (AE 31 [Kelly] 86:8-87:18; AE
32; AE 29 [Ibrahim] 54:14-56:9.) On September 30, 2019, CVS instituted a practice for managers to
enter an earnings code ("PGR") to account for this time daily. (AE 29 [Ibrahim] 51:10-53:19, 57:24-
62:19, 65:23-67:8; AE 30; AE 47 [Kouyoumijian] 85:9-87:19.) On April 7, 2020, CVS began
automatically paying a "grace period" of one minute of pay to compensate Front Store supervisors
working the first or last shift of the day for this previously unpaid time, and (after soliciting Pharmacist
feedback) of five minutes of pay for Target Pharmacists. (AE 29 [Ibrahim] 39:5-10, 39:22-40:20; 62:5-
65:22; AE 47 [Kouyoumijian] 83:9-84:8; 87:20-91:25; AE 48.)

6.    **CVS' Personal Cell Phone Usage and Related Policies and Practices.**

CVS provides company cell phones to its managers to use in the course of their work, but non-
exempt employees are not eligible to participate in this program. (AE 69 [Seymour 2] 19:1-10; 42:4-19;
AE 31 [Kelly] 22:13-24; 197:23-201:22-24; AE 35; AE 76 [Hyams] 163:13-17; AE 82-83.) Managers
regularly use cell phones to communicate with other colleagues, including non-exempt employees who

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

do not have company phones, so must handle those calls and texts on their personal cell phones. (AE 69 [Seymour 2] 19:1-22; 31:19-32-6; AE 31 [Kelly] 23:3-8; 200:2-204:3; AE 35; AE 76 [Hyams] 43:9-24; AE 200 [Hyams] ¶ 13; AE 75 [Duhon] 93:11-17, 200:8-22; AE 176 [Greensword] ¶ 4; AE 177 [Ruby] ¶¶ 4, 7.) Employees must provide their personal cell phone and email contact information at the outset of employment, which is then regularly used for work-related issues. (AE 31 [Kelly] 201:2-204:3; AE 35; AE 176 [Greensword] ¶ 7; AE 177 [Ruby] ¶ 7; AE 94.) CVS has no policy or guidance prohibiting employees from using personal cell phones for work purposes, or for determining if or the extent to which non-managers use their cell phones in the course and scope of their work, and it does not pay any employee who uses a personal cell phone for work any percentage of its use. (AE 31 [Kelly] 169:8-170:2; 180:12-21, 198:7-199:23, 204:4-207:5; AE 69 [Seymour 2] 19:11-22, 20:10-15, 41:8-46:24; AE 75 [Duhon] 199:21-24, 200:17-201:24; AE 80, 82; AE 93.) Yet Pharmacists are regularly contacted for long periods of time to complete the schedule, which is necessary for CVS to ensure seamless coverage. (AE 31 [Kelly] 203:15-204:3; 201:22-202:15, 169:14-21; AE 176 [Greensword] ¶¶ 8, 11, 18; AE 177 [Ruby] ¶ 9, 15; AE 177A [Flores] ¶¶ 4-7, 9-13.) Employees also regularly use their cell phones to communicate with each other about work both while on and off the clock, without pay. (AE 31 [Kelly] 203:15-24; AE 76 [Hyams] 199:15-18, 43:9-24; AE 200 [Hyams] ¶13; AE 75 [Duhon] 199:12-17, 200:17:22, 156:6-17, 51:1-5; AE 183; AE 94.) As part of its HR Compliance Audits, CVS has not deemed it important enough to examine if, or the extent to which, non-exempt employees used their cell phones for work. (AE 21 [Bailey], 101:14-23; AE 22-28.) This translates to a total of almost 1.4 million months in which class members were not reimbursed for their regular personal cell phone usage for work; about 230,000 months worked by Pharmacists. (AE 189 [Drogin] Table 6a.)

F. **Time and Pay Data for CVS' Non-Exempt Employees Can Identify the Number of Shifts, Pay Periods, or Months Worked Sufficient to Provide Common Proof.**

All of CVS' non-exempt employees enter their time into a timekeeping system called "Workbrain." (AE 31 [Kelly] 56:21-58:24.) CVS produced pay and timekeeping data for the time period of August 21, 2014 to December 20, 2019. (AE 1 [Gunn] ¶ 26.) Plaintiffs' expert, after analyzing this data, has calculated the number of shifts, pay periods, and months worked by different groups of employees for the various claims sought to be certified in this motion. (AE 189 [Drogin].) The data also enables Plaintiffs' expert to generate damages calculations depending on which theory of recovery

19

Chambers Copy - Do Not File

a factindicate may adopt. (*Id.*) His detailed declaration is concurrently filed as evidence. (*Id.*)

G. **Plaintiffs are Typical and Adequate Class Representatives.**

Hyams, a Pharmacy Manager, and Duhon, a Tech, both worked at a CVS location inside a Target store in San Francisco, California. (AE 75 [Duhon] 27:1-17, 34:5-35:16; AE 76 [Hyams] 43:25-45:12.) They each worked for Target prior to the acquisition and continued working for CVS afterwards – Hyams worked until August 2017 and Duhon worked until February 2018. (AE 75 [Duhon] 27:1-17, 36:2-19; AE 76 [Hyams] 153:22-154:5.) They each testified regarding the circumstances detailed above, reiterating the information from class members' declarations and feedback, and their time and pay data reveals that they each worked a substantial number of shifts during the class period. (AE 75 [Duhon] 50:22-51:5, 54:7-20, 60:3-7, 74:15-75:7, 84:9-88: 25, 115:23-118:21, 135:2-136:21, 156:12-17, 187:7-20; AE 76 [Hyams] 67:14-17, 69:16-70:16, 85:18-23, 91:7-19, 97:19-98:8, 101:19-103:15, 105:20-106:24, 110:19-111:16, 116:16-117:14, 127:9-16, 136:8-12, 197:12-25, 199:15-18, 201:1-18, 203:11-207:14, 215:4-20, 226:22-229:13, 232:10-14; AE 77; AE 189 [Drogin] ¶¶ 39-40.)  Hyams worked at over 60 Target and Core CVS locations during the class period and has substantial knowledge of CVS' uniform policies and practices, the metrics, and the consistently understaffed working conditions throughout CVS. (AE 76 [Hyams] 232:23-234:5; AE 200  [Hyams] ¶6, 8-18.) Both Plaintiffs worked for Walgreens after leaving CVS, where, like at Target, pharmacists and technicians worked overlapping schedules with time to provide sufficient coverage for breaks. (AE 76 [Hyams] 44:21-46:25, 50:23-55:4; AE 75 [Duhon] 195:5-198:8.) Plaintiffs chose to pursue their valuable claims via a class action, instead of individually, to speak up for other CVS workers who may be too fearful to pursue claims on their own and to hold CVS accountable for its blatant violations of California law. (AE 76 [Hyams] 232:23-234:5; AE 200 [Hyams] ¶22-23; AE 75 [Duhon] 215:11-216:4, 217:6-220:8.)

III. **LEGAL STANDARD TO CERTIFY A CLASS PURSUANT TO FRCP 23**

Certifying a class pursuant to FRCP 23 requires showing each of the four criteria of FRCP 23(a) and at least one of the FRCP(b) factors. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). FRCP 23(a) is satisfied when: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and

adequately protect the interests of the class." FRCP 23(a); *see also Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012). FRCP 23(b) is fulfilled where the proffered evidence shows that either (1) separate actions by individual class members risk inconsistent judgments and establish incompatible standards; or (3) both "predominance" and "superiority" exist, meaning "questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." (FRCP 23(b)(1)(A) and (b)(3)); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

The third element requires consideration of: (A) the class members' interests in individually controlling separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by class members; (C) the benefits of litigating in the forum; and (D) the likely difficulties in managing a class action. FRCP 23(b)(3)(A)–(D). The merits of claims may be considered only to the extent that they bear on satisfaction of the FRCP 23 elements. *See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (citing *Dukes*, 564 U.S. 350–51). Ultimately, the issue to be decided in a certification motion is a procedural one – whether the case should proceed on a class-wide basis or an individual basis only. *See Dukes*, 564 U.S. at 348.

## IV.  THE CLASS CLAIMS SHOULD BE CERTIFIED.

### A.  Each of Plaintiffs' Claims in This Motion Fulfill the FRCP 23(a) Factors.[3]

Plaintiffs move to certify a Retail Pharmacy Class defined as all individuals who worked as non-exempt CVS retail employees in California at any time during the period from August 21, 2014 through the date set by the Court for notice of certification of the Class, and the following subclasses:

| Claim | Proposed Class/Subclass |
|---|---|
| Failure to Authorize and Permit Rest Breaks | All Non-Exempt California Retail Employees ("Retail Pharmacy Class") |
| Failure to Provide Meal Breaks | Pharmacists who worked at least one shift in which they were the only pharmacist on duty ("Solo Pharmacist Subclass") |
| Failure to Provide Meal Breaks | All California Non-Exempt Employees whose time records do not show a timely meal break and who did not receive a meal period premium in compliance with CVS' policy ("Meal Break Subclass") |

---

[3] The claims and classes/subclasses Plaintiffs seek to certify have been refined from the operative complaint. If the Motion is granted, Plaintiffs seek leave to file a Third Amended Complaint.

21

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

| Failure to Pay the Regular Rate of Compensation for Meal Break/Rest Break Premium Pay | All California Non-Exempt Employees whose time records show a meal period premium ("MPP") or rest period premium ("RPP") was paid ("Premium Pay Subclass") |
|---|---|
| Failure to Pay All Wages Due (including Overtime Wages) | All California Non-Exempt Employees in the Position of Shift Supervisor, Operations Supervisor, Operations Manager, Store Team Leader, Pharmacist or Pharmacy Manager who worked opening and closing shifts ("Off-the-Clock Subclass") |
| Failure to Pay Overtime Wages at the Proper Regular Rate of Pay | All California Non-Exempt Employees who worked overtime ("Regular Rate Subclass") |
| Failure to Pay Overtime Wages at the Proper Regular Rate of Pay | All California Bonus-Eligible Employees who worked overtime ("Regular Rate/Bonus Subclass") |
| Failure to Reimburse for Necessary Business Expenses | Retail Pharmacy Class |
| Failure to Maintain Business Records/Issue Accurate Itemized Wage Statements | Retail Pharmacy Class |
| Failure to Pay All Wages Due at Termination | Former California Non-Exempt Employees who did not receive all wages upon termination ("Former Employee Subclass") |

1. **The Proposed Class/Subclasses are Numerous and Ascertainable.**

The class and proposed subclasses unquestionably meet the numerosity threshold. Based on the data to date,[4] there are: 58,877 employees in the Retail Pharmacy Class, with the smallest subclass comprised of about 4,600 employees. (AE 189 [Drogin] Table 2a.) "[C]ourts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members." *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605–06 (N.D. Cal., Nov. 20, 2014). The proposed class and subclasses are also readily ascertainable, as their definitions are "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 237 (N.D. Cal., Sept. 18, 2014). CVS has provided this proof by identifying the class members in a class list. *See Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 185 (N.D. Cal., Feb. 3, 2015) (class is ascertainable if determined from objective criteria). Thus, the class is numerous and ascertainable.

2. **Common Questions of Law and Fact Exist.**

A question is common if "it is capable of classwide resolution – which means that determination

---

[4] The data provided by CVS ends on December 20, 2019 and will require updating.

22

of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Commonality exists where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008). The key inquiry is "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S at 350. "Even a single [common] question will do" to show commonality. *Dukes*, 564 U.S. at 359.

The common questions here are: (1) whether CVS' universal staffing practices, which accounted for only one 15-minute rest period per each 8-hour period of work, failed to authorize and permit rest periods as California law requires; (2) whether CVS' uniformly-applied rest break policy requiring employees to remain on the premises failed to authorize and permit rest periods as California law mandates; (3) whether CVS' "special rules" for Solo Pharmacists, coupled with other expectations for pharmacists' job performance, prevented them from taking legally-compliant meal breaks; (4) whether premiums were paid at the correct "regular rate of compensation;" (5) whether CVS paid employees for doing opening and closing work off-the-clock; (6) whether CVS paid the overtime rate as California law requires; (7) whether CVS adjusted overtime pay due to annual non-discretionary bonuses as California law requires; (8) whether CVS reimbursed employees for personal cell phone usage for business needs; (9) whether CVS kept business records/issued accurate itemized wage statements as California law demands; and (10) whether terminated employees received all wages due.

### 3. **Plaintiffs' Claims are Typical of the Class.**

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Under FRCP 23(a)(3)'s "permissive standards," the claims need only be "reasonably co-extensive with those of absent class members," not "substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In other words, typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010).

Plaintiffs satisfy the typicality requirement because, as detailed above, they experienced the

23

Chambers Copy - Do Not File

1  same effects of CVS' uniform class-wide policies and practices as other Class Members.

2     **4.**   **The Representatives Will Adequately Represent the Class' Interests.**

3    Adequacy depends on whether: (1) the named plaintiffs and their counsel have any conflicts of

4  interest with other putative class members, and (2) the named plaintiffs and their counsel will prosecute

5  the action vigorously on behalf of the proposed class. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d

6  454, 462 (9th Cir. 2000). Plaintiffs' interests are aligned with the class; indeed, they have vigorously

7  prosecuted this action, been deposed and elevated the class' interests above their own. The sheer

8  amount and quality of work conducted thus far demonstrates that Plaintiffs' counsel have vigorously

9  litigated this case. (AE 1[Gunn] ¶¶ 18, 23-25.) They are experienced class action litigators with a

10  combined decades of experience, including in California employment class actions and securing class

11  certification. (AE 1[Gunn Dec] ¶¶ 30-36; AE 196 [Coble] ¶¶ 2-13; AE 199 [Kramer], ¶¶2-11.)

12    **B.**   **Each of Plaintiffs' Claims in This Motion Fulfill the FRCP 23(b) Factors.**

13     **1.**   **Separate Actions Would Create a Risk of Inconsistent Adjudications.**

14    CVS leverages its power as a large national employer and well-funded defendant to scare

15  employees into not bringing claims, to compel arbitration, or to crush them with manipulation and

16  delay. As the history of this action has shown, only persistent litigants capable of spending money in

17  discovery can attain the critical evidence to prove their claims. Here, such key evidence surfaced only

18  after thorough discovery, relentless follow-up, and motions to compel. Without the resources to

19  withstand such tactics, other litigants – as many in other cases have seen – are unlikely to gain access

20  to the same type of evidence, resulting in inconsistent adjudications.

21    **2.**   **Common Questions of Law and Fact Predominate and a Class Action is the Superior Means of Adjudicating the Controversy.**

22    FRCP 23(b)(3) requires that "the questions of law or fact common to class members

23  predominate over any questions affecting only individual members, and that a class action is superior

24  to other available methods for fairly and efficiently adjudicating the controversy." FRCP (23)(b)(3).

25  The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant

26  adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). An

27  individual question is "one where members of a proposed class will need to present evidence that varies

28  from member to member, while a common question is one where the same evidence will suffice for each

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (quotation omitted). This "inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.*

### (a) Plaintiffs' Rest Break Claim Relies on Common Class-Wide Evidence.

Labor Code sections 226.7(b) and 512 requires employers to "authorize and permit" legally compliant rest periods (as defined the Wage Orders). The "authorize" prong of the statute obligates employers to make clear to employees, through official policies, that they may take rest breaks that fully comply with California law, which includes making employees free to do as they please during their rest breaks. *See Augustus v. ABM Security Servs., Inc.,* 2 Cal.5th 257 (2016) (holding that the employee must be "free from labor, work, or any other employment-related duties. And employees must not only be relieved of work duties, but also freed from employer control over how they spend their time"). "[O]ne cannot square the practice of compelling employees to remain at the ready, tethered by time and policy to particular locations or communications devices, with the requirement to relieve employees of all work duties and employer control during 10-minute rest periods." *Id.* A long line of cases in California have held that employer control exists when the employer requires an employee to be at the work location. *See Ridgeway v. Walmart Inc.,* 946 F.3d 1066, 1079 (9th Cir. 2020) ("the question of control boils down to whether the employee may use break or non-work time however he or she would like") (citing *Augustus*); *Mendiola v. CPS Sec. Sols., Inc.*, 60 Cal.4th 833, 182 (2015) ("When an employer directs, commands or restrains an employee from leaving the work place and thus prevents the employee from using the time effectively for his or her own purposes, that employee remains subject to the employer's control."). Further, an employer's failure to record rest breaks may create a rebuttable presumption that employees were not relieved of duty, and that a rest break was not provided. *See Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004, 1033, 1053 (2012).

Plaintiffs rest break claim relies on the following universally applicable evidence: (1) CVS' policy and practices requiring employees to stay on the premises; (2) CVS' training modules which do not give permission to leave the premises; (3) CVS' advice, provided through their call-in advice line, that employees must stay on the premises during rest breaks to be available for work; (4) testimony that

25

Chambers Copy - Do Not File

employees could not leave the premises due to work demands; (5) testimony that rest breaks were interrupted; and (6) testimony and data showing that rest break premiums were not paid. In addition, Plaintiffs will rely on: (7) testimony and documents regarding CVS' labor budgeting and scheduling processes, during which **CVS consciously schedules workload so that there is only 15 minutes of rest break time in each 8-hour shift**, while expecting the rest of the time to be fully dedicated to work; (8) testimony and documents about store and pharmacy metrics that could not be met if sufficient staff were not available to satisfy the targets set by CVS; and (9) data regarding the number of rest-break eligible shifts in which employees were not paid rest break premium pay.

This evidence is overwhelming class-wide, common proof of CVS' policies and practices that did not authorize and permit rest breaks as California law dictates. As such, class certification is warranted. *See Cahilig v. IKEA U.S. Retail, LLC*, 2019 WL 3852490, at *2 (C.D. Cal., June 20, 2019) (finding rest period policy requiring employees to remain onsite and "tethered" to particular locations sufficient to establish viable claim for failure to provide rest periods); *Vasquez v. Leprino Foods Co.*, 2020 WL 1527922, at *15 (E.D. Cal., Mar. 31, 2020) (certifying a FRCP 23 rest period class despite the employer's facially compliant rest break policy, on the ground that other facts evidencing company-wide incentives to remain "on-call" during rest breaks, such as productivity metrics and communications expectations, combined with declaration testimony from multiple class members, demonstrated that class-wide evidence could resolve the common question).

### (b) Plaintiffs' Meal Break Claim Relies on Common Class-Wide Evidence.

Labor Code section 512 requires employers to provide an uninterrupted, duty-free, 30-minute meal break prior to the fifth hour of work, during which all control is relinquished, and the employer may not "impede or discourage" employees from taking such breaks." *Brinker Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004, 1040, (2012). Here, Plaintiffs' claim depends on two legal theories. First, CVS' meal break policy for Solo Pharmacists is not legally compliant. Solo Pharmacists cannot realistically leave the premises or be free from their duties and still comply with their professional obligations. For example, they cannot supervise Techs as required by Cal. Bus. & Prof. Code § 4115(f)(1), which dictates a 1:1 ratio of pharmacist to technician supervision at all times. Solo Pharmacists may only leave the pharmacy if written rules exist to govern their absence; yet CVS does not have such rules. *See* Cal.

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

Code Regs., tit. 16, § 1714.1 ( "The pharmacy shall have written policies and procedures regarding the operations of the pharmacy during the temporary absence of the pharmacist for breaks and meal periods. The policies and procedures shall include the authorized duties of ancillary staff, the pharmacist's responsibilities for checking all work performed by ancillary staff and the pharmacist's responsibility for maintaining the security of the pharmacy").

Plaintiffs' Solo Pharmacist meal break claim relies upon the following common evidence: (1) CVS' universal meal break policy containing "Special Rules for Pharmacists," limiting the ability to leave the premises; (2) documents and testimony illustrating CVS' 1:1 ratio for Solo Pharmacists; (3) testimony and discovery responses reflecting CVS' lack of written rules for how pharmacy operations will be handled in the absence of an on-duty Pharmacist; (4) testimony and discovery responses reflecting the absence of any guidance or training regarding Solo Pharmacists' procedures for leaving the pharmacy; (5) testimony reflecting a class-wide pattern and practice of interrupting Solo Pharmacists' meal breaks; and (6) data reflecting the number of shifts worked by Solo Pharmacists. Combined with the evidence of CVS' lean scheduling practices used to support the rest break claim cited above, this common class-wide evidence will resolve the question regarding whether Solo Pharmacists were impeded or discouraged from taking duty-free meal breaks. "Claims alleging that a uniform policy consistently applied to a group of employees in violation of wage and hour laws are of the sort routinely, and properly, found to be suitable for class treatment." *Brinker*, 53 Cal. 4th at 1033 (finding certification of meal and rest breaks classes appropriate under California law), *Villalpando v. Exel Direct Inc.,* 2016 WL 1598663 at *53 (certifying a class for meal and rest break claims where the plaintiffs' "theory of liability is based on common policies that make it difficult or impossible for class members to take breaks"). Because Plaintffs' theory of liability is based on common policies that make it difficult or impossible for class members to take breaks, such a class may be certified.

Second, CVS fails to act in accordance with its purportedly compliant meal break policy at all times. CVS' time records show that, for over 1.6 million shifts, employees did not receive complaint meal breaks, had no waiver in place, and were not paid a meal period premium. (AE 189 [Drogin] Table 2) As a result of CVS' consistent deviation from its policy, class-wide resolution is possible.

CVS also paid meal break premiums at employees' hourly rates of pay in effect at the time, not

27

Chambers Copy - Do Not File

their "regular rate of compensation," as Labor Code section 226.7 prescribes. *See Ferra v. Loews Hollywood Hotel*, 257 Cal. Rptr. 3d 591 (Cal. Jan. 22, 2020) (examining whether the term "regular rate of compensation" in Labor Code section 226.7 means "regular rate of pay," which expects all rates of pay to be considered in generating the overtime rate).

### (c) Plaintiffs' Off-the-Clock Claim Relies on Common Class-Wide Evidence

Labor Code sections 1194 and 1182.12 requires employers to for all time worked. As set forth above, time is compensable if an employee is subject to the control of the employer. *See Frlekin v. Apple Inc.*, 8 Cal.5th 1038, 1048 (2020) (reh'g denied (May 13, 2020)) (citing the IWC definition in Wage Orders of "hours employed" to include all time during which employees are "required to be on the employer's premises ready to work, or to be on duty, or to be at a prescribed work place"). Plaintiffs' off-the-clock claim relies upon the following common evidence: (1) testimony and documents about CVS' mandated opening and closing duties that occur off-the-clock; (2) testimony and documents reflecting CVS' concession, in September 2019 and April 2020, that employees working such shifts are entitled to automatic "Paid Grace" time of one or five minute's pay for such time; and (3) data reflecting the number of opening and closing shifts worked by employees tasked with working those shifts. Claims such as these are amenable to class certification. *See Lao v. H&M Hennes & Mauritz, L.P.*, 2018 WL 3753708 at *1–2 (N.D. Cal., Aug. 8, 2018) (certifying off-the-clock class where plaintiffs challenged a company-wide policy requiring employees to undergo security checks before leaving the store for rest breaks and at the end of their shifts); *Moore v. Ulta Salon Cosmetics & Fragrance Inc.*, 311 F.R.D. 590, 604, 612 (C.D. Cal., Nov. 16, 2015) (certifying off-the-clock class on the basis of evidence of standardized off-the-clock tasks, including a "written exit inspection policy" and "company-wide practice" of checking bags while off-the-clock).

### (d) Plaintiffs' Off-the-Clock Claim Relies on Common Class-Wide Evidence.

Labor Code section 510(a) entitles employees to "no less than one and one-half times the regular rate of pay for an employee" for any work in excess of 8 hours in one workday or 40 hours in any one workweek. Further, California law requires that the regular rate of pay must be re-calculated for all overtime paid during the year covered by a bonus upon the payout of nondiscretionary bonuses earned by meeting annual performance targets. *See Alvarado v. Dart Container Corp. of Cal.*, 4 Cal.5th 542

Chambers Copy - Do Not File

(2018) (requiring the calculation to use as the denominator the total number of hours worked as regular time during the period covered by the bonus, not the FLSA method in which the denominator is the total number of hours worked at all rates of pay). As common, class-wide evidence that nondiscretionary bonuses were not factored into the "regular rate of pay" to calculate overtime, Plaintiffs will rely on the following evidence of CVS' consistent pay practices: (1) testimony and documents about the incentives based on performance results from the previous calendar year; (2) testimony and documents showing that CVS did not calculate the regular rate of pay according to the formula in *Alvarado*; and (3) no pay data to the contrary. Further, Plaintiffs will rely on evidence and data (or lack thereof) that premium pay was not paid pursuant to the proper regular rate of pay. As a result, this issue is capable of class-wide adjudication. *See Chavez v. Lumber Liquidators, Inc.*, 2012 WL 1004850 (N.D. Cal., Mar. 26, 2012) (unreported) (holding that the common pay practices involved in calculating the regular rate of pay was sufficient common proof to certify a class); *Provine v. Office Depot, Inc.,* 2012 WL 2711085, at *10 (N.D. Cal. July 6, 2012) (finding common questions of law and fact as to whether employer improperly excluded award payments from employees' regular rate of pay to calculate overtime).

### (e) Plaintiffs' Cell Phone Reimbursement Claim Relies on Common Class-Wide Evidence

Labor Code section 2802 requires employers to pay "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer…" This includes a reasonable portion of the usage of employees' personal cell phones. *See Cochran v. Schwan's Home Serv., Inc.*, 228 Cal. App. 4th 1137, 1144, (2014) ( "If an employee is required to make work-related calls on a personal cell phone, then he or she is incurring an expense for purposes of section 2802."). Personal cell phone expenses are reimbursable where "it was necessary that the employees make calls and do so with phones that were not provided by the company." *Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1078 (9th Cir. 2020).

Plaintiffs' failure to reimburse cell phone expenses claim relies on testimony and documents showing that: (1) CVS collected employees' cell phone numbers as a matter of course for contacting them; (2) CVS managers were provided company-issued cell phones to communicate with their fellow workers who were not provided with company-issued phones; (3) employees were regularly required to use their personal cell phones for communicating with managers at CVS; (4) CVS did not have a

---

29

Chambers Copy - Do Not File

policy prohibiting personal use of cell phones for work purposes; (5) CVS did not issue company cell phones or reimburse non-exempt employees for using personal cell phones for work purposes; (6) Pharmacy Schedulers regularly contacted Pharmacists for sufficient amounts of time that were not *de minimis*, as an integral part of the scheduling process, to ensure that there was coverage for all shifts, a crucial element of CVS' business; (7) the number of months in which employees were not compensated for their personal cell phone usage; and (8) expert testimony regarding the amounts of reasonable cell phone plans for use in calculating damages. (AE 187 [Breshears].) Certification is justified where employees were regularly contacted via cell phone in furtherance of company business, such that some portion of their personal cell phone expenses should have been reimbursed. *See Castro v. ABM Indus., Inc.*, 325 F.R.D. 332 (N.D. Cal. Jan. 26, 2018) (certifying FRCP 23 class where common question asked whether personal cell phone use was "necessary," based on proposed common proof that the employer knew that required communications, which were important to the business, were occurring); *Richie v. Blue Shield of Cal.*, 2014 WL 6982943 (N.D. Cal., Dec. 9, 2014) (granting FRCP 23 class where the questions were whether the employer's reimbursement policy complied with the "reasonable percentage" requirement in *Cochran*, whether the employer required personal cell phone usage, and whether the employer acted with due diligence to ensure that its employees were compensated for their personal cell phone use).

### (f) Plaintiffs' Failure to Maintain Pay Records/Issue Wage Statements Relies on Common Class-Wide Evidence.

Labor Code section 226(a), obligates employers to furnish each employee, each pay period, with an accurate itemized wage statement showing, among other things, (1) gross wages earned, (2) total hours worked, (3) net wages earned, and (4) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee. *See* Labor Code §226(a). In addition, "a copy of the statement" must be "kept on file by the employer for at least three years." *Id.* A "'copy' includes a duplicate of the itemized statement provided to an employee or a computer-generated record *that accurately shows all of the information required by this subdivision*." *Id.* Further, an employee who suffers "injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a)," is entitled to damages. Labor Code § 226(e)(1). "Injury" occurs if the information cited above is missing and "the employee cannot promptly and easily

30

Chambers Copy - Do Not File

determine" what the missing information is. Labor Code § 226(e)(2). Here, CVS failed to provide accurate wage statements by not listing the accurate number of hours worked, the corresponding rate of pay for each type of earnings code, including properly calculated overtime rates. CVS also did not retain accurate copies of the information for the time period required.

Plaintiffs' common evidence in support of the Labor Code section 226 claim is comprised of testimony and documents reflecting: (1) CVS' class-wide payroll practices; (2) the evidence above for the off-the-clock and regular rate of pay claims; (3) sample wage statements, including those issued to Plaintiff Hyams; (4) testimony from class members indicating that they were not able to promptly and easily determine the missing information; and (5) CVS' pay data reflecting that CVS' retained pay data does not satisfy the statutory requirements. (AE 185; AE 189[Drogin] ¶38.) *See Amey v. Cinemark USA Inc.*, 2018 WL 3956326 (N.D. Cal. Aug. 17, 2018) (unreported) (certifying FRCP 23 class to decide if inaccurate regular rate of pay on stubs violated Labor Code).

**(g) Plaintiffs' Waiting Time Penalties Claim Relies on Common Class-Wide Evidence.**

Labor Code section 203 entitles employees to be paid "waiting time penalties" when all wages owed from their employment were not paid upon their termination. *See* Labor Code § 203; *Iljas v. Ripley Entertainment Inc.,* 403 F.Supp.3d 793, 803 (N.D.Cal. 2019). Any unpaid amounts for meal or rest period premium wages, overtime wages, or off-the-clock work at the time of termination triggers the penalties specified in Labor Code section 203. In addition to the class-wide proof cited above for each of the underlying claims, Plaintiffs will rely upon the data pertaining to the former employees, including their average hourly shifts, and their last hourly rates of pay, to calculate the amounts of the penalties due. *See Sevilla v. Aaron's, Inc.,* No. 2019 WL 2879874, at *14 (C.D. Cal. Mar. 25, 2019) (certifying derivative waiting time claim where overtime, vacation pay, and business expense claims were certified). (AE 189 [Drogin] Tables 2a, 4, 8, 9, 10a.)

**(h) Plaintiffs' Unfair Business Practices Claim Relies on Common Class-Wide Evidence.**

CVS' "deep, system-wide" failure to provide meal or rest breaks, pay rest period premiums, pay for employee expenses, and otherwise follow California law as alleged herein constitutes unfair business practices subject to class certification. *Safeway, Inc. v. Superior Court*, 238 Cal. App. 4th 1138, 1159, (2015). (finding evidence to support a reasonable inference that in the context of a class

31

Chambers Copy - Do Not File

action, the employer engaged in a practice of never paying meal break premium wages, even though a significant number of employees accrued them.") *Id.*

### (i) Damages are Capable of Measurement on a Class-Wide Basis.

Predominance requires that monetary "damages are capable of measurement on a classwide basis, in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). As such, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable" to the relevant theory of liability. *Comcast*, 569 U.S. at 35. A proffered model "need not be exact" at the class certification stage, it only "must be consistent with [the plaintiff's] liability case." *Id.*; *see also Cal. v. Infineon Techs. AG*, 2008 WL 4155665, at *9 (N.D. Cal. Sept. 5, 2008) (stating that at class certification stage, court's role is to "discern only whether plaintiffs have advanced a plausible methodology to demonstrate that ... injury can be proven on a class-wide basis"). As Plaintiffs' experts' testimony makes clear, damages may be calculated according to the theories of liability underlying their class claims, based on the number of shifts, pay periods, or months worked during the relevant time period by the relevant group of employees, using the employees' hourly rates of pay. This factor weighs in favor of class certification, as "[p]laintiffs need only show a method of proving damages and impact through common proof – whether class members were *actually* damaged is a merits question…" *Kamakahi v. American Society for Reproductive Medicine*, 305 F.R.D. at 180.

## V. CONCLUSION

Because Plaintiffs undoubtedly satisfy the FRCP 23 criteria, their motion should be granted.


DATED:  August 27, 2020                    GUNN COBLE LLP

                                           By: /s/ Beth Gunn
                                                Beth Gunn
                                                Catherine J. Coble
                                           Attorneys for Plaintiffs RYAN HYAMS and
                                           REGINE DUHON, on behalf of themselves and
                                           others similarly situated

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FRCP 23

Chambers Copy - Do Not File

# **EXHIBIT D**

BETH A. GUNN, CA Bar No. 218889
beth@gunncoble.com
CATHERINE J. COBLE, CA Bar No. 223461
cathy@gunncoble.com
GUNN COBLE LLP
101 S. 1st Street, Suite 407
Burbank, CA 91502
Telephone:     818.900.0695
Facsimile:     818.900.0723

JENNIFER KRAMER, CA Bar No. 203385
Jennifer@laborlex.com
BARBARA DUVAN-CLARKE, CA Bar No. 259268
barbara@laborlex.com
ASHLEY CRUZ, CA Bar No. 306235
ashley@laborlex.com
JENNIFER KRAMER LEGAL, APC
5015 Eagle Rock Blvd., Suite 202
Los Angeles, CA 90017
Telephone:     213.955.0200
Facsimile:     213.226.4358

Attorneys for Plaintiffs
RYAN HYAMS and REGINE DUHON,
on behalf of themselves and as
representative plaintiffs for similarly
situated and other aggrieved employees

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND

| | |
|---|---|
| RYAN HYAMS, and REGINE DUHON, individuals, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CVS HEALTH CORPORATION, a Rhode Island Corporation, CVS PHARMACY, INC., a Rhode Island Corporation, GARFIELD BEACH CVS, LLC, a California Corporation, and CVS RX SERVICES, INC., a New York Corporation, DOES 1 through 25, inclusive,<br><br>Defendants | Case No. 4:18-cv-06278-HSG<br><br>**DECLARATION OF RICHARD DROGIN, Ph.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23**<br><br>Action Filed:     August 21, 2018<br>Removal Date:  October 12, 2018<br>Trial Date:        Not set<br><br>DATE:     December 3, 2020<br>TIME:      2:00 pm<br>PLACE:    Courtroom 2, 4th Floor<br>                1301 Clay Street<br>                Oakland, CA 94612 |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' Chambers Copy – Do Not File

## BACKGROUND

1.      I hold a Ph.D. in statistics from the University of California at Berkeley, earned in 1970. I am currently an Emeritus Professor in the Department of Statistics at California State University, Hayward, where I have taught graduate and undergraduate courses in data analysis, non-parametric methods, regression analysis, sample surveys, probability theory, queuing theory, simulation methods and design of statistical software. I have been employed at California State University, Hayward, since 1973, and became an Emeritus Professor in 1996.

2.      I am a partner in the statistical consulting firm of Drogin, Kakigi & Associates. This firm provides consulting services and computerized database management. We have experience in designing and analyzing random sampling plans, organizing and managing large database systems, stochastic modeling, and performing advanced statistical analysis. Our firm has served as statistical consultants to both governmental agencies and the private sector for over twenty-five years. I have been retained as a statistical consultant in over 250 class action cases, primarily cases involving employment discrimination and wage and hour claims, and I have testified over 25 times as an expert witness (statistical analysis, computer processing) in numerous state, and federal courts. I have never failed to qualify as an expert in statistics in any litigation. A copy of my current resume is attached hereto as **Exhibit A**.

3.      My firm has been retained by counsel for Plaintiffs in the matter of *Ryan Hyams and Regine Duhon, on behalf of themselves and all others similarly situated against CVS Pharmacy Inc., et al.*, pending in the Northern District of California (4:18-cv-06278-HSG). In particular, we have been asked to provide various tabulations regarding hours worked and earnings among employees at CVS stores, based on employee time and payroll records produced in the *Hyams* matter and provided to me by counsel. In addition, we have been asked to make a calculation of class damages and PAGA penalties resulting from various alleged violations of the Labor Code, using factual assumptions for legal theories provided by Plaintiffs' counsel.

4.      To perform my study I was provided with various data files and documents. A detailed list of the materials provided to me is attached as **Exhibit B**.

**DATA PROCESSING**

5.    I have been provided with timekeeping records and payroll files, along with various files designating class membership, type of store, and specific subgroups of employees.  The timekeeping records were provided in several files, which were combined into a single file containing over 59.2 million records.  These records show details of shifts worked during August 21, 2014 through December 20,2019.  This file includes timekeeping records for a total of 59,635 employees.  The timekeeping records show each work interval on each shift.  So, for example if an employee worked in the morning, took a lunch break and then returned to work in the afternoon, there would be two records for that person for that shift, showing the times when the employee started work in the morning, left for a lunch break, then returned, and finally the time the employee clocked out of the shift in the afternoon.  The time records were processed into a person-shift file that contained one record per shift per person, combining the information from the work intervals by that person for that shift into a single record.  This resulted in a total of over 23.99 million person-shift records.  Various pieces of information were then appended onto each record, indicating whether a person fell into certain categories.  For example, whether the store was a Target Store or not, whether the person was subject to arbitration, whether the person worked in the Pharmacy or not, and whether the person was a Pharmacist, and other factors relevant to implementing various constraints in the analysis.  Approximately 4.7% person-shift records were excluded because they were for non-California stores or because they had anomalous values. This resulted in a working file of over 22.86 million person-shifts for 58,877 distinct employee IDs with date range covering the time period August 21, 2014 through December 20, 2019.

6.    I have been provided with scheduling data contained in several Excel files listing the daily schedules for employees in the stores.[1]  These files include 23,210,941 records showing daily schedules for CVS employees during the period from August 17, 2014 through March 21, 2020. These records include fields indicating the store, employee ID, shift start date, and shift in and out times.  These records were augmented to include the job code held by the employee, based on job

---

[1] These files are identified in Exhibit 2.

3

Chambers Copy - Do Not File

1  code information included in the time keeping records.

2  　　　　7.　　I have been provided with an Excel File entitled "CVS 004202 – Arbitration Training

3  List (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx", which I understood to

4  contain information regarding individuals that CVS might claim were subject to an arbitration

5  agreement.  I used the data contained in the field entitled "Finished Date" to determine whether the

6  data indicated that the employee had taken the training regarding CVS' arbitration program, and the

7  date on which the employee had taken the training.

8  　　　　8.　　I have been provided with an Excel file entitled "CVS 3399 – Updated Class List

9  Including Arb Opt Outs (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx", which

10  I understood to contain information regarding individuals that CVS believed to have opted out of its

11  arbitration program.

12  　　　　9.　　I have been provided with an Excel File entitled "2020.03.13 Doc Production

13  (004199)/2020.03.13 Putative Class Meal Waivers 2014-2016.xlsx", which I understood to contain

14  information regarding individuals that CVS claimed had entered into a meal period waiver

15  agreement with CVS.  I used the data contained in the field entitled "CA  MW  LESSTHAN  6" to

16  determine whether the data indicated that the employee had a meal period waiver affecting shifts

17  that were 5-6 hours in length.  I used the data contained in the field entitled

18  "CA  MW  B  W  10  to  12" to determine whether the data indicated that the employee had a meal

19  period waiver affecting shifts that were 10-12 hours in length.

20  　　　　　　　　　　**DATA ANALYSIS**

21  　　　　10.　　Counsel has provided me with a list of Job Codes that indicate jobs in the Pharmacy

22  Department, and whether the job was a Pharmacist or not.  This list is attached as **Exhibit C**.

23  Counsel also provided a list of jobs and Job Codes for employees to include in the calculations as

24  "Front Store employees."  These jobs and Job Codes are identified in **Exhibit D**, attached.

25  　　　　11.　　Counsel has provided me with a list of Job Codes that indicate supervisory jobs for

26  Front Store employees that performed off-the-clock opening and closing procedures.  This list is

27  attached as **Exhibit E**.

28  　　　　12.　　Pay periods for non-exempt employees at CVS are bi-weekly 14-day periods

4

beginning on a Sunday and ending on a Saturday, as reflected in the deposition transcript and exhibit provided to me by counsel, which is attached as **Exhibit F**.

13.    Unless otherwise noted, the tabulations described in this declaration cover the time period of August 21, 2014 to the date where the data ends ("the data period").   The time punch records data ends on December 20, 2019.

14.    If additional data is provided for the time period after the end dates listed above, then the calculations presented in this declaration could be updated using the same methodology described herein.

15.    All of the calculations below rely upon factual assumptions and legal theories provided to me by counsel.  Additionally, I can divide the data into multiple subgroups as necessary to support any of the asserted theories of liability or associated theories of liability.

## CALCULATIONS FROM THE CVS TIME PUNCH DATA AND EARNINGS DATA

### Numerosity of Class Members

16.    As part of my analyses, I ascertained the number of employees working in various subgroups, using the most current information.  The following terms are used to define the following subgroups:

      a.    "Front Store" includes all Job Codes in Exhibit D.

      b.    "Pharmacist" includes all Job Codes categorized as "Pharmacist" Job Codes in Exhibit C.

      c.    "Other Rx" includes all Job Codes in Exhibit C except for those categorized as "Pharmacist" Job Codes.

      d.    "All Pharmacy" includes all Pharmacists and Other Pharmacy employees.

      e.    "Arbitration Subgroup 1" reflects the employees for whom, based on information provided to me by counsel, CVS may argue an arbitration agreement exists.  I considered an employee to be part of "Arbitration Subgroup 1" if all of the following criteria applied:  (1) the employee's name appeared on the list entitled "CVS 004202 – Arbitration Training List (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx"; (2) the column entitled "Finish Date" associated with the employee's name

contained a training date prior to August 21, 2018; and (3) the column entitled "Arbitration Opt Out Date" on the list entitled "CVS 3399 – Updated Class List Including Arb Opt Outs (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx" did not contain any information in the field associated with the employee's name.

   f. "Arbitration Subgroup 2" reflects the employees for whom, based on information provided to me by counsel, CVS may argue an arbitration agreement exists.  I considered an employee to be part of "Arbitration Subgroup 2" if all of the following criteria applied:  (1) the employee's name appeared on the list entitled "CVS 004202 – Arbitration Training List (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx"; and (2) the column entitled "Arbitration Opt Out Date" on the list entitled "CVS 3399 – Updated Class List Including Arb Opt Outs (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx" did not contain any information in the field associated with the employee's name.

   g. "Arbitration Subgroup 3" reflects the employees for whom, based on information provided to me by counsel, CVS may argue an arbitration agreement exists.  I considered an employee to be part of "Arbitration Subgroup 3" if the column entitled "Arbitration Opt Out Date" on the list entitled "CVS 3399 – Updated Class List Including Arb Opt Outs (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx" did not contain any information in the field associated with the employee's name.

  17. **Table 1** below summarizes my findings regarding the number of employees in and average hourly rate of pay for each of the above-referenced subgroups during the data period, using the most current information in the data.  The following terms in the table have the following meanings:

   a. "RPh" refers to Pharmacists;

   b. "Other Rx" refers to Other Pharmacy employees;

   c. "Front Store" refers to Front Store employees as described above.

   d. "ALL" refers to the aggregate of Pharmacists, Other Pharmacy employees, and Front Store employees.

1       e.    "Description" refers to the description of the criteria being measured in the

2   table.

3       f.    "Optout Group" refers to whether the numbers are adjusted to remove

4   individuals who fall into one of the Arbitration Subgroups listed above; the term "No"

5   indicates that members of the identified Arbitration Subgroup were removed from the

6   analysis.

7       g.    "Arb Sub 1" refers to Arbitration Subgroup 1.

8       h.    "Arb Sub 2" refers to Arbitration Subgroup 2.

9       i.    "Arb Sub 3" refers to Arbitration Subgroup 3.

10       j.    "Ave" means "average."

| Table 1: Number of Persons and Average Hourly Rates of Pay Divided by Arbitration Subgroup Categories Time period from 2014-08-21 to 2019-12-20 Stores included   Target and Non-Target | | | | |
|---|---|---|---|---|
| **RPh** | **Other Rx** | **Front Store** | **ALL** | **Description/Optout Group** |
| **All Employees** | | | | |
| 6,274 | 16,680 | 35,923 | 58,877 | 1. Persons All |
| $69.09 | $16.95 | $ 14.72 | $21.14 | 2. Ave Rate All |
| **Employees (Excluding Arbitration Subgroup 1)** | | | | |
| 2,836 | 11409 | 25,690 | 39,935 | 1. Persons  No Arb Sub 1 |
| $68.25 | $ 16.36 | $ 13.80 | $18.40 | 2. Ave Rate   No Arb Sub 1 |
| **Employees (Excluding Arbitration Subgroup 2)** | | | | |
| 2,767 | 11154 | 25,327 | 39,248 | 1. Persons   No Arb Sub 2 |
| $68.25 | $ 16.28 | $ 13.75 | $18.31 | 2. Ave Rate   No Arb Sub 2 |
| **Employees (Excluding Arbitration Subgroup 3)** | | | | |
| 357 | 869 | 1,200 | 2,426 | 1. Persons   No Arb sub 3 |
| $70.22 | $ 19.76 | $ 17.97 | $26.30 | 2. Ave Rate   No Arb sub 3 |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS'   Chambers Copy - Do Not File

18.     **Table 1a** below summarizes my findings regarding the number of employees in each of the above-referenced subgroups during the data period, separated by potential violation, using the most current information in the data.  In addition to any terms used above, the following terms in the table have the following meanings:

a.     "Meal violation" refers to instances in which the data analysis, set forth in more detail below, identified at least one type of meal break violation.

b.     "RPP" refers to an earnings code in the pay data indicating that a rest period premium was paid.

c.     "no RPP" refers to shifts in which the data reflects that no rest period premium was paid.

d.     "3  hrs" refers to shifts in which the data indicates that the shift was 3.5 hours or greater in length.

e.     "6  hrs" refers to shifts in which the data indicates that the shift was 6 hours or greater in length.

f.     "Solo RPh" refers to shifts in which the data reflects that only one pharmacist was working.

g.     "5  hrs, valid meal" refers to shifts in the data that were five hours or greater in length, and the data reflects that a timely meal break was recorded.

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' ... Chambers Copy – Do Not File

| RPh | Other Rx | Front Store | ALL | Violation Category/Optout Group |
|---|---|---|---|---|
| **Table 1a: Number of Persons by Rest and Meal Violation Categories** **Divided by Arbitration Subgroup Categories** Time period from 2014-08-21 to 2019-12-20 Stores included   Target and Non-Target** | | | | |
| | | | | **All Employees** |
| 5,901 | 13,409 | 27,359 | 46,669 | Meal violation All |
| 6,266 | 16,637 | 35,837 | 58,740 | 3.5  hrs, no RPP All |
| 6,247 | 16,242 | 34,539 | 57,028 | 6.0  hrs, no RPP All |
| 5,902 | 0 | 0 | 5,902 | Solo RPh 3.5  hrs, no RPP All |
| 4,672 | 0 | 0 | 4,672 | Solo RPh 5.0  hrs, valid meal All |
| | | | | **Employees (Excluding Arbitration Subgroup 1)** |
| 2,567 | 8,680 | 18,314 | 29,561 | Meal violation No Arb Sub 1 |
| 2,832 | 11,372 | 25,622 | 39,826 | 3.5  hrs, no RPP No Arb Sub 1 |
| 2,822 | 11,018 | 24,487 | 38,327 | 6.0  hrs, no RPP No Arb Sub 1 |
| 2,640 | 0 | 0 | 2,640 | Solo RPh 3.5  hrs, no RPP No Arb Sub 1 |
| 1,939 | 0 | 0 | 1,939 | Solo RPh 5.0  hrs, valid meal No Arb Sub 1 |
| | | | | **Employees (Excluding Arbitration Subgroup 2)** |
| 2,499 | 8,437 | 17,964 | 28,900 | Meal violation  No Arb Sub 2 |
| 2,763 | 11,117 | 25,259 | 39,139 | 3.5  hrs, no RPP No Arb Sub 2 |
| 2,753 | 10,763 | 24,125 | 37,641 | 6.0  hrs, no RPP No Arb Sub 2 |
| 2,578 | 0 | 0 | 2,578 | Solo RPh 3.5  hrs, no RPP No Arb Sub 2 |
| 1,895 | 0 | 0 | 1,895 | Solo RPh 5.0  hrs, valid meal No Arb Sub 2 |
| | | | | **Employees (Excluding Arbitration Subgroup 3)** |
| 351 | 823 | 1,107 | 2,281 | Meal violation No Arb sub 3 |
| 357 | 869 | 1,155 | 2,381 | 3.5  hrs, no RPP No Arb sub 3 |
| 357 | 868 | 1,149 | 2,374 | 6.0  hrs, no RPP No Arb sub 3 |
| 325 | 0 | 0 | 325 | Solo RPh 3.5  hrs, no RPP No Arb sub 3 |
| 275 | 0 | 0 | 275 | Solo RPh 5.0  hrs, valid meal No Arb sub 3 |

## Liability Based on Shifts Worked By Class Members

19.    **Table 2a** below summarizes my findings regarding what the data reflects as the breakdown of the number of person-shifts worked by employees, and the corresponding characteristics of the shifts, during the data period.  In addition to the terms already used, the following terms in the table have the following meanings:

a.    "MPP" refers to an earnings code in the data indicating that a meal period premium was paid.

9

b.      "Meal eligible" refers to shifts in which the data indicates that the shift was 5 hours or greater in length and no MPP was paid.

c.      "no MPP/waiver" refers to shifts in which the data indicates that no MPP was paid and the meal waiver data did not include the employee working the shift.

d.      "Meal eligible shifts (no MPP)" refers to shifts in which the data indicates that the shift was 5 hours or greater in length and no MPP was paid to the employee for that shift.

e.      "Meal eligible meal missing" refers to shifts in which the data indicates that the shift was 5 hours or greater in length and there is no time punch reflecting time taken for a meal break.

f.      "Meal eligible violation" refers to meal eligible shifts in which the data indicates that the shift was 5 hours or greater in length and either (1) no meal break was recorded; (2) the recorded meal break shows that the meal break occurred after 5 hours of work; or (3) the recorded meal break was less than 30 minutes in duration; or the shift was 10 hours or greater in length and (4) no second meal break was recorded.

g.      "Rest" refers to shifts identified for the purpose of analyzing potential rest period violations.

h.      "5   hrs" refers to shifts in which the data indicates that the shift was 5 hours or greater in length.

i.      "8   hrs" refers to shifts in which the data indicates that the shift was 8 hours or greater in length.

j.      "10.   hrs" refers to shifts in which the data indicates that the shift was 10 hours or greater in length.

k.      " 12 hrs" refers to shifts in which the data indicates that the shift was greater than 12 hours in length.

l.      "Meal eligible 5-6 hrs" refers to shifts that were between 5 and 6 hours in length, no meal break was recorded, and no MPP was paid.

m.      "Meal 5-6 hrs violation" refers to shifts that were between 5 and 6 hours in

10

length, no meal break was recorded, no MPP was paid, and the data reflects a meal period violation.

          n.     "Meal eligible 10-12 hrs" refers to shifts that were between 10 and 12 hours in length, no second meal break was recorded, and no MPP was paid.

          o.     "Meal 10-12 hrs violation" refers to shifts that were between 10 and 12 hours in length, no meal break was recorded, no MPP was paid, and the data reflects a meal period violation.

| colspan |
|---|

**Table 2a: Person Shifts for All Employees**
Time period from 2014-08-21 to 2019-12-20
Stores included   Target and Non-Target

| RPh | Other Rx | Front Store | ALL | Description |
|---|---|---|---|---|
| 3,541,227 | 7,023,368 | 11,651,468 | 22,216,063 | 1. Total number of shifts |
| 2,985,933 | 4,988,998 | 8,978,446 | 16,953,377 | 2. Meal eligible (no MPP/waiver) |
| 79,732 | 291,729 | 523,461 | 894,922 | 3. Meal eligible meal missing |
| 434,974 | 390,026 | 781,237 | 1,606,237 | 4. Meal eligible violation |
| 3,486,900 | 6,865,016 | 11,439,290 | 21,791,206 | 5. Rest 3.5   hrs, no RPP |
| 3,330,047 | 5,866,059 | 10,203,421 | 19,399,527 | 6. Rest 5.0   hrs, no RPP |
| 3,004,200 | 4,811,468 | 8,619,274 | 16,434,942 | 7. Rest 6.0   hrs, no RPP |
| 1,927,850 | 2,310,825 | 4,065,706 | 8,304,381 | 8. Rest 8.0   hrs, no RPP |
| 383,647 | 50,742 | 162,072 | 596,461 | 9. Rest 10.0  hrs, no RPP |
| 37,237 | 6,497 | 23,408 | 67,142 | 10. Rest    12.0 hrs, no RPP |
| 52,499 | 306,510 | 573,380 | 932,389 | 11. Meal eligible 5-6 hrs |
| 42,229 | 264,436 | 457,799 | 764,464 | 12. Meal 5-6 hrs violation |
| 45,357 | 10,884 | 35,272 | 91,513 | 13. Meal eligible 10-12 hrs |
| 38,527 | 6,024 | 25,765 | 70,316 | 14. Meal 10-12 hrs violation |
| 873,396 | 0 | 0 | 873,396 | 15. Solo RPh 3.5   hrs, no RPP |
| 842,332 | 0 | 0 | 842,332 | 16. Solo RPh 5.0   hrs, no MPP |
| 647,676 | 0 | 0 | 647,676 | 17. Solo RPh 5.0   hrs, valid meal |
| 835,068 | 0 | 0 | 835,068 | 18. Solo RPh 6.0   hrs, no RPP |
| 591,219 | 0 | 0 | 591,219 | 19. Solo RPh 8.0   hrs, no RPP |
| 26,385 | 0 | 0 | 26,385 | 20. Solo RPh   12.0 hrs, no RPP |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' Chambers Copy - Do Not File

20.     **Table 2b** below summarizes my findings regarding the shift categories set forth in Table 2a above, using the same terms and methodology described above.   However, Table 2b is adjusted so that it removes any employees who are part of Arbitration Subgroup 1.

| | | | | |
|---|---|---|---|---|
| **Table 2b: Person Shifts for Employees (Excluding Arbitration Subgroup 1)** Time period from 2014-08-21 to 2019-12-20 Stores included   Target and Non-Target | | | | |
| **RPh** | **Other Rx** | **Front Store** | **ALL** | **Description** |
| 1,145,201 | 3,601,484 | 5,354,230 | 10,100,915 | 1. Total number of shifts |
| 963,295 | 2,479,113 | 3,965,959 | 7,408,367 | 2. Meal eligible (no MPP/waiver) |
| 32,563 | 206,729 | 369,713 | 609,005 | 3. Meal eligible meal missing |
| 187,883 | 245,151 | 450,937 | 883,971 | 4. Meal eligible violation |
| 1,128,660 | 3,516,535 | 5,258,372 | 9,903,567 | 5. Rest 3.5  hrs, no RPP |
| 1,078,758 | 2,931,365 | 4,565,602 | 8,575,725 | 6. Rest 5.0  hrs, no RPP |
| 975,827 | 2,336,843 | 3,665,369 | 6,978,039 | 7. Rest 6.0  hrs, no RPP |
| 671,445 | 1,056,295 | 1,570,018 | 3,297,758 | 8. Rest 8.0   hrs, no RPP |
| 175,582 | 20,482 | 46,975 | 243,039 | 9. Rest 10.0  hrs, no RPP |
| 13,194 | 2,431 | 7,337 | 22,962 | 10. Rest    12.0 hrs, no RPP |
| 34,777 | 233,559 | 439,615 | 707,951 | 11. Meal eligible 5-6 hrs |
| 25,720 | 198,996 | 356,758 | 581,474 | 12. Meal 5-6 hrs violation |
| 27,945 | 5,085 | 14,080 | 47,110 | 13. Meal eligible 10-12 hrs |
| 24,262 | 2,838 | 9,646 | 36,746 | 14. Meal 10-12 hrs violation |
| 414,825 | 0 | 0 | 414,825 | 15. Solo RPh 3.5   hrs, no RPP |
| 393,846 | 0 | 0 | 393,846 | 16. Solo RPh 5.0   hrs, no MPP |
| 288,194 | 0 | 0 | 288,194 | 17. Solo RPh 5.0   hrs, valid meal |
| 391,271 | 0 | 0 | 391,271 | 18. Solo RPh 6.0   hrs, no RPP |
| 303,190 | 0 | 0 | 303,190 | 19. Solo RPh 8.0   hrs, no RPP |
| 9,617 | 0 | 0 | 9,617 | 20. Solo RPh  12.0 hrs, no RPP |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS'   Chambers Copy - Do Not File

21. **Table 2c** below summarizes my findings regarding the shift categories set forth in Table 2a above, using the same terms and methodology described above. However, Table 2c is adjusted so that it removes any employees who are part of Arbitration Subgroup 2.

| | | | | Table 2c: Person Shifts for Employees (Excluding Arbitration Subgroup 2) Time period from 2014-08-21 to 2019-12-20 Stores included   Target and Non-Target |
|---|---|---|---|---|
| **RPh** | **Other Rx** | **Front Store** | **ALL** | **Description** |
| 1,106,949 | 3,400,215 | 5,060,494 | 9,567,658 | 1. Total number of shifts |
| 931,184 | 2,334,666 | 3,727,731 | 6,993,581 | 2. Meal eligible (no MPP/waiver) |
| 30,981 | 200,536 | 359,818 | 591,335 | 3. Meal eligible meal missing |
| 182,780 | 235,742 | 434,860 | 853,382 | 4. Meal eligible violation |
| 1,090,839 | 3,318,626 | 4,968,600 | 9,378,065 | 5. Rest 3.5  hrs, no RPP |
| 1,042,954 | 2,757,575 | 4,295,382 | 8,095,911 | 6. Rest 5.0   hrs, no RPP |
| 943,397 | 2,194,129 | 3,431,658 | 6,569,184 | 7. Rest 6.0   hrs, no RPP |
| 650,284 | 981,239 | 1,458,859 | 3,090,382 | 8. Rest 8.0   hrs, no RPP |
| 171,810 | 18,440 | 44,172 | 234,422 | 9. Rest 10.0  hrs, no RPP |
| 12,953 | 2,090 | 6,955 | 21,998 | 10. Rest    12.0 hrs, no RPP |
| 33,357 | 228,010 | 429,310 | 690,677 | 11. Meal eligible 5-6 hrs |
| 24,422 | 193,830 | 348,276 | 566,528 | 12. Meal 5-6 hrs violation |
| 26,984 | 4,722 | 13,281 | 44,987 | 13. Meal eligible 10-12 hrs |
| 23,417 | 2,642 | 9,095 | 35,154 | 14. Meal 10-12 hrs violation |
| 408,278 | 0 | 0 | 408,278 | 15. Solo RPh  3.5  hrs, no RPP |
| 387,870 | 0 | 0 | 387,870 | 16. Solo RPh  5.0   hrs, no MPP |
| 283,257 | 0 | 0 | 283,257 | 17. Solo RPh  5.0   hrs, valid meal |
| 384,984 | 0 | 0 | 384,984 | 18. Solo RPh 6.0   hrs, no RPP |
| 299,347 | 0 | 0 | 299,347 | 19. Solo RPh 8.0   hrs, no RPP |
| 9,453 | 0 | 0 | 9,453 | 20. Solo RPh   12.0 hrs, no RPP |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' ... Chambers Copy - Do Not File

22.     **Table 2d** below summarizes my findings regarding the shift categories set forth in Table 2a above, using the same terms and methodology described above.   However, Table 2d is adjusted so that it removes any employees who are part of Arbitration Subgroup 3.

| | | | | |
|---|---|---|---|---|
| **Table 2d: Person Shifts for Employees (Excluding Arbitration Subgroup 3)** Time period from 2014-08-21 to 2019-12-20 Stores included    Target and Non-Target | | | | |
| **RPh** | **Other Rx** | **Front Store** | **ALL** | **Description** |
| 277,814 | 780,605 | 997,360 | 2,055,779 | 1. Total number of shifts |
| 234,604 | 579,139 | 822,993 | 1,636,736 | 2. Meal eligible (no MPP/waiver) |
| 5,077 | 15,499 | 24,013 | 44,589 | 3. Meal eligible meal missing |
| 36,770 | 26,502 | 47,890 | 111,162 | 4. Meal eligible violation |
| 273,589 | 769,357 | 983,084 | 2,026,030 | 5. Rest 3.5  hrs, no RPP |
| 260,511 | 684,304 | 922,587 | 1,867,402 | 6. Rest 5.0   hrs, no RPP |
| 236,636 | 574,313 | 812,599 | 1,623,548 | 7. Rest 6.0   hrs, no RPP |
| 154,203 | 315,159 | 414,429 | 883,791 | 8. Rest 8.0   hrs, no RPP |
| 31,420 | 4,117 | 10,321 | 45,858 | 9. Rest 10.0  hrs, no RPP |
| 2,629 | 605 | 1,285 | 4,519 | 10. Rest   12.0 hrs, no RPP |
| 286 | 12,313 | 20,376 | 32,975 | 11. Meal eligible 5-6 hrs |
| 200 | 11,372 | 17,179 | 28,751 | 12. Meal 5-6 hrs violation |
| 278 | 423 | 925 | 1,626 | 13. Meal eligible 10-12 hrs |
| 249 | 205 | 682 | 1,136 | 14. Meal 10-12 hrs violation |
| 49,329 | 0 | 0 | 49,329 | 15. Solo RPh  3.5  hrs, no RPP |
| 48,315 | 0 | 0 | 48,315 | 16. Solo RPh 5.0  hrs, no MPP |
| 38,391 | 0 | 0 | 38,391 | 17. Solo RPh 5.0  hrs, valid meal |
| 47,612 | 0 | 0 | 47,612 | 18. Solo RPh 6.0  hrs, no RPP |
| 30,911 | 0 | 0 | 30,911 | 19. Solo RPh 8.0  hrs, no RPP |
| 1,613 | 0 | 0 | 1,613 | 20. Solo RPh   12.0 hrs, no RPP |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' ... Chambers Copy - Do Not File

**Damages Calculations Based on Shifts Worked by Class Members**

23.      **Table 3a** below summarizes my findings regarding the damages associated with the potential violations during the data period based on the information set forth in Table 2a above.  The following methodology was applied when calculating damages:

a.      Each employee's hourly rate for each shift at issue was used to calculate damages based on hourly wage rates.

b.      Using Table 2a, rest break violations can be assumed pursuant to different theories of recovery based on the shift lengths set forth in the column of the table entitled "Shift Category."  Rest break violations can be assumed as occurring for every shift that was 3.5 hours or greater in length, 6 hours or greater in length, or 8 hours or greater in length.  When a rest break violation is assumed, damages are calculated by multiplying each employee's hourly rate of pay per each shift in which a violation is assumed.  These amounts of damages for unpaid premiums per employee are aggregated to reflect all of the amounts of damages for unpaid premiums for all employees who worked the corresponding shift lengths reflected in the column of the table entitled "Shift Category."  These damages are not intended to be cumulative, but rather, only one unpaid rest break premium is assumed per employee for all potential rest break violations occurring during the shift.  Thus, one of these damages calculations can be applied depending on the theory of recovery deemed to be appropriate.

c.      Using Table 2a, meal break violations can be assumed pursuant to different theories of recovery based on the assumptions set forth in the column of the table entitled "Shift Category."  Meal break violations can be assumed as occurring for every shift in which the data reflects that a compliant meal break was not taken (either because it was late, short or missed), and no MPP was paid.  Meal break violations can also be assumed when, even though the time data reflects that a compliant meal break was recorded, a pharmacist was the only pharmacist on duty during the shift.  When a meal break violation is assumed, damages are calculated by multiplying each employee's hourly rate of pay per each shift in which a violation is assumed.  These amounts of damages for unpaid

15

Chambers Copy - Do Not File

premiums per employee are aggregated to reflect all of the amounts of damages for unpaid premiums for all employees who worked the corresponding types of shifts reflected in the column of the table entitled "Shift Category." Meal break damages based on the two separate theories of recovery are intended to be cumulative, as the separate types of non-complaint meal-break eligible shifts do not overlap in the data analysis.

24.    **Table 3b** below summarizes my findings regarding the damages associated with the potential violations during the data period based on the information set forth in Table 2b above, using the same terms and methodology described above.

25.    **Table 3c** below summarizes my findings regarding the damages associated with the potential violations during the data period based on the information set forth in Table 2c above, using the same terms and methodology described above.

26.    **Table 3d** below summarizes my findings regarding the damages associated with the potential violations during the data period based on the information set forth in Table 2d above, using the same terms and methodology described above.

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS'          Chambers Copy – Do Not File

| RPh | Other Rx | Front Store | ALL | Description |
|---|---|---|---|---|
| **Table 3a: Unpaid Premium Payments   All Employees** ||||| 
| *Time period from 2014-08-21 to 2019-12-20, All Locations* ||||| 
| 30,031,955 | 6,393,187 | 12,500,115 | 48,925,257 | 16. Premiums Meal violation |
| 240,548,715 | 115,555,601 | 179,615,732 | 535,720,048 | 17. Premiums Rest break 3.5  hrs |
| 207,561,678 | 82,834,876 | 141,981,199 | 432,377,754 | 18. Premiums Rest break 6.0  hrs |
| 133,315,087 | 40,336,693 | 73,209,220 | 246,861,000 | 19. Premiums Rest break 8.0  hrs |
| 2,834,139 | 4,165,079 | 6,124,144 | 13,123,362 | 20. Premiums 5-6 hrs meal violation |
| 2,628,483 | 109,103 | 639,396 | 3,376,983 | 21. Premiums 10-12 hrs meal violation |
| 44,777,062 | 0 | 0 | 44,777,062 | 28. Premiums Solo RPh valid meal |

| RPh | Other Rx | Front Store | ALL | Description |
|---|---|---|---|---|
| **Table 3b: Unpaid Premium Payments (Excluding Arbitration Subgroup 1)** ||||| 
| *Time period from 2014-08-21 to 2019-12-20, All Locations* ||||| 
| 12,957,416 | 3,923,429 | 6,348,995 | 23,229,840 | 16. Premiums Meal violation |
| 77,547,260 | 57,759,584 | 76,304,193 | 211,611,037 | 17. Premiums Rest break 3.5  hrs |
| 67,168,846 | 39,412,737 | 55,783,512 | 162,365,095 | 18. Premiums Rest break 6.0  hrs |
| 46,317,036 | 18,069,662 | 25,838,014 | 90,224,712 | 19. Premiums Rest break 8.0  hrs |
| 1,717,569 | 3,121,152 | 4,705,223 | 9,543,945 | 20. Premiums 5-6 hrs meal violation |
| 1,641,948 | 49,219 | 235,032 | 1,926,199 | 21. Premiums 10-12 hrs meal violation |
| 19,955,498 | 0 | 0 | 19,955,498 | 28. Premiums Solo RPh valid meal |

| RPh | Other Rx | Front Store | ALL | Description |
|---|---|---|---|---|
| **Table 3c: Unpaid Premium Payments (Excluding Arbitration Subgroup 2)** ||||| 
| *Time period from 2014-08-21 to 2019-12-20, All Locations* ||||| 
| 12,612,821 | 3,762,827 | 6,105,245 | 22,480,893 | 16. Premiums Meal violation |
| 74,994,407 | 54,300,714 | 71,738,348 | 201,033,469 | 17. Premiums Rest break 3.5   hrs |
| 64,975,688 | 36,857,979 | 52,025,933 | 153,859,600 | 18. Premiums Rest break 6.0  hrs |
| 44,884,134 | 16,709,296 | 24,005,276 | 85,598,707 | 19. Premiums Rest break 8.0   hrs |
| 1,630,660 | 3,040,254 | 4,587,043 | 9,257,957 | 20. Premiums 5-6 hrs meal violation |
| 1,585,110 | 45,487 | 224,288 | 1,854,885 | 21. Premiums 10-12 hrs meal violation |
| 19,621,238 | 0 | 0 | 19,621,238 | 28. Premiums Solo RPh valid meal |

| RPh | Other Rx | Front Store | ALL | Description |
|---|---|---|---|---|
| **Table 3d: Unpaid Premium Payments (Excluding Arbitration Subgroup 3)** ||||| 
| *Time period from 2014-08-21 to 2019-12-20, All Locations* ||||| 
| 2,566,836 | 448,222 | 796,696 | 3,811,754 | 16. Premiums Meal violation |
| 18,997,882 | 13,831,800 | 16,345,687 | 49,175,368 | 17. Premiums Rest break 3.5  hrs |
| 16,459,022 | 10,493,901 | 13,785,932 | 40,738,854 | 18. Premiums Rest break 6.0  hrs |
| 10,739,135 | 5,823,445 | 7,341,138 | 23,903,718 | 19. Premiums Rest break 8.0  hrs |
| 13,390 | 167,082 | 226,003 | 406,475 | 20. Premiums 5-6 hrs meal violation |
| 16,102 | 3,620 | 15,809 | 35,531 | 21. Premiums 10-12 hrs meal violation |
| 2,666,492 | 0 | 0 | 2,666,492 | 28. Premiums Solo RPh valid meal |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS'  Chambers Copy - Do Not File

27.     I have examined the California data, excluding outlier data, to determine the number of times that the MPP and RPP earning codes appear during the data period.  This analysis showed that 321,316 MPPs appeared in the data, and only 8 RPPs codes appeared.

**Liability Based on Pay Periods Worked By Class Members**

28.     **Table**   below summarizes my findings regarding what the data reflects as the aggregate number of pay periods worked by employees during the time period of August 21, 2017 to the end of the data.  In addition to the terms already used, the term "Pay Periods" refers to the bi-weekly two-week period of time as described in Exhibit F.  The table reflects my findings, which reflect the pay periods worked by the following subgroups:  (1) Pharmacists ("RPh"); (2) other (non-Pharmacist) Pharmacy employees ("Other Rx"); and (3) Front Store employees.  The table further reflects a division of these subgroups into the various Arbitration Subgroups.

| Table   : Number of Person Pay Periods<br>Time period from 2017-08-21 to 2019-12-20<br>Stores included    Target and Non-Target | | | | |
|---|---|---|---|---|
| **RPh** | **Other Rx** | **Front Store** | **ALL** | **Employees Included** |
| 215,380 | 420,911 | 670,102 | 1,306,393 | All Employees |
| 88,028 | 253,546 | 367,464 | 709,038 | All without Arb Sub 1 |
| 84,566 | 240,638 | 348,105 | 673,309 | All without Arb Sub 2 |
| 13,973 | 43,013 | 54,460 | 111,446 | All without Arb Sub 3 |

**Damages Calculations Based on Pay Periods Worked by Class Members**

29.     **Table 5** below summarizes my findings regarding the damages associated with the potential violations during the data period based on the information set forth in Table 4 above. The following methodology was applied when calculating damages:

        a.     Violations for failure to maintain business records and/or issue accurate itemized wage statements are assumed for each pay period worked by each employee in which the data provided did not specify the corresponding hourly rate paid for each different type of earning code contained in the data during the time period of August 21, 2014 to the end of the data.  Based on my review of the data provided to me, the data did not specify the corresponding hourly rate paid for each different type of pay itemized in the

18

pay data for any of the employees during the data period.

   b.   Using Table 4, damages for failure to maintain business records and/or issue accurate itemized wage statements are calculated based on the aggregate number of Pay Periods worked (from August 21, 2017), at a rate of $50 for the first violation per employee and $100 for all subsequent violations per employee, limited to $4,000 per each employee.  These amounts of damages for violations per employee are aggregated to reflect all of the amounts of damages for violations for all employees during the time period of August 21, 2017 to the end of the data.

   c.   Table 5 is divided into subgroups as set forth above.

| Table 5: Damages -  5 / 1   per Pay Period with   ,   Cap<br>Time period from 2017-08-21 to 2019-12-20<br>Stores included   Target and Non-Target | | | | |
|---|---|---|---|---|
| **RPh** | **Other Rx** | **Front Store** | **ALL** | **Employees Included** |
| 15,824,250 | 32,058,900 | 52,129,000 | 100,012,150 | All Employees |
| 6,692,400 | 19,995,800 | 30,427,050 | 57,115,250 | All without Arb Sub 1 |
| 6,440,200 | 19,075,250 | 29,063,500 | 54,578,950 | All without Arb Sub 2 |
| 977,700 | 2,993,150 | 3,832,250 | 7,803,100 | All without Arb Sub 3 |

### Liability Based on Months Worked By Class Members

30.   **Tables   a- d** below summarize my findings regarding what the data reflects as the number of months worked by employees during the data period.  In addition to the terms already used, the following terms in the table have the following meanings:

   a.   "Person months" refers to the aggregate of the number of total months worked by each employee during the data period.  If an employee worked at least one shift during the month, that month was counted as a person month worked.

   b.   The years listed as following "Person months worked" refer to the time period of January 1 to December 31 of the year specified.

   c.   Tables 6a-6d are divided into subgroups as set forth above.

| RPh | Other Rx | Front Store | ALL | Description |
|---|---|---|---|---|
| **Table a: Person Months for All Employees** Time period from 2014-08-21 to 2019-12-20 Stores included Target and Non-Target |||||
| RPh | Other Rx | Front Store | ALL | Description |
| 15,763 | 26,909 | 53,512 | 96,184 | 1. Person months in year 2014 |
| 37,712 | 67,248 | 126,651 | 231,611 | 2. Person months in year 2015 |
| 44,262 | 85,033 | 131,377 | 260,672 | 3. Person months in year 2016 |
| 44,124 | 86,830 | 134,873 | 265,827 | 4. Person months in year 2017 |
| 43,769 | 85,133 | 134,538 | 263,440 | 5. Person months in year 2018 |
| 42,869 | 84,491 | 133,658 | 261,018 | 6. Person months in year 2019 |

**Table b: Person Months for Employees (Excluding Arbitration Subgroup 1)**
Time period from 2014-08-21 to 2019-12-20
Stores included Target and Non-Target

| RPh | Other Rx | Front Store | ALL | Description |
|---|---|---|---|---|
| 2,315 | 7,766 | 13,713 | 23,794 | 1. Person months in year 2014 |
| 6,743 | 25,654 | 44,240 | 76,637 | 2. Person months in year 2015 |
| 15,221 | 46,940 | 60,599 | 122,760 | 3. Person months in year 2016 |
| 16,164 | 48,737 | 66,287 | 131,188 | 4. Person months in year 2017 |
| 17,471 | 49,936 | 71,238 | 138,645 | 5. Person months in year 2018 |
| 18,837 | 54,601 | 81,474 | 154,912 | 6. Person months in year 2019 |

**Table c: Person Months for Employees (Excluding Arbitration Subgroup 2)**
Time period from 2014-08-21 to 2019-12-20
Stores included Target and Non-Target

| RPh | Other Rx | Front Store | ALL | Description |
|---|---|---|---|---|
| 2,299 | 7,176 | 12,848 | 22,323 | 1. Person months in year 2014 |
| 6,585 | 24,059 | 41,910 | 72,554 | 2. Person months in year 2015 |
| 14,853 | 44,940 | 57,774 | 117,567 | 3. Person months in year 2016 |
| 15,626 | 46,306 | 62,699 | 124,631 | 4. Person months in year 2017 |
| 16,794 | 47,370 | 67,331 | 131,495 | 5. Person months in year 2018 |
| 18,099 | 51,993 | 77,743 | 147,835 | 6. Person months in year 2019 |

**Table d: Person Months for Employees (Excluding Arbitration Subgroup 3)**
Time period from 2014-08-21 to 2019-12-20
Stores included Target and Non-Target

| RPh | Other Rx | Front Store | ALL | Description |
|---|---|---|---|---|
| 1,555 | 2,962 | 4,415 | 8,932 | 1. Person months in year 2014 |
| 3,470 | 7,364 | 10,461 | 21,295 | 2. Person months in year 2015 |
| 3,265 | 8,199 | 10,736 | 22,200 | 3. Person months in year 2016 |
| 3,053 | 9,117 | 11,933 | 24,103 | 4. Person months in year 2017 |
| 2,860 | 8,844 | 11,223 | 22,927 | 5. Person months in year 2018 |
| 2,626 | 7,750 | 9,533 | 19,909 | 6. Person months in year 2019 |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' ... Chambers Copy – Do Not File

**Damages Calculations Based on Months Worked by Class Members**

31.     **Tables a- d.** below summarize my findings regarding the damages associated with the potential violations during the data period based on the information set forth in Tables 6a-6d above.  The following methodology was applied when calculating damages:

a.     Using Tables 6a-6d, damages for failure to reimburse monthly cell phone expenses are calculated by multiplying the number of person months worked by the amount of a basic monthly cell phone plan for the year specified, as set forth in a document provided to me by counsel entitled the Declaration of David Breshears. Specifically, the amounts set forth as the "Estimated [Year] Avg. Monthly Mobile Voice & Data Price" for each specified year were multiplied by the aggregate number of person months worked per year as listed in the table.

b.     Tables 7a-7d are divided into subgroups as set forth above.

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' Chambers Copy - Do Not File

| Table a: Summary of Damages Resulting from Failure to Reimburse Cell Phone Expenses All Employees | | | | |
|---|---|---|---|---|
| Year | RPh | Other Rx | Front Store | ALL |
| 2014 | 722,418 | 1,233,240 | 2,452,455 | 4,408,113 |
| 2015 | 1,791,320 | 3,194,280 | 6,015,922 | 11,001,522 |
| 2016 | 1,917,872 | 3,684,480 | 5,692,566 | 11,294,918 |
| 2017 | 1,691,273 | 3,328,194 | 5,169,682 | 10,189,149 |
| 2018 | 1,635,210 | 3,180,569 | 5,026,340 | 9,842,119 |
| 2019 | 1,560,860 | 3,076,317 | 4,866,488 | 9,503,665 |
| Total | ,318, 5 | 1 , , 8 | 2 ,223, 5 | 5 ,23 ,8 |

| Table b: Summary of Damages Resulting from Failure to Reimburse Cell Phone Expenses (Excluding Arbitration Subgroup 1) | | | | |
|---|---|---|---|---|
| Year | RPh | Other Rx | Front Store | ALL |
| 2014 | 106,096 | 355,916 | 628,467 | 1,090,479 |
| 2015 | 320,292 | 1,218,565 | 2,101,400 | 3,640,258 |
| 2016 | 659,526 | 2,033,910 | 2,625,755 | 5,319,191 |
| 2017 | 619,566 | 1,868,089 | 2,540,781 | 5,028,436 |
| 2018 | 652,717 | 1,865,609 | 2,661,452 | 5,179,778 |
| 2019 | 685,855 | 1,988,022 | 2,966,468 | 5,640,346 |
| Total | 3, , 53 | ,33 ,112 | 13,52 ,322 | 25,8 8, 88 |

| Table c: Summary of Damages Resulting from Failure to Reimburse Cell Phone Expenses (Excluding Arbitration Subgroup 2) | | | | |
|---|---|---|---|---|
| Year | RPh | Other Rx | Front Store | ALL |
| 2014 | 105,363 | 328,876 | 588,824 | 1,023,063 |
| 2015 | 312,788 | 1,142,802 | 1,990,725 | 3,446,315 |
| 2016 | 643,580 | 1,947,250 | 2,503,348 | 5,094,178 |
| 2017 | 598,945 | 1,774,909 | 2,403,253 | 4,777,106 |
| 2018 | 627,424 | 1,769,743 | 2,515,486 | 4,912,654 |
| 2019 | 658,985 | 1,893,065 | 2,830,622 | 5,382,672 |
| Total | 2, , 8 | 8,85 , | 12,832,258 | 2 ,35, 8 |

| Table d: Summary of Damages Resulting from Failure to Reimburse Cell Phone Expenses (Excluding Arbitration Subgroup 3) | | | | |
|---|---|---|---|---|
| Year | RPh | Other Rx | Front Store | ALL |
| 2014 | 71,266 | 135,748 | 202,339 | 409,354 |
| 2015 | 164,825 | 349,790 | 496,898 | 1,011,512 |
| 2016 | 141,472 | 355,263 | 465,191 | 961,926 |
| 2017 | 117,021 | 349,455 | 457,392 | 923,868 |
| 2018 | 106,850 | 330,412 | 419,291 | 856,553 |
| 2019 | 95,613 | 282,178 | 347,097 | 724,887 |
| Total | , | 1,8 2,8 5 | 2,388,2 8 | ,888,1 |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS'   Chambers Copy – Do Not File

**Liability Based on Opening/Closing Shifts Worked By Certain Class Members**

32.      **Table 8** below summarizes my findings regarding the number of opening and closing shifts worked by Front Store employees in specified supervisory positions in Core (non-Target) stores during the data period, for which no earning code of "PGR" appears in the data.  In addition to the terms already used, the following terms have the following meanings:

a.      "PGR" refers to the earning code for "Paid Grace Period," which reflects a payment made to cover the one-minute increment of time assumed to be spent by Front Store employees engaged in opening or closing duties necessarily performed off-the-clock.

b.      "Opening shift" refers to the first shift scheduled for the day and worked by a Front Store employee in one of the positions listed in Exhibit E.

c.      "Closing shift" refers to the last shift scheduled for the day and worked by a Front Store employee in one of the positions listed in Exhibit E.

d.      Table 8 is divided into subgroups as set forth above.

33.      **Table 8** also summarizes my findings regarding the damages associated with the potential violations for off-the-clock work occurring during opening and/or closing shifts during the data period based on the number of opening and closing shifts involved.  The following methodology was applied when calculating damages:

a.      It was assumed that a violation, in the amount of one minute of time, occurred each time a Front Store supervisory employee in one of the positions listed in Exhibit E worked an opening or closing shift and did not receive any earnings coded as "PGR."

b.      For each shift in which a violation was assumed to occur, each employee's hourly rate was divided by 60 to reflect one minute of unpaid wages arising from each violation.  These amounts were aggregated to reflect all of the damages for all Front Store supervisory employees who worked the opening and closing shifts as reflected in the table.

c.      These damages could be multiplied by the number of minutes deemed appropriate to assess as off-the-clock time.

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' Chambers Copy – Do Not File

| | All RPh | No Arb Sub 1 | No Arb Sub 2 | No Arb Sub 3 | |
|---|---|---|---|---|---|
| **Table 8: Summary of Opening and Closing Shifts Core (Non-Target) Stores Only (Supervisors Only)** Off-the-Clock Time (OTC)  1 minutes of pay for each Opening or Closing shift worked Excluding shifts with Earning Code "PGR" | | | | | |
| | 1,652,293 | 684,143 | 642,338 | 202,206 | Number of person-shifts |
| | 458,106 | 188,407 | 176,124 | 59,025 | Unpaid OTC for opening/closing shifts |

34.     **Table**    below summarizes my findings regarding the number of opening and closing shifts worked by Pharmacists in Target stores during the data period, for which no earning code of "PGR" appears in the data.  In addition to the terms already used, the following terms have the following meanings:

a.     "PGR" refers to the earning code for "Paid Grace Period," which reflects a payment made to cover the five-minute increment of time assumed to be spent by Target Pharmacists engaged in opening or closing duties necessarily performed off-the-clock.

b.     "Opening shift" refers to the first shift scheduled for the day and worked by a Target Pharmacist.

c.     "Closing shift" refers to the last shift scheduled for the day and worked by a Target Pharmacist

d.     Table 9 is divided into subgroups as set forth above.

35.     **Table**    also summarizes my findings regarding the damages associated with the potential violations for off-the-clock work occurring during opening and/or closing shifts during the data period based on the number of opening and closing shifts involved.  The following methodology was applied when calculating damages:

a.     It was assumed that a violation, in the amount of five minutes of time, occurred each time a Target Pharmacist worked an opening or closing shift and did not receive any earnings coded as "PGR."

b.     For each shift in which a violation was assumed to occur, each employee's hourly rate was divided by 60 and then multiplied by 5 to reflect five minutes of unpaid wages arising from each violation.  These amounts were aggregated to reflect all of the

24

damages for all Target Pharmacists who worked the opening and closing shifts as reflected in the table.

| | All RPh | No Arb Sub 1 | No Arb Sub 2 | No Arb Sub 3 | |
|---|---|---|---|---|---|
| **Table : Summary of Opening and Closing Shifts**<br>**Target Stores Only (Pharmacists Only)**<br>Off-the-Clock Time (OTC) 5 minutes of pay for each Opening or Closing shift worked<br>Excluding shifts with Earning Code "PGR" | | | | | |
| | 561,832 | 520,882 | 520,199 | 7,899 | Number of person-shifts |
| | 3,213,746 | 2,988,326 | 2,987,573 | 46,947 | Unpaid OTC for opening/closing shifts |

**Liability Based on Former Employees Who Experienced Violations**

36.    **Tables 1 a-1 d** below summarize my findings regarding the number of employees potentially subject to "waiting time penalties" for violation of California Labor Code section 203 during the time period of August 21, 2015 to the end of the data, pursuant to the various theories of recovery in this case.  For purpose of generating the number of employees at issue, only terminated employees were considered as potentially experiencing violations.  In addition, only those former employees who worked shifts or pay periods triggering liability as set forth in the above tables during the time period of August 21, 2015 were considered.

a.    Tables 10a-10d are divided into subgroups as set forth above.

b.    Tables 10a-10d are also divided into subgroups based on theories of liability set forth elsewhere in this declaration, as designated in the column "Theory of Liability."

37.    **Tables 1 a-1 d** also summarize my findings regarding the damages associated with the potential violations for "waiting time penalties" for violation of California Labor Code section 203, pursuant to the various theories of recovery in this case, during the time period of August 21, 2015 to the end of the data based on the number of employees contained therein.  The following methodology was applied when calculating damages, which appear in the row entitled "Waiting Time Penalty Calculations":

a.    It is assumed that a violation occurred if the data reflected that any of the circumstances described in the tables above occurred, divided by theory of recovery, to the

25

employee at least once during the time period of August 21, 2015 to the end of the data.

        b.        Damages are calculated by multiplying the average hourly rate worked by the employees in question by the average number of hours per shift worked by those employees during the data period, multiplying by the number of employees, and then multiplying the result by 30.  To avoid double-counting, the damage calculation depends on the information contained in the row entitled "Any one violation/no duplicates."  The results of all employees in each category are then aggregated to reflect the total amount of penalties associated with each theory of recovery.

| Table 1  a:  Waiting Time Penalties (Violations of Labor Code 2  3)<br>All Employees<br>Restricted to persons terminated after August 21, 2015<br>Waiting Time Penalty    (Ave \$/hr)*(Ave Hrs/Shift)*(NbrPersons)*x(30) | | | | |
|---|---|---|---|---|
| | **Front Store** | **RPh** | **Other Rx** | **All** | **Theory of Liability** |
| 1 | 14,524 | 2,184 | 7,044 | 23,752 | Rest Breaks - until June 8, 2017 |
| 2 | 21,670 | 2,433 | 8,683 | 32,786 | Rest Breaks - Entire Class Period |
| 3 | 15,467 | 2,197 | 6,330 | 23,994 | Meal Breaks - Not paid per policy |
| 4 | 8 | 2,385 | 0 | 2,393 | Meal Breaks – Solo RPh |
| 5 | 19,417 | 2,088 | 5,779 | 27,284 | OTC Work |
| 6 | 17,887 | 2,393 | 7,968 | 28,248 | Failure to Pay OT at correct rate |
| 7 | 13.29 | 67.96 | 15.77 | | Average \$/Hr |
| 8 | 6.32 | 7.69 | 6.29 | | Average Hrs/Shift |
| 20 | 21,686 | 2,436 | 8,690 | 32,812 | Any one violation/no duplicates |
| | **5 , 55,  1** | **38,1  ,2** | **25,853, 25** | **118,  8,5 2** | **Waiting Time Penalty Calculation** |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' ... Chambers Copy - Do Not File

| | Front Store | RPh | Other Rx | Total | Theory of Liability |
|---|---|---|---|---|---|
| | **Table 1 b: Waiting Time Penalties (Violations of Labor Code 2 3)** **(Excluding Arbitration Subgroup 1)** Restricted to persons terminated after August 21, 2015 Waiting Time Penalty (Ave $/hr)*(Ave Hrs/Shift)*(NbrPersons)*x(30) | | | | |
| 1 | 10,214 | 918 | 4,654 | 15,786 | Rest Breaks – until June 8, 2017 |
| 2 | 16,975 | 1,127 | 6,174 | 24,276 | Rest Breaks - Entire Class Period |
| 3 | 11,372 | 957 | 4,171 | 16,500 | Meal Breaks - Not paid per policy |
| 4 | 4 | 1,106 | 0 | 1,110 | Meal Breaks – Solo RPh |
| 5 | 14,879 | 957 | 3,914 | 19,750 | OTC Work |
| 6 | 13,410 | 1,101 | 5,513 | 20,024 | Failure to Pay OT at correct rate |
| 7 | 12.86 | 67.46 | 15.30 | | Average $/Hr |
| 8 | 6.21 | 7.77 | 6.14 | | Average Hrs/Shift |
| 20 | 16,987 | 1,129 | 6,180 | 24,296 | Any one violation/no duplicates |
| | , ,355 | 1 , 52, 53 | 1 , 31,1 3 | 5,8 3,551 | **Waiting Time Penalty Calculation** |

| | Front Store | RPh | Other Rx | Total | Theory of Liability |
|---|---|---|---|---|---|
| | **Table 1 c: Waiting Time Penalties (Violations of Labor Code 2 3)** **(Excluding Arbitration Subgroup 2)** Restricted to persons terminated after August 21, 2015 Waiting Time Penalty (Ave $/hr)*(Ave Hrs/Shift)*(NbrPersons)*x(30) | | | | |
| 1 | 10,174 | 911 | 4,629 | 15,714 | Rest Breaks – until June 8,2017 |
| 2 | 16,920 | 1,118 | 6,138 | 24,176 | Rest Breaks - Entire Class Period |
| 3 | 11,319 | 949 | 4,136 | 16,404 | Meal Breaks - Not paid per policy |
| 4 | 4 | 1,097 | 0 | 1,101 | Meal Breaks – Solo RPh |
| 5 | 14,824 | 949 | 3,885 | 19,658 | OTC Work |
| 6 | 13,356 | 1,092 | 5,477 | 19,925 | Failure to Pay OT at correct rate |
| 7 | 12.85 | 67.46 | 15.28 | | Average $/Hr |
| 8 | 6.20 | 7.77 | 6.14 | | Average Hrs/Shift |
| 20 | 16,932 | 1,120 | 6,144 | 24,196 | Any one violation/no duplicates |
| | , 8 , 5 | 1 , 13,883 | 1 ,2 ,583 | 5,3 ,12 | **Waiting Time Penalty Calculation** |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS'

| | Front Store | RPh | Other Rx | Total | Theory of Liability |
|---|---|---|---|---|---|
| | | | | | **Table 1 d:  Waiting Time Penalties (Violations of Labor Code 2 3) (Excluding Arbitration Subgroup 3)** Restricted to persons terminated after August 21, 2015 Waiting Time Penalty   (Ave \$/hr)\*(Ave Hrs/Shift)\*(NbrPersons)\*x(30) |
| 1 | 331 | 106 | 215 | 652 | Rest Breaks – until June 8, 2017 |
| 2 | 395 | 107 | 234 | 736 | Rest Breaks - Entire Class Period |
| 3 | 365 | 105 | 216 | 686 | Meal Breaks - Not paid per policy |
| 4 | 0 | 106 | 0 | 106 | Meal Breaks – Solo RPh |
| 5 | 383 | 94 | 191 | 668 | OTC Work |
| 6 | 389 | 106 | 228 | 723 | Failure to Pay OT at correct rate |
| 7 | 15.76 | 68.81 | 17.31 | | Average \$/Hr |
| 8 | 6.93 | 7.98 | 6.81 | | Average Hrs/Shift |
| 20 | 396 | 107 | 234 | 737 | Any one violation/no duplicates |
| | 1,2 8, 53 | 1, 3, 2 | 82 ,8 3 | 3,88 , 8 | **Waiting Time Penalties (no duplicates)** |

## Liability Based on Improper Calculation of Regular Rate of Pay

38.     As part of my analysis, I attempted to determine whether the regular rate of pay had been properly calculated for overtime payments made to certain employees and to assess potential damages accordingly.  However, because the pay data was deficient, I was unable to conduct this analysis.  While the data contains earnings codes associated with overtime payments, it does not show the amounts of payments made per earnings code or the hourly rate of pay used.  I am informed that annual bonuses were paid to certain employees, and understand that, for a portion of the data period, CVS did not adjust the overtime rate to reflect the regular rate of pay at all, and for the remaining portion of the data period, CVS utilized the FLSA standard, instead of the California standard, to calculate the regular rate of pay to adjust overtime associated with these bonuses, as well as to adjust overtime paid in periods where shift differentials, such as Pharmacist Night Rate earnings codes occurred.  If CVS supplied accurate data to reflect such information, I could conduct an analysis to determine the amount of instances in which the regular rate was not properly calculated, as well as damages arising from it.

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' ... Chambers Copy – Do Not File

<u>**Liability for Class Representatives**</u>

39.          As part of my findings, I analyzed the specific data pertaining to Ryan Hyams (empid 1368443) during the data period.  Hyams worked from 2016-01-31 to 2017-08-24 for 41 pay periods and 20 months.  Hyams' latest pay rate was $79 per hour.  Hyams' name did not appear on the list entitled "CVS 004202 – Arbitration Training List (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx" or in the column entitled "Arbitration Opt Out Date" on the list entitled "CVS 3399 – Updated Class List Including Arb Opt Outs (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx," thus he would be considered a member of Arbitration Subgroup 3.  The tables below display the results of the same analyses conducted above for Hyams:

| Table 2a for Hyams: Person Shifts Worked Time period from 2014-08-21 to 2019-12-20 Stores included    Target and Non-Target | |
|---|---|
| **RPh** | **Description** |
| 439 | 1. Total number of shifts |
| 385 | 2. Meal eligible (no MPP/waiver) |
| 0 | 3. Meal eligible meal missing |
| 140 | 4. Meal eligible violation |
| 433 | 5. Rest 3.5   hrs, no RPP |
| 428 | 6. Rest 5.0   hrs, no RPP |
| 421 | 7. Rest 6.0   hrs, no RPP |
| 358 | 8. Rest 8.0   hrs, no RPP |
| 166 | 10. Rest 10.0   hrs, no RPP |
| 22 | 11. Rest    12.0 hrs, no RPP |
| 0 | 12. Meal eligible 5-6 hrs |
| 0 | 13. Meal 5-6 hrs violation |
| 0 | 14. Meal eligible 10-12 hrs |
| 0 | 15. Meal 10-12 hrs violation |
| 233 | 22. Solo RPh 3.5   hrs, no RPP |
| 216 | 23. Solo RPh 5.0   hrs, no MPP |
| 103 | 24. Solo RPh 5.0   hrs, valid meal |
| 229 | 25. Solo RPh 6.0   hrs, no RPP |
| 216 | 26. Solo RPh 8.0   hrs, no RPP |
| 15 | 27. Solo RPh   12.0 hrs, no RPP |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' Chambers Copy – Do Not File

| Table 3a for Hyams: Unpaid Premiums for Shifts Worked Time period from 2014-08-21 to 2019-12-20 Stores included    Target and Non-Target | |
|---|---|
| **RPh** | **Description** |
| 10,640 | 16. Premiums Meal violation |
| 32,908 | 17. Premiums Rest break  3.5   hrs |
| 31,996 | 18. Premiums Rest break  6.0   hrs |
| 27,208 | 19. Premiums Rest break  8.0   hrs |
| 0 | 20. Premiums 5-6 hrs meal violation |
| 0 | 21. Premiums 10-12 hrs meal violation |
| 7,828 | 28. Premiums Solo RPh valid meal |

| Tables   a-  d Results for Hyams: Unreimbursed Cell Phone Expenses Time period from 2014-08-21 to 2019-12-20 | | | |
|---|---|---|---|
| **2 1** | **2 1** | **All** | |
| 12 | 8 | | Months worked |
| 43.33 | 38.33 | | Amount of monthly cell phone plan |
| 519.96 | 306.64 | **82 .** | **Total** |

| Tables 1  a-1  d Results for Hyams:  Waiting Time Penalties Assumes at least one violation Waiting Time Penalty    (Ave \$/hr)*(Ave Hrs/Shift)*(NbrPersons)*x(30) | |
|---|---|
| 76.00 | Average \$/Hr |
| 9.53 | Average Hrs/Shift |
| **21, 28** | **Waiting Time Penalty Calculation** |

40.      As part of my findings, I analyzed the specific data pertaining to Regine Duhon (empid 1397497) during the data period.  Duhon worked from 2016-02-29 to 2018-02-11 for 52 pay periods and 25 months.  Duhon's latest pay rate was \$19.39 per hour. Duhon's name did not appear on the list entitled "CVS 004202 – Arbitration Training List (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx" or in the column entitled "Arbitration Opt Out Date" on the list entitled "CVS 3399 – Updated Class List Including Arb Opt Outs (CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER).xlsx," thus she would be considered a member of Arbitration Subgroup 3.  The tables below display the results of the same analyses conducted above for Duhon:

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' Chambers Copy – Do Not File

| Table 2a for Duhon: Person Shifts Worked<br>Time period from 2014-08-21 to 2019-12-20<br>Stores included    Target and Non-Target | |
|---|---|
| **Other Rx** | **Description** |
| 500 | 1. Total number of shifts |
| 417 | 2. Meal eligible (no MPP/waiver) |
| 14 | 3. Meal eligible meal missing |
| 16 | 4. Meal eligible violation |
| 489 | 5. Rest 3.5   hrs, no RPP |
| 471 | 6. Rest 5.0   hrs, no RPP |
| 453 | 7. Rest 6.0   hrs, no RPP |
| 292 | 8. Rest 8.0   hrs, no RPP |
| 33 | 10. Rest 10.0   hrs, no RPP |
| 0 | 11. Rest    12.0 hrs, no RPP |
| 19 | 12. Meal eligible 5-6 hrs |
| 14 | 13. Meal 5-6 hrs violation |
| 10 | 14. Meal eligible 10-12 hrs |
| 0 | 15. Meal 10-12 hrs violation |
| 0 | 22. Solo RPh 3.5   hrs, no RPP |
| 0 | 23. Solo RPh 5.0   hrs, no MPP |
| 0 | 24. Solo RPh 5.0   hrs, valid meal |
| 0 | 25. Solo RPh 6.0   hrs, no RPP |
| 0 | 26. Solo RPh 8.0   hrs, no RPP |
| 0 | 27. Solo RPh   12.0 hrs, no RPP |

| Table 3a for Duhon: Unpaid Premiums for Shifts Worked<br>Time period from 2014-08-21 to 2019-12-20<br>Stores included    Target and Non-Target | |
|---|---|
| **Other Rx** | **Description** |
| 309 | 16. Penalties Meal violation |
| 9,223 | 17. Penalties Rest break 3.5   hrs |
| 8,536 | 18. Penalties Rest break 6.0   hrs |
| 5,491 | 19. Penalties Rest break 8.0   hrs |
| 271 | 20. Premiums 5-6 hrs meal violation |
| 0 | 21. Premiums 10-12 hrs meal violation |
| 0 | 28. Premiums solo Rx valid meal |

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' ... Chambers Copy - Do Not File

| Tables a- d Results for Duhon: Unreimbursed Cell Phone Expenses Time period from 2014-08-21 to 2019-12-20 | | | | |
|---|---|---|---|---|
| 2 1 | 2 1 | 2 18 | All | |
| 11 | 12 | 2 | | Months worked |
| 43.33 | 38.33 | 37.36 | | Amount of monthly cell phone plan |
| 476.63 | 459.96 | 74.72 | 1, 11.31 | Total |

| Tables 1 a-1 d Results Duhon: Waiting Time Penalties Assumes at least one violation Waiting Time Penalty (Ave $/hr)*(Ave Hrs/Shift)*(NbrPersons)*x(30) | |
|---|---|
| 19.39 | Average $/Hr |
| 7.99 | Average Hrs/Shift |
| , 8 | Waiting Time Penalty Calculation |

41.     If the court determines that subclasses should be certified based on other factors available in the data, such as location, time periods, or other criteria forming the bases of wage and hour violations, I could use the data set currently provided to generate similar liability and damages analyses as those set forth above.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 27th day of August, 2020, at Berkeley, California.



_____

Richard Drogin

DECLARATION OF RICHARD DROGIN IN SUPPORT OF PLAINTIFFS' Chambers Copy - Do Not File

# **<u>EXHIBIT E</u>**

11/13/2020    Half of letters delayed in some cities amid USPS slowdowns - Los Angeles Times
Case 2:16-cv-08979-AB-AGR    Document 187-1    Filed 11/13/20    Page 98 of 108    Page ID
#:6817

CALIFORNIA

# We mailed 100 letters to test the Postal Service. The verdict: Spotty at best, dismal at worst

The Los Angeles Times tested first-class U.S. Postal Service delivery. The results? Spotty at best, dismal at worst.

By MARIA L. LA GANGA, RONG-GONG LIN II

SEP. 15, 2020 | 5 AM



The letter — filled with stickers for a 5-year-old boy named William — was mailed at the post office in the Los Angeles community of Sylmar on Aug. 22. It was sent first class, at a cost of 55 cents, and with a promise, according to the U.S. Postal Service

☰                                        Los Angeles Times                                        🔍

The plain white envelope arrived at its destination, a ranch-style house in Austin, Texas, 11 days later.

Another letter, mailed from Malibu to the San Francisco suburb of Millbrae, sat in a Los Angeles processing center for three days and wasn't delivered for an additional

four days after that.

And a letter sent from the Alhambra post office to a residence in Washington, D.C., took four days to get to the mail processing center in the capital, and three more days elapsed before it reached its final destination.

ADVERTISEMENT

The slow mail service from Los Angeles to cities near and far was just one of the findings of a Los Angeles Times effort to test, in a small but revealing way, the reliability of the Postal Service as it comes under increasing scrutiny due to deep cuts by the Trump administration.

The Times survey, which tracked 100 letters sent between Aug. 21 and 24 to multiple destinations within California and beyond, showed that postal performance in the summer of 2020 is spotty at best, dismal at worst.

There is no single snag in the complex postal delivery system. Instead, multiple choke points can slow a letter's journey. In the worst cases, the postal system fails in more than one way.

The Times measured its letter delivery times against the advertised figure from the Postal Service, which says first-class letters should arrive at their destination in one to three business days. Gaare Davis, president of the American Postal Workers Union, California, said the Postal Service has had a goal of delivering first-class letters within the state in two business days and in three business days to Austin, Atlanta and Washington.

## Among the findings:

• Half of the 20 letters sent to the San Francisco Bay Area arrived late, taking four to five business days to be delivered.

• Only about half of the 40 letters sent to Atlanta and Washington were marked as arriving on time. Ten arrived within four to five business days; eight were never

marked in the Postal Service's certified mail tracking system as delivered, although
they did end up arriving at some point.

ADVERTISEMENT

• One letter sent to Texas never arrived; another took eight business days to land, out
of 20 letters sent to Austin.

• Overall, 75% of the letters sent by The Times that should have arrived within two
business days actually arrived on time. This rate is substantially lower than the Postal
Service's most recent performance metric, which shows a 92.4% on-time delivery rate
in April, May and June.

The Times survey found that it is possible for first-class mail to arrive far quicker
than the official standards, but it didn't happen all that often. Of the 60 letters sent to
Texas and the East Coast, just 12 were scanned as arriving within three calendar days.

In response to questions about The Times' findings, Postal Service spokeswoman
Evelina Ramirez said in an email that the agency continues to "identify and address
some ongoing service issues in certain areas."

But she stressed that "service performance improved across all major mail categories
in the weeks prior to Postmaster General [Louis] DeJoy's testimony on Aug. 24, and
this trend has continued through August, returning to early July levels." Ramirez did
not respond to any specific finding and would not discuss whether the slow
performances were related to the recent cutbacks.

But Davis called the findings "unacceptable" and said they should be brought to the
attention of Congress, particularly to the House Oversight Committee, which grilled
DeJoy on Aug. 24 about cost-cutting measures that led to current postal delays.

The changes in service have left customers waiting for prescription drugs and
landlords waiting for rent checks, and created chaos in the Los Angeles processing
center.



**CALIFORNIA**

### 'Like Armageddon': Rotting food, dead animals and chaos at postal facilities amid cutbacks

Aug. 20, 2020

---

DeJoy "is the current problem," Davis said. "He took the [sorting] machines out. If the mail was running fine before he took over and before COVID, what's the problem now? It sure ain't the employees. The employees are doing their jobs with the tools provided."

DeJoy, a major donor to President Trump, started as postmaster general in mid-June. The Postal Service, starting in July, dismantled sorting machines, slashed employee overtime pay and began strictly enforcing truck schedules, which workers say caused further disruptions.

ADVERTISEMENT

The ensuing uproar caused DeJoy on Aug. 18 to say he would suspend some of the operational changes until after the presidential election, but he also said the cutbacks would not be restored.

DeJoy has acknowledged significant slowdowns in service. "We had some delays in the mail," he said in Senate testimony on Aug. 21. "Our recovery process in this should have been a few days, and it's amounted to be a few weeks."



Postmaster General Louis DeJoy arrives to testify before a House Oversight and Reform Committee hearing on the Postal Service on Aug. 24. (Tom Brenner / Associated Press)

But he also vowed that the possible flood of mail-in ballots — an expected increase tied to fears of standing in long lines during the COVID-19 pandemic — will be handled appropriately.

"As we head into the election season, I want to assure this committee and the American public that the Postal Service is fully capable and committed to delivering the nation's election mail securely and on time," he said. "This sacred duty is my No. 1 priority between now and election day."

The degradation of first-class mail is not exactly a new phenomenon; California has lost more processing plants than any other state between about 2006 and 2012, said Phil Warlick, the union's legislative director.

In 2015, the Postal Service changed its first-class service mail standards so that most mail once delivered overnight is now delivered in two days. That shift largely ended the overnight first-class mail delivery service once enjoyed by people sending letters within the same metro region.

The worsening delays worry Ola Steenhagen, a 74-year-old from Porter Ranch who was protesting in front of the Granada Hills post office on Aug. 22, waving a sign that said, "Save our Post Office!"



Ola Steenhagen, 74, from Porter Ranch, protests outside the Granada Hills post office on Aug. 22. (Maria LaGanga / Los Angeles Times)

It was a Saturday, the same day the House held a rare weekend session and voted to block Postal Service changes and give the beleaguered agency $25 billion. Trump tweeted that the measure was a "money wasting HOAX."

ADVERTISEMENT

Steenhagen's husband is a veteran who receives his medication in the mail. Inhalers that help him breathe have been arriving weeks late. The couple vote by mail and are worried about the effect of postal problems on the coming election.

"I'm worried about everybody," she said. "I'm worried about the farmworkers, the people who might be able to vote and won't have the services to mail their vote. And their kids who can vote, but it's not easy."

CALIFORNIA



**Holocaust reparations, prescriptions and rent checks: USPS delays put
Americans in jeopardy**

Aug. 29, 2020

---

This is how The Times' survey worked: From Aug. 21, when DeJoy was grilled by a
Senate committee, to Aug. 24, when he testified before the House, The Times mailed
100 letters to five destinations.

The first-class letters were sent from 20 post offices all around Los Angeles County,
from Lancaster in the north to Long Beach in the south, from as far west as Malibu to
as far east as Pomona. They were sent from pricey spots, such as Beverly Hills, and
from Boyle Heights, a working-class Eastside neighborhood with high poverty rates.

The destinations included Arcadia, in the San Gabriel Valley northeast of downtown
Los Angeles; Millbrae; Austin; Atlanta; and Washington, D.C.

Among the bottlenecks The Times' survey revealed were inexplicably long travel
times, lengthy waits at the processing center in the destination city and unexplained
stretches of time between leaving that facility and landing in the recipient's mailbox.

None of the departure neighborhoods in Los Angeles County had dramatically
different levels of service; mail sent from Compton fared about the same as that sent
from Pasadena.



A USPS processing and distribution center in the City of Industry on May 14. (Irfan Khan / Los Angeles Times)

Three distribution centers that process outgoing mail for L.A. County also had no systemic delays in sorting departing letters, according to The Times' survey. Of the letters sent to the Bay Area, most spent less than three hours in the sorting facilities in Los Angeles, Santa Clarita and Santa Ana.

But arrival cities are a different story entirely. Mail delivered to Washington took markedly longer to arrive than that sent to Austin or Atlanta.

ADVERTISEMENT

The processing center that serves the Washington, area was a destination bottleneck. The three letters The Times sent that lingered longest between destination processing center and final recipient were all headed to a residence in the capital.

It took three days for all three letters to get from the Washington processing center to the residence, even though it was just one mile away.

Letters sent to Millbrae were slowed by multiple choke points in the system: one during the time in transit, another at the destination processing center in San Francisco, and a third at the local post office.

In one vivid example illustrating the slow California service, it took nearly three times as long for a letter mailed in Malibu to reach the San Francisco distribution center as it took for a letter mailed in Pomona to reach the distribution center in Washington.

**How a letter took seven days to travel from L.A. County to the Bay Area**

| Date | Location |
| --- | --- |
| Aug. 24, 9:05 am | Dropped off in Malibu |
| Aug. 24, 5:55 pm | Leaves Malibu Post Office |
| Aug. 24, 7:46 pm | Arrives at Los Angeles Distribution Center |
| Aug. 27, 5:55 pm | Departs Los Angeles Distribution Center |
| Aug. 29, 12:21 am | Arrives at San Francisco Distribution Center |
| Aug. 30, 6:16 pm | Departs San Francisco Distribution Center |
| Aug. 31, 11:30 am | Final delivery in Millbrae, just west of San Francisco International Airport |

Source: U.S. Postal Service

Los Angeles Times

The Postal Service can be speedy. Seven of the 20 letters sent from Los Angeles County to the residence in Millbrae arrived within two calendar days. These envelopes spent only about four hours at the sorting facility in San Francisco.

However, just as many letters took a full week to make that same trip. The transit time alone between L.A. County and the Bay Area was between 2½ and 4½ days for a drive that takes less than seven hours in traffic that's coronavirus-light.

The letters then spent between one and four days at the San Francisco sorting facility before being sent to the post office in Millbrae.

There was still one more stop. And at this point, the journey got even stranger.

Most of the slowest letters were marked as out for delivery and en route to their final destination at 8:36 a.m. on Aug. 27.

ADVERTISEMENT

But it took them more than a day to get from the Millbrae post office to a residence within the tiny city, which is less than four square miles in size, arriving on Aug. 28 at 10:05 a.m.

The distance? Just a quarter-mile.

About 1,400 feet.

A five-minute walk.

CALIFORNIA    WORLD & NATION    POLITICS    CALIFORNIA LAW & POLITICS

---



**The stories shaping California**

Get up to speed with our Essential California newsletter, sent six days a week.

Enter Email Address

SIGN ME UP

You may occasionally receive promotional content from the Los Angeles Times.



Maria L. La Ganga

🐦 Twitter    📷 Instagram    ✉ Email    f Facebook

Maria L. La Ganga is a Metro reporter for the Los Angeles Times. She has covered six presidential elections and served as bureau chief in San Francisco and Seattle.

Rong-Gong Lin II

🐦 Twitter    📷 Instagram    ✉ Email    f Facebook

Rong-Gong Lin II is a metro reporter based in San Francisco who specializes in covering statewide earthquake safety issues and the COVID-19 pandemic. The Bay Area native is a graduate of UC Berkeley and started at the Los Angeles Times in 2004.

Show Comments

---

MORE FROM THE LOS ANGELES TIMES



CALIFORNIA

**Sunday and Monday will begin 'a quick trip back to summer' in L.A. region, forecasters say**

1 hour ago

Half of letters delayed in some cities amid U.S. mail crisis - Los Angeles Times



CALIFORNIA

**Young Kim defeats Gil Cisneros in another victory for Republicans in Orange County**

Nov. 13, 2020

---

CALIFORNIA

**Oakland ballots not counted after voters wrongly told they were receipts, civil rights groups say**

Nov. 13, 2020

---

CALIFORNIA

**Martin Fox, youth coach ensnared in college admissions scandal, sentenced to three months in prison**

Nov. 13, 2020

---

Subscribe for unlimited access

Follow Us

Copyright © 2020, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell My Personal Information