UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEVAG CHALIAN, an Individual, Individually and on behalf of all others similarly situated and the general public,<br><br>                  Plaintiff,<br><br>v.<br><br>CVS PHARMACY, INC., a Rhode Island corporation; CVS RX SERVICES, INC., a New York corporation; GARFIELD BEACH CVS, LLC, a California limited liability company; and DOES 1 thru 100, inclusive,<br><br>               Defendants. | Case No. CV 16-08979 AB (AGRx)<br><br>**ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL AND FOR AN AWARD OF ATTORNEYS' FEES, AND OVERRULING OBJECTIONS** |

Before the Court is Plaintiff Sevag Chalian's ("Plaintiff") Motion for Final Approval of Class Action Settlement ("Final Approval Motion," Dkt. No. 180) and Motion for Award of Attorneys' Fees, Costs, Settlement Administration Expenses, and Class Representative Enhancement Awards ("Fees Motion," Dkt. No. 160). The following objections and supporting materials were filed: The Andrews Objectors' filed an Objection to Class Action Settlement ("Andrews Obj. Class Settlement," Dkt. No. 198) and supporting declarations (Dkt. Nos. 187-1 through 187-8, Dkt. No. 188), and a separate Objection to PAGA Settlement ("Andrews Obj. PAGA," Dkt. Nos.

1.

1   185, 186 [RJN]). Parvin Ghassemian submitted an objection ("Ghassemian Obj.,"

2   Dkt. Nos. 203-1, Ex. 6 [partial] and Dkt. No. 215-2 pp. 8-99 [complete][1]), and so did

3   Tina Lee ("Lee Obj." Dkt. No. 203-1, Ex. 5). Plaintiffs and Defendants CVS

4   Pharmacy, Inc., CVS Rx Services, Inc., and Garfield Beach CVS, LLC (collectively,

5   "CVS" or "Defendants") filed Replies/responses along with supplemental

6   declarations, responding to the Objections, (Dkt. Nos. 199, 200, 201, 202, 203, 204,

7   205, 206, 216, 218, 224). The Andrews Objectors also filed extensive objections to

8   Declarations filed by Class Counsel (Dkt. Nos. 209, 210, 211, 212). The Court

9   reviewed each and every one of the numerous and voluminous documents filed, and

10  heard oral argument on December 4, 2020. Thereafter, the Court ordered (Dkt. No.

11  231) Plaintiffs to file a Supplemental Brief, which they filed with supporting

12  declarations on March 19, 2021 (Dkt. Nos. 232, 233). For the following reasons, the

13  Motions are **GRANTED**.[2]

14  **I.   BACKGROUND**

15       The background and procedural history of this case is complex. The following

16  account is adapted primarily from Plaintiffs' Final Approval Motion and CVS's Reply

17  (Dkt. No. 201).

18       This Settlement resolves two actions that were consolidated for purposes of

19  settlement: *Chalian* and *Cabrera*. The Court begins by describing those proceedings.

20

21  _____

22  [1] Neither the parties nor the Administrator filed Objector Ghassemian's complete
    objection with the final approval papers as they should have. Just prior to the final

23  approval hearing, Ghassemian sought to intervene because of that omission, among
    other reasons. *See* Ex Parte to Intervene (Dkt. No. 215). However, as stated in its

24  Order denying Ghassemian's ex parte to intervene, the Court received her complete
    objection via FedEx, and had reviewed it. *See* Order Denying Ex Parte Applications

25  (Dkt. No. 223). Ghassemian also filed her complete objection with her ex parte
    application. *See* Dkt. No. 215-2, pp. 8-99. Therefore, her objection is on the record.

26  [2] The Requests for Judicial Notice are **DENIED** as they seek notice of matters not

27  relevant to the disposition of these motions. Any objections are **OVERRULED** to the
    extent this Order reflects reliance on the objected-to matters. All other objections are

28  **MOOT**.

## A. The *Chalian* Action

On July 20, 2016, Sevag Chalian filed a putative wage and hour class action against CVS in the Los Angeles County Superior Court, and on December 5, 2016, CVS removed the action to this Court. Mr. Chalian alleged that CVS violated the law by requiring California pharmacists in Regions 65 and 72 to work off-the-clock to complete mandatory training modules. *See* First. Am. Compl. ("FAC," Dkt. No. 44) ¶ 1. He stated five causes of action on behalf of non-exempt California pharmacists in Regions 65 and 72 who completed mandatory training outside of their scheduled shifts. *Id.* at ¶ 15. The claims are for: (1) unpaid wages (Cal. Labor Code § 1194); (2) overtime (Cal. Labor Code § 1194); (3) failure to provide accurate itemized wage statements (Cal. Labor Code § 226); (4) waiting time penalties (Cal. Labor Code § 201-2013); and (5) unfair business practices (Cal. Bus. & Prof. Code §§ 17200 et seq.). *Id.* at ¶¶ 29 - 58.

On March 7, 2019, Mr. Chalian's counsel submitted a letter to the California Labor and Workforce Development Agency ("LWDA") PAGA Administrator on behalf of yet another potential new plaintiff, May Eldanaf. *See* Signs Decl. (Dkt. No. 203) ¶ 10, Ex. 4. The letter claims CVS failed to pay her and other pharmacists for work they performed off-the-clock due to, among other things, having to complete mandatory training modules. *Id.* at Ex. 4. It echoes the *Cabrera* plaintiffs' theories regarding labor hours, describing an instance when Ms. Eldanaf spoke with a district leader about she and her colleagues not being able to finish all work and trainings during scheduled shifts. *Id.* According to Ms. Eldanaf, "the district leader responded that 'the budget is the budget.'" *Id.* Ms. Eldanaf thus stated an intent to file a wage and hour action on behalf of herself and other aggrieved employees. *Id.*

There was significant litigation in the *Chalian* action before Class Counsel started working together sometime in 2018, including: a motion for remand that the Court denied; an amended complaint that added named plaintiff Tamara Aleksandryan; a motion to compel Aleksandryan to arbitration, which the Court

3.

1 granted; and a motion for judgment on the pleadings based on res judicata that the

2 Court denied, but whose grounds CVS intended to pursue at summary judgment and

3 appeal.

4 **B. The *Cabrera* Action**

5       On August 3, 2017, slightly over one year after Mr. Chalian filed his action,

6 Sigfredo Cabrera ("Mr. Cabrera") filed a much broader putative wage and hour class

7 action against CVS in Alameda County Superior Court. Mr. Cabrera asserted his

8 claims on behalf of not only pharmacists, but also pharmacy technicians, pharmacy

9 managers, and pharmacy service associates (collectively, "pharmacy employees"). He

10 alleged pharmacy employees worked off-the-clock pre-shift and post-shift and during

11 meal and rest breaks based on numerous factual theories, and asserted these claims on

12 behalf of all of CVS's exempt pharmacy employees throughout the state of California.

13 Plaintiff filed an amended complaint to add a second named plaintiff (Enko Telehun),

14 factual allegations, and a PAGA claim for civil penalties. *See* First Am. *Cabrera*

15 Compl. (Dkt. No. CF 94-2, PageID 3064-3100).

16       On October 9, 2017, CVS removed the *Cabrera* action to the United States

17 District Court for the Northern District of California, Case No. 3:17-cv-05803. *See*

18 Notice of Removal (Dkt. No. 94-2, PageID 3016-25). On January 11, 2018, CVS

19 moved to compel Mr. Cabrera's and Mr. Telahun's claims to arbitration, *see* Motions

20 to Compel Arbitration (Dkt. Nos. 94-3 and 94-4), causing the *Cabrera* Plaintiffs to

21 fortify their pleadings.

22       On March 16, 2018, the *Cabrera* Plaintiffs filed a Second Amended Complaint,

23 which substituted Christine McNeely ("Ms. McNeely") for Mr. Cabrera and Mr.

24 Telahun as the would-be class representative for Counts 1-8. Second Am. *Cabrera*

25 Compl. (Dkt. No. 94-6, PageID 3180-3232). Mr. Cabrera and Mr. Telahun remained

26 in the case solely as to Count 9, which asserted a claim for civil penalties under

27 PAGA. *Id.* CVS fought the amendment, arguing that Ms. McNeely's claims were also

28 subject to arbitration, but the Court found Ms. McNeely's arguments against

arbitration compelling and set an evidentiary hearing on whether Ms. McNeely was in fact subject to an arbitration agreement with CVS. *See* Order (Dkt. No. 94-5, PageID 3175). CVS appealed the District Court's refusal to enforce Ms. McNeely's arbitration agreement. *See* Not. of Appeal, Case No. 3:17-cv-05803-WHA (Dkt. No. 50).

On July 10, 2018, Mr. Cabrera, Mr. Telahun, and Ms. McNeely sent CVS a proposed Third Amended Complaint, adding Patrick Brennan and Lynn Brickman as named plaintiffs and adding Longs Drug Stores as a defendant, and adding allegations that the CVS failed to timely pay wages upon termination. *See* Signs Decl. (Dkt. No. 203) ¶¶ 8-9, Exs. 1-3; Ex. 2 at ¶ 123. And, the *Cabrera* plaintiffs submitted yet a third amended letter to the LWDA. Signs. Decls. Ex. 3.

On August 9, 2018, CVS moved for summary judgment on Mr. Cabrera's and Mr. Telahun's PAGA claim. *See* Order on Mtn for Summ. J. (Dkt. No. 94-7). CVS asserted Mr. Cabrera and Mr. Telahun were not "aggrieved employees" entitled to sue under PAGA because they previously waived their individual Labor Code claims. *Id.* at PageID 3244. The District Court agreed, relying on *Kim v. Reins Int'l Cal., Inc.*, 18 Cal. App. 5th 1052, 1055 (2017), in which "the California Court of Appeal held that a plaintiff who voluntarily dismissed his individual Labor Code claims with prejudice also lacked standing under PAGA as an 'aggrieved employee.'" Dkt. No. 94-7, PageID 3244-45 (discussing *Reins*).

On January 9, 2019, Mr. Cabrera and Mr. Telahun appealed the entry of partial summary judgment in CVS's favor on Count 9 to the United States Court of Appeals for the Ninth Circuit, Case No. 19-15059 ("PAGA Appeal"). Notice of Appeal (Dkt. No. 94-9). While the PAGA Appeal was pending, the California Supreme Court reversed the California Court of Appeals in *Kim v. Reins*. 9 Cal. 5th 73, 80 (March 12, 2020). The California Supreme Court held that settling individual Labor Code claims does not "strip" a plaintiff of the right "to pursue PAGA remedies . . . as the state's authorized representative." *Id.*

**C. The *Chalian* and *Cabrera* Plaintiffs Work Together and Settle with CVS.**

In 2018, counsel for the Plaintiffs in the *Chalian* and *Cabrera* actions decided to work cooperatively and jointly prosecute their respective actions. New fee sharing agreements were signed. Morrison Decl. (Dkt. No. 180-1) ¶ 19. The parties mediated the cases and the claims collectively over the course of two days, July 29, 2019 and November 11, 2019, in San Francisco, California before David A. Lowe, Esq., of Rudy Exelrod Zieff & Lowe LLP, a prominent and well-respected mediator in wage and hour class litigation. Before mediation, and between the mediations, CVS produced significant discovery, formally and informally, including but not limited to the following: 1. Class list with information on who did and did not execute arbitration agreements; 2. Excel spreadsheets detailing dates of employment, annual salary, and hourly rate for employees in the Class; 3. Excel spreadsheets containing LEARNet data, which shows when a sampling of Class Members logged into training; 4. Excel spreadsheet containing Site Minder data for 2017 and 2018, which reflects Class Member activity on the LEARNet training site; 5. Excel spreadsheets showing time punches for a sampling of Class Members, which, when compared to LEARNet data, identifies persons who logged onto LEARNet while not clocked in. The same data also helps reveal potential Labor Code section 850-851 and 550-551 as well as meal period violations; 6. Excel spreadsheet showing what was paid to Class Members each pay period; and 7. Relevant policies and procedures regarding training modules, off the clock work, sick pay, reimbursement policy, and meal and rest periods. Morrison Decl. ¶ 21.

Class Counsel retained an expert to analyze the data to determine damages, interest, and penalties arising out of the claims, before the first mediation and again before the second mediation, incorporating additional information. Morrison Decl. ¶¶ 21-23. Additional information was provided for Class Counsel to check their analysis after the settlement in principle was reached.

Upon the parties' request, the Ninth Circuit Court of Appeals dismissed the

pending appeals without prejudice and remanded to the district court. Then, on March 9, 2020, Judge Alsup granted the parties' stipulated request to transfer the latter-filed *Cabrera* action to the Central District of California for settlement together with *Chalian*. The Court directed that on "transfer, the parties will move to consolidate the *Cabrera* Action with the first-filed *Chalian* Action pursuant to Rule 42 of the Federal Rules of Civil Procedure." *Id.* The *Cabrera* action was transferred to the Central District and thereafter reassigned to this Court.

On June 3, 2020, the Parties filed a stipulation for leave to file a consolidated Second Amended Complaint which combines the *Chalian* and *Cabrera* actions into one consolidated action. The only new claims added were to the PAGA cause of action for violations of Labor Code §246 (employer must provide notice of paid sick leave available on wage statement or via separate writing provided on the pay date), §§ 550-551 (employees entitled to 1 day's rest in 7) and §§ 850-851 (limiting work hours of pharmacy employees to not more than an average of nine hours in a day, or for more than 108 hours in any two consecutive weeks or for more than 12 days in any two consecutive weeks). On June 5, 2020, Plaintiffs Ryan Hyams and Regine Duhon ("*Hyams* Plaintiffs") filed a motion to intervene in this case. The Court denied without prejudice the parties' stipulation to consolidate and file the consolidated complaint pending the *Hyams*'s Plaintiffs motion to intervene. Upon receipt of a further status report, the Court permitted the parties to refile their stipulation to consolidate and granted it on July 2, 2020. Dkt. No. 102. The Second Amended Consolidated Complaint ("SACC") was filed on July 3, 2020. *See* SACC (Dkt. No. 104).

The SACC alleges numerous wage and hour violations and derivative Labor Code claims. Plaintiffs allege that they were not properly compensated for all hours worked, were not provided with all legally compliant meal and rest periods, were not paid all wages owed upon termination of the employment relationship, were provided with inaccurate wage statements, were not provided proper written notice regarding their eligibility for paid sick leave, were not reimbursed for necessary work expenses,

among other wage and hour violations, and were subject to CVS's unlawful, unfair, and fraudulent business practices. *See* SACC ¶ 3 (summarizing some of the claims). Plaintiffs' claims are based on the following factual predicates: (1) Plaintiffs had to complete various training modules at home/remotely or during meal and rest periods, for which they were not compensated (SACC ¶¶ 38-39, 50); (2) Plaintiffs were directed by CVS to work off the clock before and after their shifts, and during break periods, to meet the needs of the pharmacy because of CVS's procedure of strictly allocating work hours based on prescription volume from the previous year (SACC ¶ 49); (3) Plaintiffs were not reimbursed for necessary work expenses, including their use of a personal computer or device and internet, including to complete mandatory training, and for licensing, background check, and travel expenses (SACC ¶¶ 62, 63)); and (4) pharmacists were unable to take legally compliant meal breaks because of CVS's practice of scheduling only one pharmacist on duty (1-pharmacist-on-duty claim) (SACC ¶ 56).

These factual predicates give rise to claims for failure to pay minimum wages (count 1) and overtime (count 2), failure to provide legally compliant meal and rest breaks (counts 3 and 4), failure to pay wages owed at separation (count 5), providing wage statements that were inaccurate for many reasons (count 6, *see also* SACC ¶ 65), failure to maintain accurate records (7), failure to reimburse for necessary work expenses (count 8), unfair business practices (count 9), and numerous derivative claims under California's Private Attorneys' General Act ("PAGA"), Lab. Code §§ 2698, *et seq.*, including violations of labor code sections requiring 1-day's-rest-in-7 (§§ 550-551) and limitations on the hours of pharmacy employees (§§ 850, 851) (count 10).

In the meantime, briefing was completed on the *Hyams*'s Plaintiffs Motion to Intervene and Plaintiffs filed a Motion for Preliminary Approval, which the *Hyams* Plaintiffs opposed. Both motions were heard on July 24, 2020. The Court denied the motion to intervene on July 31, 2020 (Dkt. No. 125), and granted the motion for

preliminary approval on August 5, 2020, amending it on October 29, 2020. *See* Dkt.
Nos. 127, 164.

Thereafter, additional litigation occurred concerning the *Hyams* Counsel's
attempts to contact class members. The details of that litigation are not germane to the
motions for final approval and attorneys' fees, so the Court will not summarize it.

Ultimately, the present Motions were filed.

**D. Terms of the Settlement**

The Settlement Agreement ("Settlement Agreement" or "Settlement," Morrison
Decl. Ex. 1) proposes to settle all claims based on the facts alleged in the SACC, for
about 24,706 putative class members (397 putative class members in the Pharmacist
Settlement Class and 24,309 putative class members in the Retail Pharmacy
Settlement Class). Under the Settlement Agreement, CVS will pay an amount not to
exceed $10,371,346.60[3] (exclusive of employer payroll taxes) to settle: (1) the claims
of all Settlement Class Members for wages, penalties and interest, as specified herein;
(2) all claims for an award of the attorneys' fees, costs and expenses of all Plaintiffs'
attorneys or counsel for the Class; (3) any Class Representative service payments
awarded by the Court; (4) payment to the LWDA; and (5) settlement administration
expenses.

Class Members are entitled to all of the "Net Settlement Amount," which

---

[3] Because of on an escalator clause in the Agreement, this amount is $621,346.571
more than the amount agreed to at the preliminary approval stage. The Court does not
believe this change requires new notice since the Settlement Agreement itself
contemplated this possibility. Furthermore, because this is an increase in the benefits
available to the class, with no reduction in benefits, no new notice to the Class is
required. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales
Practices, & Prod. Liab. Litig.*, No. 810ML02151JVSFMOX, 2013 WL 12327929, at
*12 n.15 (C.D. Cal. July 24, 2013) ("Where the benefit to the class is increased by
changes to proposed class action settlements, courts have held that supplemental direct
notice to the class is not required. … This is so because an increase to a class
member's recovery is not the type of change that would cause a class member to
request exclusion from the class settlement.").

is the Maximum Settlement Amount, less all of the following: Plaintiffs' Attorneys'
fees and costs, any Class Representative service payments awarded by the Court,
payment to the LWDA, and the costs of settlement administration. In particular, the
Net Settlement Amount is calculated by subtracting the following amounts from the
Maximum Settlement Amount of $10,371,346.60:

> (1) Plaintiffs' attorneys' fees (they requested 30% of the Maximum Settlement
> Amount, but the Court is awarding 25%, which is $2,592,836.65);
>
> (2) Plaintiffs' litigation costs ($32,385.77);
>
> (3) Class Representative Service Awards ($10,000 requested each for Sevag
> Chalian, Sigfredo Cabrera, Enko Telahun, and Christine McNeely; and $3,000
> requested for Patrick Brennan, which is $43,000 in total);
>
> (4) Payment to the LWDA in the amount of $56,250 (75% of $75,000
> designated as PAGA civil penalties); and
>
> (5) Settlement Administration expenses incurred by Simpluris, Inc.
> ($98,750.00).

Subtracting these amounts ($2,823,222.42) from the Maximum Settlement
Amount ($10,371,346.60) yields a Net Settlement Amount of **$7,548,124.18**.

There is no reversion of funds and all unclaimed amounts shall be remitted to
California's Unclaimed Property Fund. CVS's employer-side payroll taxes will
be paid separately from the Maximum Settlement Amount by CVS.

### E. Notice Process, Opt-Outs, and Objections

The Court-approved Notice (*see* Dkt. Nos. 133, 136) was distributed by first
class mail according to the plan set forth in the Settlement and the preliminary
approval papers, and as approved in the preliminary approval order.

Of the 24,706 class notices mailed, 145 notices (0.59%) were ultimately
undeliverable. *See* Butler Decl. (Dkt.  No. 180-2) ¶¶ 7-8.

There were 157 total requests for exclusion, of which 102 are valid and will be
honored. *See* Suppl. Br. pp. 11-16. A list of the 102 opt-outs will be included with the

1    concurrently-issued Order and Judgment.

2           There were three timely objections: the Andrews Objectors[4] filed an Objection

3    to Class Action Settlement (Dkt. No. 198) and supporting declarations (Dkt. Nos. 187-

4    1 through 187-8, Dkt. No. 188), and an Objection to PAGA Settlement (Dkt. Nos.

5    185, 186 [RJN]); Parvin Ghassemian, represented by counsel Rob Hennig, objected

6    (Dkt. Nos. 203-1, Ex. 6 [partial] and 215-2 pp. 8-99 [complete]); and Tina Lee, pro se,

7    objected (Dkt. No. 203-1, Ex. 5).

8           The Court has read and considered every objection, and in this Order, the Court

9    has endeavored to respond to all of them. The same or very similar objections may

10   have raised by more than one objector, or by the same objector in different papers. In

11   such instances, while the Court may attribute the objection to a certain objector or

12   filing, the Court intends for its response to apply to the same or similar objections

13   raised by multiple objectors or in multiple papers.

14   **II.    FINAL APPROVAL ANALYSIS**

15          A court deciding whether to approve a class action settlement must conduct a

16   four-step inquiry. First, the court must assess whether the defendants have met the

17   notice requirements under the Class Action Fairness Act ("CAFA"). *See* 28 U.S.C. §

18   1715(b), (d). Second, the court must determine whether the notice requirements of

19   Rule 23(c)(2)(B) have been satisfied. Third, the court must determine whether the

20   class satisfies Rule 23. Finally, the court must conduct a hearing to determine whether

21   the settlement agreement is "fair, reasonable, and adequate." *See* Fed. R. Civ. P.

22   23(e)(2); *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (discussing the Rule

23   _____

24   [4] The Andrews Objectors' filings were filed by *Hyams* counsel on behalf of four

25   people: Trent Andrews, Victoria Cosio, Elizabeth Garcia, and Cynthia Cardenas. But,
     for the reasons stated in CVS's Reply, *see* Dkt. No. 201 10:28-11:16, only Trent

26   Andrews has clear standing to object. As for the rest, it is not clear whether Cosio's
     objection was timely (Dkt. No. 187-3 PageID 6851); Garcia opted out and therefore

27   cannot object; and Cardenas worked as a store associate and not in a pharmacy
     position so she is not a class member and cannot object. However, because Andrews

28   has standing, the Court has considered and responded to the objections.

23(e)(2) standard). While "the district court may suggest modifications," it "may not delete, modify, or substitute certain provisions" of the settlement agreement but rather "must consider the proposal as a whole and as submitted." *Officers for Justice*, 688 F.2d at 63. Also, the district court "must give a reasoned response to all non-frivolous objections." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citations and quotation marks omitted).

A PAGA claim is included in the Settlement. The Court will address it separately after addressing the above factors relating to the class claims.

**A. CAFA Notice Requirements are Satisfied.**

CAFA requires "[n]ot later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve [notice of the proposed settlement] upon the appropriate State official of each State in which a class member resides and the appropriate Federal official." 28 U.S.C. § 1715(b). Here, Mary Butler, Case Manager with the administrator Simpluris, Inc., attested to providing notice to the appropriate attorneys' general. *See* Butler Decl. (Dkt. No. 180-2) ¶¶ 14. More than 90 days have passed from service of the notice, and no governmental authority has objected to the Settlement. *See In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 589 (N.D. Cal. 2015) ( "CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures."). The Court finds that this requirement is satisfied.

**B. The Notice Requirements of Rule 23(c) Are Satisfied.**

Class actions brought under Rule 23(b)(3) must satisfy the notice provisions of Rule 23(c)(2), and upon settlement of a class action, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Rule 23(c)(2) prescribes the "best notice that is practicable under the circumstances, including individual notice" that "clearly and concisely" states "(i) "the nature of the action; (ii) the definition of the class certified; (iii) the class claims,

12.

issues, or defenses; (iv) that a class member may enter an appearance through an attorney. . . ; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3)." Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

The Settlement proposed a notice procedure through first class mail, *see* Sett. Agmt. § 7, and at the preliminary approval hearing the Court approved the method and form of Notice (Morrison Decl. (Dkt. No. 89-1) Ex. 2) as satisfying Rule 23(c). Ms. Butler's declaration establishes that of the 24,706 class notices mailed, only 145 notices were ultimately undeliverable. *See* Butler Decl. (Dkt.  No. 180-2) ¶¶ 7-8. That only 0.59% of class notices went undelivered indicates that the method of notice was effective. The Notice also included all seven of the elements required by Rule 23(c)(2)(B).

**1. The Andrews Objectors' Objections to the Notice are Overruled.**

The Andrews Objectors argue that the Notice was insufficient for numerous reasons, including that its method, form, and content were insufficient. *See* Class Settlement Obj. (Dkt. No. 198-1) 29:21-31:13.[5] Their objections are overruled.

The Court first addresses the five objections to the method and form of notice. *First*, the Andrews Objectors argue that first-class mail was inadequate because the United States Postal Service was overwhelmed with election-related mail, including mail-in ballots, during the opt-out period. But the 0.59% undelivered, and 99.41% delivered, rate rebuts this claim. *Second*, the Andrews Objectors argue that no website was set up even though the Notice references one, and that any website (and the Notice itself) should include an opt-out form. But the Andrews Objectors do not

---

[5] The Court has grouped the Andrews Objectors' multifarious objections to the Notice as objections to the method and form of Notice, and objections to the content of the Notice, and has numbered them 1-9.

present any evidence supporting their claim that there was no website. To the

contrary, at least as of the final approval hearing, typing "CVS" or "Chalian" in the

search window on the webpage indicated on the Notice leads to a webpage with

documents from the case. *See* < https://www.simpluris.com/case-information > (last

accessed December 4, 2020). Although the website does not have an opt-out form and

could have been more comprehensive, the Notice itself provided Class Counsel's

contact information for any class members who wanted more information, and simple

instructions for opting out. In sum, the shortcomings of the website, and the lack of an

opt-out form, do not take away from the reasonableness of the class Notice sent via

first class mail. *Third*, the Andrews Objectors argue that notice should have been

given by text message or email because the "class is not a heavily mail-dependent

workforce" and because class members were likely inundated with election-related

mail. *See* Class Settlement Obj. 30:1-3. It is not clear what is meant by "not a heavily

mail-dependent workforce," but the nearly 99.5% delivery rate suggests it is

reasonable to expect that the overwhelming majority of class members were reached

by first class mail. In addition, Rule 23(c)(2)(B) recognizes that it may be satisfied by

different methods, stating "notice may be by one or more of the following: United

States mail, electronic means, or other appropriate means." Here, the Court approved

mailed notice as opposed to email or text notice because Class Counsel was able to

obtain address data for each class member. *Fourth*, the Andrews Objectors argue that

the Notice was inadequate and doesn't afford due process because the Settlement

purports to bind members who did not actually receive notice. But the Ninth Circuit

has held that due process is satisfied for purposes of a Rule 23(b)(3) class settlement

by Rule 23(c)(2)(B)'s "best notice that is practicable under the circumstances," and

that a member may be bound by a settlement even if notice was not "actually

received." *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (discussing

distinction between reasonable notice and actual notice). All things considered, the

means of notice was the best practicable under the circumstances and satisfied due

14.

process. *Fifth*, the Andrews Objectors criticize the appearance of the Notice, arguing that the font was too small, and that the amount to be awarded to each recipient should have been in bold and underlined font. The objections are not well-taken. The font size was simply not too small, and furthermore, interested class members could readily find their approximate recovery on the first page under the header "How much will my payment be?"

The Court turns to the Andrews Objectors' objections that the content of the Notice was substantively deficient—their sixth through eighth objections. The *sixth* objection is that that the Notice references overlapping actions/claims, including the *Hyams* action, but fails to explain which claims overlap or how to find out such information, i.e., it lacked the contact information for *Hyams* counsel, who also represent the Andrews Objectors. But Rule 23 does not require a notice to provide information about related litigation. *See Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1044 (9th Cir. 2019) (noting that objectors cited no cases requiring "the inclusion in a settlement notice of such information about parallel litigation," and that "although Rule 23 lists seven items that must be included in the required notice, information about related lawsuits is not one of them."). Here, in response to the *Hyams* Plaintiffs' concerns, after the preliminary approval hearing and with the Court's approval, the Parties added reference to the overlapping actions specifically to better inform class members that the release in this case would impact putative class members' claims in the other cases. *See* Stipulation and Order (Dkt. Nos. 133, 136). This information about other claims was added for the benefit of class members, and additional explanation regarding these overlapping cases was not necessary. *See Id.*, at 1044 ("As we have consistently maintained, Rule 23(e) simply requires notice that describes 'the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'") (citations omitted). *Seventh*, the Andrews Objectors also argue that "the omission of several key facts, such as the number of class members falling into each class or the PAGA settlement,

15.

makes it difficult for class members to determine the relative fairness of the settlement." *See* Class Settlement Obj. 31:11-13. This objection is also overruled. It is not clear what difference the breakdown of class members per class would make to a class members' assessment of the reasonableness of the settlement, especially as the Notice tells each member how much each stood to receive personally. And while the Andrews Objectors fault the Notice for omitting "key facts" such as "the PAGA settlement," it is not clear what they are referring to: the Notice clearly states that the PAGA claims are being settled for $75,000 and explains that 75% will go to the State of California and 25% to the class. The Notice need not include more to satisfy due process.  *See Lane v. Facebook, Inc.*, 696 F.3d 811, 826 (9th Cir. 2012) (holding that notice provided pursuant to Rule 23(e) "does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class' claims, and it does not require an estimate of the potential value of those claims"). *Eighth*, the Andrews Objectors argue that the Notice lacked clarity in several respects, including that there were some members who did not know what it was, some believed they needed to appear in person and hire an attorney in order to object, and that the scope of the release and the methodology for distributing the settlement award was confusing. The Court has reviewed the Notice with these objections in mind, and finds that they lack merit. The Notice explains what it is, and informs class members they could appear at the final approval hearing in person or through an attorney if they wished—but didn't tell them they must have an attorney. It also employed standard release language, which, as discussed below, the parties have agreed to further clarify, and the method of distribution was adequately explained.

The Court believes it has considered all objections to the Notice, and finds none of them meritorious. In sum, the Court finds that the Notice given to the class satisfies Rule 23 and overrules the objections.

**C. The Classes Meet the Class Certification Requirements of Rule 23.**

Plaintiffs seek to certify the following classes under Rule 23(b)(3):

16.

***Pharmacist Settlement Class:*** All hourly, non-exempt retail pharmacists who worked in Regions 65 or 72 in California between July 20, 2012 and the date of the Preliminary Approval Order, whose claims are not subject to arbitration and who have not previously released and/or adjudicated the Released Claims, and whose LEARNet and/or Site Minder data indicates activity when time punch records do not show he or she was clocked-in.

***Retail Pharmacy Settlement Class:*** Any person who is not a member of the Pharmacist Settlement Class who held an hourly, non-exempt position in a CVS retail pharmacy in the State of California between August 3, 2014 and the date of the Preliminary Approval Order who has not previously released and/or adjudicated the Released Claims.

The Court previously found that the classes satisfy Rule 23 and preliminarily certified them. *See* Order (Dkt. No. 164). The Court has considered the factors again, along with the objections, and finds that the classes still warrant certification.

### 1. Legal Standard

A class may be certified if it satisfies all of the prerequisites of Rule 23(a) and is one of the types of class actions defined in Rule 23(b). The Rule 23(a) prerequisites are commonly referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. A Rule 23(b)(3) class is one in which "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) lists four non-exclusive factors "pertinent" to this finding: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

17.

1    The Supreme Court and the Ninth Circuit have explained that the applicable
2    Rule 23 factors "must be considered in light of the reason for which certification is
3    sought—litigation or settlement—which 'is relevant to a class certification.' " *In re*
4    *Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019) (citing *Amchem*
5    *Prods., Inc. v. Windsor*, 521 U.S. 591, 619 (1997)). When "deciding whether to certify
6    a settlement-only class, 'a district court need not inquire whether the case, if tried,
7    would present intractable management problems [because the proposal is that there be
8    no trial].' " *Id.* (citing *Amchem*, 521 U.S. at 620). However, "other specifications of
9    the Rule—those designed to protect absentees by blocking unwarranted or overbroad
10   class definitions—demand undiluted, even heightened, attention in the settlement
11   context." *Amchem,* 521 U.S. at 620. Heightened attention to a settlement class
12   definition is warranted in the absence of additional adversarial proceedings, because
13   the court must safeguard against the risk of collusion, and, furthermore, the court will
14   not have the opportunity to adjust the class definition down the road. *See In re*
15   *Hyundai*, 926 F.3d at 558. Thus, the "aspects of Rule 23(a) and (b) that are important
16   to certifying a settlement class are 'those designed to protect absentees by blocking
17   unwarranted or overbroad class definitions.' [ ] The focus is 'on whether a proposed
18   class has sufficient unity so that absent members can fairly be bound by decisions of
19   class representatives.' " *Id.* (citing *Amchem*, 521 U.S. at 621).

20       **2.  Rule 23(a) Is Satisfied**

21   Numerosity is satisfied because there are over 400 members in the Pharmacist
22   Class and more than 20,000 members of the Retail Pharmacy Class. Commonality
23   requires that there be questions of law or fact common to the class, and may be
24   satisfied by even a single common question. *See Wal-Mart Stores, Inc. v. Dukes*, 564
25   U.S. 338, 359 (2011). The commonality requirement is satisfied because Class
26   Members allege that CVS had a common policy and practice of not compensating
27   them for work performed outside of their shifts, or during meal and rest breaks.
28   Typicality means that the named plaintiffs' claims are typical in nature to those of the

18.

class, "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Id.* (citing *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D.Cal.1985)). The named plaintiffs' claims here are typical of the class members claims as they assert they have suffered the same injury caused by the same conduct by CVS. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) ("[u]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical") (overruled on other grounds by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 (2011)).  Finally, adequacy protects absent class members' due process rights, and it "depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Brown v. Ticor Title Ins. Co.,* 982 F.2d 386, 390 (9th Cir. 1992) (quotation omitted). Here, the Court finds that counsel are well-qualified to represent the class, that named plaintiffs' interests are aligned with those of the absent class members, and that the settlement is not collusive. Objectors raised a number of concerns regarding collusion, and the Court will address these in detail when it assesses whether the settlement is fair, adequate, and reasonable.

Insofar as the classes have weak points relative to these elements, they relate to manageability concerns that are less important to settlement classes than they are to classes headed for trial. As such, the Court finds that Rule 23(a) is satisfied.

### 3.  Rule 23(b)(3) Is Satisfied.

The classes also qualify for certification under Rule 23(b)(3). The Court finds that common issues sufficiently predominate over individualized issues to warrant certification for settlement. "The predominance inquiry is mainly concerned with 'the

19.

balance between individual and common issues.' " *In re Hyundai*, 926 F.3d at 560 (citing *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 635 (9th Cir. 2018)). Even if just one common question predominates, " 'the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.' " *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454 (2016) (quoting 7AA Wright, Miller, & Kane, *Federal Practice & Procedure* § 1778 pp. 123-124 (3d ed. 2005)).

As noted, the common legal and factual issues derive from CVS's alleged policy and practice of requiring the members of both classes to undergo mandatory training without pay, requiring them to work without pay, and requiring them to work through breaks without pay. Although there are individualized issues—such as how frequently any class member was required to work off the clock or through breaks— these do not outweigh the common issues for settlement purposes, as they would pose primarily problems of trial management that are by definition avoided upon settlement. The Court also finds that a class action is superior to other available methods of adjudicating the controversy as it will efficiently and fairly resolve the claims of more than 24,000 class members, resulting in a recovery for them, instead of proceeding inefficiently in thousands of individual actions or arbitrations, or proceeding not at all. Of course, class members who preferred to proceed individually also had the opportunity to opt out. Thus, a class action is superior to other methods of adjudication, which in any event remained available (via opting out) to any class member who preferred an alternative.

The four factors specifically enumerated in Rule 23(b)(3)(A)-(D) also support certification. As for the first factor, a class member's interest in controlling separate actions could be satisfied by opting out. And given there relatively small number of opt-outs (102 valid opt-outs, 55 invalid opt-outs), that interest was small. Furthermore, "[f]rom either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater

prospect for recovery." *Hanlon*, 150 F.3d at 1023. As for the second factor, there are at least two other litigations overlapping with to this case—the *Hyams* class action, and Objector Ghassemian's individual action—but this case is far more advanced and much less complicated than the *Hyams* action, and Ghassemian could have opted out to preserve her individual claims, but apparently didn't. Neither the *Hyams* litigation nor Ghassemian's case weighs against certification here. As for the third factor, concentrating the litigation in this forum makes sense because the action covers class members throughout California, including in this district. Finally, as to the fourth factor, the difficulties in managing this case are not weighty since the parties are seeking certification for settlement and not for trial.

In sum, " 'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication,' " so the Court finds that "there is clear justification for handling the dispute on a representative rather than on an individual basis" under Rule 23(b)(3). *Hanlon*, 150 F.3d at 1022 (quoting Wright & Miller, § 1778).

### 4. Objector Ghassemian's Objections to the Class Definitions are Overruled.

Objector Parvin Ghassemian raises three objections to the class definitions. *See* Ghassemian Obj. 15:9-16:28. The Court construes these as objecting to certification, and therefore addresses them here. They are overruled.

*First*, Ghassemian appears to argue that the class definitions have the potential to overlap and be in conflict, and that a person could be a member of both classes. Ghassemian Obj. 15:23-16:7. The Court ordered Plaintiffs to address this objection in their Supplemental Brief, which they did. The Court understands Plaintiffs' response to be that there is no person who is a member of both classes, so any overlap in the class definitions does not actually result in any member being denied compensation for hours based on membership in both classes.

*Second*, Ghassemian objects that Regions 65 and 72 might have changed

21.

boundaries, such that Class A might be both over-inclusive and underinclusive. *Id.*
16:8-17. But Plaintiff explains that any class member's settlement shares are based on
workweeks, so that even if a location changed Regions during the class period, any
time worked in any store that was in either Region 65 or 72 during the class period
would count towards that member's recovery. *See* Pls' Response to Ghass. Obj. (204)

*Third*, Ghassemian argues that the Retail Pharmacy Class is overbroad because
it includes employees with different job titles and duties who would not experience
wage and hour violations in the exact same way. Ghass. Ojb. 16:18-28. But this
objection goes to whether individualized issues predominate—a trial-management
concern that is not important for settlement-only classes like those here.

In summary, in certifying the classes for settlement, the Court is mindful that
"whether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed
by whether certification is for litigation or settlement. A class that is certifiable for
settlement may not be certifiable for litigation if the settlement obviates the need to
litigate individualized issues that would make a trial unmanageable. *See* 2 William B.
Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ('Courts ... regularly
certify settlement classes that might not have been certifiable for trial purposes
because of manageability concerns.')." *In re Hyundai*, 926 F.3d at 558. For the
foregoing reasons, the Court finds that the  Pharmacist Settlement Class and the Retail
Pharmacy Settlement Class satisfy Rule 23(a) and are sufficiently cohesive to satisfy
Rule 23(b)(3) for purposes of settlement. The Court likewise overrules Objector
Ghassemian's objections to class certification.

**D. The Settlement is Fair, Reasonable, and Adequate.**

The Court turns to whether the settlement agreement is "fair, reasonable, and
adequate." *See* Fed. R. Civ. P. 23(e)(2); *Staton*, 327 F.3d at 959 (discussing the Rule
23(e)(2) standard).

**1. Legal Standard**

To determine whether a settlement agreement is fair, reasonable, and adequate

1   the court must weigh some or all of the following factors: "[1] the strength of the

2   plaintiff's case; [2] the risk, expense, complexity, and likely duration of further

3   litigation; [3] the risk of maintaining class action status throughout the trial; [4] the

4   amount offered in settlement; [5] the extent of discovery completed and the stage of

5   the proceedings; [6] the experience and views of counsel; [7] the presence of a

6   governmental participant; and [8] the reaction of the class members of the proposed

7   settlement." *See Hanlon*, 150 F.3d at 1026 ("*Hanlon* factors").

8        The recent amendments to Rule 23 direct the Court to consider a similar list of

9   factors, including whether: (A) the class representatives and class counsel have

10  adequately represented the class; (B) the proposal was negotiated at arm's length; (C)

11  the relief provided for the class is adequate, taking into account: (i) the costs, risks,

12  and delay of trial and appeal; (ii) the effectiveness of any proposed method of

13  distributing relief to the class, including the method of processing class-member

14  claims; (iii) the terms of any proposed award of attorney's fees, including timing of

15  payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and

16  (D) the proposal treats class members equitably relative to each other. Fed. R. Civ. P.

17  23(e)(2). The Advisory Committee's notes clarify that these factors do not "displace"

18  the *Hanlon* factors, "but instead aim to focus the court and attorneys on 'the core

19  concerns of procedure and substance that should guide the decision whether to

20  approve the proposal.'" *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-04883, 2019

21  WL 3290770, at *6 (N.D. Cal. July 22, 2019) (quoting Rule 23(e)(2) advisory

22  committee's note to 2018 amendment).

23       In addition, when "a settlement agreement is negotiated prior to formal class

24  certification, consideration of these [] . . . . factors alone is not enough to survive

25  appellate review." *In re Bluetooth Headset Prod. Liab. Litig. ("Bluetooth")*, 654 F.3d

26  935, 946 (9th Cir. 2011) (emphasis in original). This is because "[p]rior to formal

27  class certification, there is an even greater potential for a breach of fiduciary duty

28  owed the class during settlement." *Id.* Therefore, district courts must also determine

1    "that the settlement is not the product of collusion among the negotiating parties." *Id.,*

2    at 947 (internal quotation and alteration marks omitted).

3        To make that determination, courts should look for signs of collusion, including

4    "(1) when counsel receive a disproportionate distribution of the settlement, or when

5    the class receives no monetary distribution but class counsel are amply rewarded[;]"

6    "(2) when the parties negotiate a clear sailing arrangement providing for the payment

7    of attorneys' fees separate and apart from class funds[;]" and "(3) when the parties

8    arrange for fees not awarded to revert to defendants rather than be added to the class

9    fund[.]" *Id.* (internal quotation marks, citations omitted) ("*Bluetooth* factors").

10       While the "district court must show it has explored comprehensively all

11   factors," ultimately "[i]t is the settlement taken as a whole, rather than the individual

12   component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at

13   1026.

14       **2.  The *Hanlon* / Rule 23(e)(2) Factors Are Satisfied.**

15       The Court has considered all of the applicable factors set forth in *Hanlon* and

16   the related factors set forth in Rule 23(e)(2), and finds that they favor final approval of

17   the settlement.

18       **a.  The Class Was Adequately Represented And The Settlement Was**

19       **Negotiated At Arm's Length Before A Neutral Mediator.**

20       ***First***, the Court finds that the class representatives and class counsel have

21   adequately represented the class, and that the proposal was negotiated at arm's length,

22   satisfying the fifth *Hanlon* factor and Rule 23(e)(2)(A) and (B).

23       The Court finds no conflict between class counsel and representatives on one

24   hand, and the class members on the other. Four class representatives seek service

25   awards of $10,000, and one seeks $3,000. The Court finds that these payments are

26   reasonable given the representatives' ongoing involvement in and attention to this

27   case over many years, as set forth in the Motion for Fees and Costs pp. 40-44. Absent

28   these representatives' efforts, there would be no case. And the Court does not find the

24.

amounts to be so great that they put the representatives in conflict with the class members.

The Objectors charge Class Counsel with colluding with CVS; the Court discusses and overrules this objection below. Class Counsel—first in *Chalian* and *Cabrera* separately, and then together—have vigorously represented their clients through years of litigation. First, both actions saw significant adversarial litigation while they were independent cases. In *Chalian*, a Complaint and an Amended Complaint were filed, Plaintiff filed and lost a motion to remand, CVS filed and prevailed on a motion to compel arbitration as to one named plaintiff, and Defendant filed and lost a motion for judgment on the pleadings on grounds that they said they would reassert at summary judgment or on appeal. In *Cabrera*, before Judge Alsup, the Plaintiffs filed a Complaint, a First Amended Complaint, and a Second Amended Complaint, which together added named plaintiffs and claims, and proposed a Third Amended Complaint that would have also added a named plaintiff and additional claims. Judge Alsup also denied, pending an evidentiary hearing, a motion to compel arbitration as to Ms. McNeely's claims, and granted summary judgment as to PAGA claims, which plaintiffs appealed. And, Plaintiffs appealed the summary judgment order—an appeal that was not concluded because all parties recognized it would succeed based on an intervening California Supreme Court case that made it clear that the plaintiffs did in fact have standing to pursue the PAGA claims. The foregoing proceedings demonstrated that Class Counsel zealously advocated for their clients in plainly adversarial proceedings.

Sometime after Plaintiffs' counsel in both cases decided to work together, they had two mediation sessions before David A. Lowe, Esq., of Rudy Exelrod Zieff & Lowe LLP, a prominent and well-respected mediator in wage and hour class litigation, which included all claims in the case, including those in the *Cabrera* proposed Third Amended Complaint. The mediation sessions were on July 29, 2019 and November 11, 2019. Before the first session, meaningful discovery was produced, including data

25.

1   regarding class members' dates of employment and rates of pay, and whether they
2   signed arbitration agreements; samples of LEARNet, SiteMinder, and time punch data
3   that could be used to reveal labor code violations; and Defendant's policies and
4   procedures, including regarding training modules, off the clock work, sick pay,
5   reimbursement policy, meal and rest periods, and time punch data, among other data.
6   Morrison Decl. ¶ 21. Plaintiffs hired an expert to analyze the data to determine
7   damages, interest, and penalties. Additional data was exchanged between the
8   mediations, and the expert did additional calculations. An agreement in principal was
9   reached at the first mediation, and then additional information was provided to Class
10  Counsel to re-check the sufficiency of the recovery. The foregoing reflects facially
11  adequate discovery and investigation by counsel prior to mediation.

12          The Andrews Objectors argue that the representation was inadequate in
13  numerous respects.[6] The Court has considered and overrules these objections. *First*,
14  they claim that the "no formal discovery was conducted" and no depositions were
15  taken. *See* Andrews Obj. 7:14-19. But Class Counsel attests that formal discovery was
16  conducted, yielding the above categories of materials. Morrison Decl. ¶ 45. CVS also
17  produced informal discovery during the mediation period, and Counsel interviewed
18  over 100 class members about their experiences relative to the claims in this case.
19  Reply Morrison Decl. ¶¶ 3, 14; Falvey Decl. ¶¶ 7-8. In addition, Class Counsel Mr.
20  Falvey previously litigated some 14 wage and hour class actions against CVS, Falvey
21  Decl. ¶¶ 4-6, and therefore already had developed substantial knowledge regarding
22  CVS's operations and their employees' experiences. *See Linney v. Cellular Alaska*
23  *P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) (representation adequate in part because
24  counsel "possessed a wealth of experience related to the class actions, garnered after

25
26  _____

27  [6] Both the Andrews Objectors and Objector Ghassemian interspersed objections
    regarding adequacy of representation with objections regarding the adequacy of relief.
    The Court has tried to sort these two different kinds of objections in order to treat
28  them separately as they are listed in Rule 23 and *Hanlon*.

1   years of settlement negotiations with AT&T. A per se rule that would deprive new

2   class counsel of the benefit of such experience clearly would not be in the best

3   interests of the class."). In addition, there is no per se requirement that counsel must

4   conduct depositions in order to have sufficient information to negotiate a settlement.

5   The putative shortcomings in discovery that the Andrews Objectors perceive are

6   therefore either illusory or fail to undermine the sufficiency of the discovery and other

7   investigation counsel *did* conduct. These objections are therefore overruled.

8        *Second*, and relatedly, the Andrews Objectors contend that Class Counsel did

9   not establish that they engaged in a sufficiently thorough investigation of some 11

10  issues relevant to the claims. *See* Andrews Obj. 7:20-8:12. But these assertions are

11  rebutted by a chart provided by Class Counsel listing their "investigation and

12  discovery" relevant to the claims. *See* Morrison Reply Decl. ¶ 7. Furthermore, Class

13  Counsel Mr. Falvey attests that his discussions with numerous class members

14  "centered *on the full panoply* of any and all viable legal claims alleged, to be alleged,

15  and the potential trial of this matter." Falvey Decl. (204-1) ¶ 7 (emphasis added). The

16  Court is satisfied that Class Counsel did adequately investigate the claims and had

17  sufficient information to negotiate a fair, adequate, and reasonable settlement.

18       *Third*, the Andrews Objectors argue that the Plaintiffs did not provide an

19  explanation of their expert's data analysis sufficient to analyze the reliability of the

20  expert's conclusion. They also note the expert fees were minimal ($5,000), and the

21  expert did not submit a declaration. In reply, Class Counsel explains that the expert's

22  methodology as follows: "he: (1) determined average hourly rates for Pharmacist

23  Settlement Class [$61.88] alone [and] for the Retail Pharmacy Class [$38.40]; (2)

24  determined the total number of shifts and/or pay periods depending upon the claim

25  and relevant statute of limitations; and (3) determined the violation rate (where

26  applicable) and applied it to the entire Class. For claims where violations could not be

27  ascertained from the records, assumptions were used." Morrison Reply Decl. ¶ 8. And,

28  in the opening brief, Counsel explained how damages were calculated for the primary

1   claims in issue, based on a combination the expert's data analysis and counsel's

2   assessment of the claims. *See, e.g.*, Mot. 31:6-45:15. With their Supplemental Brief,

3   Plaintiffs further explained valuation methodology and filed a declaration from their

4   expert Bennett S. Berger (Dkt. No. 232-4). It is true that there was no expert

5   declaration filed initially, but Counsel's explanation of the expert's methodology, and

6   how it was used to generate potential damages data, along with the supplemental

7   filing, is sufficient to support the expert's reliability. The objection that the expert

8   charged only $5,000 is not well taken either. Such experts calculate their damages

9   estimates by running the data through computer programs. It is not clear why work

10  that costs $5,000 would not be sufficient to perform a largely automated task. (It is

11  equally unclear why such a task should require at least $1,000,000 in expert fees, as

12  Ghassemian's counsel suggested at oral argument.)

13      Objector Ghassemian's counsel Mr. Hennig filed a declaration faulting the

14  investigation and diligence by class counsel. The Court has considered these

15  objections and overrules them. Attorney Hennig reviewed Class Counsel's time

16  entries (filed with the Motion for Fees) and argued that they simply did not spend

17  enough time on this case before settlement to adequately assess the value of the case.

18  *See* Hennig Decl. ¶¶ 42-52. According to Mr. Hennig's calculations, Mr. Morrison

19  spent 219.5 hours on this case before settlement, and Mr. Boyamian spent 91.6 hours.

20  Mr. Clark's firm spent a total of 1,308.6 hours but Mr. Henig did not determine how

21  much was before settlement, claiming the time records were too small to be readable,

22  although the Court had no problem reading them. He also contends that the time

23  records for attorneys Kizirian and Falvey "show no significant work in discovery and

24  investigation of the claims, the class members, or the potential value of the class

25  claims as a whole." Hennig Decl. ¶ 51. Finally, he faults Mr. Haines for not including

26  contemporaneous time records, just a rough breakdown of his hours. Hennig Decl. ¶

27  52. Mr. Hennig "would expect in a case having over 24,000 class members that the

28  lead attorney would have well over 1,000 hours specifically *in discovery or*

*investigation* of the claims and their potential value *prior to any settlement discussions*," and suggests that Mr. Morrison's time records "reflect a lack of preparation and diligence prior to the mediation and reaching of a settlement." Hennig Decl.¶ 46 (emphasis in original). Mr. Hennig's criticisms of Class Counsel's efforts are not well taken. It is hard to credit Hennig's claim that a case requires 1,000 hours—that is, a full 25 normal work-weeks of billable hours, or about half a year's worth of billable hours—in "discovery or investigation of the claims and their potential value" simply because the class has 24,000 members. Class Counsel explained that, among other things, they examined CVS's policies and found they were facially valid, interviewed about 100 class members, had an expert analyze the applicable pay and related records to value the claims, and considered defenses that applied to most or all of the class—most notably the existence of arbitration agreements and the difficulty of securing class certification—when they assessed the viability and value of the claims. Class Counsel also has the benefit of extensive labor and employment class action experience, including against CVS, which informed their assessment of this case and, it is reasonable to infer, likely led to some efficiencies relative to evaluating the case ahead of settlement. By contrast, Mr. Hennig's declaration recites substantially less class action experience. In light of Class Counsel's facially-sufficient efforts, the Court rejects Objector Ghassemian's objections to the adequacy of representation, and rejects the notion that 1,000 hours of pre-mediation investigation is per se necessary for a 24,000-member class based solely on another interested attorney's say-so.

The Court believes it has considered all of the objections to the adequacy of representation, and overrules them. In sum, the adequacy of representation and the arms-length negotiations presided over by an experienced mediator tend to support that the settlement warrants approval

### b. The Settlement Affords Sufficient Relief To The Class.

***Second***, the Settlement affords significant relief to the Class, satisfying the first

three *Hanlon* factors and Rule 23(e)(2)(C). The first three *Hanlon* factors consider the strength of the plaintiff's case balanced against the risk, expense, complexity and likely duration of further litigation; the risk of maintaining class certification through trial; and the amount of settlement. Similarly, Rule 23(e)(2)(C) requires the Court to examine "the relief to the Class in light of the costs, risks, and delay of trial and appeal, the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, the terms of any proposed award of attorney's fees, including timing of payment; and any agreement required to be identified." In assessing the settlement's value, courts are instructed to take into account that "[o]f course, the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (citations omitted).

The Court addresses the simplest of these factors first. There appear to be no other agreements required to be identified; the only relevant ones are the Settlement Agreement (Dkt. No. 89-1), the First Amendment (Dkt. no. 180-1) that increased the Settlement Amount, and Second Amendment (Dkt. No. 232, p. 10; Dkt. No. 238) clarifying the release language. *See* Settlement § 16. (For clarity, the Court had Plaintiffs' counsel refile these in a single exhibit. *See* Dkt. No. 238.) Regarding attorneys' fees, Class Counsel is seeking by separate motion 30% of the settlement amount, to be paid from the settlement fund within 14 days of the effective settlement date. Furthermore, the settlement cannot be revoked if the Court awards a lesser (or no) fee. *See* Settlement ¶ 3.2. Although the Court will assess the fee request separately, these terms standing alone appear fair.

Rule 23(e)(2)(C)(ii) requires the Court to go beyond the benefits offered and review of the method of distribution of the benefits. Here, because the class members were individually identified, they need not make any claim but instead the Administrator will simply mail them checks for their recovery amount. Thus, Class

Members need not do anything to receive benefits. The calculation method also took into account class members' pay rates and the number of weeks they worked, distributing their awards to them proportionally and therefore fairly.

The Court now turns to assessing the relief secured to the class. The Court concludes it is sufficient.

At stated above, the settlement amount is $10,371,346.60 for about 24,604 class members (24,706 total members, minus 102 opt-outs). Subtracting the fees and costs that the Court will award ($2,823.,222.42)[7], a net settlement amount of $7,548,124.18 remains for distribution to the class. This averages about $307 per class member. This sum is in exchange for releasing all of the class claims asserted in this action.

On the other side of the ledger, under Rule 23(e)(2)(C)(ii), there are significant risks associated with continuing to litigate this factually and legally complicated case. Class Counsel's assessment of the value, strengths, and weaknesses of these claims is extensive, *see* Morrison Decl. ¶¶ 50-96 (about 17 pages of analysis), and the Court will not recap it here in its entirety. The Court concludes that Counsel reasonably valued the claims, including by determining that all of the claims are vulnerable to certain defenses and weaknesses that warranted significant discounts or even valuations of zero. The Court first notes several of the claims' serious vulnerabilities, then considers examples of counsel's valuations.

### i.     The Vast Majority of Class Members Signed Arbitration Agreements.

First, Counsel indicates that most class members signed arbitration agreements that would have required them to arbitrate the claims herein individually. Of the 24,604 members of both classes, only about 825 did *not* sign agreements to arbitrate

---

[7] The Court will award Class Counsel 25% of the settlement amount as their attorneys' fee. This is $2,592,836.65. Other deductions from the settlement are $43,000 awarded to the named plaintiffs; $32,385.77 in litigation costs; $98,750 in settlement administration costs; and $56,250 paid to the LWDA.

workplaces disputes with CVS. Morrison Decl. ¶ 53. About 6,500 class members are unionized pharmacists and pharmacy techs subject to a collective bargaining agreement requiring them to arbitrate overtime claims, including any claims that off-the-clock work led to overtime violations. *See* Morrison Decl. ¶ 54. Those class members subject to arbitration would have to proceed individually in arbitration, and would be barred from proceeding in any class action, including this one. In fact, this Court dismissed named plaintiff Alexandryan and ordered her to arbitration. *See* Order GRANTING Motion to Compel Arbitration (Dkt. No. 52). Likewise, in *Cabrera*, it appears that at least three motions to compel arbitration were filed, and Judge Alsup denied one pending an evidentiary hearing to determine whether that plaintiff (McNeely) validly opted out of the arbitration program. Thus, the existence of arbitration agreements is a real impediment that threatened to defeat this action for the vast majority of class members.

### ii.   Achieving and Maintaining Class Certification for Any Claims Would Have Been Difficult.

Second, Counsel faced significant obstacles to class certification on every claim. Of course, the existence of arbitration agreements for the vast majority of class members is likely to thwart certification. Beyond that, there are claim-specific reasons why certification would be difficult to achieve. For example, claims based on working on training modules from home faced an uphill battle on certification for several reasons. Such claims might not satisfy the commonality or predominance elements because after January 25, 2017, CVS's policy and practice explicitly prohibited working on training modules from home and limited the technical ability to do so without pay. *See* Morrison Decl. ¶¶ 59, 64. Before the January 2017 policy change, some employees who did training from home did report that their managers paid them for it upon request. *See* Morrison Decl. ¶ 61. Furthermore, CVS could readily argue that individualized issues predominate for off the clock claims based on all factual predicates because its written policies require payment for all time worked, and

correspondingly, there is no central policy authorizing off-the-clock work. *See* Morrison Decl. ¶ 60.

Class certification of the meal period and rest break claims also faced a number of hurdles. CVS appears to have facially valid policies for both. *See* Morrison Decl. Ex. 7 (meal and rest break policy). For the meal break claims based on training performed during a meal break, there was only a 0.5% violation rate—probably too low to establish a class-wide policy or practice to gain certification. And the violation rate for training during rest breaks was probably lower, since rest breaks are shorter. Furthermore, ascertaining whether training was done on rest breaks would be problematic: because rest breaks are taken *on* the clock, there is no punch-card data to cross check with training data to identify violations. *See* Morrison Decl. ¶ 73. Thus, anecdotal evidence would be need to establish the training during rest break claims. But, interviews with class members revealed that their ability to take rest breaks varied by store and often depended on supervisors. For the meal and rest break claims based on the 1-Pharmacist-on-Duty theory[8], Counsel points out that CVS changed their policy during the class period to allow pharmacists to close the pharmacy so they could take meal and rest breaks. *See* Morrison Decl. Ex. 6. And although the *Hyams* Counsel / Andrews Objectors fault the valuation of the single-pharmacist meal break claims, they found only a 3.3% violation rate – a rate likely too low to secure certification. *See* Morrison Decl. ¶ 71.

Claims based on pre-shift and post-shift opening and closing activities face the same obstacles that the other off-the-clock claims face: CVS's policy is facially valid, and since this time is undocumented, it is subject to individualized issues. Clams regarding failure to reimburse employees necessary expenses would be difficult to

---

[8] This theory is that when only one pharmacist was on duty, that pharmacist missed meal breaks because California law requires one pharmacist to always be on duty when the pharmacy is open. Thus, when there was only one pharmacist scheduled, there was no other pharmacist to relieve her so she could take a break.

certify. For example, regarding use of home computers/personal electronic devices for training, CVS contends that all such training could have been done in-store, and further, individualized issues would predominate was to whether use of a home computer and related devices was a *necessary* work-related expense. And determining the value of any such expenses would be challenging at best, and likely beset by individualized issues. Other claims such as for inaccurate wage statements and waiting time penalties are derivative of the above claims and therefore suffer from the same class certification challenges. Counsel cited numerous cases in which courts denied motions to certify wage and hour and meal/rest break classes where, as here, the defendant had a facially-valid policy, where the violation rate was low, and/or where proving violations required individualized evidence. *See e.g., Brewer v. General Nutrition Corp*., 2014 WL 5877695 at *11 (N.D. Cal. November 12, 2014) (declining to certify off-the-clock class for unpaid closing activities because if the employee is clocked out, the presumption is the employee was not working; also requiring substantial evidence that employer knew of off-the-clock work where there is a policy prohibiting off-the-clock work); *York v. Starbucks Corp.*, 2011 WL 8199987, at *26 (C.D. Cal. Nov. 23, 2011) (declining to certify class where meal breaks were taken by plaintiff on 569 of 580 shifts and plaintiff was aware of defendant's policy mandating compliance with California law); *Hadjavi v. CVS Pharmacy, Inc.*, 2011 WL 3240763, at *4 (C.D. Cal. July 25, 2011) (denying certification where "Plaintiffs have failed to demonstrate that Defendants had a uniform or common policy in place that 'prevented' employees from taking meal and rest breaks and did not provide overtime wages throughout all California locations"); *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 641 (N.D. Cal. 2010) (denying certification because "In the absence of any common policy, an individualized inquiry will be required to determine whether any single employee failed to take a meal break because he/she was too busy, and also to determine whether a particular employee signed a waiver based on a decision not to take meal breaks. For this reason alone, common issues do not predominate with

1   regard to the meal break claim.").

2          In sum, all of the class claims faced serious obstacles at the threshold because

3   the vast majority of class members signed arbitration agreements, and because it

4   would be difficult to achieve class certification for any of the claims. Thus, class

5   members would have to pursue these claims individually (whether in court or in

6   arbitration), which would have made it more difficult to secure representation.

7   Furthermore, class members who prefer to proceed individually could have done so by

8   opting out.

9                    **iii.    The Settlement Amount is Sufficient.**

10         The Ninth Circuit has stated that a district court "need not include in its

11   approval order a specific finding of fact as to the potential recovery for each of the

12   plaintiffs' causes of action," and "act[s] properly in evaluating the strength of the

13   plaintiffs' case in its entirety rather than on a claim-by-claim basis." *Lane v.*

14   *Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012). Yet district courts sometimes

15   determine whether the relief afforded is sufficient by comparing the value of the

16   settlement with an estimate of the class's potential recovery discounted by applicable

17   risk factors. *See, e.g., Lusk v. Five Guys Enterprises LLC*, 2019 WL 7048791, at *7

18   (E.D. Cal. Dec. 23, 2019) (" 'The primary way a court determines whether the

19   settlement's value is sufficient is by (1) making a rough estimate of what the class

20   would have received had it prevailed at trial (or at other endpoints) and then (2)

21   discounting that value by the risks that the class would face in securing that outcome.'

22   Newberg on Class Actions § 13:51 (5th ed.)"). This approach may serve as some

23   guidance as to sufficiency of the relief, but assessing the potential recovery for each

24   cause of action could be unduly "onerous" and "would often be impossible" because

25   "the amount of damages a given plaintiff (or class of plaintiffs) has suffered is a

26   question of fact that must be proved at trial . . . thus making any prediction about that

27   recovery speculative and contingent." *Lane*, 696 F.3d at 823. This Court notes that

28   virtually every element of an attempt to value class claims is fraught with uncertainty,

and the uncertainty compounds. For example, where arbitration agreements are a likely bar to proceeding in court, and when class certification is unlikely and merits issues abound, then securing a class-wide post-trial judgment is doubly or triply unlikely. What is an appropriate overall discount for that ultimate risk? It is difficult to say. Nevertheless, despite their weaknesses, reasoned valuations provide at least some reference point to consider in ascertaining whether a settlement amount is sufficient.

Class Counsel have presented their appraisal of the potential value of most of the claims in issue, along with their assessment of the risks and obstacles to prevailing on those claims. Recognizing that such valuations are necessarily inexact and provide only guidance, the Court has reviewed and considered these assessments and finds them reasonable, and further finds that they demonstrate that the settlement amount is fair, adequate, and reasonable for Plaintiffs' case considered in its entirety. The Court has also carefully considered the objections to Plaintiffs' counsel's valuation of the case and overrules them.

Regarding off-the-clock training claims, it appears that Counsel valued all of them, in the aggregate, at $5,157,072 in total. *See* Mot. 31-32, Morrison Decl. ¶¶ 66, 67. This value derives primarily from violations based on class members completing training off-the-clock. The SACC alleged other factual bases for off-the-clock claims—opening and closing activities, and needs of the store. But Counsel contends the opening and closing activities claim is worth zero due to the difficulty of certifying and prevailing on these claims. *See, e.g.*, Morrison Decl. ¶ 68 (noting difficulty of certifying and prevailing on claims based on unpaid opening and closing activities). It also appears that Counsel did not consider the needs of the store basis to be worth much, if anything. [9]

---

[9] To be clear, Counsel did not provide an express valuation for each and every factual basis for the claims alleged in the SACC. For example, Counsel did not explain their valuation of claims based on class members working off the clock or missing breaks "to meet the needs of the pharmacy," and perhaps Counsel should have been more

Regarding meal and rest break claims, Counsel thought there was very little chance of prevailing on them. *See, e.g.*, Mot. 33:1-2 ("the most likely value of the [meal break] claim [based on performing training during meal periods] is very minimal or nil…"), Morrison Decl. ¶ 70; Morrison Decl. ¶ 79 ("taking into account arbitration, merits, and class certification issues, Plaintiffs believe there is a 10 to 25% chance" of prevailing on rest break claims). Nevertheless, Counsel estimate the potential value the meal claim to be up to $3,000,000 and the risk-discounted rest period claim to be between $1,000,000 to $3,000,000. *See* Morrison Decl. ¶¶ 70, 79.

Regarding the claim for reimbursement of expenses (Labor Code § 2802), Counsel appears to have valued each of the three factual bases at zero. First, the claim for reimbursement for use of personal computers and devices were valued at zero because of the difficulty of certification these claims, the difficulty of proving the claims (including of showing class members' use of their equipment was "necessary"), and the difficulty of determining damages for that usage. *See* Morrison Decl. ¶ 81. Reimbursement for travel expense was also valued at zero because CVS has a facially valid policy and many class members were reimbursed, so certification would have been difficult. *See* Morrison Decl. ¶ 82. And Counsel contends that CVS is not required to reimburse employees for professional licensing expenses, and therefore valued this basis of the claim at zero. *See* Morrison Decl. ¶ 83.

Regarding Labor Code violations for inaccurate wage statements (§ 226) and waiting time penalties (§ 203), it appears that Counsel also valued these at zero because they are derivative of all of the other claims and therefore face all of the same obstacles to success. Furthermore, these claims face an additional merits challenge: to prevail, the class would have to also prove that the violations were "willful" (§ 203) and "knowing and intentional" (§ 226).

---

complete in showing their work. However, it is also clear that these claims face the same obstacles as the other off-the-clock claims (besides the training claims) and the meal and rest break claims, so assigning them little or no value was not unreasonable.

1    Thus, the total of these valuations is from $9,000,000 to $11,000,000.

2    In their Supplemental Briefing, Plaintiffs further explained their valuations and

3    provided additional valuations calculated by their expert prior to the mediation. The

4    Court accepts Counsel's representation that they considered the values of the claims of

5    all class members (regardless of whether they signed arbitration agreements) before

6    they mediated. Counsel's expert also provided what counsel characterized as his

7    "starting point . . . maximum-under-any-scenario" damages valuations that informed

8    Plaintiff's counsel's mediation positions, which he also updated to run through

9    preliminary approval. *See* Suppl. Morrison Decl. ¶ 9, Berger Decl. Using violation

10   rates of 10% (calculated for the meal period violations, and assuming the same

11   number for the rest break claims), Mr. Berger calculated CVS's maximum total

12   "exposure" as of preliminary approval (August 5, 2020) to be about $268 million.

13   However, Counsel explains that these maximum amounts would be impossible to

14   achieve. For example, the 10% violation rate assumed for the rest break claims was

15   generous given CVS's policy, interviews showing employees were able to leave for

16   rest breaks, the law on this claim, and the likelihood of CVS having a substantial good

17   faith defense. *See* Suppl. Morrison Decl. ¶¶ 7-9.  Furthermore, these starting

18   valuations would need to be discounted substantially due to the real obstacles to

19   certification and the serious difficulty of prevailing on the merits. Finally, the recovery

20   is also lower given that a settlement necessarily entails a compromise.

21    The $10,371,346.60 recovery here is about 3.8% of the maximum possible

22   $268 million "exposure" calculated by Plaintiffs' expert. But as made clear above, the

23   maximum possible exposure was calculated with generous assumptions highly

24   favorable to the class, and furthermore a defendant's *maximum potential exposure* is

25   not synonymous with what plaintiffs may *realistically attain by judgment or*

26   *settlement*. In light of the many potentially dispositive challenges of prevailing on

27   these claims and counsel's valuation, the settlement amount of $10,371,346.60 is

28   adequate.

### iv.    The Andrews Objectors' Objections are Overruled.

The Andrews Objectors proffer numerous objections to the adequacy of the settlement amount. The Court has endeavored to address them all.

First, the Andrews Objectors argue that the scope of the release is impermissibly overbroad. The release covers:

> "all claims, causes of action, and legal theories of relief that were alleged **or that could have been alleged or otherwise raised in Wage and Hour Actions** [ ] (the "Released Claims"). The Released Claims include, **but are not limited to**: (a) failure to pay minimum wages; (b) failure to pay overtime wages; (c) failure to pay all wages or amounts due under the Labor Code and/or federal Fair Labor Standards Act; (d) failure to comply with Labor Code Sections 850, 851, 851.5, 852 and/or 29 U.S.C. §201 et seq.; (e) failure to provide proper meal periods, or premium pay for non-compliant meal periods; (f) failure to authorize and permit rest periods, or premium pay for non-compliant rest periods; (g) failure to provide complete, accurate, and/or properly formatted wage statements; (h) failure to reimburse all necessary business expenses; (i) failure to timely pay wages due or final wages due; (j) all claims under [PAGA] that were or could have been asserted based on the facts, claims, causes of action, or legal theories described above or on any of the claims, causes of action facts or legal theories of relief pleaded in the Wage and Hour Actions; and (k) all damages, penalties, including penalties under Labor Code sections 203 and 558, interest, costs (including attorney's fees) and other amounts recoverable under said claims or causes of action **as to the facts and/or legal theories alleged *or which could have been alleged*** in the operative complaint."

Settlement Agreement § 4.3.

Counsel contends that the bolded language releasing claims that "could have been alleged" is overbroad. A class action settlement agreement may release "a claim [that] was not presented and might not have been presentable in the class action," if the released claim is "based on the identical factual predicate as that underlying the claims in the settled class action." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (citation omitted).

The Court ordered the parties to address this in their Supplemental Brief.

39.

1   Although the parties maintain the view that the release as written complies with the

2   law, they nevertheless agreed to revise it by adding the following sentence: "This

3   Release applies only to claims, whether asserted or unasserted, based on the same

4   factual predicate underlying the claims asserted in the Wage and Hour Actions." *See*

5   Suppl. Br. 10:18-28. This clarification ensures that the release complies with the law,

6   and the Court **APPROVES** it.[10] Accordingly, the objection is overruled.

7       The Andrews Objectors also argue that the consideration received is insufficient

8   for the claims released for numerous reasons. First, they argue that Class Counsel did

9   not evaluate off-the-clock claims based on opening and closing activities, and based

10  on the understaffing and 1-pharmacist on duty theories, but Plaintiffs' submissions

11  show that they valued these claims at zero based on the obstacles discussed above.

12  They also argue that counsel did not evaluate a claim for failure to maintain business

13  records under Labor Code §226, or the cell phone component of the business

14  reimbursement theory. But any failure to maintain business records claim is derivative

15  from the deficient wage statement claims, which counsel valued at zero, with

16  sufficient justification. Insofar as the SACC alleges a cell phone-based claim, it stands

17  to reason that all components of the business expense reimbursement claim premised

18  on class members using their own equipment—be it personal computers, laptops, or

19  cell phones—suffer from the same vulnerabilities, i.e., they are difficult to certify, and

20  to prove liability and damages on.

21      Second, it appears that the Andrews Objectors argue that Class Counsel simply

22  undervalued many of the claims. Their brief includes tables presenting their expert's

23  evaluation of several claims, and they filed an extensive declaration their expert

24  prepared for the *Hyams* matter. *See* Drogin Decl. (Gunn Decl. Ex. D (Dkt. No. 187-

25  1)). Reviewing the charts specifically presented in the brief, the Court notes that they

26

27  [10] Because the Second Amendment clarifies the release language and does not reduce
    the gross settlement amount or work to the detriment of class members, the Court
28  finds that no additional notice is required.

40.

are all described as the "high-end damages" for that claim. Simply stated, the sufficiency of an existing proposed settlement cannot be ascertained by comparing it with a competing counsel's wished-for "high-end damages." As the Ninth Circuit has stated, "'it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators,'[and] ' the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.' [] 'The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.' " *Linney*, 151 F.3d at 1242 (several internal citations omitted). The Court has also reviewed the dense and extensive Drogin Declaration, and its application to this case is not readily intelligible: it is not entirely clear how or whether the valuations stated therein neatly map to the claims in this case. More fundamentally, the Court does not believe that evaluating this settlement requires it to parse through the expert report prepared for a different—albeit overlapping— competing litigation. Finally, although the Andrews Objectors' brief dissects the Agreement here and presents competing valuations for many individual claims, they fail to propose a reasonable and *realistic* (i.e., one that CVS would agree to) total settlement amount for plaintiffs' case *in its entirety*—which is the question before the Court. *See Lane*, 696 F.3d at 823 (a district court "need not include in its approval order a specific finding of fact as to the potential recovery for each of the plaintiffs' causes of action," and "act[s] properly in evaluating the strength of the plaintiffs' case in its entirety rather than on a claim-by-claim basis."). Therefore, although the Court has reviewed these charts and the Drogin Declaration, and notes that they reflect many higher valuations, they are of limited value to the task before this Court: to assess, realistically, whether the settlement amount made available by this settlement is sufficient for this case, in its entirety. The Court therefore overrules the Andrews

Objectors objections to the settlement amount.

Third, the Andrews Objectors fault Class Counsel for valuing claims at zero and releasing them for no consideration. The Andrews Objectors argue that it is "impermissible" to release claims for no consideration, but the cases they rely upon are distinguishable. For example, *Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) was a class action under the Americans with Disabilities Act and the California Unruh Civil Rights Act against a defendant who owned some 1,200 gas stations. The Complaint sought damages and injunctive relief on the behalf of the class. However, the parties settled for $5,000 in damages to the named plaintiff only, $50,000 in attorneys' fees, a tax-deductible cy pres donation to disability organizations, and injunctive relief, while releasing for no consideration all of the class members' claims for damages under those statutes, including statutory damages of $4,000 available under the Unruh Act. *See Molski*, 318 F.3d at 953-954. The Ninth Circuit found that this settlement was unfair to the class members because in exchange for releasing their claims for damages, "class members received nothing; the named plaintiff and class counsel received compensation for his injury and their time; and the defendant escaped paying any punitive or almost any compensatory damages." *Id.* at 954. Thus, the reasoning in *Molski*—where class members received literally nothing for releasing individual claims—does not apply here, where numerous wage and hour claims were asserted, and Counsel valued them and secured a monetary settlement for all of the claims as whole, including for *some* claims they valued at zero. And in *Belew v. Brink's, Inc.*, 721 F. App'x 734, 735 (9th Cir. 2018), the Ninth Circuit determined that it was inappropriate for a class settlement to release numerous claims that were completely unrelated to the sole factual predicate alleged in the complaint and for which the class received no consideration. Here, by contrast, the release extends only to claims based on factual predicates alleged in the complaint, and the Settlement Amount encompasses both claims that have value and claims that Counsel reasonably concluded have no value. It is also not quite accurate to say there was no consideration

42.

for releasing claims that have no value: a settlement is the product of negotiation, and a defendant is not likely to either agree to add consideration for no-value claims or to agree to a settlement that leaves some pled claims unresolved, even if they are low-risk to the defendant. *C.f., Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) ("ordinarily, 'a defendant is interested only in disposing of the total claim asserted against it. . .'") (citation omitted). Accordingly, the Ninth Circuit has instructed courts to "evaluat[e] the strength of the plaintiffs' case in its entirety rather than on a claim-by-claim basis." *Lane*, 696 F.3d at 823. Thus, it is fair to characterize the settlement amount as the consideration for the case in its entirety, which is a mix of claims with value and claims with little or no value. In other words, in the context of a total settlement of many claims, it can be reasonable to release some claims for arguably no separate consideration when those claims are worth zero. The Court therefore overrules objections complaining that some claims were released for no consideration.

Fourth, the Andrews Objectors (and Objectors Ghassemian and Lee as well) object that the settlement does not compensate *them* adequately. These objections are overruled. The Objectors' beliefs about the maximum amount they are entitled to do not account for at least the following obstacles to achieving that amount through this action: (1) the fact that this is a settlement, which by definition represents a compromise; (2) the fact that this is a *class action* settlement, where there are often further discounts to the class-wide recovery based on issues particular to class action suits, such as obstacles to certification; and (3) that to achieve their hoped-for recovery even on an individual basis they would have to prove their claims, many of which lack documentation. In sum, a class member who wants close to a maximum recovery for their individual claims can seldom advance that interest by staying in a class action; realistically, that preference can best be pursued by opting out of a class action and pursuing an individual action. Indeed, Objector Ghassemian was well-positioned to do just this, as she has an individual action pending in state court (it also includes retaliation claims), but for some reason she did not opt out of this case. For

43.

1  the foregoing reasons, the individual objectors' objections that their recovery is
2  inadequate are overruled.

3       In light of all of these challenges inherent in continued class action litigation,
4  the benefits afforded by the Settlement are sufficient. *Eisen v. Porsche Cars North*
5  *American, Inc.,* No. 11-09405-CAS, 2014 WL 439006, at *3 (C.D. Cal. Jan. 30, 2014)
6  ("unless the settlement is clearly inadequate, its acceptance and approval are
7  preferable to lengthy and expensive litigation with uncertain results.").

8       Having considered the first three *Hanlon* factors and Rule 23(e)(2)(C), the
9  Court therefore finds that the relief provided to the class is adequate.

10               **c.  The Settlement Treats Class Members Equitably.**

11      ***Third***, the Settlement treats class members equitably relative to each other. *See*
12  Fed. R. Civ. P. 23(e)(2)(D). The Settlement does not give preferential treatment to any
13  subset of the class. For example, the formula for calculating the recovery is the same
14  for each class member: each member receives a proportional share of the recovery
15  based on their specific hourly rates and the number of weeks each member worked.
16  Although Class Members who did not sign arbitration agreements will not receive a
17  greater share despite the absence of the arbitration risk to their claims, their claims
18  were nevertheless subject to the other major and likely fatal risk governing all
19  claims—the difficulty of securing class certification. It is not inequitable to conclude
20  that one risk that is likely fatal triggers the same discount as two risks that are likely
21  fatal. In addition, it is apparently common for class action settlements to include a mix
22  of plaintiffs whose claims are and are not subject to arbitration, and to not distinguish
23  between them when valuing their claims. It appears that defendants are unlikely to
24  agree to such arrangements because they discount claims of those who sign arbitration
25  agreements and thus, in theory, discourage persons from consenting to arbitration
26  agreements. The Court therefore concludes it was not inequitable to treat Class
27  Members who did not have arbitration risk the same as class members who did, given
28  that they both faced severe challenges to certification and in light of the practicalities

1  of negotiating a settlement, and overrules objections to the contrary. *See, e.g.*,

2  Andrews Obj. (198-1) 21:6-14.

3        The Andrews Objectors also object that the settlement does not treat

4  pharmacists fairly because it distributes the value of the 1-pharmacist-on-duty claims

5  across the entire class—pharmacists and non-pharmacists alike—even though only

6  pharmacists can have such a claim. As discussed herein, however, claims based on

7  this factual scenario were valued at zero, so there was no reason to apportion their

8  value to pharmacists only. This objection is overruled. The Andrews Objectors also

9  argue that there is no explanation for why the class definitions are based on two

10 different statute of limitations dates, and suggest this is unfair. But it is clear that the

11 Pharmacist Class, with the longer period, derives from the earlier-filed *Chalian* case,

12 while the Retail Pharmacy Class, with the shorter period, derives from the later-filed

13 *Cabrera* case. Accordingly, it is not inequitable for the class definitions to preserve

14 the two different limitations periods captured by the two underlying cases that were

15 filed at different times. This objection is overruled.

16       The Court finds that the Settlement treats all Class Members equitably and

17 satisfies Rule 23(e)(2)(D).

18                **d.  The Last Four *Hanlon* Factors Favor Approval**

19       ***Finally***, the four remaining *Hanlon* factors (["5 the extent of discovery

20 completed and the stage of the proceedings; [6] the experience and views of counsel;

21 [7] the presence of a governmental participant; and [8] the reaction of the class

22 members of the proposed settlement," *Hanlon*, 150 F.3d at 1026) favor approval. As

23 described above, the Settlement was achieved after substantial discovery, and

24 accordingly, Plaintiffs had ample information and opportunity to assess their claims

25 and take appropriate negotiating positions. *Eisen*, 2014 WL 439006, at *13 (finding

26 that counsel had "ample information and opportunity to assess the strengths and

27 weaknesses of their claims" despite "discovery [being] limited because the parties

28 decided to pursue settlement discussions early on"). Counsel, including Plaintiffs'

counsel and CVS's counsel, are highly experienced and respected litigators, and they all favor approval. However, this factor should carry little weight because counsel seeking court approval of a settlement they negotiated are not going to criticize the settlement. There is no governmental participant, and although the LWDA and appropriate state attorneys' general were notified of this settlement, none of them have objected.

The reaction of Class Members also favors approval. Of the 24,706 Class Members, only 102, or 0.4%, validly opted out. *See* Suppl. Br. p. 11. This small percentage of exclusions demonstrate that Class Members have reacted favorably to the Settlement, supporting final approval. *See, e.g., Churchill Vill. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming final approval where 45 of the approximately 90,000 class members objected and 500 opted out).

Furthermore, there were timely objections from only 3 Class Members, and for the reasons explained above, none of them warrants rejecting the Settlement. *See Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (the district court "must give a reasoned response to all non-frivolous objections") (citations and quotation marks omitted).  Wanting a more favorable settlement is not a sufficient basis for an objection to a class action settlement that is otherwise fair, adequate, and reasonable. *See Linney*, 151 F.3d at 1242 ("[I]t is well settled that a proposed settlement may be acceptable even though it may amount to a fraction of the potential recovery that might be available to class members at trial.").

For the foregoing reasons, the last four *Hanlon* factors favor final approval.

### 3.  The Settlement Satisfies the *Bluetooth* Factors.

Pre-certification settlements require further inquiry for "more subtle signs" of potential collusion between class counsel and defendant. *In re Bluetooth*, 654 F.3d at 946-47. None of the three factors identified in *Bluetooth* are indicative of collusion here.

The first factor asks whether counsel will receive a disproportionate distribution

of the settlement, or whether class will receive no monetary distribution but class counsel are amply rewarded. The answer to both questions is no. Plaintiffs' counsel are seeking a fees of 30% of the class payout. Although this amount is more than the 25% benchmark that the Ninth Circuit has set, *see Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-1048 (9th Cir. 2002) (acknowledging 25% benchmark, though noting it is a starting point), it is not *disproportionate* to Class's benefits. Of course, Class Counsel's request is subject to the Court's review, and Counsel cannot revoke the Settlement even if the Court awards no fee. *See* Settlement § 3.2(d). Objectors object that the attorneys' fees counsel seek are disproportionate to their individual recoveries, and that this suggests collusion. *See, e.g.*, Ghassemian Obj. 6:15-7-1. But it makes no sense to compare the attorneys' fees for the entire class, to the recovery of individual class members, so this objection is overruled. In sum, counsel are not seeking a disproportionate fee, so this factor does not suggest collusion in this case.

The second *Bluetooth* factor asks whether there is a clear-sailing provision, such that the defendant will not object to the plaintiffs' counsel's fee request, and whether this payment is separate from the class fund. *See In re Bluetooth*, 654 F.3d at 947 (a clear sailing "arrangement provid[es] for the payment of attorneys' fees separate and apart from class funds, which carries 'the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class,' ") (citing *Lobatz v. U.S. West Cellular*, 222 F.3d 1142,1148 (9th Cir. 2001). However, clear-sailing provisions are not inherently problematic and the mere existence of a clear-sailing provision is not indicative of collusion. *See, e.g., Schuchardt v. Law Office of Rory W. Clark*, 314 F.R.D. 673, 687 (N.D. Cal. 2016) (clear-sailing provision does not signal collusion when the agreed-upon fees are reasonable and the relief negotiated for the class is favorable). Here, although CVS is not objecting to the fee request, it is being paid out of the fund, not separately from the fund: this is not a clear-sailing provision as defined by *Bluetooth*. In any event, the fee request is within the range of reasonable,

47.

1   and the relief for the class is sufficient, so to the extent the circumstances here reflect
2   some kind of clear-sailing provision, is it not indicative of collusion.

3   Finally, the third *Bluetooth* factor is absent, as no class benefits will revert to
4   CVS.

5   In sum, none of the *Bluetooth* indicia of collusion are present in this case to
6   undermine the fairness, reasonableness, and adequacy of the settlement.

7   **i.    The Objections Regarding Collusion Are Overruled.**

8   Both the Andrews Objectors and Objector Ghassemian charge Class Counsel
9   with colluding with Defendant for Counsel's benefit and to the detriment of the class.
10  These objections are speculative and are overruled.

11  The Andrews Objectors' assertion of collusion is based in part on their
12  argument that the settlement amount is woefully inadequate. Relatedly, the Andrews
13  Objectors suggest that CVS engineered a reverse auction, a situation in which
14  defendants use the existence of overlapping class action cases to pit plaintiffs' lawyers
15  against each other, causing a race-to-the-bottom on the plaintiffs' side, resulting in an
16  unreasonable low-value settlement with the most amenable class counsel. But for the
17  reasons discussed above, the Court rejects the premise that the settlement here is
18  inadequate and therefore also overrules the derivative argument that the settlement
19  amount suggests collusion. The Court is also not convinced that a reverse auction took
20  place here. First, this is because the settlement value is adequate. Second, when the
21  *Chalian* and *Cabrera* counsel decided to work together, they apparently did so to
22  *strengthen* their negotiating leverage, suggesting they would likely resist being subject
23  to a reverse auction situation involving yet another case. Although the *Hyams* matter
24  also existed, Class Counsel apparently was not aware of it and therefore was not
25  susceptible being leveraged into a low-value settlement by some threat from CVS to
26  settle the case out from under them through *Hyams*.

27  The Andrews Objectors and Objector Ghassemian also see collusion in the
28  procedural history of this case, whereby *Chalian* and *Cabrera* counsel decided to

48.

1  work together, and ultimately expanded the scope of the class to include members

2  who are subject to arbitration and unpled PAGA claims. But again, that counsel

3  decided to work together is not suspect and does not suggest collusion with CVS; to

4  the contrary, it helped avoid conflict between counsel with competing cases (such as

5  with *Hyams* counsel) that could potentially be exploited by a defendant (such as a

6  reverse-auction that Objectors suggest happened vis-à-vis *Hyams*). Nor does the

7  expansion of the case to include class members subject to arbitration necessarily

8  suggest collusion between Class Counsel and CVS. To the contrary, including these

9  members likely gave Counsel greater leverage to negotiate, and ensured that otherwise

10 excluded employees could benefit from their representation. Furthermore, earlier

11 Complaints in both *Chalian* and *Cabrera* did not exclude—and therefore included—

12 persons who signed arbitration agreements: this undermines the Objectors' assertion

13 that such members were suddenly added into the case during mediation simply to

14 settle their claims away for nothing. In addition, that the Settlement Agreement

15 required Plaintiffs to file the Second Amended Consolidated Complaint expanding the

16 case as described does not suggest collusion with defendant, but instead strikes the

17 Court as unremarkable: if the parties negotiated a settlement that included additional

18 related claims, then the SACC must also include those claims. The Court will address

19 the PAGA claims separately below. In summary, given the Court's conclusion that the

20 settlement amount is adequate, and the lack of any substantial evidence, the charge of

21 collusion with CVS is unavailing and therefore overruled.

22     **E. The PAGA Settlement Warrants Approval**.

23         The Settlement provides that $75,000 of the Settlement Amount will be

24 penalties awarded under the California Private Attorney General Act, Lab. Code §§

25 2698, *et seq.* ("PAGA"). This amount is a penalty for all of the violations of the Labor

26 Code asserted under the PAGA claim. *See* SACC ¶¶ 181-192.  Pursuant to PAGA,

27 75% of this amount is paid to the LWDA, and 25% is distributed to the class. PAGA

28 provides that the court "shall review and approve any settlement of any civil action

filed pursuant to this part," and that "[t]he proposed settlement shall be submitted to the agency at the same time that it is submitted to the court." Cal. Lab. Code § 2699(*l*)(2). Here, the LWDA has not objected to the Settlement.

The Andrews Objectors and Objector Ghassemian object to the PAGA portion of the settlement. These objections are overruled.

First, the Objectors have no standing to object to the PAGA portion of the Settlement. A PAGA claim is not a class claim that belongs to class members; it is a claim brought by an aggrieved employee on behalf of the LWDA. Relatedly, while PAGA requires notice to the LWDA so it can object, it does not require aggrieved employees to be given notice. Courts have thus found that other aggrieved employees have no right to receive notice of the settlement, or an opportunity to opt-out or object. *See Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 436 (9th Cir. 2015) ("PAGA has no notice requirements for unnamed aggrieved employees, nor may such employees opt out of a PAGA action."); *Ochoa-Hernandez v. Cjaders Foods, Inc.*, 2010 WL 1340777, at *5 (N.D. Cal. Apr. 2, 2010) ("[u]nnamed employees need not be given notice of the PAGA claim, nor do they have the ability to opt-out of the representative PAGA claim. *There is no indication that the unnamed plaintiffs can contest a settlement, if any, reached between the parties*.") (emphasis added). In addition, a PAGA claim "is not a dispute between an employer and an employee [], [i]t is a dispute between an employer and the state." *Iskanian v. CLS Transportation Los Angeles, LLC*, 59 Cal. 4th 348, 386 (2014)). From these premises, it follows that the Objectors have no standing to object to the PAGA portion of the Settlement, and on this basis their objections are overruled.

Nevertheless, Courts often consider objections when assessing a PAGA settlement, so in the alternative, this Court will also.

One objection is that the Court the "Court lacks jurisdiction to grant a release of [PAGA] claims [for violation of] Lab. Code §§ 241(i) [*sic* should be 246(i)], 550-551 and 850-852 as no party to the Settlement has filed the notice required under PAGA

1   with the California Labor and Workforce Development Agency ("LWDA") . . ."

2   Andrews PAGA Obj. 1:16-20. To the extent this is truly a jurisdictional argument, it is

3   rejected because a court can approve the release of claims over which it would not

4   have jurisdiction. *See Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1288 (9th Cir. 1992)

5   ("we conclude that it was not necessary for the district court to actually exercise

6   subject matter jurisdiction over the claims to approve their release."). Furthermore,

7   Courts often approve the settlement of PAGA claims over objections that such claims

8   were not exhausted or alleged in the complaints. *See, e.g., Harvey v. Morgan Stanley*

9   *Smith Barney LLC*, No. 18-CV-02835-WHO, 2020 WL 1031801, at *16 (N.D. Cal.

10  Mar. 3, 2020) ("Parties are allowed to settle PAGA claims even if plaintiffs never

11  exhaust administrative remedies or allege it in their complaints."); *Villacres v. ABM*

12  *Indus. Inc.*, 189 Cal. App. 4th 562, 587 (2010) (the release of "all claims" included

13  PAGA claims, even though plaintiffs did not exhaust administrative remedies or

14  allege PAGA in their complaint). And, here, although none of the PAGA letters to the

15  LWDA referenced PAGA claims based on Lab. Code §§ 246(i), 550-551 and 850-852

16  specifically, these letters referenced numerous other Labor Code violations based on

17  the same facts. Furthermore, the SACC does allege these sections within the PAGA

18  claim, *see* SACC ¶¶ 188, and they are derivative of the facts alleged in the SACC. For

19  all of these reasons, this objection is overruled.

20        Second, there are objections that the PAGA penalty is too little. The Andrews

21  Objectors, for example, argue that "[w]hile placing a range of $13.4 to $26.4 million

22  on PAGA violations at issue here, only 0.28-0.56% of that value is reflected in the

23  $75,000 allocated to PAGA portion of the settlement." Andrews PAGA Obj. 1:21-24.

24  But "where a settlement for a Rule 23 class is robust, the statutory purposes of PAGA

25  may be fulfilled even with a relatively small award on the PAGA claim itself, because

26  such 'a settlement not only vindicates the rights of the class members as employees,

27  but may have a deterrent effect upon the defendant employer and other employers, an

28  objective of PAGA.'" *Viceral v. Mistras Grp., Inc.*, No. 15-CV-02198-EMC, 2016

WL 5907869, at *9 (N.D. Cal. Oct. 11, 2016) (citing *O'Connor v. Uber Technologies, Inc.*, No. 13-CV-03826-EMC, 2016 WL 4398271, at *18 (N.D. Cal. Aug. 18, 2016). Thus, in *Viceral*, for example, the Court applied this "sliding scale" approach and approved a PAGA settlement that was only 0.15% of the total value of the PAGA claims because the settlement as a whole was sufficient especially in light of the facts that (1) courts often substantially reduce PAGA verdicts below the statutory penalty, and (2) "Plaintiffs face a substantial risk of recovering nothing on either the PAGA or class claims." *Viceral*, 2016 WL 5907869, at *9. The same situation applies here: the Rule 23 settlement is sufficiently robust so the purposes of PAGA are satisfied, and the Plaintiffs face a strong possibility of recovering nothing at trial. In addition, there is high risk that a PAGA verdict would be reduced substantially, including to avoid "stacking" penalties. Furthermore, the LWDA has not objected to the PAGA portion of the settlement, which tends to support its adequacy. *See Rodriguez v. Danell Custom Harvesting, LLC*, 293 F.Supp.3d 1117, 1133 (E.D. Cal. 2018) ("The Agency has not filed an objection to the terms of the settlement. Based on the Agency's lack of objection, the Court preliminarily approves the PAGA penalties."). In sum, the PAGA penalty is sufficient.

Finally, there are objections to the diligence and investigation conducted by counsel on the PAGA claims, objections to the scope of the release, and arguments that Class Counsel and CVS colluded to reach an insufficient PAGA settlement. But these objections are either derivative of other overruled objections to the PAGA settlement, or redundant to the parallel objections regarding the class claims. These objections are therefore overruled based on the same reasoning.

The Court finds that the PAGA settlement, considered in conjunction with the settlement as whole, serves the purposes of PAGA, including encouraging compliance and deterring non-compliance, with the Labor Code.

## III.   MOTION FOR FEES AND COSTS

Finally, the Court turns to the motion for fees and costs, and for incentive

1  awards.

2      Class Counsel seek attorneys' fees in the amount of $3,111,403.98 (30% of the

3  total settlement fund) and their litigation costs in the amount of $32,385.77.

4      When a litigant's efforts create or preserve a fund from which others derive

5  benefits, the court may spread litigation costs proportionately among all the

6  beneficiaries to compensate those who created the fund. *Boeing Co. v. Van Gemert*,

7  444 U.S. 472, 478 (1980) ("[A] lawyer who recovers a common fund for the

8  benefit of persons other than…his client is entitled to a reasonable attorneys' fee

9  from the fund as a whole."); *see also Six (6) Mexican Workers v. Arizona Citrus

10 Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). The Ninth Circuit has established

11 25% as the benchmark attorney fee in common fund cases, but that benchmark is

12 "a starting point for analysis" because it "may be inappropriate in some cases."

13 *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). The Court may

14 adjust the benchmark percentage based on the following factors: "(1) the result

15 obtained for the class; (2) the effort expended by counsel; (3) counsel's experience;

16 (4) the skill of counsel; (5) the complexity of the issues; (6) the risks of non-

17 payment assumed by counsel; (7) the reaction of the class; and (8) comparison with

18 counsel's lodestar." *In re Northrop Grumman Corp. ERISA Litig.*, No. 06-6213,

19 2017 WL 9614818, at *2 (C.D. Cal. Oct. 24, 2017) (citing *In re Quintus Sec. Litig.*,

20 148 F. Supp. 2d 967, 973–74 (N.D. Cal. 2001), among others).

21     Here, the Court awards the benchmark of 25% of the total settlement fund,

22 which is $2,592,836.65, and declines to increase that to 30%. The 25% benchmark

23 amount is fair and reasonable considering Class Counsel's experience, the degree

24 of success and the benefits being conferred on the Class, and the amount and

25 quality of work performed on the case. The Court further finds Class Counsel has

26 adequately represented the interests of the Settlement Class and do not have any

27 conflicts of interests with respect to their representation of the Settlement Class.

28     The Court also finds that $2,592,836.65 of the $10,371,346.60 common fund

1    is reasonable under the lodestar cross-check. *In re Bluetooth*, 654 F.3d at 941.

2    Under this alternative method of calculating attorneys' fees, a lodestar figure is

3    tabulated by multiplying the number of hours reasonably expended on the litigation

4    by a reasonable hourly rate for the region and for the experience of the lawyer. *Id.*

5    "Though the lodestar figure is 'presumptively reasonable,' *Cunningham v. Cnty. of*

6    *Los Angeles*, 879 F.2d 481, 488 (9th Cir. 1988), the court may adjust it upward or

7    downward by an appropriate positive or negative multiplier reflecting a host of

8    'reasonableness' factors, 'including the quality of representation, the benefit

9    obtained for the class, the complexity and novelty of the issues presented, and the

10   risk of nonpayment[.]'" *In re Bluetooth*, 654 F.3d at 941 (citing *Hanlon*, 150 F.3d

11   at 1029 and *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).

12       Class Counsel submitted timesheets reflecting the hours they expended in

13   litigating this matter, resulting in a lodestar of $1,931,323.50. The 25% benchmark

14   award of $2,592,836.65 represents a multiplier of approximately 1.34 on Counsel's

15   lodestar of $1,931,323.50. Based on the result obtained for the class, the risks of

16   further litigation, the difficulty of the questions involved in this litigation, the

17   amount and quality of work performed, the skill and experience of Class Counsel,

18   that Class Counsel's fee award is contingent in nature, and in consideration of the

19   awards granted by courts in similar cases, the Court finds that a multiplier of about

20   1.34 on a lodestar of $1,931,323.50 for a total attorneys' fee award of

21   $2,592,836.65 is reasonable and appropriate. *See*, *e.g.*, *Vizcaino*, 290 F.3d at 1050-

22   51 (upholding 28% fee award that constituted a 3.65 multiplier); *id.* at 1052-54

23   (noting district courts in Ninth Circuit approving multipliers as high as 6.2, and 3

24   of 24 decisions approved multipliers below 1.4); *McKenzie v. Federal Exp. Corp.*,

25   2012 WL 2930201 at *10 (C.D. Cal. July 2, 2012) (approving percentage-based fee

26   award in wage and hour case that represented multiplier of 3.2).

27       The Court finds the costs requested ($32,385.77) are reasonable and awards

28   them.

1   The Court also approves the Class Representative Incentive/Service awards

2   for the Class Representatives as follows: $10,000.00 each to Sevag Chalian,

3   Sigfredo Cabrera, Enko Telahun, and Christine McNeely; and $3,000.00 to Patrick

4   Brennan. This totals $43,000. The Court finds that the Class Representatives have

5   adequately represented the Settlement Class and do not have any conflicts of

6   interest affecting their status as Class Representatives for the Settlement Class.

7   Objector Andrews argues that the fees counsel seek are exorbitant based on his

8   view that the settlement is inadequate and counsel's work was inadequate in various

9   respects. Objector Ghassemian argues that the fee request is a windfall for various

10   similar reasons. As discussed above, the Court rejects the contention that the

11   settlement is inadequate, and finds that counsel's work was adequate and secured a

12   good result for the class. The Court also rejects the arguments that the named

13   plaintiffs' incentive fees are excessive. The four named plaintiffs receiving $10,000

14   devoted substantial time and effort to this litigation over several years. The $3,000

15   award for plaintiff Brennan is likewise commensurate with his involvement in the

16   case.

17   The Court finds and determines that the fees and expenses of Simpluris, Inc.

18   in administrating the settlement, in the amount of $98,750.00, are fair and

19   reasonable.  The Court hereby orders that the payment of that amount be paid out

20   of the Gross Settlement Amount in accordance with the Settlement Agreement.

21

22   ///

23   ///

24   ///

25   ///

26

27

28

55.

## IV.    CONCLUSION

For the foregoing reasons the Court **<u>GRANTS</u>** the Motion for Final Approval and the Motion for Fees and Costs. Concurrently with this reasoned Order, the Court will enter Plaintiffs' Proposed Order and Judgment as it includes the judgment language necessary to effectuate this Order, the list of opt-outs, and the complete Settlement Agreement as an attachment.

**IT IS SO ORDERED.**

Dated: July 16, 2021

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

56.